# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MALLINCKRODT, PLC, *et al.*, | Case No. 20-12522-JTD |
| Debtors.[1] | (Jointly Administered) |

| | |
|---|---|
| AD HOC FIRST LIEN NOTES GROUP, *et al.*, | Appeals from the Bankruptcy Court |
| Appellants, | |
| v. | Case No. 22-cv-00331-TLA |
| | Case No. 22-cv-00330-TLA |
| MALLINCKRODT, PLC, *et al.*, | Oral Argument Requested |
| Appellees. | |

## OPENING BRIEF OF APPELLANT
## AD HOC FIRST LIEN NOTES GROUP

QUINN EMANUEL URQUHART & SULLIVAN, LLP
K. John Shaffer
Benjamin I. Finestone
865 S Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
johnshaffer@quinnemanuel.com

SULLIVAN HAZELTINE ALLINSON LLC

William D. Sullivan
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Telephone: (302) 428-8191
Facsimile: (302) 428-8195
bsullivan@sha-llc.com

May 17, 2022          *Counsel to Appellant Ad Hoc First Lien Notes Group*

---

[1]    A complete list of each of the Debtors in the chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.   The Debtors' mailing address is 675 McDonnell Boulevard, Hazelwood, Missouri 63042.

## CORPORATE DISCLOSURE STATEMENT PURSUANT TO
## FEDERAL RULE OF BANKRUPTCY PROCEDURE 8012[2]

1.      Aurelius Capital Management, LP has no parent corporation, and no publicly held corporation owns 10% or more, directly or indirectly, of Aurelius Capital Management, LP.

2.      Navigator Global Investments Limited indirectly owns 10% or more of Bardin Hill Investment Partners LP.  No other publicly held corporation owns 10% or more, directly or indirectly, of Bardin Hill Investment Partners LP.

3.      Capital Research and Management Company is a wholly-owned subsidiary of The Capital Group Companies, Inc., a non-public corporation.

4.      Moore Global Investments, LLC is owned by Remington Investment Strategies, LP, and no publicly held corporation owns 10% or more of Moore Global Investments, LLC.

5.      Stonehill Capital Management LLC has no parent corporation, and no publicly held corporation owns 10% or more, directly or indirectly, of Stonehill Capital Management LLC.

6.      Two Seas Capital LP has no parent corporation, and no publicly held corporation owns 10% or more, directly or indirectly, of Two Seas Capital LP.

---

[2]   The Ad Hoc First Lien Notes Group's Bankruptcy Rule 8012 disclosures also were attached as Exhibit "A" to Appellant's *Omnibus Objection To Motions To Intervene* (D.I. 23 in this appeal, 22-cv-00331-TLA).

7.     VR Advisory Services Ltd. is the sole member of VR Global Partners, L.P. and VR Capital Group Ltd. is the only entity that directly or indirectly owns or controls greater than 10% of VR Global Partners, L.P.'s partnership capital.  No publicly held corporation owns 10% or more, directly or indirectly, of VR Global Partners, L.P.

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................1

JURISDICTIONAL STATEMENT .........................................................................4

ISSUES PRESENTED............................................................................................4

STATEMENT OF THE CASE.................................................................................5

      A.    The Debtors............................................................................5

      B.    The Debtors' First Lien Notes And Obligation To Pay
The Applicable Premium ........................................................6

      C.    The Second Lien Intercreditor Agreement .................................13

      D.    The First Lien Noteholders' Claim And The Debtors'
Objection Thereto ...............................................................14

      E.    The Debtors' Plan Of Reorganization ......................................16

      F.    Procedural Background...........................................................17

SUMMARY OF ARGUMENT ...............................................................................22

ARGUMENT .......................................................................................................23

    I.    THE BANKRUPTCY COURT ERRED IN CONCLUDING
THAT THE DEBTORS' PLAN LEAVES THE FIRST LIEN
NOTEHOLDERS UNIMPAIRED.............................................23

      A.    The Applicable Premium Is An Allowable Claim In
Bankruptcy, And The Bankruptcy Court Erred In
Holding That The Claim Violated "Public Policy" ................23

      B.    Consistent With The Bankruptcy Code's Strong
Presumption Of Impairment, Reinstatement Of The First
Lien Notes Requires Strict Compliance With Section
1124.................................................................................34

      C.    The Plan Impairs The First Lien Noteholders By
Extinguishing Their Contractual Right To Receive The
Applicable Premium ............................................................37

            1.    Section 1124(2) Does Not Excuse The Debtors
From Curing In Order To Reinstate The First Lien
Notes .......................................................................38

2. Even If The Debtors Were Not Required To Cure Their Bankruptcy Default, Section 1124(2) Does Not Disallow Or Otherwise Override The Debtors' Obligation To Pay The Applicable Premium ................. 42

    a. Unimpairment Does Not Disallow The First Lien Noteholders' Allowable Claim For The Applicable Premium ............................................... 42

    b. Section 1123(d) Requires Payment Of The Applicable Premium ............................................... 48

3. The Plan Does Not Compensate The First Lien Noteholders For Reasonable Reliance Damages ............ 49

4. At A Minimum, The Debtors' Cure Obligation Requires Payment Of Interest On The Applicable Premium During The Pendency Of Their Bankruptcy Cases ............................................................. 51

D. The Plan Impairs The First Lien Noteholders By Extinguishing Their Rights Under The Second Lien Intercreditor Agreement ............................................................. 55

1. The Plan Insulates The Second Lien Noteholders From Intercreditor Liability ............................................. 55

2. The Plan Improperly Eliminates Important Intercreditor Rights Of the First Lien Noteholders ........ 57

CONCLUSION ........................................................................................ 66

# TABLE OF AUTHORITIES

**Page**

## Cases

*A & B Assocs., L.P.*,
  2019 WL 1470892 (Bankr. S.D. Ga. Mar. 29, 2019) .........................................38
*Anderson v. Hancock*,
  820 F.3d 670 (4th Cir. 2016) ...................................................... 46, 47
*Butner v. United States*,
  440 U.S. 48 (1979)................................................................ 24, 41
*Ellis v. Westinghouse Elec. Co., LLC*,
  11 F.4th 221 (3d Cir. 2021) ...........................................................27
*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
  530 U.S. 1 (2000)...................................................................2, 33
*In re 1 Ashbury Ct. Partners, L.L.C.*,
  2011 WL 4712010 (Bankr. D. Kan. Oct. 5, 2011) ...........................................49
*In re 1111 Myrtle Ave. Grp., LLC*,
  598 B.R. 729 (Bankr. S.D.N.Y. 2019)............................................... 47, 54
*In re 139-141 Owners Corp.*,
  313 B.R. 364 (S.D.N.Y. 2004)...................................................... 37, 53
*In re AMR Corp.*,
  730 F.3d 88 (2d Cir. 2013)........................................................ passim
*In re Bartomeli*,
  303 B.R. 254 (Bankr. D. Conn. 2004) ...................................................40
*In re Carpenter*,
  331 B.R. 529 (Bankr. D. Conn. 2005) ............................................. 54, 55
*In re Energy Future Holdings Corp.*,
  842 F.3d 247 (3d Cir. 2016)....................................................... passim
*In re Energy Future Holdings Corp.*,
  546 B.R. 566, 571-72 (Bankr. D. Del. 2016), *aff'd*, 773 F. App'x 89 (3d Cir.
  2019) .............................................................................59
*In re Entz-White Lumber & Supply, Inc.*,
  850 F.2d 1338 (9th Cir. 1988) .........................................................53
*In re EP Energy Corp.*,
  case no. 19-35654 (Bankr. S.D. Tex. 2020) ...................................... 32, 50
*In re Fobian*,
  951 F.2d 1149 (9th Cir. 1991) .........................................................26
*In re General Growth Props., Inc.*,
  451 B.R. 323 (Bankr. S.D.N.Y. 2011)........................................ 31, 38, 53, 54

*In re John Q. Hammons Fall 2006, LLC*,
  612 B.R. 779 (Bankr. D. Kan.), *as amended* (Jan. 21, 2020),
  *on reconsideration*, 614 B.R. 371 (Bankr. D. Kan. 2020)............................ 46, 54
*In re Jones*,
  296 B.R. 447 (Bank. M.D. Tenn. 2003) ............................................................40
*In re K Lunde, LLC*,
  513 B.R. 587 (Bankr. D. Colo. 2014) ...............................................................36
*In re L & J Anaheim Assocs.*,
  995 F.2d 940 (9th Cir. 1993) ..........................................................................5, 34
*In re Madison Hotel Assocs.*,
  749 F.2d 410 (7th Cir. 1984) ...............................................................................34
*In re Moody Nat'l SHS Houston H, LLC*,
  426 B.R. 667 (Bankr. S.D. Tex. 2010) ...............................................................38
*In re Moshe*,
  567 B.R. 438 (Bankr. E.D.N.Y. 2017)................................................................53
*In re New Investments, Inc.*,
  840 F.3d 1137 (9th Cir. 2016) ............................................................. 46, 47, 53
*In Re Onco Invest. Co.*,
  316 B.R. 163 (Bankr. D. Del. 2004) ........................................................ passim
*In re PPI Enters. (U.S.), Inc.*,
  324 F.3d 197 (3d Cir. 2003)................................................................... 35, 40
*In re Reuter*,
  427 B.R. 727 (Bankr. W.D. Mo. 2010), *aff'd*, 443 B.R. 427
  (B.A.P. 8th Cir. 2011), *aff'd*, 686 F.3d 511 (8th Cir. 2012)...............................35
*In re Sagamore Partners, Ltd.*,
  620 F. App'x 864 (11th Cir. 2015) ................................................................ 49, 53
*In re Satellite Restaurants Inc. Crabcake Factory USA*,
  626 B.R. 871 (Bankr. D. Md. 2021) ....................................................................40
*In re School Specialty, Inc.*,
  2013 WL 1838513 (Bankr. D. Del. Apr. 22, 2013)............................................25
*In re Taddeo*,
  685 F.2d 24 (2d Cir. 1982)............................................................ 34, 36, 42, 48
*In re Tribune Co.*,
  972 F.3d 228 (3d Cir. 2020)................................................................................28
*In re Trico Marine Servs., Inc.*,
  450 B.R. 474 (Bankr. D. Del. 2011) ...................................................................33
*In re Ultra Petroleum Corp.*,
  624 B.R. 178 (Bankr. S.D. Tex. 2020) ...............................................................33
*In re United Merchants & Mfrs., Inc.*,
  674 F.2d 134 (2d Cir. 1982)....................................................................... 25, 29

*In re Wilhelm*,
   101 B.R. 120 (Bankr. W.D. Mo. 1989) ...............................................................34
*In Re Windstar*,
   554 F.3d 382 (3d Cir. 2009)...................................................................................60
*Lamie v. U.S. Trustee*,
   540 U.S. 526 (2004)...............................................................................................28
*Law v. Siegel*,
   571 U.S. 415 (2014)....................................................................................... 24, 32
*Momentive Performance Materials Inc. v. BOKF, NA*
   (*In re MPM Silicones, L.L.C.*),
   874 F.3d 787 (2d Cir. 2017)...................................................................................28
*Patterson v. Shumate*,
   504 U.S. 753 (1992)...............................................................................................27
*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012)...............................................................................................33
*Raleigh v. Illinois Dep't of Revenue*,
   530 U.S. 15 (2000)......................................................................................... 25, 27
*Stuart v. Carter (In re Larsen)*,
   59 F.3d 783 (8th Cir. 1995) ...................................................................................39
*Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co.*,
   549 U.S. 443 (2007)....................................................................................... passim
*United States v. Remoi*,
   404 F.3d 789 (3d Cir. 2005)...................................................................................20
*W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012)....................................................................................32

## Statutes

11 U.S.C § 363(*l*) ............................................................... 15, 27, 29, 30, 31
11 U.S.C. § 365(b)(2)............................................................................... passim
11 U.S.C. § 365(b)(1)................................................................................ 32, 38, 39
11 U.S.C. § 365(b)(2)............................................................................... passim
11 U.S.C. § 365(e)(1)............................................................................ 26, 27, 28
11 U.S.C. § 506(a)(1)............................................................................................30
11 U.S.C. § 507(a) ................................................................................................39
11 U.S.C. § 510(a) ...........................................................................................3, 65
11 U.S.C § 541(c) ......................................................................... 15, 27, 29, 30, 31, 32
11 U.S.C. § 541(c)(1)(B) ......................................................................................27
11 U.S.C. § 545(1) ................................................................................................27
11 U.S.C. § 726(b) ................................................................................................39
11 U.S.C. § 1123(d) ............................................................................................ passim

11 U.S.C. § 1124 .................................................................................. passim
11 U.S.C. § 1124(1) ......................................................................... 35, 36
11 U.S.C. § 1124(2) ............................................................................ passim
11 U.S.C. § 1124(2)(A) ...............................................................................38
11 U.S.C. § 1124(2)(B) ...............................................................................45
11 U.S.C. § 1124(2)(C) ...............................................................................49
11 U.S.C. § 1124(2)(E) ...............................................................................55
11 U.S.C. § 1305(c) ....................................................................................31
28 U.S.C. § 157 .............................................................................................4
28 U.S.C. § 158(a)(1) ....................................................................................4
28 U.S.C. § 1334 ...........................................................................................4

## Other Authorities

Black's Law Dictionary (11th ed. 2019) ....................................................43
David Gray Carlson, *Rake's Progress: Cure and Reinstatement of
    Secured Claims in Bankruptcy Reorganization*,
    13 Bankr. Dev. J. 273 (1997).............................................................54
Emil A. Kleinhaus & Peter B. Zuckerman,
    *The Enforceability of Ipso Facto Clauses in Financing Agreements:*
    American Airlines *and Beyond*, Norton J. Of Bankr.
    Law & Prac., Vol. 23 (2014)..................................................... 30, 31, 32
Kenneth N. Klee, *Adjusting Chapter 11: Fine Tuning the Plan Process*,
    69 Am. Bankr. L.J. 551, 561 (1995) ..................................................28

# INTRODUCTION

The bankruptcy court's confirmation of the Debtors' Plan should be reversed as it relates to the treatment of Appellant's First Lien Notes.[3]  The bankruptcy court incorrectly held that the Plan did not impair the First Lien Noteholders, even though the Plan (1) failed to honor an "Applicable Premium" to which the noteholders are contractually entitled, and (2) violated the First Lien Noteholders' contractual seniority vis-à-vis the subordinated, Second Lien Noteholders.

The bankruptcy court's decision improperly substitutes the court's notions of "policy" for the plain language of the Bankruptcy Code.  According to the bankruptcy court, *ipso facto* claims such as the Applicable Premium that arise automatically upon a debtor's filing violate the "public policy behind the bankruptcy code."  But no such generalized policy is codified anywhere in the Code.  The Code's sections that govern allowance of claims—502 and 506—contain numerous bankruptcy-specific limitations on claims, but none permits disallowance of a claim

---

[3]  The Appellant Ad Hoc First Lien Notes Group consists of Aurelius Capital Management, LP (solely on behalf of the funds and entities that it manages or advises, and not in its individual capacity), Bardin Hill Investment Partners LP (solely on behalf of the funds and entities that it manages or advises, and not in its individual capacity), Capital Research and Management Company, Moore Global Investments, LLC, Stonehill Capital Management LLC, Two Seas Capital LP, and VR Global Partners, L.P.  Each Member of the Ad Hoc First Lien Notes Group files this brief exclusively on its own behalf and does not assume any fiduciary or other duties to any other Member or to any other entity or individual.

simply because it arose automatically upon the debtor's bankruptcy filing.  When Congress intended to address *ipso facto* rights and obligations, it did so with specific statutory provisions which, by their terms, are limited to the subject matters they address.  "[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."  *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (internal quotations omitted).

Because the Applicable Premium is an allowable claim in bankruptcy, the Debtors' Plan could not alter the First Lien Noteholders' right to receive it while also purporting to unimpair the claims of the First Lien Noteholders.  Although Bankruptcy Code section 1124(2) excuses a debtor from curing certain defaults "of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured," that exception does not apply to the First Lien Notes Indenture, which is not an executory contract governed by section 365.

Moreover, even if the Debtors were excused from "curing" their bankruptcy default, nothing in the plain language of section 1124 (or anywhere else in the Code) relieves the Debtors of their obligation to satisfy allowable claims against their estates, including the Applicable Premium.  Section 1123(d) makes clear that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable

2

nonbankruptcy law."   In short, claim unimpairment does not result in claim disallowance.  In order for the Debtors to reinstate and unimpair the First Lien Notes, they must honor the Applicable Premium that is now owing.

At a minimum, the Debtors must pay interest on the Applicable Premium for the more than 19 months that their chapter 11 cases have been pending (approximately $15 million as of the date of this brief).  The Applicable Premium was added automatically to the principal amount owing on the Petition Date, and it has remained both owing and unpaid throughout the Debtors' cases.  Yet, the Debtors have only paid interest on the prepetition principal, without regard to the Applicable Premium.  Nor have the First Lien Noteholders received default interest; the Applicable Premium and interest thereon are the remedies they are contractually entitled to under the First Lien Notes Indenture.  There is no basis to deny the First Lien Noteholders interest on the Applicable Premium at least through the duration of the default, particularly when the Debtors have yet to cure and reinstate the First Lien Notes, which as of the filing of this brief remain in default.

Finally, even if the Debtors were excused from paying the Applicable Premium themselves, that benefit does not extend to nondebtor parties, such as the Second Lien Noteholders.  The plain language of Bankruptcy Code section 510(a) and the Second Lien Intercreditor Agreement requires that all distributions received by the Second Lien Noteholders on account of their Collateral—including their new

replacement second lien notes—be turned over to the First Lien Noteholders.  The bankruptcy court's sweeping release of the Second Lien Noteholders' obligations was in error, and, as a consequence, the First Lien Noteholders have been further impaired under the Plan.

## JURISDICTIONAL STATEMENT

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 157 and 1334.  The bankruptcy court issued an oral opinion on November 5, 2021 ("11/5/21 Tr."),[4] issued a written opinion on February 3, 2022,[5] issued a revised written opinion on February 8, 2022 ("Rev. Op."),[6] and entered a final order ("Confirmation Order") confirming the Debtors' Fourth Amended Plan (With Technical Modifications) ("Plan") on March 2, 2022.[7]  Appellant filed a timely notice of appeal on March 16, 2022.[8]  This Court has jurisdiction under 28 U.S.C. § 158(a)(1).

## ISSUES PRESENTED

Whether the bankruptcy court erred in concluding that the First Lien Notes were left unimpaired by a plan of reorganization that (i) extinguishes the First Lien

---

[4]    ECF 5220 (A.2722).  All "ECF" citations herein, unless otherwise specified, are to the docket numbers in the bankruptcy case, and all "A.__" citations are to the accompanying Appendix.

[5]    ECF 6347 (A.2841).

[6]    ECF 6378 (A.2944).

[7]    ECF 6660 (A.3240).

[8]    ECF 6779 (A.3697).

Noteholders' contractual right to receive the Applicable Premium due under the First Lien Notes Indenture, and (ii) extinguishes the First Lien Noteholders' intercreditor rights under the Second Lien Intercreditor Agreement.[9]

"Whether a claim is impaired under section 1124 is a question of law, subject to de novo review." *In re L & J Anaheim Assocs.*, 995 F.2d 940, 942 (9th Cir. 1993). Similarly, questions of statutory construction and contract interpretation are reviewed de novo. *In re Energy Future Holdings Corp.*, 842 F.3d 247, 253 (3d Cir. 2016).

## STATEMENT OF THE CASE

### A.    The Debtors

The Debtors "operate a global specialty biopharmaceutical company that produces and sells both generic and branded pharmaceutical products including specialty products for the treatment of rare diseases and controlled substances, such as opioids." Rev. Op. 1 (A.2944). "In the years leading up to the commencement

---

[9]    Appellant is not pursuing its appeal of whether a refinancing of the Debtors' other first lien obligations would, in itself, invoke the First Lien Intercreditor Agreement's sharing provisions. *See* ECF 6987 ¶ 5 & A.2240. However, as of this time, the Debtors have not finalized the terms of this refinancing or other treatment for the other first lien creditors, nor have publicly made available definitive documents relating to it. Accordingly, Appellant reserves all rights as to whether the refinancing or other treatment of other first lien creditors, as actually consummated under the Plan or otherwise, complies with the terms of the First Lien Notes Indenture and the First Lien Intercreditor Agreement, as they must in order for the First Lien Notes to be "unimpaired" as purported to be under the Debtors' Plan.

of these bankruptcy cases, Debtors faced an onslaught of litigation arising out of their production of certain drugs." *Id.* at 2 (A.2945). This litigation includes thousands of cases "stemming from their production and sale of opioid medications," as well as additional civil cases and government investigations relating to the marketing and sale of a drug called Acthar H.P. Gel. *Id.*

The Debtors filed for chapter 11 on October 12, 2020 ("Petition Date"), and their Plan was confirmed on March 2, 2022. The Plan has not become effective.

## B. The Debtors' First Lien Notes And Obligation To Pay The Applicable Premium

The First Lien Notes were issued by Debtors Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC in connection with a private exchange consummated in April 2020 for the Debtors' then-outstanding unsecured notes due April 2020 (the "2020 Private Exchange"). The First Lien Notes are unconditionally guaranteed by most of the Debtors and certain non-Debtor guarantors. Subject to limited exceptions, the First Lien Notes are secured by first-priority liens on substantially all assets of the Debtors (other than Debtors Mallinckrodt Holdings GmbH, Mallinckrodt Group S.à r.l., and Mallinckrodt Canada ULC) and of the non-Debtor guarantors. *See Declaration of Stephen A. Welch, Chief Transformation Officer, in Support of Chapter 11 Petitions and First Day Motions* ¶¶ 58-59, ECF 128 (A.0024-25). There is no dispute that the First Lien Notes are significantly

oversecured on a reorganization basis.  *See* Rev. Op. 73 & Appendix 1 (A.3016 & 3042-46).

The 2020 Private Exchange provided the Debtors with key benefits at a critical stage of their business and at the height of the first COVID wave.  In particular, it allowed the Debtors to conserve liquidity that otherwise would have been consumed by repaying approximately $495 million in unsecured notes as they came due in April 2020.  The transaction afforded the Debtors flexibility while Debtor Mallinckrodt ARD LLC pursued reconsideration of the adverse decision it had received in Acthar-related litigation with the Centers of Medicare and Medicaid Services in March 2020, and the Debtors continued to engage with opioid claimants regarding the settlement announced earlier in the year (which had not contemplated a whole-company bankruptcy filing).  Indeed, the 2020 Private Exchange was an express condition precedent for the Debtors' opioid litigation settlement, and its consummation helped that settlement move forward.[10]

In consideration of those important benefits, the Debtors agreed to provide the First Lien Noteholders with corresponding economic concessions and protections.  These negotiated concessions and protections expressly included: (1) automatic

---

[10]   *See* Mallinckrodt plc, Quarterly Report (Form 10-Q), at 16-17 (May 6, 2020) (ECF 4719 Ex. 1, A.1454-55).

acceleration upon a bankruptcy filing, and (2) the Applicable Premium becoming automatically due and added to principal upon a bankruptcy filing.

The indenture governing the First Lien Notes (the "First Lien Notes Indenture")[11] provides for acceleration of the First Lien Notes following an Event of Default. *See* First Lien Notes Indenture § 6.02 (A.1566). As relevant here, acceleration of the First Lien Notes is triggered automatically by a bankruptcy or other similar filing, making "the principal of, premium, if any, and interest on all the Notes . . . immediately due and payable without any declaration or other act on the part of the First Lien Trustee or any holders." *Id.* Thus, the First Lien Notes were automatically accelerated upon the Debtors' bankruptcy filing.

The Debtors also agreed in the First Lien Notes Indenture that, upon the acceleration of the First Lien Notes in connection with a bankruptcy filing or payment default prior to April 15, 2022, "an amount equal to the Applicable Premium . . . *that would have been payable* in connection with an optional redemption of the Notes at the time of the occurrence of such acceleration will become and be immediately due and payable with respect to all Notes *without any declaration or other act on the part of the First Lien Trustee or any holders* of the

---

[11]   *See* ECF 4719 Ex. 2 (A.1488).

Notes."   First Lien Notes Indenture § 6.02 (A.1566) (emphasis added).[12]   This additional amount is "deemed to be principal of the Notes and interest shall accrue on the full principal amount of the Notes (including the Applicable Premium or such other premium) from and after the applicable triggering event."   *Id.*

The First Lien Notes do not otherwise provide for default interest, including after an acceleration event.   Thus, the Applicable Premium is the only additional obligation triggered by a default or acceleration, other than fees and expenses as permitted under the First Lien Notes Indenture.

Because the October 12, 2020 Petition Date occurred prior to April 15, 2022, the filing triggered an obligation for the Debtors to pay the Applicable Premium of approximately $94 million.[13]   The Applicable Premium became immediately due and payable and was added to the outstanding $495 million principal amount of the First Lien Notes.   The obligations have continued to accrue postpetition interest

---

[12]   If an acceleration occurred between April 15, 2022 and April 15, 2024, a "redemption price" would have been due, starting at 105% of the outstanding principal in 2022.   First Lien Notes Indenture, App. A ¶ 5 (A.1619).

[13]   The Applicable Premium that must be paid in the event of an acceleration prior to April 15, 2022, is defined as the greater of (1) 1% of the then outstanding principal amount of the First Lien Notes; and (2) the excess, if any, of (a) the present value of the redemption price of First Lien Notes, at April 15, 2022, plus all required interest payments due on the First Lien Notes through April 15, 2022, computed using a discount rate equal to the Treasury Rate plus 50 basis points; over (b) the then outstanding principal amount of the Notes.   *See* First Lien Notes Indenture § 1.01 (A.1495-96) (defining "Applicable Premium"); *id.* App. A ¶ 5 (A.1619) (specifying redemption terms).

since the Debtors' filing.  The Debtors, however, have only paid postpetition interest on the prepetition portion of the principal during the chapter 11 case, and all parties have "reserved and preserved in all respects" their rights as to the Applicable Premium pursuant to a stipulated cash collateral order.  ECF 586 at 29 (A.285).[14] This is in contrast to other creditors, such as the credit agreement lenders, who received an additional 2% of interest (equal to their default rate) during the bankruptcy case.  *Id.* at 28 (A.284).

The Debtors agreed in the First Lien Notes Indenture that their obligation to pay the Applicable Premium represents a "reasonable calculation of each holder's lost profits" from the triggering event, "in view of the impracticability and difficulty of ascertaining actual damages."  First Lien Notes Indenture § 6.02 (A.1566).  The First Lien Notes Indenture further provides that the premium "shall be presumed to be liquidated damages sustained by each holder as the result of the acceleration of the Notes."  *Id.*

Although the Debtors could have negotiated to exclude a bankruptcy filing from the list of defaults that would trigger an acceleration giving rise to their obligation to pay the Applicable Premium, *compare In re AMR Corp.*, 730 F.3d 88,

---

[14]   A failure by the Debtors to pay postpetition interest or fees in their full amount would constitute a further impairment of the First Lien Notes, and Appellant reserves all rights with respect thereto.

99 (2d Cir. 2013),[15] that was not the bargain the parties struck. The parties expressly agreed that the Applicable Premium would become due and payable automatically upon a bankruptcy filing. In this respect, the First Lien Notes Indenture is materially different not only from the indenture in *AMR*, but also in *Energy Future Holdings*, 842 F.3d at 256-57, in which—unlike here—only an actual redemption, rather than an acceleration event, triggered a make-whole requirement. Moreover, the First Lien Notes Indenture departs from the treatment provided for in certain of the Debtors' prior note issuances, under which only an "optional redemption" of the notes would give rise to a prepayment premium.[16]

Indeed, the Debtors' agreements with the First Lien Noteholders went much further than the Debtors had gone in the indenture governing the Debtors' second lien notes (the "Second Lien Notes Indenture"),[17] which had been negotiated only months earlier. There, the Debtors agreed that, upon a bankruptcy-triggered acceleration, "an amount equal to the Applicable Premium" would "become and be

---

[15] The indenture in *AMR* provided that the obligations were due "*without Make-Whole Amount*" upon an acceleration, which is the polar opposite of what the First Lien Notes Indenture provides. *See* 730 F.3d at 99 (emphasis in original).

[16] *See, e.g.*, Indenture for 5.625% Senior Notes due 2023, § 6.02, App. A ¶ 5 (ECF 4719 Ex. 3 (A.1717-18, 1772)); Indenture for 4.875% Senior Notes due 2020 and 5.500% Senior Notes due 2025, § 6.02, Ex. A-1-6 ¶ 5 (ECF 4719 Ex. 4 (A.1863, 1908)); Indenture for 5.75% Senior Notes due 2022, § 6.02, Ex. A-6 ¶ 5 (ECF 4719 Ex. 5 (A.2029, 2084)).

[17] *See* ECF 4719 Ex. 6 (A.2101).

immediately due and payable with respect to all Notes without any declaration or other act on the part of the Second Lien Trustee or any holders of the Notes." Second Lien Notes Indenture § 6.02 (A.2174). The Debtors further agreed that this amount was "intended to be liquidated damages and not unmatured interest or a penalty." *Id.* But—unlike in the First Lien Notes Indenture—the Debtors did not include the further stipulation that the Applicable Premium "shall be deemed to be principal of the Notes," and that "interest shall accrue on the full principal amount of the Notes (including the Applicable Premium or such other premium) from and after the applicable triggering event." First Lien Notes Indenture § 6.02 (A.1566).

The Debtors also agreed in the First Lien Notes Indenture—again in language with no precedent in the Second Lien Notes Indenture—that this resolution was "reasonable" and a "product of an arm's length transaction between sophisticated business entities ably represented by counsel." First Lien Notes Indenture § 6.02 (A.1566). They also "expressly acknowledge[d] that their agreement to pay the premium . . . [was] a material inducement to holders to acquire the Notes," *id.*—a frank acknowledgment that this agreement provided the new First Lien Noteholders with an important economic benefit, and that without such an "inducement," the First Lien Noteholders would not have agreed to lend the funds or would surely have insisted on a higher rate of interest, particularly following a default, or other offsetting economic concessions.

12

Finally, the Debtors agreed—again in new language, without precedent in their prior debt issuances—that "a course of conduct between holders and the Issuers" gave "specific consideration in this transaction for such agreement to pay the premium," and that the Issuers would "be estopped hereafter from claiming differently than as agreed to." First Lien Notes Indenture § 6.02 (A.1566). And they agreed—in all caps—to "EXPRESSLY WAIVE (TO THE FULLEST EXTENT THEY MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE PREMIUM." *Id.*

In sum, there can be no conceivable doubt that the parties intended and fully expected that the Debtors' obligation to pay the Applicable Premium would be binding and enforceable, including in any future bankruptcy proceeding. The First Lien Notes Indenture differs materially from those in *AMR*, *Energy Future*, and the Debtors' own prior issuances, with the clear result that the Applicable Premium is due and owing.

## C.     The Second Lien Intercreditor Agreement

In addition to first priority liens and guaranties, the First Lien Noteholders received protections under an agreement with the holders of Second Lien Notes (the "Second Lien Intercreditor Agreement"),[18] which governs the relative rights of the

---

[18]     ECF 4719 Ex. 8 (A.2291).

Debtors' First Lien and Second Lien debt.  Section 4.2(b) of the Second Lien Intercreditor Agreement provides that, "so long as the Discharge of First Lien Obligations has not occurred, if in any Insolvency or Liquidation Proceeding the Second Lien Collateral Agent or any other Second Lien Claimholders shall receive any distribution of money or other property in respect of or on account of the Collateral . . . such money, other property or amounts shall be segregated and held in trust and forthwith paid over to the First Lien Collateral Agent for the benefit of the First Lien Claimholders in the same form as received."  A.2316.  Under the Second Lien Intercreditor Agreement, "Discharge" is defined to require, among other things, "payment in full in cash."  Second Lien Intercreditor Agreement § 1.1 (A.2299).  As discussed further below, the First Lien Notes have not been paid in full; instead, they have purportedly been "reinstated" without the Applicable Premium that is owing.

### D.  The First Lien Noteholders' Claim And The Debtors' Objection Thereto

The First Lien Notes Indenture Trustee timely filed its proof of claim on behalf of all First Lien Noteholders on February 15, 2021.[19]  The claim sought allowance of, among other things, $495,032,000 in principal, interest, and "all applicable premiums or payments due under the First Lien Secured Notes

---

[19]    Proof Of Claim No. 4515 (A.3680).

14

Documents, including, without limitation, all amounts due under the First Lien Secured Notes Documents in respect of the Applicable Premium (as defined in the First Lien Indenture)."  A.3690.

The Debtors objected to the First Lien Notes Claims on July 30, 2021.[20]  The Debtors contended that the Applicable Premium was disallowable because, under the Debtors' proposed "Plan, the First Lien Notes . . . will be reinstated in accordance with 11 U.S.C. § 1124(2)."[21]  The Debtors also argued that, "even without [s]ection 1124(2), the makewhole claims should also be disallowed under [s]ections 363(*l*) and 541(c), as well as in the Court's discretion under [s]ection 506(b)."[22]

A hearing on the Debtors' claim objection was scheduled concurrently with the Plan confirmation hearing.[23]

---

[20]  *Debtors' Objection To Funded Debt Claims Pursuant To Article VII.J Of The Debtors' Joint Plan Of Reorganization (Fifth Omnibus Objection (Substantive))*, ECF 3504 (A.1317).

[21]  *Id.* ¶ 8 (A.1322).

[22]  *Id.*

[23]  *Order Approving Stipulation Between The Debtors And The Ad Hoc First Lien Notes Group Regarding Responses To The July 30 Claim Objection*, ECF 4683 (A.1357).

### E.    The Debtors' Plan Of Reorganization

The Debtors first proposed their Plan on April 20, 2021, and a Disclosure Statement was approved on June 17, 2021.[24]  The Debtors' Plan proposed that the First Lien Notes Claims would be in Class 3, and would be allowed:

> in the aggregate principal amount of $495,032,000.00 . . . , plus accrued and unpaid Allowed interest on such principal amount, plus any other Allowed unpaid premiums, fees costs, or other amounts due and owing pursuant to the First Lien Notes Indenture.[25]

The Plan also proposed that, if the Applicable Premium was not allowed, "all Allowed First Lien Notes Claims shall be Reinstated" by being "rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code."[26]  Otherwise, the First Lien Noteholders would receive either "the Cram-Down First Lien Notes in a face amount equal to the amount of such Allowed First Lien Notes Claims or (2) Cash in an amount equal to the amount of such Allowed First Lien Notes Claims . . . ."[27]

Finally, the Plan proposed broadly to exculpate the Second Lien Noteholders from any intercreditor liability to the First Lien Noteholders, based on the erroneous

---

[24]   ECF 2911.

[25]   ECF 2916 at 51 (A.0389); *as confirmed* ECF 6510 at 60 (A.3110).

[26]   ECF 2916 at 33, 51 (A.0371, 0389), *as confirmed* ECF 6510 at 40, 60 (A.3090, 3110).

[27]   ECF 2916 at 51 (A.0389); *as confirmed* ECF 6510 at 60 (A.3110).

proposition that "the holders of First Lien Notes Claims shall have received recovery in full pursuant to the terms of this Plan":

> [T]he holders of First Lien Notes shall not have any claims (including, without limitation, for turnover of payments) against the holders of Second Lien Notes (or the Second Lien Indenture Trustee or the Second Lien Collateral Agent) under the existing Intercreditor Agreement in any way arising from, relating to or as a result of the Debtors' restructuring (including, without limitation, of the First Lien Notes and Second Lien Notes), the Plan (including, without limitation, the treatment of the existing First Lien Notes Claims or Second Lien Notes Claims under the Plan or the making of distributions to the holders of the existing First Lien Notes Claims or Second Lien Notes Claims in accordance with the Plan), the distribution of property by the Debtors under the Plan, any related document or any order of the Bankruptcy Court, or any other transaction, agreement, event, omission or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, including without limitation the payment of any reasonable and documented out-of-pocket fees or expenses of the advisors to the Ad Hoc Second Lien Notes Group or the payment of the Second Lien Notes Indenture Trustee Fees, which payments shall be final and not subject to disgorgement, turnover, recovery, avoidance, recharacterization or any other similar claim.

Plan Art. IV.GG.[28]

## F.     Procedural Background

Appellant, another holder of First Lien Notes (Columbus Hill), and the First Lien Notes Indenture Trustee objected to confirmation on various grounds, including

---

[28]     *As confirmed* ECF 6510 at 112-13 (A.3162-63).

that the Plan improperly failed to honor the Applicable Premium and violated the

First Lien Noteholders' rights under the Second Lien Intercreditor Agreement.[29]

On November 5, 2021, the bankruptcy court issued an oral decision overruling

the First Lien Noteholders' objections.  The bankruptcy court held that:

> Section 1124(2) permits the reinstatement of an obligation
> notwithstanding any contractual provisions requiring an acceleration of
> any claim or interest after the occurrence of default.  Section 6.02 of the
> first lien notes indenture is a contractual provision that triggers and
> accelerates the payment of the applicable premium after the occurrence
> of the default as a result of the bankruptcy filing.  That is precisely the
> type of situation Section 1124(2) is intended to address; therefore, the
> applicable premium can be de-accelerated and paid if and when owing
> at a later time.

11/5/21 Tr. 108:6-16 (A.2829).  The bankruptcy court held that section 1124(2)

overrides all "*ipso facto*" defaults and the consequences thereof, regardless of

whether the obligation being reinstated is an executory contract.  11/5/21 Tr. 110:7-

13 (A.2831).  The bankruptcy court relied heavily on the "public policy behind the

bankruptcy code," as well as legislative history stating that an unimpaired creditor

"has no cause to complain."  11/5/21 Tr. 108:19–109:1 (A.2829-30).

The bankruptcy court also held that unimpairment under section 1124(2) does

not just "'de-accelerate the debt'"; it "'rol[ls] back the clock to the time before the

default existed.'"  11/5/21 Tr. 109:12-16 (A.2830) (quoting *In Re Onco Invest. Co.*,

---

[29]   The objections also opposed the Plan's alternative "cram down" treatment of the
First Lien Notes.  The bankruptcy court, however, did not address those
objections because of its holding that the First Lien Notes were unimpaired.

316 B.R. 163, 167 (Bankr. D. Del. 2004)).  Since section 1124(2) "rolls back the clock to the time before the asserted default the applicable premium is not triggered and is not, therefore, due and owing."  11/5/21 Tr. 109:22-24 (A.2830).

Finally, the bankruptcy court held that the Plan did not violate the First Lien Noteholders' rights under the Second Lien Intercreditor Agreement because the default was cured.  11/5/21 Tr. 111:11-16 (A.2832).  The court also held that the intercreditor agreement was not implicated because the distributions the second lien creditors were receiving were not on account of "Shared Collateral."  11/5/21 Tr. 111:17 – 112:20 (A.2832-33).

The bankruptcy court entered a Revised Opinion in support of confirmation on February 8, 2022 (ECF 6378, A.2944).  Among other things, the bankruptcy court found that the Debtors' enterprise value was more than $5 billion, which shows that the approximately $3.3 billion in secured funded debt (which included the First Lien Notes) was oversecured.  Rev. Op. 84-85 (A.3027-28).[30]

---

[30]  Subsequent to this appeal being filed, the Debtors successfully sought to extend their use of cash collateral through the Plan's Effective Date, arguing:

> [T]he Court found, based on the evidence adduced at the confirmation hearing, that the Debtors have a reorganization enterprise value of over $5 billion.  In addition, the Debtors currently have approximately $1.228 billion of cash on hand, for total assets of $6.228 billion.  Accordingly, the value of the Prepetition Secured Parties' collateral exceeds their debt (approximately $3.62 billion) by approximately $2.608 billion, representing an equity cushion of at least 72%.

The bankruptcy court entered its Confirmation Order on March 2, 2022 (ECF 6660, A.3240).[31]  Paragraph 253 stated that "[f]or the reasons set forth by the Court on the record in the November 5, 2021 Ruling, the First Lien Noteholders' Plan Objections are overruled,"[32] and that "[a]ll findings of fact and conclusions of law set forth in the November 5, 2021 Ruling are expressly incorporated into this Confirmation Order."  A.3394.  Paragraph 153 (A.3325-26) further provided:

> On the Effective Date, subject to the terms of the Plan and this Confirmation Order, the obligations of the Debtors under the First Lien Notes, and the guarantees, mortgages, pledges, Liens, and other security interests granted pursuant thereto or in connection therewith, are hereby reinstated pursuant to Section 1124 of the Bankruptcy Code. Upon the occurrence of the Effective Date, no Default or Event of Default shall have occurred and be continuing under the First Lien Notes or the First Lien Notes Indenture.

The Confirmation Order also stated (¶ 253, A.3394) that "[i]n light of the Court's conclusion—as stated in the November 5, 2021 Ruling—that the proposed

---

*Motion Of The Debtors For Entry Of Order Extending Outside Termination Date Under Cash Collateral Order By 30 Days And Granting Related Relief* (ECF 7105) at 10 (A.3676) (footnotes omitted).  This Court may take judicial notice of this filing.  *See United States v. Remoi*, 404 F.3d 789, 793 n.1 (3d Cir. 2005).

[31] *Findings Of Fact, Conclusions Of Law, And Order Confirming Fourth Amended Joint Plan Of Reorganization (With Technical Modifications) Of Mallinckrodt PLC And Its Debtor Affiliates Under Chapter 11 Of The Bankruptcy Code*.  ECF 6660 (A.3240).

[32] The only First Lien Noteholder objection the bankruptcy court sustained was to the Plan's broad general release provisions, which the court gave the objecting holders the right to opt out of.

treatment of the First Lien Notes Claims under the Plan satisfies 11 U.S.C. § 1124(2) (*i.e.*, reinstatement without payment of any First Lien Notes Makewhole Claim), the Funded Debt Claim Objection is otherwise moot to the extent it addresses the First Lien Notes Makewhole Claim."

Finally, the Confirmation Order purported to release any claims the First Lien Noteholders had against the Second Lien Noteholders under the Second Lien Intercreditor Agreement.  Paragraph 253 stated:

> For the reasons set forth in the November 5, 2021 Ruling, the Holders of First Lien Notes Claims shall not have, and shall hereby be prohibited and enjoined from asserting, any claims (including, without limitation, for turnover of payments) against any of the Prepetition Secured Parties (as defined in the Cash Collateral Order) or their agents, advisors, or other representatives under any of the Intercreditor Agreements in any way arising from, relating to, or as a result of the Debtors' restructuring, the Plan, the distribution of property or any payments made under the Plan, or any order of the Bankruptcy Court in this case, or any other transaction, agreement, event, omission or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.

A.3394.

Appellant Ad Hoc First Lien Notes Group timely appealed on March 2, 2022 (A.3697).  This appeal has been consolidated with the appeal of another First Lien Notes holder (Columbus Hill, 22-cv-00330).   The First Lien Notes Indenture Trustee's appeal is stayed pending the resolution of this appeal (22-cv-00337).

## SUMMARY OF ARGUMENT

The bankruptcy court incorrectly concluded that the First Lien Notes could be validly reinstated at their original principal amount of $495,032,000, without regard to the additional $94 million in Applicable Premium.  To justify that conclusion, the Debtors were required to demonstrate that the Plan leaves the First Lien Notes unimpaired.  That requirement is a demanding one, and the bankruptcy court erred as a matter of law in concluding that the Debtors' Plan satisfies it here.

*First,* the Applicable Premium is expressly provided for in the First Lien Indenture and is an allowable claim in bankruptcy.  There is no general *per se* prohibition on claims that mature upon a Debtors' bankruptcy filing, whether in Bankruptcy Code sections 502, 506, or otherwise.  The bankruptcy court's reliance on "policy" to disregard the claim is contrary to the plain language of the Bankruptcy Code and Supreme Court precedent rejecting "equitable" exceptions to the Code's plain language.

*Second,* in order to reinstate the First Lien Notes, the Debtors were required to cure and reinstate them under Bankruptcy Code section 1124(2).  The bankruptcy court erred in a number of respects in holding that the Debtors' Plan satisfied section 1124(2), including by holding that (i) the exception to curing "a default of a kind specified in section 365(b)(2)" applies to the non-executory First Lien Notes

22

Indenture, and (ii) the curing of the default, even if permitted, negated the Applicable Premium, which remained owing and was payable under section 1123(d).

**Third,** even if the Debtors were not required to pay the full Applicable Premium, at a minimum the Debtors must pay interest on the Applicable Premium for the approximately 19 months that their chapter 11 cases have been pending prior to any purported "reinstatement" of the First Lien Notes.

**Finally,** even if section 1124(2) were to permit the Debtors to avoid the consequences of their default, it does not protect non-debtors such as the Second Lien Noteholders.   The bankruptcy court erred in granting the Second Lien Noteholders a release of the First Lien Noteholders' claims against them under the Second Lien Intercreditor Agreement.

## ARGUMENT

**I.     THE BANKRUPTCY COURT ERRED IN CONCLUDING THAT THE DEBTORS' PLAN LEAVES THE FIRST LIEN NOTEHOLDERS UNIMPAIRED**

### A.     The Applicable Premium Is An Allowable Claim In Bankruptcy, And The Bankruptcy Court Erred In Holding That The Claim Violated "Public Policy"

The bankruptcy court held that the Applicable Premium "would be contrary to the strong public policy behind the [B]ankruptcy [C]ode." 11/5/21 Tr. 108:19-20 (A.2829).   According to the bankruptcy court, the Applicable Premium is an improper "bankruptcy penalty," and requiring the Debtors to pay it would violate the Supreme Court's admonition that "a party should not receive a 'windfall merely

23

by reason of the happenstance of the bankruptcy.'" 11/5/21 Tr. 109:2-19 (A.2830) (quoting *Butner v. United States*, 440 U.S. 48, 55 (1979)).[33] The bankruptcy court's reliance on generalized policy considerations was in error, and it cannot substitute for the express terms of the Bankruptcy Code's text. *See Law v. Siegel*, 571 U.S. 415, 425–26 (2014) ("equitable" considerations cannot override the Bankruptcy Code's express terms).

Bankruptcy Code section 502 governs the allowance of claims in bankruptcy. Under section 502(a), a claim is deemed allowed unless a party in interest objects. If an objection is filed, the bankruptcy court "shall allow such claim . . . except to the extent that" one of the nine enumerated exceptions to section 502(b) applies. As discussed further below, none of the exceptions applies to the Applicable Premium.

The Supreme Court has made clear that "we have long recognized that the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Travelers Cas. and Sur. Co. of America v. Pacific*

---

[33] *Butner* actually supports Appellant's position, holding that a secured party's interest in a debtor's property should be determined based on state law, rather than "a federal rule of equity." 440 U.S. at 49, 56. The "windfall" with which the Supreme Court was concerned in *Butner* was not a creditor receiving its contractual rights under state law, but rather the creditor receiving different rights under "equitable" bankruptcy principles. *Id.* at 53. Thus, the Court held that to avoid a windfall, there must be "uniform treatment of property interests by both state and federal courts." *Id.* at 55.

*Gas and Elec. Co.*, 549 U.S. 443, 450-51 (2007) (internal quotations omitted); *see also Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000) ("The basic federal rule in bankruptcy is that state law governs the substance of claims." (internal quotations omitted)).

Here, the Applicable Premium arises under the First Lien Notes Indenture, an agreement governed by New York law.  § 14.08 (A.1594).  The First Lien Notes Indenture unambiguously provides for the payment of the Applicable Premium upon acceleration of the loan.  *Id.* § 6.02 (A.1566).  The loan, in turn, was accelerated based on the Debtors' voluntary commencement of a case under "Bankruptcy Law." *Id.* §§ 6.01(f)(i), 6.02 (A.1564-66).[34]   New York law has long recognized the enforceability of *ipso facto* provisions, including liquidated damages.  *See In re United Merchants & Mfrs., Inc.*, 674 F.2d 134, 140-44 (2d Cir. 1982); *In re School Specialty, Inc.*, 2013 WL 1838513, at *2 (Bankr. D. Del. Apr. 22, 2013).  Thus, the Applicable Premium is an allowable claim under New York law and Bankruptcy Code section 502. *See Travelers*, 549 U.S. 443, 450-53; *United Merchants*, 674 F.2d at 143-44 (rejecting "bankruptcy policy" objection to *ipso facto* liquidated damages claim under the Bankruptcy Act); *see also AMR*, 730 F.3d at 105-07 (finding automatic acceleration of a debt enforceable in bankruptcy, notwithstanding section

---

[34]   "Bankruptcy Law" includes "the Bankruptcy Code, or any similar Federal or state law for the relief of debtors."  Indenture § 6.01 final paragraph (A.1566).

25

365(e)(1)'s limitations on enforcing *ipso facto* clauses in executory contracts).  And, because there is no dispute that there was more than enough collateral to cover the Applicable Premium and all other secured funded debt, the Applicable Premium—which is added to principal—is a fully secured claim under Bankruptcy Code section 506(a).

The Supreme Court has made clear that "we generally presume that claims enforceable under applicable state law will be allowed in bankruptcy ***unless they are expressly disallowed***" by the Bankruptcy Code.  *Travelers*, 549 U.S. at 452 (emphasis added).  In *Travelers*, the Supreme Court rejected the bankruptcy policy-based "*Fobian* rule,"[35] which disallowed postpetition attorneys' fees for unsecured creditors.  The Supreme Court noted that when Congress wanted to disallow attorneys' fees, it knew how to do so with express language.  *Id.* at 453 (citing section 502(b)(4)'s limitation on unreasonable prepetition fees incurred by the debtor).  "The existence of that provision suggests that, in its absence, a claim for such fees would be allowed in bankruptcy to the extent enforceable under state law." *Id.*  The Supreme Court explained that:

> the validity of a claim is generally a function of underlying substantive law.  Bankruptcy courts are not authorized in the name of equity to make wholesale substitution of underlying law controlling the validity

---

[35]  *See In re Fobian*, 951 F.2d 1149 (9th Cir. 1991) (abrogated by *Travelers*, 549 U.S. at 453-54).

of creditors' entitlements, but are limited to what the Bankruptcy Code itself provides.

*Raleigh*, 530 U.S. at 24-25.

Nothing in Bankruptcy Code section 502 disallows the Applicable Premium. Section 502(b) contains **nine** categories of disallowable claims, but none of them disallows claims that arise in connection with the acceleration of debt, whether by default or otherwise. Nor do any of the nine categories in section 502(b) disallow claims based on so-called *ipso facto* defaults, notwithstanding Congress' clear and express references to such defaults in other provisions of the Code. *See*, *e.g.*, 11 U.S.C. §§ 363(*l*), 365(b)(2), 365(e)(1), 541(c)(1)(B) & 545(1). The absence of any such language in section 502 is compelling—Congress did not enact a general prohibition on the allowance of claims such as the Applicable Premium. *See Travelers*, 549 U.S. at 453; *see also Patterson v. Shumate*, 504 U.S. 753, 758 (1992) ("The Code reveals, significantly, that Congress, when it desired to do so, knew how to restrict the scope of applicable law to 'state law' and did so with some frequency."); *Ellis v. Westinghouse Elec. Co., LLC*, 11 F.4th 221, 235 (3d Cir. 2021) ("Congress knew when not to include any carveout language . . . ."). If that had been Congress' intent, notwithstanding the plain language of the Code, then it is for Congress to make that intent clear through further legislation:

> If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent. It is beyond

27

our province to rescue Congress from its drafting errors, and to provide for what we might think . . . is the preferred result.

*Lamie v. U.S. Trustee*, 540 U.S. 526, 542 (2004) (internal quotations omitted).[36]

Any argument that the Applicable Premium could be disallowed under section 502(b)(1) would fail. Section 502(b)(1) disallows claims that are unenforceable "under any agreement or applicable law." As noted, the First Lien Notes Indenture expressly provides for the payment of the Applicable Premium, and thus this case is distinguishable from cases such as *AMR* and *Momentive Performance Materials Inc. v. BOKF, NA (In re MPM Silicones, L.L.C.)*, 874 F.3d 787 (2d Cir. 2017), in which the Second Circuit held that the contractual prerequisites for the make-wholes had not been satisfied.

Nor does section 502(b)(1)'s reference to "applicable law" provide a basis for disallowing the Applicable Premium on the basis of "bankruptcy policy." Section 502(b)(1) incorporates non-bankruptcy law. *Travelers*, 549 U.S. at 450 ("§ 502(b)(1) is generally understood to 'make available to the trustee any defense' available to the debtor 'under applicable nonbankruptcy law'" (quoting 4 Collier ¶

---

[36]   The Third Circuit recently noted Professor Klee's proposal that the reference to section 510(a) in section 1129(b) be eliminated, because a literal interpretation of the statute could lead to an "anomalous result." *See In re Tribune Co.*, 972 F.3d 228, 239 (3d Cir. 2020) (citing Kenneth N. Klee, *Adjusting Chapter 11: Fine Tuning the Plan Process*, 69 Am. Bankr. L.J. 551, 561 (1995)). The court nonetheless held that "[a]s Congress has not changed the law to reflect Professor Klee's proposal, we rely on the plain language of § 1129(b)(1)." *Id.*

28

502.03[2] [b], at 502–22 (15th Ed. Rev.))).  There is no prohibition in applicable state law—here New York law—against the imposition of a claim upon a debtor's bankruptcy filing.

In any event, the Bankruptcy Code does not contain a blanket prohibition on "*ipso facto*" claims triggered by a bankruptcy default (or what the bankruptcy court pejoratively labeled as a "bankruptcy penalty").  *See AMR*, 730 F.3d at 105-07; *United Merchs.*, 674 F.2d at 140-44.  To be sure, a series of Code provisions expressly limit the enforceability of *ipso facto* clauses in specified circumstances. Section 541(c), for instance, provides that:

> an interest of the debtor in property becomes property of the estate . . . notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law . . . that is conditioned on . . . the commencement of a case under this title . . . , and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

11 U.S.C § 541(c).  And section 363(*l*) provides that:

> a plan under chapter 11, 12, or 13 of this title may provide for the use, sale, or lease of property, notwithstanding any provision in a contract . . . that is conditioned . . . on the commencement of a case under this title concerning the debtor . . . and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property.

11 U.S.C § 363(*l*).

Neither of these provisions has the effect of disallowing claims against the estate, such as the Applicable Premium.  Rather, section 541 governs what property

comes into the estate.  But the fact that such property may be encumbered by a lien is distinct from whether such property is property of the estate.  The Bankruptcy Code plainly recognizes that the debtor's property is still property of the estate even if it may be encumbered by a lien.  *See*, *e.g.*, 11 U.S.C. § 506(a)(1) (claim may be "secured by a lien on property in which the estate has an interest," and a secured creditor has an "interest in the estate's interest in such property").[37]   As one commentator has correctly recognized:

> By its terms, section 541(c)(1)(B) invalidates *ipso facto* clauses only to the extent that they cause a forfeiture, modification, or termination of an "interest in property" of the debtor that would otherwise enter the estate.  ***Although Congress could have drafted a provision that would simply invalidate any contractual provision that negatively impacts a debtor as a result of a bankruptcy filing, the language of the statute is not that broad.***

Emil A. Kleinhaus & Peter B. Zuckerman, *The Enforceability of Ipso Facto Clauses in Financing Agreements:* American Airlines *and Beyond*, Norton J. Of Bankr. Law & Prac., Vol. 23, No. 2 at 197 (2014) (emphasis added) ("Kleinhaus & Zuckerman").

Similarly, although section 363(*l*) permits a debtor to use property notwithstanding an "*ipso facto*" restriction on such use, that is a far cry from disallowing all *ipso facto* claims under section 502.

---

[37]   If section 541(c)(1)(B) (or section 363(*l*), for that matter) included a blanket prohibition on all claims that arise upon a bankruptcy filing, there would have been no reason for Congress to include section 545(1)(A) in the Code, which specifically bars the attaching of statutory liens upon a bankruptcy filing.

> Like section 541(c)(1)(B), section 363(l) has not generally been treated by courts as a basis to invalidate ipso facto clauses in loan agreements. By its terms, the statute protects the debtor's ability to use its property; ***it does not speak to creditor recoveries or the claims allowance process***.

Kleinhaus & Zuckerman at 198 (emphasis added).[38]

Thus, far from supporting a generalized policy against the enforcement of *ipso facto* clauses, these Code provisions in fact confirm the opposite conclusion.  As the Second Circuit explained in *AMR*, these provisions "demonstrate that Congress clearly knows how to limit or negate the effect of *ipso facto* clauses when it wants to," and their "specificity . . . counsels against the position . . . that *ipso facto* provisions are broadly or categorically denied enforcement by the Code."  730 F.3d at 107.  Especially because Congress took care to specify the circumstances under which *ipso facto* clauses may not be enforced, "[t]he absence of textual support is fatal" to any suggestion that the Code prohibits the enforcement of *ipso facto* clauses in all circumstances.  *Id.* (alteration in original) (quoting *Travelers*, 549 U.S. at 452); *see also In re General Growth Props., Inc.*, 451 B.R. 323, 330 (Bankr. S.D.N.Y. 2011) (holding that *ipso facto* clauses "are not *per se* invalid . . . except where

---

[38] By contrast, Congress knew how to disallow claims when it intended to do so, whether in section 502 or otherwise.  *See, e.g.*, 11 U.S.C. § 1305(c) ("A ***claim*** filed under subsection (a)(2) of this section ***shall be disallowed*** if the holder of such claim knew or should have known that prior approval by the trustee of the debtor's incurring the obligation was practicable and was not obtained." (emphasis added)).

contained in an executory contract or unexpired lease" addressed by section 365(b)

of the Code).[39]

More broadly, disallowance of the Applicable Premium cannot be squared

with the Supreme Court's direction that, because the "Bankruptcy Code standardizes

an expansive (and sometimes unruly) area of law," the Code should be "interpret[ed]

---

[39] The Debtors relied below on two policy-based decisions, neither of which was cited by the bankruptcy court in its decision, and neither of which addresses the Bankruptcy Code's plain language or is otherwise persuasive.

*W.R. Grace* from this District states (in what is arguably dicta) that the court "agree[d] with the general trend of the federal courts that the prohibition against ipso facto clauses is not limited to actions based upon §§ 541(c) and 365(e)." *In re W.R. Grace & Co.*, 475 B.R. 34, 154 (D. Del. 2012). In reaching its decision, the court invoked the "purpose" of bankruptcy—"to provide the debtor with a 'fresh start'"—and concluded that "enforcement of ipso facto clauses," including in loan agreements, "would punish debtors by negating this central purpose." *Id.* at 152. The court failed, however, to address the absence of any language disallowing *ipso facto* claims in section 502 and the instruction in *Travelers* that "[t]he absence of textual support is fatal." 549 U.S. at 452. Nor did the court have the benefit of the Supreme Court's subsequent decision in *Law v. Siegel*, holding that equitable considerations cannot override the Bankruptcy Code's plain language. 571 U.S. at 425–26. In any event, "[t]he *W.R. Grace* court's discussion of default interest was arguably unnecessary because the court went on to find that the unsecured lenders were not entitled to any post-petition interest under section 502(b)(2) of the Bankruptcy Code . . . ." Kleinhaus & Zuckerman at 202.

The Debtors also cited a since-vacated, unpublished oral ruling in *EP Energy*, which stated (with no citations) that an *ipso facto* claim "is inconsistent with the public policy." *See* ECF 5017 Ex. 1 (A.2709) (March 6, 2020 transcript in *In re EP Energy Corp.*, case no. 19-35654 (Bankr. S.D. Tex. 2020)); *see also EP Energy* D.I. 1103 (March 23, 2020 order vacating confirmation). As with *W.R. Grace*, *E.P. Energy* cannot be squared with the absence of any language disallowing *ipso facto* claims in section 502.

. . . clearly and predictably using well established principles of statutory construction." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 649 (2012). Those principles do not license courts to augment the Code's carefully articulated (and limited) rules governing the enforcement of *ipso facto* clauses based on their own views of proper bankruptcy policy. *See id.* ("[N]othing in the generalized statutory purpose of protecting secured creditors can overcome the specific manner of that protection which the text of § 1129(b)(2)(A) contains."). Yet that is precisely what the bankruptcy court did here. The bankruptcy court's holding that *ipso facto* claims violate "bankruptcy policy" cannot be squared with the plain language of the Bankruptcy Code. *See Hartford Underwriters*, 530 U.S. at 6 ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.") (internal quotations omitted).

Finally, the Debtors argued below that the Applicable Premium may constitute "unmatured interest," but the substantial weight of authority holds that make-wholes are liquidated damages, and not interest. *See, e.g.*, *In re Ultra Petroleum Corp.*, 624 B.R. 178, 184 (Bankr. S.D. Tex. 2020); *In re Trico Marine Servs., Inc.*, 450 B.R. 474, 480-81 (Bankr. D. Del. 2011) (collecting cases). In any event, even if the Applicable Premium were considered "unmatured interest" under section 502(b)(2), it would be allowed for the First Lien Noteholders' fully secured

claim under section 506(b).  Either the Applicable Premium is "interest," and thus allowable under section 506(b), or it is not "interest," in which case it is not subject to disallowance under section 502(b)(2).

### B.     Consistent With The Bankruptcy Code's Strong Presumption Of Impairment, Reinstatement Of The First Lien Notes Requires Strict Compliance With Section 1124

Because the Applicable Premium is an allowable claim in bankruptcy, the Debtors were required to honor it in order to unimpair the First Lien Notes.  To the contrary, the Plan as confirmed by the bankruptcy court authorizes the Debtors to disregard completely the Applicable Premium.

Impairment is governed by section 1124, which provides that "a class of claims or interests is impaired under a plan" unless the plan complies with one of two narrowly circumscribed exceptions.  Because an unimpaired class is conclusively presumed to accept a plan and not entitled to vote, *see* § 1126(f), the Code defines impairment "in the broadest possible terms."  *In re Madison Hotel Assocs.*, 749 F.2d 410, 418 (7th Cir. 1984); *see also*, *e.g.*, *In re L & J Anaheim Assocs.*, 995 F.2d 940, 942 (9th Cir. 1993); *In re Taddeo*, 685 F.2d 24, 28 (2d Cir. 1982).  "[E]ven the *slightest* impairment will entitle a creditor to vote on confirmation." *In re Wilhelm*, 101 B.R. 120, 122 (Bankr. W.D. Mo. 1989) (emphasis added).

34

As the Third Circuit has emphasized, section 1124 embodies a strong "presumption of impairment 'so as to enable a creditor to vote on acceptance of the plan.'"  *In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 203 (3d Cir. 2003) (internal quotations omitted).  As the proponents of the Plan, it was the Debtors' burden to overcome that presumption.  *Id.*; *see also, e.g.*, *In re Reuter*, 427 B.R. 727, 773 (Bankr. W.D. Mo. 2010), *aff'd*, 443 B.R. 427 (B.A.P. 8th Cir. 2011), *aff'd*, 686 F.3d 511 (8th Cir. 2012).

Under section 1124(1), a class of claims is unimpaired under a plan *only* if the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim . . . entitles the holder of such claim."  11 U.S.C. § 1124(1).  It is common ground that this provision does not authorize reinstatement of the First Lien Notes Claims— either with or without payment of the Applicable Premium.  As noted above, under the terms of the First Lien Notes Indenture, the outstanding principal amount of the First Lien Notes was immediately accelerated upon the Debtors' bankruptcy filing.  *See* pp. 7-13 *supra*; First Lien Notes Indenture § 6.02 (A.1566).  Rather than paying the amounts due under the terms of the First Lien Notes Indenture, however, the Debtors' Plan leaves the First Lien Notes outstanding, such that the First Lien Noteholders must await repayment over time.  Thus, the Plan indisputably alters the First Lien Noteholders' contractual right to receive *immediate* payment, and the First Lien Notes Claims cannot be deemed unimpaired under section 1124(1).

The Plan's reinstatement treatment for the First Lien Notes thus rests on section 1124(2), which "builds on" the exception set forth in section 1124(1) by "allow[ing] for only one alteration, the deceleration of a debt following a default." *In re K Lunde, LLC*, 513 B.R. 587, 595 (Bankr. D. Colo. 2014); *see also Taddeo*, 685 F.2d at 28 (Section 1124(2) "carve[s] out a small exception to impairment"). Section 1124(2) provides that a class of claims or interests is unimpaired if the plan,

> notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—
>
> (A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured;
>
> (B) reinstates the maturity of such claim or interest as such maturity existed before such default;
>
> (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;
>
> (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and
>
> (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

11 U.S.C. § 1124(2).  Thus, "[s]ubsection (2) on its face is concerned only with a contract provision requiring 'accelerated payment' upon a default, and the statute

36

permits the debtor to de-accelerate and reinstate the pre-default maturity of the loan only if the plan ([E]) 'does not otherwise alter' the secured creditor's contractual rights." *In re 139-141 Owners Corp.*, 313 B.R. 364, 368 (S.D.N.Y. 2004).

### C.   The Plan Impairs The First Lien Noteholders By Extinguishing Their Contractual Right To Receive The Applicable Premium

The bankruptcy court erred in holding that, by purporting to unimpair the First Lien Notes, the Debtors were relieved from honoring the Applicable Premium.

**First,** the bankruptcy court erred in holding that the Debtors were excused from curing the default caused by their bankruptcy. The default was not "of a kind specified in section 365(b)(2)," because the First Lien Notes Indenture is not an executory contract governed by section 365.

**Second,** even if the Debtors were excused from curing their bankruptcy default, that would not excuse them of having to satisfy the Applicable Premium, which itself is an allowable claim in the Debtors' bankruptcy. De-acceleration of the First Lien Notes—even if it were properly accomplished under section 1124(2)—would not cause the Applicable Premium to disappear. Section 1123(d) mandates that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law." Moreover, the Debtors' failure to pay the Applicable Premium itself represents an additional default under the First Lien Indenture, which must be cured in order for the First Lien Notes to be unimpaired.

37

Thus, even assuming that the Debtors were not required to cure the default caused by their bankruptcy filing, reinstatement of the First Lien Notes would not excuse the Debtors from their obligation to pay the Applicable Premium.

### 1.    Section 1124(2) Does Not Excuse The Debtors From Curing In Order To Reinstate The First Lien Notes

The bankruptcy court held (11/5/21 Tr. 110:7-13, A.2831) that no cure was necessary because of section 1124(2)(A)'s caveat that a plan need not cure "a default of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured." 11 U.S.C. § 1124(2)(A). But section 365 governs "default[s] in an *executory contract* or *unexpired lease* of the debtor." 11 U.S.C. § 365(b)(1) (emphasis added). It has no application to defaults under a non-executory debt contract, such as the First Lien Notes Indenture. *See In re Moody Nat'l SHS Houston H, LLC*, 426 B.R. 667, 673-74 (Bankr. S.D. Tex. 2010) (proviso held inapplicable because "[a] mortgage note is neither a lease nor an executory contract"); *see also In re General Growth Props., Inc.*, 451 B.R. at 327-31 (awarding default-rate interest triggered by bankruptcy default, where non-executory debt contract was reinstated by plan); *In re A & B Assocs., L.P.*, 2019 WL 1470892, at **46-47 & n.59 (Bankr. S.D. Ga. Mar. 29, 2019) ("the Court finds that the Loan Agreement here is not an executory contract, that its *ipso facto* clause is not subject to § 365(e)(1), and that the Debtor's filing of this Chapter 11 case constituted an

event of default," and creditor's "entitlement to default interest was triggered by the bankruptcy filing itself").

The bankruptcy court nonetheless concluded that the cross-reference to section 365(b)(2) "merely incorporates the definition in Section 365(b)(2) of the types of defaults that do not need to be cured, i.e., a bankruptcy filing," but "does not in any way incorporate the requirement in Section 365 that would apply only to executory contracts."  11/5/21 Tr. 110:9-13 (A.2831).  But that conclusion ignores the fact that section 365 governs *only* executory contracts and unexpired leases.  *See* 11 U.S.C. § 365(a), (b)(1).  It follows that the "kind" of defaults "specified in section 365(b)(2)" must be similarly limited.  Contrary to the bankruptcy court's conclusion, defaults in other contracts are a different "kind" of default, which are not excluded from section 1124(2)(A)'s cure obligation.

The bankruptcy court's overly broad reading of the phrase "of a kind" conflicts with other courts that have interpreted similar language in other provisions of the Code.  As one court aptly explained:

> Congress used the phrase "of a kind" in at least 35 other places in the Bankruptcy Code.  Viewed in the context of its broader statutory usage, "of a kind" captures the elements or characteristics specified in another section of the Bankruptcy Code and makes the incorporated provision a condition for satisfaction of the section making the reference.  For example, 11 U.S.C. § 726(b) provides for payment on claims "of a kind specified" in paragraphs (1) through (8) of 11 U.S.C. § 507(a).  In *Stuart v. Carter (In re Larsen)*, 59 F.3d 783, 787 (8th Cir. 1995), the Eighth Circuit reached the reasonable conclusion that the phrase "of the kind specified in section 507(a)(1)" in § 726(b) limits the first priority of

distribution to claims that first "qualify as administrative expense claims" under the referenced subparagraphs of § 507(a). This straight forward interpretation of "of the kind" makes sense elsewhere in the Bankruptcy Code.

*In re Bartomeli*, 303 B.R. 254, 270 n.24 (Bankr. D. Conn. 2004) (quoting *In re Jones*, 296 B.R. 447, 449 (Bank. M.D. Tenn. 2003), footnotes omitted); *see also In re Satellite Restaurants Inc. Crabcake Factory USA*, 626 B.R. 871, 875-79 (Bankr. D. Md. 2021) (exclusion from small business debtor's discharge of debts "of the kind specified in section 523(a)" (§ 1192(1)) only applies to debts of an *individual* small business debtor, because only individuals are included within the purview of section 523(a)).[40]

Finally, to the extent there is any ambiguity in section 1124(2) and its use of the phrase "of a kind," it must be resolved in favor of the First Lien Noteholders. Because of the critical interests at stake when a bankruptcy court is asked to find that a creditor is unimpaired—and thus to disenfranchise that creditor from voting on a proposed plan, the "best interests" test, and "fair and equitable" protection—the Code creates a strong "presumption of impairment." *PPI Enters.*, 324 F.3d at 203.

---

[40] The Debtors below cited *AMR*, 730 F.3d at 108-09, as an example of a case in which the phrase "of a kind specified in section 365(b)(2)" was applied to a non-executory contract. However, the provision at issue in *AMR*—section 1110—makes clear through express language that it applies not only to leases and sales contracts, but also to non-executory "security agreements." No such language exists in section 1124(2)(A).

By concluding that any ambiguity would be resolved against a conclusion of impairment, the bankruptcy court effectively reversed that presumption.

Honoring the Code's presumption of impairment is particularly warranted in this case, where the parties expressly contemplated the possibility of a future bankruptcy filing and deliberately chose contractual language to ensure that the Debtors' obligation to pay the Applicable Premium would be binding and enforceable, including in bankruptcy. *See* pp. 7-13, *supra*. By accepting the Debtors' reinstatement argument, the bankruptcy court upset that carefully negotiated bargain, thereby eliminating what the Debtors candidly acknowledged to be a "material inducement" to the new First Lien Noteholders at the time the notes were issued. First Lien Notes Indenture § 6.02 (A.1566). In that respect, it was the Debtors that were permitted to receive a "windfall merely by reason of the happenstance of the bankruptcy," *Butner*, 440 U.S. at 55. Section 1124—under which a creditor's legal, equitable, and contractual rights must generally be left *unaltered*—offers no support for that result.

2. **Even If The Debtors Were Not Required To Cure Their Bankruptcy Default, Section 1124(2) Does Not Disallow Or Otherwise Override The Debtors' Obligation To Pay The Applicable Premium**

    a. **Unimpairment Does Not Disallow The First Lien Noteholders' Allowable Claim For The Applicable Premium**

As explained above, the bankruptcy court's conclusion that reinstatement of the First Lien Notes was permissible without paying the Applicable Premium rests on section 1124(2)'s "small exception to impairment." *Taddeo*, 685 F.2d at 28. But section 1124(2) has no application to the Debtors' failure to pay the Applicable Premium.

Section 1124(2) permits a debtor to "cure[]," or be excused from curing, certain kinds of defaults—in particular, "such default[s]" (and *only* "such default[s]") that "entitle[] the holder of such claim . . . to demand or receive accelerated payment of such claim . . . after the occurrence of a default." As a matter of basic grammar, the phrase "such default" necessarily refers back to the particular *kind* of "default" described in section 1124(2)'s introductory clause—that is, *a default that gives rise to acceleration of a creditor's claim*. Section 1124(2) thus has a limited domain, authorizing a debtor to reverse a contractual or legal acceleration by curing the default that led to that acceleration.

Here, the default that gave rise to acceleration was the commencement of the Debtors' chapter 11 cases. First Lien Notes Indenture § 6.01(f) (A.1564-65). That

default resulted in the automatic acceleration of the prepetition principal of the First Lien Notes under section 6.02, and thus it is that default which section 1124(2) requires to be cured or, if applicable, excused as "a kind specified in section 365(b)(2)."[41]

"Curing" the bankruptcy default, however, does not cause the Applicable Premium to disappear. The Applicable Premium matured immediately and automatically upon the bankruptcy filing, and nothing in the First Lien Notes Indenture causes it to "unmature." Although the First Lien Notes Indenture allows the Debtors to undo the effects of some defaults, that is not the case with the

---

[41] Notably, the Applicable Premium was not "accelerated" by the bankruptcy filing. It was a contingent obligation triggered by the Debtors' bankruptcy filing, and thus was not something that even could be accelerated. Acceleration refers to "[t]he advancing of a loan agreement's maturity date so that payment of the entire debt is due immediately." Black's Law Dictionary (11th ed. 2019); *see also Energy Future Holdings*, 842 F.3d at 259 ("[A]cceleration, by definition, advances the maturity date of the debt . . . .") (alteration in original). The obligation to pay the Applicable Premium is distinct from the acceleration of the First Lien Notes—it is a new charge that the Debtors became liable to pay upon triggering an Event of Default through their bankruptcy filings. The Applicable Premium is expressly "[i]n addition" to the obligation to pay those accelerated amounts. First Lien Notes Indenture § 6.02. It follows that, because Section 6.02 of the First Lien Notes Indenture is not a contractual provision that "entitles the holder of such claim . . . to demand or receive accelerated payment . . . after the occurrence of a default," 11 U.S.C. § 1124(2), section 1124(2) offers no basis for the Debtors' refusal to pay the Applicable Premium. Under section 1124(2)(E), reinstatement cannot "otherwise alter the legal, equitable, or contractual rights" of the First Lien Noteholders to the Applicable Premium.

Applicable Premium, which can only be waived by the noteholders themselves.  First Lien Indenture § 6.02 (A.1566-67).[42]

Nothing in section 1124(2) changes this result.  Even if the Debtors may reinstate the original *maturity* of the First Lien Notes, they cannot adjust the *principal* amount of the First Lien Notes, which includes the applicable premium as a result of the default.  First Lien Notes Indenture § 6.02 (A.1566).  Those are plainly distinct terms of the parties' contractual agreement, and a conclusion that section 1124(2) authorizes adjustment of the former term (through de-acceleration of amounts that would otherwise be immediately due) says nothing about the latter.  Reducing the outstanding principal amount of the First Lien Notes, as the bankruptcy court allowed the Debtors to do here by disregarding the Applicable Premium, is plainly an alteration of the First Lien Noteholders' "legal, equitable, or contractual rights."  That, in turn, makes reinstatement unavailable under these circumstances.

The bankruptcy court nevertheless held that reinstatement under section 1124(2) operates not only to "de-accelerate the debt," but also to "rol[l] back the clock to the time before the default existed."   11/5/21 Tr. 109:12-19 (A.2830)

---

[42]   Many of the defaults set forth in Section 6.01 of the First Lien Notes Indenture have either grace periods or opportunities to cure (*e.g.*, 6.01(c) (90-day period after written notice to cure certain covenant defaults)).    A.1564-66.  The assessment of the Applicable Premium under Section 6.02, however, is immediate and automatic, and can be rescinded only by the holders of a majority of the First Lien Notes.  A.1566-67.

(quoting *Onco*, 316 B.R. at 167).   The court reasoned that "[t]he Applicable Premium is only triggered upon acceleration of the notes in connection with an event of default" and that "Section 1124(2) rolls back the clock to the time before the asserted default," and thus concluded that "the [A]pplicable Premium is not triggered and is not, therefore, due and owing."   11/5/21 Tr. 109:20-24 (A.2830).

Nothing in section 1124(2) supports the bankruptcy court's conclusion that reinstatement operates as a time-travel machine.   Section 1124(2) provides that a plan may reinstate the maturity of an obligation.   It does not, however, provide that a plan may alter the amount of the obligation, or strip away portions of the claim the debtor does not like.   To the contrary, section 1124(2)(E) makes clear that the plan cannot "otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest."   In short, section 1124 is not a claims disallowance provision—that role is left to section 502(b) and the handful of other provisions in the Code that specifically address claims disallowance.   *See* pp. 23-34, *supra.*

To be sure, section 1124(2) operates to return a debtor to pre-default conditions in one respect:  The plan must "reinstate[] the maturity of such claim . . . as such maturity existed before such default" that gave rise to acceleration.   11 U.S.C. § 1124(2)(B).   But although "reinstat[ing] the maturity" of the First Lien Notes would permit the Debtors to avoid their obligation to pay the accelerated

principal amount *immediately*, it does not modify their obligation to pay the Applicable Premium that is expressly "[i]n addition" to that accelerated amount. First Lien Notes Indenture § 6.02.  A.1566.

The bankruptcy court's turn-back-the-clock theory has been rejected by numerous courts.  As one court recently explained:

> At its base, § 1124 concern[s] de-acceleration and reinstatement of the original maturity date of a loan upon curing of a default.  [It] say[s] nothing about eliminating otherwise enforceable, accrued default interest which would have to be paid as part of the default cure.  The key here is that § 1124(2) applies to accelerated payment, and that is all it does.  The point of § 1124(2) is to deaccelerate—it does not invalidate all *ipso facto* defaults, it only reverses acceleration arising out of *ipso facto* defaults.  Section 1124 simply provides no basis to nullify the post-petition default interest claimed by [a creditor] to the extent it is otherwise allowable under [the creditor's] loan documents and applicable nonbankruptcy law.

*In re John Q. Hammons Fall 2006, LLC*, 612 B.R. 779, 804–05 (Bankr. D. Kan.), *as amended* (Jan. 21, 2020), *on reconsideration*, 614 B.R. 371 (Bankr. D. Kan. 2020) (internal quotations and footnotes omitted).

Similarly, the Southern District of New York bankruptcy court recently explained:

> several recent appellate decisions from other circuits have centered on the separate roles of default interest and acceleration as consequences of default in the context of the debtor's ability to "turn back the clock" pursuant to 1123(a)(5)(G) and 1322(b)(3), which authorize a Chapter 11 or 13 plan to "provide for curing or waiving any default."  *See In re New Investments, Inc.*, 840 F.3d 1137 (9th Cir. 2016); *Anderson v. Hancock*, 820 F.3d 670, 672 (4th Cir. 2016).  Both courts ruled that while a debtor may utilize bankruptcy to cure a pre-petition default in

46

order to de-accelerate the loan, a debtor is not entitled to "cure" the imposition of default interest following the default.

*In re 1111 Myrtle Ave. Grp., LLC*, 598 B.R. 729, 737 n.4 (Bankr. S.D.N.Y. 2019).

In *New Investments*, the Ninth Circuit rejected the debtor's argument that reinstatement under section 1124(2) eliminated the debtor's obligation to pay default interest and fees. The court held:

> the borrower does not effectuate a cure merely by paying past due installments of principal at the pre-default interest rate. Rather, the borrower's cure obligations may also include late charges, attorneys' and trustee's fees, and publication and court costs. . . . It is only once these penalties are paid that the debtor can return to pre-default conditions as to the remainder of the loan obligation.

840 F.3d at 1141-42 (internal quotations and citations omitted).[43]

Finally, the one authority on which the bankruptcy court relied for its turn-back-the-clock theory—*Onco*—provides no support. In that case, the senior creditor *conceded* that cure and reinstatement under section 1124(2) relieved the debtor from satisfying a make-whole. 316 B.R. at 166. Thus, the key issue in this case was not contested. The only issue actually contested in *Onco* was whether the creditor could recover the make-whole from other, subordinated creditors. The court held that the

---

[43]   Similarly, in *Anderson v. Hancock*, the Fourth Circuit held that "cure" under section 1322(b)(3) "focuses on the ability of a debtor to decelerate and continue paying a loan, thereby avoiding foreclosure." 820 F.3d at 674. The court rejected the debtors' position that "a cure thus unravels every consequence of default, and returning to pre-default conditions for an increased interest rate requires decreasing the interest rate back to its pre-default amount." *Id.* at 675 (internal quotations and punctuation omitted).

language of the applicable subordination agreement—which differs materially from the intercreditor language in this case—did not allow such recovery. *Id.* at 166-67. In what was arguably dicta, the court then stated that its conclusion as to the agreement's meaning was consistent with "the intended effect of reinstatement under section 1124(2)." *Id.* at 167. The *Onco* court's sole purported support for that proposition was the Second Circuit's decision in *Taddeo*. But in *Taddeo*—a chapter 13 case—the only issue was whether the debtor could de-accelerate the loan; there was no contention that the debtor could also avoid payment of any additional charges that arose on account of the default. *See* 685 F.2d at 26-27. Nothing in the plain language of section 1124 (or anywhere else in the Code) provides for the disallowance of claims simply because they are "unimpaired."

### b.    Section 1123(d) Requires Payment Of The Applicable Premium

The analysis under section 1124(2) should end here: Even if section 1124(2) permits the Debtors to ignore their bankruptcy default, it does not override the Debtors' obligation to pay the Applicable Premium (or at a minimum to include it in the reinstated principal amount of the First Lien Notes). But to the extent section 1124(2) leaves any doubt, section 1123(d) dispels it.

Bankruptcy Code section 1123(d) provides that the "amount necessary to cure [a] default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law." Thus, curing the Debtors' default would require

payment of the Applicable Premium, as the amount provided in the "underlying agreement" governing the First Lien Notes.   The bankruptcy court's decision "ignore[d] the clear mandate of § 1123 that allows a creditor to demand default-rate interest as a condition for reinstating the loan." *In re Sagamore Partners, Ltd.*, 620 F. App'x 864, 869 (11th Cir. 2015); *see also In re 1 Ashbury Ct. Partners, L.L.C.*, 2011 WL 4712010, at *4 (Bankr. D. Kan. Oct. 5, 2011) (section 1123 provides that "cure and reinstatement require[s] more than simply rolling back the clock as some courts had held").

### 3.    The Plan Does Not Compensate The First Lien Noteholders For Reasonable Reliance Damages

Reinstatement of the First Lien Notes was also impermissible because the Plan makes no effort to "compensate[]" the First Lien Noteholders "for any damages incurred as a result of any reasonable reliance . . . on such contractual provision" that entitles them to demand or receive accelerated payment. 11 U.S.C. § 1124(2)(C). Because compliance with section 1124(2)(C)'s compensation obligation is a mandatory prerequisite to reinstatement, the Plan's failure to provide for such compensation means that the First Lien Notes cannot be deemed unimpaired.

The bankruptcy court discounted that failure by suggesting that the First Lien Noteholders had not asserted "that they have any uncompensated damages." 11/5/21 Tr. 110:14-18 (A.2831).  In fact, however, the First Lien Noteholders specifically argued that the Plan's failure to provide compensation for any reliance damages was

a basis to deny confirmation.  ECF 4709 at 21 (A.1386).  And they explained that damages could be required, among other bases, (i) in an amount equal to the Applicable Premium, which the Debtors agreed would provide a "reasonable calculation of each holder's lost profits" in the event of acceleration of the First Lien Notes, First Lien Notes Indenture § 6.02; or (ii)  to compensate the First Lien Noteholders for the differential between the interest rate on the First Lien Notes and the higher interest rate that would have been required in the absence of the Debtors' agreement to pay the Applicable Premium upon a bankruptcy filing.  *Id.* at 22 (A.1387).  The bankruptcy court appears to have simply overlooked the First Lien Noteholders' arguments on this point.[44]

---

[44] The First Lien Noteholders also noted that Judge Isgur's oral confirmation ruling in *EP Energy* highlighted the Debtors' failure to comply with section 1124(2)(C).  The Debtors had invoked that oral ruling, in which Judge Isgur concluded that certain secured notes could be reinstated without payment of a premium that had been triggered when those notes were accelerated upon the bankruptcy filing.  As noted above (p. 32 n.39, *supra*), that oral ruling offers limited persuasive support for the bankruptcy court's reinstatement conclusion here, given that Judge Isgur vacated his ruling shortly after it was entered, and the ruling was therefore never subject to appeal.  *See* Order Vacating Order Confirming Plan, *In re EP Energy Corp.*, No. 19-35654 (Bankr. S.D. Tex. Mar. 23, 2020; D.I. 1103 in that case).  But even as Judge Isgur permitted reinstatement, he also made clear that the plan needed to provide for payment of any section 1124(2)(C) reliance damages established by the noteholders in post-confirmation proceedings.  *See* ECF 5017 Ex. 1 (A.2713) (March 6, 2020 *EP Energy* transcript at 19), *see also EP Energy* Confirmation Order ¶ K.8 (Mar. 12, 2020; D.I. 1049 in that case) (establishing procedures for post-confirmation litigation).  Here, the Debtors' Plan makes no provision for payment of reliance damage, and thus is facially non-compliant with section 1124(2)(C).

### 4.    At A Minimum, The Debtors' Cure Obligation Requires Payment Of Interest On The Applicable Premium During The Pendency Of Their Bankruptcy Cases

At a bare minimum, the Debtors' cure obligation requires payment of interest on the Applicable Premium that has accrued during their bankruptcy cases.  As of the filing of this brief, that amount would be approximately $15 million, or less than 2% per annum based solely on the pre-bankruptcy principal of $495 million.

Here, one effect of the Debtors' default is that the Applicable Premium became immediately due and owing, but *another* effect is that interest has accrued on the Applicable Premium, which was automatically added to the outstanding principal amount of the First Lien Notes on the Petition Date.  The Debtors have never paid any of the additional interest that has accrued on the Applicable Premium since their bankruptcy filing.  Nor have the Debtors paid any default interest to the First Lien Noteholders during the 19-month pendency of their cases, because the Applicable Premium and interest thereon—rather than default interest—are the additional charges that the parties expressly agreed to in the First Lien Notes Indenture (other than the customary right to reimbursement of fees and expenses). This is so even though some other secured creditors have received postpetition interest at their default rate.  *See* ECF 586 at 28 (A.0284) (providing for an additional 2% of postpetition interest—above the non-default rate—for credit agreement lenders).

Although this alternative argument was pressed below, the bankruptcy court appears to have overlooked it.  For their part, the Debtors appear to have adopted a circular theory of cure, under which reinstatement operates *retroactively* and allows them to proceed as though the First Lien Notes had never been accelerated.  On that (mistaken) view, the Debtors could invoke reinstatement to return to pre-default conditions without first satisfying the cure obligations that were triggered by their default.  The Debtors appeared to assume that (i) payment of the Applicable Premium is not required to reinstate the First Lien Notes; and (ii) for that reason, they may proceed as though the Applicable Premium *never* came due, and thus refuse to pay the accrued interest on the Applicable Premium.

But even if the Debtors were correct on proposition (i)—and they are not, for the reasons we have explained above—proposition (ii) still would not follow.  Under section 1124(2)(A), payment of cure is a *prerequisite* to reinstatement.  The Debtors must therefore cure their separate default in payment of interest on the Applicable Premium *before* the First Lien Notes could ever be reinstated.  They may not simply assume the conclusion of reinstatement—that, in their view, it is as though the Applicable Premium never came due—and then use that conclusion to avoid their cure obligations.

When addressing claims for default-rate interest, courts have rejected the "time travel" sleight-of-hand attempted by the Debtors here.  In that context, debtors

have sometimes argued that cure and reinstatement permits them to nullify all consequences of a default, including the application of a contractual default rate of interest. But as discussed above (pp. 45-48), courts have rejected those arguments, particularly since the enactment of section 1123(d), concluding instead that "the debtor can return to pre-default conditions, which can include a lower, pre-default interest rate, *only* by fulfilling the obligations of the underlying loan agreement and applicable state law." *New Invs.*, 840 F.3d at 1142 (emphasis added).[45]

In other words, a debtor's cure obligation is evaluated under the parties' contract *at the time the debtor proposes to cure and reinstate*. *Id.* at 1141-42.[46] As one bankruptcy court put it: "The arrearage" that a debtor must pay to reinstate a claim "must be determined under the terms of the agreements and regulations applicable to the debt as it exists prior to its 'de-acceleration,' rather than by looking to what might have been had no default occurred. *Not until the default is cured are its consequences undone*." *In re Carpenter*, 331 B.R. 529, 534 (Bankr. D. Conn.

---

[45]   The Ninth Circuit in *New Investments* overruled that court's prior decision in *In re Entz-White Lumber & Supply, Inc.*, 850 F.2d 1338 (9th Cir. 1988), which had held—prior to the enactment of 11 U.S.C. § 1123(d)—that curing a default permits a debtor "to avoid all consequences of the default—including higher post-default interest rates." 850 F.2d at 1342.

[46]   *See also*, *e.g.*, *In re Sagamore Partners, Ltd.*, 620 F. App'x at 869; *General Growth Props., Inc.*, 451 B.R. at 331; *In re Moshe*, 567 B.R. 438, 445-47 (Bankr. E.D.N.Y. 2017); *In re 139-141 Owners Corp.*, 306 B.R. 764, 768 (Bankr. S.D.N.Y. 2004), *aff'd in relevant part*, 313 B.R. 364 (S.D.N.Y. 2004).

2005) (emphasis added) (citation omitted); *see also John Q. Hammons*, 612 B.R. at 804–05 (requiring default interest even when loan is de-accelerated under § 1124(2)); *General Growth Props.*, 451 B.R. at 327–31 (same, holding "right to receive default interest derives from the Debtors' reinstatement of the loan under § 1124"); *In re 1111 Myrtle Ave. Grp., LLC*, 598 B.R. at 737 n.4 ("while a debtor may utilize bankruptcy to cure a pre-petition default in order to de-accelerate the loan, a debtor is not entitled to 'cure' the imposition of default interest following the default").[47]

Those observations are equally applicable here.  Today, the Debtors are unquestionably in arrears in paying the interest due on the Applicable Premium.

---

[47]  Indeed, the retroactive reimagining that the Debtors advocate for here lacks any logical stopping point.  As one commentator has explained:

> Pretending the contract is not in default (when it is) and thereby invoking the predefault rate in violation of the contract cannot be called a contractual theory of cure.  Indeed, subjunctive work of this sort (reimagining the world "as if" the contract were never breached) threatens to produce a cure price of zero.  That is, if we can pretend the debtor never defaulted for the purpose of triggering postdefault interest, we can pretend no default for other reasons as well.  Namely, we can pretend that the secured party was paid all amounts due and owing under the contract, plus attorneys' fees.  If we unleash subjunctive imagination, there is no limit, save that which imagination chooses to impose upon itself, in reordering the contractual rights of the parties.  Reimagining the world and then proclaiming that the contract is not in default does not constitute following the contract.

David Gray Carlson, *Rake's Progress: Cure and Reinstatement of Secured Claims in Bankruptcy Reorganization*, 13 Bankr. Dev. J. 273, 333-34 (1997).

Rather than curing that default, however, they propose that their payment obligation can be nullified through reinstatement of the First Lien Notes. But cure must *precede* reinstatement. *See Carpenter*, 331 B.R. at 534. Thus, at an absolute minimum, the First Lien Noteholders must be treated as impaired absent payment of the interest that accrued on the Applicable Premium during the pendency the bankruptcy case, at least through the Effective Date of the Plan.

### D. The Plan Impairs The First Lien Noteholders By Extinguishing Their Rights Under The Second Lien Intercreditor Agreement

Apart from the Plan's treatment of the Applicable Premium, reinstatement of the First Lien Notes is also impermissible because the Plan strips the First Lien Noteholders of important intercreditor rights vis-à-vis holders of the Debtors' subordinated Second Lien Notes, as set forth in the Second Lien Intercreditor Agreement. This alteration of the First Lien Noteholders' "legal, equitable, or contractual rights," 11 U.S.C. § 1124(2)(E), is incompatible with reinstatement and not otherwise permitted by the Bankruptcy Code.

### 1. The Plan Insulates The Second Lien Noteholders From Intercreditor Liability

Under the Plan, the Second Lien Noteholders received distributions of "New Second Lien Notes." *See* Plan Arts. I.A.254, III.B.4.c; *id.* Ex. 2 (A.3077, 3111, 3218-19). As set forth below, those distributions would be subject to the Second Lien Intercreditor Agreement. The Plan, however, purports to extinguish the First

Lien Noteholders' rights by broadly exculpating the Second Lien Noteholders from

any intercreditor liability to the First Lien Noteholders:

> [T]he holders of First Lien Notes shall not have any claims (including, without limitation, for turnover of payments) against the holders of Second Lien Notes (or the Second Lien Indenture Trustee or the Second Lien Collateral Agent) under the existing Intercreditor Agreement in any way arising from, relating to or as a result of the Debtors' restructuring (including, without limitation, of the First Lien Notes and Second Lien Notes), the Plan (including, without limitation, the treatment of the existing First Lien Notes Claims or Second Lien Notes Claims under the Plan or the making of distributions to the holders of the existing First Lien Notes Claims or Second Lien Notes Claims in accordance with the Plan), the distribution of property by the Debtors under the Plan, any related document or any order of the Bankruptcy Court, or any other transaction, agreement, event, omission or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, including without limitation the payment of any reasonable and documented out-of-pocket fees or expenses of the advisors to the Ad Hoc Second Lien Notes Group or the payment of the Second Lien Notes Indenture Trustee Fees, which payments shall be final and not subject to disgorgement, turnover, recovery, avoidance, recharacterization or any other similar claim.

*Id.* Art. IV.GG (A.3162-63).

Other provisions of the Plan are to the same effect.  The Plan states that the

Second Lien Noteholders' recovery under the Plan "shall not be deemed a

distribution or payment in respect of Shared Collateral," *id.* Art. III.B.4.c (A.3111),

and that "[t]he financial accommodations to be extended pursuant to the New Second

Lien Notes . . . shall not be subject to avoidance, recovery, turnover,

recharacterization, or subordination (including equitable subordination) for any

purposes whatsoever." *Id.* Art. IV.H.5 (A.3133-34).  The Plan further provides that

56

adequate protection payments made in respect of the Second Lien Notes shall not be "subject to disgorgement, turnover, recovery, avoidance, recharacterization or any other similar claim by any party under any legal or equitable theory." *Id.* Art. III.B.4.b (A.3111). And the bankruptcy court's Confirmation Order swept even more broadly, providing that "Holders of First Lien Notes Claims shall not have, and shall hereby be prohibited and enjoined from asserting, any claims (including, without limitation, for turnover of payments) against any of the Prepetition Secured Parties"—including the Second Lien Noteholders—"under any of the Intercreditor Agreements in any way arising from, relating to, or as a result of the Debtors' restructuring, the Plan, the distribution of property or any payments made under the Plan." Confirmation Order ¶ 253 (A.3394).

## 2. The Plan Improperly Eliminates Important Intercreditor Rights Of the First Lien Noteholders

The Plan's exculpatory provisions are incompatible with reinstatement because they modify the First Lien Noteholders' rights under the Second Lien Intercreditor Agreement,[48] which governs the relative rights of the Debtors' First Lien and Second Lien debt.

Section 4.2(b) of the Second Lien Intercreditor Agreement provides that, "so long as the Discharge of First Lien Obligations has not occurred, if in any Insolvency

---

[48]   *See* ECF 4719, Ex. 8 (A.2291).

or Liquidation Proceeding the Second Lien Collateral Agent or any other Second Lien Claimholders shall receive any distribution of money or other property in respect of or on account of the Collateral . . . such money, other property or amounts shall be segregated and held in trust and forthwith paid over to the First Lien Collateral Agent for the benefit of the First Lien Claimholders in the same form as received." A.2316. Under the Second Lien Intercreditor Agreement, "Discharge" of the senior first lien obligations is defined to require, among other things, "payment in full in cash." Second Lien Intercreditor Agreement § 1.1 (A.2299-2230). "Discharge" of the First Lien Notes has not occurred for two reasons: (1) the First Lien Notes have not been paid in cash, and (2) the First Lien Noteholders will receive nothing on account of the Applicable Premium under the Plan. Thus, the bankruptcy court's statement that "the holders of First Lien Notes Claims shall have received recovery in full pursuant to the terms of this Plan" is erroneous. *See* Plan Art. IV.GG (A.A.3162-63).

The New Second Lien Notes that are to be issued to the Second Lien Noteholders under the Plan are subject to Section 4.2(b) of the Second Lien Intercreditor Agreement's turnover obligation. They represent a "distribution of . . . property" to the Second Lien Noteholders in an "Insolvency . . . Proceeding," which is unquestionably "on account of the Collateral" that is subject to the Second Lien Intercreditor Agreement. Second Lien Intercreditor Agreement § 4.2(b) (A.2316).

Indeed, the Plan acknowledges that the New Second Lien Notes are distributed to the Second Lien Noteholders "in full and final satisfaction, settlement, release, and discharge" of their claims on the existing Second Lien Notes—that is, on account of their secured claims against the Debtors. Plan (ECF 6510) Art. III.B.4.c (A.3111). Moreover, the New Second Lien Notes are secured by the very same Collateral, and thus derive their value directly from it. *Id.* 4 (A.3224) ("Liens on the ***same collateral*** as secures the existing Second Lien Notes" (emphasis added)). Until the First Lien Notes are discharged through payment in full in cash, the Second Lien Noteholders must turn over any such distribution of property—and the Plan's contrary determination is therefore an impermissible alteration of the First Lien Noteholders' rights.

In concluding otherwise, the bankruptcy court reasoned that "[t]he issuance of new debt" to the Second Lien Noteholders "is not a distribution of debtor's money or property." 11/5/21 Tr. 112:10-14 (A.2833).[49] But Section 4.2's turnover

---

[49] The bankruptcy court cited two cases for this proposition, neither of which is persuasive. In *Energy Future Holdings*, the relevant intercreditor agreement limited the senior creditors' rights to collateral and its "proceeds." *In re Energy Future Holdings Corp.*, 546 B.R. 566, 571-72 (Bankr. D. Del. 2016), *aff'd*, 773 F. App'x 89 (3d Cir. 2019). Here, by contrast, the Second Lien Intercreditor Agreement mandates the turnover of "***any*** distribution of money or other property ***in respect of or on account of*** the Collateral. § 4.2(a) (A.2316) (emphasis added). Clearly, new Second Lien Notes secured by the Collateral are in respect of, or on account of, the Collateral.

obligation is not triggered only by a distribution of the *Debtors'* property; it applies to *any* distribution of property in an insolvency proceeding that is "on account of the Collateral." Second Lien Intercreditor Agreement § 4.2(b) (A.2316). And there can be no doubt that the new notes distributed to the Second Lien Noteholders are a form of property (even if not a distribution of the Debtors' property), and that they are being distributed to the Second Lien Noteholders on account of the Collateral. Indeed, the treatment that the Second Lien Noteholders are receiving under the Plan is substantially superior to that being received by unsecured creditors with claims against essentially the same Debtors, and the only reason for that superior treatment is the Collateral. *Compare* Disclosure Statement, ECF 2917 at 6 (A.0498) (projecting Class 4 Second Lien Noteholder recoveries at 100%) *with id.* at 7 (A.0499) (projecting Class 5 Guaranteed Unsecured Notes Claims recoveries at 57% to 86%).

---

The bankruptcy court's reliance on *Windstar* for the proposition that the new Second Lien Notes are not the Debtors' property is even less on point. *See* 11/5/21 Tr. at 111:17 – 112:1 (A.2832-33) (citing *In Re Windstar*, 554 F.3d 382, 400 (3d Cir. 2009)). *Windstar* was a preference case involving the "earmarking" doctrine, which had nothing to do with intercreditor disputes. In any event, nothing in the Second Lien Intercreditor Agreement requires that the property the Second Lien Noteholders receive be the *Debtors'* property in order for it to be subject to turnover. The property only need be "in respect of, or on account of, the Collateral."

The bankruptcy court also emphasized that "the proposed new second lien notes will be subject to the second lien inter-creditor agreement," apparently adverting to the second sentence of Section 4.2(b) of the Second Lien Intercreditor Agreement, which provides that "[a]ny lien received by" the Second Lien Noteholders "in respect of any of the Second Lien Obligations in any Insolvency . . . Proceeding shall be subject to the terms of this Agreement." A.2316; *see also* 11/5/21 Tr. 112:15-20 (A.2833). And the court suggested that "nothing in the inter-creditor agreement prohibits issuance of new debt obligations so long as they remain junior to the first lien obligations," 11/5/21 Tr. 112:15-20 (A.2833), an apparent reference to the "Reorganization Securities" provision in Section 6.6 of the Second Lien Intercreditor Agreement. That provision addresses new debt obligations distributed in a bankruptcy case, and mandates that the provisions of the Second Lien Intercreditor Agreement continue to apply to such new obligations:

> If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a plan of reorganization or similar dispositive restructuring plan, arrangement, compromise or liquidation or similar dispositive restructuring plan, both on account of First Lien Obligations and on account of Second Lien Obligations, then, to the extent the debt obligations distributed on account of the First Lien Obligations and on account of the Second Lien Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

Second Lien Intercreditor Agreement § 6.6 (A2326).

61

As a logical matter, however, these two provisions merely serve to restrict what securities may be *distributed* to the Second Lien Noteholders, in the first instance, under a plan of reorganization.  They do not suggest that the Second Lien Noteholders are entitled to *retain* any such securities in violation of the turnover requirement imposed by Section 4.2.

The Plan also alters the First Lien Noteholders' intercreditor rights with respect to the adequate protection payments that the Second Lien Noteholders received during the pendency of the Debtors' case.   Under the Second Lien Intercreditor Agreement, to the extent that "the First Lien Claimholders do not receive payment in full in cash of all First Lien Obligations upon the effectiveness of the plan of reorganization," adequate protection payments received by the Second Lien Noteholders "*shall* be paid over."   Second Lien Intercreditor Agreement § 6.3(b)(ii) (A.2325) (emphasis added).[50]

---

[50]  The "Pay-Over Amount" is defined as "the lesser of (x) the Second Lien Adequate Protection Payments received by the Second Lien Claimholders and (y) the amount of the short fall (the "Short-Fall") in payment in full of the First Lien Obligations," with the proviso that, "to the extent any portion of the Short-Fall represents payments received by the First Lien Claimholders in the form of promissory notes, equity or other property equal in value to the cash paid in respect of the Pay-Over Amount, the First Lien Claimholders shall, upon receipt of the Pay-Over Amount, transfer those promissory notes, equity or other property, equal in value to the cash paid in respect of the Pay-Over Amount, to the applicable Second Lien Claimholders pro rata in exchange for the Pay-Over Amount."  Second Lien Intercreditor Agreement § 6.3(b)(ii) (A.2325).

The bankruptcy court held that the Second Lien Noteholders have no liability under Section 6.3(b)(ii) because, following reinstatement, the First Lien Noteholders "cannot claim that they have been paid less than full value and seeking recovery from the second lien lenders."  11/5/21 Tr. 113:3-6 (A.2834).  But that is a non sequitur:  Even assuming (counterfactually) that reinstatement without payment of the Applicable Premium represents "full value," the Second Lien Noteholders' intercreditor obligations persist until "Discharge" of the First Lien Obligations, which requires, among other things, "payment in full *in cash*."  Second Lien Intercreditor Agreement § 1.1 (A.2299-2230) (emphasis added).  To state the obvious, reinstatement of the First Lien Notes pursuant to the Plan is not repayment in full in cash.  It therefore follows that the Second Lien Noteholders' intercreditor obligations—including the obligation to pay over adequate protection payments under Section 6.3(b)(ii)—necessarily remain in place.

Moreover, the bankruptcy court erred in concluding that, if the Debtors' obligation to pay the Applicable Premium can be avoided through reinstatement, then that amount would not be recoverable from the Second Lien Noteholders.  Under the Second Lien Intercreditor Agreement, if any amounts "to be paid by a First Lien Obligor . . .  are disallowed by order of any court of competent jurisdiction, including by order of a court presiding over an Insolvency or Liquidation Proceeding," such amounts "shall, as between the First Lien

Claimholders and the Second Lien Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the 'First Lien Obligations.'" Second Lien Intercreditor Agreement § 1.1 (A.2302). Thus, the Second Lien Noteholders' turnover obligation would encompass not only the original principal amount of the First Lien Notes, but also the Applicable Premium and interest thereon.

The bankruptcy court rejected that conclusion because, in its view, reinstatement of the First Lien Notes meant that "any consequences from any alleged default as it relates to the second lien creditors are reversed." 11/5/21 Tr. 112:24 - 113:1 (A.2833-34). It attributed that conclusion to a single, non-precedential bankruptcy court decision, *Onco*, which rejected a senior creditor's attempt to recover a prepayment charge from a subordinated creditor following reinstatement of the senior creditor's claim vis-à-vis the debtor. *See* 316 B.R. at 167. But the court in that case did not set out a general rule of law from which parties cannot agree to depart. Rather, it construed the specific contractual agreements at issue in that case to determine whether they made the subordinated creditor "subordinate to any amount not paid by the Debtor if the Debtor *ever* owed such amount." *Id.* In undertaking that inquiry, the court looked to section 1124(2)'s reinstatement provision and the policies underlying it, which ultimately led the court to reject the senior creditor's "strained interpretation that once a default exists, it and all of [its]

consequences are frozen in time for all purposes and all parties except a debtor who" has reinstated the claim. *Id.*

Critically, *Onco* did not consider any contractual provision confirming that amounts held to be unrecoverable vis-à-vis the debtor would remain recoverable from the subordinated creditor. Here, by contrast, Section 1.01 of the Second Lien Intercreditor Agreement contains just such a provision in the definition of "First Lien Obligations." A.2302. For that reason, the bankruptcy court's reliance on *Onco* was misplaced.

In any event, nothing in section 1124(2) purports to alter the contractual relationships between two creditors. To the contrary, section 1124(2)(E) requires that the Plan "not otherwise alter the legal, equitable, or contractual rights to which" the First Lien Noteholders are entitled. Moreover, section 510(a) requires that subordination agreements be honored in bankruptcy. Thus, even if the Debtors can avoid their own obligation to pay the Applicable Premium, that benefit does not extend to non-debtor third parties who are contractually obligated to honor it. The Second Lien Intercreditor Agreement treats the First Lien Noteholder's contractual entitlements from the Debtors as the measure of the Second Lien Noteholders' intercreditor liability, even if those entitlements turn out to be unenforceable as against the Debtors.

65

## CONCLUSION

The judgment of the bankruptcy court should be reversed as to the Plan's treatment of the Applicable Premium and the First Lien Noteholders' rights under the Second Lien Intercreditor Agreement.

DATED:  May 17, 2022             QUINN EMANUEL URQUHART &
                                 SULLIVAN, LLP

                                 By:  */s/ K. John Shaffer*
                                      K. John Shaffer
                                      Benjamin I. Finestone
                                      865 S Figueroa St., 10th Floor
                                      Los Angeles, CA 90017
                                      Telephone: (213) 443-3000
                                      Facsimile: (213) 443-3100
                                      johnshaffer@quinnemanuel.com

                                      SULLIVAN HAZELTINE ALLINSON LLC
                                      William D. Sullivan
                                      William A. Hazeltine (No. 3294)
                                      919 North Market Street, Suite 420
                                      Wilmington, DE 19801
                                      Telephone: (302) 428-8191
                                      Facsimile: (302) 428-8195
                                      bsullivan@sha-llc.com

                                      *Counsel to Appellant Ad Hoc First Lien*
                                      *Notes Group*

**RULE 8015(h) CERTIFICATION**

Pursuant to Fed. R. Bankr. P. 8015(h), I certify that this brief complies with the Type-Volume Limitation of Fed. R. Bankr. P. 8015(a)(7), as modified by D.I. 30 ¶ 7 (permitting 17,000 words).  This brief contains 16,814 words, excluding parts of the document excluded by Fed. R. Bankr. P. 8015(g).

DATED:  May 17, 2022

*/s/ K. John Shaffer*
K. John Shaffer