Tab 13

```
 1                     UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2
                                        .    Chapter 11
 3     IN RE:                           .
                                        .    Case No. 20-12522 (JTD)
 4     MALLINCKRODT PLC, et al.,        .
                                        .
 5                                      .    Courtroom No. 5
                                        .    824 North Market Street
 6                                      .    Wilmington, Delaware 19801
                                        .
 7                        Debtors.      .    Friday, November 5, 2021
 8     . . . . . . . . . . . . . . . .       9:30 A.M.

 9                        TRANSCRIPT OF HEARING
                 BEFORE THE HONORABLE JOHN T. DORSEY
10                  UNITED STATES BANKRUPTCY JUDGE

11                   CONFIRMATION HEARING (DAY 4)

12     APPEARANCES:

13
       For the Debtor:          Michael J. Merchant, Esquire
14                              RICHARDS, LAYTON & FINGER, P.A.
                                Rodney Square
15                              920 N. King Street
                                Wilmington, Delaware 19801
16
                                - and -
17
                                Emil Kleinhaus, Esquire
18                              WACHTELL, LIPTON, ROSEN & KATZ
                                51 West 52nd Street
19                              New York, New York 10019

20
       Audio Operator:          Jason Spencer, ECRO
21
       Transcription Company:   Reliable
22                              1007 N. Orange Street
                                Wilmington, Delaware 19801
23                              (302)654-8080
                                Email: gmatthews@reliable-co.com
24
25     Proceedings recorded by electronic sound recording, transcript
       produced by transcription service.
```

A2722

```
 1  APPEARANCES (Cont'd):

 2  For the Ad Hoc First     Michael Cohen, Esquire
    Lien Lender Group:       GIBSON DUNN & CRUTCHER LLP
 3                           200 Park Avenue
                             New York, New York 10166
 4
 5                           - and -

 6                           Lawrence Robbins, Esquire
                             Donald Burke, Esquire
 7                           ROBBINS, RUSSELL, ENGLERT, ORSECK
                               UNTEREINER & SAUBER LLP
 8                           2000 K Street NW, 4th Floor
                             Washington, DC 20006
 9
    For the Ad Hoc           James Johnston, Esquire
10  Revolving Loan           JONES DAY LLP
    Participants:            555 South Flower Street, 50th Floor
11                           Los Angeles, California 90071

12
    For Deutsche Bank:       Andrew Zatz, Esquire
13                           WHITE & CASE LLP
                             1221 Avenue of the Americas
14                           New York, New York 10020

15  For Deerfield            Benjamin Beller, Esquire
    Partners:                SULLIVAN & CROMWELL LLP
16                           125 Broad Street
                             New York, New York 10004
17
18  For Columbus Hill        Paul Silverstein, Esquire
    Capital Management:      HUNTON ANDREWS KURTH LLP
19                           200 Park Avenue
                             New York, New York 10166
20
    For Attestor/Humana:     Benjamin McCallen, Esquire
21                           WILLKIE FARR & GALLAGHER LLP
                             787 Seventh Avenue
22                           New York, New York 10019

23  For Acthar Plaintiffs:   Donald Haviland, Esquire
                             HAVILAND HUGHES
24                           112 Haddontowne Court, Suite 202
                             Cherry Hill, New Jersey 08034
25
```

```
 1   APPEARANCES (Cont'd):

 2   For the Committee:        Evan Lazerowitz, Esquire
                               COOLEY LLP
 3                             55 Hudson Yards
                               New York, New York 10001
 4
                               - and -
 5
                               Patrick Birney, Esquire
 6                             ROBINSON & COLE LLP
                               280 Trumbull Street
 7                             Hartford, Connecticut 06103

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    CONTINUATION OF CONFIRMATION HEARING:

2    1. First Amended Joint Plan of Reorganization of Mallinckrodt
     PLC and its Debtor Affiliates under Chapter 11 of the
3    Bankruptcy Code [Docket No. 4508; Filed 9/29/21]

4        **Court's Ruling:  105**

5
     DEBTORS' WITNESS(s):
6
     **BRENDAN HAYES**
7
         Direct Examination by Mr. Kleinhaus          11
8
         Cross Examination by Mr. Robbins             16
9
         Redirect Examination by Mr. Kleinhaus        27
10

11

12   EXHIBITS:                                  ID    Rec'd

13   Debtor's Funded Debt Exhibits 26-28              9

14   Debtor's Funded Debt Exhibits 72-76              9

15   Debtor's Funded Debt Exhibits 77-82              9

16   First Lien Noteholders Phase One Exhibit 2       9

17   First Lien Noteholders Phase One Exhibit 3       9

18   Term Loan Group's Phase One Exhibit 1            9

19   Hayes Declaration:
         Paragraphs 1-2
20       Paragraphs 28-32
         Appendices C&D                              11
21

22

23

24

25

A2725

5

1          (Proceedings commence at 9:34 a.m.)

2               THE COURT:  All right.  Let me try this again.

3               This is Judge Dorsey.  We're on the record in

4     Mallinckrodt PLC, Case Number 20-12522.  For some reason, the

5     courtroom camera is not working, so I have my Zoom camera on,

6     so you see me from a strange angle here.  Maybe I'll just

7     turn this way, so everybody can see me.

8               Today was the day we set aside for the debtors'

9     objection to the first lien lenders' claim.  Is that correct?

10              MR. MERCHANT:  That's --

11              MR. KLEINHAUS:  Yes, Your Honor.

12              THE COURT:  All right.  Go ahead.

13              MR. MERCHANT:  I'm sorry, Your Honor.  Michael

14    Merchant from Richards, Layton & Finger.  I'll turn it over

15    to Mr. Kleinhaus.

16              THE COURT:  All right.  Before we begin, yesterday

17    we had some problems with people not having their lines muted

18    and speaking over the proceedings.  If it happens today, I

19    will just immediately kick out whoever does that.  It's not -

20    - it's just outright rude and it interrupts the proceedings.

21    So, if you're on the call and you're not speaking, make sure

22    your phone is muted or you're going to get kicked off and you

23    won't be let back in.

24              And with that, we'll turn it over to -- was it Mr.

25    Kleinhaus, are you going?

1          MR. KLEINHAUS:  Yes.  Good morning, Your Honor.

2   Emil Kleinhaus, Wachtell, Lipton, Rosen & Katz, co-counsel

3   for the debtors.

4          Your Honor, the purpose of the hearing today is to

5   address the treatment of the first lien notes under the first

6   amended plan.  A notice of supplemental agenda was filed at

7   Docket Number 5139.

8          As stated on the agenda, consistent with the

9   Court's guidance at the pretrial conference and consistent

10  with the pretrial order, the hearing today will focus on

11  reinstatement.  If the Court needs to address issues beyond

12  reinstatement to deal with the treatment of the first lien

13  notes, we will reconvene on a future date to cover additional

14  objections to the make-whole as well as the cram-down

15  dispute.

16         Before I jump into it, as a logistical matter, I

17  would ask that my colleague Mitchell Levy be given permission

18  to share his screen during the hearing.

19         THE COURT:  Yes.  Mr. Levy, can you raise your

20  hand, so we can find you on the screen?  There's 192 people.

21  It makes it easier.  There you go.  All right.  You're good

22  to go, Mr. Levy.

23         MR. KLEINHAUS:  Thank you, Your Honor.

24         Before jumping into the evidence and argument, I

25  want to take a quick step back and put this dispute in the

1   context of the debtors' capital structure as a whole.  As

2   discussed in Section 2(c) of the disclosure statement, the

3   debtors filed these cases with close to 5.3 billion of funded

4   debt outstanding.  And as shown in the slide on the screen,

5   the debtors had over 3.6 billion of first and second lien

6   secured obligations, including the 495 million of first lien

7   notes.  The debtors also had close to 1.7 billion of

8   unsecured funded debt.

9          And the good news is that, with the exception of

10   the first lien noteholders, the debtors have reached

11   agreements with all of their other groups of financial

12   creditors.  Those agreements, which are embedded in the plan,

13   cover around 94 percent of the debtors' funded debt,

14   including the vast majority of the first lien debt, all of

15   the second lien debt, and all the unsecured funded debt.

16          So what's left for today are first lien notes with

17   a principal amount of $495 million.  And under the proposed

18   plan, Article 3(b)(3)(c), the debtors propose to reinstate

19   those first lien notes, as long as reinstatement does not

20   require payment of a ninety-four-million-dollar make-whole

21   premium.

22          So, with that introduction, unless the Court has

23   preliminary questions, I would propose to present the fairly

24   targeted evidence relevant to reinstatement and then move on

25   to argument.

 1              THE COURT:  All right.  Go ahead.

 2              MR. KLEINHAUS:  In terms of evidence, Your Honor,

 3   starting with documents, I'm going to read a list of

 4   documents the debtors would move into evidence.  We did

 5   confer with the Ad Hoc Group of First Lien Noteholders, and

 6   they have confirmed that there's no objection to the

 7   admission of these particular exhibits.

 8              First of all, we have the first lien notes

 9   indenture, which is Debtors' Funded Debt Exhibit 26.

10              We then have the second lien indenture and

11   supplements to that indenture, which is Debtors' Funded Debt

12   Exhibit 27 and 72 to 76.

13              We then have the first lien intercreditor

14   agreement, which is First Lien Notes Phase One Exhibit 3.

15              We have the second lien intercreditor agreement,

16   which is First Lien Notes' Phase One Exhibit 2.

17              We have the first lien credit agreement, otherwise

18   known as the "incremental assumption agreement number four."

19   That's Debtors' Funded Debt Exhibit 28.

20              We have the first lien collateral agreement and

21   supplements.  That's Debtors' Funded Debtor Exhibits 77 to

22   82.

23              And then, finally, we have Mallinckrodt's monthly

24   operating report for October 2021, which is the Term Loan

25   Group's Phase One Exhibit 1.

 1              So I would move each of those evidence -- those

 2    documents into evidence.

 3              THE COURT:  All right.  Let me just confirm

 4    there's no objection.

 5         (No verbal response)

 6              THE COURT:  All right.  They're admitted without

 7    objection.

 8         (Debtors' Funded Debt Exhibit 26 through 28 received in

 9    evidence)

10         (Debtors' Funded Debt Exhibits 72 through 76 received

11    in evidence)

12         (Debtors' Funded Debt Exhibits 77 through 82 received

13    in evidence)

14         (First Lien Noteholders' Phase One Exhibit 2 received

15    in evidence)

16         (First Lien Noteholders' Phase One Exhibit 3 received

17    in evidence)

18         (Term Loan Group's Phase One Exhibit 1 received in

19    evidence)

20              MR. KLEINHAUS:  As for testimony, Your Honor,

21    Brendan Hayes of Guggenheim, who is, of course, present

22    today, submitted a declaration that will be his direct

23    testimony.  That's at Docket Number 5001.  We also filed a

24    proposed redacted version at Docket Number 5179.

25              For today, Your Honor, since we're only dealing

1   with reinstatement, the paragraphs of the declaration that we

2   will present as Mr. Hayes' direct testimony are Paragraphs 1

3   through 19, which provides relevant background; Paragraph 20,

4   which is a summary of Mr. Hayes' testimony on the make-whole;

5   and Paragraphs 28 to 32, which has the substance of Mr.

6   Hayes' testimony on the make-whole.

7           We will also introduce Appendices C and D to Mr.

8   Hayes' declaration, which consist of calculations discussed

9   in Paragraph 29 of the declaration.

10          So, to repeat, we are introducing Paragraphs 1

11  through 20, Paragraphs 28 through 32, and Appendices C and D,

12  in support of the debtors' case on reinstatement.

13          Mr. Hayes is here to be sworn and to attest that

14  those paragraphs reflect his testimony.  I also plan to ask

15  Mr. Hayes just a few additional questions to make a record as

16  to his expertise.

17          THE COURT:  All right.  Is there any objection to

18  the introduction of those provision -- those portions of the

19  declaration?

20          MR. ROBBINS:  There's no objection, Your Honor,

21  from the first lien noteholders, subject to cross-

22  examination.

23          THE COURT:  All right.  So those provision --

24  those paragraphs of the declaration, along with Appendices C

25  and D are admitted.

1

2          (Hayes Declaration Paragraphs 1 through 20, Paragraphs

3    28 through 32, and Appendices C and D received in evidence)

4               THE COURT:  Mr. Hayes, are you -- can you turn on

5    your camera, please?  Oh, there you are.  Mr. Hayes, can you

6    please raise your right hand, state your full name for the

7    record and spell your last name?

8               THE WITNESS:  Brendan Vincent Hayes, H-a-y-e-s.

9    BRENDAN HAYES, WITNESS FOR THE DEBTORS, AFFIRMED

10              THE COURT:  Thank you.

11              Go ahead, Mr. Kleinhaus.

12                        DIRECT EXAMINATION

13   BY MR. KLEINHAUS:

14   Q    Mr. Hayes, what is Guggenheim's role in this case?

15   A    We're advising the debtors.

16   Q    And in what capacity are you advising the debtors?

17   A    We're their investment banker.

18   Q    How long has Guggenheim been in that role?

19   A    Since September 2019.

20   Q    What is your personal role on the Guggenheim team

21   working on this case?

22   A    I lead the restructuring team, working on Mallinckrodt

23   within our broader team.

24   Q    Mr. Hayes, what is your educational background?

25   A    I have a Bachelor of Science from Tulane University and

1  an MBA from NYU.

2  Q    And following your education, can you please tell the

3  Court how you've spent your career?

4        (No verbal response)

5            THE COURT:  Mr. Hayes, we can't hear you.  Mr.

6  Hayes, are you muted?

7        (No verbal response)

8            THE COURT:  I guess I've lost my audio.  Hold on.

9  Wait.

10       (Court and court personnel confer)

11           THE COURT:  Can everyone hear me?

12       (No verbal response)

13           THE COURT:  Okay.  I cannot hear anybody else.

14  We're going to have to take a short recess and call our IT

15  folks and see if we can find out what's going on.  Let's take

16  a recess until ten o'clock, and then we'll jump back on.  I

17  apologize.

18       (Recess taken at 9:43 a.m.)

19       (Proceedings resume at 10 a.m.)

20           THE COURT:  All right.  This is Judge Dorsey.  Can

21  everyone hear me okay?

22           MR. KLEINHAUS:  I can, Your Honor.

23           THE COURT:  Okay.  I apologize.  We had some kind

24  of a glitch in our system here.  I'm still going to be on my

25  Zoom camera instead of the courtroom camera, but that's fine.

 1          So go ahead, Mr. Kleinhaus.

 2  BY MR. KLEINHAUS:

 3  Q    Okay.  I'm going to go back to the last question, Mr.

 4  Hayes.  Following your education, please tell the Court how

 5  you spent your career.

 6  A    After college, I worked at a small asset management firm

 7  in Boston.  I was, among other things, an analyst and a

 8  trader.

 9          Subsequent to that, I went to business school at NYU to

10  get my MBA.

11          After that, starting in 2004, I went to Lehman Brothers

12  and worked in the leverage finance group at Lehman Brothers,

13  until 2008, when Barclays acquired Lehman Brothers.  At that

14  point in time, up until 2010, I worked in the restructuring

15  and finance group at Barclays.

16          I then moved to work at Lazard in Lazard's

17  restructuring group.

18          And thereafter, in 2012, I went to join Millstein &

19  Company, which was a boutique investment bank just starting.

20  We did restructuring advisory work, similar to the work I do

21  today.  We sold that firm to Guggenheim in 2018, and I've

22  been at Guggenheim, in Guggenheim's restructuring group since

23  then.

24  Q    Mr. Hayes, as part of your work at Guggenheim, do you

25  regularly participate in helping companies raise debt

1  financing?

2  A    Yes, I do.

3  Q    Do you regularly advise companies in negotiating the key

4  terms of debt financing?

5  A    Yes, I do.

6  Q    Approximately how many companies have you advised in

7  negotiating debt financing terms?

8  A    I would say many dozens.

9  Q    Mr. Hayes, you have a section in your declaration,

10  starting at Paragraph 28, which has been admitted into

11  evidence, called the "Make-Whole Provisions."  Generally

12  speaking, what is a "make-whole provision"?

13  A    A make-whole provision generally is something that --

14  that essentially compensates bondholders or lenders for not

15  having been paid future interest payments; so in the case of

16  an early redemption, for example.

17  Q    Do you regularly advise companies in negotiating make-

18  whole provisions in corporate debt documents?

19  A    Yes, I do.  It's generally part of, you know, most

20  financings.

21  Q    Are you and your colleagues at Guggenheim regularly

22  involved in calculating make-whole amounts under corporate

23  debt documents?

24  A    Yes, we are.

25  Q    Approximately how many companies have you advised in

1  negotiating make-whole provisions?

2  A    I'd say most of the many dozens that I outlined,

3  certainly where bonds are involved.

4  Q    Do you consider yourself to be an experienced banker

5  when it comes to negotiating make-wholes and debt documents?

6  A    Yes, I do.

7           MR. KLEINHAUS:  Your Honor, at this point, given

8  that the substance of Mr. Hayes' testimony in his

9  declaration, which has been admitted into evidence, I'm not

10 going to repeat that.  But I would, based on the declaration

11 and the testimony today, tender Mr. Hayes as an expert in

12 corporate debt financing.

13           THE COURT:  Is there any objection?

14           MR. ROBBINS:  No objection, subject to cross-

15 examination, Your Honor.

16           THE COURT:  All right.  I will recognize him as an

17 expert in corporate debt financing.

18           MR. KLEINHAUS:  All right.  Your Honor, the -- as

19 I noted, the remainder of Mr. Hayes' testimony, including

20 with respect to make-wholes, is in his declaration.  So,

21 subject to other testimony on other issues, if necessary, I

22 will pass the witness.

23           THE COURT:  All right.  Thank you.

24           Mr. Robbins, are you doing the cross?

25           MR. ROBBINS:  Yes.  Thank you, Your Honor.

```
 1                          CROSS-EXAMINATION
 2   BY MR. ROBBINS:
 3   Q    Mr. Hayes, I'm not sure I can see you on the screen.
 4   Ah, there you are.
 5        Mr. Hayes, can you -- first of all, can you hear me all
 6   right?
 7   A    Yes, I can.
 8   Q    All right.  This is Larry Robbins, in case we haven't
 9   met before, representing the one L noteholders.  Just a few
10   questions, if I might, sir.
11        You testified on direct that you regularly advise
12   companies on make-whole provisions.  Is that right?
13   A    Yes.
14   Q    And so I assume that has caused you, has it not, to
15   review the text of other make-whole provisions or other
16   applicable premiums, however they're labeled.  You've seen a
17   number of these in the course of your career.  Is that right?
18   A    I have, though I say -- you know, I'd say they're
19   generally pretty standard, so I'm more focused on the
20   economic terms than I am on, you know, reading the specific
21   language.
22   Q    Well, I want -- I will, in a moment, direct you to some
23   language in the make-whole provision in the one L indenture,
24   and ask you to what extent it's standard.
25        But let's start with just your declaration for just a
```

1   moment.  Do you have that in front of you, sir?

2   A    I do.

3   Q    May I ask you to turn to Page 16, and in particular the

4   paragraph that Mr. Kleinhaus directed your attention to.

5   That's Paragraph 28.  Is that right?

6   A    Yes.

7   Q    And am I right, sir, that, before you prepared this

8   declaration and signed it, you had occasion to read the one L

9   indenture in this case?

10  A    Yes, I did.

11  Q    And you had an opportunity to discuss it with counsel,

12  if you so choose.  Is that right?  Chose.  Is that right?

13  A    Yes, I have opportunities to discuss it with counsel.

14  Q    And you satisfied yourself, before you prepared this

15  declaration, that you understood, certainly, the provisions

16  in the indenture that you were going to testify about in your

17  declaration, correct?

18  A    Yes.

19  Q    All right.  Let's start, if we could, at Paragraph 28.

20  And do you see, sir, in the middle of the paragraph, if I can

21  direct your attention, perhaps just below the middle of the

22  paragraph, there's a sentence that begins "The applicable

23  premium is determined in part."  Do you see that?

24  A    Yes.

25  Q    And when you use the words "in part," what you're saying

18

1   is that there's something else, besides what you're putting

2   down in this paragraph, that is part of the calculation of

3   the applicable premium.  Am I right?

4   A    I think that's what I meant, yeah, and I'd have to go

5   back and look at that actual definition.

6   Q    So are you able to say, as you sit here today, whether

7   there is, for example, some other way to calculate the

8   applicable premium apart from what you've presented in

9   Paragraph 28?

10  A    No, I can't tell you that there's a different way.

11  Q    Okay.  Do you understand, sir, that there are

12  alternative ways of calculating the applicable premium, and

13  that the actual figure is going to be the greater of those

14  two?  Do you understand at least that much?

15  A    Yes.  As I recall, there is a minimum of one percent --

16  Q    Okay.

17  A    -- I believe --

18  Q    All right.

19  A    -- it's in the definition of "applicable premium."

20  Q    And you describe the applicable premiums, sir, as

21  intended, you say, to compensate holders for future interest

22  that would not be paid on such notes.  Is that correct?

23  A    That's correct --

24  Q    And under --

25  A    -- yes.

1   Q    And under the formula that you recount here, one of the

2   inputs is the treasury rate, as defined in the relevant

3   indentures.  Is that right?

4   A    Yes.

5   Q    And generally speaking, am I correct, sir, that the way

6   this formula works is that, as the treasury rates get higher,

7   the applicable premium goes lower?

8   A    That's correct.

9   Q    And it follows, does it not, sir, that there are

10  scenarios in which the market rate, the interest rates for

11  treasuries, could go high enough that the applicable premium,

12  if calculated in the alternative that you recount in

13  Paragraph 28, approaches zero, does it not?

14  A    It's theoretically possible, yes, if --

15  Q    Indeed --

16  A    -- (indiscernible)

17  Q    -- it is not only theoretically possible, it is, indeed,

18  factually possible that the applicable premium in the -- if

19  calculated under the formula involving T bills, could be

20  zero, could it not?

21  A    It could, if rates are high enough.

22  Q    All right.  So, when the parties sat down to negotiate

23  this provision, they were, of course, in an -- what lawyers

24  sometimes like to call the "*ex-ante* position," right?  That's

25  just a fancy Latinism for the fact that, when these deals are

1   struck, you don't know how the future is going to unfold.  Am

2   I right?

3   A     That's correct, you don't know.

4   Q     Yeah, treasuries can go up, they can go down.  You don't

5   know what the refinancing market is going to look like at the

6   moment that you're contracting.  Right or wrong?

7   A     That's correct, you don't -- you can't predict the

8   future.

9   Q     And so what parties do is they try to anticipate the

10  possibility of what the world will look like in the event

11  that there is a default, correct?

12  A     Well, I think, yeah, among many other things, correct.

13  Q     Yeah.  And they can't know if there's going to be a

14  default, correct?

15  A     That's correct.

16  Q     And they can't know when the default might happen, if,

17  indeed, it happens at all, correct?

18  A     That's correct.

19  Q     And they can't know where the treasury markets will be

20  or where -- what the refinancing opportunities are going to

21  be, if and when there is a redeeming -- there is a default --

22  an event of default.  That's all correct, isn't it?

23  A     Yeah.  I think people have expectations, but they don't

24  know for sure and they can't predict the future.

25  Q     Right.  And -- all right.

1       Now, in Paragraph 29 and the paragraphs that follow,

2   what you were asked to do, am I right, sir, is you were asked

3   to calculate the applicable premium on a set of different

4   assumptions about when the effective date of the applicable

5   premium might be, correct?

6   A    Correct.

7   Q    Are you aware of anything in the text of the indenture

8   itself -- by the way, you would agree with me, just as a

9   business matter -- and I'm not asking for a legal opinion.

10  You're not a lawyer, are you?

11  A    I'm not.

12  Q    Okay.  I'm not asking for a legal opinion.  But as a

13  businessman or as somebody who advises companies, you would

14  agree with me, would you not, Mr. Hayes, that the place to

15  look when we want to figure out what an indenture means,

16  permits, prohibits, so on and so forth, is the text of the

17  indenture itself?  That's where we should look, correct?

18  A    Yes, you always start with the indenture.  But there are

19  obviously other considerations, to the extent that the

20  indenture doesn't give you the full answer.

21  Q    All right.  But you would at least start with the text,

22  right?

23  A    Yes.

24  Q    And if the text provides an answer -- and the text often

25  provides an answer, doesn't it?

1   A     It can.  It depends on the situation.

2   Q     I mean, that's why people negotiate these things.

3   They're writing down what they want to -- the commitments

4   they want to hold one another to, right?  That's why they --

5   that's why they invented fountain pens, right?

6   A     Yeah.  The purpose of the indenture is to -- to reflect

7   that negotiation.

8   Q     All right.  Now you've done this exercise in which

9   you've imagined, you've hypothesized a series of effective

10  dates that are well after the date, the actual event of

11  default in this case, correct?

12  A     Yes, if you're -- if you're talking about, you know, the

13  event of default being the filing of the bankruptcy case,

14  yes, we're talking about, you know, dates thereafter.

15  Q     And you would agree with me that the text of the

16  indenture tells us that the effective date for calculating

17  the applicable premium is, in fact, the date of the event of

18  default, not some date months afterwards.  Isn't that

19  correct?

20  A     I'd have to go back and look at the language of the

21  indenture.  I -- you know, my declaration uses two different

22  dates.  One is an assumed effective date of the plan, and the

23  other is the date of the filing.

24  Q     Now where did you get those dates, sir?

25  A     They were -- I guess they were requested by counsel to -

1  - as two dates to use to do the calculations.

2  Q    Well, did you ask them, sir, where did these dates come

3  from, guys?

4  A    Well, I -- I think I know where they come from, which is

5  one is the filing date and one is an assumed effective date.

6  Q    Are you aware of anything in the text of the indenture

7  that permits the applicable premium to be calculated based on

8  an effective date that is after the moment of the event of

9  default?  Can you point us to anything in the indenture that

10  does that?

11  A    Again, I'd have to go back and look at the indenture.  I

12  don't -- I don't recall something in the indenture that says

13  you look to the effective date of the plan of reorganization.

14  Q    To the contrary, what do you do recall is that the

15  indenture tells us that the applicable premium is calculated

16  using the event of default as the benchmark date.  Am I

17  correct?

18  A    I believe that's right.

19  Q    All right.  Now you mentioned, finally, sir, that you've

20  advised companies on make-wholes and you've seen language

21  like 6.02 before, so on and so forth.  Do you have in front

22  of you the one L indenture?

23  A    I don't.

24  Q    You don't --

25  A    No.

24

1    Q    You don't have access to it, as you sit here today?

2    A    I could -- I could pull it up on my computer --

3    Q    Can I --

4    A    -- if that --

5    Q    Well, I don't want to take up too much more time.  Can I

6    just ask:  How long would it take you to get that document in

7    front of you?  It has been marked in evidence by Mr.

8    Kleinhaus, I believe, as Exhibit 26 as of this morning.  You

9    tell me how long it would take you to get that document on a

10   screen in front of you?

11   A    I could do it very quickly.

12   Q    Okay.  Tell me -- if I could trouble you to do that, Mr.

13   Hayes.  Go ahead.

14   A    Sure.

15   Q    And then tell me when you have it in front of you.

16        (Pause in proceedings)

17   A    Okay.  I have it in front of me.

18   Q    Great.

19        May I ask you, sir, to turn to Section 6.02, labeled

20   "Acceleration"?  Tell me when you're there.

21        (Pause in proceedings)

22   A    Okay.  I have it up.

23   Q    Thank you.

24        All right.  Now, in the course of your work on this

25   matter, did you have occasion to review -- you've already

1  told me you reviewed this indenture.  Did you also review

2  Exhibit 27, the two L indenture?

3  A    I don't recall spending time with the two L indenture.

4  Q    Okay.  Do you know if there is an acceleration provision

5  in the two L indenture?

6  A    My -- my -- I don't know for sure.  My guess is there

7  is, but I don't know for sure.

8  Q    Have you ever compared the language in the acceleration

9  provision in the two L indenture to 6.02 in Exhibit 26?

10  A    I have not.

11  Q    Have you ever -- you -- but you have, am I right,

12  advised companies on comparable acceleration provisions in

13  the course of your work that you outlined on direct, in your

14  testimony for Mr. Kleinhaus, correct?

15  A    I have.  But I really focus on the economic provisions,

16  rather than the specific language.  The language is, you

17  know, really left to the lawyers to negotiate.

18  Q    Okay.  So you can't tell me, as you sit here, whether

19  the language around -- in 6.02 concerning the applicable

20  premium is more detailed and robust, if you will, than the

21  other indentures that you've read in the course of your

22  profesisonal work.  Is that right?

23  A    I really can't tell you without, you know, going back

24  and looking at others, which isn't something that I've done.

25  Q    Uh-huh.  Can you recall, sir, for example, there --

1   you'll notice that -- can I just ask you:  Do you see that,

2   in 6.02, there are some words that are capitalized?  Do you

3   see that?

4   A    Yes.

5   Q    Can you read them to yourself and then tell me when

6   you're done?

7        (Pause in proceedings)

8   A    Okay.

9   Q    Have you seen language comparable to that in any other

10  indenture?

11  A    Again, I'd have to -- I don't know the answer.  I'd have

12  to go back and look at other indentures, which I just have

13  not done.

14  Q    Is that likely to be your answer to any other language I

15  draw your attention to in 6.02?

16  A    It is.  My area of focus is really on the -- the

17  financial and economic terms --

18  Q    All right.

19  A    -- not the --

20  Q    Well, then I don't want to --

21  A    -- the words.

22  Q    I don't want to take your time up with something that

23  would be outside of your balliwick.

24           MR. ROBBINS:  And Your Honor, at this time, I

25  pass the witness.

1          THE COURT:  Thank you.

2          Mr. Kleinhaus, redirect?  Or I'm sorry.  Does

3   anybody else wish to cross first before we do that?

4          MR. SILVERSTEIN:  Your Honor, it's Paul

5   Silverstein.  I have no questions at this time.

6          THE COURT:  Okay.  Thank you.

7          Anyone else?

8      (No verbal response)

9          THE COURT:  Okay.  Mr. Kleinhaus.

10          MR. KLEINHAUS:  Just a few questions, Your Honor.

11                    REDIRECT EXAMINATION

12  BY MR. KLEINHAUS:

13  Q    Mr. Hayes, if you calculate the make-whole as of the

14  petition date, does the applicable premium approach zero?

15  A    It does not.  It was $94 million, as I outlined in my

16  declaration.

17  Q    And at the time the make-whole was negotiated, based on

18  treasury rates at the time, is it fair to say the make-whole

19  was expected to be higher than zero?

20  A    Yes, that's fair to say.

21  Q    And why is that?

22  A    Because treasury rates aren't even approaching amounts -

23  - I haven't done the specific math, but the amounts that

24  would be required to have it approach zero.

25  Q    Mr. Hayes, in calculating the make-whole, one of the

1  scenarios you ran was as of the petition date, correct?

2  A    That's correct.

3  Q    And Mr. Hayes, if you look at Paragraph 32 of your

4  declaration, you testified that:

5           "If the debtors are required to pay the applicable

6  premium as of the petition date, then, with respect to the

7  period between the petition date and the effective date, they

8  will have paid both the contractual interest owed on the

9  first lien notes during the period and the premium intended

10  to compensate for the loss of such interest, essentially

11  giving the noteholders a double recovery, which, seen purely

12  from a financial and market-based perspective, produces a

13  result that goes beyond the commercial interests, as such

14  make-whole provisions are generally intended to protect."

15       Is that your testimony, Mr. Hayes?

16  A    Yes, it is.

17  Q    Can you elaborate for the Court as to why you testified

18  that, if you calculate the make-whole as of the petition

19  date, in these circumstances, that would lead to a doubel

20  recovery?

21  A    Yes.  When calculating the make-whole as of the petition

22  date, it includes the present value of future interest

23  payments not made.  And in the case that those future

24  interest payments are made post the petition date, there's

25  essentially a double recovery, if you would receive both the

1    make-whole at $94 million and then tens of millions of

2    dollars of interest payments subsequent to that date.

3              MR. KLEINHAUS:  Thank you.  I have nothing

4    further, Your Honor.

5              THE COURT:  Thank you.

6              MR. ROBBINS:  One brief recross, if I might, Your

7    Honor?

8              THE COURT:  I don't allow recross, Mr. Robbins.  I

9    didn't hear --

10             MR. ROBBINS:  Okay.

11             THE COURT:  -- anything outside of the redirect

12   that was outside of cross.

13             MR. ROBBINS:  Okay.  Thank you, Your Honor.

14             THE COURT:  Mr. Hayes, you are excused.  Thank

15   you.

16             THE WITNESS:  Thanks.

17        (Witness excused)

18             THE COURT:  Let me try to -- can we un-spotlight

19   Mr. Hayes?  I'm not sure what happened here.

20        (Pause in proceedings)

21             THE COURT:  It still shows -- it still shows on

22   the Zoom as the ... well, in any event.

23             Any other witnesses at this time?

24             MR. KLEINHAUS:  Not from the debtors on

25   reinstatement, Your Honor.

1          THE COURT:  All right.  And any further evidence

2     at all?  Any -- are the documents all introduced, Mr.

3     Kleinhaus?

4          MR. KLEINHAUS:  Correct, Your Honor.  The evidence

5     on reinstatement includes the documents that have been

6     admitted into evidence by consent, as well as the testimony

7     of Mr. Hayes.

8          THE COURT:  All right.  Do the first lien lenders

9     have any evidence to present?

10          MR. ROBBINS:  We do not, Your Honor.  We're just

11     going to argue the law.

12          THE COURT:  All right.  All right.  Let's go to

13     argument then.  Mr. Kleinhaus?

14          MR. KLEINHAUS:  Thank you, Your Honor.

15          The debtors are proposing to reinstate the first

16     lien notes, which means that, after the effective date, the

17     first lien noteholders will hold the same claims against the

18     same obligors with the same maturities and other terms,

19     including the same ten percent interest rate they had before

20     the bankruptcy.

21          The notes will continue to be senior to the

22     company's second lien debt, including the notes being issued

23     to the second lien noteholders under the plan.

24          And the notes will be *pari passu* with the debtors'

25     exit financing, which will be used to refinance the 900

1  million of first lien revolving debt that's coming due at the

2  end of February.

3           In short, the first lien noteholders will be in

4  the same position they occupied prior to this case, with the

5  same indenture, the same intercreditor agreements, and the

6  same security documents.

7           And since the debtors have paid all the

8  contractual interests owed to the first lien noteholders on

9  the dates due under the indenture and going forward, post-

10  effective-date, the reorganized debtors will pay all of the

11  additional interest owed to the first lien noteholders as it

12  comes due under the indenture, the noteholders will be not be

13  short so much as one dollar as a result of this case.

14           Nonetheless, the noteholders are here objecting.

15  And the reason they're objecting is they don't want to be in

16  the same position they occupied prior to the bankruptcy, they

17  want more.

18           Their first and main argument against

19  reinstatement is that, in order to reinstate, the debtors

20  have to pay a ninety-four-million-dollar make-whole,

21  approximately 19 percent of principal, based solely on this

22  bankruptcy.  They don't claim any defaults whatsoever that

23  are not tied to the bankruptcy.  Essentially, the noteholders

24  want to charge the debtors and the unsecured creditors a

25  ninety-four-million-dollar fee for the privilege of filing

1  Chapter 11 petitions with the Clerk of this Court.

2          Now, to explain why the first lien notes can be

3  reinstated without that 94 million or 19 percent make-whole,

4  I want to start by just going through the relevant provisions

5  of the indenture.

6          And Mr. Levy, I'd ask you to please put up Section

7  6.01(f).

8      (Pause in proceedings)

9          MR. KLEINHAUS:  I am not seeing 6.01(f) on the

10 screen.  Is that true of others?

11         THE COURT:  No, it's not there.

12     (Pause in proceedings)

13         MR. KLEINHAUS:  Okay.  Well, I'm not sure how to

14 fix this.  Maybe what I'll do is continue my argument and

15 we'll hopefully fix it while I speak, if that's okay, Your

16 Honor.

17         THE COURT:  I have -- you're referring to the

18 first lien indenture, is that what you're --

19         MR. KLEINHAUS:  This is the --

20         THE COURT:  -- what you're trying to lay out?

21         MR. KLEINHAUS:  This is the first lien indenture.

22 We've put together some slides that just put the words on a

23 page to try to facilitate the argument --

24         THE COURT:  All right.  Which --

25         MR. KLEINHAUS:  -- but it --

1          THE COURT:  -- section?  I have it open.

2          MR. KLEINHAUS:  This is --

3          THE COURT:  Which section?

4          MR. KLEINHAUS:  This is Section 6.01(f).

5      (Pause in proceedings)

6          MR. KLEINHAUS:  All right.  Well, Your Honor --

7          THE COURT:  I have it.

8          MR. KLEINHAUS:  -- 6 --

9          THE COURT:  Go ahead.

10          MR. KLEINHAUS:  What Section 6.01(f) says is the

11  commencement of a voluntary case under the Bankruptcy Code is

12  an event of default.

13          And then I want to go to the key provision in this

14  dispute, which is Section 6.02.  And that section is entitled

15  "Acceleration."  And it says that, if there is an event of

16  default under Section 6.01(f), namely, a bankruptcy filing,

17  all obligations automatically accelerate.

18          It then goes on to say that, when there is a

19  bankruptcy default and acceleration under 6.01(f), in amount

20  equal to the applicable premium or optional redemption

21  premium, as applicable, that would have been payable in

22  connection with an optional redemption of the notes at the

23  time of the occurrence of such acceleration, becomes, quote,

24  "immediately due and payable."

25          So Section 6.02 requires immediate payment of an

1 amount that would have been payable in connection with an

2 optional redemption as of the petition date.

3          And to figure out what would have been payable in

4 the case of an optional redemption, we have to look at

5 Section 5 of the note appended to the indenture, which I

6 would have put on the screen, but I'll voice it over, absent

7 that.  That section entitled "Redemption" says that, after

8 April 15th, 2022, the debt can be redeemed at a fixed

9 redemption price.  But to redeem prior to April 15th, 2022 --

10 which is what we're talking about -- the borrower needs to

11 pay a hundred percent of the principal redeemed, accrued

12 interest, plus the, quote, "applicable premium."

13          And the definition of "applicable premium" is in

14 the indenture.  Again, I meant to put it on the screen, but

15 I'll voice it over.  And what the definition of "applicable

16 premium" essentially says is, as Mr. Hayes has testified,

17 that you present value future interest payments and the 5

18 percent amount by a treasury-based rate plus 50 basis points.

19 So it's a present valuing of future interest in substantial

20 part.  So, if there's an optional redemption before April

21 15th, 2022, those interest payments, plus the 5 percent, are

22 discounted.  That's the make-whole.

23          So, coming back to Section 6.02, what the first

24 lien noteholders are saying is that, in order to reinstate

25 them, the debtors would have to pay the same amount they

1   would have had to pay had the notes been redeemed on October

2   12th, 2020, which is the petition date.  Using the applicable

3   premium formula, as Mr. Hayes testified, that's $94 million.

4          Now we submit, Your Honor, that Section 1124(2) of

5   the Bankruptcy Code permits reinstatement without that $94

6   million, and I'm going to go through the statute in detail in

7   a moment.

8          But before I do that, I want to dwell for a minute

9   on the result the noteholders are seeking here.  The

10  noteholders are seeking a blatant double recovery.  There's

11  no other way to say it.  And here's why:

12         As Mr. Hayes has testified in Paragraph 32 of his

13  declaration, the first lien noteholders have already received

14  current interest throughout this case.  Since this case

15  began, the debtors have paid the noteholders over $50 million

16  of interest at the 10 percent interest rate, on time and in

17  full.  And if the notes are reinstated as proposed, the

18  noteholders will continue to receive future interest through

19  maturity; or, if the company redeems prior to maturity,

20  they'll get those future interest paymetns, plus a make-

21  whole, at that time.

22         Now, if the objectors are correct and the make-

23  whole has to be paid in a reinstatement scenario as if the

24  notes had been redeemed on the petition date, the ninety-

25  four-million-dollar make-whole would be in addition to all of

1   the interest paid since the petition date and all of the

2   interest to be paid in the future.  And the make-whole would

3   be calculated, as Mr. Hayes has testified, using a formula

4   that's specifically designed to compensate the noteholders

5   for the loss of that very same income stream.  That's what a

6   make-whole is all about.  To quote the Third Circuit in EFH:

7              "It's a contractual substitute for interest lost

8   on notes redeemed before their expected due date."

9              So, to be very clear, Your Honor, what the

10  objectors are saying is that, in a reinstatement scenario,

11  they should get all the interest that would be owed after the

12  petition date, much of which has been paid, plus a make-whole

13  compensated -- calculated to compensate them for not getting

14  that same amount.  Textbook double recovery.  They get all

15  the interest owed through exit, they get all the interest

16  owed after exit, and they get a make-whole designed to

17  compensate them for not getting the interest they got.

18             Your Honor, I think the word "absurd" may be

19  overused in litigation, so I tried to think of a different

20  adjective, but this fits the bill.  It's an absurd result and

21  it's a punitive result.  It would allow the noteholders to

22  get a windfall that wouldn't be available had the debtors not

23  taken the step of filing a Chapter 11 petition with the Clerk

24  of this Court.

25             Now, in advocating for this result, the

1    noteholders' basic theme is that Congress, despite saying in

2    the legislative history of Section 1124, that it wanted to

3    allow borrowers a fresh start without giving effect to

4    bankruptcy defaults, and despite saying that creditors -- and

5    I'm quoting:

6            "-- restored to their original position, when

7    others receive less or nothing at all, are fortunate, indeed,

8    and have no cause to complaint."

9            Despite saying all that, Congress just blew it and

10   failed to draft a statute that allows for reinstatement in

11   situations like this.  That's absolutely wrong.  Section

12   1124(2) permits the debtors to do exactly what we're

13   proposing to do.

14           And what I want to do now is go through the

15   subsections of Section 1124(2) and apply it to Section 6.02

16   of the indenture, the contractual provision at issue.  And to

17   try to solve the tech issue we had, I want to take one shot

18   at -- if my colleague Michael Cassel could be given

19   permission to share his screen, let's see if that works.

20   Otherwise, I'll just go forward.

21           THE COURT:  All right.  Mr. Cassel, can you raise

22   your hand, so we can find you easier and give you the right -

23   - there we go.  Okay.  You're good to go, Mr. Cassel.

24       (Pause in proceedings)

25           MR. KLEINHAUS:  We're going to put a slide up on

1  the screen now that just has the text of Section 1124.  This

2  section provides, Your Honor, 1124(2) that a class of

3  creditors is unimpaired if the requirements of Subsections

4  (a) through (e) are met and that is true notwithstanding,

5  that's the word "notwithstanding," a contractual provision

6  that entitles the holder of a claim to demand or receive

7  accelerated payment of such claim after the occurrence of a

8  default.

9          Now Section 6.02 of the indenture, as I started to

10  explain, is exactly such a provision.  Using the language of

11  1124(2) to track Section 6.02 after the occurrence of a

12  default, namely a bankruptcy default.  Section 6.02, by its

13  terms, entitles the holder of a first lien note claim to

14  "demand and receive," that's the language of 1124(2),

15  accelerated payment of all amounts due under the loan

16  agreement including a premium that would, otherwise, have

17  been payable only at another time.

18          Focusing on a make-whole in particular, outside of

19  bankruptcy the so called applicable premium, as I went

20  through earlier, would be payable in a redemption scenario or

21  if there is a payment default followed by acceleration, but

22  in bankruptcy the premium has to be paid immediately; that's

23  the word.  So by its plain terms Section 6.02 takes an

24  obligation that would have been payable in different

25  circumstances later, something that is not matured and it

1   accelerates it and makes it immediately payable.

2          Now to try to argue that we're not dealing with

3   acceleration the objectors cited Black's Law Dictionary, the

4   definition of acceleration.  As shown here, Black's Law

5   Dictionary has multiple definitions of acceleration and in

6   their brief the objectors chose to just skip the first one

7   and highlight the second one.  They only quote the second

8   one.

9          Now even if the second definition were the only

10  definition Section 6.02 would still fall within Section

11  1124(2) because it accelerates the entire loan balance

12  including the applicable premium.  Regardless, the first

13  definition, the ones the objectors just skip over is "the act

14  or process of quickening or shortening the duration of

15  something such as payments."

16         Section 6.02 quite clearly quickens the payment of

17  the applicable premium.  That is true whether the applicable

18  premium is called principal, or interest, or a premium, or a

19  charge or whatever.  Whatever it is called it an accelerated

20  payment.  What the document says, 6.02, is that the premium

21  is payable immediately whereas outside of bankrutcy it's not

22  payable immediately.

23         The objectors also argue that the make-whole is

24  not, itself, a provision that requires accelerated payment.

25  In other words, they want to separate the bankruptcy default

1   from the make-whole and argue that because it's the

2   bankruptcy default rather than the make-whole that causes

3   acceleration, the make-whole is somehow not effected by the

4   statute. That is not how the statute works, that is not what

5   it says.  The statute, on its face, speaks in terms of

6   contractual provisions.

7            The relevant provision here is Section 6.02 of the

8   indenture and by its terms it allows the holder of a claim to

9   demand or receive accelerated payment after occurrence of a

10  default, namely a bankruptcy default.  So if the other

11  requirements of the statute are met, which I will turn to

12  momentarily, reinstatement is permitted notwithstanding that

13  provision.  The noteholders can't escape that logic by trying

14  to split the provision into separate parts and acting as if

15  the make-whole is not tied directly to the bankruptcy default

16  and acceleration which it clearly is.

17           So now, Your Honor, I will turn to the other

18  subsections of the statute because what is left to analyze is

19  whether the make-whole has to be paid to satisfy the

20  requirements of Subsections (a) to (e) and the answer is no.

21           Let's start with Section 11124(2)(a).  That

22  subsection requires that the debtor cure the default that

23  gave rise to an accelerated payment obligation other than a

24  default of a kind specified in Section 365(b)(2) of this

25  title or of a kind that Section 365(b)(2) expressly does not

1   require to be cured.

2          So let's look at the slide with Section 365(b) and

3   in particular Section 365(b)(2)(b).  It says that in the

4   context of assumption of an executory contract no cure is

5   required with respect to "a default that is a breach of a

6   provision relating to the commencement of a case under this

7   title."

8          Now Section 6.02 of the indenture, as we

9   discussed, is a provision relating to commencement of a

10  Chapter 11 case.  The bankruptcy default in Section 6.02 is a

11  default that is a breach of a provision relating to the

12  commencement of a case.  So the bankruptcy default is a

13  default of a kind specified in Section 365(b)(2); that's

14  plain language, which means there is no cure required under

15  1124(2)(a).  That is what the statute says.

16         We also know that the house report on the

17  bankruptcy court says very plainly that reinstatement is

18  permitted without regard to a default under an *ipso facto* or

19  bankruptcy clause.

20         Now the noteholders response is that this

21  indenture is not, itself, an executory contract because

22  Section 365 deals with executory contracts, their argument

23  goes.  The default here cannot be a default of a kind

24  specified in Section 365(b)(2).  Respectfully, that is a

25  misreading of the statute.

1           Looking at Section 1124(2) it says that a debtor

2   does not have to cure defaults of a kind specified in

3   365(b)(2).  It does not speak in terms of contracts of a kind

4   specified in 365(b)(2).  And to confirm that it is talking

5   about defaults and not contracts in Paragraph 21 of our brief

6   we provided several examples of other provisions of the

7   bankruptcy code that used the same verbiage, of a kind, and

8   they all show that of a kind is not used to import every

9   requirement from another provision.

10          If there is any question about how to read this

11  provision, and we don't think there is based on the language,

12  let's think about the implications of their argument.  Their

13  position, simply put, is that following a bankruptcy default

14  reinstatement under Section 1124(2) is not available in the

15  context of notes and loan agreements.  That is another absurd

16  result.  It proves way too much.

17          The point of Section 1124(2), as enacted in 1978

18  was to allow reinstatement without regard to bankruptcy

19  defaults including specifically in loan agreements.  The

20  house report, as I mentioned, says in words of one syllable

21  that Section 1124(2) excuses cure of any default under an

22  *ipso facto* or bankruptcy clause.  (Indiscernible) bankruptcy

23  says, under Section 1124(2) the filing of a case under Title

24  XI never needs to be cured, never.

25          If the objectors were correct a bankruptcy default

1    and a non-executory loan agreement would always have to be

2    cured contrary to the language and purpose of Section

3    1124(2).  So reinstatement would not be available in

4    bankruptcy situations for loan agreements or indentures of

5    their kind.  That cannot be right and it's not right under

6    the language.  So we have met the requirements of 1124(2)(a).

7              I want to run through the other subsections.

8    Section 1124(2)(b) requires the plan to reinstate the

9    maturity of an accelerated claim as such maturity existed

10   before the default requiring accelerated payment.  Now here,

11   if the notes are reinstated all of the obligations under the

12   first lien notes will be reinstated including the make-whole

13   obligation.  No one has argued otherwise.

14             The next Subsection 1124(2)(c) requires the plan

15   to compensate the holder of a claim for any damages incurred

16   as a result of any reasonable reliance by such holder on the

17   contractual provision that accelerated the debtor's payment

18   obligation.  Now no one has seriously contested this element

19   either.  The debtors are paying all fees and expenses they're

20   required to pay under the indenture and more.  The

21   noteholders have already received and will continue to

22   receive all their contract interests on the original maturity

23   date so they are getting their compensation for the debtor's

24   use of their capital at 10 percent.

25             The first lien noteholders filed a proof of claim

1   in this case that is Cassel declaration Exhibit D, but it

2   says absolutely nothing about damages.  There is no claim for

3   damages.  So these noteholders have not articulated any

4   viable damages.  They haven't articulated any damages theory

5   and there is none.

6           Section 1124(2)(d) is the next subsection.  No one

7   has addressed that or disputed it so I am not going to take

8   the court's time on that.

9           Finally, Section 1124(2)(e) requires that the plan

10  not, otherwise, alter the legal, equitable or contractual

11  rights of a claimant.  For all the reasons discussed Section

12  1124(2) authorizes the debtors to reinstate the original

13  maturities of the notes without paying a make-whole.  So the

14  plan does not, otherwise, alter the noteholders rights by not

15  paying a make-whole.

16          So putting this all together the statue permits

17  the debtors to reinstate without this make-whole and the case

18  law leads to the same result.  The objectors do not cite and

19  we're not aware of a case in which a court has required

20  payment of a bankruptcy triggered make-whole despite

21  reinstatement.

22          Interestingly, in the Anko Investments case, a

23  case from this district cited in our brief, which it also

24  involved reinstatement without a bankruptcy triggered make-

25  whole the first lien lenders they are conceded that

1   reinstatement would defeat the make-whole. So it seems like

2   it was only recently that first lien lenders have started to

3   argue that reinstatement does not defeat a make-whole.

4          When they argued that recently in another case,

5   which is EP Energy in Texas, Judge Isgur rejected their

6   position.  In his ruling, which we have submitted as an

7   attachment to Mr. Cassel's second declaration, Exhibit A,

8   Judge Isgur went through each of the elements I just went

9   through and he concluded that the loan could be reinstated

10  without a make-whole for various reasons.  I refer the court

11  to that decision.  The results here should be the same.

12         Now, Your Honor, before turning to the inter-

13  creditor issue I want to address a backup argument that the

14  noteholders have made regarding reinstatement which is that

15  even if they're not paid a make-whole they should get paid

16  interest on the non-payable make-whole during the pendency of

17  this case.  The noteholders base this argument on cases in

18  which courts have required default interest as a condition to

19  reinstatement.

20         Let's put aside whether default interest is

21  comparable to a make-whole in terms of being an accelerated

22  payment.  Putting that aside, as we explained in our briefs

23  basically all the cases they have cited involve situations

24  where there was a payment default before the bankruptcy and

25  the debt was then accelerated by the lenders before the

1   bankruptcy.  Now in cases involving a pre-bankruptcy payment
2   default the analysis I just went through under 1124(2) is not
3   applicable because the acceleration is not the result of a
4   bankruptcy triggered default and resulting acceleration.

5           For a pre-bankruptcy payment default there's no
6   exception to the requirement that the default be cured of the
7   kind that there is an exception for *ipso facto* default.  So
8   cases saying that you pay default interest when there's a
9   prepetition payment default really don't help the objectors.

10          In a case like this one which involves a
11  bankruptcy default, and that's it, and resulting acceleration
12  there is no basis to charge interest on the make-whole
13  because the statute, by its terms, permits reinstatement
14  notwithstanding and without curing a default that accelerates
15  obligations upon a bankruptcy filing.  Requiring debtors to
16  pay interest on the bankruptcy triggered make-whole would
17  give effect to and require cure of the very *ipso facto*
18  default that the statute does not require to be cured.

19          One last point, Your Honor, before I speak to the
20  inter-creditor issue and it goes to how the court should
21  interpret Section 1124(2).  We don't believe this statute is
22  ambiguous in any way for all the reasons I said, but in
23  permitting the instatement without a make-whole in EP Energy
24  one of Judge Isgur's insights was that if Section 1124 were
25  ambiguous in some way the court should -- can and should

1  construe the statute to avoid a public policy issue.  Here is

2  what Judge Isgur said:

3         "There is no question in my mind that a charge

4  that is imposed solely upon the filing of a bankruptcy case

5  is inconsistent with the public policy of the country,

6  inconsistent with what everyone has assumed is true in

7  bankruptcy and that is that you can't unreasonably block

8  someone's ability to file bankruptcy."

9         Judge Isgur goes on in the next paragraph to say

10  that while he interprets 1124 to permit reinstatement without

11  the make-whole he in doing so, to the extent there are any

12  ambiguities, he's going to interpret Section 1124 in a way

13  that is consistent with public policy including the policy in

14  favor of giving the debtor a fresh start.  So, again, we

15  don't think the statute is ambiguous, but to the extent the

16  court struggles with the statute at all Judge Isgur has a

17  good insight here as to the policy backdrop of the statute.

18         As Judger Isgur recognized it, it's really hard to

19  come up with a result more at odds with bankruptcy policy

20  then giving noteholders a double recovery, a 19 percent bump

21  on their claim just based on a bankruptcy filing.  It will be

22  a punitive result, it will be a terrible result for unsecured

23  creditors and it would mean that going forward secured

24  lenders could prevent reinstatement and, basically, gut a

25  debtor's rights and prerogatives under Section 1124 as long

1  as they negotiate for a big enough make-whole.

2          There is no precedent for that draconian result

3  and it should not be accepted.  So unless Your Honor has

4  questions I will turn next and last to inter-creditor issues.

5          THE COURT:  Okay.

6          MR. KLEINHAUS:  Your Honor, I am going to be

7  somewhat more brief in addressing the inter-creditor issues

8  and that is because the objections themselves present those

9  issues in a summary way. Some of the points are only in

10  footnotes which, of course, is not sufficient so I am just

11  going to address as concisely as possible the points that are

12  made in the body of their objection.

13          To put these inter-creditor arguments in context I

14  want to emphasize again, at the outset, that after the

15  effective date the current inter-creditor agreements will

16  remain in place.  Under those arrangements the reinstated

17  first lien notes will continue to come ahead of the second

18  lien debt and the notes will be *pari passu* with the first

19  lien debt that will refinance the debtor's revolving loans.

20  So, again, the first lien noteholders are here objecting even

21  though they will be in the same position they had prior to

22  bankruptcy.

23          I would also note at the outset that the objectors

24  haven't pointed to any provision of any inter-creditor

25  agreement which says or comes close to saying that

1   distributions under a Chapter 11 plan have to be shared pro

2   rata among first lien lenders or that second lien lenders

3   have an obligation to turnover their Chapter 11 plan

4   distributions.  Put aside whether provisions of that kind

5   would be enforceable.  If the parties intended that kind of

6   broad result they could have easily written provisions

7   reflecting that and they certainly didn't.

8          So I want to address each inter-creditor agreement

9   starting with the first lien inter-creditor agreement.

10         In the first lien it's a creditor agreement, the

11  objectors rely on Section 2.01(a) and that is a dense

12  provision.  Instead of quoting the whole wall of words I am

13  just putting up a slide showing how the objecting parties

14  themselves describe the provision.

15         The noteholders complaint here is that other first

16  lien lenders, in particular revolving lenders whose loan

17  matures in February 2022, in a few months, will be paid cash

18  whereas they will get reinstated.  But under Section 2.01(a),

19  as described here, that could only be a problem if two things

20  were true, they both have to be true.  First, there has to be

21  a continuing event of default at the time of the relevant

22  payments.  Second, the payments have to be distribution in

23  respect of any shared collateral.

24         Here, neither of these requirements is met.

25  Starting with the continuing event of default.  Your Honor,

1    the entire point of reinstatement is that at emergence when

2    the plan closes there will be no continuing event of default.

3    All maturities will have been reinstated, all payments will

4    be current.  The document -- the loan agreement will be

5    intact.

6           The only default, the bankruptcy default, will

7    have been cured or excused from cure as a matter of law under

8    Section 1124(2).  So by its plain terms, as described by the

9    objectors themselves, Section 2.01(a) is, on its face, not

10   applicable here because there will be no continuing event of

11   default following reinstatement.  The absence of a continuing

12   even to default presents a simple straight-forward way for

13   the court to address any and all of the objections that have

14   been raised relating to the first lien inter-creditor

15   agreement.

16          The court can stop there, but as to the other

17   independent requirement of Section 2.01(a), namely that there

18   be a distribution in respect of any shared collateral, the

19   objectors seem to be saying that cash payments to revolving

20   lenders on debt that matures in February are distributions in

21   respect of shared collateral.  But they don't grapple with,

22   they ignore, what is actually happening under the plan.  What

23   is happening, as stated in the plan definition of new term

24   loan facility, and as Mr. Hayes has testified in Paragraph 18

25   of his declaration, is that new first lien exit financing

1  will replace existing first lien debt.

2          The first lien noteholders have no arguable lien

3  on the new financing being authorized and raised under the

4  plan and they are not prejudiced by substituting one piece of

5  *pari passu* debt for another.  They will be in the same

6  position vis-à-vis their collateral rights before and after

7  the transaction.

8          The slide deck I am about to put on the screen,

9  that Mr. Cassel put on the screen, has a couple of quotes

10  from cases that get at this point which is that there isn't a

11  distribution of collateral where the collateral remains

12  intact and unchanged.  One quote is the big picture here is

13  what is happening that doesn't have one iota of a negative

14  effect on the 101(a)'s [phonetic].  The 101(a)'s are the --

15  were the reinstated first lien loans in EP Energy.  And

16  because it has not one iota of negative effect on them or on

17  their collateral I think it is not done in respect of the

18  collateral.

19          There is a similar quote from the Momentive case,

20  Judge Drain's decision, rejecting an inter-creditor argument

21  relating to a similar plan.  Now here, as in those cases, the

22  collateral is not changing. And as I said, the payments of

23  the first lien lenders will be at emergence when there are no

24  continuing defaults. So the first lien noteholders have no

25  basis to complain under the first lien inter-creditor

1    agreement.  There is no violation of that agreement.  Their

2    rights are not being altered in any way with respect to the

3    first lien inter-creditor agreement.  So that is the first

4    lien inter-creditor arguments.

5           The arguments under the second lien inter-

6    creditor agreement are just as strained.  The first argument

7    is based on Section 4.2 of the second lien inter-creditor

8    agreement which governs, and I'm quoting, "distributions of

9    money or other property in respect of or on account of the

10   collateral."

11          The ad hoc group has asserted, in Paragraph 88 of

12   their objection, that the new second lien notes being issued

13   to second lien noteholders are a distribution of property on

14   account of the collateral.  That is not correct.  And the

15   noteholders objection just doesn't grapple with the cases

16   from the district that have addressed, essentially, the same

17   argument including a decision that went up to the Third

18   Circuit and that is EFH.

19          In EFH Judge Sontchi held, and was affirmed by the

20   Third Circuit in holding, that,

21          "Issuance of new securities pursuant to a plan is

22   not a distribution of the debtor's money or other property

23   subject to a provision such as Section 4.2."

24          It's a debt obligation of the reorganized debtors,

25   not a distribution of collateral.  A debt obligation, an

1 obligation of the reorganized debtors.  The <u>Momentive</u>

2 decision cited in our brief comes out the same way.  Those

3 decisions make sense because the new notes being distributed

4 to the second lien noteholders they're being distributed to

5 address and satisfy the noteholders' claims.  They are not

6 being distributed on account of the collateral.  The

7 collateral is staying where it is.  It will continue to

8 secure the second lien obligations as well as the first lien

9 obligation.

10        So there is no violation of Section 4.2(b) as a

11 result of the plan distributions.  And I would also emphasize

12 here that there are specific sections of the second lien

13 inter-creditor agreement ignored by the objectors that deal

14 with the exact situation we're dealing with here.  In

15 particular, Section 6.6 of the inter-creditor agreement deals

16 with reorganization securities.  The last sentence of Section

17 4.2(b), which is the provision they rely on, also deals wiht

18 liens under new securities.

19        What those provisions require, by their terms, is

20 that any new obligations provided to the second lien

21 noteholders have to remain subject to the inter-creditor

22 agreement.  But, Your Honor, that is exactly what we are

23 doing.  We are complying with Section 6.6, we're complying

24 with Section 4.2(b).  The inter-creditor agreement addresses

25 exactly what we're doing.  It says that is okay as long as

1    the inter-creditor relationship belongs intact.  So there is

2    no objection that is viable to the treatment of the plan

3    distribution to the second lien noteholders.

4           The very last argument the objectors make, albeit

5    in quite a summary way, is under Sections 6.3(b)(2) of the

6    second lien inter-creditor agreement which deals with

7    adequate protection payments.  This is another long dense

8    provision, but there are multiple issues with the argument

9    here as well.

10          First of all, looking at the language, the

11   payments have to be adequate protection payments.  Deerfield

12   and the second lien trustee have made an argument which, I

13   think, has force that there was no diminution of collateral

14   here.  Let's assume these are adequate protection payments

15   what was paid during the case.  Two points.

16          First of all, I mean in looking at the key clause

17   which is what has to be turned over, all that needs to be

18   turned over is what is defined as the shortfall.  That pay-

19   over amount is defined as the lesser of the second lien

20   adequate protection payments, that's one, and the amount of

21   the shortfall in payment in full of the first lien

22   obligations; payment in full, those are the words, nothing

23   more.

24          Now under Section 1124(2) reinstatement is a form

25   of payment in full as a matter of law.  The first lien

1   noteholders are getting everything owed to them other than

2   accelerated amounts which are being reinstated in compliance

3   with a federal statute.  So they are getting paid in full.

4   Now the objectors say that they still have a claim against

5   the noteholders, the second lien holders, because they are

6   getting paid in notes rather than cash.

7          Now the shortfall definition says payment in full,

8   but even if it were written differently to say payment in

9   full in cash the objectors run right into the last proviso in

10  Section 6.3(b)(2) starting with the words "provided that."

11  What that language says is that the extent the second

12  noteholders need to pay over adequate protection payments to

13  the first lien noteholders due to a supposed shortfall -- we

14  don't think there is a shortfall, but if there was a supposed

15  shortfall in cash payments the first lien noteholders would

16  need to transfer to the second lien noteholders in exchange

17  for the cash in equivalent value of the notes they get.

18         Now, Your Honor, the debtors don't believe that

19  the objecting first lien noteholders have any interest in

20  swapping face value of first lien notes which have a 10

21  percent interest rate for cash of the same value from the

22  second lien noteholders, but that is exactly what they would

23  need to do if they were right and the court agreed with them

24  in their reading of Section 6.3(b)(2).

25         So for the reasons I've said and for the reasons

1    others have given we don't think Section 6.3(b)(2) is

2    applicable, but if it were that would not stand in the way of

3    confirmation.  At most the plan would have to be amended to

4    say that to the extent this provision is triggered the second

5    lien noteholders would have to trade cash for first lien

6    notes of the same value.

7            We sincerely doubt that the first lien noteholders

8    want that amendment.  They have argued this Section 6.3(b)

9    point in a rather cursory way, I think, because that is not

10   the result they want, but that would be the result if their

11   argument were actually successful.

12           So, Your Honor, with that I have gone through my

13   arguments.  I am happy to answer any questions or, otherwise,

14   turn over the virtual podium.

15           THE COURT:  Thank you, Mr. Kleinhaus.  I don't

16   have any questions at this time.

17           Is there anyone else who wants to speak in support

18   of the debtor's position?

19           Mr. Cohen.

20           MR. COHEN:  Yes, Your Honor.  Thank you, Your

21   Honor.  Good morning.  Michael Cohen, Gibson Dunn & Crutcher

22   on behalf of the ad hoc first lien lender group.

23           As Your Honor is aware, our group holds the vast

24   majority of the approximately $1.7 billion of first lien term

25   loans outstanding under the first lien credit agreement.  Our

1  claims reside in Classes 2(b) and 2(c) under the plan which

2  this class has -- both classes have voted to accept the plan.

3  We filed a statement in support of confirmation at Docket No.

4  5008.

5          I just also want to make clear that the word

6  "lender" has been used interchangeably with "noteholder" at

7  time. I want to be absolutely clear we are in no way aligned

8  with the first lien noteholders as to the issues being

9  disputed here today.  The first lien lenders -- the first

10 lien term loan lenders are supporting the debtors in this

11 issue.

12         Stepping back, with respect to this first lien

13 term loan claims, our claims are not being paid in full in

14 cash under the plan.  We are taking a new first lien debt

15 instrument and in addition we will receive what is called the

16 term loan exist payment.  That will be an obligation of the

17 debtor -- of the reorganized debtors arising under the plan

18 to be paid on the effective date in the amount of

19 approximately $17 million or 1 percent of the loan.  That is

20 only if the claims are not refinanced before the effective

21 date.

22         Our treatment is the product of the amended RSA

23 that the term lenders joined in March of 2021 and we have

24 been supportive of the plan process since then.  So with

25 respect to that we only rise to respond to the objectors'

1   issues as it pertains to the impairment under the first lien

2   inter-creditor agreement which, you know, as Mr. Kleinhaus

3   mentioned, governs the respective rights of the first lien

4   lenders and first lien noteholders solely as it pertains to

5   shared collateral.

6           The objecting noteholders limit their argument

7   with respect to this first lien term loan exit payment only

8   as to half of that payment or approximately $8.8 million

9   since half of that payment has already been approved by this

10   court on April 13th pursuant to the order modifying the cash

11   collateral order.  That is at Docket 2021.

12           Their argument, as Mr. Kleinhaus mentioned, is, in

13   effect, that the term lenders receipt of this payment on the

14   effective date pursuant to the plan impairs their rights

15   under the first lien inter-creditor agreement.  That

16   proposition I would submit, Your Honor, is incorrect and

17   there are five independent and dispositive reasons why and I

18   will touch on each of them briefly.

19           First, I'd like to focus, Your Honor, on the

20   source of the obligation with respect to the term loan exit

21   payment.  That payment does not arise under the existing

22   prepetition first lien credit agreement.  It arose under the

23   RSA and now will be a product of the plan and the plan

24   obligation.  It is an entirely separate obligation of the

25   debtors and is in no way a part of the credit agreement by

1    its terms.  The inter-creditor agreement only deals with

2    collateral and lien issues as it pertains to the payment of

3    obligations under the first lien credit agreement or the

4    first lien notes.

5              Courts have weighed in this issue and agree with

6    this proposition.  MPM Silicones, the case that Mr. Kleinhaus

7    eluded to, also covers this issue.  In that case second lien

8    holders were paid a backstop commitment fee.  That fee arose

9    under a separate agreement with the debtors.  Judge Drain in

10   that case held that the backstop fee was a separate

11   obligation, did not arise under the applicable second lien

12   indenture and was not subject to the inter-creditor

13   agreement.

14             In that case the first lien noteholders tried to

15   assert rights and entitlements to those payments and that was

16   rejected.  That case was affirmed by the Southern District of

17   New York on appeal.  That is In Re MPM Silicones LLC, 518

18   B.R. 740 at 753 Bankruptcy Southern District of New York

19   2014.  The affirming case is 596 B.R. 416, Southern District

20   of New York 2019.

21             In addition, this court in Energy Future Holdings

22   found similarly.  Judge Sontchi was dealing with other

23   similar types of payments made to lenders during the case.

24   He found that those payments were not payments of collateral

25   because those payments were made in a fashion that did not

1  reduce the underlying obligations of the debt.  The Third

2  Circuit affirmed them on that basis.

3        I would submit the same thing applies here, Your

4  Honor.  The first lien term loan exit payment is not reducing

5  the debt, it's not a payment under the credit agreement.

6  Again, that is Energy Future Holdings the Bankruptcy Court

7  opinion is 546 B.R. 566 a 582 Bankruptcy District of Delaware

8  2016.  The Third Circuit affirmance is at 773 Federal

9  Appendix 89 at 93, Third Circuit 2019.  So that is one

10 critical ground on which there is no impairment here.

11        The second one, and I will be brief because Mr.

12 Kleinhaus mentioned it, is we are not in a default setting on

13 the effective date and that is when the payment will be made.

14 It is beyond -- there is no dispute that when the payment

15 will be made that the debtors will have emerged and there

16 will be the effective date.  There will be no event of

17 default by definition at that point in time.  That is a fully

18 dispositive and independent basis to find no impairment.

19        The third reason is just as Mr. Kleinhaus

20 mentioned, there is going to be $1.1 billion of new financing

21 incurred by the debtors namely through the refinancing new

22 term loan facility that is used to take out the revolver as

23 well as a $200 million securitization facility.  The debtors

24 intend to make these payments from those facilities.  That

25 cash, as of that moment in time, is not in any form, shape or

1 | way first lien prepetition collateral.  It's going to go
2 | directly from that external source and pay those payments.
3 | So it's completely outside the scope of this agreement.
4 | The fourth basis, Your Honor, is the very language
5 | of 2.01(a) of the first lien inter-creditor that Mr.
6 | Kleinhaus went over in passing as he went through his
7 | argument.  I want to focus on the object of that provision,
8 | it's about nine lines into it, and the object is the proceeds
9 | of any sale, collection or other liquidation of any such
10 | collateral.  And it goes onto say it shall be applied.  So
11 | the proceeds of any sale, collection or liquidation of shared
12 | collateral will be applied during a default to be shared.
13 | Now, you know, that is the only instance where
14 | this provision is applicable.  A monetization event whether
15 | its remedy, enforcement or voluntary sale, collection or
16 | liquidation which is entirely sensible, Your Honor, if there
17 | were to be a sale of collateral.  In a default setting, you
18 | know, all the *pari passu* first lien stakeholders will want to
19 | know how to share those proceeds.
20 | The satisfaction of the term loan exit payment
21 | simply is not coming from proceeds of sale, collection or
22 | liquidation of shared collateral. In fact, there is no
23 | distribution of any such proceeds being effected here.
24 | To quote the Third Circuit again from the Energy
25 | Future Holdings case they say "proceeds cannot be from a sale

1  when there was no sale."  That is exactly the case here.

2  That is 773 Federal Appendix 89 at 93, Third Circuit 2019.

3          Now turning to the fifth independent dispositive

4  basis to find that there is no impairment we could look to

5  2.01(c) of the first lien inter-creditor agreement.  The

6  objectors don't even mention this clause.  It's

7  understandable because it identifies various assets that are

8  expressly not shared collateral.  In fact, they are called

9  the non-share collateral.  Thus, these items are completely

10  outside the scope of Section 2.01(a).

11          And in Romanette (I), Clause (I) of this provision

12  it includes cash and cash equivalents otherwise held by the

13  collateral agent.  And I would note, Your Honor, the

14  collateral agent here is Deutsche Bank AG.  This is one of

15  the exhibits that was admitted; its term loan group exhibit

16  one.  It's also filed at Docket 4850-1 on pages 10 to 11 of

17  that document.  This is debtor's latest monthly operating

18  report.  It shows amounts well in excess of the $17.7 million

19  term loan exit payment residing in accounts held by Deutsche

20  Bank AG.  All those dollars are not shared collateral.

21          So, Your Honor, there are several separate

22  independent groups to find that there is no impairment under

23  the first lien inter-creditor agreement.  Unless Your Honor

24  has any questions I will cede the podium.

25          THE COURT:  Thank you, Mr. Cohen.

1                     Mr. Johnston?

2                     MR. JOHNSTON:  Good morning, Your Honor.  Can you

3      hear me?

4                     THE COURT:  Yes.

5                     MR. JOHNSTON:  Jim Johnston, on behalf of Diameter

6      Capital as the holder of claims under the first lien

7      revolving loan facility.

8                     Your Honor, for today's purposes, our focus is on

9      the issue of whether eh instatement of the first lien notes

10     implicates the sharing provisions of the first lien

11     intercreditor agreement.

12                    It does not.  There are really two main points

13     that I won't belabor, because they were covered well by Mr.

14     Kleinhaus, but I will touch on them briefly.  First and

15     foremost, Your Honor, the text of the intercreditor agreement

16     simply does not apply in the event of a reinstatement of the

17     notes because the sharing provision cited by the noteholders,

18     Section 2.01(a), operates if, and only if an event of default

19     has occurred and is continuing.

20                    Upon reinstatement, there will be no continuing

21     event of default.  As the Onco case from this district and

22     many others make clear, you can see that in the briefs, Onco

23     tells us that, herein, reinstatement under Section 1124(2)

24     completely wipes the slate clean and returns the debt

25     instrument, quote, to pre-default conditions.  As a result of

1   that, the intercreditor agreement simply does not come into

2   play when these notes are reinstated.

3           You could stop there, because that point is

4   dispositive, but there is a second independent reason why the

5   noteholders' argument fails.  Even if after reinstatement,

6   there somehow could be considered to be a continuing event of

7   default under the reinstated debt, Section 2.01(a) still

8   would not apply because revolving lenders here are not

9   receiving a distribution of shared collateral under the plan.

10          Section 2.01 only applies to proceeds of actions

11  to enforce rights in respect of shared collateral or

12  distributions in respect of shared collateral.  That's clear

13  and that's admitted by the noteholders.  But shared

14  collateral, as a defined term, is defined as the property or

15  collateral encumbered in favor of what are called "*pari passu*

16  obligations."

17          The first lien intercreditor agreement defines the

18  *pari passu* obligations as the existing revolving credit

19  facility, the existing term loan facility, and the first lien

20  notes.  You can get that from those respective definitions in

21  the agreement.

22          Under the plan, as you've heard, the revolving

23  loans are going to be paid 100 percent from the proceeds of

24  the new term loan.  Those new loan proceeds are not proceeds

25  of shared collateral because the new term loan is not one of

1  the *pari passu* obligations covered by the intercreditor

2  agreement.  So, the sharing provision cited by the

3  noteholders is simply not operative as to the funds that will

4  be used to pay the revolving loans.

5           And as Mr. Kleinhaus explained, there is no

6  prejudice whatsoever to the noteholders from the swap of one

7  set of first lien obligations, the existing revolving credit

8  facility, for another in the form of the new term loan.

9           Your Honor, I'll close by noting that this

10  conclusion that the intercreditor agreement does to the apply

11  to the payment of the revolving credit facility makes

12  particular sense in the context of my client's claims.  The

13  revolving credit facility matures in February; less than four

14  months from now.  Given that short maturity, it can't

15  practically be reinstated or crammed down with new debt, even

16  if the debtors wanted to try.

17           As Mr. Kleinhaus noted, the drafters of the Code

18  contemplated situations like this and they gave debtors the

19  flexibility to reinstate some of their debt obligations and

20  to pay others.  The suggestion that the debtors here cannot

21  use that facility to repay this very short-term revolving

22  facility without repaying in cash, in full, the longer-dated

23  notes, flies in the face of what the drafters of the Code

24  were intending to accomplish.

25           That's all I had, Your Honor, unless you have

1   questions for me.  We would ask that you overrule the

2   objection based on the intercreditor agreement.

3               THE COURT:  Thank you, Mr. Johnston.

4               MR. JOHNSTON:  Thank you.

5               THE COURT:  Mr. Zatz, did you want to be heard?

6               MR. ZATZ:  Yes, Your Honor.

7               Can you hear me?

8               THE COURT:  I can.  But I cannot see you.

9               MR. ZATZ:  Yes, I apologize.  I am struggling with

10  my video and I can't seem to figure out how to get myself on

11  the video.  Would it be possible for me to proceed without

12  being on video and just audibly?

13              THE COURT:  Go ahead.

14              MR. ZATZ:  All right.  Thank you.

15              Your Honor, Andrew Zatz of White & Case, on behalf

16  of Deutsche Bank AG, New York Branch, as administrative

17  agent.

18              We filed the reply to confirmation objections that

19  were raised by certain first lien noteholders at Document

20  5066.

21              Deutsche Bank is the administrative agent under

22  the first lien revolving loan and term loan and is the

23  collateral agent for both facilities, as well as the first

24  lien notes.  It is also a large revolving lender.

25              As one of the key parties as agent to the

1   intercreditor agreement that is key to certain of these

2   confirmation disputes.  We wanted to speak simply to give our

3   interpretation of the relevant provisions of the

4   intercreditor agreement.  In short, we agree with the

5   arguments made by the debtors and others that it if the first

6   lien notes are reinstated, there is no event of default to

7   cure and, therefore, Section 2.01(a) of the intercreditor

8   agreement is not implicated.  That is made clear by the Onco

9   case and others cited in our reply and others.

10          Further, the cash that would be used to make

11  distributions to the first lien revolving lenders and term

12  lenders under the plan do not share collateral under the

13  credit agreement because of the source of the funds and the

14  time of the payment.

15          While we do not adopt all arguments made by the

16  parties in response to the first lien noteholders'

17  confirmation objection, we feel that either of these two

18  arguments demonstrate that the intercreditor agreement would

19  not be implicated by the proposed distributions contemplated

20  by the debtors' plan.  Thank you.

21          THE COURT:  Thank you, Mr. Zatz.

22          Does anyone else wish to speak in support of the

23  debtors' position?

24          MR. BELLER:  Your Honor, if I may, this is

25  Benjamin Beller from Sullivan & Cromwell.

1          THE COURT:  Go ahead, Mr. Beller.

2          MR. BELLER:  All right.  Are you able to see and

3  hear me?

4          THE COURT:  Yes.  How do you spell your last name,

5  Mr. Beller?  You are showing up as New York Room 37(e)(1).  I

6  mean, we have to have your name on there.  We have to do that

7  for you.

8          MR. BELLER:  Apologies for that, Your Honor.

9  Thank you.

10          It's B-, as in boy, e-l-l-e-r.

11          THE COURT:  All right.  Go ahead, Mr. Beller.

12          MR. BELLER:  And, again, it's Benjamin Beller from

13  Sullivan & Cromwell, on behalf of Deerfield Partners.

14          Deerfield submitted a statement in support of

15  confirmation of the debtors' plan in response to certain of

16  the objections by certain of the first lien noteholders at

17  Docket 4992 and Deerfield has agreed to the terms of the

18  settlement with respect to the treatment of the second lien

19  notes, which the terms of which were filed at Docket 4121 on

20  September 3rd.

21          That settlement included a provision regarding the

22  resolution of any intercreditor issues under the plan and

23  Mr. Kleinhaus has outlined the key arguments in response to

24  the objecting first lien noteholders and I just want to

25  emphasize a few points.  First, the Ad Hoc First Lien Note

1    Group in their own objection acknowledges that the

2    distributions being made to second lien noteholders are on

3    account of those holders claims.  That is the starting point

4    for any determination about whether there are valid claims

5    under the intercreditor agreement against second lien

6    noteholders and it gets you quite far along in that analysis.

7            If you then apply the decisions in Momentive and

8    EFH, as Mr. Kleinhaus has outlined, which underscores the

9    importance of distinction between distributions on account

10   claims and distributions on account of collateral.  That

11   gives you the answer whether these claims have any merit.

12           The intercreditor only governs distributions on

13   account of or in respect of collateral; it's simply not what

14   we have here.  It's not what was in Momentive.  It's not what

15   was in EFH.

16           It was, however, what the facts were in the Paloma

17   case, which is the only case that the objecting first lien

18   noteholders cite to in support of these purported

19   intercreditor claims against second lien noteholders.  In

20   that case, you have a liquidation of collateral and a

21   distribution of the proceeds of that collateral.  It is

22   precisely the scenario contemplated by the intercreditor

23   agreements:  distributions on account of the collateral being

24   liquidated.

25           It's just not what we have here.  There's no event

1   that alters the *status quo* of the lateral here.  We have

2   distributions of new securities being grant -- distributed on

3   account of claims.

4            Your Honor, the first lien notes are getting paid

5   in full, whether they're reinstated or whether they're

6   crammed down with getting the indubitable equivalent of their

7   claims.  And argument that they're not getting paid in full

8   ignores the reality of those two scenarios and ignores the

9   consequences of Your Honor's rulings one way or the other.

10  And that goes not only to the adequate protection provision

11  that Mr. Kleinhaus outlined, 6.3, but as a general matter.

12           The first lien noteholders here are seeking a

13  windfall and they're hunting for it wherever they can find

14  it; whether it's against the debtors, whether it's against

15  the first lien credit agreement lenders, or whether it's

16  against the second lien holders.  And that's why they argue

17  that somehow the second lien noteholders should be obligated

18  to account for a make-whole premium that Your Honor, assuming

19  that's the result, has determined is not payable under the

20  first lien indenture.

21           And Mr. Kleinhaus said it right:  These are absurd

22  results that the first lien noteholders are pressing.  First

23  lien noteholders are seeking to keep the door open here to,

24  if they lose out on a double recovery from the debtors, to

25  pursue that on a post-emergence basis from the second lien

1    noteholders or otherwise.  That door should not be kept open.

2           Finally, Your Honor, the full and final resolution

3    of these intercreditor disputes, again, it's part and parcel

4    of the settlement that Deerfield agreed to with the debtors

5    to resolve disputes with respect to second lien noteholders'

6    treatment under the plan.  That settlement is part and parcel

7    of the plan as a whole, which as Your Honor knows, it

8    resolves the very complex issues and disputes in this case,

9    with numerous creditors, including second lien noteholders.

10           Deerfield asked the Court to overrule these

11   objections, provide the finality and certainty that Deerfield

12   has negotiated for with the debtors and which the debtors and

13   these creditors rightfully are pursuing.  Thank you.

14           THE COURT:  Thank you, Mr. Beller.

15           Anyone else before I turn to the first lien

16   noteholders?

17           All right.  Mr. Robbins?

18           MR. ROBBINS:  Thank you, Your Honor.

19           And may I please the Court?

20           For the record, this is Larry Robbins for the

21   first lien noteholders.  I am joined this morning, Your

22   Honor, by my partner, Donald Burke, and with the Court's

23   permission, I propose to address the debtors' contention that

24   they are entitled to reinstate the 1L debt without paying the

25   make-whole that they promised to pay in the contract, and

1    then Mr. Burke will then address the intercreditor issues.

2            THE COURT:  All right.

3            MR. ROBBINS:  Your Honor, let me start with some

4    propositions that I think ought not to be fairly debatable,

5    because whatever else the parties may disagree about this

6    morning, and it sounds like there are a number of those

7    points, it seems to me that three basic propositions cannot

8    fairly be disputed.  The first, the best evidence of what is

9    or is not permitted under the Code is the plain language of

10   the Code, itself.

11           Second, under the Code, there is a presumption of

12   impairment.  That's exactly what the Third Circuit said in

13   PPI Enterprises and the text of Section 1124 reinforces that

14   presumption, which means, Your Honor, that even if the text

15   of 1124 were ambiguous, which for reasons I'm going to come

16   to momentarily, we think it is not and it is unambiguous in

17   our favor, but even if it were ambiguous, the Court's

18   obligation, we respectfully submit is to break that tie in

19   favor of a finding of impairment and not in the direction of

20   the debtors, as Mr. Kleinhaus contended.  So, close calls

21   must be resolved in favor of impairment so as not to deprive

22   creditors of the protections of plan voting and the

23   confirmation process.

24           Finally, the presumption in favor of impairment is

25   reinforced, still, further, by the unique features of the

1    parties' contract in this case.  In contrast to other

2    indentures in this very case or in other Mallinckrodt

3    indentures, the 1L indentures makes clear just how crucial

4    the applicable premium was to the April 2020 note exchange.

5    The parties agreed in language that I had hoped to draw the

6    experts of Mr. Hayes' attention to, but he was unable to tell

7    me about other indentures this morning during cross, but I

8    submit that had he read the other indentures, he would have

9    found that the language here are unusually robust in favor of

10   the applicable premium.

11          The parties agreed in precisely these words that

12   the applicable premium was reasonable, was the product of an

13   arm's-length transaction, was a "material inducement" to the

14   exchange, and was the result of "specific consideration in

15   this transaction."  The parties even agreed that the

16   protections of any statute that might somehow foreclose the

17   enforcement of the make-whole would be waived in the language

18   that was capitalized and which I drew Mr. Hayes' attention

19   to.

20          It follows, we'd submit, Your Honor, that the

21   debtors have a heavy burden this morning, which I did not

22   hear Mr. Kleinhaus acknowledge; a heavy burden to show that

23   the text of 1124 unambiguously permits them to dishonor this

24   contractual undertaking.  But far from doing so, far from

25   authorizing their disavowal of the make-whole, Section 1124

1   flatly forbids the debtors from breaching their make-whole

2   obligation.

3           I'd like to start with the text and if I could

4   trouble Mr. Cassel, if I'm pronouncing his name right, to put

5   back on the screen, a couple of the exhibits that he was kind

6   enough to use during Mr. Kleinhaus' argument, I'd like to

7   start by asking Mr. Cassel to put 1124 on the screen.  And I

8   can't tell because there are so many names on the screen,

9   whether Mr. Cassel has been kind enough to stick with us, but

10  may I just ask whether he or someone on his team could put

11  that back on the shared screen.

12      (Pause)

13          MR. ROBBINS:  Great.  Thank you very much, Mr.

14  Cassel.  I very much appreciate it.

15          So, let's start with the language of the text,

16  because as I say, that is, in my view, where this case begins

17  and ends.  The debtors are invoking Section 1124(2).  They

18  are saying that they meet all the reinstatement or the

19  curative provision of this statute.  And they start with

20  1124(2)(a) and you'll notice, Your Honor, that it begins by

21  saying, "Cures any such default ..."

22          And, of course, the reserves to "such default" is

23  a reference back to the preamble of 1124(2).  So, what is the

24  type of default that such default is a reference to, or put

25  another way, what are the set of defaults that are subject to

1   being cured through reinstatement or otherwise under 1124?

2              Well, the preamble tells us.  It says that you can

3   cure the kinds of defaults that entitle the holder of a claim

4   or interest to demand or receive accelerated payment.  So,

5   the first question you have to ask is whether the default at

6   issue is a default that gives rise to accelerated payment of

7   such claim or interest.  There is no fair dispute here that a

8   default in respect of the payment of a make-whole does not

9   give rise to an acceleration.  If you don't pay the make-

10  whole, nothing is accelerated; you simply owe the make-whole.

11             As such, I think it is indisputable that if we're

12  allowed to look at that phrase, that provision, if you will,

13  it cannot possibly fall within the definition of such default

14  because it is not the kind of default that, itself, gives

15  rise to acceleration, which is what the preamble limits the

16  scope of the cure to.

17             Now, the debtors don't really dispute that.  They

18  don't argue that not paying the make-whole somehow gives rise

19  to acceleration; no, that's not what they're saying.  What

20  they say is that we are looking at the -- we are slicing the

21  onion too thinly.  They say in substance, you can't just look

22  at that provision.  You have to look at 6.02 as a whole and

23  because 6.02 as a whole, does, in fact, have a provision that

24  accelerates something, in particular, the payment of

25  principal and interest, well, then, you're allowed to

1   basically reinstate the debt without regard to anything

2   that's in 6.02, whether it's the make-whole or anything else.

3           I would like to address that, because I think

4   that's the main action here.  And let's start with whether

5   they're entitled to look at 6.02 as a whole, as the

6   "contractual provision or applicable law" referred to in

7   11(2), the preamble.  I would like to suggest, Your Honor,

8   that they are looking through the wrong end of the telescope

9   when they say that.

10          And why do I say that?

11          And let me just be clear of the point I'm making.

12  They are telling you that you can't look at the make-whole,

13  the applicable provision of the -- the applicable premium

14  provision alone, which they acknowledge, at least by their

15  silence, doesn't give rise to acceleration.  They say you

16  have to look at 6.02 as whole.  I suggest that that is a

17  mistake, and the reason I say so is that if you look at the

18  preamble to the entirety of 1124, and after all, you have to

19  look at 1124 as a whole, you have to construe it as a whole,

20  you'll see that it refers to, it says with respect to each

21  claim or interest -- each claim or interest -- that is a

22  directive to focus on the specific claim.

23          Here, the specific claim is the make-whole and,

24  therefore, it seems to me that a fair reading of the preamble

25  in 1124, that very first paragraph at the top, tells us that

1   the relevant provision we should be looking at is the make-

2   whole claim, by itself, and not the entirety of 6.02, as the

3   debtors would have the Court do.

4           But let's give the devil his due.  Let's assume

5   for the moment that they're right; that we're entitled to

6   look at 6.02 as a whole and ask the question, okay, is the

7   default in the -- is the refusal and the default and the

8   payment of the make-whole -- is 6.02, as a whole, the kind of

9   provision or applicable law that entitles the holder to

10  receive accelerated payment?

11          So, let's -- although I resist the suggestion that

12  you're allowed to look at this as a whole because of the

13  preamble in 1124, let's assume that they're right.

14          And now, I would like to ask Mr. Cassel to put up

15  the Black's Law Dictionary definition of acceleration back up

16  on the screen.  Thank you very much, sir.

17          They accuse us using only the second of two

18  definitions, so let's talk about the first one.  The first

19  definition of acceleration is the act or process of

20  quickening or shortening the duration of something.

21          And they tell you that that applies to the make-

22  whole.  And if you want to see the written version of this

23  argument, because this is where the bodies are buried, Judge,

24  you should look at their reply brief at paragraph 13 and

25  following of where they lay out this argument.  And I think

1   everything rides on whether this contention is correct.

2            They say that the make-whole is, in fact, the

3   product of acceleration.  Why?

4            Well, here's their argument.  They say that the

5   make-whole, if it was ever going to be paid, would be paid

6   sometime in the future in the event that there was an early

7   redemption prior to maturity.  And since it might or might

8   not have happened in the future, making it payable today

9   under the acceleration provision, 6.02, constitutes an

10  acceleration of the make-whole.

11           That is false.  That is a plain misconstruction of

12  the text of 6.02 and makes a hash of ordinary English.  If

13  you look at this first definition, the one they like, the one

14  they say that we somehow hid the ball on, you'll see that it

15  says:  Shortening the duration of something.

16           That's what acceleration means.  It means that

17  something that was going to happen, that something that was

18  going to mature at a later date was hastened to sometimes

19  closer to the present.

20           That is not true about the make-whole.  It the

21  make-whole is a contingent event.  It isn't being

22  accelerated.  It is simply being imposed, whereas, it may

23  never have happened in the future, Judge.

24           In that respect, Judge, it's entirely different

25  from the payment of a new stream of principal and interest.

1  Principal and interest has a maturity.  It has a schedule.

2  It is inevitably going to be paid, if it's going to be paid

3  at all, at prescribed times, going out into the future.  If

4  it's made to be paid immediately, that, and only that, is

5  acceleration.  But a make-whole is not accelerated in any

6  sense that matters.

7          So, even -- the short of it is that even if you

8  believe that it is appropriate to consider 6.02 as a whole

9  for purposes of the analysis under 1124, which I submit you

10  can't, given the preamble of that statute, but even if you

11  could, it is simply not true, that the make-whole is, itself,

12  accelerated.  And that, I think, is the death nail for the

13  proposition that they're entitled to renege on their

14  contractual agreement and reinstate the debt, without adding

15  the make-whole to the principal.

16          So, I think we, therefore, stand, with Delaware

17  Bankruptcy Judge Walsh, who, in the Ace-Texas case, which

18  although we cited, is not, as best I can tell, is not

19  referred to in the debtors' reply brief, and I can only

20  assume they don't have a particularly compelling answer to

21  it, thereto, the debtor was arguing that the acceleration --

22  and these were the words from the Court:

23          "The acceleration language of Code Section 1124(2)

24  does not limit the scope of a cure."

25          Judge Walsh, as he said, declined to adopt that

1  view; instead, quoting from a legal bankruptcy treatise, the

2  Court held, Section 1124(2) applies only to the curing of

3  defaults that have accelerated the debt.

4         The failure to pay the make-whole accelerated

5  nothing and the petition for bankruptcy did not accelerate

6  the make-whole; it is simply a payment that is due if

7  something else is accelerated.

8         So, I think, in short, Your Honor, the language,

9  the plain text, which is dispositive, is unambiguous in our

10  favor.  But, again, if this were fairly debatable, if there

11  were another way to read the language I've just walked the

12  Court through, that ambiguity would have to be resolved in

13  favor of a finding that we are impaired.  That's the

14  implication of PPI Enterprises.  It's the implication of the

15  fact that 1124, in two different places, emphasizes that, you

16  know, you are impaired unless every one of your rights is

17  left unaltered.

18         And so, our central submission this morning, is

19  that the make-whole is simply not subject to cure under

20  1124(2).  So, you don't have to get into the question whether

21  Section 365 applies beyond executory contracts or unexpired

22  leases.  You don't have to get into the niceties of

23  1124(2)(a) through (e); none of that comes into play, because

24  all of that comes into play, if and only if, this is the kind

25  of default, or in the words of the statute, the such default,

 1   end quote, that the statute embraces.

 2            And the answer to that is:  No, it is not.

 3            So, you know, for all of these reasons, we think

 4   that the Code forbids the reinstatement.  The Code makes us

 5   impaired.  The plan treats us as impaired.  And, therefore,

 6   the question presented is not whether they can reinstate, but

 7   whether their second toggle, which proposes these cram-down

 8   notes, satisfies the confirmation standards.

 9            In a moment, I'm going to stop, Your Honor, unless

10   the Court has questions; otherwise, I propose to turn the

11   virtual podium over to Mr. Burke, who's going to address the

12   intercreditor issues.

13            THE COURT:  All right.  Mr. Burke?

14            MR. ROBBINS:  Oh, let me just -- actually, if I

15   might, I just want to diffuse one argument that I keep

16   hearing.  It's not really a legal argument; it's actually, I

17   guess, a play for atmospherics, and that is, I keep hearing

18   the word "absurd" thrown around, a blatant double recovery.

19            I think Mr. Kleinhaus said that the word "absurd"

20   is overused in litigation; of course, that didn't stop him

21   from using it once again.  And what is said to be absurd and

22   what is said to be punitive and a windfall and a "blatant

23   double recovery" is that as things have worked out, our

24   clients are entitled to a make-whole that is, I'm told,

25   around $94 million, as well as principal interest on the

1    principal, and that is said to be double-counting.

2         The problem with that argument is not simply that

3    it isn't legal argument, but an argument, you know, of

4    atmospherics, but, more fundamentally, again, it looks at the

5    issue through the wrong end of the telescope.

6         The question whether something is punitive or a

7    windfall or a penalty, as I believe Mr. Kleinhaus also said,

8    that question must be looked in an *ex ante* perspective.  You

9    have to ask yourself whether the parties, at the moment of

10   contract, were acting reasonably, which, of course, they said

11   they were when they wrote the indenture.  They said, this was

12   a reasonable anticipation of damages.

13        Now, because it worked out in a particular way

14   after the fact, they say it's punitive.  That is an argument

15   that is simply not cognizable.  That is why I asked Mr. Hayes

16   whether the way we are supposed to look at this is from an *ex*

17   *ante* perspective, and I think he agreed.  The case law

18   supports that and I don't think I need to trouble the Court

19   with citations about that because it is so well-settled.

20        So, the mere fact that looking in hindsight, they

21   think this is an over-rich result; well, it could have been

22   different.  As Mr. Hayes acknowledged, Treasury bills could

23   have gone up, not down.  They could have gone up sufficiently

24   that there would be no make-whole under the alternative

25   calculation at all.

```
 1              And for that reason, from an ex ante perspective,
 2   the parties acknowledgment in the contract that this is a
 3   reasonable solution, these are reasonable numbers, should be
 4   honored.  And all this -- I'll call this "chitchat" about
 5   double recovery, and punitive, and Draconian -- I think I
 6   heard that adjective, as well -- is just so much filibuster.
 7   That's not the way these issues are supposed to be
 8   considered; they are supposed to be considered ex ante, and
 9   from that perspective, the contract should be honored.
10              And with that, I will turn, with the Court's
11   permission, the argument over to my partner, Donald Burke.
12              THE COURT:  All right.  Mr. Burke, how long do you
13   think you're going to take?
14              MR. BURKE:  Maybe 10 to 15 minutes.  I don't have
15   a great estimate to be honest.
16              THE COURT:  Okay.  Let's take a very short, five-
17   minute recess.  We'll come back at 11:55, and I'll go back to
18   Mr. Burke.
19              I do need to break at 12:30, or we will break at
20   12:30 for lunch, if we're not done by then; hopefully, we
21   will be.
22              So, let's take a five-minute recess; we'll
23   reconvene at 11:55.
24              MR. SILVERSTEIN:  Your Honor, it's Paul
25   Silverstein.  I'll need 5 to 10 minutes after, on behalf of
```

1    Columbus Health, if that's all right with you?

2            THE COURT:  That's fine.

3            MR. SILVERSTEIN:  Thank you.

4        (Recess taken at 11:51 a.m.)

5        (Proceedings resumed at 11:55 a.m.)

6            THE COURT:  All right, we are back on the record.

7            Mr. Burke, go ahead.

8            MR. BURKE:  Good morning, Your Honor.  Are you

9    able to hear me okay?

10           THE COURT:  Yes.

11           MR. BURKE:  Great.  Just for the record, Donald

12   Burke from Robbins, Russell on behalf of the 1L Noteholder

13   Group.

14           I want to discuss briefly the other aspects of the

15   plan that would alter the 1L Noteholders' legal, equitable,

16   and contractual rights, setting aside the make-whole

17   applicable premium issue that Mr. Robbins already covered,

18   our objection laid that out, and a number of other aspects of

19   the plan that would impermissibly alter the 1L Noteholders'

20   rights and are, therefore, incompatible with reinstatement.

21           First, I just wanted to address, I think as a

22   matter of housekeeping, our objection included a challenge to

23   the broad third party releases that the plan would subject

24   the 1L Noteholders to despite treating them as unimpaired

25   under the plan, which we laid out in our objection.  We think

1    it makes no sense to say that a claim holder can be

2    unimpaired while they're also exposed to a nonconsensual

3    release.  And in paragraph 32 of the debtors' reply, they

4    don't defend that result; they say they're prepared to modify

5    the plan to allow the 1L Noteholders to opt out of the

6    releases, and that does resolve our objection as to that

7    component of the plan.

8              So, with that out of the way, I want to turn to

9    the inter-creditor issues that have already been discussed by

10   Mr. Kleinhaus and others earlier this morning.

11             I think, as a general observation, there is a bit

12   of a tension in the way that the parties have presented these

13   issues.  For the most part, the briefing tries to defend the

14   plan's treatment of the interparty claims as simply

15   declaratory of what the 1L Noteholders' rights are.  I think

16   that can't be true for reasons I'll explain a moment, but I

17   also heard Mr. Beller for Deerfield describe these

18   resolutions of inter-creditor issues as part of Deerfield's

19   settlement with the debtors.

20             That strikes me as an admissible almost and

21   certainly a suggestion that what the plan does is alter the

22   1L Noteholders' rights as part of the debtors' efforts to get

23   to, you know, peaceful resolutions with other claimants in

24   the case.  The debtors may prefer to get to that result, but

25   it's incompatible with the idea of reinstatement under

1  1124(2).  The code is perfectly clear that any alteration of

2  1L Noteholders' rights that, you know, is not specifically

3  authorized by 1124 precludes reinstatement, and that's

4  consistent with the code's background presumption of

5  impairment that Mr. Robbins talked about earlier today.

6           So I think it's just generally hard to understand

7  what some of these provisions are doing in the plan.  If they

8  are meant to alter our rights, then they're quite obviously

9  incompatible with reinstatement; if they are meant to be

10  declaratory, it's sort of hard to understand what they're

11  doing here and why the debtors and their supporting parties

12  think they're entitled to these, you know, anticipated

13  exculpations that they've loaded up the plan with.

14           Moving on from there, I do want to address more

15  particularly the 1L inter-creditor issues, and then I'll move

16  on to the 2L inter-creditor issues.

17           Our objection to the plan with respect to the 1L

18  inter-creditor agreement is that several provisions of the

19  plan would provide that cash payments made to holders of

20  creditor agreement debt are not and shall not be deemed to be

21  a distribution or payment in respect of shared collateral.

22  Those are in Articles 3(b)(2)(A)(i), 3(b)(2)(B)(iii), and

23  3(b)(2)(C)(iii) of the plan, if I've got my citations correct

24  here.

25           The debtors and their supporting parties try to

1    defend those statements on a number of grounds, but I don't

2    think any of them survive scrutiny.

3            Their first argument turns on the timing of when

4    to evaluate this provision.  They say that, assuming the 1L

5    notes are reinstated, then there's no continuing event of

6    default and, at that point, the payment waterfall in Section

7    2.01 of the 1L inter-creditor is inapplicable.  That doesn't

8    work, though, because all of these plan treatments are part

9    of the package that happened at the same time.  It doesn't

10   make sense to say that the defaults under the 1L indenture

11   have been cured as part of the plan; it's also violating this

12   provision of the 1L inter-creditor agreements.  I don't think

13   timing can do the trick for them.

14           They also make the argument that these cash

15   payments are not a distribution of shared collateral, but I

16   think that rests on their own hypothesis or their

17   contemplation of how the debtors plan to proceed; that isn't

18   supported by the language of the plan.  So I think it's -- I

19   think it's quite significant that when the debtors try to

20   defend that result in their reply brief their citations are

21   to the disclosure statements and Mr. Hayes' declaration,

22   which itself is just cited in the disclosure statement,

23   they're not identifying, you know, any provision of the plan

24   that actually restricts the source of the cash payments that

25   may go to -- that will or may go to credit agreement debt

1   holders under the plan.

2          So I think they may have established that there

3   are possible scenarios in which these payments could be made

4   without distributing shared collateral, but of course that's

5   not the finding they're asking the Court to make as part of

6   the plan.  They want you to say that these payments, no

7   matter where they're sourced from, are not and shall not to

8   be -- shall not be deemed to be distributions of shared

9   collateral, and I don't think they've provided a basis on

10  which the Court can get to that result.

11          Mr. Cohen tries to draw a distinction between the

12  term loan exit payment and obligations that are due to the

13  term lenders under the credit agreement itself.  I think, as

14  a first observation, that argument can't save the possible

15  treatment under the plan where the term loan is repaid in

16  full, but I think it's also the sort of thing that

17  potentially could be a defense that term lenders could try to

18  raise in an inter-creditor proceeding.  But I think trying to

19  do it at this stage in summary fashion, based on their own

20  description of how the payment was arrived at, just can't get

21  them there.  I don't think they've provided the Court a basis

22  on which you can reach that result.

23          I want to make sure I try to address each of Mr.

24  Cohen's arguments.

25          (Pause)

1          MR. BURKE:  He also refers to section 2.01(c) in

2     his definition of shared collateral, but I think, again, all

3     they're able to do is identify possible scenarios in which

4     they could make these payments without implicating the

5     waterfall provision in Section 2.01 of the first lien inter-

6     creditor, but, again, they're not establishing a basis on

7     which the Court can, in effect, enter the finding that

8     they're asking for as part of the plan.

9          I think that largely addresses the points we want

10    to make with respect to the lender inter-creditor agreement.

11    So, unless the Court has questions on that, I'll move on to

12    our arguments with respect to the 2L inter-creditor agreement

13    and the 2L Noteholders.

14          There, our primary argument is that the new

15    securities that will be issued to holders of the second lien

16    notes under this plan are a distribution of property and an

17    insolvency proceeding that is subject to the turnover

18    obligation in section 4.2(b) or the second lien inter-

19    creditor agreement.  Those distributions are made on account

20    of the collateral because it is perfectly clear that they are

21    to be made in satisfaction of the 2L Noteholders' secured

22    claims; it's plain on the face of the plan.

23          The debtors and Deerfield respond to that point by

24    invoking the EFH case and the Momentive case, but both of the

25    inter-creditor provisions at issue in those cases dealt with

1    turnover of proceeds of collateral.  Here, the turnover

2    provision we're relying on, 4.2(b), is actually broader in

3    the sense that it applies to any distribution of property on

4    account of the collateral, which is a broader concept and I

5    think you can see that very clearly when you compare 4.2(b)

6    of the second lien inter-creditor with 4.2(a).  4.2(a) is a

7    turnover provision that deals with collateral and proceeds of

8    collateral, and 4.2(b) doesn't have any such limitation.  So

9    4.2(b) is a broader provision and it encompasses, you know,

10   any sort of distribution of property that is made on account

11   of the collateral here, and that includes the new securities

12   that are to be issued to the second lien note holders under

13   the plan.

14          (Pause)

15          MR. BURKE:  The debtors in Deerfield also point to

16   Section 6.6 of the 2L inter-creditor, which has a set of

17   rules to govern reorganization securities and a case where

18   the 1L claim holders and the 2L claim holders received new

19   securities as part of the bankruptcy plan, and it provides

20   for lien subordination, you know, the instrument issued to 2L

21   Noteholders.  But that's all it does.  It doesn't create any

22   exception to the turnover right or turnover obligation in

23   4.2(b) of the inter-creditor agreement, so I think it's just

24   entirely inept to refer the Court to Section 6.6.  They have

25   to comply with Section 6.6, but they also have to comply with

1  the other obligations under the inter-creditor, including

2  4.2(b).

3         The debtors in Deerfield, they also cite the court

4  to the decision in Onco, which they say holds that

5  reinstatement as to the debtor, works a reinstatement as to

6  the world, including as to any inter-creditor claims, but I

7  think that's very plainly over-reading the decision in Onco

8  that say -- a brief decision that isn't entirely clear with

9  respect to its reasoning.  I think it's primarily focused on

10 an interpretation of the particulate language of the inter-

11 creditor agreements at issue there, which the Court can find

12 quoted, I believe it's at 316 B.R. 166.

13        And there the inter-creditor was focused on all

14 obligations due from the borrower, and the court held that,

15 in light of reinstatement of the claim as to the debtor,

16 there was no longer any obligation due from the debtor, and

17 that was the basis for the decision that there was also no

18 inter-creditor claim that could be pursued.  Here, in the

19 definition of the first lien obligations in the 2L inter-

20 creditor agreement, it's clear that amounts to be paid by an

21 obligor are included in the definition of the first lien

22 obligations and any amounts that are disallowed by the Court

23 are still part of the first lien obligations as it respects

24 the 2L Noteholders in their inter-creditor capacity.

25        So, I think here the inter-creditor agreement is

1    quite clear that it's meant to pick up any obligations that

2    would have been due from the debtor that are no longer due as

3    a result of a decision by this Court.  In that respect, it's

4    different from the language at issue and Onco, and so I think

5    the reliance on Onco is quite misplaced.

6              I also think the reasoning in Onco is a bit hard

7    to follow and ultimately is not persuasive.  Whatever policy

8    rationales come into play when you're focused on a

9    reinstatement of the claim as to the debtor, it's hard to see

10   how this carries through to inter-creditor disputes that are

11   governed by separate agreements as between the senior and

12   subordinated creditors and don't have any of the same policy

13   implications that reinstatement of the debtors' obligation

14   has.

15             I think, in closing, I do want to get to the

16   adequate protection component of our argument on the 2L

17   inter-creditor.  Mr. Kleinhaus quoted the definition of the

18   adequate protection turnover obligation, in particular the

19   shortfall definition in the 2L inter-creditor, and he focused

20   on the proviso that first lien claim holders may be required

21   to exchange:  "promissory notes, equity, or other property

22   equal in value to the cash paid in respect to the pay-over

23   amount."  But that proviso refers only to a situation where

24   the first lien claim holders received payments under the plan

25   in that form, these debt securities or equity, and of course

1    here we're talking about a plan that proposes to reinstate

2    the 1L, so there's no sense in which the 1L Noteholders

3    wouldn't be receiving payments under the plan.  If we're in

4    this state of the world where the Court approves

5    reinstatement, that's a state of the world where we're

6    keeping the existing notes and we're not receiving any new

7    payments under the plan.

8              I think those are all the points I wanted to cover

9    with respect to the inter-creditor issues, unless Your Honor

10   has any questions for me.

11             THE COURT:  All right.  Thank you, Mr. Burke.

12             Mr. Silverstein, you wanted to make an argument?

13             MR. SILVERSTEIN:  Yes, Your Honor.  Thank you very

14   much.  Good afternoon, Your Honor.  For the record, Paul

15   Silverstein for Columbus Hill Capital Management, one of the

16   larger holders of 1L notes.

17             Our objection at Docket 4729 addresses in detail

18   the issues that Mr. Kleinhaus argued today and I trust -- I

19   know that Your Honor will carefully consider our written

20   submissions.  Similarly, I will not repeat Mr. Robbins' and

21   Mr. Burke's arguments today; they were very direct in all

22   respects.  I would just highlight the following couple of

23   things.

24             The debtors could reinstate an unimpaired, the 1L

25   notes, but they must, however, include the applicable premium

1   in the reinstated amount.  We are not seeking accelerated

2   payment.  Section 1124 of the code does not determine the

3   amount of a claim, it only provides a rule for determining

4   whether a given treatment under a plan impairs the claim or

5   not.  The amount of the claim is determined by applicable

6   state law, here New York law, and -- I'm sorry, here New York

7   law for the first lien notes, and any applicable provision of

8   the bankruptcy code.  There's nothing in the bankruptcy code

9   that limits the allowance of the applicable premium.  The

10   applicable premium is a liquidated damages provision that is

11   enforceable under New York law.

12          The debtors' arguments, Your Honor, that the

13   applicable premium is punitive or too high or not fair and

14   subject to disallowance under a reasonableness standard is

15   likewise meritless.  New York law, which --

16          THE COURT:  Mr. Silverstein, can I ask you to turn

17   your phone off?  I think -- or someone's phone is ring, I

18   don't know whose it is.

19          MR. SILVERSTEIN:  No, it's in where I'm -- I think

20   it stopped -- it was in my location.  I apologize, Your

21   Honor.  Let me start that sentence again, if I may, I

22   apologize.

23          The debtors' argument that the applicable premium

24   is punitive or too high or not fair and subject to

25   disallowance under a reasonableness standard is likewise

1 meritless.  New York law, which governs the indenture,

2 recognizes applicable premiums and similar provisions as

3 liquidated damages, as I said.  Like other liquidated damages

4 provisions, the reasonableness of the applicable premium is

5 evaluated as of the date of execution of the underlying

6 contract.  As a result, any arguments regarding the actual

7 damages suffered are irrelevant.  Under New York law, the

8 reasonableness of liquidated damages provisions under Sherman

9 based on the circumstances that existed at the time of the

10 contract, not by reference to actual damages.

11         Section 602 of the indenture states that the

12 applicable premium, quote, "shall be presumed to be

13 liquidated damages sustained by each holder as a result of

14 the acceleration of the notes and the issuers agree that it

15 is reasonableness under the circumstances currently

16 existing," end quote.

17         In Section 602 of the indenture, the debtors --

18 the 1L indenture -- that's, I believe, Exhibit 26 -- the

19 debtors further agree that, "(a) the applicable premium is

20 reasonable and is the product of an arm's length transaction

21 between sophisticated business entities ably represented by

22 counsel; (b), the applicable premium shall be payable

23 notwithstanding the then-prevailing market rates at the time

24 acceleration occurs; (c) there has been a course of conduct

25 between holders and the issuers giving specific consideration

1  in this transaction for such agreement to pay the applicable

2  premium; and, (d), the issuers shall be estopped hereafter

3  from claiming differently than as agreed in this paragraph.

4  The issuers expressly acknowledge that their agreement to pay

5  the applicable premium holders pursuant to the first section

6  of this paragraph is a material inducement to holders to

7  acquire the notes."

8          I mean, I think that's rather compelling, but I'm

9  not going to belabor that point, I think Your Honor

10  understands it.

11         Finally, Your Honor, as to the debtors' citation

12  to -- citation or reliance upon Judge Isgur's EP Energy

13  statements, that decision, I think, as Your Honor is aware,

14  was vacated by Judge Isgur.  So, you know, to the extent it

15  has any merit -- it would have any effect that's similar to

16  colloquy of any of your colleagues, you know, musing-type

17  comments at an ABI conference, frankly, and I think the

18  reference to EP Energy really has to be discarded.

19         And that's basically all I have to add, Your

20  Honor.  I think the presentation and the pleadings here by

21  the 1L Noteholders are fairly comprehensive and I think they

22  make the point.  I think the applicable premium must be

23  allowed in any reinstatement context here and must be

24  included in the principal amount.

25         Thank you.

1          THE COURT:  Thank you, Mr. Silverstein.

2          Mr. Kleinhaus, any brief response?

3          MR. KLEINHAUS:  Sure, Your Honor, and I will try

4    to be brief, a couple of specific points.

5          I heard Mr. Robbins reference Ace-Texas, the Judge

6    Walsh decision.  The reason we haven't gotten into Ace-Texas

7    is because that was a case where default interest was

8    asserted because the debtor defaulted prepetition.  In Judge

9    Walsh's words, the notes were not accelerated by a

10   bankruptcy.  The notes mature prepetition, it has nothing to

11   do with 1124 as applied to a bankruptcy default.

12         EP Energy, my understanding is it was vacated as

13   the plan did not go effective; it wasn't repudiated in any

14   way.  Your Honor is free to consider it persuasive or not if

15   you think the reasoning is persuasive.

16         I've heard some references to language in 6.02 of

17   waiver, which purports to waive rights to object to the make-

18   whole.  It's well established that an estate is not bound by

19   bankruptcy waivers.  Footnote 16 of our brief cites authority

20   for that proposition.  I don't understand the objectors to be

21   arguing that that waiver is effective.  We're perfectly

22   entitled as an estate to take advantage of and argue Section

23   1124.

24         On the argument on the text of Section 1124, the

25   word "provision" has an absolutely clear meaning.  I mean, it

1    means provision, it's a section.  The provision here is

2    Section 6.02.  In arguing that the provision is part -- that

3    the make-whole is part of the provision and it can be viewed

4    on its own, the objectors are at war with the language.

5    They're splitting up something not only do the parties to the

6    contract choose not to split it, but they're completely

7    linked conceptually.  There's one acceleration of one claim,

8    the title of the entire provision is acceleration.  Mr.

9    Robbins was saying the make-whole is not accelerated, then

10   why is that acceleration of the make-whole right next to the

11   broader acceleration, part and parcel of it, in the

12   acceleration provision?

13          Now, I think I heard Mr. Robbins say that

14   everything rides on whether the make-whole is accelerated and

15   he argued that, under Black's Law's definition otherwise, you

16   can't quicken or bring to fruition earlier something that's

17   contingent rather than absolutely certain to happen.  My

18   first question is, why?  The point was asserted, but not

19   supported.  As a matter of plain language, something that may

20   happen in the future can absolutely be accelerated.  Instead

21   of happening later under particular conditions, the

22   contingency is satisfied right away.  That's a quickening, it

23   comes about earlier, it's acceleration.

24          And, if Mr. Robbins were correct, any lender could

25   just smack a make-whole or a penalty or a fee on a bankruptcy

1  and then turn around and say, even though it's based on the

2  bankruptcy, the default, even though it comes due

3  immediately, to use the words of the indenture, whereas it

4  previously would have come due at a different time, that's

5  not acceleration.  Your Honor, it's not persuasive.

6       On the inter-creditor issues, you're starting with

7  why is this -- these provisions in the plan.  The answer is,

8  in agreeing on treatment with other creditors, 94 percent of

9  the capital structure, the debtors agree to include language

10 in the plan to provide finality to other first lien creditors

11 and to second lien note holders, and that's appropriate under

12 the code.  Section 1123(b)(6) allows inclusion of a

13 provision, of any appropriate provision not inconsistent with

14 applicable provisions of this title.

15      Now, far from being inconsistent, Section 510(a)

16 authorizes the Court to enforce subordination provisions.

17 And here we are in a core proceeding, approval of a plan.  So

18 -- and the objectors here, they just came right in on the

19 plan and they argued the merits of the inter-creditor.  They

20 didn't do what other first lien lenders or some first lien

21 lenders have done in similar situations.  As in Onco -- in

22 Onco, the first lien lenders, after the plan was filed, they

23 brought an adversary proceeding and the court ruled on it

24 while the plan was still pending.  That's not what these

25 objectors did.  They waited until the plan was on file, it

1  had been on file for months by the time their objection was

2  filed, and they argued these objections on the inter-creditor

3  issues on the merits and we've answered them.

4          And there are plenty of examples of cases in plan

5  situations, including BWS Holding from the Third Circuit,

6  where inter-creditor issues are addressed in the plan

7  context.

8          Now, I heard Mr. Burke say, well, we argued

9  earlier that there won't be a continuing event of default

10 when the payments are made under the plan to revolving

11 lenders, so there can't be a violation of the first lien

12 inter-creditor.  That's a simple, straightforward argument

13 that defeats all the first lien inter-creditor points.

14         Mr. Burke said timing can't solve the problem;

15 respectfully, it can.  Respectfully, the plan will go

16 effective and then the payments will be made.  The whole

17 point of reinstatement is that there will be no event of

18 default at that time and, therefore, Section 2.01 of the

19 inter-creditor will no longer be applicable, not that it was

20 ever applicable.

21         Mr. Burke said this is -- he's not sure whether

22 shared collateral will be distributed.  Even though Mr. Hayes

23 has testified and, you know, the plan says the payments will

24 get made out of new financing, it's not clear enough.  I

25 think it is clear enough from the evidence that's been

1    provided.  We said in our reply, if there's really any lack

2    of clarity, we can make the plan clearer to say the revolving

3    loan will be paid out of any -- and any other -- you know,

4    the 0.5 percent, as Mr. Cohen argued, is not a prepetition

5    debt anyway, but that could also be paid out of new

6    financing.

7              So I think on the first lien inter-creditor

8    there's -- they really don't have an answer to the points

9    that were made.  As to the second lien inter-creditor, I'm

10   going to rest on the arguments that I made earlier prior to

11   Mr. Burke's response.

12             Thank you very much, Your Honor.

13             THE COURT:  Thank you, Mr. Kleinhaus.

14             All right, Mr. Beller, Mr. Johnston, and Mr.

15   Cohen, I'll give you each one minute.

16             Mr. Beller, go ahead.

17             MR. BELLER:  Your Honor, just to quickly address

18   the few points because, again, you're hearing more of the

19   same, which is cursory assertions by the first lien note

20   holders.

21             On the turnover language in Momentive and EFH, the

22   language in those inter-creditors is "collateral" or

23   "proceeds of collateral."  And Judge Drain in Momentive very

24   clearly walked through the definition of proceeds under the

25   UCC, which includes property distributed on account of

1  collateral, among many other elements.

2          So, if anything, the language here is more narrow

3  than the language in Momentive and EFH, not the other way

4  around.

5          On the definition of first lien obligations under

6  the inter-creditor, again, completely ignores the important

7  part of the definition that says it's only obligations that

8  are to be paid under the first lien indenture and related

9  documents.  The make-whole here if the first lien notes are

10 reinstated is not to be paid under the first lien indenture.

11 It's a distinction from disallowance that the first lien note

12 holders are completely ignoring, just as if any other claim

13 that would be asserted by the first lien note holders that

14 isn't -- that they're not entitled to doesn't magically

15 become an obligation under the inter-creditor.

16          Finally, on the adequate protection point, again,

17 the first lien note holders want to have their cake and eat

18 it too.  They want to say that what they're getting if

19 they're reinstated shouldn't count for anything, right?  So

20 there's still a shortfall that they're not getting anything

21 for.  So they get to double recover from the reinstatement,

22 giving them full value, and look to other parties to bolster

23 their recoveries way beyond full -- payment in full.

24          And, finally, as Mr. Kleinhaus just said, the fact

25 that the parties -- that Deerfield has negotiated for the

1    inclusion of finality under the plan with respect to these

2    issues has no bearing on whether it is in fact impairing the

3    first lien notes or whether it's otherwise appropriate.

4              Thank you, Your Honor.

5              THE COURT:  Thank you, Mr. Beller.

6              Mr. Johnston?

7              MR. JOHNSTON:  Thank you, Your Honor, two points.

8              Mr. Burke said that there was nothing in the plan

9    that specified or required that proceeds of the new term loan

10   go to repay the revolving term facility; that is not correct.

11   I would draw your attention to Section 1(a)-256 of the plan,

12   which is the definition of the new term loan facility, which

13   provides in relevant part that the facility, quote, "will be

14   used to refinance the first lien revolving credit facility."

15   So I think that disposes of that argument.

16             Secondly, I just wanted to echo Mr. Kleinhaus and

17   Mr. Beller with respect to the really troubling implication

18   of Mr. Burke's argument that all of this somehow should be

19   preserved for some future litigation between the revolving

20   facility lenders, the term lenders, the 1L note holders, the

21   2L note holders.  That, Your Honor, is completely untenable.

22   This plan is intended to and does resolve these issues

23   completely and fully, all the issues are now joined.  If the

24   plan doesn't resolve these issues, you'd have the specter of

25   post-confirmation litigation where parties are seeking to

1    grab plan distributions from another party, seeking to give

2    up plan distributions, seeking to swap plan distributions.

3    The new term lenders would be brought into the fray, other

4    creditors could be brought into the fray.  I'd submit that's

5    just completely antithetical to what this plan of

6    reorganization is supposed to do.

7            Thank you.

8            THE COURT:  Thank you, Mr. Johnston.

9            Mr. Cohen?

10           MR. COHEN:  Yes, Michael Cohen, Gibson, Dunn &

11   Crutcher.  Your Honor, I'll be very brief.

12           The reality is Mr. Burke states that let's not

13   look at the words of this provision, 2.1(a), let's not

14   acknowledge that there's no event of default when a plan goes

15   effective, these are all truisms and facts that are clearly

16   before the Court.  The term loan exit payment is not an

17   obligation under the creditor agreement; it has nothing to do

18   with the inter-creditor agreement.  All these are plain and

19   simple facts that completely, you know, spell out the notion

20   that there's -- the impairment that is alleged just is not

21   occurring, it's just the provision is not operative and that

22   it's just simple.

23           So this is -- they are just basic, straightforward

24   facts.  The words on the page talk about the proceeds of any

25   sale, collection, or liquidation.  To quote, again, Third

1  Circuit, there's no sale here, there's no proceeds of a sale,

2  so they're just not applicable.

3          And, Your Honor, just to reiterate something we

4  had in our papers, we too, as term lenders, are a party to

5  the second lien inter-creditor.  Our rights are fully

6  reserved there.  I didn't want silence to be interpreted

7  otherwise, but that's all I have, Your Honor.

8          THE COURT:  All right.  Thank you, Mr. Cohen.

9          All right.  We're going to take a lunch recess.  I

10  want to take a little bit of time to put my thoughts together

11  on this issue.  Let's reconvene -- let's reconvene at 4

12  o'clock and by then I should be able to give you my ruling on

13  this issue, and then we can see where we are at that point.

14          All right?  Anything before we recess?

15      (No verbal response)

16          THE COURT:  Okay.

17          MR. MERCHANT:  Nothing from the debtors, Your

18  Honor.  Thank you.

19          THE COURT:  All right.  Thank you all.  We're

20  recessed until 4:00 p.m.

21      (Recess taken at 12:29 p.m.)

22      (Proceedings resumed at 4:04 p.m.)

23          THE COURT:  Good afternoon.  This is Judge Dorsey.

24  We're back on the record in Mallinckrodt PLC; Case No, 20-

25  12522.

1        Before I jump into my ruling is there anything

2   else we need to address, Mr. Merchant?

3        MR. MERCHANT:  Your Honor, Michael Merchant of

4   Richards Layton on behalf of the debtors.  I am not aware of

5   anything else that needs to be addressed today.

6        THE COURT:  So this is my ruling on the first lien

7   noteholders objection to the debtor's proposed plan of

8   reorganization.

9        The first lien noteholders argue that they are

10  entitled to collect what is referred to in the first lien

11  notes as an applicable premium triggered by an event of

12  default under the notes.  That event of default is the

13  debtor's bankruptcy filing.

14       Specifically, the first lien noteholders argue

15  that Section 6.02 of the first lien indenture provides that,

16       "In addition, upon the acceleration of the notes

17  in connection with an event of default, an amount equal to

18  the applicable premium or optional redemption premium, as

19  applicable, that would have been payable in the optional

20  redemption of the notes at the time of the occurrence of such

21  acceleration will become and be immediately payable with

22  respect to all notes."

23       The first lien noteholders concede that the only

24  event of default here is that the debtors filed for

25  bankruptcy.  Debtors have objected to the first lien

1    noteholders claims asserting that under the debtor's proposed

2    plan of reorganization the first lien notes will be

3    reinstated so that the holders will be paid what they are

4    owed on the original maturity date with all of the terms of

5    the applicable notes remaining intact.

6         Relying on Section 1124(2) of the code the debtors

7    assert that because the notes are being reinstated and

8    because no cure is required because the only default is based

9    upon the *ipso facto* provisions of the notes, and any proposed

10   damages arising from the default have been paid, and

11   reinstatement does not, otherwise, alter the legal, equitable

12   or contractual rights of the noteholders.  The first lien

13   noteholders are not entitled to the applicable premium.

14        Noteholders counter that Section 1124(2) applies

15   only to curing of defaults that have accelerated the debt

16   because the applicable premium is not a contract provision

17   requiring accelerated payment upon a default and debtors

18   default in the payment of the applicable premium has not

19   occasioned any acceleration of the first lien notes the

20   debtor's reliance on Section 1124(2) is misplaced.

21        In other words, the noteholders argue the

22   applicable premium is a "new charge" that the debtors became

23   liable to pay upon the triggering of an event of default

24   through their bankruptcy filing.  I disagree.  What the

25   noteholders are saying, in effect, is that despite the fact

1    that the debtors are proposing to reinstate their notes and

2    will pay the notes in full as originally contemplated with

3    all terms remaining intact they are entitled to extract what

4    amounts to a penalty and, if allowed, a windfall solely

5    because the debtors filed for bankruptcy protection.

6            Section 1124(2) permits the reinstatement of an

7    obligation notwithstanding any contractual provisions

8    requiring an acceleration of any claim or interest after the

9    occurrence of default.  Section 6.02 of the first lien notes

10   indenture is a contractual provision that triggers and

11   accelerates the payment of the applicable premium after the

12   occurrence of the default as a result of the bankruptcy

13   filing.  That is precisely the type of situation Section

14   1124(2) is intended to address; therefore, the applicable

15   premium can be de-accelerated and paid if and when owing at a

16   later time.

17           Reading the noteholders -- even if the 1124(2) is

18   somehow ambiguous reading 1124 in the way the noteholders

19   suggest would be contrary to the strong public policy behind

20   the bankruptcy code.  As Congress noted in passing 1124,

21           "The holder of a claim or interest who, under the

22   plan, is restored to his original position when others

23   receive less or get nothing at all is fortunate indeed and

24   has no cause to complain."

25           That is center report No. 989 Ninety-Fifth

1    Congress Second Session 120, 1978.

2            Reading Section 1124(2) to say that reinstating

3    the notes would prevent the acceleration of the principal in

4    interest under the notes, but allow the bankruptcy penalty to

5    remain as a claim against the estate is simply inconsistent

6    with that stated goal of 1124(2) as well as the code as a

7    whole.

8            As the Supreme Court has noted, a party should not

9    receive a "windfall merely by reason of the happenstance of

10   the bankruptcy."  That is Butner v. United States, 440 U.S.

11   48 at 55, 1979.

12           Moreover, as this court has previously noted,

13   reinstatement and cure, if there were a non-bankruptcy

14   default, which there is no here, do not just "de-accelerate

15   the debt, they role back the clock to the time before the

16   default existed."  That is MW Post Portfolio Fund Ltd., v.

17   Norwest Bank Minnesota NA, or In Re Onco Investment Company,

18   316 B.R. 163 at 167, Bankruptcy Court District of Delaware

19   2004.

20           The applicable premium is only triggered upon

21   acceleration of the notes in connection with an event of

22   default.  Since Section 2014(2) rolls back the clock to the

23   time before the asserted default the applicable premium is

24   not triggered and is not, therefore, due and owing.

25           The noteholders do not seriously contest that the

1  requirements for the reinstatement under Section 1124(2)(a)

2  through (e) have not been met other than their contention

3  that their rights under the first and second lien indentures

4  are being effected.

5        Let me address first a couple of the arguments

6  made in the pleadings.

7        First, the idea that Section 1124(2)(a) somehow

8  makes the provision applicable only to executory contracts is

9  completely meritless.  Section (a) merely incorporates the

10  definition in Section 365(b)(2) of the types of defaults that

11  do not need to be cured, i.e. a bankruptcy filing.  It does

12  not in any way incorporate the requirement in Section 365

13  that would apply only to executory contracts.

14        Second, the noteholders do not contest that the

15  proposed plan would reinstate maturity that they have any

16  uncompensated damages or unperformed non-monetary

17  obligations; therefore, the provisions of Subsections (b)

18  through (d) -- excuse me, (b) through (c) are also met.

19        That brings us to the noteholders' claims that the

20  debtors proposed plan -- that brings us to the noteholders'

21  claim that the debtors proposed plan somehow effects their

22  contractual or other legal rights under the inter-creditor

23  agreement in violation of Section 1124(d)(2).

24        The first lien creditor agreement governs the

25  relationship between the first lien revolving facility, the

1  term loan facility and the notes.  The noteholders argue that

2  proposed cash payments under the plan to the revolving

3  lenders and the term lenders violate the inter-creditor

4  agreement because they are not distributed pro rata to all

5  three first lien lenders.

6         The noteholders rely on Section 2.01(a) of the

7  inter-creditor agreement which provides that when an event of

8  default has occurred, and is continuing, and a distribution

9  is made of any shared collateral, as defined in the inter-

10 creditor agreement, that distribution must be made pro rata.

11        It was previously noted that Section 1124(2)

12 allows for reinstatement of the notes and that reinstatement

13 rolls back the clock to the time prior to any default.  As

14 such, there will be no continuing event of default at the

15 time the cash payments are made if the plan is approved.

16 This alone is sufficient to defeat the noteholder's position.

17        Even so the noteholders' position fails for the

18 additional reason that the cash payments to the revolver and

19 the term lenders are not being made from the shared

20 collateral.  Rather, the proposed payments will come from a

21 new term loan facility or a new AR revolving facility.  These

22 new loan proceeds that are not part of the bankruptcy estate,

23 see In Re Windstar, 554 F.3d 382 at 400, Third Circuit 2009,

24 do not, therefore, constitute part of the shared collateral

25 under the indenture.  As such, the noteholder's collateral

1    position or priority will not be effected by the plan.

2           The noteholders' rights under the second lien

3    inter-creditor agreement are also not adversely effected by

4    the proposed plan.  Here, the noteholders rely on Section

5    4.2(b) of the second lien inter-creditor agreement which

6    provides that in any insolvency proceeding any "distribution

7    of money or property in respect of or on account of the

8    collateral" shall be paid over to the first lien collateral

9    agent for the benefit of the first lien claim holders.

10          The issuance of new debt, however, is not a

11   distribution of debtor's money or property; see Energy Future

12   Holdings, 546 B.R. 566 at 580, Bankruptcy District of

13   Delaware 2019, affirmed 773 Federal Appendix 89, Third

14   Circuit 2019.

15          Because the proposed new second lien notes will be

16   subject to the second lien inter-creditor agreement and

17   nothing in the inter-creditor agreement prohibits issuance of

18   new debt obligations so long as they remain junior to the

19   first lien obligations, the first lien noteholder's rights

20   are un-affected by the plan.

21          Finally, while it is unclear whether the

22   noteholders are pressing their argument under Section

23   6.3(b)(2) of the second lien indenture that argument is also

24   misplaced.  Since the first lien notes are being reinstated

25   any consequences flowing from any alleged default as it

1   relates to the second lien creditors are reversed; see In Re

2   Onco Investments, 316 B.R. 163 at 165, Bankruptcy District of

3   Delaware, 2014 -- excuse me, 2004.  Therefore, they cannot

4   claim that they have been paid less than full value and seek

5   recovery from the second lien lenders; therefore, the first

6   lien noteholders objection to the plan is overruled.

7           The parties should confer and submit a proposed

8   form of order under certification of counsel.

9           Are there any questions?

10          MR. MERCHANT:  Not from the debtors.  Thank you,

11  Your Honor.

12          THE COURT:  Thank you everybody.

13          Anything else for today, Mr. Merchant, before we

14  adjourn?

15          MR. MERCHANT:  Nothing further, Your Honor.  Thank

16  you for your time this week.

17          THE COURT:  Wait, Mr. McCallen raised his hand.  I

18  knew I shouldn't have asked that question.  Go ahead, Mr.

19  McCallen.

20      (No verbal response)

21          THE COURT:  You're muted, Mr. McCallen.

22          MR. MCCALEN:  Thank you.  I guess you have to be

23  careful what you ask for.

24          Thank you, Your Honor.  Benjamin McCallen from

25  Willkie Farr & Gallagher on behalf of the Acthar insurance

1   claimants.

2          Your Honor, I just wanted to give you a brief

3   update, with the indulgence of the court, for a few minutes.

4   If Your Honor recalls, last Monday we were in front of the

5   court on issues related to the UCC discovery and I wanted to

6   give the court a brief update in terms of where that stands

7   as we move forward into the next phase.  I guess the Acthar

8   trial has been called a phase, but let me get on the other

9   side of that moving quickly into phase two.

10          If Your Honor recalls, last Monday the UCC coming

11  out of that hearing was going to review and produce

12  additional communications related to Acthar, they were also

13  to identify which witnesses they would be designating as

14  experts and to make additional productions accordingly.  Last

15  Tuesday we learned from the UCC that Mr. Greenberg, who is

16  one of the witnesses from Alvarez & Marsal, is going to be

17  designated as an expert on issues related to the waterfall;

18  however, to date this is almost two full weeks ago, there

19  have been no additional documents produced by the UCC related

20  to either Mr. Greenberg's testimony to the extent they're

21  going to be produced.  And I don't know that they are, but to

22  the extent they are they haven't been produced.  The Acthar

23  communications have also not been produced.

24          Your Honor, they have also told us that they are

25  likely to offer one or two additional witnesses and that

1 later today they will be making disclosures pursuant to Rule

2 26 as to the subject matter of those witnesses testimony and

3 presumably any documents supporting their testimony.  We

4 don't know yet what they will be producing or how much.

5          You know, we got a reach out from them as well

6 today just to set depositions for next week, you know, while

7 the Acthar trial is going on.  So if I had to make a guess,

8 you know, additional productions will probably be coming

9 tonight or over the weekend.

10          Your Honor, we continue to move as quickly as

11 possible.  We have taken a couple of depositions this week of

12 committee members reserving our rights to bring them back

13 based upon additional documents that are produced, but we

14 wanted to keep moving forward.  It looks like we are going to

15 have a couple depositions next week from experts and, you

16 know, coming quickly on the heels of that will be phase two.

17 Obviously, we need those depositions in order to formulate

18 our arguments for our objections.

19          I will give credit where credit is due.  The

20 debtors have been working with us cooperatively to try to,

21 you know, get us time that we need.  I do think there will

22 come a time whenever their patience will bump into the needs

23 of their case and wanting to move things forward quickly.

24 And I am concerned, Your Honor, that when that happens we

25 will get squeezed.

1          So at this point I am not here seeking any relief.

2     I don't have a specific, you know, request for the court.

3     It's just because we have been in front of Your Honor

4     repeatedly on this and Your Honor has been so involved and,

5     obviously, the schedule is tied into substantively what we

6     are doing here since it has been a week and a half and, you

7     know, we are still largely where we were a week and a half

8     ago with the UCC discovery minus a couple depositions of

9     committee members I just wanted to give the court the update.

10          You know, it's been almost six weeks since the

11     amended plan has been filed, two months into the UCC

12     settlement.  Obviously, we have been in front of the court on

13     several occasions seeking discovery.  It's been a little

14     frustrating to be where we are where we are right now, but,

15     again, I just wanted to update the court that we are prepared

16     to move fast, but from our perspective it can't come at the

17     expense of our due process and our ability to get the

18     information that we need to present our case.

19          Thank you, Your Honor.

20          THE COURT:  Mr. Haviland.

21        (No verbal response)

22          THE COURT:  You're muted too, Mr. Haviland.

23     Everybody is muted today.

24          MR. HAVILAND:  Sorry, Your Honor. I didn't expect

25     to talk today, but I appreciate Mr. McCallen giving an

 1  update.

 2          I wanted to do the same for the ad hoc Acthar

 3  group.  We -- Your Honor had asked for briefing on the common

 4  interest privilege that was asserted by the UCC. I know the

 5  UCC sent their letter in mid-week.  We have ours done.  It

 6  will be filed probably within minutes.  So we will send that

 7  over to Mr. Cavello.  So that issue is fully joined for Your

 8  Honor to review.

 9          You will note in our letter, Your Honor, that we

10  don't have a log in the UCC on that.  So it's really just, I

11  think, more for the courts edification about the issue of

12  privilege.  Then when we get a log we will be able to

13  interpose objections and bring things to the court's

14  attention, but I did want to give you that update that that

15  issue will be closed this week in terms of providing the

16  court the update.

17          Thank you.

18          THE COURT:  Thank you, Mr. Haviland.

19          Does the UCC wish to be heard?  I guess we talked

20  about the UCC.  Does anybody from the UCC want to say

21  something?

22          MR. LAZEROWITZ:  Your Honor, Evan Lazerowitz of

23  Cooley on behalf of the UCC.

24          Your Honor, I was not expecting to address the

25  court on this issue especially on Friday at 4:20 p.m.  I

1  think we would just like to say that, you know, we disagree

2  with the characterizations of our participation, discovery.

3  You know, we are, obviously, moving quickly under the court

4  ordered schedule.  I think we can, you know, respond to more

5  detail on Monday.  But I think suffice it to say that we have

6  had several depositions take place already with more

7  scheduled next week.

8            I will just leave it at that, that we disagree

9  with those characterizations and look forward to addressing

10 the court further next week.  Thank you.

11           THE COURT:  I will wait to see what gets brought

12 before me to rule on.

13           Mr. Lathrop.

14           MR. LATHROP:  Good afternoon, Your Honor.  Can you

15 hear me okay?

16           THE COURT:  Yes.

17           MR. LATHROP:  Sorry, I'm on video, but on my phone

18 for audio purposes.

19           I did want to just update briefly the Acthar

20 documents are in production.  There was a productive meet and

21 confer this week and those will be rolling out shortly.  So

22 there will be documents coming across.

23           THE COURT:  Thank you.

24           I am not going to ask again, I'm just going to say

25 we are adjourned.  We are going to start at 9:30 on Monday

1  morning.  I will see everybody then.  Have a good weekend.

2       (Proceedings concluded at 4:21 p.m.)

3

4                    CERTIFICATE

5

6     We certify that the foregoing is a correct transcript

7  from the electronic sound recording of the proceedings in the

8  above-entitled matter.

9

10 /s/Mary Zajaczkowski          November 5, 2021
   Mary Zajaczkowski, CET**D-531

11

12 /s/Coleen Rand               November 5, 2021
   Coleen Rand, AAERT Cert. No. 341

13

14 /s/William J. Garling        November 5, 2021
   William J. Garling, CE/T 543

15

16 /s/ Tracey J. Williams       November 5, 2021
   Tracey J. Williams, CET-914

17

18

19

20

21

22

23

24

25

A2840