Tab 15

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MALLINCKRODT PLC, *et al.,* | ) | Case No. 20-12522 (JTD) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Re:  D.I. 6067 & 6347** |

## REVISED[1] OPINION[2]

Debtors seek approval of the Fourth Amended Joint Plan of Reorganization of

Mallinckrodt PLC and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code (the

"**Plan**").[3]  Hearings to consider the Plan and the objections to confirmation were held over

sixteen days between November 2021 and January 2022 (the "**Confirmation Hearings**" or

"**Confirmation**").  I have reviewed the Plan and the evidence presented in support and in

opposition, and, except for the below-described modifications to the exculpation provision, I find

that the Plan satisfies all the requirements of the Bankruptcy Code, and it is therefore confirmed.

## FACTUAL BACKGROUND

### I.    **Pre-Petition**

Debtors and their non-debtor affiliates operate a global specialty biopharmaceutical

company that produces and sells both generic and branded pharmaceutical products including

specialty products for the treatment of rare diseases and controlled substances, such as opioids.[4]

The Mallinckrodt global enterprise operates as two separate business: (1) the specialty brands

---

[1] This Opinion has been revised only to correct typos in footnotes 159 and 180, which are noted in bold.

[2]  This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.  Any terms not defined herein are defined in the Plan.

[3] D.I. 6067.

[4] D.I. 128, Declaration of Stephen A. Welch, Chief Transformation Officer, in Support of Chapter 11 Petitions ("**First Day Declaration**"), AICX P2 Ex 1685.

business ("**Specialty Brands**") and (2) the specialty generics business ("**Specialty Generics**").

The Specialty Brands business focuses on autoimmune and rare diseases in specialty areas such

as neurology, rheumatology, and nephrology, among others.  The Specialty Generics business

offers a portfolio of over twenty generic product families, most of which are controlled

substances such as opioids.

In the years leading up to the commencement of these bankruptcy cases, Debtors faced an

onslaught of litigation arising out of their production of certain drugs.  On the one hand, certain

Debtors, primarily those on the Specialty Generics side of the business, were named in over

3,000 lawsuits stemming from their production and sale of opioid medications (the "**Opioid**

**Litigation**").[5]  As of the Petition Date, Debtors had spent more than $100 million defending

these suits and $30 million to settle just two of them.  Litigation expenses were averaging a

million dollars every week.[6]  On the other hand, Debtors' Specialty Brands business faced more

than two dozen lawsuits and government investigations arising out of its marketing and sale of a

drug called Acthar H.P. Gel ("**Acthar**"), including a rebate-related litigation with the Centers for

Medicare and Medicaid Services ("**CMS**")[7], a related *qui tam* False Claims Act action in which

the Department of Justice ("**DOJ**") had intervened,[8] and a separate *qui tam* action concerning

Debtors' charitable donations in which the DOJ had also intervened (collectively, the

"**Federal/State Acthar Litigation**").[9]  Debtors were also named in multiple private actions and

---

[5] First Day Declaration ¶ 12.
[6] First Day Declaration, ¶ 12.
[7] *Mallinckrodt ARD LLC v. Verma*, 444 F. Supp. 3d 150 (D.D.C. 2020) (the "**CMS Litigation**").
[8] The *qui tam* action filed in 2018 under the False Claims Act, *United States ex rel. Landolt v. Mallinckrodt Pharma. Inc.*, No. 18-11931-PBS (D. Mass) (the "**False Claims Act Litigation**"), involves the same pricing dispute at issue in the CMS Litigation, but with additional allegations that Debtors were knowingly using an incorrect rebate calculation for Acthar.  Because of the False Claims Act's provision for treble damages, this litigation exposed Debtors to a judgment of potentially more than $1.9 billion. First Day Declaration at ¶ 20.
[9] First Day Declaration ¶ 18.

A2945

putative class actions asserting claims arising out of the pricing of Acthar, which alleged, among other things, violations of antitrust and consumer protection laws as well as unfair trade practices and securities law violations.[10]   Managing the litigation ultimately became untenable and Debtors realized that they would need to file for chapter 11 protection and reorganize the enterprise.[11]

In February 2020, Debtors announced that they had reached the principal terms of a comprehensive opioid settlement with the Attorneys General of more than forty states and U.S. territories which was later finalized following negotiations with the Plaintiffs' Executive Committee,[12] the Guaranteed Unsecured Notes Ad Hoc Group, and each of their advisors (the "**Original Opioid Settlement**").[13] The Original Opioid Settlement provided for the creation of one or more trusts (the "**Opioid Trust(s)**") for the benefit of opioid claimants, which would be funded with $1.6 billion in structured cash payments, warrants to acquire 19.99% of the public common stock of the reorganized debtor, Mallinckrodt plc, and certain of Debtors' other assets.[14] All opioid claims would then be channeled to the Opioid Trust(s), which would in turn liquidate all claims asserted by opioid claimants.

---

[10] Debtors originally estimated that all of the Acthar-related litigations could collectively result in more than $15 billion in alleged damages and penalties.  As discussed below, that estimate has changed.

[11] During this same time period, Debtors were also facing near-term debt maturity.  Debtors' term loan lenders had agreed to extend new financing to deal with that maturing debt, but when the judgment in the CMS Litigation came down, the term lenders withdrew the financing, forcing Debtors to pursue a private exchange, which changed the company's financial position appreciably.  12-6-21 Tr. at 86-87 (Welch testimony).

[12]  The "**Plaintiffs' Executive Committee**" is a court-appointed committee in the national opioid multidistrict litigation.  First Day Declaration at ¶ 88.

[13] First Day Declaration.

[14] First Day Declaration; Original Opioid Settlement Term Sheet, attached as Schedule 1 to the Restructuring Support Agreement at Debtors P2 Ex 84.

A2946

In March 2020, the Court in the CMS Litigation issued a judgment adverse to Debtors that established an approximately $650 million near-term liability, retroactively increasing back to 2013 the Medicaid rebates paid by ARD to state Medicaid programs.[15]

In September 2020, Debtors reached an agreement in principle with CMS and the DOJ, contingent on a chapter 11 filing by Mallinckrodt plc, that resolved most of the Acthar-related claims and investigations held by the federal government.  Debtors also reached an agreement in principle with each of the 50 states, Washington D.C., and Puerto Rico that would resolve claims asserted in the rebate related *qui tam* action (collectively, the "**Federal/State Acthar Settlement**").[16]  The Federal/State Acthar Settlement provides for Debtors to pay a total of $260 million to the DOJ and various states in return for a release by the relevant governmental agencies of their Acthar-related claims.[17]

By this time, Debtors had also begun negotiating with several creditor groups including the Guaranteed Unsecured Notes Ad Hoc Group, the Ad Hoc First Lien Term Lender Group, an ad hoc group of Debtors' revolving lenders, and the administrative agent under Debtors' credit facility, which ultimately resulted in an agreement on a comprehensive restructuring (the "**Noteholder Restructuring Agreement**"), whereby Debtors would reinstate their secured debt and issue new secured takeback second lien notes and equity interests in reorganized Mallinckrodt to the holders of Debtors' fulcrum unsecured notes.  The Original Opioid Settlement and Noteholder Restructuring Agreement were memorialized in a Restructuring

---

[15] First Day Declaration ¶ 19.
[16] Memorialized in the settlement agreements filed on August 6, 2021, as Exhibit Q to the Plan Supplement, D.I. 3602.
[17] *Id.*

A2947

Support Agreement (the "**RSA**"), which contemplated a comprehensive restructuring of Debtors' enterprise.[18]

## II.   **Post-Petition**

On October 12, 2020 (the "**Petition Date**"), Debtors commenced these cases under chapter 11 of the Bankruptcy Code (the "**Code**").  Debtors continued to operate their business and manage their property as debtors in possession pursuant to Sections 1107(a) and 1108 of the Code.  On October 27, 2020, an official committee of unsecured creditors (the "**Unsecured Creditors' Committee**" or "**UCC**") and an official committee of opioid claimants (the "**Opioid Claimants' Committee**" or "**OCC**") (together the "**Committees**") were appointed.[19]  On March 16, 2021, Roger Frankel was provisionally appointed as the legal representative of the future claimants (the "**FCR**"), and finally appointed on June 11, 2021.[20] The Chapter 11 cases are jointly administered for procedural purposes only pursuant to Rule 1015(b).

On November 30, 2020, I entered an order establishing certain deadlines for the filing of proofs of claim (the "**Bar Date Order**").[21]  The Bar Date order established (i) February 15, 2021, as the General Bar Date for all non-governmental entities to file proofs of claim (other than opioid claims); and (ii) April 12, 2021, as the Governmental Bar Date for all proofs of claim (other than opioid claims).[22]

On April 20, 2021, Debtors filed their first iteration of the Plan and Disclosure Statement (the "**Original Plan**").[23]  On June 18, 2021, Debtors filed the solicitation versions of the Plan and Disclosure Statement.[24]  Plan supplements were filed in August and September 2021.[25]

---

[18] First Day Declaration at ¶ 15.
[19]  D.I. 306 and 308.
[20]  D.I. 1747 and 2813.
[21]  D.I. 667.
[22] No bar date was set for opioid claims.
[23] D.I. 2074.

A2948

On September 2, 2021, Debtors reached an agreement in principle with the Governmental Plaintiff Ad Hoc Committee, the Multi-State Governmental Entities Group ("**MSGE**"), and the OCC (the "**OCC Settlement**").[26]  The OCC Settlement (together with the Original Opioid Settlement, the "**Opioid Settlement**") requires Debtors to make an additional $125 million cash contribution to the Opioid Trust(s) (increasing the aggregate cash contribution to the Opioid Trust(s) to $1.725 billion) as well as contribute 50% of Debtors' interest in certain claims arising from their 2015-2018 share repurchase program.  It further provides for certain mutual releases, which will be discussed in detail below.

Also on September 2, 2021, following extensive mediation with this Court's then Chief Judge Sontchi, Debtors reached an agreement in principle with the UCC (the "**UCC Settlement**").[27]  The UCC Settlement provides for two significant changes to the distributions to general unsecured creditors contained in the Original Plan.  First, it increases the distributions to these creditors from the $100 million in previous iterations of the Plan to $135 million plus certain non-cash assets, all of which will be held in a general unsecured creditors trust (the "**GUC Trust**").  Second, instead of providing the distribution in a "pot" that would later be allocated as the claims are liquidated, the UCC Settlement provides for an allocation of the consideration among its members (the "**UCC Allocation**"), which will be discussed in detail below.

---

[24] D.I. 2916, 2917.
[25]  D.I. 3596-3602, 3604-3606, 3610, 3613, 3614, 4147, 4149, and 4639.
[26] D.I. 4121-2, Global Opioid Settlement Term Sheet.
[27] D.I. 4121-1, General Unsecured Claims ("**GUC**") Settlement Term Sheet, AICX P2 Ex 1525.  The UCC Allocation was determined after the terms of the settlement were agreed to.

A2949

III.    **The Plan**

Debtors filed the Second Amended Plan on September 29, 2021.[28]  The Plan incorporates

the above-described settlements and classifies holders of claims and interests into the following

classes: [29]

**Summary of Classification and Treatment of Claims and Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2(a) | First Lien Revolving Credit FacilityClaims | Unimpaired | Presumed to Accept |
| 2(b) | 2024 First Lien Term Loan Claims | Unimpaired or Impaired | Presumed to Accept or Entitled to Vote |
| 2(c) | 2025 First Lien Term Loan Clams | Unimpaired or Impaired | Presumed to Accept or Entitled to Vote |
| 3 | First Lien Notes Claims | Unimpaired or Impaired | Presumed to Accept or Entitled to Vote |
| 4 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| 5 | Guaranteed Unsecured NotesClaims | Impaired | Entitled to Vote |
| 6(a) | Acthar Claims | Impaired | Entitled to Vote |
| 6(b) | Generics Price Fixing Claims | Impaired | Entitled to Vote |
| 6(c) | Asbestos Claims | Impaired | Entitled to Vote |
| 6(d) | Legacy Unsecured Notes Claims | Impaired | Entitled to Vote |
| 6(e) | Environmental Claims | Impaired | Entitled to Vote |
| 6(f) | Other General Unsecured Claims | Impaired | Entitled to Vote |
| 6(g) | 4.75% Unsecured Notes Claims | Impaired | Entitled to Vote |
| 7 | Trade Claims | Impaired | Entitled to Vote |
| 8(a) | State Opioid Claims | Impaired | Entitled to Vote |
| 8(b) | Municipal Opioid Claims | Impaired | Entitled to Vote |
| 8(c) | Tribe Opioid Claims | Impaired | Entitled to Vote |
| 8(d) | U.S. Government Opioid Claims | Impaired | Entitled to Vote |
| 9(a) | Third-Party Payor Opioid Claims | Impaired | Entitled to Vote |
| 9(b) | PI Opioid Claims | Impaired | Entitled to Vote |
| 9(c) | NAS PI Opioid Claims | Impaired | Entitled to Vote |
| 9(d) | Hospital Opioid Claims | Impaired | Entitled to Vote |
| 9(e) | Ratepayer Opioid Claims | Impaired | Entitled to Vote |
| 9(f) | NAS Monitoring Opioid Claims | Impaired | Entitled to Vote |
| 9(g) | Emergency Room PhysiciansOpioid Claims | Impaired | Entitled to Vote |

---

[28] A Third Amended Plan was filed on December 29, 2021.  A Fourth Amended Plan was filed on January 6, 2022.  All citations to the Plan herein are to the Fourth Amended Plan.
[29] D.I. 6067, Fourth Amended Plan at 57.

A2950

| 9(h) | Other Opioid Claims | Impaired | Entitled to Vote |
|------|---------------------|----------|------------------|
| 9(i) | No Recovery Opioid Claims | Impaired | Deemed to Reject |
| 9(j) | Released Co-Defendant Claims | Impaired | Deemed to Reject |
| 10 | Settled Federal/State Acthar Claims | Impaired | Entitled to Vote |
| 11 | Intercompany Claims | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 12 | Intercompany Interests | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 13 | Subordinated Claims | Impaired | Deemed to Reject |
| 14 | Equity Interests | Impaired | Deemed to Reject |

## IV.   <u>Voting</u>

Debtors' claims and noticing agent, Prime Clerk LLC ("**Prime Clerk**"), filed a report detailing the results of the Plan voting process on October 31, 2021.[30]  The Voting Report provides that Classes 1 and 2(a) are unimpaired and conclusively presumed to have accepted the Plan.  Classes 4 through 9(h) and 10 are impaired (the "**Impaired Classes**") and were entitled to vote.  Classes 2(b), 2(c), 4, 5, 6(c), 6(d), 6(g), 7-9(g), and 10 each voted to accept the Plan (the "**Voting Accepting Classes**").  Holders of Claims and Interests in Classes 9(i), 13, and 14 (together with Holders of Claims in Classes 11 and 12, to the extent Impaired under the Plan) shall receive no distribution under the Plan and are therefore conclusively deemed to have rejected the Plan pursuant to Section 1126(g) of the Code (the "**Deemed Rejecting Classes**").  Holders of Claims and Interests in Classes 3, 6(a), 6(b), 6(e) (solely as to Debtors Mallinckrodt Brand Pharmaceuticals LLC, Mallinckrodt LLC, Mallinckrodt plc, Mallinckrodt US Holdings LLC, and MNK 2011 LLC), 6(f) (solely as to Mallinckrodt ARD LLC, Mallinckrodt Hospital Products, Inc., Mallinckrodt LLC, Mallinckrodt Pharmaceuticals Ireland Limited, Mallinckrodt Pharmaceuticals Limited, Mallinckrodt plc, and ST Shared Services LLC), and 9(h) (the "**Voting**

---

[30] D.I. 5087, Final Declaration of James Daloia Regarding Solicitation of Votes and Tabulation of Ballots, Covidien P2 Ex 10; see also Debtor P1 Ex 23, Tabulation Summary (together the "**Voting Report**").

A2951

**Rejecting Classes**" and, together with the Deemed Rejecting Classes, the "**Rejecting Classes**") have voted to reject the Plan.[31]

## JURISDICTION

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334. Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2). The Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Code and should be confirmed.[32] Venue is proper under 28 U.S.C. § 1408 and 1409.

## DISCUSSION

For a plan of reorganization to be confirmed, it must meet the specific requirements of Section 1129 of the Code. *In re Armstrong World Indus.*, 348 B.R. 111, 120 (D. Del. 2006). "To satisfy the requirements of § 1129(a), all impaired classes must accept the Plan." *Id.* "Section 1129(b) allows the confirmation of a plan over the objection of an impaired class if the 'plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." *Id.* quoting 11 U.S.C. § 1129(b)(1). When a plan is confirmed pursuant to Section 1129(b) it is referred to as a "cramdown." "A cramdown may be necessary under certain circumstances to foreclose the possibility that a small minority would prevent confirmation of the plan." *Id.* "In the context of a cramdown, the debtor's standard of proof that the requirements of § 1129 are satisfied is preponderance of the evidence." *Id.*

---

[31] Classes 11 and 12, Intercompany Claims and Interests, are either (a) unimpaired, in which case they are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Code or (b) impaired, in which case they are deemed to have rejected the Plan pursuant to Section 1126(g). In either case they were not entitled to vote. See Disclosure Statement at D.I. 2917, Covidien P2 Ex 2. See also Plan at III.B.11 and 12 ("No property will be distributed to the Holders of allowed Intercompany Claims. Unless otherwise provided for under the Plan, each Intercompany Claim will either be Reinstated or canceled and released at the option of the Debtors in consultation with [certain creditor constituencies]").
[32] Additional discussion of this Court's jurisdiction is contained *infra* at 27.

Because there were numerous objections filed alleging non-compliance with many of the confirmation requirements, I will address them in connection with the individual Code sections.

I.      **Section 1122 (Classification of Claims)**

Section 1122 provides that:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122.  While "Section 1122(a) does not expressly provide that 'substantially similar' claims may not be placed in separate classes[,]" it is nevertheless clear from other provisions that "the Code was not meant to allow a debtor complete freedom to place substantially similar claims in separate classes." *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993) (noting that requirements of Sections 1129(a)(8) and (a)(10) would be undermined if a debtor could gerrymander classes).  Accordingly, the Third Circuit has held that "the classification of the claims or interests must be reasonable." *Id.*  "In a 'cram down' case, this means that each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed." *Id.* at 159.

The Plan here divides the Claims and Interests into classes and subclasses, as noted in the chart above.[33]  Debtors argue that this satisfies Section 1122 of the Code "because the Claims and Interests in each Class differ from the Claims and Interests in each other Class based on the different rights and attributes of the respective Holders as well as to facilitate the different types

---

[33]  See Plan Art. III.A

A2953

of consideration provided to different Classes (i.e. equity, debt, Cash)."[34]  Thus, they argue,

"valid business, factual, and legal reasons exist for classifying separately the various Claims and

Interests under the Plan."[35]

Three parties assert that their claims are misclassified: Sanofi-Aventis U.S. LLC

("**Sanofi**"),[36] Kenneth R. Greathouse, Stuart Rose, and Lloyd Glenn (collectively, the

"**Glenridge Principals**" or "**Glenridge**"),[37] and Mr. Daniel Koppenhafer (acting *pro se*).[38]

Sanofi argues that the Plan improperly classifies its claims as Class 6(f) General

Unsecured Claims instead of Class 7 Trade Claims.  Sanofi alleges that Debtors had no

justifiable basis to separate their claim and that Debtors' failure to classify Sanofi's claim with

other like trade creditor claims is a violation of § 1122.  Specifically, Sanofi argues that Debtors

derive substantial value from the sale of Acthar and related intellectual property that Debtors

acquired under an Asset Purchase Agreement ("**APA**") with Sanofi.  Without the APA, Sanofi

contends, Debtors would not have generated the large revenue stream from Acthar that they have

relied upon to fund these cases.  Sanofi argues that the fact that Debtors continue to derive value

from the APA shows that Sanofi is a trade creditor that provides benefits to Debtors just like the

other Class 7 trade creditors. Further, Sanofi asserts that Debtors' projections in the Disclosure

Statement clearly reflect Debtors' intent to continue to reap the benefits of the APA through

future sales of Acthar.

Debtors argue that their classification of Sanofi separately was done to distinguish trade

claimants – those with whom Debtors have a go-forward business relationship and provide goods

and services necessary for Debtors' continued operations – from other general unsecured

---

[34]  Debtors' Brief in Support of Confirmation, D.I. 5016, at 20.
[35]  *Id.*
[36]  D.I. 4702, Sanofi Objection.
[37]  D.I. 4701, Glenridge Objection.
[38]  D.I. 3797, Koppenhafer Objection.

A2954

claimants.  In support of this position, Debtors cite to *Matter of Jersey City Med. Ctr.*, in which the Third Circuit approved the separate classification of trade claims because the court found that the classification of claims separately had a reasonable basis. *Matter of Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987). Debtors argue that the classification of Sanofi as distinct from trade creditors is appropriate here because Sanofi does not provide goods or services to Debtors.  On the contrary, Debtors breached the APA with Sanofi post-petition, as they considered it to be a burden on Debtors' estates.[39] Therefore, they argue, the classification of Sanofi in Class 6(f) instead of Class 7 is a valid exercise of their business judgment.  I agree.

There is "one clear rule that emerges from otherwise muddled caselaw on § 1122 claims classification: thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *In re Greystone III Joint Venture* 995 F.2d 1274, 1279 (5th Cir. 1991), *on reh'g* (Feb. 27, 1992).  Under Section 1122 of the Code, claims or interests within each class must be "substantially similar" to the other claims or interests in the class. *See* 11 U.S.C. § 1122; *In re Lightsquared Inc.*, 513 B.R. 56, 82-83 (Bankr. S.D.N.Y. 2014) ("[T]he separate classification of otherwise substantially similar claims and interests is appropriate so long as the plan proponent can articulate a 'reasonable' (or 'rational') justification for separate classification."). A debtor is prohibited from separately classifying similar unsecured claims without a legitimate business reason supported by credible proof. *See In re Boston Post Rd. Ltd. P'ship*, 21 F.3d 477, 483 (2d Cir. 1994) ("This Court thus holds that separate classification of unsecured claims solely to create an impaired assenting class will not be permitted; the debtor must adduce credible proof of a legitimate reason for separate classification of similar claims.").  "It remains clear that Congress intended to afford bankruptcy judges broad

---

[39] See discussion in the Ruling on Sanofi's Motion for Determination that Debtors Cannot Reject or Discharge Post-Confirmation Royalty Obligations. D.I. 5186.

A2955

discretion to decide the propriety of plans in light of the facts of each case." *Matter of Jersey City Med. Ctr.*, 817 F.2d at 1060–61; *Cf. In re U.S. Truck Co., Inc.*, 800 F.2d 581, 584–86 (6th Cir.1986) (discussing the legislative history of Section 1122).

Here, I find that Debtors have a legitimate business reason to classify Sanofi's claims separately from the trade creditors in Class 7.  The Class 7 claimants are those who will have a future relationship with Debtors, providing goods and services necessary for Debtors' continued operations.  Debtors do not wish to continue their relationship with Sanofi, because the agreements impose a burden on Debtors.  Sanofi will not be providing any necessary goods or services to Debtors, and accordingly, Sanofi does not fit within Debtors' definition of a trade creditor.  For these reasons, I find that Sanofi's claims are appropriately and permissibly classified, and the Plan satisfies Section 1122 of the Code.  Sanofi's objection on this issue is therefore overruled.

Glenridge also objects to the classification scheme.  The Glenridge Principals are parties to an agreement (the "**Royalty Agreement**") with debtor Mallinckrodt Pharmaceuticals Ireland Limited ("**MPIL**") that provides for MPIL's payment of royalties to the Glenridge Principals equal to a percentage of net sales of Acthar.[40]  The Plan classifies Glenridge in Class 6(f) Other General Unsecured Claims and combines Class 6(f) with Class 6(e) Environmental Claims to share in a single distribution pool.  Glenridge argues this is improper because "neither the Plan nor the UCC Settlement . . . adequately explain the disparate treatment among the Class 6 subgroups.  While there are certain obvious differences (the litigation claims of Classes 6(a), 6(b), and 6(c)), there is no explanation as to the differences that arise via alleged contractual claimants (Classes 6(d), 6(e), 6(f), and 6(g)).[41]  Glenridge argues that the unsecured creditor

---

[40]  Questcor, MPIL's predecessor, was originally also a party to the royalty agreement.
[41]  Glenridge Supplemental Objection, D.I. 5104.

A2956

group was broken up into various subgroups "in order to obtain approval of a less terrible deal than the deal originally proposed under the RSA in these cases."[42]  However, they contend, "the end result remains the same: the royalty claims, including the Glenridge claims, are funding creditors outside of Class 6 and have been excluded from the benefit of the various deals made to obtain confirmation of the Plan via the unsecured classes.  And no effort is made to explain the reasoning behind such disparate treatment."[43]

Debtors counter that they had good reasons to adopt the classification scheme they did – namely to maximize the likelihood of settlement with creditors in one or more of the subclasses. Debtors argue that "notwithstanding that all claims in Class 6 are unsecured claims, the claims are different in nature (ranging from funded debt to contingent litigation claims, environmental claims, and non-supporting trade claims), sit at different Debtors, and the holders of such claims are separately represented in these cases. To have classified all such claims together would have significantly diminished Debtors' ability to reach settlements with these constituents, as Debtors would have no way of providing the settling class with its own bargained-for treatment, separate from the other unsecured claimants in the class."[44]  I agree.

Glenridge has not pointed to any evidence that Debtors' classification of claims was done for any improper purpose.  The explanation offered by Debtors for their classification scheme is reasonable, particularly in light of the settlements Debtors were able to reach with most of the Class 6 subgroups.  Glenridge's objection on this issue is therefore overruled.

Mr. Koppenhafer argues that the 4.75% Unsecured Notes should be included in the same class as the Guaranteed Unsecured Notes because they have equal rights and priority.  Debtors point out that the two groups have very different legal entitlements.  The 4.75% Notes are issued

---

[42] *Id.*
[43] *Id.*
[44] D.I. 5660, Debtors' Omnibus Reply to Supplemental Objections at 16.

A2957

by MIFSA and guaranteed only by the parent company, PLC.[45] The Guaranteed Unsecured

Notes, however, while also issued by MIFSA and guaranteed by PLC, are also guaranteed by 60

other debtor entities including the ones that own Debtors' IP and most other operating assets. At

the same time, there are different structuring rights in the relevant debt documents that show a

distinct difference between the two notes.[46]  Because the two groups have different pre-

bankruptcy entitlements, Debtors argue, they may be classified separately.  I agree.

     As discussed above, Debtors have satisfied the standards of Section 1122.  The Class 6(g)

4.75% Notes are different and have divergent debt structuring rights than the Class 5 Guaranteed

Unsecured Notes. Their differences allow Debtors to classify them in different groups.  Mr.

Koppenhafer's objection is therefore also overruled.

**II.**   **Section 1123(a)**

     Only one creditor has raised an objection based on Debtors' alleged failure to comply

with Section 1123(a) of the Code.  Section 1123(a) requires that "notwithstanding any otherwise

applicable nonbankruptcy law, a plan shall"

> (1) designate, subject to section 1122, . . . classes of claims . . .
> and classes of interests;
>
> (2) specify any class of claims or interests that is not impaired
> under the plan;
>
> (3) specify the treatment of any class of claims or interests that is
> impaired under the plan;
>
> (4) provide the same treatment for each claim or interest of a
> particular class, unless the holder of a particular claim or
> interest agrees to a less favorable treatment of such particular
> claim or interest;
>
> (5) provide adequate means for the plan's implementation . . . ;

---

[45] 1-6-22 Tr. at 101-102.
[46] Debtors' P2 Exhibit 95-98.

A2958

(6) provide for . . . a provision prohibiting the issuance of
nonvoting equity securities and [provide an appropriate
distribution of voting power among the classes of
securities]…; and

(7) contain only provisions that are consistent with the interests
of creditors and equity security holders and with public policy
with respect to the manner of selection of [the reorganized
company's officers and directors].

11 U.S.C. § 1123(a).  The Canadian Elevator Industry Pension Trust Fund (the "**Pension Trust**")

argues that the Plan does not satisfy Section 1123(a)(4) because it authorizes a settlement with

one subset of Class 13 claimholders but deprives others the same opportunity to recover on their

claims, thereby failing to treat all holders of claims in Class 13 equally.

Courts have interpreted Section 1123(a)(4) as requiring that "all claimants in a class must

have 'the same opportunity' for recovery."  *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir.

2013) (quoting *In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2008)).  "What matters, then, is not

that claimants recover the same amount but that they have equal opportunity to recover on their

claims."  *Id.*

The Pension Trust's claims were classified in Class 13 Subordinated Claims.  The

Pension Trust filed its objection in its capacity as court-appointed lead plaintiff in a putative

securities class action in the District of New Jersey captioned *Strougo v. Mallinckrodt Public

Limited Company*, et al., No. 20-cv-10100 (the "**Strougo Action**").[47]  Other Class 13

claimholders are plaintiffs in another putative securities class action captioned *Shenk v.

Mallinckrodt plc*, No. 1:17-cv-00145-DLF (D.D.C), pending in the District of Columbia (the

"**Shenk Action**").[48]  Debtors have entered into a settlement with the Shenk Plaintiffs that

resolves the Shenk Action in exchange for a payment of $65.7 million to be paid from the

---

[47] It has filed its objection on behalf of all plaintiffs in the Strougo Action (the "**Strougo Plaintiffs**").
[48] The plaintiffs in the Shenk Action will be referred to as the "**Shenk Plaintiffs**".

A2959

proceeds of D&O policies held by the individual defendants in the Shenk Action.[49]  No

settlement has been reached with respect to the Strougo Action.

The Pension Trust argues that the Plan violates Section 1123(a)(4) because it authorizes a

settlement with one subset of Class 13 claim holders, the Shenk Plaintiffs, but deprives others,

such as the Pension Trust and other Strougo Plaintiffs, the same opportunity to recover on their

claims, thereby failing to treat all the holders of claims in Class 13 equally.  Specifically, the

Pension Trust argues that "if the Shenk Settlement is not approved, the plaintiffs in the Shenk

Action will not be granting any third-party releases, without regard to whether they submit an

Opt-Out Form.[50]  This is the very opportunity that the Strougo Plaintiffs are being denied under

the Plan."[51]  The Pension Trust further argues that the Strougo Plaintiffs should be afforded the

same opportunity as the Shenk Plaintiffs to recover damages on their claims against the

individual Strougo defendants and any applicable insurance policies.[52]

Debtors' response is three-fold.  First, they argue that the Pension Trust does not have

standing to object on behalf of the Strougo Plaintiffs because this Court has not certified the class

in the Strougo Action.  Second, they argue that the Shenk Settlement does not invoke analysis

under Section 1123(a)(4) because no portion of the settlement with the Shenk Plaintiffs is being

paid by Debtors.  Rather, the settlement will be paid only from the proceeds of the D&O policies

that cover the defendants in the Shenk Action and therefore Section 1123(a)(4) does not apply.[53]

Third, Debtors argue, even if Section 1123(a)(4) does apply, it is satisfied here because the

Pension Trust and the other holders of Class 13 claims receive the same treatment because: 1) the

Shenk Plaintiffs and all other holders of Class 13 claims had equal opportunity to opt out of the

---

[49] See Shenk Settlement Motion, D.I. 2393 at ¶ 11.
[50] See discussion of Third-Party Releases *infra* at 45-52.
[51] D.I. 4090, Pension Trust Objection at 24.
[52] *Id.*
[53] D.I. 2393, Shenk Settlement Motion.

A2960

Plan's Third-Party Releases; 2) the Pension Trust, and any other Strougo Plaintiff who opt out of the Third-Party Releases, will retain the opportunity to litigate its third-party Claims; and 3) the Pension Trust and the Strougo Plaintiffs had the same opportunity as the Shenk Plaintiffs to reach a settlement and their failure to do does not mean Debtors treated them unequally. Therefore, the fact that Debtors settled with some holders of Class 13 claims does not result in unequal treatment in violation of Section 1123(a)(4) of the Bankruptcy Code. I agree.

Debtors are correct that the Pension Trust does not have standing to object on behalf of the putative class in the Strougo Action.  The purported class proof of claim was filed without permission of the Court, the putative class was not certified prepetition, class certification was not sought in this proceeding, and the purported class proof of claim was expunged without objection from the putative class representative.[54]  The Pension Trust argues that "Rule 3001 should be construed to allow class proofs of claims, at least on a tentative basis, until the court rejects the class action process" and that can only happen after Debtors object to the class proof of claim in the context of an adversary proceeding or a contested matter.[55]  That argument is without merit.

As I previously noted in connection with my ruling on Debtors' objection to class proofs of claims filed by certain Acthar Claimants, the Third Circuit has expressed, at least in a non-precedential opinion, that the "authority to act for a class under Rule 23 does not imply any authorization to file a class proof of claim for an individual in bankruptcy proceedings." *In re W.R. Grace & Co.*, 316 Fed. App'x 134 (3d Cir. 2009) (citing *In re Standard Metals Corp.*, 817 F.2d 625, 631 n.10 (10th Cir. 1987), vacated on other grounds, 839 F. 2d 1383 (10th Cir. 1987)).

---

[54] D.I. 3189 (Omnibus Claims Objection); D.I. 4266 (Order Sustaining Objection).
[55] D.I. 5887, Pension Trust Supplemental Objection at 25 (quoting *Gentry v. Siegel,* 668 F.3d 63, 68-69 (4th Cir. 2012).

A2961

Thus, as I previously held, a party seeking to file a class proof of claim must first seek permission from the court to do so.[56]  The Pension Trust did not.

Even if the Pension Trust was not required to seek prior permission to file a class proof of claim, the putative class lead plaintiff could not act on behalf of the putative class until it obtains class representative status under Rule 7023.  *In re Dynegy*, 770 F.3d 1064, 1070 (2d Cir. 2014).  Here the putative class representative never sought class certification under Rule 7023, and, therefore, does not have standing to act on behalf of the putative class members.

Finally, the Pension Trust is wrong factually.  Debtors did file an objection to the putative class action proof of claim, the Pension Trust failed to respond, and an order was entered expunging that claim.[57] So, even if the Pension Trust is correct that Rule 3001 should be construed to allow class proofs of claims, at least on a tentative basis, there is no class proof of claim for which the putative class representative can act.  Debtors' objection to the putative class's standing to object to the Plan is therefore sustained.

However, even if the Pension Trust was correct regarding its ability to act at least on a provisional basis for the benefit of the putative class, its arguments under Section 1123(a)(4) fail.  As the District Court held in *In re Exide Holdings, Inc.*, "[n]othing in the Bankruptcy Code requires a third party to make settlement payments or provide substantial contributions to similarly situated creditors in equal or prorated amounts."  *In re Exide Holdings, Inc.*, 2021 WL 3145612, *15 (D. Del. 2021).  The consideration for the Shenk Settlement is being paid from the proceeds of D&O policies, which are not property of the Debtors.  Because the Plan treats all

---

[56] D.I. 3074, Transcript of 6-29-21 Hearing (Bench Ruling); D.I. 3435 (Order).
[57] Order Sustaining Debtors' Second Omnibus Objection to Certain Claims. D.I. 4266.

A2962

Class 13 claimholders equally,[58] Section 1123(a)(4) simply does not apply.  However, even if Section 1123(a)(4) is applicable, I find that it is satisfied here.

Section 1123(a)(4) only requires that creditors in the same class have the same opportunity to recover.  It does not mean that all the recoveries received by the creditors in the same class must be exactly the same.  *In re Adelphia Communs. Corp.*, 368 B.R. 140, 249-50 (Bankr. S.D.N.Y. 2007) (observing that "courts have held that [Section 1123(a)(4)] does not require identical treatment for all class members in all respects under a plan[.]").

Here, the Plan offers the same treatment to all holders of Class 13 claims: opt out of the Third-Party Releases and litigate the claims at a later date or choose not to opt out and release their claims.  While the Shenk Plaintiffs may have their rights to opt out effectuated automatically if the settlement is not approved, the end result is the same – both the Shenk Plaintiffs and the Strougo Plaintiffs had the same opportunity to opt out of the Third-Party Releases.[59] While the Pension Trust argues that the Strougo Plaintiffs should have the same opportunity to recover from applicable insurance policies as the Shenk Plaintiffs, there is no evidence before me that they did not.  The settlement by itself is not proof that the Strougo Plaintiffs were denied anything.  *See In re Washington Mutual, Inc.*, 442 B.R. 314, 355-56 (Bankr. D. Del. 2011) ("Providing different treatment to a creditor who agrees to settle instead of litigating is permitted by section 1123(a)(4)."); *Energy Future Holdings Corp. v. Del. Tr. Co.*, 648 F. App'x 277, 284 (3d Cir. 2016) ("[M]ere differences in potential final outcomes resulting from choices made by individual creditors do not violate the equal treatment protections of § 1123(a)(4).").

---

[58]  See Plan Art. III.B.13 ("Subordinated Claims shall be discharged, cancelled, and extinguished on the Effective Date.  Each Holder of Subordinated Claims shall receive no recovery or distribution on account of such Subordinated Claims.").

[59] Notably, the Pension Trust has already returned an opt out form (see discussion *infra* at 46). Accordingly, the precise harm that the Pension Trust complains of with this argument is unclear.

For these reasons, I find that the Plan satisfies Section 1123(a) of the Code and the Pension Trust's objection is overruled.

### III.    Section 1123(b)

The Code provides a debtor with flexibility to include provisions in a plan of reorganization that are not required by the Code but are deemed necessary to effectuate a fair and reasonable reorganization.  Specifically, Section 1123(b) of the Code provides that a plan may:

> "(1) impair or leave unimpaired any class of claims, secured or unsecured, or of interests; (2) subject to section 365. . . provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtors not previously rejected…; (3) provide for (A) the settlement or adjustment of any claim or interest belonging to the debtor or the estate…; (4) provide for the sale of all or substantially all of the property…; (5) modify the rights of holders of secured claims. . . or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; and (6) include any other appropriate provision not inconsistent with the applicable provisions of this title.

11 U.S.C § 1123(b).

Debtors' Plan contains several discretionary provisions, including a structure for the allowance and disallowance of claims, a process for distributions under the Plan, and settlement, release, exculpation, and injunction provisions.[60]  Only the settlement, release, exculpation, and injunction provisions are subject to objections.

### A. Settlements

As discussed above, the Plan incorporates numerous settlements of some of Debtors' largest prepetition claims including the Opioid Settlement, the Federal/State Acthar Settlement, and the UCC Settlement (together the "**Plan Settlements**").[61] There are two objections to the Plan Settlements, one made by the U.S. Trustee ("**UST**") and one made by several individuals, acting pro se (the "**Pro Se Objectors**").

---

[60] See Plan Art. V, VI, VII, and IX.
[61] Plan Art IX; *See* D.I. 4121-1 GUC Settlement Term Sheet, D.I. 4121-2 Global Opioid Settlement Term Sheet; see also discussion supra at 2-6 (discussing claims resolved by each settlement).

A2964

The UST argues that Article IX.C of the Plan impermissibly seeks the approval of the Opioid Releases under Rule 9019, which is not the appropriate mechanism for the Court to approve them.[62]  While I agree that Rule 9019 is not the correct standard by which to measure the propriety of releases in a plan of reorganization, that is not the standard I am applying here. As discussed at length below, I am evaluating the Releases under the guidelines set forth by the Third Circuit in *Continental* and *Millennium*.  Thus, while I find that the Opioid Settlement, which includes the releases, satisfies the Rule 9019 standard, I also find that the releases comply with the requirements of Section 1123(b).  Accordingly, this objection is overruled.

There were also several objections filed by the Pro Se Objectors to the Opioid Settlement.[63]  Specifically, they argue that the Opioid Settlement (1) is too costly, causing there to be nothing left for equity holders; and (2) was entered into unnecessarily because Debtors have good defenses to the underlying claims.  Debtors counter that the Opioid Settlement meets the Third Circuit's requirements for determining whether a compromise should be approved in the context of a bankruptcy, citing in *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996).  The *Martin* court explained that courts should "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *Id.* In striking this balance, the court should consider: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Id.*  "In evaluating the fairness of a settlement, the court does not have to be

---

[62] Article IX.C states that "Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval pursuant to Bankruptcy Rule 9019, of the releases…".

[63] There was no express objection to the other settlements incorporated into the Plan and there was ample evidence presented at Confirmation regarding the necessity of each of the Settlements to the reorganization and the fact that they built upon one another and were intertwined in several respects. Having considered the totality of the evidence, I find the Settlements to be reasonable and an appropriate exercise of Debtors' business judgment.

A2965

convinced that the settlement is the best possible compromise, but only that the settlement falls within a reasonable range of litigation possibilities.  Therefore, the settlement need only be above the 'lowest point in the range of reasonableness.'" *In re Tribune Co.*, 464 B.R. 126, 158 (Bankr. D. Del. 2011) (quoting *Washington Mut.*, 442 B.R. at 328).  In applying the *Martin* factors to the Opioid Settlement, it becomes clear that it should be approved.

First, regarding the probability of success in litigation, Debtors argue that while they believe they have meritorious defenses to the opioid lawsuits, the sheer volume of them was more than could be handled simultaneously.   As Mr. Welch testified, though Debtors believed they could successfully defend some of the cases, it was unlikely that they would win all of them, and because the damages claimed in each case were so high, the loss of even a few would quickly impact Debtors' operations.[64]  When all of these factors are taken into consideration, it is clear that Debtors' probability of success with respect to all of the opioid lawsuits was very low. This factor weighs in favor of approving the settlement.

The second *Martin* factor requires consideration of the likely difficulties of collecting a recovery. This factor is neutral here as Debtors are defending the lawsuits, not asserting them.

The third *Martin* factor, the complexity of the litigation, weighs in favor of approving the Plan Settlements.  As Mr. Welch testified, defending against thousands of lawsuits simultaneously is inherently complicated.  It is also prohibitively expensive, costing Debtors $100 million in legal fees and expenses pre-petition and $30 million in cash and products to settle just two cases.  The lingering potential liability also affected Debtors' ability to obtain sufficient funding and retain the necessary employees, and defending the cases was both time consuming and extremely expensive.  This factor also weighs in favor of settlement.

---

[64] 12-6-21 Tr. at 61-69.

A2966

The fourth *Martin* factor requires consideration of the effect that the Plan Settlements would have on the Debtors' creditors. *Id.* A plan settlement satisfies this factor when the settlement was the result of arm's length and good-faith negotiations and where the settlement provides tangible and intangible benefits. *See In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 520 (Bankr. D. Del. 2010).

Here, the Opioid Settlement allows Debtors to maximize enterprise value to the benefit of all creditors. Without the settlement, Debtors would be unable to effectuate the reorganization and would need to conduct a Section 363 sale, which would result in a lower valuation for the business.[65] Additionally, without the Opioid Settlement Debtors would be forced to litigate the opioid claims which would result in a long, drawn-out bankruptcy, during which the business would suffer.[66] Moreover, the testimony reflects that the Opioid Settlement was the product of extensive negotiations, is supported by roughly 97% of voting opioid creditors, and is on the low end of the range of similar opioid settlements reached by other pharmaceutical companies.[67] This factor also weighs in favor of settlement.

On balance, consideration of the record before me demonstrates that the Opioid Settlement should be approved because it is fair, reasonable, and in the best interest of the estate. The extensive record highlights the complex nature of the litigation faced by Debtors prior to filing their Chapter 11 petition and the threat of even more extensive litigation during the course of these proceedings. I am satisfied that, without the Plan Settlements, Debtors would face great expense, inconvenience and delay attending to this litigation. The Pro Se Objections are overruled.

---

[65] 11-1-21 Tr. at 36-38 (Mehta).
[66] 12-10-21 Tr. at 7-13, 16, 18 (Eisenberg).
[67] 12-13-21 Tr. at 21 (Mullin); 12-7-21 Tr. at 150-51 (Welch).

24

### B. Releases

The Plan contains four types of releases: 1) releases made by Debtors contained in Article IX.B (the "**Debtors' Release**"); 2) releases made by non-debtor third parties contained in Article IX.C (the "**Third Party Releases**"); 3) the releases by the opioid claimants in Article IX.D (the "**Opioid Release**"); and 4) the releases by Debtors and related parties of the opioid claimants in Article IX.E (the "***Debtors Release of Opioid Claimants***") (together with Debtors' Release, the "**Debtors' Releases**").

#### 1. Debtors' Releases

Article IX.B and IX.E of the Plan include releases by Debtors of non-debtor third parties. There are no objections to Debtors' Releases and Debtors introduced evidence at the Confirmation Hearing to show that the potential claims being released were fully and independently investigated (including potential derivative claims against current and former officers and directors and claims arising from intercompany transactions) and the investigation determined that Debtors' Releases would not extinguish any viable claims.[68]  This evidence was uncontroverted and I found it to be credible and persuasive.  Accordingly, I find Debtors' Releases to be fair and a reasonable exercise of Debtors' business judgment.

#### 2. Opioid Releases

Article IX.D of the Plan provides for releases by holders of opioid claims against certain "Protected Parties," which include a vast number of persons and entities beyond Debtors.[69]  The

---

[68] 12-8-21 Tr. at 40-45 (describing independent investigation regarding potential claims held by the entities on the Specialty Brands side of the business); 12-9-21 Tr. at 17-25 (describing independent investigation of potential claims held by the Specialty Generics side of the business).

[69]  "***Protected Party***" means (a) the Debtors, (b) the Reorganized Debtors, (c) the Non-Debtor Affiliates, (d) with respect to each of the foregoing Persons in clauses (a) through (c), such Persons' predecessors, successors, permitted assigns, subsidiaries, and controlled Affiliates, respective heirs, executors, Estates, and nominees, in each case solely in their capacity as such, and (e) with respect to each of the foregoing Persons in clauses (a) through (d), such Person's respective current and former officers

25

Opioid Releases are referred to as non-consensual because the opioid claimants were not given the opportunity to opt out but are nonetheless bound. Debtors, as well as the plan support parties, argue that the Opioid Releases are appropriate under controlling Third Circuit law because they are fair and necessary to the reorganization. The UST and Rhode Island disagree. Both the UST and Rhode Island argue that the releases are vastly overbroad, releasing persons and entities that did not contribute anything of value to the reorganization. The UST additionally argues that the Court lacks authority to approve the releases, and that approving them would be a violation of the opioid claimants' due process rights.

For the reasons discussed below, I find that because the Opioid Releases are integral to the success of Debtors' Plan, I have the jurisdictional authority to approve them as both fair and reasonable.

---

and directors, managers, principals, members, partners, employees, agents, advisors (including financial advisors), attorneys (including attorneys retained by any director in his or her capacity as a director or manager of a Person), accountants, investment bankers (including investment bankers retained by any director in his or her capacity as a director or manager of a Person), consultants, experts and other professionals (including any professional advisor retained by any director in his or her capacity as a director or manager of a Person) or other representatives of the Persons described in clauses (a) through (d), *provided* that consultants and experts in this clause (e) shall not include those retained to provide strategic advice for sales and marketing of opioid products who have received a civil investigative demand or other subpoena related to sales and marketing of opioid products from any State Attorney General on or after January 1, 2019 through the Petition Date. "Protected Party" shall also include each Settling Opioid Insurer, but shall not include the Opioid MDT II or any Opioid Creditor Trust. Notwithstanding anything to the contrary herein, none of the following Persons, in their respective following capacities, shall be Protected Parties: (1) Medtronic plc or Covidien plc, (2) any subsidiaries or Affiliates of Medtronic plc or Covidien plc that existed as a subsidiary or Affiliate of Medtronic plc or Covidien plc after July 1, 2013, (3) any successors or assigns of any Entity described in clause (1) or clause (2) that became such a successor or assign after July 1, 2013 (excluding, for the avoidance of doubt, the Debtors, the Reorganized Debtors, and the Non-Debtor Affiliates), (4) any former subsidiaries or Affiliates of Covidien plc that ceased being such a subsidiary or Affiliate before July 1, 2013, and any successor or assign to such subsidiary or Affiliate of Covidien plc, (5) current or former shareholders of Mallinckrodt plc to the extent that they are subject to Share Repurchase Claims, other than any of the Debtors' current and former officers, directors, or employees, and (6) any Representative of any Entity described in the foregoing clauses (1) through (5) except to the extent such Representative is described in clause (d) and (e) of this definition of "Protected Party," and (7) any Released Co-Defendant. D.I. 6067 at 39 (Fourth Amended Plan).

A2969

      i.      <u>Jurisdiction to Approve Non-Consensual Third-Party Releases in the Context of Plan Confirmation</u>

The Third Circuit recently addressed the authority of bankruptcy courts to approve plans of reorganization that contain non-consensual third-party releases and related injunctions. *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126 (3d Cir. 2019). In *Millennium*, the bankruptcy court approved a plan that included releases for equity holders that had agreed to make a significant monetary contribution to the debtor in return for third-party releases. A creditor whose claims were being released objected and argued that the bankruptcy court lacked constitutional authority to grant the releases over its objection. The Third Circuit found that "the Bankruptcy Court indisputably had 'core' statutory authority to confirm the plan" under 28 U.S.C. § 157(b)(2)(L). The Court recognized, however, that "even in cases where a bankruptcy court exercises its 'core' statutory authority, it may be necessary to consider whether that exercise of authority comports with the Constitution." 945 F.3d at 135. To answer that question, a bankruptcy court must look to the content of the plan and determine whether the matter is "integral to the debtor-creditor relationship." *Id.* at 137. The bankruptcy court in *Millennium* concluded, based on the record, that the releases were critical to the success of the plan because without them there would not be a contribution from the equity holders and without that contribution the debtor would be unable to confirm a plan. Based on those findings, the Third Circuit concluded that in approving the plan, the bankruptcy court was resolving a matter "integral to the restructuring of the debtor-creditor relationship, and, therefore, acting within its statutory and constitutional authority." *Id.*

The objecting creditor in *Millennium* argued that this conclusion was contrary to the Supreme Court's ruling in *Stern v. Marshall*. Because its claims against the released parties could only be determined by an Article III court, it argued, those claims did not stem from the

A2970

bankruptcy itself and would not be resolved in the claims-allowance process.  The Court disagreed finding that the *Stern* Court did not limit what constitutes "integral to the debtor-creditor relationship" to matters arising only in the claims-allowance process. Rather, as the Court noted, "bankruptcy courts may adjudicate matters arising in the claims-allowance process because those matters are integral to the debtor-creditor relationship, not the other way around." *Id.* (relying on the Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011)).

The Court also dismissed the objecting creditors concerns that the Court's "integral to the restructuring rule" would mean that bankruptcy courts could approve releases simply because parties demanded they be included in a plan of reorganization.  The Court was clear that it was "not broadly sanctioning the permissibility of non-consensual third-party releases" and that those releases must meet "exacting standards" for approval.  *Millennium,* 945 F.3d at 139 (citing *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011) (explaining that suit injunctions must be "both necessary to the reorganization and fair") and *In re Continental Airlines*, 203 F.3d 203, 214 (3d Cir. 2000) ("The hallmarks of permissible non-consensual releases [are] fairness, necessity to the reorganization, and specific factual findings to support these conclusions[.]").

In *Continental*, the Third Circuit considered the validity of a provision in Continental Airlines' plan of reorganization that released and permanently enjoined shareholder lawsuits against certain of the Airline's present and former directors and officers who were not themselves debtors.  Plaintiffs, members of a shareholder class action that held claims against the directors and officers, objected to the release because it enjoined their claims without notice to individual class members and without consent or consideration.  *In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000).

A2971

Acknowledging the absence of a rule regarding the permissibility of such releases in this Circuit, the Court analyzed the cases from other circuits on both sides of the issue. It noted that while some courts (such as the Ninth and Tenth Circuits) have drawn a hard line and held that non-debtor releases and permanent injunctions are impermissible in all cases, others (such as the Second and Fourth Circuits) "have adopted a more flexible approach, albeit in the context of extraordinary cases." *Id.* at 212 (citing *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Johns-Manville Corp.*, 843 F.2d 636, 640, 649 (2d Cir. 1988), and *In re A.H. Robins Co.*, 880 F.2d 694, 702 (4th Cir. 1989). With respect to these "extraordinary cases," the Court observed that "[a] central focus of these three reorganizations was the global settlement of massive liabilities against the debtors and co-liable parties. Substantial debtor co-liable parties provided compensation to claimants in exchange for the release of their liabilities and made these reorganizations feasible." *Id.* at 212-13. The Court further observed that its review of cases indicated that courts have held that fairness dictates that "it is necessary to provide adequate consideration to a claimholder being forced to release claims against non-debtors." *Continental*, 203 at 212-13.

While the *Continental* Court ultimately declined to set its own rule because the release before it "[did] not pass muster under the most flexible tests for the validity of non-debtor releases[,]" it did identify the "hallmarks of permissible non-consensual releases" as "fairness, necessity to the reorganization, and specific factual findings to support these conclusions[.]" *Id.* at 214. The Court was careful to note, however, that "Courts generally have not construed the more permissive view of the Second and Fourth Circuits to give them 'unfettered discretion to discharge non-debtors from liability.'" *Id.* at n.9 (quoting *Chateaugay*, 167 B.R. 776, 780 (S.D.N.Y. 1994) (observing that the *Chateaugay* court noted "that bankruptcy courts have

A2972

permanently enjoined future lawsuits against non-debtors only when essential to plan confirmation."); and *In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994) (explaining that such injunctions are rare and should not be considered absent "a showing of exceptional circumstances" as demonstrated by the presence of several key factors). The *Millennium* Court cautioned that courts should "approach the inclusion of nonconsensual third-party releases or injunctions in a plan of reorganization with the utmost care and [] thoroughly explain the justification for any such inclusion." *Millennium*, 945 F.3d at 139. With these principles in mind, I consider the proposed releases.[70]

ii.   <u>Analysis</u>

As stated above, to be approved, the Opioid Releases must be both necessary and fair. At the Confirmation Hearing, Debtors offered extensive evidence to demonstrate that the releases were necessary to the reorganization. Specifically, Debtors' position is that without the releases, the Settlements could not have been achieved and that, without the Settlements, the Plan falls apart and Debtors would be forced to sell off the company in pieces. In other words, Debtors argue the Releases, the Settlements, and the Plan are all inextricably intertwined such that the Releases are essential to Plan confirmation.

---

[70] While I am cognizant of the objection by the U.S. Trustee that Section 524(e) of the Code should be read to preclude non-debtor releases, I disagree with the notion that releases are the equivalent of a discharge. *See In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 273 (Bankr. D. Del. 2017) ("An order confirming the plan with releases does not rule on the merits of the state law claims being released."), *aff'd* 591 B.R. 559 (D. Del. 2018), *aff'd* 945 F.3d 126 (3d Cir. 2019), *cert. denied*, *s*, —— U.S. ——, 140 S. Ct. 2805, 207 L.Ed.2d 142 (2020). I am also aware of the recent rulings from courts in the Second Circuit and the Fourth Circuit that hold otherwise. See *In re Purdue Pharma L.P.*, 633 B.R. 53, 66 (Bankr. S.D.N.Y. 2021) overruled on other grounds by 2021 WL 5979108 (S.D.N.Y. Dec. 16, 2021) (concluding that "the Bankruptcy Code does not authorize a bankruptcy court to order the nonconsensual release of third-party claims against non-debtors in connection with the confirmation of a chapter 11 bankruptcy plan.") and *Patterson v. Mahwah Bergen Retail Grp., Inc.*, No. 3:21cv167 (DJN), 2022 U.S. Dist. LEXIS 7431 (E.D. Va. Jan. 13, 2022) (same). In this case, however, I am applying the law of the Third Circuit which has recognized that bankruptcy courts do have statutory and constitutional authority to approve a plan of reorganization that contains non-consensual third-party releases, *albeit*, only in extraordinary cases.

A2973

In support of this position, Debtors offered the testimony of their Chief Transformation Officer, Stephen Welch.  Mr. Welch testified that the opioid litigation Debtors faced was "enterprise-threatening," especially in light of the other issues Debtors were battling.[71]  As of the Petition Date, the Debtors were named in more than 3,000 opioid related lawsuits alleging potentially trillions of dollars in damages.  While they believed they had meritorious defenses to those claims, there were simply too many to litigate.  The company was spending approximately $1 million a week on legal expenses, and the amount of time required of management to spend on the litigation was distracting from business operations.  Additionally, the possibility of large judgments was impacting the company's ability to obtain sufficient credit and the reputational harm of the mass litigation also led to difficulties in attracting and keeping the necessary employees.  The company quickly concluded that a bankruptcy filing was the most viable path toward preserving the company.[72]

Mr. Welch testified that the releases are integral to the company's reorganization.  But for the inclusion of these releases, the underlying deals that are embodied in the Plan would not have been done.  He stated that the releases were negotiated at arm's length over many months by very competent parties. The releases protect the interests of the reorganized debtors going forward by giving them the fresh start intended under the Bankruptcy Code.  Without the releases, Debtors and their directors, officers, and other employees would be pulled into lawsuits which would once again lead to all the problems that led Debtors into bankruptcy in the first place.  He testified that the Opioid Settlement brought peace with a significant estate fiduciary

---

[71] 12-6-21 Tr. at 57-62 (discussing reasons Debtors filed for chapter 11 protection, which included concerns about Debtors' ability to manage their debt load in addition to the litigation burden they faced).
[72] 12-6-21 Tr. at 62, 68-69.

A2974

(the OCC) and led to private opioid claimants supporting the plan.  Without that support the reorganization would likely not be successful.[73]

One of Debtors' independent directors also testified on these points.  Mr.  Sherman Edmiston, independent director at nine of the Specialty Generics debtors, was tasked with assessing both the necessity as well as the fairness and reasonableness of the releases contained in the Plan on behalf of the creditors and stakeholders of the Specialty Generics entities.[74]  Mr. Edmiston testified that he believed the releases were an essential part of the Opioid settlement and that a settlement would not have been reached if the releases were not included.[75]  Mr. Edmiston additionally testified that without the releases the directors, officers, and employees would be distracted by having to defend themselves in lawsuits, which would impair their ability to manage the company.  He stated that continued litigation would also subject the company to reputational uncertainty and overhang which would impair the company's access to capital markets and hinder the company's ability to attract and maintain management talent.[76]  He further stated that even if the litigation only involved the individual directors and officers, it would nevertheless pull the company in and require a financial commitment from the company. In addition to indemnification obligations, the company would lose significant employee time as members of management prepared and defended against the litigation, as well as significant costs associated with locating and producing documents.[77]  Additionally, Mr. Edmiston testified that

---

[73] 12-6-21 Tr. at 99-100 (Welch).
[74] 12-9-21 Tr. at 9-10 (Edmiston).
[75]  12-9-21 Tr. at 21-22 (Edmiston) ("[B]ased on our team's interviews [] with the legal and financial advisors and the management team [] of the debtor . . . it was made very clear to us that, without those releases, there would be no settlement.").
[76] 12-9-21 Tr. at 22-23.
[77] 12-9-21 Tr. at 23-24.

A2975

continued litigation could impact the company's ability to attract necessary funding due to the specter of potential billion-dollar judgments in Debtors' future.[78]

Debtors also offered the testimony of Punit Mehta, Senior Managing Director at Guggenheim Securities, Debtors' financial advisor.  Mr. Mehta provided an expert opinion on the enterprise value of Debtors and testified that based on his experience as an investment banker, the absence of the settlements would adversely impact Debtors' ability to maximize value because, as he noted, with prolonged litigation comes a prolonged bankruptcy, which would negatively impacts the business of the company, employee retention, and result in a prolonged period where the company is unable to make the appropriate investments.[79]  In that scenario, Mr. Mehta testified, the business would likely be sold off in pieces, some as going concerns and others in a liquidation, which would result in a much lower value being achieved for creditors than is estimated through the Plan.[80]

Debtors also presented Randall Eisenberg of Alix Partners, Debtors' Chief Restructuring Officer ("**CRO**"), who likewise testified that if the Opioid Settlement were not approved, Debtors would be forced to litigate all of the lawsuits against them, which would result in a lengthy chapter 11 process and would present great risk to the all of Debtors.[81]  Mr. Eisenberg stated that the financial impact of not settling would be "value destructive" because it would be very difficult for the company to operate effectively in that type of environment.[82]

I find these witnesses to be credible and their testimony on this issue to be persuasive. None of the objecting parties argue that the releases are not necessary to Debtors' reorganization, and there is no evidence in the record that would refute Debtors' position that they are.  I am

---

[78] 12-9-21 Tr. at 24-25.
[79] 11-1-21 Tr. at 35-37.
[80] 11-1-21 Tr. at 37-39 (Mehta).
[81] 12-10-21 at 10 (Eisenberg).
[82] 12-10-21 Tr. at 11 (Eisenberg).

A2976

satisfied that the evidence here supports the conclusion that Debtors' reorganization is simply not possible without the releases and therefore find that they are necessary. *Cf. Continental*, 203 F.3d 203, 215 (finding "nothing in the record to even imply that the success of the Continental Debtors' reorganization bore any relationship to the release and permanent injunction of Plaintiffs' class actions.").

Debtors next presented evidence to support their position that the Opioid Releases are fair to claimants. Debtors point again to the testimony of Mr. Welch, who stated that while he believed the original OCC Settlement to be fair, the ultimate settlement incorporated into the Plan provides significantly more benefits for claimants. The final settlement includes the addition of several large constituencies to the RSA, including the MSGE group which represented a significant number of public litigants, and also incorporated the appointment of the Future Claims Representative to ensure that the interests of future claimants were adequately represented.[83] Additionally, the final settlement generated an additional $125 million, taking the settlement from $1.6 billion to $1.725 billion in cash contributed by Debtors.[84] Mr. Welch explained that under the final settlement Debtors also agreed to contribute a portion of their interest in claims that might arise from Debtors' share repurchase agreement and gave the opioid claimants additional time to exercise the opioid warrants that were a part of the consideration (which additional time, in turn could potentially increase the value of the warrants).[85]

Mr. Welch also stated that the additional $125 million that Debtors contributed as part of the final Opioid Settlement was in part reflective of the additional agreement on the part of the

---

[83] 12-6-21 Tr. at 90-95.
[84] 12-6-21 Tr. at 95-97.
[85] 12-6-21 Tr. at 97-98 (Welch).

A2977

opioid claimants to forego making claims on Debtors' D&O insurance.[86]  Debtors in turn

provided mutual releases to the claimants.

Mr. Welch testified that he believed the releases were fair because they do provide

exclusions for certain types of conduct such as criminal conduct, fraud, and gross negligence.[87]

He also concluded that, based on the voting results, the overwhelming number of the opioid

classes voted in very high percentages to support the Plan and only one unresolved individual

objection to the releases remains.

Debtors also pointed again to the testimony of Mr. Edmiston, the independent director

who investigated the fairness of the Opioid Releases.  Mr. Edmiston stated that one of the first

things that struck him about the Opioid Settlement was that there was such a large and diverse

group conducting the negotiations[88] because with so many different parties-in-interest involved

he believed there is a certain implicit fairness about any settlement that is ultimately reached.

Indeed, following a thorough investigation of the claims asserted, Mr. Edmiston concluded that

the Opioid Releases were fair to both the estate and the releasing parties because the financial

consideration being offered was significant and the settlement was well supported by the various

creditor constituencies.[89]

With respect to the consideration being offered to the claimants, Mr. Edmiston concluded

that it was likely greater than the opioid claimants would receive in the other alternative

scenarios.  For example, he testified that with the opioid cases filed against Debtors asserting an

average of more than a billion dollars each, just a few adverse rulings could force Debtors into a

---

[86] 12-6-21 Tr. at 96-97.
[87] 12-6-21 Tr. at 135.
[88] Including the first lien creditors, second lien noteholders, unsecured noteholders, the OCC, the UCC, Plaintiffs' Executive Committee that represented the 50 states and territories, and the MSGE group that represented 1300 municipalities and tribal nations.  12-9-21 Tr. at 11.
[89] 12-9-21 Tr. at 17-18 (Edmiston)

A2978

"free fall Chapter 7 kind of death spiral of the specialty generics debtors," in which case the claimants would recover significantly less than the $1.7 billion being offered through the Plan.[90]

With respect to the releases of the directors and officers specifically, Mr. Edmiston testified that he found it notable that, to date, only two lawsuits include claims against a director, officer, or employee of Debtors.  Given the thousands of lawsuits filed, this led him to conclude that there must not be very strong claims against the individuals.[91]  Mr. Edmiston further testified that although the individual directors and officers are not making a financial contribution directly in exchange for the release, the debtors paid additional money to obtain those releases, as reflected in the fact that the value of the settlement exceeds the value of the Specialty Generics entities.[92]

The OCC also offered evidence in support of the Opioid Releases through the testimony of Michael Atkinson, a Principal at Province, LLC, financial advisor to the OCC.  Mr. Atkinson testified about the Opioid Settlement negotiations.  Specifically he stated that through the OCC Allocation Mediation[93] it was agreed that all value other than what goes directly to claimants would be utilized for the abatement of the opioid epidemic.[94]  He further testified that, following the mediation, "the OCC's advisors continued to engage in multi-party negotiations … in an effort to ensure that opioid claimants would receive additional, appropriate value under the

[90] 12-9-21 Tr. at 18-19 (Edmiston).  Mr. Edmiston further testified that the Specialty Brands Debtors were also named in about a thousand lawsuits and contributed to the settlement as well to ensure their extrication from the litigation.  *Id.* at 19-20.
[91] 12-9-21 Transcript at 15, 20 (Edmiston Testimony).
[92] 12-9-21 Tr. at 20-21 (Edmiston).  Mr. Edmiston also testified that he reached this conclusion because he specifically instructed his investigation team to confirm directly with representatives of the Debtors who conducted the negotiations that more money was paid for the individual releases, which they did.
[93] In February 2021, Kenneth Feinberg, one of the nation's foremost mediators, was appointed to assist the parties in reaching an agreed allocation of any distribution to opioid claimants under the Plan (the "**OCC Allocation Mediation**").  Following approximately three months of mediation, an agreement regarding allocation was reached, which is reflected in the Opioid Settlement and incorporated into the Plan.
[94] Atkinson Declaration, D.I. 5319 at 8.

36

A2979

Debtors' proposed Plan."[95]   Those negotiations resulted in the following additional

compromises:

A. An additional $125 million in cash consideration to be provided to Opioid Claimants on the 8th anniversary of the Effective Date of the Plan, bringing the total cash consideration to Opioid Claimants to $1.725 billion over 8 years;

B. Transfer to the Opioid MDT II control over, and 50% of the proceeds from, any litigation brought against the Debtors' shareholders, as a result of the Debtors' share repurchase program from 2015 to 2018;

C. Relinquishment of Opioid Claimants' rights in respect of both (a) Directors/Officers liability insurance and (b) estate claims against co-defendants;

D. Modifying the exercise period of the New Opioid Warrants from (i) seven years from the Plan Effective Date, or five years if Mallinckrodt opts to prepay the Deferred Cash Payments to (ii) six years from the Plan Effective Date;

E. Tightening of the financial and other covenants that the Debtors will need to abide by during the period in which payments to Opioid Claimants are outstanding; and

F. An extension of Mallinckrodt's right to exercise the "prepayment option" to prepay all cash amounts owing to Opioid Claimants from 12 to 18 months.[96]

The OCC also submitted into evidence its Supplemental Plan Position Letter, which was

sent out to opioid claimants, recommending that they vote in favor of the plan.  In it, the OCC

likewise stated that the additional negotiations following the mediation were "centered on

obtaining more value for Opioid Claimants. . ." and it described the above-listed additional

compromises as "*new value* in addition to the consideration already being provided to Opioid

Claimants under the Plan. . . ."[97]   The OCC then advised claimants that,

---

[95] *Id*.

[96] *Id.* at 9.

[97] Supplemental OCC Plan Position Letter, D.I. 4535-1, Covidien P2 Ex. 4 (emphasis in original); D.I. 4587, Affidavit of Service (served on 31,495 pro se opioid creditors with claims against Purdue); D.I. 4607, Affidavit of Service (Core/2002 Service List).

A2980

> [I]n light of all of the facts and circumstances of these Chapter 11 Cases—
> including a recognition by the OCC that funds must start to be distributed to abate
> the Opioid epidemic and compensate victims ***now***—the OCC believes that the
> consideration being provided to Opioid Claimants is fair and reasonable.[98]

Lastly, the Future Claimants' Representative, Roger Frankel, also testified that he believed the Plan's injunctions and releases were fair to future opioid claimants in light of the consideration that is being given, particularly the ability to file claims against the Opioid Trust which, if allowed, will result in compensation to claimants.[99]

Once again, I find the testimony of these witnesses to be both credible and persuasive. While the Objecting Parties cross-examined Debtors' witnesses and made arguments at Confirmation that Debtors failed to carry their burden of proof, no one put on any evidence to contradict Debtors on the issue of the fairness of the Opioid Releases. Having considered all the evidence presented and the arguments made by the objecting parties, I conclude based on the specific facts and circumstances of this case, that the Opioid Releases are fair.

The decision to approve the Opioid Releases here is not one that I make lightly, and it is informed by several considerations. First and foremost is the extraordinary nature of this case. As previously noted, Debtors were sued in over 3000 cases around the country by both governmental entities seeking to abate the opioid crisis they allege Debtors contributed to, as well as private organizations and individuals who were affected by Debtors' opioid products. The settlement of those claims, of which the releases are a necessary and integral part, will remove an existential threat to Debtors' business while at the same time ensuring that Opioid Claimants receive recoveries far in excess of what they could obtain through continued litigation.

---

[98] *Id.* (emphasis in original).
[99] 12-8-21 Tr. at 69-70, 78-79.

A2981

This is particularly true given that the opioid claims are only one of several potentially massive litigation liabilities faced by Debtors.[100]

This is also a notorious and sensitive case because it involves opioids at the height of a national opioid epidemic.  The nature of the claims at issue here – personal injury claims arising out of the use of opioid medications – makes time of the essence.  While the parties here could spend decades litigating who is right and who is liable for what, the need for funds to manage and abate this crisis is real and immediate.

The confluence of these factors here makes this case exactly the type of extraordinary case the Third Circuit alluded to in *Continental*, where nonconsensual releases might be appropriate.

Second, to the extent it was not already apparent, it has become abundantly clear through several weeks of confirmation hearings that the massive number of lawsuits the Debtors face are the primary reason they are in bankruptcy and, more importantly, the settlements incorporated into the Plan are their only way out.  Here, like in the *Manville, Robins,* and *Drexel* cases referred to in *Continental*, the "central focus of these [cases] has been the global settlement of massive liabilities against the debtors and co-liable parties."  *Continental*, 203 at 212-13.  The Opioid Releases are an integral part of the Settlements here, and therefore necessary for Plan confirmation.

Third, the Opioid Releases are a fair result for opioid claimants. The settlement was negotiated at arm's length with a large group of sophisticated parties representing diverse interests.  Substantial consideration is being given in exchange for the releases in the form of a well-funded trust to which opioid claimants can turn for potential compensation.  Additionally, with respect to the non-debtors being released, the evidence shows that the Opioid Releases are

---

[100]  See 2-6 *supra* (discussing all the types of litigation Debtors presently face).

both necessary and fair.  They are necessary because the entities and individuals are involved to such a degree with Debtors' business that a suit against them is likely to be a drain on Debtors in some respect.  They are fair both because Debtors provided additional compensation in exchange for the releases of these non-debtors and because the record suggests it is unlikely that there are any material claims for liability against these non-debtors that are being waived.  The alternative to the Opioid Settlement is protracted and expensive litigation, which would not help the victims of the opioid crisis but would instead generate significant litigation costs that would drastically reduce the funds available to opioid creditors.  This Opioid Settlement and the Plan's provisions with respect to opioid claims puts money into the hands of opioid claimants and abatement programs for the good of the public.

Finally, the weight of the evidence before me suggests that these releases are not only necessary and fair, but overwhelmingly supported by the creditor body.  And while "nearly consensual" is certainly not sufficient under the law, it does provide some reassurance that this is the right result.  While I appreciate the thoughtful arguments regarding jurisdiction and authority for the releases made by the UST on behalf of all claimants, the fact is that only one single creditor out of hundreds of thousands actually objected to these releases.  To apply a blanket prohibition on non-consensual releases in this case would simply not make sense.

Here we have a very large body of creditors in support of a complex reorganization plan and only one individual creditor opposing it.   The single creditor that does object, Rhode Island, has a claim against Debtors' CEO, Mark Trudeau, that the record shows is likely worth at most, $1 million.[101]  Rhode Island argues that because it is not receiving compensation for its claims directly from Mr. Trudeau the Opioid Release should be rejected, but the result of doing so would be absurd.  If I were to sustain Rhode Island's objection, it would certainly be a case of

---

[101] See *infra* at 66 (discussing evidence regarding value of Rhode Island's claim).

the tail wagging the dog.  Excepting one creditor in the manner Rhode Island proposes would effectively enable a single creditor with a relatively small claim to hold up a $5 billion bankruptcy; a result that surely cannot be what the law intends.[102]  On the contrary, the use of nonconsensual non-debtor releases in this circumstance seems to be precisely the situation envisioned by Section 105(a).  *See e.g. In re Johns-Manville Corp.*, 801 F.2d 60, 64 (2d Cir. 1986) ("[I]f the bankruptcy court may ever use its equitable powers under section 105(a) to enjoin actions pursued in other courts as 'concerning the administration of the estate' under section 157(b)(2)(A), it may exercise that power where there is a basis for concluding that rehabilitation, the very purpose for the bankruptcy proceedings, might be undone by the other action."); *see also In re Ionosphere Clubs Inc.,* 98 Bankr. 174, 176-77 (Bankr. S.D.N.Y. 1989) ("The paramount policy and goal of Chapter 11, to which all other bankruptcy policies are subordinated, is the rehabilitation of the debtor.").

For all these reasons, I find that the Opioid Releases satisfy the requirements set forth by the Third Circuit in *Continental*.[103]  The objections are therefore overruled.

### iii.   Due Process

The UST argues that the Opioid Releases violate the Due Process Clause of the Fifth Amendment to the U.S. Constitution.[104]  Specifically, he argues that the notice that was provided

---

[102] Such a result would also affect the CEO's ability to run the company and would lead to other claimants seeking similar treatment which would threaten to unravel the settlement entirely.  See 12-9-21 Tr at 26-27 (Edmiston) (testifying that excepting the CEO, Mr. Trudeau, from the releases would impair his ability to lead the organization and lead to additional demands for litigation carve outs).

[103] I also conclude, although it is unnecessary for this ruling, that for the reasons stated throughout this section, the factors set forth in the *Master Mortgage* case are also satisfied here.  *In re Master Mortgage Inv. Fund,* 168 B.R. 930, 937 (Bankr. W.D.Mo. 1994).  As discussed above, the evidence shows that 1) there is an identity of interest between the debtor and the third party; 2) substantial contribution is being made on behalf of the non-debtor to the reorganization; 3) the injunction is essential to the reorganization; 4) a substantial majority of creditors support the injunction; and 5) the plan provides for payment substantially all the claims of the affected class.

[104] D.I. 4718, UST Objection to Confirmation; See U.S. Const. amend. V.

A2984

was insufficient because the Plan's "impenetrable" release provisions did not clearly convey the required information regarding the rights that are being extinguished.

Due process requirements apply equally in bankruptcy cases as in all others, *In re Johns-Manville Corp.*, 551 B.R. 104, 113 (S.D.N.Y. 2016), and a cause of action for damages is among the property interests that due process protects. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). Notice and a meaningful opportunity to be heard are essential conditions of constitutional due process. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (stating, "[t]he notice must be of such nature as reasonably to convey the required information…"). In evaluating whether due process requirements have been met in a particular case, the proper inquiry is whether the notice was reasonably calculated under the circumstances to apprise interested parties of action being taken and afford them an opportunity to present their objection. *Mullane*, 339 U.S. at 314.[105] In addition, "[t]he proper inquiry in evaluating notice is whether a party acted reasonably in selecting means likely to inform persons affected, not whether each person actually received notice." *In re New Century TRS Holdings, Inc.*, 465 B.R. 38, 48–49 (Bankr. D. Del. 2012) (quoting *In re Charter Co.*, 113 B.R. 725, 728 (M.D. Fla. 1990) (citing *Weigner v. City of New York*, 852 F.2d 646, 649 (2d Cir. 1988)). Here, I find the notice provided to opioid claimants satisfies these requirements.

Because no bar date was set for opioid claims, Debtors undertook a broad opioid noticing program to reach both known and unknown opioid claimants.[106] This included both a direct notice strategy and a media and community outreach strategy. As one of Debtors' noticing agents, Ms. Jeanne Finegan, testified, notice to opioid claimants here reached about 91% of all

---

[105] This requirement also applies to bankruptcy proceedings. *In Matter of Motors Liquidation Co.*, 829 F.3d 135, 159 (2d Cir. 2016) (citing *Martin v. Wilks*, 490 U.S. 755, 762 n.2 (1989), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102–166, 105 Stat. 1071).
[106] 12-6-21 Tr. at 93-94 (Welch).

adults in the United States and about 82% of all Canadian adults with an average frequency of six times.[107]  The noticing campaign was comprised of advertising on network broadcast and cable television, in newspapers, magazines, on social media and other online locations including a dedicated website, as well as terrestrial radio.[108]

Ms. Finegan testified that the opioid noticing program accounted for regional differences in opioid misuse and abuse by increasing media efforts in eleven states through hyper-local channels.[109]  Additionally, Debtors' community outreach strategy involved sending a simplified version of the print notice to third-party organizations that could help expand awareness of Debtors' Plan, voting deadline, and solicitation procedures.[110] Lastly, Debtors sent a direct, mailed notice, along with a solicitation package to: all plaintiffs with pending opioid lawsuits against Debtors, all persons that have filed opioid-related proofs of claims in these cases, all persons that have appeared in these cases on opioid-related issues, all co-defendants to the Debtors in opioid lawsuits, and all putative representatives of various opioid claim classes.[111] A direct, mailed notice was also sent to all opioid claimants who filed proofs of claim in the *Purdue* Chapter 11 Cases as well as related consolidated third party payors who filed proofs of claim in this case relating to Acthar Gel and asserted generics price fixing claims.[112]

---

[107] Finegan Supplemental Declaration, D.I. 5274-1 at 2; *See* Finegan Declaration, D.I. 2889-2 at 2-3 and 29. The estimated cost of Debtors' Opioid Noticing Program was $8,250,000.  Ms. Finegan states that the Additional Opioid Notice Plan, which was the basis of Debtors' Opioid Noticing Program, was formulated using syndicated media research data, often used by advertising agencies nationwide to select the most appropriate media to reach specific target audiences, create target audience characteristics, and select the best media communication methods to reach them.  In addition, Ms. Finegan wrote that her team studied various data sources to ensure that Debtors' Additional Opioid Notice Plan was appropriately targeted and optimized.
[108] Finegan Declaration, D.I. 2889-2 1-3, 26-29. *See* D.I. 2917, Disclosure Statement.
[109] Finegan Declaration, D.I. 2889-2 at 15. Hyper-local channels include local newspaper advertising, online display, and social media.
[110] Finegan Declaration, D.I. 2889-2 at 25-26.
[111] Finegan Declaration, D.I. 2889-2 at 8-9; Disclosure Statement Order, Debtor P2 Ex. 89 at 1358-59.
[112] *Id.*  That notice did not include a solicitation package, but it did include information on how to retrieve a solicitation package from the Notice and Claims Agent.

A2986

The evidence regarding the opioid noticing program is uncontroverted and there is no suggestion that it was inadequate in any particular way.  Rather, the UST argues that even a thorough reading of the Plan "would generally leave claimants unable to determine and to understand who is releasing claims, who is being released from claims, and what claims are being released."[113]  I appreciate the UST's concern that individual opioid claimants might not understand the dense language of the Opioid Releases.  However, concerns about whether due process has been met are ameliorated in several ways.  First, Debtors' noticing program was extensive and encouraged potential claimants to file proofs of claim.  Second, the interests of opioid claimants were being overseen by the OCC, which was represented by competent counsel who clearly understood the Opioid Releases and supported including them in the Opioid Settlement as a means of maximizing value for all creditors.  Third, opioid claims are being channeled to Opioid Trusts that will give all opioid claimants the opportunity to recover on their claims.  Because no bar date was set, this would include any future claimants or claimants who did not receive notice.  Those potential future claimants are also represented by an experienced Future Claimants Representative who also supports Plan confirmation.  Finally, the UST's objection to the propriety of the Opioid Releases ensured that I had the opportunity to consider the interests of any creditors who may not have received or understood the proposed releases.  For all these reasons, I am satisfied that the notice provided to opioid claimants regarding both the nature of the Opioid Releases as well as the process for objecting was fair and reasonable and meets constitutional requirements for due process.  The UST's objection on these grounds is overruled.

---

[113] D.I. 4718, UST Objection at 15.

A2987

3. **Third-Party Releases (Non-Opioid)**

Article IX.C of the Plan includes releases (the "**Third-Party Releases**") by certain non-debtors other than opioid claimants, including: "(a) Holders of all Claims who vote to accept the Plan, (b) the Holders of all Claims that are Unimpaired under the Plan, (c) the Holders of all Claims whose vote to accept or reject the Plan is solicited but who (i) abstain from voting on the Plan and (ii) do not opt out of granting the releases …, (d) the Holders of all Claims or Equity Interests who vote, or are deemed to reject the Plan but do not opt out of granting the releases …, (e) all Holders of Claims or Equity Interests to the maximum extent permitted by law, and (f) the Released Co-Defendants and each of their Co-Defendant Related Parties…." (the "**Non-Debtor Releasing Parties**").  The definition of Released Parties is extensive and includes, among others, the Debtors, the Reorganized Debtors, Non-Debtor Affiliates, their respective officers, directors, employees and representative, as well as parties that support the Plan and Plan Settlements and their respective employees, agents, and advisors (the "**Released Parties**").  The Third-Party Releases are also quite broad including any actions arising out of Debtors' business (other than claims held by opioid claimants), Debtors' restructuring efforts and the purchase, sale or rescission of any security or indebtedness of the Debtors prior to the Effective Date of the Plan. The Third-Party Releases also specifically exclude certain types of claims, including any cause of action that is determined to constitute actual fraud, gross negligence or intentional misconduct.[114] Debtors contend that the Third-Party Releases (unlike the Opioid Releases) are consensual because the Plan provided Non-Debtor Releasing Parties with the opportunity to opt out.

---

[114] D.I. 6067 at 141 (Fourth Amended Plan)

A2988

Three parties object to the Third-Party Releases: the UST, the Securities and Exchange Commission (the "**SEC**"), and the Pension Trust (collectively, the "**Release Objectors**").  As a threshold matter, I find that the Pension Trust does not have standing to object to the Third-Party Releases because it has opted out and is therefore not bound by them.[115]  See *In re Indianapolis Downs, LLC*, 486 B.R. 286, 304 (Bankr. D. Del. 2013) ("In the context of a confirmation hearing, creditors 'have standing only to challenge those parts of a reorganization plan that affect their direct interests.'") (quoting *In re Orlando Investors, L.P.*, 103 B.R. 593, 596-97 (Bankr. E.D. Pa. 1989)). The remaining Release Objectors argue that the opt out procedure for shareholders and general unsecured creditors does not result in consensual releases because it releases claims held by shareholders deemed to reject the plan and by unsecured creditors who are unimpaired or who did not return a ballot with the opt out box checked or otherwise submit an opt out form.[116]  Further, they contend that the releases are not consensual and therefore must satisfy the Third Circuit's requirements set forth in *Continental* for non-consensual releases, which the objectors argue they do not.

Debtors argue that these releases are consensual because all Non-Debtor Releasing Parties had an opportunity to opt out and to the extent they chose not to opt out, their consent is manifested by their silence.  In support of this argument, Debtors point to the evidence that they sent comprehensive solicitation packages to holders of claims and interests against Debtors (including those not entitled to vote on the Plan) that provided those holders with both

---

[115] Additionally, while the Pension Trust argues it has opted out on behalf of all of the Strougo Plaintiffs, as discussed *supra* at 16-19, because the putative class in the Strougo Action was never certified, the Pension Trust could not have opted out on its behalf.  The Pension Trust could have filed a motion in this Court seeking class certification, but it failed to do so.  Accordingly, the Pension Trust's opt out form is valid only with respect to the Pension Trust.  To the extent any of the Strougo Plaintiffs did not receive notice of their rights to opt out or were otherwise unaware of that option, they are free to file a motion seeking relief from the Third-Party Releases and they will have the opportunity to be heard.
[116] D.I. 4718, UST Objection at ¶ 71.

sufficiently detailed and easily understandable information about the releases and the opportunity to opt out.

Specifically, they point to the testimony of James Daloia, one of Debtors' claims and noticing agents.  Mr. Daloia testified that Prime Clerk, adhering to the solicitation procedures contained in the Disclosure Statement Order,[117] distributed solicitation packages including ballots to parties entitled to vote on the Plan.[118]  The ballots included instructions on how to opt out of the releases contained in the Plan.[119]  For beneficial holders of securities and nominees who held claims on behalf of beneficial holders of funded debt or other debt claims, Prime Clerk either mailed the relevant documents directly to the holders or their proxy agents, or sent out master ballots.[120]  For those who were entitled to receive notice of non-voting status, such as the Class 14 shareholders, Prime Clerk sent the confirmation hearing notice, notice of non-voting status, and an opt out form.  Though not required by the solicitation procedures, Prime Clerk also served former shareholders (those who held interests between January 1, 2019 and June 8, 2021).[121]  Prime Clerk also posted the solicitation materials on a website created for the Debtors, where opt out forms could also be completed and submitted,[122] and posted the notices with the relevant repositories in the U.S., Canada, and Europe.[123]   Finally, Prime Clerk published the approved form of publication notice in the *New York Times,* the *Wall Street Journal,* and *USA Today.*[124]

---

[117] D.I. 2911.
[118] Supplemental Daloia Declaration, D.I. 4955, Covidien P2 Ex. 10 at 2-3. The solicitation packages included the confirmation hearing notice, the plan, the Disclosure Statement and the Disclosure Statement Order. 1-4-21 Tr. at 26-27.
[119] *Id.* at 7.
[120] 11-4-21 Tr. at 24-25.
[121]  Daloia Declaration at ¶ 9.
[122] *Id.* at 26, 36.
[123] *Id.* at 36.
[124] D.I. 3072, Debtor P2 Ex 87.

A2990

The opt out forms contained text that was in various parts capitalized, bolded, and/or underlined, which among other things, informed recipients that "unless [they] check the box on this opt-out form below and follow all instructions, [they] will be held to forever release the Released Parties in accordance with the Plan."[125]  By the close of the voting period, Debtors had received 2,200 opt out forms.[126] This, they argue, demonstrates that their noticing efforts successfully informed claimants of their rights and that the releases are therefore consensual.  I agree.

The use of the opt out mechanism as a valid means of obtaining consent is not without controversy.  Many courts are divided on the issue, including this one.  The determination regarding when an opt out can be used to manifest consent is fact specific and, to be sure, the use of opt outs is not appropriate in every case.  Here, however, I am satisfied that they are appropriate.

There can be no debate over the proposition that a bankruptcy court can approve a plan that includes third-party releases.  The question is, what constitutes consent and can consent be inferred from failure to respond to a notice including an opt out?  In other words, can consent be inferred from silence or more accurately, the failure to act?

The notion that an individual or entity is in some instances deemed to consent to something by their failure to act is one that is utilized throughout the judicial system. When a party to a lawsuit is served with a complaint or a motion, they need to file an answer or otherwise respond, or a judgment is automatically entered against them.  Within the bankruptcy system, Debtors send out bar date notices and if claimants fail to file a proof of claim by a certain time, they lose the right to assert a claim.  Additionally, if a claim objection is filed and the claimant

---

[125]  Disclosure Statement order, D.I. 2911, Debtor P2 Ex 89.
[126]  11-4-21 Tr. at 37.

A2991

fails to respond, the claim is disallowed.  There is no reason why this principle should not be

applied in the same manner to properly noticed releases within a plan of reorganization.[127]  Judge

Sontchi discussed this in his ruling in *Extraction*, where similar third-party releases with opt out

provisions were included in the plan before him:

> Very importantly, these are consensual releases, these are not nonconsensual
> releases. I have repeatedly ruled that you can imply consent by failing to opt out
> or respond to a plan, either through a ballot or on the docket, that calls for a
> release. I don't believe this is necessarily a contractual point . . .as much as it is a
> point of notice under the Bankruptcy Code and the Bankruptcy Rules, because it's
> the plan that serves as the mechanism to have the release take effect and, thus, it's
> really the rules, the Federal Rules of Bankruptcy Procedure that figure out
> whether someone has achieved proper notice and has, by not responding, given
> their implied consent. Importantly, the Supreme Court recently, in the context of
> whether someone is consenting to the Article III jurisdiction of an Article I court,
> specifically held that you could imply consent by failure to preserve the right to
> argue that I don't have Article III powers. This is no different. This is a court who
> set up a mechanism to confirm a plan that contains releases and has provided a
> noticing mechanism under which, if it's complied with, consent can be implied.

*Extraction Oil & Gas, Inc.*, Confirmation Hearing Tr., 12-23-20 at 80-81.

The result might be quite different if the notice regarding the ability to opt out was

insufficient.  Here, however, there is ample evidence in the record that the releasing parties were

sent notices in a variety of ways that explained in no uncertain terms that action was required to

preserve claims.  As this Court has previously stated, shareholders and creditors have an

obligation to read their mail.  *In re EV Energy Partners*, No. 18-10814, Confirmation Hr'g (May

16, 2018) Tr. at 214 (Bankr. D. Del. May 25, 2018) ("[S]hareholders and creditors have to read

---

[127] And as is the case in each of these situations, the party who is bound by their failure to act may, if
notice was not actually received or in the presence of other similar circumstances, later approach the court
and demonstrate why they think the consequence should be unwound. *See In re Insys Therapeutics, Inc.*,
No. 19-11292 (KG), Confirmation Hr'g Tr. (Jan. 16, 2020), D.I. 1121 at 110.  ("[I]f a party that is -- that
is determined to have given a release comes into court and says, We didn't receive the document. We
didn't notice the document, I can't imagine a Court that would not exercise relief in that circumstance and
allow the released party to proceed.").

legal notices; that's just the way it is. And if you don't know that, then you're proceeding at your own risk when you invest in stocks and credit and bonds.").

Moreover, this is a very well-known case with a very active body of creditors and stakeholders. This case has generated over 6000 docket entries, twelve adversary proceedings, and more than 85 hearings (most of which were contested at least in part) over fifteen months. The issues involved have generated significant public interest and this case has been frequently reported on in a variety of business publications. Importantly, the public was made aware on the very first day of this case that it was precipitated by the massive litigation burden Debtors faced and that the primary purpose of this bankruptcy was to resolve that litigation.[128] All this is simply to say that the fact that the Plan here contained releases with respect to third parties was well-known and parties-in-interest (who have, on the whole been very vocal throughout this case) had countless opportunities to object and yet only one did.[129] This is also persuasive evidence that those who did not opt out intended for their silence to indicate their consent. For all these reasons, I find that the Third-Party Releases are consensual.

Judge Gross reached a similar conclusion in *Insys*, which was the first mass tort bankruptcy involving opioids. There, like here, both the SEC and the UST objected to the use of an opt-out mechanism to effectuate third-party releases. Also like here, the shareholders in *Insys* received no recovery under the plan, were not entitled to vote, and were deemed to give a third-party release unless they opted out. In approving the releases, Judge Gross stated that:

---

[128] DI 128, Welch Declaration in Support of Chapter 11 Petitions and First Day Motions, AICX P2 Ex. - 1685, at ¶ 11 ("[E]nterprise-threatening litigation on multiple fronts has left Mallinckrodt with no choice but to seek to restructure the claims against it to survive . . . . The Debtors commence these cases with a path to just that result—a restructuring transaction that will resolve all the major litigation against them . . . .").

[129] Setting aside the objections made by the SEC and the UST who were made on behalf of the creditors and shareholders generally.

> Insys is a case of great notoriety. People knew about the existence of the bankruptcy case and they knew they would have to act because there was a bankruptcy case. There was clear notice of the opt-out requirement in both, mailed and published notices, and, here, the released parties helped to resolve problems and issues and guided debtors through bankruptcy and were very instrumental in the settlement that we have here today. And as a consequence, the releases are essential to the plan[.]

*In re Insys Therapeutics, Inc.,* No. 19-11292 (KG), Confirmation Hr'g Tr. (Jan. 16, 2020), D.I. 1121 at 110;[130] s*ee also VER Technologies Holdco, LLC*, 18-10834 (KG), 7/26/18 Tr. at 54 ("But this is, I think, an unusual situation, and the Court will approve the releases and the exculpation provisions, given the fact that the plan does represent, to a very large extent, a settlement among parties who are insisting on that language.").

I am aware, of course, that this ruling conflicts with those of some of my colleagues who have suggested that consensual releases obtained through an opt out process may never be appropriate.[131] However, neither of those cases involve mass tort bankruptcies like this one. Although the Third Circuit has not explicitly commented on the propriety of non-debtor releases in these circumstances, it has suggested that if they are appropriate anywhere, it would be in a mass tort case like this one.  *See Continental*, 203 F.3d 203, 214 n.11 (citing cases in the Third Circuit that have stated that non-debtor releases are permissible only if consensual and observing that "[n]one of these cases, of course, involved the mass litigation found in *Robins, Manville,* or *Drexel*.").  This makes sense because the sheer volume and complexity of the issues presented in cases like these require creative solutions which often build upon each other or depend on the

---

[130] Judge Gross further observed that in all the years that releases of this type have been incorporated into reorganization plans, he was aware of no instance of a claimant later returning to argue that their rights were taken unlawfully.  *Insys*, Confirmation Hr'g Tr. at 111 ('And I just have never seen in 14 years, a released party come into court and say, Judge, please, we didn't know about this case -- we didn't know about the releases -- please lift the release.").  While that may not be a sufficient legal justification for such releases in the first instance, it does perhaps validate the approach.

[131] *See In re Emerge Energy Servs. LP*, 2019 Bankr. LEXIS 3717 (Bankr. D. Del. Dec. 5, 2019) and *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. Jan. 7, 2011).

A2994

success of each other in a way that unraveling one will cause all to fall apart.  Bankruptcy policy often requires flexibility rather than adherence to a strict inflexible model because the goal is to get the debtors through to the other side.  Here, I have a plan before me that is supported by every estate fiduciary, almost every organized creditor group, and 88% of voting creditors.  The settlements of which these releases are a part reflect the consensus of many and that too, is persuasive.

For all these reasons, I find the Third-Party Releases contained in the Plan to be appropriate.  The objections made by the Release Objectors are therefore overruled.  However, to be absolutely clear, any creditor that claims they did not receive notice of their right to opt out will have the opportunity to seek relief from the Court to exercise their rights.

### C.  <u>Exculpation</u>

 Debtors' Plan contains an exculpation provision, which is the result of negotiations and a global settlement embodied by the RSA.[132]  The UST argues that the provision is inconsistent with controlling case law because it is not limited to estate fiduciaries in that it includes the reorganized debtors and indenture trustees, and because it extends temporally back to the prepetition period.  Debtors respond that the indenture trustees are only being exculpated in their capacity as distribution agents and that the scope of the exculpation is targeted and has no effect on liability that is determined to have resulted from actual fraud, gross negligence, or willful misconduct.  For the reasons set forth below, I agree with the UST.

In *PWS Holding*, the Third Circuit held that "a plan may exculpate a creditor's committee, its members, and estate professionals for their actions in the bankruptcy case, except where those actions amount to willful misconduct or gross negligence."  *In re PTL Holdings LLC*, 2011 Bankr. LEXIS 4436, *37-38 (Bankr. D. Del. 2011) (citing *In re PWS Holding Corp*.,

---

[132] *See* Plan Art. IX.F.

A2995

228 F.3d 224, 246 (3d Cir. 2000)).  In reaching its conclusion, the *PWS* court examined Section 1103(c) and noted that the section "has been interpreted to imply both a fiduciary duty to committee constituents and a limited grant of immunity to committee members." *PWS,* 228 F.3d at 246.  "This immunity," the court found, "covers committee members for actions within the scope of their duties." *Id.*

This Court has interpreted *PWS* as implying that "a party's exculpation is based upon its role or status as a fiduciary." *In re PTL Holdings LLC*, 2011 Bankr. LEXIS 4436, *37-38 (Bankr. D. Del. 2011).  Accordingly, "courts have permitted exculpation clauses insofar as they 'merely state[] the standard to which ... estate fiduciaries [a]re held in a chapter 11 case.'" *Id.* (quoting *In re Washington Mutual, Inc.*, 442 B.R. 314, 350 (Bankr. D. Del. 2011). "That fiduciary standard, however, applies only to estate fiduciaries." *Washington Mutual*, 442 B.R. at 350.  *See also In re Tribune Co.*, 464 B.R. 126, 189 (Bankr. D. Del. 2011) (holding that exculpation provision must "exclude non-fiduciaries").

The exculpation provision contained in the Plan states that:

> Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any person for any Claims or Causes of Action arising on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, related to, or arising out of, the Chapter 11 Cases, formulating, negotiating, preparing, disseminating, implementing, filing, administering, confirming or effecting the confirmation or consummation of the Plan, the Disclosure Statement, the Opioid Settlement (as defined in the Restructuring Support Agreement), the Opioid MDT II Documents, the Opioid Creditor Trust Documents, the "agreement in principle for global opioid settlement and associated debt refinancing activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement (including any amendments and/or joinders thereto) **and related prepetition transactions**, or any contract, instrument, release or other agreement or document created or entered into in connection with any of the foregoing, **or any other prepetition or postpetition act** taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors . . . .[133]

---

[133] *See* Plan Art. IX.F (emphasis added).

A2996

First, I agree with the UST that this provision is temporally overbroad in that it improperly sweeps in prepetition conduct.  The inclusion of the language highlighted above would allow one to be exculpated for conduct that occurred prepetition, which exceeds the bounds of what the Code allows.  The exculpation of estate fiduciaries is afforded by Section 1103(c) of the Code, which relates to the powers and duties of committees appointed pursuant to Section 1102, which occurs only once the bankruptcy estate has been created by the filing of a bankruptcy petition.  11 U.S.C. § 1103, 1102.  It therefore only extends to conduct that occurs between the Petition Date and the effective date.  The highlighted language must therefore be stricken.

For the same reason, I also agree with the UST's second argument, that the inclusion of the reorganized debtor and distribution agents is also improper here.  The Plan defines Exculpated Parties as including:

> "(a) the Debtors (and their Representatives); (b) **the Reorganized Debtors (and their Representatives)**; (c) the Official Committee of Unsecured Creditors (and its Representatives and the members thereto and their Representatives); (d) the Official Committee of Opioid-Related Claimants (and its Representatives and the members thereto and their Representatives); (e) the Future Claimants Representative (and its Representatives); and (f) **the Guaranteed Unsecured Notes Indenture Trustee, the 4.75% Unsecured Notes Indenture Trustee, the Legacy Unsecured Notes Indenture Trustee and (g) the Second Lien Notes Indenture Trustee (hereinafter "Indenture Trustees"), each solely in its capacity and to the extent it serves as a Distribution Agent.**"[134]

Neither the reorganized debtor nor the distribution agents have any role in the bankruptcy prior to the effective date.  The reorganized debtor does not even exist until the effective date, and the indenture trustees will not distribute anything until after the effective date, meaning they

---

[134]  Plan at I. A. 118 (emphasis added).

54

A2997

cannot act as distribution agents prior to that time.[135]  Accordingly, the exculpation provision's inclusion of either is improper here and must also be removed.[136]

      For these reasons, the UST objection to the exculpation provision is sustained.  Debtors will need to provide a revised form of the Confirmation Order consistent with this ruling.

## IV.    Section 1129(a)

### A.  Section 1129(a)(1)

      Section 1129(a)(1) requires that the Plan comply with the applicable provisions of the Code.  The determination of whether the Plan complies with this section requires an analysis of the Plan's compliance with Sections 1122 and 1123 of the Code.  *In re S & W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of this Section reveals that although its scope is certainly broad, the provisions it was most directly aimed at were Sections 1122 and 1123.").  As discussed above, I have found that Sections 1122 and 1123 of the Code are satisfied.

### B.  Section 1129(a)(2)

      Section 1129(a)(2) requires that a proponent of a plan of reorganization comply with the applicable provisions of the Code.  The case law and legislative history relevant to this section indicate that its primary concern is the disclosure and solicitation requirements of Sections 1125 and 1126 of the Code.  See *In re WorldCom, Inc.*, 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) ("The legislative history to section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code.) (citing H.R.Rep. No. 95–595, at 412 (1977); S.Rep. No. 95–989, at

---

[135] The inclusion of provisions like this one in orders previously entered by this Court does not persuade me otherwise.  Orders containing provisions to which there was no objection do not generally have precedential value.

[136] It may, however, be proper for the reorganized debtor and the distribution agents to be included in an exculpation clause contained in the final decree.

A2998

126 (1978)).  There are no objections to confirmation of the Plan for failure to meet the

requirements of Section 1129(a)(2) and following my review of the Plan and the evidence and

testimony submitted in support, I am satisfied that its requirements have been met.

### C.   Section 1129(a)(3) (Good Faith)

Section 1129(a)(3) of the Code requires that "the plan has been proposed in good faith

and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  The Third Circuit has held

that this section is satisfied where a plan "fairly achieve[s] a result consistent with the objectives

and purposes of the Bankruptcy Code."  *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir.

2000).  Accordingly, determining whether a plan has been proposed in good faith requires an

inquiry into the totality of the circumstances surrounding the plan's proposal.  *See W.R. Grace II*,

475 B.R. at 87 (citing *Brite v. Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985)).

Courts will examine good faith on a case-by-case basis, and the court is given

"considerable discretion in finding good faith." *Id.* (citing *In re Coram Healthcare Corp.*, 271

B.R. 228, 234 (Bankr. D. Del. 2001)).  To satisfy the good faith standard, a plan must establish

that it: "(1) fosters a result consistent with the Code's objectives; (2) [ ] has been proposed with

honesty and good intentions and with a basis for expecting that reorganization can be [a]ffected;

and (3) there was fundamental fairness in dealing with the creditors." *In re Genesis Health

Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001) (internal citations omitted).

Debtors argue that these requirements are met here for several reasons.  First, the Plan

fosters a result consistent with the objectives of the Code.  Second, the Plan was negotiated at

arm's-length among representatives of the Debtors, the supporting parties, the OCC, the UCC,

the Future Claimants Representative, and their respective professionals to satisfy the Code's

A2999

primary objectives. Third, the significant support from Debtors' major creditor constituencies demonstrates that the Plan is fundamentally fair to creditors.

In support of their position, Debtors point to the testimony of their Chief Transformation Officer. Mr. Welch explained that Debtors filed bankruptcy with the intention of resolving the "enterprise-threatening litigation in the face of near-term debt maturities,"[137] that he believed the RSA was in the best interests of Debtors' estates,[138] that the Plan is a reasonable compromise of all claims, that all the parties that negotiated the Plan made concessions in good faith and that the Plan is the best available alternative for Debtors.[139] He further testified that even after Debtors' initial plan was proposed, the parties continued negotiating to resolve as many objections as possible and try to achieve a plan that is both fair and equitable.[140]

There are several parties making good faith objections. Sanofi, Mr. Darrel Edelman (acting *pro se*), and several additional *pro se* shareholders (the "**Pro Se Shareholders**").[141]

Sanofi argues that Debtors intentionally tried to prevent Sanofi from voting on the Plan because although Sanofi holds claims valued in the millions of dollars, Debtors sent Sanofi a ballot in the amount of only $1.00.[142] Debtors respond that Sanofi's unliquidated claim vote was

---

[137] 12-6-21 Tr. at 57
[138] *Id.* at 90.
[139] *Id.* at 112-13.
[140] *Id.* at 118.
[141] Tilo Bernhardt, Manan Salvi, Antonio Hidalgo Pedraza, Fahad Ali Mosaed, Shachar Rachmani, Arman R. Khosravi [Docket No. 302]; Antonio Hidalgo Pedraza [Docket No. 367]; Israel Perez Larrrcoudo, Jesus Maria Sani Ramirez [Docket No. 368]; Jesus Maria Sani Ramirez [Docket No. 369]; Humoud Sulaiman M Alqahtani [Docket No. 370]; Alex Wounlund [Docket No. 400]; John Deery [Docket No. 401]; Christopher Wooten [Docket No. 416]; Alexander Koch [Docket No. 472]; Giuliano Carnevali [Docket No. 494]; Dunin Aleksandroviah [Docket No. 527]; and Sean Vo [Docket No. 614].
[142] Sanofi also argues in its objection that the Plan's treatment of its claims constitutes a violation of the Takings Clause of the Fifth Amendment because it allows Debtors to continue to sell Acthar without compensating Sanofi. D.I. 4702. However, this argument is moot following my ruling that Debtors' APA with Sanofi is not an executory contract subject to rejection and that Debtors' breach of the APA only results in a prepetition unsecured claim for damages subject to discharge upon confirmation. See Sanofi's Motion at D.I. 4675 and Bench Ruling at D.I. 5186. Sanofi also made a different good faith argument during closings at the Confirmation Hearing (that Debtors intentionally misled the UCC about

A3000

set at $1.00 consistent with the requirements set forth in the Disclosure Statement Order.[143]

Additionally, Debtors assert that they provided notice that Sanofi's claim was voting at $1.00

and received no response.[144]  Accordingly, they argue, Sanofi's objection should be overruled.   I

agree.

As the Notice of One Dollar Claims clearly states, any objection Sanofi may have had to

the inclusion of its claims among the "one dollar contingent, unliquidated, and disputed claims"

should have been filed by July 26, 2021.[145]  No objection was made and therefore any objection

Sanofi had was waived.  Additionally, Sanofi points to absolutely no evidence that would

support the conclusion that Debtors assigned Sanofi's claim a $1.00 voting value with the intent

to suppress Sanofi's vote.  Sanofi's objection is therefore overruled.

Mr. Edelman and the Pro Se Shareholders argue that the Plan was proposed solely to

benefit the Guaranteed Unsecured Noteholders and management.  Having considered the totality

of the circumstances surrounding Debtors' proposal of the Plan, I conclude that it was proposed

in good faith. In *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, the Supreme

Court held that the two purposes of Chapter 11 are: (1) preserving going concerns; and (2)

maximizing property available to satisfy creditors. 526 U.S. 434, 453 (1999). I find that that Plan

---

the value of Sanofi's claim thereby causing the UCC to settle for less than it should have), but because
that argument was made for the first time during closing arguments, it will not be considered. *MZM
Constr. Co., Inc. v. New Jersey Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 406 n.13 (3d Cir.
2020) (concluding that when a party first raised an issue at oral argument, it is too late for the court to
consider it, and the argument must be forfeited); *see also L-3 Commc'ns Corp. v. Sony Corp.*, 2014 WL
4674815, at *3 (D. Del. Sept. 12, 2014) (stating that an argument raised for the first time during oral
argument is waived).

[143]  D.I. 2911, Attachment 1, § D (providing that "[i]f a Claim for which a Proof of Claim has been timely
filed is wholly contingent, unliquidated, or disputed (based on the face of such Proof of Claim or as
determined upon the review of the Debtors), such Claim is accorded one (1) vote and valued at One
Dollar ($1.00) for voting purposes only, and not for purposes of allowance or distribution, unless such
Claim is disputed as set forth in subparagraph j below[.]").

[144]  See D.I. No. 3196, Notice of Contingent, Unliquidated, or Disputed Claims for Voting Purposes
("**Notice of One Dollar Claims**").

[145]  *Id.*

A3001

satisfies these objectives.  The Plan resolves the morass of litigation brought against Debtors, restructures their funded indebtedness of over $5 billion, recapitalizes their businesses, and maximizes the returns available to creditors.  Additionally, there is no evidence or allegations of "misconduct in bankruptcy proceedings, such as fraudulent misrepresentations or serious nondisclosures of material facts to the court" that would give me cause to conclude the Plan was not proposed with honesty and good intentions.  *In re River Vill. Assocs.*, 161 B.R. 127, 140 (Bankr. E.D. Pa. 1993), *aff'd*, 181 B.R. 795 (E.D. Pa. 1995); see also *W.R. Grace II*, 475 B.R. 34, 88 (D. Del. 2012) ("In analyzing whether a plan has been proposed for honest and good reasons, courts routinely consider whether the debtor intended to abuse the judicial process, whether the plan was proposed for ulterior motives, or if no realistic probability for effective reorganization exists.").  Lastly, I find that the record demonstrates that Debtors were fundamentally fair in dealing with creditors.  Negotiations were conducted at arm's length and the Plan has the overwhelming support of Debtors' creditors.  While the Plan provides for different recoveries for different creditors (the propriety of which is discussed throughout this Opinion) there is simply nothing in the record to support the conclusion that it was proposed solely to benefit the Guaranteed Unsecured Noteholders or Debtors' management.  *See W.R. Grace II*, 475 B.R. at 90 ("courts have found that different treatment of a creditor, by itself, does not necessarily run afoul of the good faith standard.").  For these reasons, I find that the Plan satisfies Section 1129(a)(3) of the Code.

### D.  Section 1129(a)(4)

The UST argues that the Plan's Indenture Trustee fee payment provision violates Section 1129(a)(4) of the Code.  Section 1129(a)(4) provides that:

> Any payment made or to be made by the proponent, by the debtor, or by a
> person issuing securities or acquiring property under the plan, for services or for
> costs and expenses in or in connection with the case, or in connection with the
> plan and incident to the case, has been approved by, or is subject to the approval
> of, the court as reasonable.

11 U.S.C. § 1129(a)(4).

The UST argues that Article IV.S of the Plan and similar provisions,[146] seek to give

Indenture Trustees[147] priority payment without complying with Section 503 of the Code.[148]

Article IV.S provides that:

> On the Effective Date or as soon as reasonably practicable thereafter and upon the
> presentment of invoices in customary form (which may be redacted to preserve
> any confidential or privileged information), the Reorganized Debtors shall pay in
> Cash the Indenture Trustee Fees (whether accrued prepetition or postpetition,
> whether before or after the Effective Date of this Plan and to the extent not
> otherwise paid during the Chapter 11 Cases), without the need for application by
> any party to the Bankruptcy Court, and without notice and a hearing pursuant to
> section 1129(a)(4) of the Bankruptcy Code or otherwise. From and after the
> Effective Date, the Reorganized Debtors will pay any Indenture Trustee Fees in
> full in Cash without further court approval.[149]

The UST argues that each of these provisions is improper because they provide for the

payment of fees without requiring those seeking payment to meet the requirements of Section

503 of the Code, *i.e.*, (a) timely submission of a fee application, (b) notice and hearing before the

Court, (c) showing the fees are actual and necessary; and (d) showing a substantial contribution

to the Chapter 11 cases.  11 U.S.C. § 503.

Debtors assert that the payment of Indenture Trustee Fees is integral to the Plan because

assuming the RSA requires Debtors to cure any defaults, including the payment of Indenture

---

[146] Plan Article IV.JJ (4.75% Unsecured Notes Indenture Trustee and Legacy Unsecured Notes Indenture Trustee).
[147] "**Indenture Trustees**" means the Guaranteed Unsecured Notes Indenture Trustee, the 4.75% Unsecured Notes Indenture Trustee, and the Legacy Unsecured Notes Indenture Trustee.
[148]  The UST also objects to the Plan's provision for payment of fees of other non-estate professionals, which is addressed infra at 92.
[149] Plan Article IV.S.

A3003

Trustee fees. Debtors also argue that they have satisfied Section 503(b) of the Code because the Indenture Trustees have made an invaluable contribution to this bankruptcy case and Debtors would not have been able to obtain substantial support for the Plan without agreeing to pay the Indenture Trustee fees.[150] Additionally, counsel representing the Indenture Trustees have argued that, in exchange for the payment of their reasonable fees, the Indenture Trustees have agreed to limit the payment to fees incurred as of the effective date, to forego their right to exercise a charging lien over distributions made to the general unsecured noteholders, and to serve as distribution agents.[151]

In support of their position, Debtors offered the testimony of Mr. Welch.  Mr. Welch stated that Debtors believe that paying the Indenture Trustee fees is in the best interest of Debtors' estates based on the contributions of the Indenture Trustees to the Plan.[152] Mr. Welch testified that the Indenture Trustees worked with Debtors on the RSA, the UCC settlement, and on other hard fought negotiations that helped create a value-maximizing plan.[153]  Moreover, the Indenture Trustees have agreed to serve as distribution agents and the Indenture Trustee fee amounts are reasonable.[154]

Debtors' arguments on this point are persuasive.  I am satisfied that the Indenture Trustees have made a substantial contribution to the bankruptcy case and find that the payment of Indenture Trustee fees under the Plan is reasonable and appropriate.

---

[150] 12-6-21 at 123-26.
[151] *See* D.I. 5007, 12-6-21 Tr. at 124-126 (Welch); *See also* 1-03-22 Tr. 98-101, D.I. 4121-1, GUC Settlement Term Sheet.
[152] 12-6-21 Tr. at 124 (Welch).
[153] 12-6-21 Tr. at 124-126 (Welch).
[154] 12-6-21 Tr. at 124-125 (Welch).

A3004

### E.  Section 1129(a)(5)

Section 1129(a)(5) provides that the court may only confirm a plan if the plan proponent discloses "the identify and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan."  11 U.S.C. § 1129(a)(5).  There is one objection to confirmation of the Plan based on this section.[155]

Glenridge argues that the Plan fails to satisfy the requirements of Section 1129(a)(5) because it fails to identify each individual member of the Reorganized Board and the nature of compensation for insiders.  Debtors respond that Glenridge's argument fails for three reasons.  First, Section 1129(a)(5) only requires that Debtors disclose "the identity and affiliations of any individual *proposed* to serve, after confirmation of the plan, as a director."  11 U.S.C. § 1129(a)(5)(A)(i) (emphasis added).  Second, Debtors state that they have identified the proposed member(s) of the Reorganized Board in multiple filings.[156]  Third, Debtors note that they did disclose the compensation of directors and officers in their 10-K for the fiscal year ended December 25, 2020.[157]  I agree with Debtors.

Article IV.M of the Plan sets forth the process for the appointment of the directors for the Reorganized Board, a process which is already underway.[158]  Debtors have continuously disclosed the proposed members of the Reorganized Board throughout this bankruptcy.  At the same time, Debtors have published the compensation of the directors and officers.  No

---

[155] D.I. 4701, Glenridge Objection.
[156] *See* D.I. 3606, Exhibit B (Members of Reorganized Board); D.I. 5716 Plan Supplement, Exhibit A (Identity of Proposed Member(s) of the Reorganized Board; D.I. 6075 Plan Supplement, Exhibit A (Identity of Proposed Member(s) of the Reorganized Board.
[157] Mallinckrodt plc, Annual Report (Form 10-K/A (Amendment No. 1)), at 12-24, 27 (Apr. 19, 2021).
[158] 1-03-22 Tr. at 81-82.

A3005

affirmative evidence was brought forth by Glenridge from which the court might conclude that Section 1129(a)(5)'s requirements were not met.  Therefore, Glenridge's objection is overruled.

### F.  <u>Section 1129(a)(7) (Best Interests of Creditors)</u>[159]

Section 1129(a)(7) of the Code requires that, with respect to each impaired class, each holder of a claim or an equity interest in such class either: "(i) has accepted the plan; or (ii) will receive or retain under the plan … property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the [Code]."  11 U.S.C. § 1129(a)(7)(A).  Commonly referred to as the "best interests" test, the requirements of Section 1129(a)(7) apply to individual dissenters rather than classes of creditors.  *Bank of America Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle II*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan.").  "In determining whether the best interests standard is met, the court must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7."  *In re Adelphia Communs. Corp.*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007).  "In doing so, the court must take into consideration the applicable rules of distribution of the estate under chapter 7, as well as the probable costs incident to such liquidation." *Id.*

To demonstrate the Plan's compliance with the best interests test, Debtors prepared a hypothetical liquidation analysis (the **"Liquidation Analysis"**),[160] which estimates what claimholders would likely recover in a liquidation under chapter 7.  Debtors presented two witnesses on this issue from their restructuring advisor, AlixPartners, LLC.

---

[159]  Section 1129(a)(6) is not applicable to **these** Chapter 11 cases and is therefore not discussed herein.
[160]  Disclosure Statement, Joint P1 Ex. 2, at pdf 750.

A3006

First, Debtors offered Marc Brown of AlixPartners, the Debtors' financial advisor and an expert in conducting liquidation valuations of assets including pharmaceutical assets.[161]  Mr. Brown looked at the value of certain of Debtors' assets in the context of a chapter 7, excepting the assets related to the opioid side of the business.  Mr. Brown testified that, using both the discounted cash flow and market approaches, he determined that the value of these assets in a liquidation would be between $2.4 and $2.9 billion.

Debtors then offered testimony from Mr. Eisenberg, their Chief Restructuring Officer and an expert in chapter 11 restructurings, liquidation analyses, waterfall analyses of expected recoveries, and the analysis of projections and business plans.[162]  Mr. Eisenberg walked through Debtors' Liquidation Analysis which shows, on a debtor-by-debtor basis, what recoveries the various creditor groups would receive in a liquidation under chapter 7.[163]  He testified that the Liquidation Analysis demonstrates that the Plan meets the best interests test because no creditor would receive or retain an amount under the Plan on account of a claim that is less than the amount that such holder would receive or retain if Debtors were liquidated.[164]

Mr. Eisenberg acknowledged that in the months since the Liquidation Analysis was prepared there were some developments that would impact his original calculations.  First, Debtors updated their Financial Projections[165] to reflect lower than anticipated revenues for certain products. Second, the First Amended Plan (and all versions of the Plan after the Original Plan) include additional recoveries to both the opioid claimants and the general unsecured creditors.[166]  He explained that the combined effect of these two developments on the best

---

[161] 11-1-21 Tr. at 123.
[162]  12-9-21 Tr. at 188-89 (Eisenberg).
[163] 12-9-21 Tr. at 211-212; Debtors Ex 34 at pdf page 166, 181
[164] 12-9-21 Tr. at 195 (Eisenberg).
[165] See discussion of Refreshed Projections, *infra* at 73.
[166] 12-9-21 Tr. at 212-213 (Eisenberg).

A3007

interest analysis is that overall creditor recoveries under a liquidation would go down, and overall recoveries to creditors under the Plan will go up.[167]  Accordingly, the change in Debtors' projections do not alter the conclusion that all creditors do better under the Plan than they would in a liquidation scenario.

Three creditors, Rhode Island, Sanofi, and Glenridge argue that Debtors have failed to meet the best interests standard as it relates to their claims.[168]

Glenridge argues that the best interests test is not satisfied here because the Liquidation Analysis is based on overly conservative assumptions and does not accurately assess creditors' recovery in a liquidation scenario.  However, Glenridge did not offer any evidence to contradict that offered by Debtors, which established that the approaches and methodologies used to create the Liquidation Analysis are actually creditor-favorable.  As Mr. Eisenberg testified, the Liquidation Analysis assumes several facts for purposes of the hypothetical that would likely bear out differently in real life.  For example, though the Liquidation Analysis assumes that a chapter 7 trustee would continue to operate the business for a full 90 days, that is unlikely.  Similarly, the assumption that Debtors would easily be able to repatriate international cash and assets in a chapter 7 is also unrealistic.  Likewise, the analysis does not assume the need for any foreign insolvency proceedings, which would likely need to occur in a chapter 7 and would impact both the timing and realization of recoveries.[169]  Mr. Eisenberg testified that these, among other creditor-favorable assumptions, resulted in a liquidation analysis that provides for a more generous picture of the assets that would be realized and the recoveries creditors would receive than is likely to happen in an actual chapter 7 liquidation.  I find Mr. Eisenberg's testimony on

---

[167] 12-9-21 Tr. at 214.
[168]  D.I.  4235, 4690, 4702, 4701, and 5104.
[169] 12-9-21 Tr. at 221-22.

A3008

these issues to be credible and his methodologies and conclusions to be sound.  Glenridge's objection is therefore overruled.

Rhode Island argues that the Plan fails the best interests test because the Liquidation Analysis does not account for the fact that the claims held by Rhode Island that are being released by the Plan would survive in a chapter 7 liquidation.  *See In re Washington Mutual, Inc.*, 442 B.R. 314, 359-60 (Bankr. D. Del. 2011) ("In a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under the chapter 11 plan as they would in a chapter 7 liquidation.").  Without assigning any value to its claims, Rhode Island contends, Debtors cannot meet their burden of showing that it would receive more under the Plan than in a liquidation.

While Debtors concede that the Liquidation Analysis assigns no value to any litigation-based claims against them, they argue that it would make no difference if they did.  This, they argue, is because even if a value were assigned to the claims, Rhode Island would still recover less in a hypothetical liquidation than they do under the Plan because its ability to recover from Debtors would be limited by both the availability of funds and by the number of other claims against Debtors that would cause the funds to be diluted.  I agree.

Rhode Island has offered no evidence of the value of its claim, estimated or otherwise, nor any evidence regarding the likelihood of a recovery on such claim.  The record before me shows only that Rhode Island's claim is one of thousands of opioid-related claims that Debtors would be facing in a chapter 7 liquidation and that there would be a finite amount of money available to opioid creditors in that scenario.  While Rhode Island points to the existence of a $200 million D&O insurance policy that would be available for recovery, the evidence suggests

that any recovery from that policy is not likely to be meaningful to Rhode Island. As Mr. Eisenberg testified, Rhode Island is not the only creditor that is or could bring claims against that policy. Accordingly, any recovery that Rhode Island might receive under the policy would likely be diluted by the claims held by other creditors. Furthermore, the cost of litigating would come out of those policies prior to any distribution.[170]

Additionally, the evidence shows that even if a recovery was assumed, the best interests test would still be satisfied because it is still likely to recover more through the Plan. Under the Plan, Rhode Island should receive approximately $5 million, which is .45% of the total funds available to states and municipalities. Under the Liquidation Analysis, where there is, at most, $54 million available to opioid creditors, Rhode Island's share would only be a few hundred thousand dollars. If it recovered under the policy as well, its share would only be approximately $900,000. So even if the two recoveries were combined, Rhode Island would still receive far less than the $5 million it is projected to receive under the Plan.[171] While Rhode Island disagrees with this conclusion, it has not put any evidence into the record that would support a different one. Rhode Island's objection is therefore overruled.

Sanofi makes several arguments as to why Debtors' Plan does not comply with Section 1129(a)(7). First, Sanofi argues that it would receive a greater recovery under a Chapter 7 liquidation because a Chapter 7 trustee would be required to sell the APA subject to Sanofi's royalty payments. That argument was mooted, however, by my ruling on Sanofi's Motion seeking an order determining that Debtors could not reject or discharge their obligations under the APA.[172] As I previously ruled, Sanofi did not retain any property interest the Acthar intellectual property ("**IP**") when it sold those assets to Questcor. Instead, the property interests

---

[170] 12-9-21 Tr. at 225-226.
[171] 12-9-21 Tr. at 226-28.
[172] See D.I. 4675 (Motion) and 5210 (Order).

A3010

in the Acthar IP vested in the Debtors when they purchased the IP from Questcor.  Any subsequent purchaser from a Chapter 7 trustee, therefore, would also not be required to make the royalty payments.

Second, Sanofi contends that the UCC Waterfall[173] undervalues their claim, and if the full amount of what they claim were included in the analysis, recoveries to creditors in Class 6(f) would be significantly lower at MPIL. While Sanofi couches this argument as one under Section 1129(a)(7), it failed to connect the dots between the lower recoveries to creditors and what its recovery would be under a hypothetical Chapter 7 liquidation.  For this reason alone, the argument fails.  In addition, Mr. Eisenburg credibly testified that using his estimate of Sanofi's claim, Class 6(f) creditors at MPIL will recover an estimated 43.6% under the Plan compared to 3.3% in a Chapter 7.[174]

Third, Sanofi argues that the Liquidation Analysis undervalues Debtors' IP associated with Acthar. If valued properly, Sanofi contends, creditors would receive far more in a liquidation than what is projected by Debtors.  Specifically, they argue that Debtors' valuation relied on a discounted cash flow analysis that included a 15.5% present value factor without a terminal value which is inappropriate because Acthar is a proven commodity and Debtors' projections include annual revenue from Acthar in excess of $550 million through at least 2030. Additionally, Debtors apply a "liquidation discount" of 20-30%, which Sanofi claims cannot be justified.  Finally, Sanofi argues, the Liquidation Analysis deducts the value of inventory from the IP value, which is inappropriate because the projected cash flows already include all relevant Acthar costs and expenses.  Sanofi suggests that correcting these "errors" would increase the

---

[173] The UCC prepared its own waterfall analysis for purposes of settlement negotiations with the Debtors as well as for use as a reference point in preparing the UCC Allocation.
[174] 12-9-21 Tr. at 229.

value of the IP in a liquidation setting from $400-$500 million to $1.4-$1.5 billion, thereby

significantly increasing the net recovery that would flow to unsecured creditors.

Debtors disagree and point to the testimony of Mr. Brown who testified that a liquidation

discount of between 10-40% or even above 50% is standard and that he did not apply a terminal

value as part of the DCF analysis because he did not believe a buyer would under-write the

business in perpetuity.[175]  Second, Debtors point to Mr. Eisenberg's statements that the value of

the IP actually increases if there is inventory on hand for a buyer.  If the Acthar assets were sold

without the inventory, it could prevent Debtors from being able to obtain the full going-concern

value that is included in the Liquidation Analysis because it would take too long (up to a year)

for a new buyer to bring the product to market.[176]  These conclusions are uncontroverted.

Accordingly, Debtors argue, there is nothing in the record to support Sanofi's arguments

regarding the impropriety of the present value factor or the liquidation discount.  I agree.

While Sanofi intended to present evidence in support of its position regarding the best

interests test through its own expert, that evidence was excluded.[177]  Accordingly, the only

evidence in the record is that put forth by Debtors, which I find to be well-reasoned and

persuasive.  Sanofi's objection is therefore be overruled.[178]

---

[175] 11-1-21 Tr. at 132-33.

[176] 12-9-21 Tr. at 229-30.

[177]  12-8-21 Tr. at 29 (Bench ruling granting Debtors' Motion in Limine to Preclude Sanofi from Submitting Certain Expert Opinions, D.I. 5575).

[178]  While Sanofi's counsel made additional arguments on the best interests issue during closings at the Confirmation Hearing, including that its claim should be valued at the amount set forth in its allegedly undisputed amended proof of claim, these arguments were not included in Sanofi's objections and therefore do not need to be considered.  *MZM Constr. Co., Inc. v. New Jersey Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 406 n.13 (3d Cir. 2020) (concluding that when a party first raised an issue at oral argument, it is too late for the court to consider it, and the argument must be forfeited); *see also L-3 Commc'ns Corp. v. Sony Corp.*, 2014 WL 4674815, at *3 (D. Del. Sept. 12, 2014) (stating that an argument raised for the first time during oral argument is waived).  Nonetheless, to ensure that the record is perfectly clear on this point, I will note that the only valid proof of claim on file by Sanofi is its original proof of claim stating a claim for $45 million.  Its purported amended proof of claim in which it states a claim for $189 million is invalid, as it was filed long after the bar date (and after confirmation

For all the reasons set forth above, I find that the record reflects that no creditor will recover more in a liquidation than under the Plan and that the Plan therefore satisfies the best interests test and meets the requirements of Section 1129(a)(7).

### G. Section 1129(a)(8)

Section 1129(a)(8) of the Code provides that a court shall confirm a plan only if "with respect to each class of claims or interests—(A) such class has accepted the plan; or (B) such class is not impaired under the plan." 11 U.S.C. § 1129(a)(8). A class that receives full payment on its claims under the plan is deemed to have accepted the plan. 11 U.S.C. § 1126(f). Conversely, a class that receives nothing under the plan is deemed to have rejected the plan. 11 U.S.C. § 1126(g). A class of impaired claims accepts a plan if holders of at least two-thirds in dollar amount and more than one-half in number of the allowed claims in that class submit ballots to vote to accept the plan. 11 U.S.C. § 1126(c).

Here, the Voting Report establishes that several classes voted to reject the Plan.[179] Accordingly, section 1129(a)(8) is not satisfied. However, a debtor may fail to satisfy section 1129(a)(8) and nonetheless have its plan confirmed where it satisfies the 'cramdown' provisions of section 1129(b) (discussed below).

### H. Section 1129(a)(9)

Section 1129(a)(9) generally provides that holders of claims entitled to priority under Section 507(a) of the Code receive payment in full in cash unless the holder of a particular claim agrees to different treatment. See 11 U.S.C. § 1129(a)(9). There are no objections to

---

proceedings had begun) without leave of court. Debtors therefore properly valued Sanofi's claim at $45 million. Moreover, the record reflects that even if Debtors had valued Sanofi's claim at something much closer to the amount Sanofi says is appropriate ($176 million), it is still receiving more under the Plan that it would in a liquidation. See 12-9-21 Tr. at 228-29.

[179] Debtors P1 Ex 23; Debtors P2 Ex 67.

confirmation that relate to this subsection, and I am satisfied, following my review of the Plan and related evidence and testimony, that its requirements are met.

## I.   Section 1129(a)(10)

Section 1129(a)(10) requires that "if a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan. . . ." 11 U.S.C. § 1129(a)(10).  To demonstrate compliance with this section, Debtors point to the Voting Report[180] and the testimony of Mr. Welch, who stated that there is certainly more than one impaired class that has voted to accept the Plan.[181]

Sanofi objects and argues that "the Voting Report is inadequate to prove compliance with the 'per debtor' requirement of Section 1129(a)(10) of the Bankruptcy Code."[182]  However, Sanofi cites to nothing in support of this argument.  Having reviewed the Voting Report, I conclude that it satisfies the requirements of section 1129(a)(10).  Sanofi's objection is therefore overruled.[183]

## J.   Section 1129(a)(11) (Feasibility)

Section 1129(a)(11) provides that confirmation of the plan must not be "likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the to the debtor under the plan, unless such liquidation or reorganization is

---

[180] The "**Voting Report**" is defined *supra* at note **30**.

[181] 12-6-21 Tr. at 126-27; see also Debtors P2 Ex 67.

[182] Sanofi's Supplemental Objection, D.I. 5101 at 7.

[183] In its Supplemental Objection, Sanofi also argues that "The Voting Report also indicates that certain classes have been 'deemed to accept the Plan in accordance with Article III of the Plan'. . . . Article III(G) of the Plan provides that 'any Class of Claims that is occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018, but as to which no vote is cast, shall be deemed to accept the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code'" but that Section 1129(a)(8) provides no support for the requirement that if no vote is cast, then a class is presumed to accept. However, as Sanofi did not present any evidence on this issue or otherwise raise it in its argument at the Confirmation Hearing, I consider it to be waived.  In any event, as Sanofi does not hold claims against either of the entities to which this provision of the Plan applied (Mallinckrodt Canada ULC and Mallinckrodt Group S.a.r.l), Sanofi has no standing to object.

proposed in the plan." 11 U.S.C. § 1129(a)(11). Frequently referred to as the "feasibility"

requirement, "the purpose of § 1129(a)(11) is to prevent confirmation of visionary schemes

which promise creditors and equity security holders more than the reorganized debtor is capable

of delivering after confirmation." *In re Trigona*, No. 08-70806 BM, 2009 Bankr. LEXIS 5545,

at *9 (Bankr. W.D. Pa. July 24, 2009) (quoting *Pizza of Hawaii, inc. v. Shakey's, Inc.*, 761 F.2d

1374, 1382 (9th Cir. 1985)).

"The phrase 'not likely to be followed' appearing in § 1129(a)(11) is critical in

determining whether a chapter 11 plan is feasible. It indicates that success in carrying out the

plan need not be guaranteed." *In re Trigona*, 2009 Bankr. LEXIS 5545, at *9 (quoting *In re

Danny Thomas Properties II, LLC*, 241 F.3d 959, 963 (8th Cir. 2001)). "The bare possibility that

a plan might fail is not fatal to its feasibility. All that is required for purposes of feasibility is a

reasonable prospect of success." *Id.* 241 F.3d at 963. Thus, the court "only must find that 'the

plan present[s] a workable scheme or organization and operation from which there may be

reasonable expectation of success.'" *In re W.R. Grace & Co.*, 475 B.R. 34, 115 (D. Del. 2012)

(internal citations omitted).

"Relevant factors for determining whether a plan is feasible may include: (1) the

adequacy of a debtor's capital structure; (2) the earning power of the business; (3) economic

conditions; (4) the ability of management; (5) the probability of the continuation of the same

management; and (6) any other related matters which bear on the prospect of a sufficiently

successful operation to enable performance under the provisions of the plan." *In re Trigona*,

2009 Bankr. LEXIS 5545, at *9 (quoting *In re U.S. Truck Co.*, 800 F.2d 581, 589 (6th Cir.

1986)). The plan proponent bears the burden of proving that the plan is feasible, within the

meaning of Section 1129(a)(11) by a preponderance of the evidence. *In re Trigona*, 2009 Bankr. LEXIS 5545, at *10 (Bankr. W.D. Pa. July 24, 2009).

To address the feasibility of their Plan, Debtors offered the expert testimony of their CRO, Mr. Eisenberg.  Mr. Eisenberg stated that the Plan will maximize value for stakeholders receiving distributions, is not likely to be followed by liquidation or a need for further reorganization, and post-restructuring, the reorganized debtor will not be left with an unreasonably small amount of capital to operate.[184]

In reaching these conclusions, Mr. Eisenberg relied on the financial projections contained in the disclosure statement and the Refreshed Projections issued in September of 2021, which cover the years 2022 to 2025.[185]  The Refreshed Projections show that over the next four years, net sales are projected to increase from $2.2 billion to $2.4 billion and adjusted EBITDA is anticipated to grow from $791 million to $820 million.  Compared with the previously issued projections contained in the Disclosure Statement, the adjusted EBITDA numbers in the refresh have decreased 5-7% per year.[186]  This change did not cause Mr. Eisenberg to alter his opinion regarding feasibility.

In connection with his review of the projections and in preparing his opinion, Mr. Eisenberg also ran a series of sensitivity analyses on the EBITDA projections contained in the original Financial Projections. Those sensitivity analyses demonstrated that Debtors' EBITDA could drop more than 25% per year in each of the years included in the Disclosure Statement and they would still have sufficient liquidity to meet all their obligations and be able to operate.[187] Accordingly, even when taking into account the reduction in adjusted EBITDA reflected in the

---

[184] 12-9-21 Tr. at 194 (Eisenberg).
[185] 12-9-21 Tr. at 197 (Eisenberg); Debtors Ex. 15 (Financial Projections); Debtors Ex. 42 (Refresh); Debtors' Ex 8 (summary of refresh).
[186] 12-9-21 Tr. at 200 (Eisenberg).
[187] 12-9-21 Tr. at 205 (Eisenberg).

A3016

Refreshed Projections, the adjusted amount is still well within the allowed range of the sensitivity analysis and, therefore, it does not impact feasibility.[188] For all these reasons, Mr. Eisenberg concluded that, assuming emergence on December 31, 2021, the Plan is not likely to be followed by liquidation or the need for further reorganization.

Only Glenridge has objected to the Plan's feasibility.[189]  Glenridge asserts that the Plan does not provide an estimate of the relevant administrative claims.  Further, Glenridge contends that the Debtors have failed to provide evidence of sufficient cash on hand, the sources and uses of such cash, and the amount of cash that will be used to fund administrative claims on the Effective Date.[190]

In response, Debtors point to the testimony of Mr. Eisenberg, who stated that Debtors will have sufficient cash on hand to pay the projected administrative expenses.[191]  Mr. Eisenberg testified that Debtors are expected to generate between $37 million and $240 million of levered free cash flow over the projected period.  In aggregate over the four-year period, Debtors are expected to generate $597 million of excess cash flow after satisfying their obligations.[192]  This should leave Debtors with the ability to voluntarily repay approximately $770 million of debt over the projected period.  Further, at the end of each fiscal year, Debtors are anticipated to have $400 million of liquidity, which Mr. Eisenberg testified was a conservative estimate.  Debtors' credit metrics are also expected to improve during the projection period.[193]

---

[188] 12-9-21 Tr. at 206 (Eisenberg).
[189] While both Sanofi and the AICs also make arguments regarding the Plan's feasibility in their objections, those arguments were dependent upon rulings in their favor on various motions that have since been denied.  Accordingly, they are moot.  See D.I. 4675 (Sanofi Motion) and 5210 (Order); D.I. 2159 (the AICs' Motion for Allowance of Administrative Claims), D.I. 5886 (Opinion and Final Order).
[190] D.I. 4701, Glenridge Objection
[191] 12-9-21 Tr. at 210 (Eisenberg).
[192] 12-9-21 Tr. at 201 (Eisenberg).
[193] 12-9-21 Tr. at 202-03 (Eisenberg).

A3017

Mr. Eisenberg also testified about the sources and uses of cash on emergence, stating that Debtors are expected to make $853 million in cash payments at emergence. This will leave $373 million in liquidity. Additionally, Debtors expect to have a $200 million accounts receivable facility and access to a revolver facility so Debtors' total liquidity at emergence will be $573 million.[194] Mr. Eisenberg concluded that the Plan is unlikely to be followed by liquidation or a need for further reorganization.

Having considered the evidence in the record, I am satisfied that the Plan is feasible. Mr. Eisenberg's testimony on this issue was persuasive and as I stated above, I find him to be a credible witness. I therefore find that the requirements of this subsection have been met. Glenridge's objection is overruled.

## K. **Section 1129(a)(12)**

Section 1129(a)(12) of the Code requires the payment of all fees payable under 28 U.S.C. § 1930. As Article XII.C of the Plan provides for the payment of such fees, and there are no objections based on this provision of the Code, I find that the requirements of this subsection have been met.

## L. **Section 1129(a)(13)**[195]

Section 1129(a)(13) of the Code requires that the Plan provide for continued, post-confirmation payments of all retiree benefits at the levels established in accordance with Section 1114 of the Code. As Article V.H of the Plan provides that the Reorganized Debtors shall honor all Debtors' compensation and benefits programs, including retiree benefit programs, and there are no objections based on this provision of the Code, I find that the requirements of this subsection have been met.

---

[194] 12-9-21 Tr. at 204-05 (Eisenberg).
[195] Sections 1129(a)(14), (15), and (16) are not applicable in chapter 11 cases and therefore not discussed.

A3018

## V.  Section 1129(b)(1)  (Unfair Discrimination)

Because not all classes of creditors voted to accept the Plan or were otherwise deemed to have rejected the Plan because they are receiving no recovery,[196] Debtors cannot comply with the requirements of Section 1129(a)(8) of the Code, which mandates that all classes of creditors must either vote to accept the Plan or receive payment in full.  Therefore, to have the Plan approved, Debtors must show that the Plan "does not discriminate unfairly and is fair and equitable with respect to each class of claims or interests that is impaired under and has not accepted the [P]lan." 11 U.S.C. § 1129(b)(1).  In bankruptcy parlance, this is referred to as a cramdown plan.  The Third Circuit has recognized that cramdown plans "are an antidote to one or more classes of claims holding up confirmation of an otherwise consensual plan." *In re Tribune Co.*, 972 F.3d 228, 237 (3d Cir. 2020).

Three unsecured creditors assert that the Plan unfairly discriminates against them and cannot be confirmed:  1) the AIC, which holds claims in Class 6(a), a class that voted to reject the Plan; 2) Mr. Koppenhafer, a holder of 4.75% notes in Class 6(g),[197] and Sanofi, which holds claims in Class 6(f), a class that also rejected the Plan.[198]

---

[196] Classes 6(a), 6(b), 6(e), 6(f), and 9(h) voted to reject the Plan and Classes 9(i), 13, 14, and to the extent impaired Classes 11 and 12, were deemed to reject the Plan.  Classes 6(a), 6(b), and 6(e) voted to reject solely as to Debtors Mallinckrodt Brand Pharmaceuticals LLC, Mallinckrodt LLC, Mallinckrodt plc, Mallinckrodt US Holdings LLC, and MNK 2011 LLC, and Class 6(f) voted to reject solely as to Debtors Mallinckrodt ARD LLC, Mallinckrodt Hospital Products, Inc., Mallinckrodt LLC, Mallinckrodt Pharmaceuticals Ireland Limited, Mallinckrodt Pharmaceuticals Limited, Mallinckrodt plc, and ST Shared Services LLC.

[197] Class 6(g) voted to accept the Plan, and therefore, Mr. Koppenhafer does not have standing to argue that the Plan discriminates against him unfairly.  See *Tribune*, 972 F.3d at 242 ("unfair discrimination applies only to classes of creditors (not the individual creditors that comprise them) and then only to classes that dissent.")  I will address his arguments, however, which were well presented by Mr. Koppenhafer.

[198] The Pro Se Shareholders also allege that the Plan improperly benefits the Guaranteed Unsecured Noteholders while discriminating against them.  This argument is misplaced.  While I appreciate the Pro Se Shareholders feeling that they are being discriminated against because the Guaranteed Unsecured Notes will receive the majority of the equity of the Reorganized Debtors, that is a function of the absolute priority rule.  The Pro Se Shareholders are not entitled to a recovery because all creditors are not being

A3019

The AIC and Mr. Koppenhafer argue that the Plan discriminates against them unfairly because the opioid claimants in Classes 8 and 9 are receiving a greater recovery than Class 6. They also argue that Class 5 claimants, the Guaranteed Unsecured Noteholders, are receiving a greater percentage recovery than Class 6.  Sanofi argues that Class 6(f) is receiving less that Class 7 Trade Creditors, and therefore, the Plan unfairly discriminates against them.[199]  This requires an analysis of the recoveries between Class 6 and other classes of unsecured creditors. Debtors argue that the Plan does not discriminate unfairly against any of the dissenting classes because they are all receiving a recovery under the Plan that exceeds what they would otherwise be entitled to.  According to Debtors, the dissenting classes would receive nothing, or far less in the case of Sanofi, but for the willingness of Class 5 to reallocate some of its recovery to Class 6.[200]

The AIC also argues that because the UCC allocated the Class 5 gift among the seven subclasses within Class 6 (the "**UCC Allocation**"), I must also determine whether that allocation unfairly discriminates against the dissenting subclasses.  Debtors and the UCC argue that I do not need to consider the UCC Allocation because, again, Debtors' evidence shows that the AIC and the other dissenting classes are receiving far greater recoveries under the Plan than they would otherwise be entitled to in comparison to baseline recoveries to those classes under the absolute priority rule.  For the reasons discussed below, I agree.

---

paid in full under the Plan.  *See In re Insilco Tech., Inc.*, 480 F.3d 212, 218 n.10 (3d Cir. 2007) (citing *Bank of Am. Nat'l Tr. & Sav. Ass'n v. N. LaSalle St. P'ship*, 526 U.S. 434 (1999). Therefore, their objection must be overruled.
[199] While Sanofi made the argument during the Confirmation Hearing that its claims should be compared with Class 6(g), that argument was not included in Sanofi's objections and therefore need not be considered.
[200]  Class 5's "gift" to Classes 6 and 7 is discussed below.

A3020

A. **Principles Applicable to Determining Unfair Discrimination**

The Code does not define what constitutes unfair discrimination.  Generally, the standard "ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes."  *In re Armstrong World Indus., Inc.* 348 B.R. 111, 121 (D. Del. 2006) (quoting *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986)).   As the District Court for the District of Delaware observed, "[v]arious tests have emerged in the caselaw, with the hallmarks being whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination."  *In re Nuverra Envtl. Sols. Inc.*, 590 B.R. 75, 90 (D. Del. 2018).

 The Third Circuit recently considered the various unfair discrimination tests in *Tribune*, distilling several principles to guide bankruptcy courts in determining whether a plan of reorganization unfairly discriminates. *In re Tribune Co.*, 972 F.3d 228, 237 (3d Cir. 2020).  The Court recognized that, as is typical in reorganizations, there is a "need for flexibility over precision…. [and] [t]he test becomes one of reason circumscribed so as to not run rampant over creditors' rights."  *Tribune*, 972 F.3d 228 at 242.  The Court also stated that unfair discrimination must be "determined from the perspective of the dissenting class" while at the same time recognizing that what that means is "subject to interpretation."  *Id.* at 242.

 While comparison of the recoveries between a preferred class and a dissenting class may be the preferred method, it is not the only acceptable approach.  "Other measures that allow courts to assess the magnitude of harm to the dissenting class may also be appropriate in some cases."  *Id.* at 242-43.  Indeed, in *Tribune*, the Court endorsed the bankruptcy court's comparing plan recoveries to the dissenting class's baseline entitlement under the absolute priority rule and determined that there was no discrimination because the difference between plan recovery and

the dissenting class's baseline recovery was only nine-tenths of one percent. *Id.* at 244-45.  As

the Third Circuit noted, "[u]nfair discrimination is rough justice…[and] exemplifies the Code's

tendency to replace stringent requirements with more flexible tests that increase the likelihood

that a plan can be negotiated and confirmed." *Id.* at 245.

Although the *Tribune* Court did not expressly adopt any one approach to evaluating

unfair discrimination, it did endorse the bankruptcy court's use of the Markell test, the approach

most often utilized in this Circuit.  *Tribune*, 972 F.3d 228 at 241 ("Reviewing the Bankruptcy

Court's choice of legal test *de novo*, we agree that it was appropriate in these circumstances to

take a pragmatic approach to measure the Plan's discrimination.").[201]  The Markell test provides

that:

> A rebuttable presumption of unfair discrimination exists when there is (1)
> a dissenting class; (2) another class of the same priority; and (3) a difference in
> the plan's treatment of the two classes that results in either (a) a materially lower
> percentage recovery for the dissenting class (measured in terms of the net present
> value of all payments), or (b) regardless of percentage recovery, an allocation
> under the plan of materially greater risk to the dissenting class in connection with
> its proposed distribution."

*Id*.  "Under this test, a presumption of unfair discrimination may be overcome if the court

finds that a lower recovery for the dissenting class is consistent with the results that would obtain

outside of bankruptcy, or that a greater recovery for the other class is offset by contributions

from that class to the reorganization. The presumption of unfairness based on differing risks may

be overcome by a showing that the risks are allocated in a manner consistent with the

prebankruptcy expectations of the parties."  *Id*.  As Professor Markell explained,

> In either case—disparity of recovery or disparity of risk—the plan
> proponent can rebut the presumption of unfairness by proving that the difference
> in treatment is attributable to differences in the prepetition status of the creditors.
> In the case of a difference in the present value of the recovery, the presumption

---

[201]  The Third Circuit noted that application of that test was not before it because the dissenting class and
the debtors had endorsed it, as did the Third Circuit. *Tribune*, 972 F.3d at 241 n.16.

may also be overcome by a demonstration that contributions will be made by the
assenting classes to the reorganization, and that these contributions are
commensurate with the different treatment. In such cases, while discrimination
exists, it is not unfair.

*In re Nuverra Envtl. Solutions, Inc.*, 590 B.R. 75 (D. Del. 2018) *affirmed on equitable mootness*

*grounds at* 834 Fed. Appx. 729 (3d Cir. 2021) (quoting Markell, *A New Perspective on Unfair*

*Discrimination in Chapter 11*, 72 Am. Bankr. L.J. 227, 250 (1998)).

In *Nuverra*, a case that pre-dates the Third Circuit's ruling in *Tribune*, the District Court

approved a plan that provided for a 100% recovery to trade creditors while unsecured

noteholders received a *de minimus* recovery.  Both classes were out-of-the-money unsecured

creditors that were recovering only because an under-secured senior lender was allocating its

recoveries to fund the distributions.  590 B.R. 75, 79-80.  Because the noteholders were

recovering more than they would under a plan that did not include the senior lender gift, the

noteholders were not harmed.  *Id.* at 90-91.  The fact that another out-of-the-money unsecured

creditor class did far better was irrelevant.  *Id.* at 91.

Similarly, in *Genesis Health* general unsecured creditors received a recovery of between

7-8% while unsecured punitive damage claimants received nothing.  *In re Genesis Health*

*Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001).  The court acknowledged that the claims

were of equal priority, but because recoveries were based on an agreement of senior lenders to

allocate a portion of their recoveries, any presumption of unfairness was rebutted. *Id.* at 612.

As these cases demonstrate, a plan can discriminate without being unfair.  *Tribune*, 972

F.3d 228 at 242 ("'Discriminate unfairly' is simple and direct: you can treat differently

(discriminate) but not so much as to be unfair.").  However, the determination of what is fair

discrimination and what is unfair discrimination is highly dependent on the facts and

circumstances of each individual case.  See, e.g. *In re Dow Corning Corp.*, 244 B.R. 634, 647

A3023

(Bankr. E.D. Mich. 1999), aff'd, 255 B.R. 445 (E.D. Mich. 2000), *aff'd and remanded*, 280 F.3d 648 (6th Cir. 2002) (no unfair discrimination where the nature of the claims between classes of unsecured creditors are different); *In re U.S. Min. Prods. Co.*, No. 01-2471 JKF, 2005 Bankr. LEXIS 3259 (Bankr. D. Del. Nov. 29, 2005) (no unfair discrimination where debtor's insurance policy is the source of recovery); *In re Sacred Heart Hosp. of Norristown*, 182 B.R. 413 (Bankr. E.D. Pa. 1995) (no unfair discrimination where sources of recovery are different); *In re Mahoney Hawkes*, LLP, 289 B.R. 285 (Bankr. D. Mass. 2002).  Accordingly, a close look at the facts and circumstances surrounding the Plan's distribution scheme here is necessary.

### B.  Analysis

The Third Circuit instructs that when deciding whether a plan discriminates unfairly, a bankruptcy court should "start by adding up all proposed plan distributions from the debtor's estate and divide by the number of creditors sharing the same priority." *Tribune*, 972 F.3d at 243. The resulting pro rata baseline can then be compared to what happens if the plan is implemented. *Id.*  This approach is relatively easy when there is a single debtor, and all similarly situated creditors have claims against that single debtor.  The analysis becomes more complicated in a case like this one where there are more than 60 debtor entities with a complex financial structure, creditors that have claims against different debtor entities, and there is no substantive consolidation.  For example, in this case while Class 5 Guaranteed Unsecured Noteholders have claims against almost all debtors in the corporate structure, the AIC has claims against only two debtors.[202]  To address these complexities, and to assess the fairness of each class's treatment under the Plan, Debtors developed a "waterfall" model (the "**Debtors' Waterfall**"), "designed to

---

[202] In my ruling sustaining Debtors' Omnibus Objection to Unsubstantiated and Duplicative Claims, I held that while the AIC filed proofs of claim against all or nearly all Debtors, they only asserted facts sufficient to support claims against Mallinckrodt PLC and Mallinckrodt ARD.  All other proofs of claim were therefore dismissed.  D.I. 3414 at 142.

show the natural recoveries that would flow to each class of creditors at each Debtor entity, i.e., the recoveries that would result from allocating Debtors' value to each Debtor and applying the absolute priority rule to that value at each Debtor, with classes of equal priority receiving pro rata distributions from that Debtor."[203]  The distributions contained in Debtors' Waterfall (the "**Entitled Recoveries**") can then be compared to each group's proposed recovery under the Plan to ensure fairness between similarly situated classes at each Debtor.[204]

Debtors' Waterfall runs three alternative scenarios: (1) the Waterfall Reorganization Scenario; (2) the Alternative Waterfall Scenario; and (3) the Second Alternative Waterfall Scenario.[205]  The first scenario is what Debtors believe most closely reflects the reality of Debtors' plan.  The second and third scenarios were done to address creditor objections and to demonstrate that even under the alternative scenarios, the creditors are still receiving more under the Plan than their Entitled Recoveries.[206]  Debtors' CRO, Mr. Eisenberg, explained the three scenarios in detail.

The first scenario, the Waterfall Reorganization Scenario, shows Debtors' view as to creditors' baseline entitlements.  It starts by accounting for the Opioid Settlement and the Federal/State Acthar Settlement, which the evidence shows are value accretive and add to the Debtors' total enterprise value ("**TEV**") which, in turn, increases recoveries to unsecured creditors.[207]  Under this scenario, Class 6 General Unsecured Creditors would be entitled to a total of just over $22.5 million, but only three of the seven subclasses within Class 6 (Class 6(b) Generic Price Fixing Claims, Class 6(e) Environmental Claims, and Class 6(f) Other GUC

---

[203] D.I. 5016, Debtors' Confirmation Brief at 124.
[204] *Id.*
[205] 12-9-21 Tr. at 233 (Eisenberg); Debtors' P2 Ex 9.  The Debtors' Waterfalls are attached hereto as Appendix 1.
[206] 12-9-21 Tr. at 233.
[207] 11-1-21 Tr. at 36-38.

Claims) receive any recovery. Class 6(a) Acthar Claims and Class 6(g) 4.75% Notes are entitled to nothing under this scenario. Class 5 Guaranteed Unsecured Note Claimants, by comparison, would be entitled to a nearly $1.4 billion recovery. In sum, this scenario shows that under the Plan all creditors are receiving an amount that is equal to or greater than their baseline entitlements, except for the Class 5 creditors, who are receiving less.[208]

Because the Plan's treatment of Class 5 is important to the unfair discrimination analysis below, it is worth a digression here to explain why Class 5 is receiving less under the Plan than its Entitled Recovery. Class 5, the Guaranteed Unsecured Noteholders, has an Entitled Recovery of $1.37 billion, which is an 89% recovery on its claims, because the notes held by the claimants in that Class are guaranteed by almost every one of the 60 entities in Debtors' corporate structure. While Class 6, the General Unsecured Creditors, have a larger estimated claim amount ($5.5 billion in claims as compared to Class 5's $1.54 billion), most of the claims within Class 6 are only held at one or two debtor entities. Accordingly, most subclasses within Class 6 are not entitled to any recovery. To avoid litigation with constituents in the other unsecured classes and facilitate settlements, the holders of Class 5 claims agreed to reallocate or "gift" $228.5 million of their Entitled Recovery to Class 6 and Class 7.[209] With that gift, Class 6 and Class 7 do far better under the Plan. Class 7's recovery goes from 1% to 100% (just over $41 million). Class 6 recoveries go from zero to 4% and allows for all Class 6 subclasses to receive some recovery, where only three of the seven subclasses were otherwise entitled to anything. The gift from Class 5 provides recoveries to Class 6(a) of slightly over $34 million, Class 6(g) of nearly $57 million, and takes recoveries to Classes 6(e) and 6(f) from under $22 million to slightly over $52 million.

---

[208] 12-9-21 Tr. at 233-34, 238; Debtors P2 Ex 10.
[209] 12-9-21 Tr. at 240; Debtors P2 Ex 10.

A3026

The second scenario, the Alternative Waterfall Scenario, was prepared by Debtors to show how things would change if the Settlements did not exist.[210]  When offering this analysis, Debtors presented credible evidence to show that removing the settlements would have an adverse effect on Debtors' TEV reducing it from $5.45 billion to $4.0 billion.[211] Under this Alternative Waterfall Scenario, total recoveries for Class 6 would be slightly reduced to approximately $21.8 million with recoveries once again limited to the same three subclasses. Unsurprisingly, this scenario also shows that Class 6 recoveries increase under the Plan due to the Class 5 gift.

Debtors' third scenario, the Second Alternative Waterfall Scenario, again assumes no Opioid Settlement or Federal/State Acthar Settlement, but also assumes that the lack of those settlements would have no impact on Debtors' TEV, leaving it at $5.45 billion.  Debtors believe that this scenario is wholly unrealistic.  However, they created it to demonstrate that even if one assumes Debtors could achieve full value without the Settlements, no rejecting classes are harmed and each rejecting class still does at least as well under the Plan as compared to baseline entitlements.[212]  While Classes 6(a) and 6(g) receive some recovery under this unrealistic scenario, their individual recoveries are still greater under the Plan.

Debtors assert that under all the Waterfall Scenarios, the dissenting classes here recover far more under the Plan than they are entitled to under the baseline and therefore no rebuttable presumption of unfair discrimination arises as to Class 6 when compared to the other classes.

The AIC and Mr. Koppenhafer argue that unfair discrimination exists and cannot be rebutted for several reasons.  First, they argue that the Settlement with Class 8 and Class 9 opioid claimants improperly transfers assets from the Specialty Brands entities (where Opioid

---

[210] 12-9-21 Tr. at 216-17.
[211] 12-9-21 Tr. at 235.
[212] 12-9-21 Tr. at 235-236.

A3027

Claimants would not have any claims) to the Specialty Generics entities.[213]  Debtors counter that opioid claims were, in fact, asserted against both sides of the business.  Therefore, opioid claimants would have pursued those claims, which presented an existential threat to the entire enterprise.[214]  Moreover, and most importantly, as discussed above, Debtors presented evidence to show that the Opioid Settlement and the Federal/State Settlement are inextricably intertwined, and together, as demonstrated by Debtors' Waterfall, they actually enhance recoveries to all unsecured creditors.  As Debtors' Alternative Waterfall analysis shows, in the absence of the Settlements, Debtors TEV would drop from $5.45 billion to $4 billion because Debtors would be forced to sell off their assets.  In that scenario, opioid claimants would receive a small fraction of the $1.725 billion they will receive under the Plan and the Federal/State Acthar Claimants would receive nothing.  Additionally, Class 6 claimants would also receive little or nothing under this scenario as compared to their Plan recoveries.  Accordingly, any unfair discrimination that arises from the Settlements is rebutted by the increased recoveries to all classes of creditors that results from the Debtors retaining the ability to continue as a going concern while making payments to the Opioid Trust over time.

Second, Mr. Koppenhafer argues that there is unfair discrimination because the Plan provides Class 5 Guaranteed Unsecured Notes with a greater recovery than the 4.75% Noteholders in Class 6(g).  As Mr. Eisenberg testified, however, Class 5's greater recovery is attributable to the fact that their claims exceed $1.5 billion (excluding potential post-petition interest) at more than 60 debtor entities while the 4.75% Notes' claims lie against only two.  No evidence was submitted to rebut Mr. Eisenberg's testimony and I find it to be credible.

---

[213] While the AICs made this argument in their initial objection to the Plan, during oral argument AICs' counsel stated that they were not objecting to the Opioid Settlement.

[214] 12-9-21 Tr. at 19-20 (Edmiston) Mr. Edmiston testified that the branded side of Debtors' business named in about a thousand of the opioid lawsuits.

A3028

Therefore, I conclude that while the differences in the recoveries of the two classes may give rise to a presumption of unfair discrimination, any presumption is rebutted because the "lower recovery for the dissenting class is consistent with the results that would obtain outside of bankruptcy[.]" *Tribune*, 972.F.3d 228, 241 (describing ways in which the presumption of unfair discrimination may be overcome).

Similarly, Sanofi's argument that it suffers unfair discrimination because Class 7 Trade Creditors are receiving a 100% recovery while Class 6(f) is receiving far less also fails. Sanofi's argument that Debtors cannot rely on *Nuverra* and *Genesis Health* because the gift is coming from Debtors, not Class 5 is plainly contradicted by the record.[215] Both Class 6 and Class 7 are only receiving more than the *de minimus* recovery to which they are entitled because another creditor group is allocating its recoveries to fund the distributions. Without the gift from Class 5, Class 6 gets next to nothing. The fact that Class 7 gets a greater gift than Class 6 does no harm to Class 6 claimants. The District Court in *Nuverra*, a case with very similar facts, explains:

> [D]istributions to holders of Trade and Business-Related Claims have no impact on the distributions to holders of unsecured claims in Class A6. The record is clear that unsecured creditors are entitled to nothing under the Bankruptcy Code's priority scheme, and an increased distribution to unsecured creditors holding Trade and Business-Related Claims does not diminish the distribution to holders of claims in Class A6. If holders of Trade and Business-Related Claims did not receive this increased recovery, the surplus distribution would revert to secured creditors, not holders of claims in Class A6. As Appellant and his class were not entitled to a distribution in the first place, providing a greater distribution to a different class of unsecured creditors does not alter the distribution to which Appellant is entitled.

*In re Nuverra Envtl. Solutions, Inc.*, 590 B.R. 75 (D. Del. 2018) *affirmed on equitable mootness grounds at* 834 Fed. Appx. 729 (3d Cir. 2021). *See also In re Genesis Health Ventures, Inc.*, 266

---

[215] While Sanofi argues that Debtors' Waterfall does not show what the various classes would be entitled to under the absolute priority rule on a debtor-by-debtor basis, as Mr. Eisenberg explained, the data regarding distributions by debtor can be found in the Liquidation Analysis, Debtor P2, Ex 14; 12-9-21 Tr. at 212 (Eisenberg).

A3029

B.R. 591 (Bankr. D. Del. 2001) ("The disparate treatment between [classes] is a permissible allocation by the secured creditors of a portion of the distribution to which they would otherwise be entitled, rather than unfair discrimination against [the dissenting classes] by the proponents of the plan.").

For this reason, any presumption of unfair discrimination that may arise due to the disparity between the Plan's distributions to Class 6 and Class 7 is rebutted by the fact that Class 6's distribution is no <u>less</u> than the *de minimus* distribution to which it is entitled in the first place. That Class 7's distribution is more than its entitlement is irrelevant. Sanofi's objection on this issue is overruled.

### C.  The UCC Allocation

Debtors' Original Plan provided for $100 million in cash (a gift from Class 5) to be divided among the Class 6 Claimants on a pro rata basis. The UCC believed that the consideration provided was inadequate and that pro rata recoveries to all Class 6 creditors did not comply with Section 1129 because subclasses held claims against different Debtor entities, each with distinct assets and liabilities. Through a mediation process, Debtors agreed to increase the total consideration to $135 million in cash plus additional non-cash assets bringing the total consideration to between $180 million and $220 million depending on the value received from liquidation of the non-cash assets. The UCC then allocated the total consideration among the various subclasses within Class 6. The UCC conditioned entry into the UCC Settlement on reaching internal agreement on allocation. The UCC Settlement, including the UCC Allocation was then included in Debtors' Plan.[216]

---

[216] Plan, Exhibit 6.

A3030

The AIC argues that inclusion of the UCC Allocation into the Plan was inappropriate, and that it unfairly discriminates against them because: 1) the methodology used to determine the allocation was flawed; and 2) certain subclasses within Class 6 will receive more of the available cash on the effective date while Class 6(a) is required to wait until the non-cash assets are liquidated to receive their full distribution. Debtors and the UCC counter that the UCC Allocation is irrelevant to determining the confirmability of Debtors' Plan because, as described above, the AIC's baseline recoveries under the absolute priority rule are zero, and whether the distribution to the AIC was done through a pot plan without allocation or through the UCC Allocation as part of the Plan, the AIC is receiving a recovery they would otherwise not be entitled to.  I agree.

The question before me is whether Debtors' Plan as presented is confirmable.  As that relates to Section 1129(b)(1), the question is, does the Plan as presented create an unrebutted presumption of unfair discrimination?  As discussed at length above, the answer to that question is no.  Under either the UCC Allocation or a pro rata distribution of the Class 5 gift, Class 6(a) is receiving a distribution whereas otherwise it would recover nothing.  As the *Nuverra* court recognized, the fact that another out of the money unsecured creditor class is doing better is irrelevant.

The AIC claims that the UCC was merely "paying lip service to the fiduciary duties owed to general unsecured creditors" in determining the UCC Allocation, and members of the UCC were "blatant[ly] self-interested in approving the Allocation which benefitted their creditor constituencies at the expense of the AIC.[217]  Therefore, the AIC asserts, inclusion of the UCC Allocation into the Plan is improper.  The issue of whether the UCC acted consistent with its

---

[217] AIC Supp Brief at 43.

A3031

fiduciary duties, however, is distinct from whether Debtors' Plan as proposed is confirmable.[218]

The AIC does not allege that Debtors acted in bad faith by including the UCC Settlement into the

Plan, or that the Plan is being proposed by the Debtors for some improper purpose.  Debtors

maintain that the allocation is a necessary part of the UCC Settlement and the UCC Settlement is

integral to the ability of Debtors to reach consensus with various creditor constituencies and

confirm a plan that provides recoveries to all classes of creditors.  I agree and find that it is well

within the bounds of Debtors' business judgment to agree to the UCC Settlement and its

inclusion in the Plan.[219]

For all these reasons, I find the Plan satisfies the requirements of Section 1129(b)(1) and

the objections regarding unfair discrimination are therefore overruled.

## VI.   <u>Section 1129(b)(2)</u>

Section 1129(b)(2) of the Bankruptcy Code provides that a plan is fair and equitable to a

dissenting class of unsecured claims if either (i) the dissenting class is paid in full . . . or (ii) no

class junior to the dissenting class receives anything under the plan on account of their junior

claims or interest.  *See* 11 U.S.C. §§ 1129(b)(2)(B)(i) and 1129(b)(2)(B)(ii).[220]  This rule is also

called the "absolute priority rule," and it requires that, if the holders of claims or interests in a

class that votes to reject a plan receive less than full value for their interests, then no holder of

---

[218] It is important to note that the UCC denies that it acted inappropriately in connection with determining the UCC Allocation and presented extensive evidence to support the bases for its decision to provide different allocations among the various subclasses. 12-13-21 Tr. at. 199-202, 219-22, & 224-34 (Greenberg).

[219] The AIC requested that if I was inclined to confirm the Plan, I require that an appropriate portion of the Class 5 distribution to Class 5 attributable to Debtors' Acthar business be withheld pending final judicial or consensual resolution of the AIC's claims against Debtors other than Mallinckrodt ARD LLC (ARD) and Mallinckrodt plc (PLC) until the AIC's appeal of my dismissal of their claims against Debtor entities other than ARD and PLC is resolved. That request is denied.  The AIC did not seek and have not been granted a stay pending appeal of that decision and there is no reason to hold up distributions to Class 5 while that appeal plays out – perhaps over months or years.

[220] Section 1129(b)(2)(B) applies to impaired unsecured claims, while § 1129(b)(2)(C) applies to interests.

claims or interests in a junior class may receive property under the plan. *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441-42 (1999); *see also Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) (concluding that "the absolute priority rule provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan.") (citations omitted); *see also In re Armstrong World Indus., Inc. II*, 432 F.3d 507, 512 (3d Cir. 2005). Under the absolute priority rule, equity holders cannot receive a distribution unless dissenting unsecured creditors receive payment in full or consent to such treatment. *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 978 (2017).

Sanofi alleges that the Plan's distribution scheme violates the absolute priority rule.[221] Specifically, Sanofi argues that the Plan provides for an equity roll up from MPIL to MIFSA (an obligor on the 4.75% Unsecured Notes) without first providing payment in full to MPIL's creditors, including Sanofi. Sanofi argues that the Class 6(g) 4.75% Unsecured Noteholders will receive an improper $57 million payment based on this equity distribution from MPIL to MIFSA while Sanofi will only receive pennies on the dollar for its claims.

In response, Debtors contend that Sanofi's argument revolves around the incorrect assumption that the only way Class 6(g) can receive a recovery is if MIFSA gets an equity distribution from MPIL.[222] However, Debtors point out that the Plan does not provide for any equity distribution to MIFSA; instead, holders of Class 5 claims are making a gift directly to the Class 6(g).[223] I agree.

---

[221] D.I. 5101, Supplemental Sanofi Objection.

[222] D.I. 5660, Debtors' Omnibus Reply to Supplemental Plan Objections; *see also* 1-6-22 Tr. at 96.

[223] 12-9-21 Tr. at 239-41. Mr. Eisenberg said, "[t]he Class 6 and 7 are being trued up by contributions that are being made by the guaranteed unsecured notes, Class 5.. . . . [T]here's $228 million of the guaranteed unsecured notes' recovery that is being provided to Class 6 and Class 7, so that Class 6 and 7 do receive the amount of recovery that's contemplated under the plan."

A3033

Debtors' Waterfall scenarios show that MPIL is not providing any recovery to MIFSA. As discussed above, Entitled Recoveries to Class 6 against all Debtors is approximately $25 million on an absolute priority basis. The increased recovery to Class 6(f), which includes Sanofi, is a result of the Guaranteed Unsecured Notes in Class 5 agreeing to redistribute a portion of their recoveries to Class 6. Moreover, that gift is not dependent on any recoveries from MPIL. Rather, as Mr. Eisenberg testified, recoveries from entities other than MPIL are more than sufficient to cover the Class 5 gift to MIFSA creditors.[224] Sanofi's expert witness, Mr. Madden, did not present an analysis sufficient to rebut that conclusion.[225] Because the Class 5 gift is not dependent on any recoveries from MPIL, the absolute priority rule is not implicated.

Accordingly, I conclude that the Plan does not violate the absolute priority rule and that the requirements of Section 1129(b)(2) are satisfied. Sanofi's objection is overruled.

**VII.** **Section 1129(d)**

Section 1129(d) of the Code specifies that a court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933. *In re Aleris Int'l, Inc.*, 2010 WL 3492664, at *31 (Bankr. D. Del. May 13, 2010); *see* 11 U.S.C. § 1129(d). There are no objections related to this subsection. Having reviewed the Plan and the record, I find that the principal purpose of this Plan is not the avoidance of taxes or avoidance of the application of section 5 of the Securities Act of 1933. Accordingly, the Plan complies with Section 1129(d).

---

[224] 12-10-21 Tr. at 30-32 (Eisenberg); see also Debtor P2 Ex 34 at 42 (Table 4).
[225] 12-15-21 Tr. at 157.

A3034

## VIII.  **Non-Estate Professionals' Fees**

The Plan proposes to pay the attorneys' fees for certain non-estate professionals. [226]  The

UST objects arguing that the fee provisions cannot be approved because Section 503 provides

the "sole source" of authority to pay post-petition professional fees on an administrative basis.[227]

Debtors respond that the payment of non-estate professional fees is authorized by other

provisions of the Code, including Section 363(b), 365, 1123(b)(6), 1129(a)(4) and Bankruptcy

Rule 9019.  They argue that "under the 'broad grant of authority' provided by Section 1123(b)(6)

of the Code to 'include any … appropriate provision not inconsistent with the applicable

provisions of' chapter 11, 'reorganization plans, after they get the requisite assent, may allocate

and distribute the value of the debtors' estates by a broad variety of means.'"[228] Section

1129(a)(4), for example, "endorses the notion that a debtor will sometimes need to negotiate

certain payments to stakeholders in order to come to a consensual resolution and get a plan

approved." *In re AMR Corp.*, 497 B.R. 690, 695 (Bankr. S.D.N.Y. 2013).  Debtors further

contend that the payment of the non-estate professional fees is in the best interests of Debtors'

business and restructuring efforts because absent the commitment of these attorneys and other

representatives, Debtors would not have been able to secure the settlements and allocations that

---

[226] Plan Article IV.X.8 and 9. (providing for the establishment of the Hospital Attorney Fee Fund for the payment of attorneys' fees and costs of the Ad Hoc Group of Hospitals with respect to Hospital Opioid Claims, the NAS Monitoring Attorney Fee Fund for the payment of attorneys' fees and costs of the NAS Committee with respect to the NAS Monitoring Opioid Claimants, the Ratepayer Attorney Fee Fund for the payment of attorneys' fees and costs of the Emergency Room Physicians Opioid Claimants, the Opioid Attorneys' Fee Fund for the payment of costs and expenses (including attorneys' fees) of the Opioid Claimants, the Municipal and Tribe Opioid Attorneys' Fee Fund for the payment of costs and expenses (including attorneys' fees) of Holders of Municipal Opioid Claims and Tribe Opioid Claims other than any amounts paid to counsel to the Governmental Plaintiff Ad Hoc Committee and the MSGE Group in accordance with the Plan and the Restructuring Support Agreement,458 and the State Opioid Attorneys' Fee Fund for the payment of costs and expenses (including attorneys' fees) of the States (including any ad hoc group thereof) other than any amounts paid to counsel to the Governmental Plaintiff Ad Hoc Committee in accordance with the Plan and the Restructuring Support Agreement).
[227] D.I. 4718, UST Objection at 34.
[228] Debtors' Confirmation Brief at 178 (citing 11. U.S.C. § 1123(b)(6) and *In re Adelphia Commc'ns Corp.*, 441 B.R. 6, 18 (Bankr. S.D.N.Y. 2010).

A3035

form the heart of the reorganization, and they would be forced to litigate thousands of lawsuits.  I agree.

"Section 503(b) does not provide, in words or substance, that it is the *only* way by which fees of this character may be absorbed by an estate."  *In re Adelphia Commc'ns Corp.,* 441 B.R. 10, 11-12 (Bankr. S.D.N.Y. 2010) (emphasis in original).[229]  Article IV.X.8 and 9 is a provision that is a part of the heavily negotiated Opioid Settlement, which is the result of the Opioid Mediation.  That settlement is subject to this Court's review under both Rule 9019 and section 1129(a)(4).  *In re Purdue*, 633 B.R. at 66 ("The settlements provided for in section 5.8 that resulted from the mediation are subject to this Court's review both under Bankruptcy Rule 9019 and … under section 1129(a)(4)[.]").  The mediation report submitted by Mr. Feinberg[230] demonstrates that the non-estate professional fees are both reasonable and necessary.  He states:

> All parties have informed the Mediator that these various fee resolutions are an integral and non-severable part of the overall settlements regarding allocation among public and private Opioid Claimants, and that the settlements reached regarding allocation indeed are dependent on the various agreements reached pertaining to contingency fees and common benefit funding. I am not aware of any facts that would make me doubt the veracity of such representations.

> [] In my opinion, based on my decades of experience and involvement in mediating mass tort litigations and settlements, I believe that the contingency fee resolutions, as well as the common benefit assessments, reached in this Mediation are consistent with fee awards, arrangements and assessments agreed upon in other similar mass tort situations, and properly reflect a fair and reasonable settlement based on the work engaged in by all Mediation participants.[231]

---

[229] I agree with Judge Drain that the UST's reliance on *In re Lehman Bros. Holdings, Inc.*, 508 B.R. 283 (S.D.N.Y. 2014) is misplaced.  As Judge Drain explained, in *Lehman Bros.*, "the district court noted that Congress specifically precluded in Bankruptcy Code section 503(b)(3)(D) recovery by official creditors' committee members of their postpetition fees and expenses, and therefore any settlement of those expenses would have been an improper workaround of that provision."  *In re Purdue Pharma L.P.*, 633 B.R. 53, 66 (Bankr. S.D.N.Y. 2021), overruled on other grounds by 2021 WL 5979108 (S.D.N.Y.  Dec. 16, 2021). That is not the situation here.

[230] Mediator's Report, D.I. 4946, Debtor P2 Ex 88.

[231] *Id.* at ¶ 13-14.

A3036

This testimony is unrefuted, and I find it to be persuasive evidence of the reasonableness of these provisions. The UST's objection is overruled.

### IX.    Substantive Consolidation

Sanofi contends that the Plan is unconfirmable because it improperly consolidates Debtors' estates without meeting the requirements for substantive consolidation set by the Third Circuit.[232] Specifically, Sanofi claims that Debtors do not breakdown the administrative, priority, and unsecured claims for each Debtor. Debtors' counter that this is simply untrue, citing to the testimony of Mr. Eisenberg, who explained how both Debtors' Liquidation Analysis and Debtors' Waterfall were done on a debtor-by-debtor basis.[233] I agree. While Sanofi made this substantive consolidation argument in its objection, it presented no evidence on the issue and there is nothing in the record to support the conclusion that the Plan assumes a *de facto* substantive consolidation of the Debtors. Sanofi's objection is therefore overruled.

### X.    Constructive Trust:

Glenridge argues that because it asserts a claim for the imposition of a constructive trust in an adversary proceeding against the Debtors that its claim must be separately classified and that Debtors must reserve funds to satisfy its claims.[234] I disagree. As I stated in my November 4th bench ruling, the Royalty Agreement between Debtors and Glenridge transferred all rights, title, and interest, if any, that Glenridge had in Acthar to the Debtors.[235] Accordingly, Glenridge has no property interest in Acthar, as would be required to impose a constructive trust. Glenridge's objection is therefore overruled.

---

[232] D.I. 5101, Supplemental Objection of Sanofi-Aventis U.S. LLC
[233] 12-9-21 Tr. at 212, 240; see also Debtors P2 Ex 14 (Liquidation Analysis) and Debtors P2 Ex 10 (Debtors' Waterfall).
[234] D.I. 4701 (Glenridge Objection) at 15; Adv. Pro. No. 21-51178 (JTD).
[235] D.I. 5186.

A3037

### XI.   Pro Se Objections

There are a few remaining objections to the Plan asserted by *pro se* parties that need to be addressed separately. First, Mr. Edelman argues that the Opioid Settlement cannot be approved because he has objected to the opioid claims and that objection must be resolved before the settlement can be approved.  Second, the Pro Se Shareholders and Mr. Koppenhafer argue that the Management Incentive Plan ("**MIP**") included in the Plan is an unwarranted attempt to benefit management and key employees who are responsible for the bankruptcy filing.  And finally, Mr. Koppenhafer asserts that the RSA Parties interests should be subordinated to the interests of the 4.75% Noteholders because the RSA Parties are non-statutory insiders.

### A.   Edelman Objection

Mr. Edelman argues that because he objects to the Opioid Claims under Section 502, that objection must be resolved first before the Opioid Settlement can be approved.  Specifically, he argues that if a party-in-interest objects to a claim, Section 502 provides that the court "shall determine" the amount of the claim and "shall allow" the claim in the determined amount. Even if Mr. Edelman had filed a claim objection under Section 502, which he has not,[236] there is no direct conflict between Section 502 and Rule 9019 that would require a resolution of the claim objection before approving the Opioid Settlement. *In re Kaiser Aluminium Corp.* 339 B.R. 91, 94 (D. Del. 2006).  Indeed, such a requirement would undermine the important policy of promoting settlements in bankruptcies as it would require parties to litigate the very issues the settlement seeks to resolve. *Id.*  Holding otherwise would allow a party-in-interest unfettered power and allow them to derail settlements, which would slow down the bankruptcy proceedings.  Mr. Edelman's objection on these grounds is therefore overruled.

---

[236] While Mr. Edelman raises an objection to the Opioid Settlement, he did not specifically file any objection to the Opioid Claims under Section 502.

A3038

B. **MIP Objection**

The Pro Se Shareholders and Mr. Koppenhafer object to the inclusion of the proposed MIP in Debtors' Plan.  They argue the MIP is an improper attempt to reward management and other key employees of Debtors when they are the ones responsible for Debtors' bankruptcy filing.  Debtors assert that the MIP is justified, proposed in good faith, and does not violate the absolute priority rule because any payments under the MIP will come from what would otherwise go to the Class 5 Guaranteed Unsecured Noteholders.  They argue that MIPs are customary for similarly situated companies and will maximize the enterprise value of the Reorganized Debtors by aligning the post-emergence interests of the MIP Participants and the Reorganized Debtors.  I agree.

In support of the MIP, Debtors offered the testimony of Douglas Friske, a compensation consultant at Willis Towers Watson.[237]  Mr. Friske explained that MIPs, which are a standard part of compensation packages offered by companies like Mallinckrodt, are incentive plans that provide stock or equity compensation to participants either for achieving certain performance metrics or for staying employed with the company.  MIPs have several purposes, including aligning the interests of the participants with those of the shareholders, ensuring continued retention of employees, and attracting new employees.[238]

Mr. Friske evaluated the MIP contained in the Plan and explained that it sets aside 10% of Debtors' post-emergence equity for "grants" or awards of equity to MIP participants, which is in line with similar MIPs offered by comparable companies. Mr. Friske stated that the initial grant of no less than 50% of reserve contained in Debtors' MIP is also standard in the market. He explained that the purpose of a sizeable grant is to get the new company off to a good start by

---

[237] 12-8-21 Tr. at 83.
[238] *Id.* at 84-86.  Debtors P2 Ex 3 (MIP Summary).

A3039

creating immediate alignment of interests and incentives for moving forward.  The initial MIP grant here will be some combination of stock options, restricted stock, and shares of performance vesting stock, but the decisions regarding what will be granted and how it will be allocated will be determined by the new board of the new entity.[239]  Debtors' MIP does not commit the reorganized debtors to any issuance beyond the initial grant and does not include a commitment to any specific employee.  He further testified that the Plan's proposed MIP was the product of arm's length negotiations with bondholders and creditors and that the post-emergence owners approve of it.[240]  Lastly, Mr. Friske testified that not having a MIP would be detrimental in terms of recruiting and the general engagement of participants.[241]

I find this testimony to be persuasive evidence that the MIP included in the Plan is reasonable and was proposed in good faith.  There is no evidence before me that would support a contrary conclusion.  This Court has previously approved plans of reorganization that contains MIPs similar to that proposed here. *See In re Global Home Products, LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (holding that the management incentive plan is in the ordinary course of the debtors' businesses, and thus, is approved); *see also In re Nellson Nutraceutical, Inc.*, 369 B.R. 787 (Bankr. D. Del. 2007) (concluding the ordinary course employee bonus compensation program, which included management, is in the ordinary course of the debtors' business); see also *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 618 (Bankr. D. Del. 2001) (stating the management incentive plan is proper. "The Senior Lenders are free to allocate such value without violating the 'fair and equitable' requirement. The objections to the New Management Incentive Plan are overruled.").  I find the MIP to likewise be appropriate here.  For these reasons, the objections of the Pro Se Shareholders and Mr. Koppenhafer are overruled.

---

[239] *Id.* at 87-93.
[240] *Id.* at 96.
[241] *Id.* at 96-97.

A3040

### C.  **Koppenhafer Objection**

Mr. Koppenhafer argues that the RSA parties should be subordinated to the interests of the 4.75% Noteholders because the RSA parties are non-statutory insiders.[242]  Debtors counter that the RSA parties are not insiders because they negotiated at arm's length with Debtors and nothing in the record would suggest otherwise.  There is therefore no basis to conclude that the RSA parties are insiders.  *See In re Winstar Commc'n, Inc.*, 554 F.3d 382, 399 (3d Cir. 2009) ("An arm's-length transaction is a transaction in good faith in the ordinary course of business by parties with independent interests ... [that] each acting in his or her own best interest[ ]would carry out ....") (quotation omitted) (quoting *Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.)*, 531 F.3d 1272, 1277 n.4 (10th Cir. 2008)).  I agree and overrule this objection.

### CONCLUSION

In sum, having considered all the testimony and evidence submitted in support of and in opposition to confirmation of Debtors' Fourth Amended Plan of Reorganization, I find the Plan satisfies the statutory requirements of the Code, with the one exception noted above.  All objections, including any not specifically addressed in this Opinion, other than to the Exculpation Provision, are overruled.  Debtors should submit a revised form of order.

Dated:  February 8, 2022

_____
JOHN T. DORSEY, U.S.B.J.

---

[242]D.I. 3797 Koppenhafer Objection.

A3041

# APPENDIX 1

In re: MALLINCKRODT PLC, et al.

Debtors-in-Possession

**Table 2 to Eisenberg Declaration: Comparison of Waterfall Entitled Recovery Scenarios to Plan Recovery**

| Classification of Claims | Entitled Recovery | | | | | | Plan Recovery | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Waterfall Reorganization Scenario | | Alternative Waterfall Scenario | | Second Alternative Waterfall Scenario | | | |
| | $ 000s | % | $ 000s | % | $ 000s | % | $ 000s | % |
| Class 2 & 3 - First Lien Claims[1] | $3,172,712 | 100% | $3,211,094 | 100% | $3,172,712 | 100% | $3,172,712 | 100% |
| Class 4 - Second Lien Notes Claims[2] | $329,535 | 100% | $355,973 | 100% | $329,535 | 100% | $329,535 | 100% |
| Class 5 - Guaranteed Unsecured Notes[3,4] | $1,376,773 | 89% | $1,330,526 | 86% | $1,647,876 | 100% | $1,148,266 | 74% |
| Class 6 - General Unsecured Claims[5] | $22,547 | 0% | $21,793 | 0% | $191,686 | 3% | $210,000 | 4% |
| Class 7 - Trade Claims[6] | $295 | 1% | $134 | 0% | $14,521 | 35% | $41,349 | 100% |
| Class 8 & 9 - Opioid Plaintiff Claims[7,8] | $1,325,200 | 5% | $132,357 | 1% | $1,032,673 | 4% | $1,325,200 | 5% |
| Class 10 - Settled Federal/State Acthar Claims[9] | $177,700 | 28% | $0 | 0% | $10,905 | 2% | $177,700 | 28% |

*(1) Class 2 & Class 3 - First Lien Claims includes the First Lien Credit Agreement Claims (Class 2) and the First Lien Notes Claims (Class 3)*

*(2) Class 3 and Class 4 Claims are assumed to have makewhole claims asserted under the Alternative Waterfall sale scenario which differs from Plan treatment.*

*(3) Class 5 Claims in the Second Alternative Waterfall Scenario include postpetition accrued interest since the principal debt claim is satisfied in full.*

*(4) Class 5 Guaranteed Unsecured Notes Claims Plan recovery is 44% after adjusting for the net effect of the Refreshed Projections.*

*(5) Class 6 General Unsecured Claims under the Plan & Reorganization Scenario: $4.3bn for Class 6(a) Acthar Claims, $800m for Class 6(b) Gx Price Fixing, $18m for Class 6(c) Asbestos, $15m for Class 6(d) Legacy Notes, $215m for Class(e) & (f) Environmental & Other GUCs, and $137m for Class 6(g) 4.75% Notes.*

*(6) Class 7 Trade Claims are not adjusted for estimated contract cure amounts.*

*(7) Recovery for Class 8 and Class 9 Claims assumes an opioid claim amount of $25 billion. This assumption is illustrative and the Holders of Class 8 and Class 9 Claims do not agree with such estimate and assert opioid claims far in excess of $25 billion.*

*(8) The Opioid Settlement of $1.325 billion represents the net present value of the cash payment stream payable under the settlement discounted at 10%. This estimate does not ascribe value to litigation claims, insurance rights, or other contingent assets being contributed as part of the Opioid Settlement.*

*(9) Class 10 - Settled Federal/State Acthar Claims recovery based on the $640 million CMS judgement claim.*

Debtor P2 Ex. 9

C.A. No. 20-12522 (JTD)

In re:  MALLINCKRODT PLC, et al.

Debtors-in-Possession

**Table 3 to Eisenberg Declaration: Bridge from Waterfall Reorganization Scenario to Plan**

| ($000s) | Estimated Claim Amount | Waterfall Reorganization Scenario | % Rec [1] | Additional Consideration Provided by Guaranteed Unsec. Notes to Trade & GUCs | Pro Forma Plan Reorganization Scenario | % Rec [1] |
|---|---|---|---|---|---|---|
| Total Enterprise Value | | $ 5,450,000 | | $ - | $ 5,450,000 | |
| less: Opioid Settlement [2] | | (1,325,200) | | - | (1,325,200) | |
| less: Federal/State Acthar Settlement | | (177,700) | | - | (177,700) | |
| Total Settlement Claims | | $ (1,502,900) | | $ - | $ (1,502,900) | |
| less: Administrative Expense | | (173,100) | | - | (173,100) | |
| less: Non-Dischargeable Liabilities | | (12,503) | | - | (12,503) | |
| Enterprise Value Available for Distribution | | $ 3,761,497 | | $ - | $ 3,761,497 | |
| add: Estimated Cash & Other Assets | | 1,237,803 | | | 1,237,803 | |
| Distributable Value | | $ 4,999,299 | | $ - | $ 4,999,299 | |
| Class 2 & 3 - First Lien Claims | $ 3,172,712 | (3,172,712) | 100% | - | (3,172,712) | 100% |
| Class 4 - Second Lien Notes Claims | 329,535 | (329,535) | 100% | - | (329,535) | 100% |
| Total Secured Claims | | $ (3,502,247) | | $ - | $ (3,502,247) | |
| Distributable Value after satisfying Secured Claims | | $ 1,497,053 | | $ - | $ 1,497,053 | |
| Priority Tax | 114,740 | (97,438) | 85% | - | (97,438) | 85% |
| Value Available to Other Unsecureds | | $ 1,399,615 | | $ - | $ 1,399,615 | |
| Class 5 - Guaranteed Unsecured Notes | 1,543,810 | (1,376,773) | 89% | 228,507 | (1,148,266) | 74% |
| Class 6 - General Unsecured Claims [3] | 5,502,304 | (22,547) | 0% | (187,453) | (210,000) | 4% |
| Class 7 - Trade Claims [4] | 41,349 | (295) | 1% | (41,054) | (41,349) | 100% |
| Total Other Unsecured Recoveries | | $ (1,399,615) | | $ - | $ (1,399,615) | |
| Value Available to Subordinate Unsecured Creditors & Equity | | $ - | | $ - | $ - | |
| **Class 6 Recoveries** | | | | | | |
| Class 6(a) Acthar Claims | | $ - | | $ 34,090 | $ 34,090 | |
| Class 6(b) Generics Price Fixing Claims | | 561 | | 7,439 | 8,000 | |
| Class 6(c) Asbestos Claims | | - | | 18,000 | 18,000 | |
| Class 6(d) Legacy Unsecured Notes Claims | | - | | 10,859 | 10,859 | |
| Class 6(e) Environmental Claims & Class 6(f) Other GUCs | | 21,986 | | 50,073 | 72,059 | |
| Class 6(g) 4.75% Unsecured Notes Claims | | - | | 56,991 | 56,991 | |
| Subtotal | | $ 22,547 | | $ 177,453 | $ 200,000 | |
| GUC Trust Expenses | | n/a | | 10,000 | 10,000 | |
| Total Class 6 Recovery | | $ 22,547 | | $ 187,453 | $ 210,000 | |

*(1) Recoveries exclude impact related to dilution from MIP.*
*(2) The Opioid Settlement of $1.325 billion represents the net present value of the cash payment stream payable under settlement discounted at 10%.  This estimate does not ascribe value to litigation claims, insurance rights, or other contingent assets being contributed as part of the Opioid Settlement.*
*(3) Class 6 Plan recovery of $210 million is based on an estimate provided by the UCC of aggregate GUC Trust Consideration before estimated GUC Trust expenses. Plan recoveries for Class 6 sub-classes are based on the allocation and methodology adopted pursuant to the UCC Settlement using current estimates of the aggregate allowable claims in Class 6(e) and 6(f) at each respective Debtor.*
*(4) Class 7 Trade Claims are not adjusted for estimated contract cure amounts.*

**Debtor P2 Ex. 10**

C.A. No. 20-12522 (JTD)

MNK_PLAN_00243562
A3044

In re: MALLINCKRODT PLC, et al.

Debtors-in-Possession

## Table 5 to Eisenberg Declaration: Alternative Waterfall Scenario Compared to Plan

| ($000s) | Est Claim Amount (Alternative Scenario) | Alternative Waterfall Scenario | % Rec[1] | Pro Forma Plan Reorganization Scenario | % Rec[1] |
|---|---|---|---|---|---|
| Total Enterprise Value | | $ 4,000,000 | | $ 5,450,000 | |
| less: Opioid Settlement[2] | | n/a | | (1,325,200) | |
| less: Federal/State Acthar Settlement | | n/a | | (177,700) | |
| Total Settlement Claims | | $ - | | $ (1,502,900) | |
| less: Administrative Expense | | (260,800) | | (173,100) | |
| less: Non-Dischargeable Liabilities | | (12,503) | | (12,503) | |
| Enterprise Value Available for Distribution | | $ 3,726,697 | | $ 3,761,497 | |
| add: Estimated Cash & Other Assets | | 1,422,632 | | 1,237,803 | |
| Distributable Value | | $ 5,149,328 | | $ 4,999,299 | |
| Class 2 & 3 - First Lien Claims[3] | $ 3,211,094 | (3,211,094) | 100% | (3,172,712) | 100% |
| Class 4 - Second Lien Notes Claims[4] | 355,973 | (355,973) | 100% | (329,535) | 100% |
| Total Secured Claims | | $ (3,567,068) | | $ (3,502,247) | |
| Distributable Value after satisfying Secured Claims | | $ 1,582,260 | | $ 1,497,053 | |
| Priority Tax | 114,740 | (97,450) | 85% | (97,438) | 85% |
| Value Available to Other Unsecureds | | $ 1,484,811 | | $ 1,399,615 | |
| Class 5 - Guaranteed Unsecured Notes | 1,543,810 | (1,330,526) | 86% | (1,148,266) | 74% |
| Class 6 - General Unsecured Claims[5] | 7,080,788 | (21,793) | 0% | (210,000) | 4% |
| Class 7 - Trade Claims[6] | 41,349 | (134) | 0% | (41,349) | 100% |
| Class 8 & 9 - Opioid Plaintiff Claims[7] | 25,000,000 | (132,357) | 1% | n/a | n/a |
| Class 10 - Settled Federal/State Acthar Claims | 640,000 | - | 0% | n/a | n/a |
| Total Other Unsecured Recoveries | | $ (1,484,811) | | $ (1,399,615) | |
| Value Available to Subordinate Unsecured Creditors & Equity | | $ - | | $ - | |
| **Class 6 Recoveries** | | | | | |
| Class 6(a) Acthar Claims | | $ - | | $ 34,090 | |
| Class 6(b) Generics Price Fixing Claims | | 49 | | 8,000 | |
| Class 6(c) Asbestos Claims | | - | | 18,000 | |
| Class 6(d) Legacy Unsecured Notes Claims | | - | | 10,859 | |
| Class 6(e) Environmental Claims & Class 6(f) Other GUCs | | 21,744 | | 72,059 | |
| Class 6(g) 4.75% Unsecured Notes Claims | | - | | 56,991 | |
| Subtotal | | $ 21,793 | | $ 200,000 | |
| GUC Trust Expenses | | n/a | | 10,000 | |
| Total Class 6 Recovery | | $ 21,793 | | $ 210,000 | |

(1) Recoveries exclude impact related to dilution from MIP.

(2) The Opioid Settlement of $1.325 billion represents the net present value of the cash payment stream payable under settlement discounted at 10%. This estimate does not ascribe value to litigation claims, insurance rights, or other contingent assets being contributed as part of the Opioid Settlement.

(3) 1st Lien Note claims include $38m make-whole claims in the Alternative Waterfall Scenario only.

(4) 2nd Lien Note claims include $25m make-whole claims in the Alternative Waterfall Scenario only.

(5) Class 6 Plan recovery of $210 million is based on an estimate provided by the UCC of aggregate GUC Trust Consideration before estimated GUC Trust expenses. Plan recoveries for Class 6 sub-classes are based on the allocation and methodology adopted pursuant to the UCC Settlement using current estimates of the aggregate allowable claims in Class 6(e) and 6(f) at each respective Debtor.

(6) Class 7 Trade Claims are not adjusted for estimated contract cure amounts.

(7) Recovery for Class 8 and Class 9 Claims assumes an opioid claim amount of $25 billion. This assumption is illustrative and the Holders of Class 8 and Class 9 Claims do not agree with such estimate and assert opioid claims far in excess of $25 billion. Includes recovery on Canadian Opioid Claim.

Debtor P2 Ex. 11

C.A. No. 20-12522 (JTD)

In re:  MALLINCKRODT PLC, et al.

Debtors-in-Possession

**Table 6 to Eisenberg Declaration: Second Alternative Waterfall Scenario Compared to Plan**

| ($000s) | Estimated Claim Amount | Second Alternative Waterfall Scenario | % Rec[1] | Consideration Provided by Guaranteed Unsecured Notes to Each Class | Pro Forma Plan Reorganization Scenario | % Rec[1] |
|---|---|---|---|---|---|---|
| Total Enterprise Value | | $ 5,450,000 | | $ - | $ 5,450,000 | |
| less: Opioid Settlement[2] | | n/a | | (1,325,200) | (1,325,200) | |
| less: Federal/State Acthar Settlement | | n/a | | (177,700) | (177,700) | |
| Total Settlement Claims | | $ - | | $ (1,502,900) | $ (1,502,900) | |
| less: Administrative Expense | | (173,100) | | - | (173,100) | |
| less: Non-Dischargeable Liabilities | | (12,503) | | - | (12,503) | |
| Enterprise Value Available for Distribution | | $ 5,264,397 | | $ (1,502,900) | $ 3,761,497 | |
| add: Estimated Cash & Other Assets | | 1,237,803 | | | 1,237,803 | |
| Distributable Value | | $ 6,502,199 | | $ (1,502,900) | $ 4,999,299 | |
| Class 2 & 3 - First Lien Claims | $ 3,172,712 | (3,172,712) | 100% | - | (3,172,712) | 100% |
| Class 4 - Second Lien Notes Claims | 329,535 | (329,535) | 100% | - | (329,535) | 100% |
| Total Secured Claims | | $ (3,502,247) | | $ - | $ (3,502,247) | |
| Distributable Value after satisfying Secured Claims | | $ 2,999,953 | | $ (1,502,900) | $ 1,497,053 | |
| Priority Tax | 114,740 | (102,292) | 89% | 4,854 | (97,438) | 85% |
| Value Available to Other Unsecureds | | $ 2,897,660 | | $ (1,498,046) | $ 1,399,615 | |
| Class 5 - Guaranteed Unsecured Notes | 1,647,876 | (1,647,876) | 100% | 499,611 | (1,148,266) | 74% |
| Class 6 - General Unsecured Claims[3] | 7,073,504 | (191,686) | 3% | (18,314) | (210,000) | 4% |
| Class 7 - Trade Claims[4] | 41,349 | (14,521) | 35% | (26,828) | (41,349) | 100% |
| Class 8 & 9 - Opioid Plaintiff Claims[5] | 25,000,000 | (1,032,673) | 4% | 1,032,673 | n/a | n/a |
| Class 10 - Settled Federal/State Acthar Claims | 640,000 | (10,905) | 2% | 10,905 | n/a | n/a |
| Total Other Unsecured Recoveries | | $ (2,897,660) | | $ 1,498,046 | $ (1,399,615) | |
| Value Available to Subordinate Unsecured Creditors & Equity | | $ - | | $ - | $ - | |

(1) Recoveries exclude impact related to dilution from MIP.

(2) The Opioid Settlement of $1.325 billion represents the net present value of the cash payment stream payable under settlement discounted at 10%.  This estimate does not ascribe value to litigation claims, insurance rights, or other contingent assets being contributed as part of the Opioid Settlement.

(3) Class 6 Plan recovery of $210 million is based on an estimate provided by the UCC of aggregate GUC Trust Consideration before estimated GUC Trust expenses. Plan recoveries for Class 6 sub-classes are based on the allocation and methodology adopted pursuant to the UCC Settlement using current estimates of the aggregate allowable claims in Class 6(e) and 6(f) at each respective Debtor.

(4) Class 7 Trade Claims are not adjusted for estimated contract cure amounts.

(5) Recovery for Class 8 and Class 9 Claims assumes an opioid claim amount of $25 billion. This assumption is illustrative and the Holders of Class 8 and Class 9 Claims do not agree with such estimate and assert opioid claims far in excess of $25 billion. Includes recovery on Canadian Opioid Claim.

**Debtor P2 Ex. 12**

C.A. No. 20-12522 (JTD)