# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| MALLINCKRODT PLC, et al., | Case No. 20-12522 (JTD) (Bankr. D. Del.) |
| Debtors. | (Jointly Administered) |
| AD HOC FIRST LIEN NOTES GROUP, | |
| Appellants, | Appeals from the Bankruptcy Court |
| v. | Case No. 22-cv-00331-TLA |
| MALLINCKRODT PLC, et al., | Case No. 22-cv-00330-TLA |
| Appellees. | |

## BRIEF OF REORGANIZED DEBTOR APPELLEES IN OPPOSITION TO FIRST LIEN NOTEHOLDER APPEALS

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
(302) 651-7700

Emil A. Kleinhaus (*pro hac vice*)
Amy R. Wolf (*pro hac vice*)
Michael H. Cassel (*pro hac vice*)
Mitchell S. Levy (*pro hac vice*)
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52 Street
New York, NY  10128
(212) 403-1000

Melissa Arbus Sherry (*pro hac vice*)
James A. Tomberlin (*pro hac vice*)
Andrew Sorkin (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

George A. Davis (*pro hac vice*)
George Klidonas (*pro hac vice*)
Anupama Yerramalli (*pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200

Jeffrey E. Bjork
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:  (213) 485-1234
Facsimile:    (213) 891-8763

- and -

Jason B. Gott
**LATHAM & WATKINS LLP**
330 North Wabash Avenue,
Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:    (312) 993-9767

*Counsel for Reorganized Debtors-Appellees*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... iii

CORPORATE DISCLOSURE STATEMENT .........................................x

INTRODUCTION ............................................................................1

STATEMENT OF THE ISSUES.................................................................6

STATEMENT OF THE CASE....................................................................6

    A.    Mallinckrodt's business and chapter 11 cases .......................6

    B.    The First Lien Noteholders receive all payments owed to them. .........7

    C.    The disputed make-whole claim ..........................................8

    D.    The Plan and Confirmation Hearing ...................................11

    E.    The Plan goes effective. ....................................................15

SUMMARY OF ARGUMENT ...............................................................16

ARGUMENT ...........................................................................................17

I.    The Bankruptcy Court correctly held that the Debtors were entitled to reinstate the First Lien Notes without paying a make-whole. ........................17

    A.    Section 1124(2) permits reinstatement without paying the Applicable Premium............................................................18

        1.    Under Section 1124(2), reinstatement is permitted "notwithstanding" Section 6.02 of the First Lien Notes Indenture. ................................................................21

        2.    Subsections (A)-(E) of Section 1124(2) do not require payment of the Applicable Premium. ....................................30

    B.    Section 1123(d) does not require payment of the Applicable Premium. ...............................................................39

    C.    Section 1124(2) permits reinstatement without paying interest on the Applicable Premium.................................................40

D.    The Bankruptcy Court did not reach, and this Court does not need to reach, other objections to the make-whole. ...........................45

1.    Under Sections 541(c) and 363(*l*) of the Bankruptcy Code, as well as applicable case law, the make-whole is an impermissible *ipso facto* clause. ..........................................46

2.    The make-whole is punitive and unreasonable.........................51

II.   The Bankruptcy Court correctly held that the Plan does not impair the First Lien Noteholders' rights under the Second Lien Intercreditor Agreement....................................................................................................56

A.    The First Lien Noteholders have no valid claim under Section 4.2 of the Second Lien Intercreditor Agreement................................58

B.    The First Lien Noteholders have no valid claim under 6.3(b)(ii) of the Second Lien Intercreditor Agreement.......................................63

CONCLUSION .......................................................................................................69

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ambac Assur. Corp.* v. *Countrywide Home Loans, Inc.*,
106 N.E.3d 1176 (N.Y. 2018) ................................................................62 n.38

*Butner* v. *United States*,
440 U.S. 48 (1979) ................................................................................3, 29

*CoreStates Bank, N.A.* v. *Huls Am., Inc.*,
176 F.3d 187 (3d Cir. 1999) ................................................................57

*General Motors Acceptance Corp.* v. *Rose (Matter of Rose)*,
21 B.R. 272 (Bankr. D.N.J. 1982) ......................................................49 n.30

*Greenwich Cap. Fin. Prods.* v. *Negrin*,
903 N.Y.S. 2d 346 (N.Y. App. Div. 2010) ..........................................63

*Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N.A.*,
530 U.S. 1 (2000) ................................................................................17

*In re 1 Ashbury Ct. Partners, L.L.C.*,
2011 WL 4712010 (Bankr. D. Kan. Oct. 5, 2011) ..............................39 n.19

*In re 1111 Myrtle Ave. Grp., LLC*,
598 B.R. 729 (Bankr. S.D.N.Y. 2019) ................................................27, 43 n.22

*In re 139-141 Owners Corp.*,
306 B.R. 764 (Bankr. S.D.N.Y. 2004) ................................................43 n.21

*In re 354 E 66th Street Realty Corp.*,
177 B.R. 776 (Bankr. E.D.N.Y. 1995) ................................................65 n.40

*In re 53 Stanhope LLC*,
625 B.R. 573 (Bankr. S.D.N.Y. 2021) ................................27 n.14, 44 n.25, 52

*In re A & B Assocs., L.P.*,
2019 WL 1470892 (Bankr. S.D. Ga. Mar. 29, 2019) ..........................36

*In re American Mariner Indus., Inc.*,
734 F.2d 426 (9th Cir. 1984) ..............................................................65

*In re AMR Corp.*,
   485 B.R. 279 (Bankr. S.D.N.Y. 2013)...................................................................50

*In re AMR Corp.*,
   730 F.3d 88 (2d Cir. 2013) ......................................................................50, 51

*In re Bartomeli*,
   303 B.R. 254 (Bankr. D. Conn. 2004) ...........................................................34

*In re Carpenter*,
   331 B.R. 529 (Bankr. D. Conn. 2005) ......................................... 43 nn. 21 & 22

*In re Charter Commc'ns*,
   419 B.R. 221 (Bankr. S.D.N.Y. 2009)..............................................................34

*In re Chedick*,
   1996 WL 762329 (Bankr. D.D.C. Mar. 22, 1996) ..............................48, 49 n.29

*In re Chemtura Corp.*,
   439 B.R. 561 (Bankr. S.D.N.Y. 2010).........................................................23 n.8

*In re Clark*,
   738 F.2d 869 (7th Cir. 1984) ...........................................................................41

*In re Deseno*,
   17 F.3d 642 (3d Cir. 1994) .................................................................20, 42 n.20

*In re Doctors Hosp. of Hyde Park, Inc.*,
   508 B.R. 697 (Bankr. N.D. Ill. 2014) ....................................................55 n.35, 56

*In re Duralite Truck Body & Container Corp.*,
   153 B.R. 708 (Bankr. D. Md. 1993) ................................................................52

*In re EBC I, Inc.*,
   356 B.R. 631 (Bankr. D. Del. 2006) ................................................................47

*In re Energy Future Holdings*,
   546 B.R. 566 (Bankr. D. Del. 2016)............................................................ 59-61

*In re Energy Future Holdings Corp.*,
   566 B.R. 669 (Bankr. D. Del. 2017)............................................................59, 60

*In re Energy Future Holdings Corp.*,
   842 F.3d 247 (3d Cir. 2016) ........................................................................*passim*

*In re EP Energy Corp.*, No. 19-35654
   (Bankr. S.D. Tex. Mar. 6, 2020)...................................................................*passim*

*In re General Growth Props., Inc.*,
   451 B.R. 323 (Bankr. S.D.N.Y. 2011)....................................................36, 43 n.23

*In re Goody's Family Clothing Inc.*,
   610 F.3d 812 (3d Cir. 2010) ...............................................................................40

*In re Hertz Corp.*,
   637 B.R. 781 (Bankr. D. Del. 2021)....................................................................55

*In re John Q. Hammons Fall 2006, LLC*,
   612 B.R. 779 (Bankr. D. Kan.) ...............................................................28, 43 n.23

*In re Jones*,
   591 F.3d 308 (4th Cir. 2010) ......................................................................49 n.30

*In re K & J Properties, Inc.*,
   338 B.R. 450 (Bankr. D. Colo. 2005)..........................................................28 n.15

*In re Kroh Bros. Dev. Co.*,
   88 B.R. 997 (Bankr. W.D. Mo. 1988) .................................................................52

*In re Lehman Bros. Holdings Inc.*,
   422 B.R. 407 (Bankr. S.D.N.Y. 2010).........................................................47 n.28

*In re McCoy*,
   2016 WL 4268702 (Bankr. E.D. Va. Aug. 11, 2016)..................................49 n.30

*In re Moody Nat'l SHS Houston H, LLC*,
   426 B.R. 667 (Bankr. S.D. Tex. 2010) ................................................................36

*In re Moshe*,
   567 B.R. 438 (Bankr. E.D.N.Y. 2017) ........................................................43 n.21

*In re MPM Silicones, L.L.C.*,
   874 F.3d 787 (2d Cir. 2017) .......................................................................25 n.10

*In re MPM Silicones, LLC*,
        518 B.R. 740 (Bankr S.D.N.Y. 2014)............................................................ 59-61

*In re New Invs., Inc.*,
        840 F.3d 1137 (9th Cir. 2016) ...............................................................28, 43 n.21

*In re Onco Inv. Co.*,
        316 B.R. 163 (Bankr. D. Del. 2004)............................................................42, 67

*In re PPI Enters. (U.S.), Inc.*,
        324 F.3d 197 (3d Cir. 2003) ...............................................................................18

*In re Payless Cashways, Inc.*,
        287 B.R. 482 (Bankr. W.D. Mo. 2002) ......................................................49 n.30

*In re Price*,
        370 F.3d 362 (3d Cir. 2004) ........................................................................17, 28

*In re Railway Reorganization Estate, Inc.*,
        133 B.R. 578 (Bankr. D. Del. 1991)..............................................28, 48, 49 n.30

*In re Residential Capital, LLC*,
        508 B.R. 851 (Bankr. S.D.N.Y. 2014)..................................................44 n.25, 52

*In re Rickel Home Centers, Inc.*,
        209 F.3d 291 (3d Cir. 2000) .................................................................. 50 & n.31

*In re Roach*,
        824 F.2d 1370 (3d Cir. 1987) ....................................................20, 21, 26, 2 n.20

*In re S. Side House, LLC*,
        451 B.R. 248 (Bankr. E.D.N.Y. 2011) .............................................................53

*In re Sagamore Partners, Ltd.*,
        620 F. App'x 864 (11th Cir. 2015)................................................39 n.19, 43 n.21

*In re Satellite Restaurants Inc. Crabcake Factory USA*,
        626 B.R. 871 (Bankr. D. Md. 2021) ..................................................................35

*In re School Specialty, Inc.*,
        2013 WL 1838513 (Bankr. D. Del. Apr. 22, 2013)....................................55 n.34

*In re SunCruz Casinos, LLC*,
    298 B.R. 833 (Bankr. S.D. Fl. 2003) ..........................................................65 n.40

*In re Swedeland Dev. Grp., Inc.*,
    16 F.3d 553 (3d Cir. 1994) ...............................................................................65

*In re Taddeo*,
    685 F.2d 24 (2d Cir. 1982) ................................................................20, 41, 42

*In re Timberline Prop. Development, Inc.*,
    136 B.R. 382 (Bankr. D.N.J. 1992) ..........................................................44 n.26

*In re Timbers of Inwood Forest Assoc., Ltd.*,
    793 F.2d 1380 (5th Cir. 1986) .........................................................................34

*In re Tribune Co.*,
    972 F.3d 228 (3d Cir. 2020) .............................................................................41

*In re United Merchants & Manufacturers, Inc.*,
    674 F.2d 134 (2d Cir. 1982) .......................................................................55 n.34

*In re W.R. Grace*,
    475 B.R. 34 (D. Del. 2012).............................................................29, 49, 52

*In re Washington Mutual, Inc.*,
    461 B.R. 200 (Bankr. D. Del. 2011).........................................................44 n.26

*John Wyeth & Bro Ltd.* v. *Cigna Int'l Corp.*,
    119 F.3d 1070 (3d Cir. 1997) ...........................................................................68

*Kelly* v. *Robinson*,
    479 U.S. 36 (1986)............................................................................................17

*Laurel Gardens, LLC* v. *McKenna*,
    948 F.3d 105 (3d Cir. 2020) ....................................................................44 n.24

*Lewis* v. *Mfrs. Nat'l Bank*,
    364 U.S. 603 (1961).........................................................................................29

*Muzak Corp.* v. *Hotel Taft Corp.*,
    133 N.E.2d 688 (N.Y. 1956).......................................................................62 n.38

*Platek* v. *Town of Hamburg*,
   24 N.Y.3d 699 (N.Y. 2015) ................................................................67

*Riggs Nat'l Bank of Wash.* v. *Perry*,
   729 F.2d 982 (4th Cir. 1984) ...........................................................29

*Sapos* v. *Provident Inst. of Sav.*,
   967 F.2d 918 (3d Cir. 1992) ...............................................20, 41, 42

*Urban Communicators PCS Ltd. P'ship* v. *Gabriel Capital, L.P.*,
   394 B.R. 325 (S.D.N.Y. 2008) ....................................................44 n.26

*Vanston Bondholders Protective Committee* v. *Green*,
   329 U.S. 156 (1946)..................................................................44 n.26

*Westmoreland Human Opportunities, Inc.* v. *Walsh*,
   246 F.3d 233 (3d Cir. 2001) ............................................................47

## Statutes

11 U.S.C.
   § 363(*l*) .................................................................................... 48-49
   § 365 ........................................................................................ 31-35
   § 502(b) .................................................................................... 53-56
   § 506(b) ...................................................................................*passim*
   § 510(a) ..........................................................................................57
   § 523(a) .................................................................................... 33, 35
   § 541(c) .................................................................................... 46-47
   §1123 .......................................................................................*passim*
   §1124 .......................................................................................*passim*
   § 1141(d).................................................................................. 32-33

## Other Authorities

*Black's Law Dictionary* .............................................................23, 24

7 Collier on Bankruptcy ¶ 1124.04[2] (16th ed. 2021)...........................34

Douglas G. Baird, *Making Sense of Make-Wholes*, 94 Am. Bankr. L.J.
   567 (2020)...................................................................27 n.12, 29, 52

H.R. Rep. No. 95-595 (1977)........................................................4, 30, 34

S. Rep. No. 95-989 (1978) ....................................................................1, 5, 20, 30, 42

*Webster's Third New Int'l Dictionary* 1545 (1971) ...............................................40

## CORPORATE DISCLOSURE STATEMENT[1]

Mallinckrodt plc and its affiliates that were Debtors and Debtors-in-possession in the above-captioned chapter 11 proceedings and are now reorganized debtors (collectively, "Debtors" or "Reorganized Debtors"), by and through undersigned counsel, respectfully represent:

1.      Debtor-Appellee Mallinckrodt plc, chartered in Ireland, has no parent company, and no publicly held company owns 10% or more of Mallinckrodt plc.

2.      Debtor-Appellee Acthar IP Unlimited Company, chartered in Ireland, is a wholly-owned subsidiary of Debtor Mallinckrodt Pharma IP Unlimited Company.

3.      Debtor-Appellee IMC Exploration Company, chartered in Maryland, is a wholly-owned subsidiary of Debtor ST US Holdings LLC.

4.      Debtor-Appellee Infacare Pharmaceutical Corporation, chartered in Delaware, is a wholly-owned subsidiary of Debtor Therakos, Inc.

5.      Debtor-Appellee INO Therapeutics LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Therakos, Inc.

---

[1] The information below was accurate as of June 15, 2022.  In connection with the Reorganized Debtors' emergence from bankruptcy, the Reorganized Debtors are engaging in certain transactions among affiliates.  This disclosure will be supplemented to the extent there is any material change as a result of those transactions.

6.     Debtor-Appellee Ludlow LLC, chartered in Massachusetts, is a wholly-owned subsidiary of Debtor MNK 2011 LLC.

7.     Debtor-Appellee MAK LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor MEH, Inc.

8.     Debtor-Appellee Mallinckrodt APAP LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor SpecGx LLC.

9.     Debtor-Appellee Mallinckrodt ARD Finance LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt Enterprises Holdings, Inc.

10.     Debtor-Appellee Mallinckrodt ARD Holdings Inc., chartered in Delaware, is a wholly-owned subsidiary of Debtor Therakos, Inc.

11.     Debtor-Appellee Mallinckrodt ARD Holdings Limited, chartered in the United Kingdom, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

12.     Debtor-Appellee Mallinckrodt ARD IP Unlimited Company, chartered in Ireland, is a wholly-owned subsidiary of Debtor Acthar IP Unlimited Co.

13.     Debtor-Appellee Mallinckrodt ARD LLC, chartered in California, is a wholly-owned subsidiary of Debtor Mallinckrodt ARD Holdings, Inc.

14.     Debtor-Appellee Mallinckrodt Brand Pharmaceuticals LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor ST US Holdings LLC.

15.     Debtor-Appellee Mallinckrodt Buckingham Unlimited Company is chartered in Ireland.  Half of Mallinckrodt Buckingham Unlimited Company is owned by Debtor Mallinckrodt Pharmaceuticals Limited, and the other half is owned by Debtor Mallinckrodt International Finance SA.

16.     Debtor-Appellee Mallinckrodt Canada ULC, chartered in Canada, is a wholly-owned subsidiary of non-Debtor Mallinckrodt Canada Cooperatie U.A.

17.     Debtor-Appellee Mallinckrodt CB LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

18.     Debtor-Appellee Mallinckrodt Critical Care Finance LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt ARD Holdings Inc.

19.     Debtor-Appellee Mallinckrodt Enterprises Holdings, Inc. is chartered in California.  Half of Mallinckrodt Enterprises Holdings, Inc., is owned by Debtor Petten Holdings Inc., and the other half is owned by Debtor MEH, Inc.

20.     Debtor-Appellee Mallinckrodt Enterprises LLC is chartered in Delaware.  Half of Mallinckrodt Enterprises LLC is owned by Debtor WebsterGx Holdco LLC, and the other half is owned by Debtor Mallinckrodt ARD Finance LLC.

21.     Debtor-Appellee Mallinckrodt Enterprises UK Limited, chartered in the United Kingdom, is a wholly-owned subsidiary of Debtor MUSHI UK Holdings Limited.

22.     Debtor-Appellee Mallinckrodt Equinox Finance LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Petten Holdings Inc.

23.     Debtor-Appellee Mallinckrodt Group S.à r.l., chartered in Luxembourg, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

24.     Debtor-Appellee Mallinckrodt Holdings GmbH, chartered in Switzerland, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

25.     Debtor-Appellee Mallinckrodt Hospital Products Inc., chartered in Delaware, is a wholly-owned subsidiary of Debtor MCCH LLC.

26.     Debtor-Appellee Mallinckrodt Hospital Products IP Unlimited Company, chartered in Ireland, is a wholly-owned subsidiary of Debtor Mallinckrodt IP Unlimited Company.

27.     Debtor-Appellee Mallinckrodt International Finance SA, chartered in Luxembourg, is a wholly-owned subsidiary of Debtor Mallinckrodt plc.

28.     Debtor-Appellee Mallinckrodt International Holdings S.à r.l., chartered in Luxembourg, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

29.     Debtor-Appellee Mallinckrodt IP Unlimited Company, chartered in Ireland, is a wholly-owned subsidiary of Debtor Mallinckrodt Pharma IP Trading Unlimited Company.

30.     Debtor-Appellee Mallinckrodt LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt Enterprises LLC.

31.     Debtor-Appellee Mallinckrodt Lux IP S.à r.l., chartered in Luxembourg, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

32.     Debtor-Appellee Mallinckrodt Manufacturing LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt Hospital Products Inc.

33.     Debtor-Appellee Mallinckrodt Pharma IP Trading Unlimited Company, chartered in Ireland, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

34.     Debtor-Appellee Mallinckrodt Pharmaceuticals Ireland Limited, chartered in Ireland, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

35.     Debtor-Appellee Mallinckrodt Pharmaceuticals Limited, chartered in the United Kingdom, is a wholly-owned subsidiary of Debtor Mallinckrodt International Holdings S.à r.l.

36.     Debtor-Appellee Mallinckrodt Quincy S.à r.l., chartered in Luxembourg, is a wholly-owned subsidiary of Debtor Mallinckrodt Buckingham Unlimited Company.

37.     Debtor-Appellee Mallinckrodt UK Finance LLP is chartered in the United Kingdom.  Half of Mallinckrodt UK Finance LLP is owned by Debtor Mallinckrodt Pharmaceuticals Limited, and half is owned by Debtor Mallinckrodt International Finance SA.

38.     Debtor-Appellee Mallinckrodt UK Ltd, chartered in the United Kingdom, is a wholly-owned subsidiary of Debtor Mallinckrodt plc.

39.     Debtor-Appellee Mallinckrodt US Holdings LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor ST US Holdings LLC.

40.     Debtor-Appellee Mallinckrodt US Pool LLC, chartered in Nevada, is a wholly-owned subsidiary of Debtor Petten Holdings Inc.

41.     Debtor-Appellee Mallinckrodt Veterinary, Inc., chartered in Delaware, is a wholly-owned subsidiary of Debtor ST US Holdings LLC.

42.     Debtor-Appellee Mallinckrodt Windsor Ireland Finance Unlimited Company, chartered in Ireland, is a wholly-owned subsidiary of Debtor Mallinckrodt Windsor S.à r.l.

43.     Debtor-Appellee Mallinckrodt Windsor S.à r.l., chartered in Luxembourg, is a wholly-owned subsidiary of Debtor Mallinckrodt Quincy S.à r.l.

44.    Debtor-Appellee MCCH LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor MCCH LLC.

45.    Debtor-Appellee MEH, Inc., chartered in Nevada, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

46.    Debtor-Appellee MHP Finance LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt ARD Holdings Inc.

47.    Debtor-Appellee MKG Medical UK Ltd, chartered in the United Kingdom, is a wholly-owned subsidiary of Debtor Mallinckrodt Windsor S.à r.l.

48.    Debtor-Appellee MNK 2011 LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt Brand Pharmaceuticals LLC.

49.    Debtor-Appellee MUSHI UK Holdings Limited, chartered in the United Kingdom, is a wholly-owned subsidiary of Debtor Mallinckrodt ARD Holdings Limited.

50.    Debtor-Appellee Ocera Therapeutics, Inc., chartered in Delaware, is a wholly-owned subsidiary of Debtor MAK LLC.

51.    Debtor-Appellee Petten Holdings Inc., chartered in Delaware, is a wholly-owned subsidiary of ST US Holdings LLC.

52.    Debtor-Appellee SpecGx Holdings LLC, chartered in New York, is a wholly-owned subsidiary of Debtor Mallinckrodt LLC.

53.     Debtor-Appellee SpecGx LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor SpecGx Holdings LLC.

54.     Debtor-Appellee ST Operations LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor MEH, Inc.

55.     Debtor-Appellee ST Shared Services LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Petten Holdings, Inc.

56.     Debtor-Appellee ST US Holdings LLC, chartered in Nevada, is a wholly-owned subsidiary of Debtor MEH, Inc.

57.     Debtor-Appellee ST US Pool LLC, chartered in Delaware, chartered in Delaware, is a wholly-owned subsidiary of Debtor ST US Holdings LLC.

58.     Debtor-Appellee Stratatech Corporation, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt Hospital Products Inc.

59.     Debtor-Appellee Sucampo Holdings Inc., chartered in Delaware, is a wholly-owned subsidiary of Debtor Sucampo Pharmaceuticals, Inc.

60.     Debtor-Appellee Sucampo Pharma Americas LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Sucampo Holdings Inc.

61.     Debtor-Appellee Sucampo Pharmaceuticals, Inc., chartered in Delaware, is a wholly-owned subsidiary of Debtor MEH, Inc.

62.     Debtor-Appellee Therakos, Inc., chartered in Florida, is a wholly-owned subsidiary of Debtor Mallinckrodt Hospital Products Inc.

63.    Debtor-Appellee Vtesse LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Sucampo Pharmaceuticals, Inc.

64.    Debtor-Appellee WebsterGx Holdco LLC, chartered in New York, is a wholly-owned subsidiary of Debtor Mallinckrodt Enterprises Holdings, Inc.

# INTRODUCTION[2]

The appellants are First Lien Noteholders that are in the *same* position today as they were before Mallinckrodt filed for bankruptcy.  They continue to hold the same claims, against the same obligors, with the same terms and priority as before.  During the bankruptcy, the First Lien Noteholders were paid contractual interest on a current basis, and Mallinckrodt covered their fees and expenses.  Now that the bankruptcy is done, they will continue to be paid on their reinstated notes as if the bankruptcy never occurred.  Like any creditor "restored to his original position" through reinstatement, "when others receive less or get nothing at all," the First Lien Noteholders are "fortunate indeed and ha[ve] no cause to complain."  S. Rep. No. 95-989, at 120 (1978).

The First Lien Noteholders are nonetheless complaining, because their goal — rather than to be restored to their original position — is to exploit the bankruptcy to obtain a windfall.  Based *solely* on the default and acceleration

---

[2]  The opening brief of the Ad Hoc First Lien Notes Group is cited as "Ad Hoc Br."  "ECF" citations are to the docket numbers in the bankruptcy case, "A" citations are to the Appendix submitted by appellants and "SA" citations are to the Supplemental Appendix submitted with this brief.  "11/5/21 Tr." refers to the transcript of the Bankruptcy Court hearing on November 5, 2021 (ECF 5220; A2722).  Capitalized terms not defined have the meanings ascribed to them in the *Fourth Amended Joint Plan of Reorganization (With Technical Modifications) of Mallinckrodt Plc and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "Plan") [ECF 6510] or the Confirmation Order [ECF 6660].

resulting from the bankruptcy filing, and without asserting any other default, the noteholders are seeking to collect a make-whole premium of approximately $94 million, or 19% of outstanding principal, plus interest on the make-whole of at least $15 million.

The noteholders rely on Section 6.02 of the governing indenture, the "Acceleration" provision.  Section 6.02 provides that, in connection with a bankruptcy default and resulting acceleration, the "Applicable Premium" — which would otherwise be due upon an optional redemption — becomes "immediately due and payable."  That premium, by its terms, is designed to compensate holders for the *loss* of future interest following a redemption.  Here, however, unlike in cases such as *Energy Future Holdings*, there has been no redemption — and, therefore, there is no loss to "make whole."  Yet the noteholders still assert that, based on the mere fact of the bankruptcy, they should receive *not only* all the interest owed to them through maturity *but also* a premium that serves as a substitute for that same interest.

As the Bankruptcy Court held, Section 1124(2) of the Bankruptcy Code provides a clear path to avoid that punitive result.  Section 1124(2) unambiguously authorizes a debtor such as Mallinckrodt to reinstate the maturities of financial debt "notwithstanding" contractual provisions that impose accelerated payment obligations following a bankruptcy default.  It is squarely applicable to this case.

As Judge Dorsey explained:  "Section 6.02 of the First Lien Notes indenture is a contractual provision that triggers and accelerates the payment of the Applicable Premium after the occurrence of the default as a result of the bankruptcy filing. That is precisely the type of situation Section 1124(2) is intended to address; therefore, the applicable premium can be de-accelerated and paid if and when owing at a later time."  Judge Dorsey went on to conclude that, even if Section 1124(2) were "somehow ambiguous," the noteholders' construction would have to be rejected, because — "contrary to the strong public policy behind the Bankruptcy Code," as well as Congress' "stated goal" in enacting Section 1124(2) — it would allow a lender to extract a "'windfall merely by reason of the happenstance of the bankruptcy.'"  A2829-30 (11/5/21 Tr. (quoting *Butner* v. *United States*, 440 U.S. 48, 55 (1979))).

In challenging the Bankruptcy Court's well-reasoned decision, the First Lien Noteholders begin by mischaracterizing the decision, and then they change the subject.  They assert at the outset that the Bankruptcy Court's decision rested on "generalized policy" rather than a "specific statutory provision."  Ad Hoc Br. 1-2, 22-23.  Not at all.  The Court's decision was based on the specific language of Section 1124(2), along with the statute's context and purpose.  A2829-2830 (11/5/21 Tr.).  The noteholders go on to spend 11 pages addressing challenges to the make-whole that are *not based* on Section 1124(2).  Ad Hoc Br. 23-34.  But, as

noted, the Bankruptcy Court did not reach those separate challenges, because it concluded that Section 1124(2) is dispositive.  This Court likewise does not have to reach those other issues to decide this appeal.

As regards Section 1124(2), the noteholders' first and lead argument for reversal is that the statute has "*no application* to defaults under a nonexecutory debt contract."  Ad Hoc. Br. 38 (emphasis added).  Congress, their theory goes, may have intended to permit reinstatement of loan agreements without regard to any "default under an *ipso facto* or bankruptcy clause" (H.R. Rep. No. 95-595, at 408 (1977)), but the drafters — by excusing cure of defaults "of a kind specified in Section 365(b)(2)" — apparently goofed and limited the reach of the statute to executory contracts.  As discussed in Point I.A.2, the Bankruptcy Court rightly dismissed that argument as "completely meritless."  A2831 (11/5/21 Tr.).  Section 1124(2)(A) excuses from cure any *default* "of a kind specified in Section 365(b)(2)," regardless of the *contract* at issue.  To accept the noteholders' contrary position, one would have to rewrite the statutory text to reach a result that would eviscerate the statutory purpose, as it would push all non-executory loan agreements outside the statute's reach.

The noteholders' other arguments regarding Section 1124(2) fare no better. The noteholders invoke Section 1123(d) of the Bankruptcy Code, which provides that any "cure" required by statute is "determined in accordance with the

-4-

underlying agreement and applicable nonbankruptcy law."  But under Section 1124(2)(A), the default at issue here (the bankruptcy default) is expressly *excused* from cure.  For similar reasons, the noteholders cannot collect interest on the non-payable Applicable Premium.  Section 1124(2) permits the Debtors to reinstate original maturities "notwithstanding" Section 6.02's *ipso facto* acceleration language — and it exists to prevent creditors from complaining about a plan if they are restored to their "original position."  S. Rep. No. 95-989, at 120 (1978).  Requiring the Debtors to pay interest on the make-whole would give effect to the bankruptcy default rather than disregarding it, and would allow the noteholders to improve their pre-bankruptcy position in a material way.

Finally, the Bankruptcy Court correctly held that the Plan does not infringe upon the rights of First Lien Noteholders under the Second Lien Intercreditor Agreement.  The Second Lien Intercreditor Agreement explicitly *permits* the Second Lien Noteholders to receive new debt securities in a bankruptcy on account of their claims, as long as the new securities remain subject to that intercreditor agreement.  Here, the New Second Lien Notes issued under the Plan are indeed subject to the Second Lien Intercreditor Agreement.  The noteholders, accordingly, are again in the same position they occupied before the bankruptcy, and they again have no basis to complain.

## STATEMENT OF THE ISSUES

1.    Did the Bankruptcy Court err when it held that the Debtors could reinstate the First Lien Notes under Section 1124(2) of the Bankruptcy Code without paying a make-whole premium?

2.    Did the Bankruptcy Court err when it held that the transactions contemplated by the Plan did not violate the Second Lien Intercreditor Agreement?

## STATEMENT OF THE CASE[3]

### A.    Mallinckrodt's business and chapter 11 cases

Mallinckrodt is a multinational pharmaceutical company that produces, markets, and sells a wide variety of branded and generic pharmaceutical products. SA0006 (Hayes Decl.) ¶ 11.  When the Debtors filed for chapter 11, they faced headwinds associated with, among other things, litigation concerning the distribution and sale of opioid-based medications, the pricing and sale of the Acthar Gel product, and the financial impact of the COVID-19 pandemic.  Those headwinds caused Mallinckrodt to conclude that the most value-maximizing path forward was a chapter 11 filing.  SA0006-07 (Hayes Decl.) ¶ 12.

---

[3]  References to the "Hayes Declaration" are to the Declaration of Brendan Hayes filed under seal on October 26, 2021 (ECF 5001, SA1-) and publicly with redactions on November 4, 2021 (ECF 5179).  All citations are to portions of the declaration that were admitted into evidence as direct testimony and filed publicly.

On October 12, 2020 (the "Petition Date"), the Debtors filed chapter 11 cases in the Bankruptcy Court for the District of Delaware.  As of the Petition Date, the Debtors had funded debt outstanding of approximately $5.283 billion, including approximately $495 million in First Lien Notes and $323 million in Second Lien Notes.[4]

**B.      The First Lien Noteholders receive all payments owed to them.**

At the outset of the bankruptcy cases, the Debtors negotiated the terms of a Cash Collateral Order with their secured lenders, including the First Lien Noteholders.  *See* SA0017-18 (Hayes Decl. ¶ 32).  Under the Cash Collateral Order, the Debtors agreed to make current payments with respect to First Lien Notes Claims in "an amount equal to the amount comprising all accrued and unpaid interest, and fees."  *See, e.g.*, A0283, A0294 (Cash Collateral Order ¶¶ 4(d), 5(d)).  Although the First Lien Notes Indenture only requires payment of certain fees and expenses incurred by the trustee for the First Lien Notes, the Debtors agreed in the Cash Collateral Order to pay reasonable fees and expenses of the Ad Hoc Group of First Lien Noteholders in addition to those of the trustee.  A0287 (Cash Collateral Order ¶ 4(g)).

---

[4]  *See Declaration of Stephen A. Welch, Chief Transformation Officer, in Support of Chapter 11 Petitions and First Day Motions* [ECF128, A0022-23]; Plan § III.B (A3110-11).

Consistent with the Cash Collateral Order, following the Petition Date, the Debtors paid interest on the First Lien Notes to the First Lien Noteholders at the applicable contract rate, plus additional amounts including fees and expenses. SA0017-18 (Hayes Decl. ¶ 32).  Given that the $495 million in First Lien Notes carry a 10% interest rate, the First Lien Noteholders have received over $80 million in interest since the October 2020 Petition Date.

### C.      The disputed make-whole claim

The First Lien Notes are governed by an indenture dated April 7, 2020 (the "First Lien Notes Indenture").  Two of the Debtors — Mallinckrodt Internal Finance S.A. and Mallinckrodt CB LLC — are the issuers under the First Lien Notes Indenture, and other Debtors (including Mallinckrodt plc) are guarantors. Wilmington Savings Fund Society, FSB is the trustee (the "First Lien Notes Trustee") and Deutsche Bank AG New York Branch, is the first lien collateral agent.

In the chapter 11 case, the First Lien Notes Trustee filed a proof of claim asserting entitlement to "applicable premiums or payments due," in particular "amounts due . . . in respect of the Applicable Premium."  A3690 (First Lien Notes Proof of Claim).  Under the First Lien Notes Indenture, the "Applicable Premium" is defined as follows:

"<u>Applicable Premium</u>" means, with respect to any Note on any applicable redemption date, as determined by the Issuer, the greater of: . . .

(2) the excess, if any, of:

(a) the present value at such redemption date of (i) the redemption price of the Note, at April 15, 2022 (such redemption price being set forth in Paragraph 5 of the Note) *plus* (ii) all required interest payments due on the Note through April 15, 2022 (excluding accrued but unpaid interest), computed using a discount rate equal to the Treasury Rate as of such redemption date plus 50 basis points; over

(b) the then outstanding principal amount of the Note.

A1495-96 (First Lien Notes Indenture).

Accordingly, prior to April 15, 2022, the Applicable Premium would be determined in part by computing the present value of future interest payments on the relevant notes using a treasury-based discount rate.  SA0016 (Hayes Decl. ¶ 28).

Outside of bankruptcy, the Applicable Premium is due upon an "optional redemption" of the notes prior to maturity or if the noteholders accelerate following a payment default.  Specifically, under the terms of each note, the issuers can opt to redeem prior to April 15, 2022, but only "at (i) a redemption price equal to 100% of the principal amount of the Notes redeemed *plus* the Applicable Premium as of . . . the applicable redemption date."  A1619 (First Lien Notes Indenture).  The premium, accordingly — like many other make-whole provisions — is expressly presented as a "contractual substitute for interest lost on Notes

redeemed before their expected due date." *In re Energy Future Holdings Corp.*, 842 F.3d 247, 251 (3d Cir. 2016); *see also* SA0016 (Hayes Decl. ¶ 28).

In a bankruptcy situation, the noteholders' make-whole claim becomes immediately payable. Under Section 6.01(f), an Event of Default occurs if Mallinckrodt plc or a Significant Subsidiary (as defined) "commences a voluntary case" under the Bankruptcy Code. A1565 (First Lien Notes Indenture). Section 6.02, the "Acceleration" provision, then states as follows:

> SECTION 6.02.  <u>Acceleration</u>.
>
> If an Event of Default specified in Section 6.01(f) or (g) with respect to the Issuers occurs, the principal of, premium, if any, and interest on all the Notes will become immediately due and payable without any declaration or other act on the part of the First Lien Trustee or any holders. In addition, upon the acceleration of the Notes in connection with an Event of Default under Section 6.01(a), (b), (f) or (g) prior to April 15, 2024, an amount equal to the Applicable Premium or optional redemption premium, as applicable, that would have been payable in connection with an optional redemption of the Notes at the time of the occurrence of such acceleration will become and be immediately due and payable with respect to all Notes without any declaration or other act on the part of the First Lien Trustee or any holders of the Notes and shall constitute part of the Notes Obligations in view of the impracticability and difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each holder's lost profits as a result thereof.
>
> A1566 (First Lien Notes Indenture).

Under Section 6.02, therefore, several categories of obligations are accelerated when there is a bankruptcy-related Event of Default. Section 6.02 accelerates the issuers' obligation to pay the "principal of, premium, if any, and

interest on all the Notes."  It then provides that, upon the same bankruptcy-related default and acceleration, the issuers "immediately" have to pay the Applicable Premium that would otherwise have been payable in the future upon an "optional redemption" of the notes.

The First Lien Noteholders have invoked Section 6.02 to seek to recover the Applicable Premium as of the Petition Date (October 12, 2020).  Applying the formula set forth above, including the present-value calculation of future interest payments, the amount of the make-whole as of the Petition Date would have been approximately $94 million.  SA0017-18 (Hayes Decl. ¶ 31).  The First Lien Noteholders have argued that they are entitled to receive that $94 million (plus interest) *in addition* to the over $80 million in interest received during the case, even though the $94 million is in large measure a present-value calculation of that very same post-petition interest.

### D.    The Plan and Confirmation Hearing

The treatment for the First Lien Notes Claims is set forth in Section VII.J of the Plan.  The First Lien Notes were to be reinstated, provided they could be reinstated without paying the First Lien Notes Makewhole Claim.[5]  If, on the other hand, the make-whole claim had to be paid, the Debtors had the option to repay the

---

[5]  The Applicable Premium is described in the Plan as the "First Lien Notes Makewhole Claim."  *See* A3067 (Plan § 1.A).

First Lien Notes Claims in cash or to issue Cram-Down First Lien Notes (on terms set forth in the Plan).  A3110 (Plan); SA0008-09 (Hayes Decl. ¶ 15).

The Debtors' reinstatement of the First Lien Notes preserved not only the original terms of the First Lien Notes Indenture but also the terms of intercreditor agreements governing those notes.  In particular, now that the Plan is effective, the Second Lien Intercreditor Agreement continues to govern the relationship between the First Lien Notes and Mallinckrodt's second-lien debt, including the New Second Lien Notes.  *See* ECF 5088-1 at 27, 31, 94.

In connection with the Plan litigation, the parties agreed that the treatment of the First Lien Notes under the Plan, as well as objections to the claims of the First Lien Noteholders, would be briefed and argued together.  Thus, on July 30, 2022, the Debtors filed an initial brief that defended the treatment of the First Lien Notes under the Plan and separately objected to the First Lien Notes Makewhole Claim. A1317-1356.  In their brief, the Debtors contended that Section 1124(2) authorized reinstatement without a make-whole.  The Debtors also contended that, setting aside Section 1124(2), the make-whole is subject to disallowance on multiple grounds, meaning that the notes could be reinstated even if Section 1124(2) did not itself dispose of the make-whole.  On October 13, 2021, the Ad Hoc First Lien Notes Group, Columbus Hill and the First Lien Notes Trustee filed responses.  On

October 26, 2021, the Debtors and other parties filed replies in support of the Plan and claim objection.

On October 29, 2021, the Bankruptcy Court held a pretrial conference regarding the First Lien Notes litigation. At the conference, the Court informed the parties that it would hear the dispute regarding Section 1124(2) prior to "other objections to the make-whole" or "cram-down." SA0161 (10/29/2021 Tr.).

The hearing on Section 1124(2) occurred on November 5, 2021. Seventeen documents were admitted into evidence. A2729-80. The Debtors called their investment banker, Brendan Hayes of Guggenheim Securities LLC, as an expert and fact witness. Paragraphs 1 through 20 and 28 to 32, as well as Appendices C and D of Mr. Hayes' declaration (SA0003-0011, 16-18, 47-52), were admitted as direct testimony. A2729-80. Cross examination and redirect followed. A2730-51. The First Lien Noteholders did not call any witnesses. A2751.

Mr. Hayes' testimony focused on the financial purpose and effect of the make-whole provision. Mr. Hayes testified that, "from a financial and market-based perspective, makewhole provisions in indentures are generally intended to compensate holders of notes for future interest that would *not* be paid in the event the applicable notes were redeemed within a certain time period after issuance." SA0016 (Hayes Decl. ¶ 28) (emphasis added). Mr. Hayes testified further that the "Applicable Premium" in dispute, which includes a present-value calculation of

future interest, "would be commonly understood by market participants . . . to compensate holders of notes for future interest that would not be paid on such notes." *Id*.

Mr. Hayes also testified that — in light of the Debtors' continued payment of interest after the Petition Date — "if the Debtors [we]re required to pay the 'Applicable Premium' as of the Petition Date," the First Lien Noteholders would receive "*both* the contractual interest owed on the First Lien Notes during that period *and* the 'premium' intended to compensate for the loss of such interest, essentially giving the noteholders a double recovery." SA0017-18 (Hayes Decl. ¶ 32) (emphases in original). Mr. Hayes reiterated that point on redirect. A2749-50 (11/5/21 Tr.).

After Mr. Hayes' testimony and extensive argument, Judge Dorsey issued a ruling, which begins on page 105 of the hearing transcript. Judge Dorsey reviewed the elements of Section 1124(2) and concluded that the Debtors could reinstate the First Lien Notes without paying the asserted make-whole. A2827-31 (11/5/21 Tr.). Judge Dorsey also held that, contrary to the First Lien Noteholders' assertion, the Plan does not impair the noteholders' rights under governing intercreditor agreements. A2832-85. As a result of those rulings, Judge Dorsey did not consider or reach the Debtors' other challenges to the make-whole.

The Bankruptcy Court entered the Confirmation Order on March 2, 2022. A3240-3666.  The Confirmation Order states that the "findings of fact and conclusions of law set forth in the November 5, 2021 Ruling are expressly incorporated into this Confirmation Order" and that, in light of the decision on Section 1124(2), the Debtors' objections to the First Lien Notes Makewhole Claim were "otherwise moot."  A3394.

For purposes of the confirmation hearing, the Debtors were treated as having a mid-point valuation of approximately $5 billion, less than the amount of debt claims.[6]  The Plan, accordingly, does not pay unsecured creditors in full.  Rather, under the Plan, unsecured noteholders received recoveries in an estimated range of 57% to 86%, primarily in the form of new equity.[7]  As a result, there can be no dispute that any payment of a make-whole to First Lien Noteholders would prejudice and reduce the recoveries of unsecured creditors.

### E.     The Plan goes effective.

The Plan went effective yesterday, June 16, 2022.  The Reorganized Debtors currently intend to move to dismiss this appeal as moot based on the consummation of the Plan.

---

[6]  *See* A1311 (Disclosure Statement valuation with mid-point of $5.45 billion); SA0101 (Mehta Declaration ¶ 10) (reduction of valuation by 7% prior to confirmation hearing).

[7]  A0499 (Disclosure Statement).

## SUMMARY OF ARGUMENT

The Bankruptcy Court's decision should be affirmed in all respects.

*First*, the Bankruptcy Court correctly held that, under Section 1124(2) of the Bankruptcy Code, Mallinckrodt was entitled to reinstate the First Lien Notes without paying the "Applicable Premium."  Section 1124(2) permits reinstatement of a payment obligation "notwithstanding" a contractual provision — such as Section 6.02 of the indenture — that permits a noteholder to demand accelerated payment following a bankruptcy default.  Here, the Debtors met each of the requirements of Section 1124(2) and, accordingly, they were entitled to reinstate "notwithstanding" the bankruptcy-triggered make-whole obligation imposed by Section 6.02 of the First Lien Notes Indenture.  *See* Point I.A-C, *infra*.  Like the Bankruptcy Court, this Court can and should dispose of the make-whole based on Section 1124(2) alone.  The Court could also affirm on other grounds, in its discretion.  *See* Point I.D, *infra*.

*Second*, the Bankruptcy Court correctly held that the Plan does not impair the rights of the First Lien Noteholders under the Second Lien Intercreditor Agreement.  There has been no violation of the Second Lien Intercreditor Agreement, which remains in full force and effect.  *See* Point II, *infra*.

## ARGUMENT

I.   **THE BANKRUPTCY COURT CORRECTLY HELD THAT THE DEBTORS WERE ENTITLED TO REINSTATE THE FIRST LIEN NOTES WITHOUT PAYING A MAKE-WHOLE.**

This appeal requires the Court to interpret and apply Section 1124(2) of the Bankruptcy Code.  In doing so, the Court should "begin with the text of [the] provision and, if its meaning is clear, end there."  *In re Price*, 370 F.3d 362, 368 (3d Cir. 2004) (citing *Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)).  If Section 1124(2) were "susceptible to differing constructions," that "does not mean . . . the provision is therefore ambiguous."  *Id.* at 369.  Rather, when interpreting the Bankruptcy Code, courts have been directed to "take a broader, contextual view" and to "'look to the provisions of the whole law, and to its object and policy.'"  *Id.* (quoting *Kelly* v. *Robinson*, 479 U.S. 36, 43 (1986)); *accord In re Denby-Peterson*, 941 F.3d 115, 124 (3d Cir. 2019).  If the meaning of the statute "remains elusive" despite "studied examination of the statutory context," other sources may be consulted, including bankruptcy "policy and legislative history."  *In re Price*, 370 F.3d at 368.

The Bankruptcy Court followed that guidance in the decision on appeal. The Court determined that Section 1124(2), by its terms, permitted the Debtors to reinstate without the make-whole.  A2829 (11/5/21 Tr.).  The Court went on to conclude that, to the extent there were any ambiguity, the noteholders' construction

of the statute should be rejected as contrary to the statutory purpose and the "stated goal" of Section 1124(2).  A2829-30 (11/5/21 Tr.).

On appeal, the noteholders contend that the Bankruptcy Court, in construing Section 1124(2), should have resolved any uncertainties in *their* favor, based on a supposed "strong 'presumption of impairment'" in the Third Circuit.  Ad Hoc Br. 34-35, 40 (quoting *In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 203 (3d Cir. 2003)).  That is not what the case law says.  The word "strong" is not in the Third Circuit's decision.  Moreover, *PPI Enterprises* makes clear that Section 1124(2) is an "*exception* to the presumption" of impairment.  324 F.3d at 203 n.9 (emphasis added); *accord, e.g.*, *In re Madison Hotel Assocs.*, 749 F.2d 410, 419 (7th Cir. 1984) (Section 1124(2) is an "exception" to the impairment presumption).

The Bankruptcy Court's analysis and conclusions were sound and its decision should be affirmed.

### A.   Section 1124(2) permits reinstatement without paying the Applicable Premium.

Section 1124(2) provides that a class of claims is not impaired for purposes of a chapter 11 plan if the plan restores the holders of those claims to the same position they occupied prior to a bankruptcy default.  The statute states as follows:

Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan —

(2)  notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default —

(A)    cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured;

(B)    reinstates the maturity of such claim or interest as such maturity existed before such default;

(C)    compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;

(D)    if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

(E)    does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

11 U.S.C. § 1124(2)

The Third Circuit has construed Section 1124(2) and analogous provisions in several cases.  In a Chapter 13 case, the court explained that Section 1124(2) "makes it clear that the authority to cure defaults [in Section 1123] may be exercised after there has been an acceleration and stipulates that the reversal of

-19-

contractual acceleration shall not be regarded as an 'impairment' of the secured

creditor's interest sufficient to confer upon him a right to vote upon the plan." *In*

*re Roach*, 824 F.2d 1370, 1376 (3d Cir. 1987), *superseded on other grounds*, *In re*

*Connors*, 497 F.3d 314, 322 (3d Cir. 2007).  The Third Circuit later adopted that

analysis in a Chapter 11 case, agreeing with the Second Circuit that the Code

provisions allowing for the "curing or waiving of any default" have "the same

meaning in Chapters 7, 11, and 13."  *In re Deseno*, 17 F.3d 642, 643-44 (3d Cir.

1994) (quoting *In re Taddeo*, 685 F.2d 24, 28-29 (2d Cir. 1982)); *see also Sapos* v.

*Provident Inst. of Sav.*, 967 F.2d 918, 926 (3d Cir. 1992) ("the plain meaning of

'cure,' as used in § 1322(b)(2) and (5), is to remedy or rectify the default and

restore matters to the *status quo ante*"), *overruled on other grounds*, *Nobelman* v.

*Am. Sav. Bank*, 508 U.S. 324 (1993).

Although there is no necessity to resort to legislative history, the history of

Section 1124(2) is instructive.  The House Report on the Bankruptcy Code

explains that reinstatement under Section 1124(2) "consists of curing any default

(other than a default under an *ipso facto* or bankruptcy clause) and reinstatement of

the maturity of the claim or interest."  H.R. Rep. No. 95-595, at 408 (1977).

The Senate Report explains further that the "concept" underlying Section

1124(2) is that creditors are only impaired by a plan if their interests are

"materially and adversely affected thereby."  S. Rep. No. 95-989, at 120 (1978).

By contrast, when a plan restores a creditor to its pre-bankruptcy position, the

creditor has no basis to object:  "The intervention of bankruptcy and the defaults

represent a temporary crisis which the plan of reorganization is intended to clear

away.  *The holder of a claim or interest who under the plan is restored to his*

*original position, when others receive less or get nothing at all, is fortunate indeed*

*and has no cause to complain.*"  *Id.* (emphasis added) (cited and quoted by the

Third Circuit in *Roach*, 824 F.2d at 1376).

### 1.    Under Section 1124(2), reinstatement is permitted "notwithstanding" Section 6.02 of the First Lien Notes Indenture.

As noted, Section 1124(2) provides that, as long as the requirements of

subsections (A) to (E) are met, a default can be waived and a claim rendered

unimpaired "*notwithstanding*" a "contractual provision . . . that entitles the holder

of such claim . . . to demand or receive accelerated payment of such claim . . . after

the occurrence of a default."

The Bankruptcy Court correctly held that Section 6.02 of the indenture is

"precisely" that kind of contractual provision.  A2829 (11/5/21 Tr.).  The

provision, titled "Acceleration," states that — in the event of a bankruptcy default

under Section 6.01(f) — "the principal of, premium, if any, and interest on all the

Notes will become immediately due and payable."  A1566.  It then provides that,

in connection with the acceleration of the notes tied to the bankruptcy default, "an

amount equal to the Applicable Premium or optional redemption premium as applicable, that would have been payable in connection with an optional redemption of the Notes at the time of the occurrence of such acceleration will become and be immediately due and payable with respect to all Notes." *Id.*

Section 6.02 thus expressly provides for accelerated payment of three types of claims:  "principal," "interest" *and*, most relevant here, "premium."  As to the claim for a "premium," the provision states in the next sentence that the "Applicable Premium" has to be paid "immediately."

The requirement that the Applicable Premium be paid immediately permits noteholders to "demand or receive accelerated payment . . . after the occurrence of a default" — the words of Section 1124(2) — in multiple ways.  On the most basic level, Section 6.02 requires "accelerated payment" of the contractual premium itself.  Outside of bankruptcy, the Applicable Premium is owed if and when the Debtors redeem the Notes or the noteholders accelerate maturities following a payment default.  But under Section 6.02, once the issuers file for chapter 11, a default occurs and the premium becomes due and payable "*immediately*" — even if other triggering events (*e.g.*, optional redemption) have not yet occurred.  The fact that the accelerated payment is treated as "principal" (Ad Hoc Br. 8-9, 44) makes no difference:  however labeled, it is an "accelerated payment" obligation

and, as the Bankruptcy Court held, "it can be de-accelerated and paid if and when owing at a later time."  A2829 (11/5/25 Tr.).

Although the acceleration of the premium is sufficient in itself to bring Section 6.02 within the ambit of Section 1124(2), the requirement to pay the Applicable Premium is also in substance an "accelerated payment" of interest.  As the Third Circuit has recognized, and as the uncontested evidence at trial showed, the make-whole at issue here is a "contractual substitute" for "lost" interest.  *In re Energy Future Holdings Corp.*, 842 F.3d at 251.[8]  Indeed, Section 6.02 says in so many words that the Applicable Premium is a "calculation of each holder's lost profits," which in the case of a loan means future interest.  The provision thus explicitly confirms that it is intended to require "immediate" payment of profits that would otherwise be received in the future as interest.

The noteholders strain to argue that Section 6.02, and in particular the language addressing the Applicable Premium, is not a provision that permits the holder of a claim to "demand or receive accelerated payment."  Quoting *Black's Law Dictionary* (11th ed. 2019), they define "acceleration" as only "[t]he

---

[8]  *See also, e.g.*, *In re Chemtura Corp.*, 439 B.R. 561, 596 (Bankr. S.D.N.Y. 2010) ("Make-whole and no-call provisions in bond indentures protect lenders' right to the yield that was expected at the time that they made their loans . . . When a loan is redeemed before maturity or (sometimes) upon default, a make-whole provision requires a borrower to pay a premium to compensate the lender for the loss of anticipated interest. . . .").

advancing of a loan agreement's maturity date so that payment of the entire debt is due immediately."  Ad Hoc Br. 43 n.41.  Even if that were the only definition, Section 6.02 would qualify as a "provision" requiring "accelerated payment," because Section 6.02 advances the maturity date of all relevant payment obligations, including the obligation to pay the premium.  But regardless, the noteholders have quoted only the **second** definition in *Black's Law Dictionary*.  The **first** definition, which the noteholders skip over, is "the act or process of quickening or shortening the duration of something, such as payments."  Section 6.02, by its plain terms, "quickens" the payment of the Applicable Premium by making it due "immediately."[9]

Black's Law Dictionary aside, the noteholders' assertion that Section 6.02's make-whole is not an "accelerated payment" requires them to ignore the fact that, under the provision, the make-whole obligation is expressly and directly tied to "acceleration of the notes" following the occurrence of a default.  They also have to ignore the legal context of Section 6.02:  The provision, negotiated in 2019, was an attempt to make the premium "*Momentive*-proof" — *i.e.*, not susceptible to an

---

[9]  The First Lien Noteholders also quote a statement of the Third Circuit that "[a]cceleration, by definition, advances the maturity date of the debt."  *In re Energy Future Holdings Corp.*, 842 F.3d at 259.  As discussed, Section 6.02 has exactly that effect, including by taking an unmatured obligation (to pay the "Applicable Premium") and making it due "immediately."

argument, of the kind accepted by the Second Circuit in *Momentive*[10] (but not the

Third Circuit in *Energy Future Holdings*[11]) that the automatic acceleration of

maturities attendant to bankruptcy defeats a claim for a make-whole due upon an

optional redemption.  The "*Momentive*-proofing" is accomplished in Section 6.02

by incorporating the premium into the panoply of accelerated obligations.  This

may (or may not) protect noteholders when there is a post-bankruptcy redemption,

as there was in *Momentive*, but it does not provide an escape from Section 1124(2),

under which bankruptcy-triggered obligations can be reinstated without regard to

*ipso facto* clauses.

The noteholders also insist that the Debtors cannot avoid the make-whole

obligation because the default on that obligation is somehow "distinct" from the

bankruptcy default and, despite reinstatement, has to be cured.  Ad Hoc Br. 44.

That argument totally misses the point.  Section 1124(2) authorizes reinstatement

of maturities "notwithstanding" contractual provisions that require "accelerated

payment[s]" after the "occurrence of a default."  Under the statute, therefore, once

---

[10]  *In re MPM Silicones, L.L.C.*, 874 F.3d 787 (2d Cir. 2017).

[11]  In *Energy Future Holdings*, the court concluded that the governing indenture required payment of a make-whole premium following a post-bankruptcy redemption; however, the court also indicated that — had the Debtors chosen to "reinstate the accelerated Notes' original maturity date under Bankruptcy Code § 1124(2) rather than paying them off immediately" — the redemption premium would *not* have been owed.  842 F.3d at 255, 261.

there has been a "reversal of contractual acceleration," *In re Roach*, 824 F.2d at 1376, there is no obligation to make an "accelerated payment" — including, in this case, the requested make-whole payment — on the petition date.  Instead, the accelerated obligations, including the make-whole, are "de-accelerated and paid if and when owing at a later time."  A2829 (11/5/21 Tr.).

In a recent decision in the *EP Energy* case, the Bankruptcy Court for the Southern District of Texas considered the same question presented here and held that a make-whole triggered by a bankruptcy default — aside from being "inconsistent with the public policy of the country"[12] — did not have to be paid where the relevant obligations were reinstated under Section 1124(2).  The court concluded that, despite a contractual provision under which a $177 million make-whole became immediately payable upon a bankruptcy, Section 1124(2) allowed the debtor to reinstate the loan obligations as they existed right *before* the bankruptcy, when the make-whole obligation "did not exist."  The court thus held that the debtor could reinstate the "the maturity of the claim *without* the [make-

---

[12]  *In re EP Energy Corp.*, No. 19-35654 (Bankr. S.D. Tex. Mar. 6, 2020), Dkt. No. 1025; A2709.  The noteholders wrongly suggest that the decision was based solely on "public policy."  Ad Hoc Br. 32 n.39.  In fact, the court construed and applied the elements of Section 1124(2).  A2710-14.  The noteholders also point out that the *EP Energy* order was vacated.  But the vacatur had nothing to do with the merits of the ruling.  *See In re EP Energy Corp.* (Bankr. S.D. Tex. March 23, 2020), Dkt. No. 1103.

whole]" and pay any make-whole obligation if and when it may "arise again in the future" under the terms of the "fully assumed" agreement.  A2710-14.[13]

The First Lien Noteholders have not cited a single case enforcing a make-whole in the face of reinstatement.  Instead, they cite cases involving default interest.  Ad Hoc Grp. 46-47.  But, in contrast to a bankruptcy-triggered make-whole, default interest — to the extent payable under Section 506(b) — is paid over time while the loan remains outstanding.  It is not payable "immediately" on the petition date, as is the case with the Applicable Premium, and thus is not the same kind of "accelerated payment."

The default-interest cases cited by appellants are inapposite for that reason and others.  *In re 1111 Myrtle Ave. Grp., LLC*, considered whether Section 506(b) required a solvent debtor to pay default-rate interest; the decision does not even mention Section 1124(2).  598 B.R. 729 (Bankr. S.D.N.Y. 2019).[14]  Another case

---

[13]  In a recent article on make-wholes, Professor Douglas G. Baird — citing *EP Energy* — likewise observed that, where a loan is deaccelerated and reinstated under Section 1124(2), "the bankruptcy process returns the creditor to the same position it would have been in had the bankruptcy never happened," the creditor "has no claim in the bankruptcy process," including for a make-whole, and the question "whether a make-whole is disallowed" for other reasons "never arises." *Making Sense of Make-Wholes*, 94 Am. Bankr. L.J. 567, 571-72 (2020).

[14]  The portion of the court's analysis on which appellants rely was also later characterized as "concededly dicta" and rejected by another judge of the same court.  *In re 53 Stanhope LLC*, 625 B.R. 573, 594 (Bankr. S.D.N.Y. 2021).

they cite involved a pre-petition payment default rather than a bankruptcy default; as a result, Section 1124(2)'s language disregarding *ipso facto* defaults had no application.  *In re New Invs., Inc.*, 840 F.3d 1137, 1139 (9th Cir. 2016).  A third case appellants cite, which involved a "solvent" debtor and "full payment plan," acknowledged that Section 1124(2) "reverses acceleration arising out of *ipso facto* defaults," but found — consistent with the distinction above — that there was no "accelerated" payment obligation in the situation presented.  *In re John Q. Hammons Fall 2006, LLC*, 612 B.R. 779, 800, 804–05 (Bankr. D. Kan.), *as amended*, 614 B.R. 371 (Bankr. D. Kan. 2020).[15]

The noteholders, accordingly, have offered no basis to overturn the Bankruptcy Court's decision that Section 6.02's make-whole provision is "precisely" the kind of provision that is disregarded by Section 1124(2).  And to affirm that decision, there is no need to look beyond the statutory text.  Should the Court look more broadly, however, both Bankruptcy Code "policy[] and legislative history" (*In re Price*, 370 F.3d at 368-69) further support a construction of the statute that permits reinstatement without a bankruptcy-triggered make-whole.

---

[15] *Hammons* is sparsely reasoned.  In the relevant portion of the decision, the court cites and relies on a single prior case, *In re K & J Properties, Inc.*, 338 B.R. 450 (Bankr. D. Colo. 2005), which did not address an *ipso facto* default because it involved a loan that matured pre-bankruptcy.

The Supreme Court admonished long ago that creditors should not receive a "windfall merely by reason of the happenstance of bankruptcy." *Butner* v. *United States*, 440 U.S. 48, 55 (1979) (quoting *Lewis* v. *Mfrs. Nat'l Bank*, 364 U.S. 603, 609 (1961)).  Courts in this Circuit have likewise concluded, based on the Bankruptcy Code as a whole, that *ipso facto* clauses "are unenforceable as a matter of law." *In re W.R. Grace & Co.*, 475 B.R. 34, 152-53 (D. Del. 2012) (citing *Riggs Nat'l Bank of Wash.* v. *Perry*, 729 F.2d 982, 984–85 (4th Cir. 1984)); *see also In re Railway Reorganization Estate, Inc.*, 133 B.R. 578, 582-83 (Bankr. D. Del. 1991) ("Not only are such clauses expressly unenforceable, but they contravene Code policy of providing debtors with a fresh start.").  Similarly, in his recent article on make-wholes, Professor Baird observed that in bankruptcy "the legal rights of all the creditors are determined relative to one another"; thus, the debtor and a particular creditor "should not be able to dictate the treatment" of other creditors by, for example, "doubl[ing]" the creditor's claim based solely on a bankruptcy filing.  Baird, 94 Am. Bankr. L.J. at 589.

The result sought by the appealing noteholders is thoroughly at odds with the directive of the Supreme Court and other authorities.  Here, as shown at trial, Mallinckrodt has *paid* all the interest owed to the noteholders, including over $80 million in interest accrued after the Petition Date.  As the Debtors' investment banker testified, if the noteholders were awarded a $94 million make-whole, in

-29-

addition to all that interest, they would receive "essentially a double recovery," because they would receive *both* "the present value of future interest payments," in the form of the make-whole, *and* the "future interest payments" themselves. A2749-50 (11/5/21 Tr.).  In that case, they would recover dramatically *more* in bankruptcy than they would outside bankruptcy.

That result is also at odds with Congress's stated purpose in enacting Section 1124(2).  Regardless of whether every *ipso facto* clause is unenforceable in every context, there is no question that the enactors of Section 1124(2) intended for *ipso facto* acceleration clauses to be set aside.  *See* H.R. Rep. No. 95-595, at 408 (1977) (statute disregards "default[s] under an *ipso facto* or bankruptcy clause"); S. Rep. No. 95-989, at 120 (1978) (creditors are unimpaired under Section 1124(2) if they are restored to their "original position" before the "intervention of bankruptcy"). That legislative history reinforces the statute's express treatment of *ipso facto* acceleration clauses.

### 2.    Subsections (A)-(E) of Section 1124(2) do not require payment of the Applicable Premium.

As shown in the prior section, the First Lien Notes can be reinstated under Section 1124(2) "notwithstanding" Section 6.02 of the First Lien Notes Indenture. Accordingly, the remaining question is whether the make-whole premium has to be paid to satisfy the requirements of subsections (A) to (E) of Section 1124(2).  The Bankruptcy Court correctly held that the answer is "no."

### a.    *Section 1124(2)(A)*

Section 1124(2)(A) requires that the debtor cure the default that gave rise to an accelerated payment obligation, "other than a default of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured."  11 U.S.C. §1124(2)(A).

Section 365(b)(2)(B) states that, in the context of assumption of an executory contract, no cure is required with respect to "a default that is a breach of a provision relating to . . . the commencement of a case under this title."  11 U.S.C. § 365(b)(2)(B).  Here, the default giving rise to the make-whole obligation is self-evidently a breach of a provision relating to commencement of a chapter 11 case. Under Section 6.01(f) of the indenture, the filing of a voluntary chapter 11 case was a default; and under Section 6.02, that default resulted in the obligation to pay the make-whole "immediately."  The default, therefore, is "a default of a kind specified in section 365(b)(2)" and "of a kind that section 365(b)(2) expressly does not require to be cured."

The First Lien Noteholders assert — indeed, their *lead argument* for reversal of the Bankruptcy Court's Section 1124(2) decision (Ad Hoc Br. 38-41) — is that the bankruptcy default in this case has to be cured because the First Lien Notes Indenture is not an executory contract, and therefore the bankruptcy default is not "of a kind specified in section 365(b)(2)."  That argument, as Judge Dorsey

concluded, is "completely meritless."  A2831 (11/5/21 Tr.).  Section 1124(2)(A) "merely incorporates the definition in Section 365(b)(2) of the types of defaults that do not need to be cured, *i.e.*, a bankruptcy filing.  It does not in any way incorporate the requirement in Section 365 that would apply only to executory contracts." *Id*.

Stated differently, Section 1124 on its face addresses *classes of claims* — not contracts.  Section 1124(2) in particular addresses a "kind" of default, namely *ipso facto* defaults, not a "kind" of contract.  The statute's reach is in no way limited to executory contracts.

Section 1110(a) offers a useful analogy.  That provision, mirroring Section 1124(2), preserves the automatic stay in the context of aircraft financing as long as the debtor cures "any default, other than a default *of a kind* specified in section 365(b)(2), under [an applicable] security agreement, lease, or conditional sale contract."  The statute's reference to a "kind" of default specified in section 365(b)(2), and then its recognition that the "kind" of default specified in section 365(b)(2) can occur under a "security agreement" (whether executory or not), shows that the "kind" of default referenced in section 365(b)(2) can occur under any kind of contract.

Section 1141(d)(6) similarly provides an analog.  That section provides that "the confirmation of a plan does not discharge a debtor *that is a corporation* from

any debt (A) of a kind specified in paragraph (2)(A) or (2)(B) of section 523(a) that is owed to a domestic governmental unit. . . ." 11 U.S.C. § 1141(d)(6)(A) (emphasis added).  But the discharge exceptions in section 523(a) on their face apply only to "an individual debtor" – *not* corporations.  If the noteholders' approach to "of a kind" were adopted, Section 1141(d)(6)(A) would be nugatory.

Although the text is clear on its own, any attention to context reveals the absurdity of appellants' position on Section 1124(2)(A).  The import of their position that *ipso facto* defaults have to be cured unless they are in executory contracts is that — to quote the noteholders' own brief — Section 1124(2) has "*no application* to defaults under a nonexecutory debt contract."  Ad Hoc. Br. 38 (emphasis added); *accord id*. at 2.  That makes no sense.  Section 365 of the Bankruptcy Code governs all matters relating to executory contracts.  If Section 1124(2) were only applicable to executory contracts, as appellants assert, the statute would serve *no purpose*, because Section 365 already establishes the rules for assumption (including excuses from cure) and rejection (which is inconsistent with unimpairment in any event).

It is quite clear, however, that Section 1124(2) was not enacted to displace Section 365 — but instead was intended to protect the rights of debtors under *loan agreements*.  "Section 1124(2) promotes the economic efficiency of reorganization by allowing the Chapter 11 debtor to reinstate the original terms of an accelerated

long-term loan" when the debtor believes those terms, including a "lower interest rate," are worth preserving.  *In re Madison Hotel Assocs.*, 749 F.2d at 420-21; *accord In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1404-05 (5th Cir. 1986), *reinstated on reh'g*, 808 F.2d 363 (1987) (en banc), *aff'd*, 484 U.S. 365 (1988).

Many other sources confirm that, under Section 1124(2), a debtor does not need to cure an *ipso facto* default, regardless of the kind of contract involved.  The House Report on the Bankruptcy Code states, without qualification, that "[r]einstatement consists of curing any default (**other than a default under an ipso facto or bankruptcy clause**) and reinstatement of the maturity of the claim or interest."  H.R. Rep. No. 95-595, at 408 (1977) (emphasis added).  The leading bankruptcy treatise says the same thing:  Section 1124(2) "expressly does not require cure" of defaults based on "the commencement of a case under title 11," and "the filing of a case under title 11 **never**" has to "be cured."  7 Collier on Bankruptcy ¶ 1124.04[2] (16th ed. 2021) (emphasis added); *see also In re Charter Commc'ns*, 419 B.R. 221, 250-51 (Bankr. S.D.N.Y. 2009) (bankruptcy defaults in credit agreements "need not be cured under Bankruptcy Code section 1124").

The First Lien Noteholders try — but fail — to find statutory provisions or cases that support their distorted reading of Section 1124(2)(A).  Their block quote from a footnote in *In re Bartomeli*, 303 B.R. 254, 270 n.24 (Bankr. D. Conn. 2004)

(Ad Hoc Br. 39-40), merely states, generically and unremarkably, that the phrase "of a kind" captures "the elements or characteristics specified in another section of the Bankruptcy Code and makes the incorporated provision a condition for satisfaction of the section making the reference." Here, the elements and characteristics of the *defaults* specified in the text of Section 365(b)(2) are *not* dependent on the contracts at issue being executory.

The appellants' comparison of Section 1124(2) to Section 1192(2), based on *In re Satellite Restaurants Inc. Crabcake Factory USA*, 626 B.R. 871 (Bankr. D. Md. 2021), also misses the mark. Section 1192(2), added as part of the Small Business Reorganization Act, provides that a small-business debtor — individual or corporation — is not discharged from debts "of the kind specified in section 523(a) of this title." Section 523(a) was also amended to provide that "[a] discharge under section . . . 1192 . . . does not discharge an individual debtor from any debt" described in the following sections. The core holding of *Crabcake* was that "the reference to Section 1192 added to Section 523(a) by the SBRA must be given meaning, and the only reasonable meaning is that Congress intended to continue to limit application of the Section 523(a) exceptions in a Subchapter V case to individuals." *Crabcake*, 626 B.R. at 876. Absent that cross-reference, the court concluded that it "may very well have been correct that Section 1192,

standing on its own, would have resulted in the discharge exceptions applying to all debtors, individual or non-individual." *Id.*

Finally, the default-interest cases cited by the noteholders do not support their misreading of Section 1124(2)(A). *See* Ad Hoc Br. 38-39. In the first case they cite — *In re Moody Nat'l SHS Houston H, LLC*, 426 B.R. 667 (Bankr. S.D. Tex. 2010) — the court concluded that, to reinstate a loan, a debtor had to pay default interest resulting from a *pre-petition* payment default, which is not excused from cure under Section 1124(2)(A). 426 B.R. at 673-74. In a subsequent decision, the same judge (Judge Isgur) concluded that a *bankruptcy* default "probably would" be excused from cure, even in a non-executory contract, and that a bankruptcy default can in any event be cured by effectuating a plan. A2711 (*EP Energy*). The second case — *In re General Growth Props., Inc.*, 451 B.R. 323 (Bankr. S.D.N.Y. 2011) — does not address the "of a kind" language in Section 1124(2)(A); instead, the court awarded default interest based on "binding authority" from the Second Circuit requiring a "highly solvent" debtor to pay interest at the full contract rate. *Id.* at 327-31 & n.14. The third case, *In re A & B Assocs., L.P.*, 2019 WL 1470892 (Bankr. S.D. Ga. Mar. 29, 2019), does not discuss Section 1124(2). *Id.* at *46-47.

The Bankruptcy Court thus correctly held, based on Section 1124(2)(A), that Mallinckrodt's *ipso facto* default did not need to be cured.

### b.   *Section 1124(2)(B)*

Section 1124(2)(B) requires the Plan to "reinstate[] the maturity of" any accelerated claim "as such maturity existed before" the default requiring accelerated payment.  Here, under the Plan, the original, pre-bankruptcy maturities of the First Lien Note Claims (including the claim for the "Applicable Premium") have been reinstated.  The First Lien Noteholders did not contest below, and they do not contest on appeal, that this element has been met.

### c.   *Sections 1124(2)(C) and (D)*[16]

Section 1124(2)(C) requires the Plan to "compensate[] the holder of" a claim "for any damages incurred as a result of any reasonable reliance by such holder" on the "contractual provision" that accelerated the debtor's payment obligation.

As the Bankruptcy Court observed, the First Lien Noteholders — in their multiple submissions below — failed to claim, let alone demonstrate, "that they have any uncompensated damages." A2831 (11/5/21 Tr. 15:16).  In the briefing below, the noteholders asserted that Section 1124(2) requires "compensation for a creditor's attorney's fees,"[17] but did not dispute that their attorneys' fees *had been paid*.  The noteholders also purported to "reserve[] the right"[18] to prove damages

---

[16]  No one has argued that the Debtors did not satisfy Section 1124(2)(D).

[17]  ECF 4725-1 ¶ 48.

[18]  ECF 4725-1 ¶ 49.

based on other potential theories, but their plan objection *did not argue* that any of those theories were valid.  Finally, despite having every opportunity to do so, the noteholders did not present any evidence at trial to support a damages claim.  They did not call any witnesses, nor did they present other evidence of damages.

Thus, contrary to the noteholders' assertion, the Bankruptcy Court did not "overlook" an argument that the First Lien Noteholders were owed reliance damages.  Ad Hoc Br. 50.  The noteholders had the opportunity — in their proof of claim, in briefing and at the confirmation trial — to assert and prove up a damages theory.  They did not do so.

### d. *Section 1124(2)(E)*

Section 1124(2)(E) requires that the Plan not "*otherwise* alter the legal, equitable, or contractual rights" of a claimant.  Here, for all the reasons discussed, Section 1124(2) authorized the Debtors to reinstate the original maturities of the First Lien Notes without paying a make-whole.  Thus, the non-payment of the make-whole does not implicate Section 1124(2)(E).  Point II, *infra*, addresses the noteholders' additional argument that provisions of the Plan not relating to the make-whole otherwise altered the rights of the First Lien Noteholders under the Second Lien Intercreditor Agreement.

**B.     Section 1123(d) does not require payment of the Applicable Premium.**

The First Lien Noteholders argue that Section 1123(d) of the Bankruptcy Code requires payment of the make-whole.  Section 1123(d) states that, "*if it is proposed in a plan to cure a default* the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."  11 U.S.C. § 1123(d) (emphasis added).

The simple answer to this argument is that the Plan did *not* "propose" to cure the defaults the noteholders are complaining about, because — as the Bankruptcy Court held — Section 1124(2) does not require those defaults to be cured.  Rather, as discussed, Section 1124(2) excused Mallinckrodt from curing the *ipso facto* default, and also permitted Mallinckrodt to reinstate (and un-impair) the noteholders without paying the Applicable Premium.  That premium has now been "de-accelerated" and can be "paid if and when owing at a later time."  A2829 (11/5/21 Tr.).  Section 1123(d) is therefore beside the point.[19]

---

[19]  The cases cited by the noteholders on Section 1123(d) again involve pre-petition payment defaults, and thus have no bearing on whether Mallinckrodt had to cure a bankruptcy default and satisfy a bankruptcy-triggered payment obligation.  *See In re Sagamore Partners, Ltd.*, 620 F. App'x 864, 867 (11th Cir. 2015) (pre-bankruptcy payment default); *In re 1 Ashbury Ct. Partners, L.L.C.*, 2011 WL 4712010, at *1-2 (Bankr. D. Kan. Oct. 5, 2011) (pre-bankruptcy payment default).

C.      **Section 1124(2) permits reinstatement without paying interest on the Applicable Premium.**

As a backup argument, the First Lien Noteholders contend that the Debtors should "at a minimum" pay interest on the Applicable Premium for the period between the Petition Date and the Plan's Effective Date.  Ad Hoc Br. at 51.

As a threshold matter, in arguing that the Bankruptcy Court "overlooked" their interest theory (Ad Hoc Br. 52), the noteholders deflect attention from the fact that they failed to present the theory in a clear way.  The proof of claim, as filed by the First Lien Note Trustee, contained no specific reference to interest on the Applicable Premium.  A3689-90 (Proof of Claim).  Since the trustee did not assert such a claim for interest, the Debtors' claim objection had no reason to address that non-asserted claim.  The idea of interest on the make-whole was first raised in a brief filed by the Ad Hoc First Lien Notes Group.  A1383-84.  But there was no amendment to the proof of claim or explanation that certain noteholders were seeking a recovery beyond what their trustee had sought.

In any event, the noteholders' theory for recovering interest on the make-whole is at odds with Section 1124(2), as that statute was correctly interpreted by the Bankruptcy Court.  Under Section 1124(2), reinstatement is permitted "notwithstanding" a "provision" that accelerates obligations.  The word "notwithstanding" has a settled meaning:  it "means 'in spite of' or 'without prevention or obstruction from or by.'" *In re Goody's Family Clothing Inc.*, 610

-40-

F.3d 812, 817 (3d Cir. 2010) (quoting *Webster's Third New Int'l Dictionary* 1545 (1971)); *see also In re Tribune Co.*, 972 F.3d 228, 238 (3d Cir. 2020) (for one clause to have effect "notwithstanding" another, the first clause "overrides" the second).

Here, although Section 6.02 purports to require immediate payment of the make-whole due to the bankruptcy, Section 1124(2) overrides that provision and permits reinstatement in spite of that provision.  In addition, in this context — where cure of the *ipso facto* default was excused — Section 1123(a)(5)(G) allowed Mallinckrodt to "waive" that default as an alternative to cure.  Requiring the Debtors to pay interest on the make-whole, rather than overriding the make-whole obligation — and rather than effectuating a "waiver" of the underlying *ipso facto* default — would give effect to the make-whole obligation and to the *ipso facto* default that the statute disregards.

Case law in this Circuit further undermines the noteholders' claim for interest on the make-whole.  The Third Circuit, when it has construed Section 1124 or Chapter 13 equivalents, has agreed that the power to cure, or to waive and excuse, defaults is a power to "restore[s] matters to the *status quo ante*."  *Sapos*, 967 F.2d at 926 (quoting *In re Clark*, 738 F.2d 869, 872 (7th Cir. 1984), and citing

*In re Taddeo*, 685 F.2d at 26-27).[20]  In addition, in a case directly on point, *In re Onco Investment Company*, the bankruptcy court rejected an argument by senior creditors that a make-whole that would have been owed to them but for reinstatement should be paid to them by junior creditors.  The court explained that, where a default is cured or cure is excused, "[t]he consequences [of the default] are thus nullified."  *In re Onco Inv. Co.*, 316 B.R. 163, 167 (Bankr. D. Del. 2004) (quoting *In re Taddeo*, 685 F.2d at 26-27).  The Bankruptcy Court, in the decision on appeal, reached the same conclusion:  Section 1124(2) "rolls back the clock to the time before the asserted default."  A2830 (11/5/21 Tr.).

Here, if the Debtors were required to pay interest on a bankruptcy-triggered make-whole, the consequences of the bankruptcy default would *not* be "nullified" (*In re Onco Inv.*, 316 B.R. at 167) and the parties would *not* be restored to the "status quo ante" (*Sapos*, 967 F.2d at 926).  Instead, the bankruptcy default would be given effect, to the detriment of the Debtors.

Section 1124(2)'s legislative history provides additional support for rejecting the interest theory.  As stated in the Senate Report on Section 1124(2), the statute exists to prevent creditors from objecting to a plan that restores them to

---

[20]  *See also In re DeSeno*, 17 F.3d at 643-44 (concluding that Section 1123(a)(5)(G), which contemplates "curing or waiving of any default," is "parallel" to Section 1322(b)(5)); *In re Roach*, 824 F.2d at 1376 (Section 1124(2) effects a "reversal of contractual acceleration").

their "original position," and it is intended to prevent creditors from improving

their position based on the "intervention of bankruptcy."  S. Rep. No. 95-989, at

120 (1978).  Here, by demanding interest on a bankruptcy-triggered make-whole,

the noteholders are emphatically seeking to *improve* their "original position" based

*solely* on the "intervention of bankruptcy."

In seeking interest on the make-whole, the noteholders again rely on cases

involving default interest.  But again, most of their cases involve *pre*-petition

payment defaults, which are not excused from cure under Section 1124(2)(A).[21]

Other cases do not discuss (or even mention) Section 1124(2).[22]  The remaining

cases involve rare situations involving "highly solvent" debtors and do not in any

way address interest on a make-whole.[23]

Section 1124(2) thus precludes any claim for interest on the bankruptcy-

triggered — and now de-accelerated — make-whole premium.  But even if that

were not the case, that claim for interest could be swiftly rejected (by this Court or

---

[21]  *In re New Invs., Inc.*, 840 F.3d at 1139 (pre-bankruptcy payment default); *In re Sagamore Partners, Ltd.*, 620 F. App'x at 867 (pre-bankruptcy payment default); *In re Moshe*, 567 B.R. 438, 441 (Bankr. E.D.N.Y. 2017) (pre-bankruptcy payment default); *In re 139-141 Owners Corp.*, 306 B.R. 764, 765-66 (Bankr. S.D.N.Y. 2004) (pre-bankruptcy payment default; solvent debtor); *In re Carpenter*, 331 B.R. 529, 534 (Bankr. D. Conn. 2005) (pre-bankruptcy default in chapter 13 case).

[22] *In re 1111 Myrtle Ave. Grp., LLC*, 598 B.R. 729; *In re Carpenter*, 331 B.R. 529.

[23]  *In re General Growth Props.*, 451 B.R. at 331; *In re John Q. Hammons Fall 2006, LLC*, 612 B.R. at 804–05.

-43-

the Bankruptcy Court).[24]  Section 502(b)(2) generally disallows claims for post-

petition interest.  And while Section 506(b) allows a holder of a secured claim to

receive "interest on such claim," subject to the Court's discretion, there are

multiple bases not to allow interest on the make-whole under Section 506(b).  First,

the fact that the interest (like the make-whole) is payable *solely* as a result of the

bankruptcy default is itself a basis not to award that interest under Section 506(b).[25]

Second, given that the make-whole is a "contractual substitute" for interest, *Energy*

*Future Holdings*, 842 F.3d at 251, the interest owed on the make-whole is a species

of interest on interest, another reason it should not be paid in an insolvent case.[26]

Beyond all that, as discussed repeatedly, the make-whole in this particular case

would duplicate interest that has been and will be *paid*.  Section 506(b) does not

---

[24]  This Court has the discretion to "affirm on any ground supported by the record."
*Laurel Gardens, LLC* v. *McKenna*, 948 F.3d 105, 116 (3d Cir. 2020); *accord, e.g.*,
*Jennings* v. *Stephens*, 574 U.S. 271, 276 (2015).

[25]  *See, e.g.*, *In re 53 Stanhope LLC*, 625 B.R. at 583 (declining, under Section
506(b), to award interest owed solely as a result of a bankruptcy default); *In re*
*Residential Cap., LLC*, 508 B.R. at 862 (same).

[26]  *See Vanston Bondholders Protective Committee* v. *Green*, 329 U.S. 156 (1946)
(where junior creditors were not paid in full, "an allowance of interest on interest"
is not "in accord with the equitable principles governing bankruptcy
distributions."); *Urban Communicators PCS Ltd. P'ship* v. *Gabriel Capital, L.P.*,
394 B.R. 325, 340 (S.D.N.Y. 2008) (allowing interest on interest "to the point that
it would not prejudice subordinate creditors (i.e. solvency), but no further"); *cf. In*
*re Washington Mutual, Inc.*, 461 B.R. 200, 246-47 (Bankr. D. Del. 2011) (citing
*Vanston* as good law); *In re Timberline Prop. Development, Inc.*, 136 B.R. 382,
386 (Bankr. D.N.J. 1992) (same).

-44-

permit recovery of interest on an amount that is itself duplicative and unconnected to any damages suffered.  *See* pp. 51-56*, infra.*

### D.    The Bankruptcy Court did not reach, and this Court does not need to reach, other objections to the make-whole.

The Bankruptcy Court's decision on the make-whole can and should be affirmed without going beyond the prior sections.  As noted, the Bankruptcy Court decided the make-whole issue based on its construction of Section 1124(2), without reaching other issues. A2827-31 (11/5/25 Tr.).  This Court should likewise begin and end its analysis with Section 1124(2).  There is no need to consider the arguments in Point I.A of the appellants' brief (pages 23-34) —  which focus on grounds *other than* Section 1124(2) to disregard or disallow the make-whole.

Nonetheless, under Third Circuit law, the Court has discretion to affirm the Bankruptcy Court's decision — and to conclude that the make-whole does not need to be paid as a condition to reinstatement — on any ground in the record.[27] Thus, if the Court does not agree with the Bankruptcy Court that Section 1124(2) is dispositive, it could remand to the Bankruptcy Court to address Mallinckrodt's other challenges to the make-whole, or it could consider those issues and affirm on an alternative ground, including that the make-whole is (a) unenforceable under

---

[27]  *See supra* note 24.

Sections 541(c) and 363(*l*) of the Bankruptcy Code, or (b) not a valid secured

claim under Section 506(b) and not allowable under Section 502(b).

> **1.      Under Sections 541(c) and 363(*l*) of the Bankruptcy Code, as well as applicable case law, the make-whole is an impermissible *ipso facto* clause.**

The noteholders' make-whole claim, to the extent predicated on the Debtors'

bankruptcy filing, is unenforceable under Sections 541(c) and 363(*l*) of the

Bankruptcy Code.  Section 541(c) ensures that property comes into the estate,

notwithstanding any *ipso facto* clause that would otherwise prevent it from doing

so.  It provides that:

> an interest of the debtor in property becomes property of the estate under [Section 541(a)(1)] . . . notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law . . . that is conditioned on . . . the commencement of a case under this title . . . and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

> 11 U.S.C. § 541(c)(1)(B).

Once property is in the estate, Section 363(*l*) precludes the operation of a

contractual *ipso facto* clause that would interfere with a plan providing for the use,

sale, or lease of that property:

> a plan under chapter 11, 12 or 13 of this title may provide for the use, sale, or lease of property. . . notwithstanding any provision in a contract . . . that is conditioned . . . on the commencement of a case under this title concerning the debtor . . . and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property.

> 11 U.S.C. § 363(*l*).

Those provisions apply to prevent enforcement of the bankruptcy-triggered make-whole.  "[P]roperty of the estate includes contract rights."  *In re EBC I, Inc.*, 356 B.R. 631, 639 (Bankr. D. Del. 2006); *accord, e.g.*, *Westmoreland Human Opportunities, Inc.* v. *Walsh*, 246 F.3d 233, 242 (3d Cir. 2001).  Here, prior to filing, the Debtors, as long as they were paying interest when due, had the contractual right to defer payment of any make-whole until they opted to redeem. Section 6.02 of the First Lien Notes Indenture — if applied to require immediate payment of the make-whole, upon the filing of a bankruptcy and absent a redemption — would modify those rights based on "the commencement of a case under this title" (§ 541(c)(1)(B)).  The provision would also modify the Debtors' "interest" in property, because the noteholders' secured claim would increase by the amount of the make-whole and the Debtors would, as a result, have a diminished interest in their unencumbered assets.  Those results cannot be squared with Section 541(c).[28]

---

[28] The noteholders do not cite any cases construing Section 541(c).  Instead, they quote an article stating that the provision does not purport to cover "any contractual provision that negatively impacts a debtor as a result of a bankruptcy filing."  Ad Hoc Br. 30 (quoting Emil A. Kleinhaus & Peter B. Zuckerman, *The Enforceability of Ipso Facto Clauses in Financing Agreements: American Airlines and Beyond*, 23 Norton J. of Bankr. Law & Prac., 193, 197 (2014)).  But the quotation is selective and incomplete.  The very next sentence of the article says that the "key question" is the effect of a provision on a debtor's "interests in property," and the article goes on to conclude that, while the issue is "not entirely clear," there is a "basis to argue" that make-whole provisions "modify" property interests insofar as they "generate larger claims against the debtors' property" as a

Section 363(*l*) permits a debtor to "use" its property in a chapter 11 plan without regard to a "provision" that modifies those rights based on the filing of the case.  Here, the noteholders assert that, as a result of an *ipso facto* clause, the Debtors lost their equity in at least $94 million of their property.  That $94 million, according to the noteholders, could no longer be "used" to fund a chapter 11 plan.

In an analogous case, a bankruptcy court in this District held that Section 363(*l*) did not allow a creditor to benefit from a "springing lien" that was supposed to come into effect upon the debtor's filing.  The court held that enforcement of the "springing lien" on the basis of an *ipso facto* clause amounted to depriving the estate of an interest in property.  *In re Railway Reorganization Estate, Inc.*, 133 B.R. at 583.  Here, imposing a make-whole based on Section 6.02 of the First Lien Notes Indenture would have the same effect as a springing lien:  a greater proportion of the Debtors' asset base would be encumbered, solely because of the bankruptcy filing.

Section 363(*l*), and the logic of *Railway*, have also been applied to *ipso facto* clauses that require a debtor to pay additional amounts upon a debtor's bankruptcy filing.  Specifically, in *In re Chedick*, the court held that a fee payable to a lender upon a debtor's filing was unenforceable under Section 363(*l*), because the clause

---

result of a bankruptcy.  *See* pp. 197-98 (citing *In re Lehman Bros. Holdings Inc.*, 422 B.R. 407, 415–16, 422 (Bankr. S.D.N.Y. 2010)).

effected a "modification of the debtor's interest in property" that interfered with the trustee's ability to use the property.  *In re Chedick*, 1996 WL 762329, at *3 (Bankr. D.D.C. Mar. 22, 1996).  Here again, as in *Chedick*, the noteholders seek to recover more from the Debtors based solely on the Debtors' bankruptcy filing.[29]

Although Section 541(c)(1)(B) and Section 363(*l*) are applicable here, courts in this Circuit have also recognized an overriding statutory policy against *ipso facto* clauses.  Specifically, in *W.R. Grace*, the District Court declined to enforce an *ipso facto* provision in an unsecured loan document, holding that "*ipso facto* clauses are unenforceable as a matter of law under the Bankruptcy Code."  *In re W.R. Grace*, 475 B.R. at 152.  Although the noteholders criticize *W.R. Grace* (Ad Hoc Br. 32 n.39), the decision is consistent with numerous others,[30] and the Third

---

[29]  The noteholders ignore *Railway* and *Chedick* and do not cite any other cases addressing Section 363(*l*).  While they cite an article stating that the language of Section 363(*l*) "does not speak to creditor recoveries or the claims allowance process" (Ad Hoc Br. 31), they again excise the sentences that follow, which quote from *Railway* and *Chedick* and explain that Section 363(*l*) has been applied by courts to *ipso facto* provisions, like the one here, that increase the quantum of "property that [is] otherwise unencumbered."  Kleinhaus & Zuckerman at 198.

[30]  *See, e.g.*, *In re Jones*, 591 F.3d 308, 312 (4th Cir. 2010) ("general rule" that an *ipso facto* clause "is unenforceable as a matter of law");  *In re McCoy*, 2016 WL 4268702, at *19 (Bankr. E.D. Va. Aug. 11, 2016) (*ipso facto* clauses "inconsistent not only with the text of the Bankruptcy Code but also with the Code's intent and central purpose"); *In re Payless Cashways, Inc.*, 287 B.R. 482, 488 (Bankr. W.D. Mo. 2002) (refusing to enforce *ipso facto* clause in loan agreement); *Railway Reorganization*, 133 B.R. at 582-83 (*ipso facto* clauses "contravene Code policy of providing debtors with a fresh start"); *General Motors Acceptance Corp.* v. *Rose (Matter of Rose)*, 21 B.R. 272, 276 (Bankr. D.N.J. 1982) ("there is simply no

---

Circuit has itself articulated much the same rule:  "The Code . . . prevents enforcement of so-called *ipso facto* clauses that trigger a default upon a bankruptcy filing or upon 'events or conditions that are likely to occur or exist around the time that a case is commenced.'"  *In re Rickel Home Centers, Inc.*, 209 F.3d 291, 298 (3d Cir. 2000) (quoting 3 *Collier on Bankruptcy* ¶ 365.05[4] (15th ed. 1999)).[31]

The noteholders also invoke the Second Circuit's decision in *In re AMR Corp.*, 730 F.3d 88 (2d Cir. 2013) (Ad Hoc Br. 31), in which the court enforced an *ipso facto* acceleration provision that expressly *deprived* lenders of a make-whole. But they omit the most salient point:  the *ipso facto* clause in *AMR* was not enforced against the debtor.  The relevant Code provisions and policies guard against contracts that would modify the *debtor*'s rights; nothing prevents a *creditor* from agreeing to forfeit rights upon an obligor's bankruptcy.  Notably, in *AMR*, the Second Circuit also affirmed the Bankruptcy Court's decision preventing the lenders from serving a de-acceleration notice that would "have the effect of assessing the Debtors with a Make-Whole not currently owed."  *In re AMR Corp.*,

---

reason to assume that Congress intended to make [*ipso facto*] clauses enforceable only in non-executory contracts").

[31]  Although the discussion in *Rickel* was in the context of Section 365, the decision states a general rule against *ipso facto* clauses, and it presents the specific rule in Section 365(e)(1) as an illustration of the general rule.  209 F.3d at 298 (stating the general rule and then explaining that, "[t]o that end," Section 365(e)(1) invalidates *ipso facto* clauses in executory contracts).

485 B.R. 279, 294 (Bankr. S.D.N.Y. 2013).  The court "agree[d] with the

bankruptcy court that any attempt . . .  to rescind acceleration now . . . is an effort

to affect American's contract rights, and thus the property of the estate."  730 F.3d

at 102-03.  Under that same logic — namely, that contractual rights to defer or

avoid a make-whole are estate property that cannot be affected — Sections

541(c)(1)(B) and 363(*l*) should apply to prevent the First Lien Noteholders from

invoking the *ipso facto* default to affect the Debtors' rights here.

**2.     The make-whole is punitive and unreasonable.**

Section 506(b) of the Bankruptcy Code permits over-secured creditors to

recover "reasonable" charges, costs and fees, as well "interest" on their claim

(subject to the Court's equitable discretion).  Here, however the asserted make-

whole is characterized, it should not be payable.  It is patently *un*reasonable — and

punitive — to charge a debtor a 19% penalty (plus interest) for filing a chapter 11

case.  It is equally *un*reasonable — and punitive — for an oversecured creditor to

collect a make-whole as of the Petition Date, based on a formula that computes lost

future interest, while also collecting that very same future interest (in this case,

more than $80 million post-petition).

The case law on Section 506(b) provides several bases not to enforce this

make-whole.  First, in similar circumstances, where the debtor's only default is the

bankruptcy filing, multiple courts have declined to impose default interest under

-51-

Section 506(b).  *In re 53 Stanhope LLC*, 625 B.R. 573, 583 (Bankr. S.D.N.Y. 2021); *In re Residential Cap., LLC*, 508 B.R. 851, 862 (Bankr. S.D.N.Y. 2014); *cf. In re W.R. Grace*, 475 B.R. at 152 (declining to impose default interest on an unsecured loan based on a bankruptcy default).  Under the same logic, the Court should not impose a make-whole obligation based solely on a bankruptcy default.

Section 506(b), moreover, applies a *federal* reasonableness standard to make-wholes that arise on or after the petition date.  Under that standard, "[o]nly a prepayment charge formula which reasonably measures actual damages will be respected under [section] 506(b)."  *In re Duralite Truck Body & Container Corp.*, 153 B.R. 708, 714 (Bankr. D. Md. 1993); *accord, e.g.*, *In re Amigo PAT Texas, LLC*, 579 B.R. 779, 783 (Bankr. S.D. Tex. 2017); *In re Kroh Bros. Dev. Co.*, 88 B.R. 997, 1001 (Bankr. W.D. Mo. 1988).

As Professor Baird has observed, make-whole provisions such as the one at issue — which "award[] the lender the difference between the contract rate" and "something close to the risk-free rate" — are "over-compensatory," even in the context of a redemption, because they put the lender in a *better* position than it occupied after it made the loan.[32]  The lender gets to "take the principal, invest it at the risk-free rate, and still enjoy the same return that the borrower promised, but

---

[32]  Baird, 94 Am. Bankr. L.J. at 582.

without running any of the risks associated with lending."[33]   In this case, however, the Court does not have to reach the question of whether the provision would be unreasonable in the context of a redemption, because *there has been no redemption*.  The First Lien Noteholders have received all the interest and other amounts owed to them.  In contravention of Section 506(b), they are trying to collect a make-whole without having been deprived of a favorable interest rate or suffering *any* actual damages.

In the Bankruptcy Court, the First Lien Noteholders argued that, if the make-whole were not enforced as a secured claim under Section 506(b), it should still be allowed as an unsecured claim under Section 502(b).  But the make-whole is objectionable under Section 502(b) as well.

Section 502(b)(1) provides for disallowance of a claim that is "unenforceable" under applicable law.  11 U.S.C. § 502(b)(1).  Under New York law, make-whole provisions are analyzed under "standards applicable to liquidated damages."  *In re S. Side House, LLC*, 451 B.R. 248, 270 (Bankr. E.D.N.Y. 2011).  Liquidated damages are unenforceable unless (a) actual damages may be difficult to determine and (b) the stipulated sum is not "plainly disproportionate" to the lender's expected loss.  *Id*. (internal quotation marks and citations omitted); *accord*

---

[33]  *Id*.

*172 Van Duzer Realty Corp.* v. *Globe Alumni Student Assistance Ass'n, Inc.*, 25

N.E.3d 952, 957 (N.Y. 2014).

In the case of an *actual* redemption of the notes, the damages to noteholders

may (or may not) be difficult to determine in advance.  But, when the notes are not

being redeemed, but are instead being reinstated with all interest being paid on a

current basis, there are no possible damages to "liquidate."  The damages that will

be suffered are necessarily — and predictably — zero.

The noteholders, while broadly referencing New York law (Ad Hoc Br. 29),

offer no basis to conclude that a New York court would enforce a make-whole on a

reinstated loan, where noteholders never miss an interest payment and where

damages will necessarily be zero.  Notably, the New York Court of Appeals found

"compelling" an argument that a landlord could not enforce an "acceleration

clause" that would allow the landlord, upon default, both to take back the property

*and* to charge its commercial tenant the entirety of the remaining rent without

discount.  *172 Van Duzer Realty*, 25 N.E. 3d at 957.  Here, the facts are more

egregious than in *Van Duzer*:  the noteholders are trying to recover not only their

principal (akin to the house), and not only their full contracted-for income stream

without discount (future interest, akin to remaining rent), *but also* a huge one-time

payment that duplicates that income stream (the make-whole).  *See* SA0017-18

(Hayes Decl. ¶ 32); A2749-50 (11/5/21 Tr.) (explaining how noteholders would receive a "double recovery").[34]

In addition, even if the make-whole were allowable under Section 502(b)(1), a court would still need to determine whether the claim should be disallowed under Section 502(b)(2).  Section 502(b)(2) disallows claims for unmatured interest. Although certain decisions have declined to treat make-wholes as unmatured interest, other cases hold otherwise.[35]  In a recent decision arising out of the *Hertz* chapter 11 case, a bankruptcy court in this District concluded that whether a make-whole should be treated as unmatured interest is a "factual" question, and that the court would look to the "'economic substance of the transaction to determine what counts as interest.'" *In re Hertz Corp.*, 637 B.R. 781, 791 (Bankr. D. Del. 2021)

---

[34]  The cases cited by the noteholders applying New York law (Ad Hoc Br. 25) — *In re United Merchants & Manufacturers, Inc.*, 674 F.2d 134 (2d Cir. 1982) and *In re School Specialty, Inc.*, 2013 WL 1838513 (Bankr. D. Del. Apr. 22, 2013) — did not involve scenarios in which loans were reinstated.  In *United Merchants*, the debtor chose to satisfy the loans with new notes rather than offering "payment according to the terms of the loan agreement," and the lenders submitted uncontested affidavits "showing substantial actual damages."  674 F.2d at 143. The Second Circuit's discussion strongly suggests that the court would not have enforced the liquidated damages provision if the debtor had proposed a "non-impairment plan."  *Id*. at 14.  In *School Specialty*, the make-whole at issue resulted from a pre-petition default and the debtor was not proposing to reinstate the loan at issue.  2013 WL 1838513, at *1-2.

[35]  *See, e.g.*, *In re Doctors Hosp. of Hyde Park, Inc.*, 508 B.R. 697, 705 (Bankr. N.D. Ill. 2014).

(quoting *In re Doctors Hosp. of Hyde Park, Inc.*, 508 B.R. 697, 705 (Bankr. N.D. Ill. 2014)).  While the Court found it "significant that [the make-whole] is calculated, in large part, on the present value of the unmatured interest" on the redemption date, it could not resolve the issue as a matter of law.  *Id*. at 791-92. Here, given the formula used to calculate the "Applicable Premium," there would be ample basis for a fact-finder to disallow the make-whole under Section 502(b)(2), even if it were to survive all the other challenges discussed above.[36]

## II. THE BANKRUPTCY COURT CORRECTLY HELD THAT THE PLAN DOES NOT IMPAIR THE FIRST LIEN NOTEHOLDERS' RIGHTS UNDER THE SECOND LIEN INTERCREDITOR AGREEMENT.

In addition to arguing that Mallinckrodt was required to pay a bankruptcy-triggered make-whole, the First Lien Noteholders assert that the Plan deprived them of rights under the Second Lien Intercreditor Agreement.  Ad Hoc Br. 55-65. The noteholders point to provisions in the Plan and Confirmation Order that address the Second Lien Intercreditor Agreement (*id*. at 55-56), and they appear to ask the Court to strike those "exculpatory provisions" from the operative documents (*id*. at 57).  But there is no basis to strike those provisions, because —

---

[36]  In the Bankruptcy Court, the Debtors also argued that, in the event the make-whole has to be paid in some part, it should be reduced to the amount that would be payable on the Effective Date of the Plan rather than the Petition Date.  A1342-43 (¶¶ 59-60).  Mallinckrodt preserves that argument and all other arguments for reduction of the make-whole if the make-whole were payable.

as the Bankruptcy Court correctly concluded — there has been no violation of the Second Lien Intercreditor Agreement.[37]

It is common ground that the Second Lien Intercreditor Agreement is a "subordination agreement" under Section 510(a) of the Bankruptcy Code. *See* 11 U.S.C. § 510(a) ("A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."). Accordingly, there is no dispute that, consistent with Section 510(a), Judge Dorsey was empowered to construe and enforce that agreement, including in the Confirmation Order. *See, e.g.*, *CoreStates Bank, N.A.* v. *Huls Am., Inc.*, 176 F.3d 187, 203-04 (3d Cir. 1999).

The First Lien Noteholders argue on appeal that the intercreditor provisions of the Plan should not have been approved — and should be stricken, along with related provisions of the Confirmation Order — because they are entitled to recover from the Second Lien Noteholders under the Second Lien Intercreditor Agreement. They are wrong. The transactions and payments identified by appellants did *not* violate the Second Lien Intercreditor Agreement.

---

[37] For the reasons stated, the noteholders' arguments relating to intercreditor matters have no merit. But if any relief were granted with respect to that aspect of the appeal, it would have to be narrowly tailored and limited to the provisions of the Plan and Confirmation Order addressing those particular matters.

**A.    The First Lien Noteholders have no valid claim under Section 4.2 of the Second Lien Intercreditor Agreement.**

The appellants' first argument is based on Section 4.2 of the agreement,

which provides as follows:

> Except as otherwise set forth in Section 6.3, so long as the Discharge of First Lien Obligations has not occurred, if in any Insolvency or Liquidation Proceeding the Second Lien Collateral Agent or any other Second Lien Claimholders shall receive any distribution of money or other property in respect of or on account of the Collateral (including any assets or proceeds subject to Liens that have been avoided or otherwise invalidated or any amounts referred to in the last sentence of Section 6.3(b)), such money, other property or amounts shall be segregated and held in trust and forthwith paid over to the First Lien Collateral Agent for the benefit of the First Lien Claimholders in the same form as received, with any necessary endorsements.  Any Lien received by the Second Lien Collateral Agent or any other Second Lien Claimholders in respect of any of the Second Lien Obligations in any Insolvency or Liquidation Proceeding shall be subject to the terms of this Agreement.  A2316.

The noteholders' position is that, because a "Discharge" of the First Lien

Obligations has not occurred — and the Second Lien Noteholders received New

Second Lien Notes under the Plan — they are entitled to recover from the Second

Lien Noteholders.

The First Lien Noteholders are asking for more than they bargained for.

Under the first sentence of Section 4.2, the First Lien Noteholders only have a

claim against the Second Lien Noteholders if those second-lien holders receive a

"distribution of money or other property in respect of or on account of the

Collateral."  Here, as multiple courts have held, new debt obligations issued to

junior noteholders are not implicated by a provision such as Section 4.2, because the issuance of the new obligations — on account of the noteholders' pre-petition claims — does not in any way affect or diminish the first-lien noteholders' collateral.

In *Momentive*, the Bankruptcy Court for the Southern District of New York addressed a situation — much like this one — in which new securities were issued to second-lien holders under a plan. *In re MPM Silicones, LLC*, 518 B.R. 740 (Bankr. S.D.N.Y. 2014), *aff'd*, 596 B.R. 416 (S.D.N.Y. 2019). The first-lien holders argued that the securities had to be turned over as "proceeds" of collateral, which were defined as property distributed "on account of" collateral. *Id*. at 754. Rejecting that argument, the court held that a distribution on account of collateral requires an "economic event altering the nature of" the collateral, and that there was no distribution on account of collateral where the collateral at issue was not "diminished one iota." *Id.* at 754-55.

In *Energy Future Holdings*, the bankruptcy court in this District reached the same conclusion in two decisions. *See In re Energy Future Holdings Corp.*, 546 B.R. 566, 569-70 (Bankr. D. Del. 2016), and 566 B.R. 669, 675 (Bankr. D. Del. 2017), *aff'd*, 585 B.R. 341 (D. Del. 2018), *aff'd*, 773 Fed. App'x 89 (3d Cir. 2019). First, in a decision relating to a proposed (but not yet effective) plan, the bankruptcy court — agreeing with *Momentive* — concluded that new debt

obligations to be issued in connection with the plan were not "proceeds" of collateral, given that the debtor retained all relevant collateral and issued notes that were by definition "*debt* and not *assets* of" the reorganized debtors.  546 B.R. at 580 (emphases in original).

In a subsequent decision, issued after a new plan was proposed and confirmed, the bankruptcy court again concluded that new debt or stock issued under a plan were not proceeds of collateral where, as in *Momentive*, "the collateral did not change in any way as a result of the issuance" of the new securities, and the transaction did not involve any "sale" of collateral or "permanently removing assets" from the reorganized debtor.  *Energy Future Holdings*, 566 B.R. at 685-86 (citing *Momentive*, 518 B.R. at 755-56).

The logic of *Momentive* and *Energy Future Holdings* applies with full force to this case.  As in those cases, the New Second Lien Notes issued to the second-lien holders are "*debt* and not *assets* of" the reorganized debtors.  546 B.R. at 580. Moreover, as in those cases, the First Lien Noteholders' collateral "did not change in any way as a result of the issuance" of the new notes, 566 B.R. at 685-86, and that "collateral will not have been diminished one iota," 518 B.R. at 754-55. Instead, the collateral is intact and available to the First Lien Noteholders.

In a footnote, the First Lien Noteholders try to make something of the fact that the contract here speaks of distributions "in respect of or on account of"

collateral, whereas the contract in *Energy Future Holdings* spoke in terms of collateral "proceeds."  Ad Hoc Br. 59 n.49.  That is no distinction at all.  The *Momentive* decision, adopted by *Energy Future Holdings*, specifically addressed a provision defining "proceeds" as property received "on account of" collateral.  518 B.R. at 754.  Moreover, the reasoning of both *Momentive* and *Energy Future Holdings* does not turn on the supposed difference in language.  The critical point of those decisions, applicable here, is that the issuance of the new securities cannot be on account of collateral where there is no "disposal of" collateral, 546 B.R. at 579-80, and where the First Lien Noteholders' senior security position has not been affected "one iota," 518 B.R. at 754-55.  The Bankruptcy Court thus correctly concluded, in reliance on *Energy Future Holdings*, that the issuance of new debt to the Second Lien Noteholders did not violate Section 4.2.  A2833 (11/5/21 Tr.).

To the extent there were any doubt about how to read the first sentence of Section 4.2, it is conclusively resolved by other provisions of the agreement. Those other provisions, including the *second* sentence of Section 4.2, make absolutely clear that the first sentence of Section 4.2 does not prevent issuance of new debt obligations to Second Lien Noteholders, as long as the Second Lien Intercreditor Agreement remains in effect.

The *second* sentence of Section 4.2, quoted above, governs the issuance of a new "Lien."  Crucially, the Lien is *not* subject to pay-over; rather, it merely has to

be made subject to the Second Lien Intercreditor Agreement.  A2316.  Similarly,

Section 6.6 of the Second Lien Intercreditor Agreement specifically addresses debt

obligations issued in a bankruptcy case, and requires only that the provisions of the

Intercreditor Agreement continue to apply to such new obligations:

> If, in any Insolvency or Liquidation Proceeding, debt obligations of the
> reorganized debtor secured by Liens upon any property of the
> reorganized debtor are distributed pursuant to a plan of reorganization
> or similar dispositive restructuring plan, arrangement, compromise or
> liquidation or similar dispositive restructuring plan, both on account of
> First Lien Obligations and on account of Second Lien Obligations, then,
> to the extent the debt obligations distributed on account of the First Lien
> Obligations and on account of the Second Lien Obligations are secured
> by Liens upon the same property, the provisions of this Agreement will
> survive the distribution of such debt obligations pursuant to such plan
> and will apply with like effect to the Liens securing such debt
> obligations.  A2326.

The Debtors satisfied the requirements of both the second sentence of

Section 4.2 and Section 6.6, because the new Second Lien Notes are subject to the

Second Lien Intercreditor Agreement.  Those specific provisions governing the

exact situation before the Court, namely one in which second-lien noteholders

receive new secured debt under a Plan, defeat any argument that the issuance of

that new secured debt was prohibited by first sentence of Section 4.2(b).[38]

---

[38]  *See Ambac Assur. Corp.* v. *Countrywide Home Loans, Inc.*, 106 N.E.3d 1176,
1185 (N.Y. 2018) ("in general, a specific provision will not be set aside in favor of
a catchall clause" (internal citations and quotations omitted)); *Muzak Corp.* v.
*Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956) ("Even if there was an

The First Lien Noteholders' response to Section 6.6, and to the second sentence of Section 4.2, is self-refuting.  They argue that the provisions "restrict what securities may be distributed to the Second Lien Noteholders" but "do not suggest that the Second Lien Noteholders are entitled to retain" those securities. Ad Hoc Br. 62.  So, according to the noteholders, the same contract (indeed, the same provision) allows issuance of securities but then prohibits retention of those very securities.  No New York court would accept such a contract interpretation, which would "produce a result that is absurd, commercially unreasonable [and] contrary to the reasonable expectations of the parties."  *Greenwich Cap. Fin. Prods., Inc.* v. *Negrin*, 903 N.Y.S. 2d 346, 348 (N.Y. App. Div. 2010) (internal quotations omitted); *accord Kreg Therapeutics, Inc.* v. *VitalGo, Inc.*, 919 F.3d 405, 414 (7th Cir. 2019) (New York law; citing *Greenwich*).

## B.    The First Lien Noteholders have no valid claim under 6.3(b)(ii) of the Second Lien Intercreditor Agreement.

The appellants also assert that the Plan runs afoul of Section 6.3(b)(ii)'s treatment of "adequate protection" payments.  Ad Hoc Br. 62-63.  Section 6.3(b)(ii) provides:

> If any Second Lien Claimholder is entitled by order of a court of competent jurisdiction to receive or receives adequate protection payments for post-petition interest and/or fees and expenses in an

---

inconsistency between a specific provision and a general provision of a contract (we find none), the specific provision controls.").

> Insolvency or Liquidation Proceeding ("Second Lien Adequate
> Protection Payments"), and the First Lien Claimholders do not receive
> payment in full in cash of all First Lien Obligations upon the
> effectiveness of the plan of reorganization or similar dispositive
> restructuring plan for, or conclusion of, that Insolvency or Liquidation
> Proceeding, then an amount shall be paid over by Second Lien
> Claimholders to the First Lien Claimholders (the "Pay-Over
> Amount") equal to the lesser of (x) the Second Lien Adequate
> Protection Payments received by the Second Lien Claimholders and
> (y) the amount of the short fall (the "Short-Fall") in payment in full of
> the First Lien Obligations; provided that to the extent any portion of
> the Short-Fall represents payments received by the First Lien
> Claimholders in the form of promissory notes, equity or other
> property equal in value to the cash paid in respect of the Pay-Over
> Amount, the First Lien Claimholders shall, upon receipt of the Pay-
> Over Amount, transfer those promissory notes, equity or other
> property, equal in value to the cash paid in respect of the Pay-Over
> Amount, to the applicable Second Lien Claimholders pro rata in
> exchange for the Pay-Over Amount.  A2325.

Appellants assert that, because they have not been paid in full in cash, the

payments of post-petition interest and attorneys' fees to the Second Lien

Noteholders are subject to turnover.  Ad Hoc Br. 62-63.  That argument was barely

pressed below,[39] and for good reason.  It has multiple flaws.

*First*, in light of the consummation of the Plan, appellants are wrong to

characterize the interest and fees paid during the case to Second Lien Noteholders

as "adequate protection."  The Bankruptcy Code requires "adequate protection" to

compensate a secured lender for diminution of value resulting from use of

---

[39]  The Bankruptcy Court found it "unclear whether the noteholders [we]re
pressing their argument under Section 6.3(b)(2)."  A2833 (11/5/21 Tr.).

collateral.  *See In re Swedeland Dev. Grp., Inc.*, 16 F.3d 553, 564 (3d Cir. 1994)

(adequate protection "compensates the secured creditor for loss of value" (quoting

*In re American Mariner Indus., Inc.*, 734 F.2d 426, 435 (9th Cir. 1984)).

Consistent with that requirement, the Cash Collateral Order in this case granted

adequate protection, in the form of current post-petition interest and certain fees

and expenses, "solely for and equal in amount to the Diminution in Value resulting

from the Debtors' sale, lease, or use of the Prepetition Collateral," A0292 (Cash

Collateral Order ¶ 5(a)), and without prejudice to "whether any such payments

should be recharacterized or reallocated pursuant to the Bankruptcy Code as

payments of principal, interest or otherwise," *id.*

Under the now-effective Plan, the Second Lien Noteholders received a 100%

recovery on their claims, *see* A0498, confirming that they were oversecured at all

relevant times.  Given that those noteholders had an equity cushion at all relevant

times, they had no entitlement to "adequate protection," and any payments they

received must be characterized differently.[40]

---

[40] *See, e.g.*, *In re SunCruz Casinos, LLC*, 298 B.R. 833, 845 (Bankr. S.D. Fl. 2003)
("If a creditor is oversecured, adequate protection payments serve as payment of
postpetition interest on the oversecured claims." (citing cases)); *In re 354 E 66th
Street Realty Corp.*, 177 B.R. 776, 782 (Bankr. E.D.N.Y. 1995) ("oversecured
creditors" not entitled to adequate protection to protect their "equity cushion";
"adequate protection" only available if "the secured creditor cannot realize the full
value of the collateral to support its claim").

Here, the payments at issue are readily characterized not as adequate protection but as payments under Section 506(b) or as components of the "Second Lien Notes Settlement" embedded in the Plan.  With respect to interest, the Second Lien Noteholders, as oversecured creditors, were entitled to post-petition interest under Section 506(b).  The Confirmation Order (A3301; ¶ 110) therefore provides that, as part of the Second Lien Notes Settlement, holders of Second Lien Notes would be entitled to all "accrued and unpaid" interest owing through the Effective Date.  In addition, under the terms of the Second Lien Notes Settlement, as reflected in the filed term sheet, the Debtors agreed to pay the fees and expenses incurred by certain Second Lien Noteholders, again not as "adequate protection" but as part of the settlement in the Plan.  *See* A3225.  Since the payments at issue were not "adequate protection" payments, Section 6.3(b)(ii) does not apply.

*Second*, even if the payments at issue were characterized as adequate protection, Section 6.3(b)(ii) still would not support recovery.  Quoting the provision, the First Lien Noteholders assert that adequate protection payments need to be turned over if they "do not receive payment in full in cash of all First Lien Obligations."  Ad Hoc Br. 62.  But the very next clause qualifies that language, stating that Second Lien Noteholders only have to pay over "the *lesser* of" the "Adequate Protection Payments received" and "the amount of the short fall (the 'Short-Fall') in payment in full of the First Lien Obligations."  A2325.  There is no

reference in the "Short-Fall" definition to payment "in cash"; rather, under that definition, the question is whether the Plan, by reinstating the First Lien Notes, offers "payment in full" (in cash or otherwise).  *See Platek* v. *Town of Hamburg*, 26 N.E.3d 1167, 1173 (N.Y. 2015) ("The use of different terms in the same agreement (here, in the same sentence) implies that they are to be afforded different meanings.").

As the Bankruptcy Court correctly held, given the reinstatement of the First Lien Notes, the First Lien Noteholders "cannot claim that they have been paid less than full value."  A2834 (11/5/21 Tr.).  To the contrary, as the court held in *Onco*, reinstatement "reverses the consequences of the default" not only as they "relate to the Debtor" but also "vis-a-vis all non-Debtor parties," meaning that a senior creditor cannot claim that it has been paid less than in full and seek recovery from a junior creditor.  316 B.R. at 165, 167.

In arguing they were not paid "in full," the First Lien Noteholders assert that the disputed make-whole is a "First Lien Obligation" for purposes of the Second Lien Intercreditor Agreement, and is therefore subject to turnover under Section 6.3(b)(ii).  Ad Hoc. Br. 63-64.  That argument was waived, and in any event is off-base.  The argument was waived because, in the Bankruptcy Court, it was raised only in a cursory footnote.  *See* A1408 (¶ 90 n.26).  That is not sufficient to present

and preserve an argument.  *See, e.g.*, *John Wyeth & Bro Ltd.* v. *Cigna Int'l Corp.*, 119 F.3d 1070, 1076 n. 6 (3d Cir. 1997).

Waiver aside, the contractual language invoked by the First Lien Noteholders — from the definition of the "First Lien Obligations" — does not support them.  The language states that, if "interest, fees, expenses or other amounts . . . to be paid by a First Lien Obligor pursuant to the First Lien Financing Documents . . . are *disallowed* by order of any court of competent jurisdiction," such amounts "continue to accrue and be added to the amount to be calculated as the 'First Lien Obligations.'"  A2302 (emphasis added).  Here, in light of the Bankruptcy Court's ruling under Section 1124(2), the Court did not need to "disallow" the make-whole under Section 502(b) or otherwise; indeed, the Confirmation Order (¶ 253) states that, in light of the Section 1124(2) ruling permitting reinstatement without a make-whole, the Debtors' objections to allowance of the make-whole claim are "moot."

For those reasons, the First Lien Noteholders have no basis to recover under Section 6.3(b)(ii) of the Second Lien Intercreditor Agreement, just as they have no basis to recover under Section 4.2.  Along with the First Lien Notes Indenture, the Second Lien Intercreditor Agreement remains fully intact following reinstatement, and the First Lien Noteholders are in the same position they occupied when the chapter 11 case started.  They have no basis to complain.

## CONCLUSION

The Bankruptcy Court's decision overruling the First Lien Noteholders'

objections to confirmation of the Plan should be affirmed in all respects.

DATED:  June 17, 2022

*/s/ Brendan J. Schlauch*
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
(302) 651-7700

Emil A. Kleinhaus (*pro hac vice*)
Amy R. Wolf (*pro hac vice*)
Michael H. Cassel (*pro hac vice*)
Mitchell S. Levy (*pro hac vice*)
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52 Street
New York, NY  10128
(212) 403-1000

Melissa Arbus Sherry (*pro hac vice*)
James A. Tomberlin (*pro hac vice*)
Andrew Sorkin (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

George A. Davis (*pro hac vice*)
George Klidonas (*pro hac vice*)
Anupama Yerramalli (*pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200

Jeffrey E. Bjork
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:  (213) 485-1234
Facsimile:   (213) 891-8763

- and -

Jason B. Gott
**LATHAM & WATKINS LLP**
330 North Wabash Avenue,
Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:   (312) 993-9767

*Counsel for Reorganized Debtors-Appellees*

## <u>RULE 8015(H) CERTIFICATION</u>

Pursuant to Fed. R. Bankr. P. 8015(h), I certify that this brief complies with the Type-Volume Limitation of Fed. R. Bankr. P. 8015(a)(7), as modified by D.I. 30 ¶ 7 (permitting 17,000 words).  This brief contains 16,867 words, excluding parts of the document excluded by Fed. R. Bankr. P. 8015(g).

DATED: June 17, 2022

*/s/ Brendan J. Schlauch*
Brendan J. Schlauch (No. 6115)
