## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| MALLINCKRODT PLC, et al., | Case No. 20-12522 (JTD) (Bankr. D. Del.) |
| Debtors.[1] | (Jointly Administered) |
| AD HOC FIRST LIEN NOTES GROUP, | |
| Appellants, | |
| v. | Case No. 22-cv-00331-TLA |
| MALLINCKRODT PLC, et al., | |
| Appellees. | |

## SUPPLEMENTAL APPENDIX IN SUPPORT OF APPELLEE NEW MALLINCKRODT'S BRIEF

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
(302) 651-7700
merchant@rlf.com

Emil A. Kleinhaus (*pro hac vice*)
Amy R. Wolf (*pro hac vice*)
Michael H. Cassel (*pro hac vice*)
Mitchell S. Levy (*pro hac vice*)
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52 Street
New York, NY  10128
(212) 403-1000
eakleinhaus@wlrk.com

---

[1] A complete list of the Debtors may be obtained on the website of the Debtors' claims and noticing agent: http://restructuring.primeclerk.com/Mallinckrodt.  The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

Melissa Arbus Sherry (*pro hac vice*)
James A. Tomberlin (*pro hac vice*)
Andrew Sorkin (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200
melissa.sherry@lw.com

George A. Davis (*pro hac vice*)
George Klidonas (*pro hac vice*)
Anupama Yerramalli (*pro hac vice*)
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022
(212) 906-1200
george.davis@lw.com

Jeffrey E. Bjork
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
jeff.bjork@lw.com

- and -

Jason B. Gott
**LATHAM & WATKINS LLP**
330 North Wabash Avenue,
Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
Email:       jason.gott@lw.com

*Counsel for Debtors-Appellees*

## <u>TABLE OF CONTENTS</u>

**Docketed Materials, *In re Mallinckrodt plc, et al.,* Case No. 20-12522 (JTD)
(ECF Refers to Docket No. in the Bankruptcy Court)**

<u>Page</u>

Tab 1 – ECF 5001
    [SEALED] Declaration of Brendan Hayes ............................................................ SA0001

Tab 2 – ECF 5000
    Declaration of Punit Mehta in Support of Confirmation of the First Amended
    Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under
    Chapter 11 of the Bankruptcy Code ....................................................................... SA0097

Tab 3 – ECF 5094
    Transcript of Pretrial Conference Before the Honorable John T. Dorsey ............... SA0104

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MALLINCKRODT PLC, *et al.*,[1] | ) | Case No. 20-12522 (JTD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| | ) | |

## DECLARATION OF BRENDAN HAYES

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

**TABLE OF CONTENTS**

I.      INTRODUCTION ......................................................................................3

       A.    Qualifications ...........................................................................4
       B.    Engagement by the Debtors ..................................................5
       C.    Compensation .........................................................................5

II.     BACKGROUND .......................................................................................6

       A.    The Debtors and the Noteholders .........................................6
       B.    Treatment of Funded Debt Claims Under the Plan...............8
       C.    Plan Objections .....................................................................11

III.    EXECUTIVE SUMMARY .....................................................................11

IV.    THE MAKEWHOLE PROVISIONS ....................................................16

V.     THE CRAM-DOWN FIRST LIEN NOTES ........................................18

VI.    RESPONSE TO MR. MANNING'S OPINIONS REGARDING THE CRAM-DOWN FIRST LIEN NOTES ........................................................25

       A.    Mr. Manning's "Peer Group" of Issuers ..............................25
       B.    Mr. Manning's Opinion Regarding the New Takeback Term Loans ..................30
       C.    Mr. Manning's Opinion Regarding Investment Bank Feedback ..........................32

VII.   THE FEDERAL/STATE ACTHAR SETTLEMENT AGREEMENTS ..........................36

SA0002

I, Brendan Hayes, declare under penalty of perjury:

## I.      INTRODUCTION

1.      I am a Senior Managing Director at Guggenheim Securities, LLC ("***Guggenheim Securities***"), an investment banking and financial advisory firm with principal offices located at 330 Madison Avenue, New York, New York 10017.

2.      I submit this declaration (this "***Declaration***") in support of the *First Amended Joint Plan of Reorganization of Mallinckrodt plc and Its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* [Docket No. 4508] (the "***Plan***"), as may be modified, amended, or supplemented from time to time, and the *Debtors' Objection to Funded Debt Claims Pursuant to Article VII.J of the Debtors' Joint Plan of Reorganization (Fifth Omnibus Objection (Substantive))* (the "***Claim Objection***").[2]  This Declaration sets forth my testimony concerning the makewhole provisions in the First Lien Notes Indenture, the expected market value of the Cram-Down First Lien Notes as of the Effective Date, and the Federal/State Acthar Settlement Agreements (as defined below).  I may supplement or amend my testimony based on further developments, including submissions and/or testimony by others.

3.      Except as otherwise indicated, all of the factual statements set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by Guggenheim Securities professionals involved in advising the Debtors in these chapter 11 cases, or information provided to me by the Debtors.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan, the Claim Objection or the *Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Mallinckrodt Plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 2917] (the "***Disclosure Statement***"), as applicable.

SA0003

### A. Qualifications

4.      I have been employed at Guggenheim Securities since 2018.  Prior to joining Guggenheim Securities, I was a Managing Director and partner at Millstein & Co., which sold its investment banking business to Guggenheim Securities.  Prior to joining Millstein & Co., I was in the restructuring group at Lazard Frères & Co., LLC, where I represented companies and stakeholders in restructuring and financing transactions.  Prior to working at Lazard, I worked in the leveraged finance and restructuring groups at Lehman Brothers and, subsequently, Barclays Capital.  I graduated with a B.S. in Mathematics and History from Tulane University and an M.B.A. from New York University.  I am also a Chartered Financial Analyst (CFA) charterholder. I am a member of the Newcomb-Tulane College Dean's Advisory Council at Tulane University, Vice Chairman of the Board of Education in New Canaan, CT and a member of the board of Metal Powder Products (MPP), a Mill Point Capital portfolio company.

5.      I have over sixteen years of experience as an investment banker advising large companies and their investors.  My areas of expertise include: (a) advising on financial restructuring strategies and M&A processes including the performance of valuation-related financial analyses, (b) analyzing business plans and related financial projections, (c) advising on liquidity alternatives, and (d) sizing, structuring, raising and executing all aspects of financing transactions, including distressed and exit financings.

6.      I am also familiar with the credit markets and the core economic terms that commonly govern credit agreements.  I have advised companies and creditors in connection with numerous in-court and out-of-court restructurings, recapitalizations and reorganizations involving aggregate liabilities of tens of billions of dollars, including, among others, Caesars Entertainment Operating Company, Claire's, 21st Century Oncology, and NII.  I previously testified as an expert

SA0004

in these chapter 11 cases in connection with the Debtors' Omnibus Objection to Motion for Appointment of an Equity Committee.

### B.    Engagement by the Debtors

7.    Members of my team and I have been working with the Debtors since September 2019.  Since the commencement of the engagement, Guggenheim Securities has rendered investment banking advisory services to the Debtors in connection with, among other things, the Debtors' evaluation of financing and strategic alternatives in light of their financial position. Guggenheim Securities has worked with the Debtors' management and other professionals retained by the Debtors, and has become familiar with the Debtors' capital structure, financial condition, liquidity needs and business operations.

8.    On November 2, 2020, the Debtors filed an application to retain and employ Guggenheim Securities as their investment banker [Docket No. 383] (the "***Retention Application***") pursuant to the terms of that certain engagement letter between Guggenheim Securities and the Debtors, dated as of September 1, 2019, as amended by that certain letter agreement between Guggenheim Securities and the Debtors, dated as of September 22, 2020 (collectively, together with the annexes and the indemnification provisions attached thereto, the "***Amended Engagement Letter***").

9.    On January 12, 2021, the Court entered the order approving the Retention Application [Docket No. 1142] (the "***Retention Order***"). A copy of the Amended Engagement Letter was appended to the Retention Order as Exhibit 1.

### C.    Compensation

5

10.     I am not being compensated specifically for my testimony in this matter other than fees to be received by Guggenheim Securities pursuant to the Amended Engagement Letter and the Retention Order.

## II.     BACKGROUND

### A.     The Debtors and the Noteholders

11.     The Debtors are a multinational pharmaceutical company that produces, markets, and sells a wide variety of branded and generic pharmaceutical products.[3]  These products include Acthar Gel, an injectable drug with a number of indications, including to treat infantile spasms; INOmax gas, a vasodilator used in neonates with hypoxic respiratory failure; Therakos, an immunotherapy treatment used for palliative treatment of certain lymphomas; and Amitiza, a leading anti-constipation drug.[4]  In 2020, the Debtors reported net sales of approximately $2.8 billion.[5]

12.     At the time that the Debtors filed for chapter 11, the Debtors faced headwinds associated with, among other things, litigation concerning the Debtors' distribution and sale of opioid-based medications,[6] the Debtors' pricing and sale of Acthar Gel product including ongoing litigation between Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services ("**CMS**") and Debtor Mallinckrodt ARD LLC ("**ARD**") regarding

---

[3] *See* Disclosure Statement at 42-44.

[4] *Id.* at 43.

[5] *Id.* Ex. D, Docket No. 2285-1, at 4.

[6] *Id.* at 48-49.

SA0006

the calculation of Acthar rebates,[7] as well as the financial impact of the COVID-19 pandemic.[8] These headwinds ultimately caused the Debtors to conclude that the most value-maximizing path forward was a chapter 11 filing of both of the Debtors' business divisions, Specialty Brands and Specialty Generics.[9]

13.     As of the Petition Date, the Debtors had approximately $5.3 billion in secured and unsecured funded debt obligations outstanding.[10]  That debt included the following secured debt issuances:

a) Approximately $2.8 billion due under a credit agreement between certain of the Debtors, Deutsche Bank AG New York Branch, as administrative agent, and various lenders ("***First Lien Credit Agreement Claims***").  This debt was secured by a first lien on substantially all of the Debtors' assets.[11]

b) Approximately $495 million in notes issued pursuant to an indenture by certain of the Debtors, with Wilmington Savings Fund Society, FSB as Trustee and Deutsche Bank AG New York Branch as collateral agent ("***First Lien Notes Claims***").  These notes were secured by a first lien on substantially all of the Debtors' assets.[12]

---

[7] *Id.* at 52.

[8] *Id.* at 50.

[9] *Id.*

[10] *Id.* at 45.

[11] *Id.* at 45-46.

[12] *Id.* at 46.

SA0007

c) Approximately \$323 million in notes issued pursuant to a certain indenture by certain of the Debtors, with Wilmington Savings Fund Society, FSB as Trustee and Deutsche Bank AG New York Branch as collateral agent ("**_Second Lien Notes Claims_**").  These notes were secured by a second lien on substantially all of the Debtors' assets.[13]

14.     The background of the issuance of the First Lien Notes in particular is described in the Disclosure Statement.[14]  The notes carry an interest rate of 10% and mature in 2025.[15]

### B.     Treatment of Funded Debt Claims Under the Plan

15.     The Plan sets forth the treatment for the First Lien Notes Claims.  The First Lien Notes will be reinstated, provided they can be reinstated without paying Makewhole Claims.[16] The holders of First Lien Notes Claims will thus retain the same notes, with the same terms and the same collateral package, on the Effective Date that they held on the Petition Date.[17]  If, in the alternative, the Makewhole Claims are required by the Court to be satisfied by the Debtors despite the proposed reinstatement of the First Lien Notes, the Debtors may elect to satisfy the First Lien Notes Claims either by paying cash or by issuing the Cram-Down First Lien Notes.[18]  The key terms and features of the Cram-Down First Lien Notes are described in the Cram-Down First Lien Notes Summary Terms.[19]  Together with the Debtors' other advisors, members of my team and I

---

[13] _Id._ at 46-47.

[14] _Id._

[15] _Id._

[16] _See_ Plan at 57-58.

[17] _See_ Disclosure Statement at 5-6.

[18] Id.

SA0008

assisted the Debtors in connection with their determination of the terms of the Cram-Down First Lien Notes, which, as noted above, may be issued if the Debtors are required to pay the disputed makewhole claims.

16.     The Plan also sets forth the treatment of Second Lien Notes Claims.  Under the Plan, in full and final satisfaction of their Claims, holders of the Second Lien Notes Claims will receive New Second Lien Notes (without any makewhole payment).[20]  The key terms and features of the New Second Lien Notes are described in the New Second Lien Notes Term Sheet.[21]  The face amount of the New Second Lien Notes — namely $322,868,000 —  is equal to the face amount of the Second Lien Notes Claims excluding the face amount of any makewhole claims.[22]  The Debtors, with the assistance of their advisors, including Guggenheim Securities, negotiated the New Second Lien Notes Term Sheet with the holders of a super-majority of the Second Lien Notes, including Deerfield Private Design Fund IV, L.P., Deerfield Special Situations Fund, L.P., and Deerfield Partners L.P. (collectively, "*Deerfield*").  I understand that the terms of the New Second Lien Notes were agreed as part of a settlement of all disputes between the Debtors and Second Lien Noteholders, including Deerfield, relating to the Plan.

17.     The Plan also sets forth the treatment of First Lien Credit Agreement Claims.  Under the Plan, holders of First Lien Credit Agreement Claims will receive either (1) payment in

---

[19] The Cram-Down First Lien Notes Summary Terms is Exhibit 1 to the Plan.  A copy of the Cram-Down First Lien Notes Summary Terms is attached as Appendix I.

[20] *See* Plan at 58-59.

[21] The New Second Lien Notes Term Sheet is Exhibit 4 to the Plan.  A copy of the New Second Lien Notes Term Sheet is attached as Appendix J.

[22] Id.

SA0009

full in cash or (2) the New Takeback Term Loans, plus payment in cash of the First Lien Term Loans Accrued and Unpaid Interest, plus the Term Loan Exit Payment.[23] The key terms and features of the New Takeback Term Loans are described in the Disclosure Statement and incorporated into the Plan.[24] The terms of the New Takeback Term Loans were negotiated by the Debtors (and their advisors, including Guggenheim Securities) with holders of First Lien Credit Agreement Claims (and their advisors) and, I understand, were agreed as part of a settlement of all disputes between the Debtors and holders of First Lien Credit Agreement Claims relating to the Plan.

18. To the extent the Plan calls for cash payments to satisfy First Lien Credit Agreement Claims, the Plan contemplates using the proceeds of exit financing – the New Term Loan Facility – to refinance the First Lien Revolving Credit Facility, and, if applicable, to refinance the First Lien Term Loans and First Lien Notes.[25] The New Term Loan Facility will be a first-lien facility with equal priority to the Debtors' other first-lien debt following emergence.[26] Together with the Debtors' other advisors, members of my team and I are assisting the Debtors in connection with their evaluation of the New Term Loan Facility and the terms of that exit financing remain subject to ongoing discussion and negotiation with financing sources.[27]

---

[23] *See* Disclosure Statement at 4-6.

[24] *See* Disclosure Statement Schedule 3.

[25] *See* Disclosure Statement at 145.

[26] The terms of the New Term Loan Facility are summarized in the New Term Loan Facility Indicative Summary Term Sheet, which is Exhibit I to the Plan Supplement (filed on August 7, 2021) [Docket No. 3613-2].

[27] Id.

10

### C.     Plan Objections

19.     With respect to the First Lien Notes Claims, I have been advised that some holders of First Lien Notes Claims are objecting to the treatment of the First Lien Notes Claims under the Plan and the disallowance of the Makewhole Claims pursuant to the Claim Objection.  *First*, I understand they assert that the Debtors cannot reinstate the First Lien Notes without paying the Makewhole Claims and they insist that those claims must be paid to confirm the Plan.  *Second*, assuming the Makewhole Claims are required to be paid (despite the Debtors' objection), and assuming the Debtors elect to satisfy the First Lien Notes Claims by issuing the Cram-Down First Lien Notes, I understand the objecting holders contend that the market value of the Cram-Down First Lien Notes will not equal the face amount of their allowed Claims, and thus the Plan will not satisfy their claims in a manner permitted by the Bankruptcy Code.

## III.    EXECUTIVE SUMMARY

### Makewhole Claims

20.     From a financial and market-based perspective, makewhole provisions in indentures, such as the makewhole provisions at issue here, are generally intended to compensate the holders of notes issued pursuant to the indentures for future interest that would not be paid in the event the applicable notes were redeemed within a certain time period after issuance.  The formula used to determine the relevant makewhole amount pursuant to the First Lien Notes Indenture and the resulting calculation of the relevant makewhole amount being asserted by certain holders of First Lien Notes Claims are described below.

### Cram-Down First Lien Notes

SA0011

21.     I believe that, if they are issued, the Cram-Down First Lien Notes, at the time of issuance on the Effective Date, will have an "at par" market value for the following reasons (among others):[28]

a) The interest or "coupon" rate for the Cram-Down First Lien Notes will be based on an index (the "***Single B Reference Index***")[29] of bonds that I believe are generally comparable in key respects to the Cram-Down First Lien Notes.  In particular, the interest or "coupon" rate will be set to the weighted average yield-to-worst ("***YTW***") rate of that index (subject to a maximum coupon of 10%) as of the Effective Date (rounded to the nearest 0.125%) (the "***Proposed Coupon Rate***").[30]  As described in further detail below, when the interest or "coupon" rate of a note, or any debt instrument, matches the market's expectation of its YTW rate, then the note can be expected to be trading at or around "par."  As a result, with respect to the bonds identified in the Single B Reference Index, each bond's YTW rate generally reflects the lowest "coupon" rate needed by prospective market participants in order for such bond to trade at or around "par."

---

[28] The basis for the views expressed in this Declaration is described more fully in Section V below and in the attached Appendices.  The views and related analyses in this Declaration are not, and should not be construed as, a guarantee regarding the value, price or range of prices at which the Cram-Down Notes, or other securities of the Debtors or Reorganized Debtors, may trade, or that they will be saleable or otherwise transferable at any time, including subsequent to consummation of the Plan.

[29] The "**Single B Reference Index**" refers to the ICE BofA 8+ Year B US High Yield Index.  As discussed below, as of October 6, 2021, this index consists of 75 high-yield bonds that are traded on the market.  The bonds tracked by the Single B Reference Index share certain matching qualifying conditions which are explained in more detail in Appendix E.

[30] The yield to worst rate is, generally, understood to refer to the lowest yield that a prospective bond investor will receive when comparing (i) the yield to such investor assuming the bond is held until its stated maturity date and (ii) the yield to such investor assuming the bond was redeemed at each of its call dates (and further assuming, in each case, that the relevant issuer of the bonds complies in full with the terms of the underlying indenture).

12

b) The Cram-Down First Lien Notes will have certain material terms (discussed further in Section V below) that are generally in line with the weighted average of those same terms as they appear in the Single B Reference Index.

c) The estimated Total Enterprise Value (as defined in Exhibit F to the Disclosure Statement) of the Reorganized Debtors, as of the Effective Date, significantly exceeds the aggregate principal amount of secured funded indebtedness that the Reorganized Debtors are expected to have upon emergence as of the Effective Date.

**Manning Report**

22.     I have reviewed the Rebuttal Expert Report of Jeffrey R. Manning, Sr., CTP, submitted in connection with these chapter 11 cases on August 25, 2021 (the "***Manning Report***"), in which Mr. Manning concludes that the Proposed Coupon Rate offers a below-market yield for the Cram-Down First Lien Notes. As set forth in the Manning Report, his conclusion is based on the following analyses: (1) an analysis of a supposed "peer" group of bonds, (2) an analysis of the New Takeback Term Loans, namely the loans being issued under the Plan to satisfy First Lien Credit Agreement Claims, and (3) an analysis of informal feedback received from investment banks in response to the Debtors' request for proposals ("***RFPs***") to refinance first lien debt. For the reasons set forth below, Mr. Manning's opinions and analyses have not persuaded me to change my views regarding the Cram-Down First Lien Notes.

23.     *First*, Mr. Manning conducted an analysis of a small number of bonds issued by supposed "peer" pharmaceutical companies. Even if I agreed with Mr. Manning's selection of "peer" pharmaceutical companies (which I do not, as explained below), I would still disagree with his approach. The data obtained from Mr. Manning's "peer" analysis is limited to a very small set of individual issuers and thus is easily skewed by idiosyncratic issues. I believe that relying on a

13

broad index of bonds sharing material terms with the Cram-Down First Lien Notes – in this case, the Single B Reference Index – is a more appropriate way to determine the proper pricing for the Cram-Down First Lien Notes.

24. *Second*, Mr. Manning has argued that the terms of the New Takeback Term Loans, which may be issued under the Plan to satisfy First Lien Credit Agreement Claims, indicate that the Proposed Coupon Rate for the Cram-Down First Lien Notes is below market. I disagree. Mr. Manning has not taken into account the timing and context of the negotiation of the New Takeback Term Loan or the particular terms of those notes. The terms of the New Takeback Term Loans resulted from extensive negotiation with the Credit Agreement lenders at an earlier point in these chapter 11 cases, many months before material settlements were reached and at a time of far greater uncertainty and unpredictability. The Debtors, moreover, are not required under the Plan to issue the New Takeback Term Loans; rather, they are entitled to pay the term loan lenders in cash with alternate financing. This condition — essentially an at-par call option for the Debtors — is a highly material term, and one that, in my view, undermines any comparison between the coupon rates of the New Takeback Term Loans and the Cram-Down First Lien Notes.



14

**Federal/State Acthar Settlement Agreements**

26.     With respect to the federal and state Acthar-related claims, as described below, the Debtors' negotiations with the DOJ and CMS (each as defined below) lasted several months.  In September 2020, as described in the Disclosure Statement, the Debtors reached an agreement in principle with the DOJ, contingent upon a chapter 11 filing by Mallinckrodt plc, to resolve most Acthar-related claims and investigations of the federal government against the Debtors.  Based upon discussions I observed and participated in, I believe that the Debtors' financial condition and impending restructuring were integral factors underlying the fundamental economic terms of the agreement in principle that the parties, including the DOJ and CMS, ultimately accepted.  Accordingly, in my view, the Debtors' financial condition and financial distress would have been priced into the fundamental economic terms of that settlement.

27.     In forming the views expressed in this Declaration, I relied on (a) my knowledge and expertise as an investment banker and the information I have acquired in connection with my work with the Debtors, (b) my review of the materials contained in and/or identified the Appendices, and (c) the various financial analyses conducted in connection with this Declaration

---

[31] *See* Plan Confirmation Exhibit (Bates No. MNK_PLAN_00224087).

[32] As of October 6, 2021.

SA0015

and herein described. Please also refer to Sections IV through VII below and the attached Appendices for a full and further description of the views and related analyses that appear in summary form in this Executive Summary, as well as for certain caveats, assumptions and other considerations related to such views and related analyses.

## IV. THE MAKEWHOLE PROVISIONS

28.     From a financial and market-based perspective, makewhole provisions in indentures are generally intended to compensate holders of notes for future interest that would not be paid in the event the applicable notes were redeemed within a certain time period after issuance. As detailed in the Claim Objection, the First Lien Notes Indenture contains provisions under which, in certain specified circumstances — including optional redemptions of the First Lien Notes prior to their originally scheduled maturities — the Debtors are required to pay an "Applicable Premium,"[33] (the defined term in the applicable indentures referring to makewhole amounts).[34] The "Applicable Premium" is determined in part by computing the present value as of any applicable redemption date of certain future interest payments due on the relevant notes to be redeemed using a discount rate tied to the Treasury Rate (as defined in the relevant indentures) plus 50 basis points.[35] Thus, in the event of an optional redemption of the relevant notes, this payment would be commonly understood by market participants as being made to compensate holders of notes for future interest that would not be paid on such notes.

---

[33] *See* Claim Objection at 8-11.

[34] *Id.* at 3.

[35] *Id.* at 9.

SA0016

29.    At the request of the Debtors, (i) Appendix C provides illustrative calculations of the amount of the "Applicable Premium" that would be payable under the First Lien Notes Indenture in connection with a hypothetical optional redemption of the underlying notes as of an assumed Effective Date of December 31, 2021, and (ii) Appendix D provides illustrative calculations of the amount of the "Applicable Premium" that would be payable under the First Lien Notes Indenture in connection with a hypothetical optional redemption of the underlying notes as of the Petition Date (October 12, 2020).

30.    If the "Applicable Premium" were illustratively calculated as being payable as of an assumed Effective Date of December 31, 2021, in the manner set forth in Appendix C (and subject to the various estimates and assumptions described there), the amount required to be paid under the First Lien Notes Indenture would equal approximately $38 million.

31.    If the "Applicable Premium" were illustratively calculated as being payable as of the Petition Date (October 12, 2020), in the manner set forth in Appendix D (and subject to the various estimates and assumptions described there), the amount required to be paid under the First Lien Notes Indenture would equal approximately $94 million.

32.    At the outset of the Debtors' bankruptcy cases, the Debtors negotiated an "adequate protection" order with representatives of First Lien Noteholders and others.[36]  Together with the Debtors' other advisors, members of my team and I assisted the Debtors in connection with those negotiations.  I understand that, since the Petition Date, the Debtors have paid interest on the First

---

[36] See Final Order Under Bankruptcy Code Sections 105(a), 361, 362, 363, 503, and 507, and Bankruptcy Rules 4001 and 9014 (I) Authorizing Debtors To Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying Automatic Stay; and (IV) Granting Related Relief [D.I. 586] (the "***Adequate Protection Order***").

Lien Notes to the First Lien Noteholders at the applicable contract rate, plus additional amounts including fees and expenses, pursuant to the Adequate Protection Order. Accordingly, as described in the Claim Objection, if the Debtors are required to pay the "Applicable Premium" as of the Petition Date, then with respect to the period between the Petition Date and the Effective Date, they will have paid *both* the contractual interest owed on the First Lien Notes during that period *and* the "premium" intended to compensate for the loss of such interest, essentially giving the noteholders a double recovery, which, seen purely from a financial and market-based perspective, produces a result that goes beyond the commercial interests that such makewhole provisions are generally intended to protect.

## V. THE CRAM-DOWN FIRST LIEN NOTES

33. As noted above, the Plan contemplates that, under certain circumstances, the holders of First Lien Notes may receive – "in full and final satisfaction" of their claims – the Cram-Down First Lien Notes. If the Cram-Down First Lien Notes are actually issued on the Effective Date on the terms set forth in the Plan and the Cram-Down First Lien Notes Summary Terms, then, subject to the assumptions set forth in this Declaration, I believe that – at their time of issuance, on the Effective Date – the Cram-Down First Lien Notes will have an "at par" market value.

34. The foregoing view is based on, among other things, (a) my review of the materials identified in Appendix B, my knowledge and expertise as an investment banker, and the totality of information I have acquired since being engaged by the Debtors in September 2019, and (b) in addition, on the following analysis:

a) Under the Plan, including the Cram-Down First Lien Notes Summary Terms, the coupon rate for the Cram-Down First Lien Notes will equal the weighted average YTW rate generated by the Single B Reference Index (rounded to the nearest 0.125%) as of the

SA0018

Effective Date (subject to a maximum coupon of 10%).[37]  As stated above, with respect to the bonds identified in the Single B Reference Index, each bond's YTW rate generally reflects the lowest "coupon" rate needed by prospective market participants in order for such bond to trade at or around "par."

b) The Single B Reference Index is a subset of the broader ICE BofA US High Yield Index, which "tracks the performance of US dollar denominated below investment grade corporate debt publicly issued in the U.S. domestic market."[38]  It includes securities with a remaining term to final maturity greater than or equal to eight years.  The Single B Reference Index consists of securities with composite ratings[39] of B1 to B3.  The securities tracked by the Single B Reference Index share certain matching qualifying conditions, which are set forth in Appendix E (the "***Qualifying Conditions***").  The Single B Reference Index is commonly viewed by financial industry participants as an appropriate measure of current market terms applicable to bonds similar to the Cram-Down First Lien Notes.

c) I believe, for the reasons explained here, that on the Effective Date, the Cram-Down First Lien Notes will be generally comparable to the bond constituents that comprise the Single B Reference Index.  Based on the Plan, including the Cram-Down First Lien Notes Summary Terms, at the time of their issuance, on the Effective Date, the Cram-Down First Lien Notes would satisfy the same key Qualifying Conditions shared by the Single B

---

[37]  For clarity, even if the applicable YTW rate as of the Effective Date is greater than 10%, the coupon rate for the Cram-Down First Lien Notes will not exceed 10%, the current interest rate on the First Lien Notes.  Such a scenario may have an adverse impact on the trading price of the Cram-Down First Lien Notes.

[38]  ICE Data Indices – Rules & Methodology (via Bloomberg).

[39]  Composite ratings are based on the simple average of ratings from Moody's, S&P and Fitch.

Reference Index's bond constituents; namely: (i) the Cram-Down First Lien Notes are anticipated to be rated below investment grade, (ii) at the time of issuance, the Cram-Down First Lien Notes' maturity date would be more than 18 months away, (iii) the Proposed Coupon Rate will consist of a fixed coupon schedule, (iv) the Cram-Down First Lien Notes will consist of an aggregate amount of principal outstanding in excess of $250,000,000, and (v) the Cram-Down First Lien Notes will have risk exposure to the countries specified in Appendix E.  In addition, based on the Plan and the Cram-Down First Lien Notes Summary Terms, certain key terms applicable to the Cram-Down First Lien Notes—the coupon rate, maturity, call protection, and equity redemption rate—are in line with the weighted average of those same terms as they appear in the Single B Reference Index. Attached as Appendix F is a chart comparing the relevant Cram-Down First Lien Notes Summary Terms to those in the Single B Reference Index across those metrics.

d) I have also examined various relevant credit statistics[40] for the Debtors, on a pro forma basis upon exit from bankruptcy, as compared to the mean credit statistics for index peers appearing in the Single B Reference Index and attached in Appendix F.  In particular, I have examined the index mean levered free cash flow to debt ratio, which is commonly viewed by financial industry participants as one of the more reliable indicators for a company's ability to satisfy its debt obligations.  This ratio calculates the amount of debt that could be repaid each year with cash flow generated by the company from its own

---

[40] As of October 6, 2021, per FactSet.

SA0020

operations.[41]  Mallinckrodt's pro forma calculation following exit (assuming year-end 2022) of its levered free cash flow to debt ratio would be 7.8%, as compared to 8.2% for the other companies appearing in the Single B Reference Index.  This further reinforces my belief that pricing the Cram-Down First Lien Notes using the weighted average YTW Rate of the Single B Reference Index is appropriate.

e)



---

[41] Calculated, with respect to any company, as (i) (A) the amount of the last twelve months of cash flow from such company's operations, minus (B) the amount of capital expenditures made by such company during the same twelve-month period, divided by (ii) the amount of such company's total debt outstanding as of the relevant determination date.

21

f) The weighted average YTW rate that is generated by the Single B Reference Index is commonly viewed by financial industry participants and bond investors alike as a reliable indicator of the lowest annual yield that a hypothetical bond investor – at the moment in time on which the relevant weighted average YTW rate is determined – expects to earn on a bond with attributes similar to those of the bond constituents that make up the Single B Reference Index. The weighted average YTW rate fluctuates daily based on the constituent bonds' pricing movements. As can be seen in Appendix F, with respect to any bond identified on the Single B Reference Index, where the price of such bond is trading at a premium to par,[43] the YTW rate for that bond will be lower than its coupon rate, and where the price of such bond is trading at a discount to par, the YTW rate for that bond will be higher than its coupon rate. The closer a bond's price comes to trading at or around "par," the closer the YTW rate comes to equaling that bond's coupon rate.

g) In light of the many attributes and commonalities shared between the Cram-Down First Lien Notes and the bond constituents in the Single B Reference Index, including ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ common key bond terms, by setting the coupon rate for the Cram-Down First Lien Notes to equal the weighted average YTW rate generated by the Single B Reference Index (subject to a maximum coupon of 10%), at their

---

[43] A bond that is trading "at a premium to par" is trading above 100% of its face amount, a bond trading "at a discount to par" is trading at less than 100% of its face amount, and a bond trading "at or around par" is trading at or around 100% of its face amount.

22

moment of issuance, on the Effective Date, the Cram-Down First Lien Notes would be expected to have an "at par" market value.

h) The likelihood of the Cram-Down Notes having an "at par" market value, as of the Effective Date, further increases when one compares the Reorganized Debtors' estimated Total Enterprise Value with the Reorganized Debtors' anticipated leverage upon emergence.

i) As set forth in the Disclosure Statement, on the Effective Date, after giving effect to the transactions contemplated by the Plan, the Reorganized Debtors expect to have approximately $4.0 billion[44] in funded debt, consisting of $4.0 billion of secured funded indebtedness and no unsecured funded indebtedness.

j) At the same time, pursuant to the Valuation Analysis attached as Exhibit F to the Disclosure Statement (subject to the various qualifiers and assumptions set forth therein), the Total Enterprise Value of the Reorganized Debtors has been estimated to be approximately $5.2 billion to $5.7 billion, with a midpoint of $5.45 billion. [45]  Even after deducting the estimated $4.0 billion of secured funded indebtedness from the $5.2 billion estimated

---

[44]  This amount assumes that the First Lien Notes Makewhole Claims are Allowed in the amount of approximately $103 million, the maximum amount contemplated by the Disclosure Statement (page 6).  In the event the Makewhole Claims are not included, the amount of secured funded indebtedness would be approximately $3.9 billion.

[45] As further explained in the Declaration of Punit Mehta in Support of Confirmation of the First Amended Joint Plan of Reorganization of Mallinckrodt Plc and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, filed contemporaneously herewith, I understand that Mr. Mehta revisited the Valuation Analysis to consider certain refreshes to the Debtors' strategic plan, leading to a decrease in the estimated midpoint of Total Enterprise Value of approximately 7%.  Even after reflecting this decrease, this continues to show a substantial cushion in excess of secured funded indebtedness and does not change my views.

SA0023

lowpoint, this continues to show a substantial minimum cushion of approximately $1.2 billion in remaining value.[46]

k)   In addition, as described more fully in the *Declaration of Stephen A. Welch, Chief Transformation Officer, in Support of Chapter 11 Petitions and First Day Motions* (Docket No. 128) (the "First Day Declaration"), the First Lien Notes have first-priority liens on substantially all of the Debtors' assets as of the Petition Date.  Based on the Plan, including the Cram-Down First Lien Notes Summary Terms, all of the obligations under the First Lien Cram-Down Notes are likewise expected to have first-priority liens in substantially all of the Reorganized Debtors' assets.  While I have not conducted an appraisal of the particular assets or other collateral expected to secure the Reorganized Debtors' post-emergence secured funded indebtedness, I understand that the liens on substantially all the Debtors' assets would be expected, in a default scenario, to provide the Reorganized Debtors' post-emergence secured creditors with access to substantially all of the value of the Reorganized Debtors' businesses.

l)   Considering the substantial minimum cushion in remaining value described above, even after deducting the full amount of the applicable estimated secured funded indebtedness that the Debtors expect to have as of the Effective Date from the $5.2 billion lowpoint of the estimated Total Enterprise Value, the Cram-Down First Lien Notes appear to be meaningfully oversecured.  This further supports the likelihood of the Cram-Down First Lien Notes having an "at par" market value as of the Effective Date.

---

[46]  If the First Lien Makewhole Claims are not Allowed, the equity cushion would increase to approximately $1.3 billion.

m) In addition to the various assumptions and other considerations specified elsewhere in this Declaration (and in the Appendices), my views and analyses are also based on the assumption that an active liquid market will exist for the Cram-Down First Lien Notes at the time they are issued on the Effective Date. While I cannot guarantee whether an active liquid market for the Cram-Down First Lien Notes will exist or be maintained as of or following the Effective Date, given the current existence of an active market for the First Lien Notes (including during the pendency of these chapter 11 cases), I have no reason to believe that an active liquid market would not exist for the Cram-Down First Lien Notes following their issuance (although any trading market, including any market for the Cram-Down First Lien Notes, may be adversely affected at certain points in time on account of economic, business, financial, legislative or other factors).

## VI. RESPONSE TO MR. MANNING'S OPINIONS REGARDING THE CRAM-DOWN FIRST LIEN NOTES

35. Mr. Manning has disclosed that, in his opinion, the Proposed Coupon Rate understates the appropriate market rate of interest for the Cram-Down First Lien Notes. In support of this opinion, Mr. Manning has offered three analyses, based on (1) the bond pricing of a supposed "peer group" of pharmaceutical issuers, (2) a comparison of the terms of the Cram-Down First Lien Notes against the terms of the New Takeback Term Loans contemplated under the Plan, and (3) preliminary responses that the Debtors received from investment banks in response to a Request for Proposals contemplating the issuance of new first-lien debt post-emergence. I have reviewed Mr. Manning's opinions and analyses, and I do not find them persuasive.

### A. Mr. Manning's "Peer Group" of Issuers

25

36.     Mr. Manning has opined that the Proposed Coupon Rate understates the appropriate coupon rate for the Cram-Down First Lien Notes in part based on his analysis of the bond pricing of purportedly comparable pharmaceutical issuers that comprise a "peer group" for the Reorganized Debtors.  I disagree with his analysis and conclusion.

37.     Although Mr. Manning has set forth a list of thirteen first lien bonds and loans that he considers "comparable" to the Cram-Down First Lien Notes, Mr. Manning has not explained his conclusion that the issuers of those notes are comparable to the Reorganized Debtors and thus appropriate for this analysis.  Instead, Mr. Manning appears to have adopted the exact same set of bonds and loans that were used in an analysis previously conducted by another expert.[47]

38.     Upon review of the pharmaceutical companies selected as "pharmaceutical peers" by Mr. Manning for purposes of his analysis, it is clear that some of those companies are not appropriate candidates for this analysis.



_____

[47]  The other expert, Alexander Rohan, was put forward by Deerfield (a second lien noteholder that has since agreed to support the Plan).  To my knowledge, Mr. Rohan will not be testifying in opposition to the Plan.

26





SA0027





SA0028



29

SA0029



43.     While the revised peer group above may be more appropriate than the one used by Mr. Manning, I believe that, in this case, peer group analysis is not an appropriate method for determining proper pricing. ███████████████████████████ Mr. Manning's peer group remains selective and much smaller than the bond constituents in the Single B Reference Index.[62]  It is thus subject to skewing by idiosyncratic issues present in those few companies.  I believe it is more appropriate to set the proper pricing for the Cram-Down First Lien Notes using the Single B Reference Index, which, as of October 2021, consists of 75 constituent securities.

**B.     Mr. Manning's Opinion Regarding the New Takeback Term Loans**

44.     In the Manning Report, Mr. Manning also opines that the Proposed Coupon Rate is too low because it is inconsistent with the implied coupon rate for the Cram-Down First Lien Notes that he derives from his analysis of the New Takeback Term Loans.  I disagree, and I do not believe

---

[62]  I note that Mr. Manning has contended that the Single B Reference Index does not include any pharmaceutical companies.  In fact, Bausch Health, a pharmaceutical company, is included on the Single B Reference Index.

SA0030

that the terms of the New Takeback Term Loans are a reliable indicator of the appropriate market-rate pricing for the Cram-Down First Lien Notes.

45.     Mr. Manning has disclosed that, in his opinion, the proposed terms for the New Takeback Term Loans "are reflective of the market rate for the Debtors' first lien credit risk" and "provide a sound basis to determine an appropriate market rate of interest for the Cram-Down First Lien Notes." Mr. Manning appears to suggest that the outcome of the mid-bankruptcy negotiations with the Credit Agreement lenders should be viewed as a proper indicator of the Cram-Down First Lien Notes' expected post-emergence "market" yield.

46.     As investment banker to the Debtors, I participated in negotiations on behalf of the Debtors with the Debtors' first-lien Credit Agreement lenders. Those negotiations covered a wide array of issues relating to these chapter 11 cases (including matters relating to adequate protection), involved a disparate group of creditors and took place against the backdrop of a challenging, longer-than-twelve-month period. Based on my involvement and participation in these negotiations, I believe the Debtors were motivated to reach an agreement with the first-lien Credit Agreement lenders in order to gain the lenders' support and accelerate the Debtors' emergence from these chapter 11 cases.

47.     In addition, at the time of those negotiations, there was significantly greater uncertainty regarding the Debtors' future capital structure and the timing for and path to emergence from bankruptcy. The Debtors did not have a settlement with either the Official Committee of Unsecured Creditors or the Official Committee of Opioid Plaintiffs. Nor did the Debtors have a settlement with the holders of Second Lien Notes. In light of the foregoing, I do not believe that the proposed terms for the New Takeback Term Loans can reasonably be viewed as reflective of the market rate for the Debtors' first lien credit risk upon emergence, nor do I believe that they

31

provide a sound basis to determine an appropriate market rate of interest for the Cram-Down First Lien Notes or, for that matter, any basis on which to predict the potential post-emergence trading price of the Cram-Down First Lien Notes.

48.     Mr. Manning's analysis also does not take into account another salient term of the New Takeback Term Loans:  namely, the Debtors' option to repay the Credit Agreement Claims in cash on the Effective Date rather than issuing the New Takeback Term Loans.  Pursuant to the Plan, the Debtors intend to refinance approximately $900 million of their first-lien debt through the New Term Loan Facility.[63]  If the terms of the New Term Loan Facility prove superior to those of the New Takeback Term Loans, the Debtors have the option to expand the size of the New Term Loan Facility and use the additional proceeds to repay holders of Credit Agreement Claims in cash, in which case they would not issue the New Takeback Term Loans.  Based on my involvement and participation in these negotiations, I believe the Debtors considered this option to be valuable to them, and they were, accordingly, willing to compensate the lenders for that optionality, including, among other terms, by agreeing to an increased interest rate to the New Takeback Term Loans.  Mr. Manning ignores the fact that the interest rate on the New Takeback Term Loans effectively functions as a ceiling, which provides the Debtors with the ability to access the capital markets to seek out cheaper, lower-yielding financing options.

###     C.     Mr. Manning's Opinion Regarding Investment Bank Feedback

---

[63] The Debtors have not yet finalized the terms of the New Term Loan Facility.  Indicative terms, including a range of interest rates, were set forth in Exhibit I of the Plan Supplement [D.I. 3613].

SA0032



33

SA0033



34



SA0035

## VII. THE FEDERAL/STATE ACTHAR SETTLEMENT AGREEMENTS

56.     As described in detail in the Disclosure Statement, prior to the commencement of these chapter 11 cases the Debtors actively engaged in discussions with the Department of Justice (the "**DOJ**") to try to settle ARD's Acthar-related liabilities in connection with a certain pending CMS Action (as defined in the Disclosure Statement) between the CMS and ARD regarding the calculation of Acthar rebates.  As noted in the Disclosure Statement, these discussions included providing the DOJ with considerable financial diligence and several rounds of offers and counteroffers.

57.     In September 2020, as described in the Disclosure Statement, the Debtors reached an agreement in principle with the DOJ, contingent upon a chapter 11 filing by Mallinckrodt plc, to resolve most Acthar-related claims and investigations of the federal government against the Debtors.  As noted in the Disclosure Statement, the terms of the agreement in principle were initially set forth in an exhibit to the Restructuring Support Agreement and, I understand, have since been memorialized in the definitive settlement agreements filed as Exhibit Q of the Plan Supplement [Docket No. 3602] (the "**Federal/State Acthar Settlement Agreements**").

58.     As set forth more fully in the Disclosure Statement, the Debtors' negotiations with the DOJ and CMS lasted several months.  As investment banker to the Debtors, I, along with certain of the Debtors' other advisors, assisted the Debtors with and participated in certain of these negotiations.  In connection with these negotiations, the Debtors provided the DOJ and CMS with diligence materials, including materials concerning the Debtors' financial condition and intention to pursue a chapter 11 restructuring.  Based upon discussions I observed and participated in, I believe that the Debtors' financial condition and impending restructuring were integral factors underlying the fundamental economic terms of the settlement that the parties, including the DOJ

36

and CMS, ultimately accepted.  Indeed, as noted in the Disclosure Statement, the settlement in principle with the DOJ and CMS was contingent upon and was to be effected through these chapter 11 cases.  Furthermore, based on negotiations I participated in and observed, I believe the existence and contemplated implementation pursuant to the chapter 11 plan of the opioid settlement (as memorialized in the Opioid Settlement Term Sheet (as defined in the Plan)) was an important consideration in the negotiations and ultimate settlement among the Debtors, the DOJ and CMS pertaining to these Acthar-related claims and investigations.  Accordingly, based on the foregoing, in my view, the Debtors' financial condition and financial distress would have been priced into the fundamental economic terms of that settlement.

SA0037

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: October 20, 2021

New York, NY

/s/ Brendan Hayes

Brendan Hayes

Senior Managing Director

38

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MALLINCKRODT PLC, *et al.*,[1] | ) Case No. 20-12522 (JTD) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DECLARATION OF PUNIT MEHTA IN**
**SUPPORT OF CONFIRMATION OF THE FIRST AMENDED**
**JOINT PLAN OF REORGANIZATION OF MALLINCKRODT PLC AND**
**ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

I, Punit Mehta, declare under penalty of perjury:

1.      I am a Senior Managing Director at Guggenheim Securities, LLC ("Guggenheim Securities"), an investment banking firm with principal offices located at 330 Madison Avenue, New York, New York 10017.  The above-captioned debtors and debtors in possession (collectively, the "Debtors") have retained Guggenheim Securities as their investment banker in these chapter 11 cases.[2]

2.      I submit this declaration (this "Declaration") in support of confirmation of the *First Amended Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter*

---

1      A complete list of the Debtors in these Bankruptcy Cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

2      On January 12, 2021, the Court entered an order approving the retention of Guggenheim Securities as the Debtors' investment banker in these chapter 11 cases [Docket No. 1142].

SA0097

*11 of the Bankruptcy Code* dated September 29, 2021 [Docket No. 4508] (the "Plan"), as modified, amended, or supplemented from time to time.[3]

3.      Although Guggenheim Securities is being compensated for its work as the investment banker retained by the Debtors, I am not being compensated separately for this testimony.   Except as otherwise indicated herein, all of the statements set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by Guggenheim Securities professionals involved in advising the Debtors in these chapter 11 cases, or information provided to me by the Debtors.  If called upon to testify, I could and would testify to the facts set forth herein on that basis.  I am over the age of 18 years and authorized to submit this Declaration.

### Qualifications

4.      I have been employed at Guggenheim Securities since October 2018.  Prior to joining Guggenheim Securities, I was the Global Co-Head of Healthcare Investment Banking at Credit Suisse Group AG.  Prior to joining Credit Suisse Group AG in 2016, I was Global Head of Life Sciences Investment Banking at Barclays Investment Bank.   Prior to joining Barclays Investment Bank, I worked at Lehman Brothers Holdings Inc.  I graduated with PGDBM/MBA from the Indian Institution of Management Ahmedabad and my B.S. from the University of Mumbai. I also received an ACA from the Institute of Chartered Accountants of India.

5.      I personally have over 21 years of experience advising healthcare and pharmaceutical companies, including with respect to restructuring transactions and mergers and

---

[3]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan, the Valuation Analysis (as defined below) or the *Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 2917] (the "Disclosure Statement"), as applicable.

SA0098

acquisitions.  I have spent the majority of my career focused on clients within the biopharma sector, including large-cap pharmaceutical companies, innovation-driven biotech companies, and specialty and generics pharmaceuticals companies.  Among other clients, I have advised Jazz Pharmaceutical in its $7.2 billion acquisition of GW Pharmaceuticals, MyoKardia in its $13.1 billion sale to Bristol Myers Squibb, Pfizer in its $11.8 billion acquisition of Array BioPharma, Albany Molecular in its $1.3 billion take-private sale to Carlyle and GTCR, Teva Pharmaceutical in its $40.5 billion acquisition of Actavis's generics business (and related acquisition financing), Endo in its $8.05 billion acquisition of Par (and related acquisition financing), and Mallinckrodt in its $1.3 billion acquisition of Therakos (and related acquisition financing) and its $5.6 billion acquisition of Questcor (and related acquisition financing).

6.      Guggenheim Securities has been engaged as investment banker to the Debtors, and I, along with my colleagues, have been working closely with the Debtors, since September 2019. Since being engaged by the Debtors, Guggenheim Securities has rendered investment banking advisory services to the Debtors in connection with, among other things, the Debtors' evaluation of their strategic alternatives and certain financing considerations. Additionally, Guggenheim Securities has worked closely with the Debtors' management and other professionals retained by the Debtors with respect to these strategic alternatives and has become acquainted with the Debtors' capital structure and businesses.

**Valuation Analysis**

7.      At the Debtors' request, and solely for purposes of the Plan and the Disclosure Statement and as more fully set forth in the valuation analysis attached as Exhibit F to the Disclosure Statement [Docket No. 2285-3], Guggenheim Securities performed various indicative financial analyses to estimate the total enterprise value (the "Total Enterprise Value") of the Reorganized Debtors on a consolidated going-concern basis and *pro forma* for the transactions

SA0099

contemplated by the Plan (the "Valuation Analysis").  I directed employees of Guggenheim Securities in connection with such indicative financial analyses and this Declaration contains my views, based upon the results of such indicative financial analyses, as to the range of the Reorganized Debtors' estimated Total Enterprise Value.

8.      As set forth in the Valuation Analysis, based on the indicative financial analyses performed by Guggenheim Securities, Guggenheim Securities estimated the Total Enterprise Value of the Reorganized Debtors to be approximately $5.2 to $5.7 billion, with a midpoint of $5.45 billion.  As more fully set forth in the Valuation Analysis, the foregoing indicative financial analyses (conducted as of April 16, 2021) are based, among other things, on the financial projections prepared by the Debtors, which are attached as Exhibit D to the Disclosure Statement (the "Financial Projections"), on an assumed September 24, 2021 Effective Date (at which time the Debtors would emerge from these chapter 11 proceedings) and on market data as of April 16, 2021; reflect information made available to Guggenheim Securities as of or prior to such date; and are based on economic, capital markets and other conditions as of such date.  Guggenheim Securities is not making any assessment regarding the impact or the economic effects of the COVID-19 pandemic, including with respect to the potential impact or effects on the future financial performance of the Reorganized Debtors.  Although the Valuation Analysis may be affected by subsequent developments, including, without limitation, developments relating to the COVID-19 pandemic, Guggenheim Securities assumes no responsibility for updating or revising the estimated Total Enterprise Value or the implied estimated Equity Value (as defined in the Valuation Analysis) of the Reorganized Debtors for any reason, whether due to facts, circumstances or events occurring after such date or otherwise.

SA0100

9.      The Valuation Analysis provides a full description of the indicative financial analyses performed by Guggenheim Securities, as well as certain caveats and considerations related to the analyses described therein.

10.     On September 8, 2021, I received a summary refresh of the Debtors' strategic plan, which updated the Reorganized Debtors' forecast through 2025 based on changes in certain high-level sales and cost assumptions prepared by Debtors' management (the "Refresh").  When comparing the Refresh with the Debtors' strategic plan underpinning Guggenheim Securities' Valuation Analysis, I believe that the net effect of utilizing the Refresh and including illustrative value for the StrataGraft Priority Review Voucher (holding all other factors constant) would lead to a decrease in estimated midpoint Total Enterprise Value of approximately 7%.

11.     In preparing the Valuation Analysis, Guggenheim Securities relied on, among other things, the Financial Projections provided by the Debtors' senior management, which we understand assume, among other things, that the Plan will be consummated in a timely manner in accordance with its terms and the terms of the Restructuring Support Agreement, and that definitive agreements memorializing the understandings set forth in the Federal/State Acthar Settlement and Opioid Settlement Term Sheet (each as defined in the Plan) (collectively, the "Settlements") will be entered into.

12.     Additionally, I have been advised by Debtors' counsel that, in the absence of the Settlements, the Debtors (i) would face a protracted and lengthy bankruptcy litigating thousands of lawsuits, (ii) would be unable to obtain the court-provided important legal protections, such as the channeling injunction, that are available as a result of the Settlements, and (iii) would remain subject to the risk of potential future opioid-related liabilities.

SA0101

13.     Accordingly, based on my experience as an investment banker, including in connection with numerous M&A processes, I believe that the most likely value-maximizing strategy the Debtors would pursue, absent the Settlements, in consultation with their advisors, would be to seek to sell their Specialty Brands and Specialty Generics businesses in one or more section 363 sale processes, with some of the businesses likely being sold as going concerns and others likely being sold in piecemeal liquidations.  I understand that AlixPartners LLP has conducted an analysis of certain such scenarios, which is laid out in the *Expert Report of Randall S. Eisenberg*, dated August 13, 2021.

14.     Finally, given the current state of some of the Debtors' key franchises, including Acthar® Gel and INOmax®, which have not yet achieved the stability that the management projections reflect over time, I believe that successfully consummating any such sale or series of sales in the near term would be difficult and challenging.  Thus, in such a scenario, I believe that any sale or series of sales of the Debtors as a going concern would likely be at a meaningful discount to the estimated Total Enterprise Value of the Reorganized Debtors set forth in the Valuation Analysis.

*[Remainder of page intentionally left blank]*

SA0102

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  October 26, 2021                     /s/ Punit Mehta
         New York, New York                   Punit Mehta
                                    Senior Managing Director
                                    Guggenheim Securities, LLC

SA0103

```
 1                      UNITED STATES BANKRUPTCY COURT
                           DISTRICT OF DELAWARE
 2
                                        .   Chapter 11
 3    IN RE:                            .
                                        .   Case No. 20-12522 (JTD)
 4    MALLINCKRODT PLC, et al.,         .
                                        .
 5                                      .   Courtroom No. 5
                                        .   824 North Market Street
 6                                      .   Wilmington, Delaware 19801
                                        .
 7                         Debtors.     .   Friday, October 29, 2021
 8    . . . . . . . . . . . . . . . .   9:30 A.M.

 9                  TRANSCRIPT OF PRETRIAL CONFERENCE
                 BEFORE THE HONORABLE JOHN T. DORSEY
10                  UNITED STATES BANKRUPTCY JUDGE

11    TELEPHONIC APPEARANCES:

12    For the Debtor:          Michael J. Merchant, Esquire
13                             RICHARDS, LAYTON & FINGER, P.A.
                               Rodney Square
14                             920 N. King Street
                               Wilmington, Delaware 19801
15
                               - and -
16
                               Betsy Marks, Esquire
17                             LATHAM & WATKINS LLP
                               200 Clarendon Street
18                             Boston, Massachusetts 02116

19

20    Audio Operator:          Lesa Neal/Jermaine Cooper, ECROs

21    Transcription Company:   Reliable
                               1007 N. Orange Street
22                             Wilmington, Delaware 19801
                               (302) 654-8080
23                             Email:  gmatthews@reliable-co.com

24
      Proceedings recorded by electronic sound recording, transcript
25    produced by transcription service.
```

```
 1  APPEARANCES (Cont'd):

 2  For the Debtors:         Jason B. Gott, Esquire
                             LATHAM & WATKINS LLP
 3                           330 North Wasabi Avenue, Suite 2800
                             Chicago, Illinois 60611
 4
                                  - and -
 5
                             Christopher Harris, Esquire
 6                           LATHAM & WATKINS LLP
                             1271 Avenue of the Americas
 7                           New York, New York 10020

 8                                - and -

 9                           Emil Kleinhaus, Esquire
                             WACHTELL, LIPTON, ROSEN & KATZ
10                           51 West 52nd Street
                             New York, New York 10019
11
    For Acthar Plaintiffs:   David Haviland, Esquire
12                           HAVILAND HUGHES
                             112 Haddontowne Court, Suite 202
13                           Cherry Hill, New Jersey 08034

14                                - and -

15                           Albert Ciardi, Esquire
16                           CIARDI CIARDI & ASTIN
                             1204 North King Street
17                           Wilmington, Delaware 19801

18  For Sanofi-Aventis:      Jason Hopkins, Esquire
19                           DLA PIPER LLP (US)
                             1900 N. Pearl Street, Suite 2200
20                           Dallas, Texas 75201

21  For the Ad Hoc First     Donald Burke, Esquire
    Lien Notes Group:        ROBBINS, RUSSELL, ENGLERT, ORSECK,
22                              UNTEREINER & SAUBER LLP
                             2000 K Street NW, 4th Floor
23                           Washington, DC 20006

24  For the First Lien       Michael Cohen, Esquire
    Term Lender Group:       GIBSON, DUNN & CRUTCHER LLP
25                           200 Park Avenue
                             New York, New York 10166
```

```
 1   APPEARANCES (Cont'd):

 2   For Deutsche Bank:        Michele Meises, Esquire
                               WHITE & CASE LLP
 3                             1221 Avenue of the Americas
                               New York, New York 10020
 4
     For the Committee:        Patrick Birney, Esquire
 5                             ROBINSON & COLE LLP
                               280 Trumbull Street
 6                             Hartford, Connecticut 06103

 7
     Ad Hoc Revolving Loan     James Johnston, Esquire
 8   Participants Group:       JONES DAY LLP
                               555 South Flower Street
 9                             Fiftieth Floor
                               Los Angeles, California 90071
10
     Governmental Plaintiffs   Gerard Cicero, Esquire
11   Ad Hoc Group:             BROWN RUDNICK LLP
                               7 Times Square
12                             New York, New York 10036

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SA0106

1   CONFIRMATION HEARING RELATED ITEMS:

2   1. Pre-trial Conference for Phase 1 of the Confirmation
    Hearing
3
    2. The Ad Hoc Acthar Group's Motion In Limine to Preclude Use
4   of Late-Produced Acthar Documents by Debtors' Counsel at
    Arnold & Porter [Docket No. 4780 – filed October 18, 2021]
5
    3. Ad Hoc Acthar Group's Motion In Limine to Preclude Any
6   Evidence at Hearing on Debtors' Motion to Assume, or at any
    Plan Confirmation Proceeding, Going to the Merits or to
7   Antitrust Issues Because the Only Issue Before the Court is
    the Exercise of the Debtors' "Business Judgment" [Docket No.
8   4785 – filed October 18, 2021]

9   4. Ad Hoc Acthar Group's Motion In Limine to Sequester
    Witnesses [Docket No. 4786 – filed October 18, 2021]
10
    5. Ad Hoc Acthar Group's Motion In Limine to Order All
11  Witnesses Testify Live, Either in Person or by Zoom with
    Appropriate Restrictions [Docket No. 4787 – filed October 18,
12  2021]

13  6. Ad Hoc Acthar Group's Motion In Limine to Preclude Debtors
    from Presenting Evidence or Testimony that Seeks to Refute or
14  Go Beyond the Scope of, or is Otherwise Inconsistent with, the
    Rule 30(b)(6) Designees [Docket No. 4788 – filed October 18,
15  2021]

16

17

18

19

20

21

22

23

24

25

1       (Proceedings commence at 10:02 a.m.)

2              THE COURT:  Good morning.  This is Judge Dorsey.

3   We're on the record in Mallinckrodt PLC, Case Number 20-

4   12522.

5              I'll go ahead and turn it over to debtors' counsel

6   to run the agenda.

7              MR. MERCHANT:  Good morning, Your Honor.  Michael

8   Merchant of Richards Layton on behalf of the debtors.

9              Your Honor, there are several matters on the

10  agenda today, but predominantly this is the date that was

11  scheduled for our pretrial conference with regards to our

12  confirmation hearing.  I see that Ms. Marks is on to address

13  that and the issues surrounding the pretrial order that was

14  filed.

15             THE COURT:  All right.  Ms. Marks, go ahead.

16             MS. MARKS:  Good morning, Your Honor.  Betsy Marks

17  for the debtors from Latham & Watkins.

18             The debtors filed their draft pretrial order

19  yesterday, last night.  We had circulated a draft of that in

20  advance to the objecting parties and other parties-in-

21  interest the day before.  We did try to incorporate feedback

22  where we got it.  There's still some information missing

23  about some of the witnesses.  But what I think we should do

24  this morning is to walk through it.  Your Honor has it, I

25  don't necessarily need to go through every detail in it,

1   although I'm happy to answer any questions.  And then, as we

2   get to open items or questions or disputes, we can pause and

3   address those.

4              THE COURT:  All right.

5              MS. MARKS:  Does that make sense for the Court, or

6   would you like to approach it a different way?

7              THE COURT:  No.  Go ahead.

8              MS. MARKS:  Okay.  There are three issues that

9   will be addressed in phase one.  And as I mentioned before,

10  I'm going to embrace the "phase" terminology.  Phase one of

11  the plan confirmation hearing is scheduled to begin next

12  week; it will begin on Monday.  The three issues to be

13  addressed in phase one are the debtors' valuation -- and this

14  is the TEV, as well as some -- as well as some analysis

15  regarding the debtors' liquidation analysis.  The debtors

16  will have two expert witnesses to put on the stand for this

17  topic.

18             The second issue to be addressed is noticing and

19  voting.  We will have one fact witness from Prime Clerk.  I

20  would note that the noticing and voting, while we will be

21  covering this in phase one, we are excluding the opioid

22  noticing program.  That was a different noticing program

23  because there was no bar date for the opioid claimants.  We

24  are saving that to address in phase two, along with other

25  opioid-related issues.

7

1          The third issue to be addressed in phase one is

2   the funded debt dispute.  It's really a two-party dispute

3   between the debtors and several tranches of noteholders.  So

4   we're referring to that as the "make-whole" or "cram-down"

5   dispute, and that will be -- we've scheduled that to be held

6   on Friday, the 5th.

7          So those are the three issues for phase one.  It's

8   relatively limited.  We will then -- you know, as the plan

9   is, we will then, next week, turn to the Acthar

10  administrative claims hearing, and that will proceed as long

11  as it takes.

12          In phase two, when we come back to the

13  continuation of the plan confirmation hearing, we will hear

14  and litigate all other issues, including the opioid

15  settlement, the UCC allocation, and other plan objections.

16  So that's a general overview of how we see this process

17  unfolding.

18          The witnesses -- I'm scrolling down the pretrial

19  order to the witnesses, which start on Page 10.  As I

20  mentioned, the debtors have two expert witnesses to put on,

21  on valuation.  Those witnesses are Punit Mehta from

22  Guggenheim Securities and Marc Brown from AlixPartners.

23          We -- the debtors would proffer putting forward

24  their direct testimony through declaration, but there have

25  been some objections to that.

8

1             THE COURT:  All right.  Ms. Marks, can I --

2             MS. MARKS:  This is --

3             THE COURT:  -- interrupt you for one second,

4    please?

5             MS. MARKS:  Of course.

6             THE COURT:  Is there a way for you to turn off the

7    notification on your computer because I keep getting bleeps

8    while you're talking every time you get a message.

9             MS. MARKS:  Yes, I am going to -- I'm going to

10   just shut down that program, so you don't hear the beeps.

11            THE COURT:  All right.  Thank you.

12            MS. MARKS:  I apologize, Your Honor.

13            And so, turning back to the witnesses, I don't

14   believe that there are any objections or disputes to the

15   debtors putting on Mr. Mehta or Mr. Guggenheim [sic].  I

16   believe the only dispute relates to whether their testimony,

17   for direct examination, should come in live on the stand or

18   via declaration.  We would propose proffering it through

19   declaration.  There has been an objection to that from the Ad

20   Hoc Acthar Group.

21            And there is a motion in limine that tees up that

22   issue.  So, in a few minutes, I will turn it over to Chris

23   Harris, who will be arguing that motion in limine.  I'll just

24   finish running through the witnesses for phase one first.

25            We have a third expert witness, it's Brendan Hayes

1  from Guggenheim Securities, and he will be the debtors'

2  witness in the funded debt litigation on the 5th.  I don't

3  believe that there are any disputes regarding him.  The

4  counterparties to that dispute have not objected to his live

5  testimony -- or I should say have not objected to his direct

6  testimony coming in via declaration.

7           In phase one, the debtors have one fact witness,

8  it is James -- and I admit I'm not exactly sure how to

9  pronounce his last name, I think it's Daloia, James Daloia

10 from Prime Clerk, who will be the fact witness on noticing

11 and voting.  Again, we would propose doing his live testimony

12 via declaration, but there is an objection to that, which we

13 can cover.

14          What we have proposed for the order of those --

15 these witnesses is that, on Monday the 1st, we will do Punit

16 Mehta and Marc Brown first, in that order.  We expect that

17 there will be some cross-examination.  The Ad Hoc Acthar

18 Group has indicated that it would like to cross-examine them.

19 Other parties have reserved their rights to do so, and it

20 possible that other parties may want to cross-examine them.

21 But at this point, it seems likely, most likely that it will

22 -- may only be the Ad Hoc Acthar Group.  We will see on that.

23          We then would put James Daloia on the stand on

24 Tuesday to cover notice and voting.  There will be several

25 parties cross-examining James:  The Ad Hoc Acthar Group, the

1   Russian Federation of Unregistered Shareholders, and the

2   Canadian Elevator Pension Fund.  So three parties have all

3   indicated that they would like to cross-examine him, and

4   other parties have reserved the right to do so, as well.

5          I understand that we do have the next two days,

6   Wednesday and Thursday, reserved for the Court, although I

7   would defer to the Court on whether we do or not.  I'm not

8   exactly sure of the schedule.  But if there are additional

9   witnesses, they could proceed on Tuesday into the next days,

10  as need.

11         The funded debt litigation is then set to go

12  forward on Friday.  And as I mentioned, that would be Brendan

13  Hayes from Guggenheim, who would be the debtors' witness.

14  And then the counterparties to that have their own witness,

15  as well.

16         And I will pause there, Your Honor.  We do have

17  some issues to address regarding other parties' witnesses;

18  specifically the Ad Hoc Acthar Group has served a witness

19  list, I think, without about a dozen witnesses, and there are

20  going to be some disputes regarding their witnesses.

21         But first, if it pleases, Your Honor, we could

22  pause and address the topic of whether or not the debtors'

23  witnesses should come in live or be a declaration or -- would

24  you like to address it that way or do you have any questions

25  so far?

11

 1            THE COURT:  Well, we can do that one, first.  But

 2   I had a couple of other issues that I saw in the pretrial

 3   order.

 4            Number one, attorneys being in the room with the

 5   witness while they're testifying, I'm not going to allow

 6   that.  Witnesses need to be alone.

 7            MS. MARKS:  Okay.

 8            THE COURT:  I need to be able to see them up

 9   close, so I can judge their credibility.  So witnesses will

10   have to be by themselves and not in communication, in any

11   way, with counsel during their testimony.

12            MS. MARKS:  Okay.  Understood.

13            THE COURT:  I had an issue with this idea that

14   witnesses who are being put on by the debtor in connection

15   with phase one, that somebody who is going to be raising an

16   issue in phase two has to cross-examine that witness on phase

17   two issues at that same time.  I'm not going to allow that,

18   either.  We're doing phase one and phase one only.  So, if

19   the witness is going to be coming back in phase two, so be

20   it.

21            We'll have to come back and do it in phase two,

22   number one, because I was asked the other day and the debtors

23   only wanted to provide me with copies of the exhibits for

24   phase one, so I don't even have all the exhibits for phase

25   two.  So we're not going to allow that, either.

1           MS. MARKS:  Okay.

2           THE COURT:  On use of depositions at trial, the

3  pretrial order refers to Federal Rule of Evidence 804.

4  There's also Federal Rule of Evidence -- or excuse me --

5  Federal Rule of Civil Procedure 32, which governs the use of

6  depositions at trial.  That wasn't addressed.  And it has

7  some additional information in Rule 32.  For example, a

8  deposition of a party opponent can be used for any purpose at

9  trial.  So that needs to be addressed in the final version.

10  So it should be pursuant to Rule 32 and Rule of Evidence 804.

11           MS. MARKS:  Understood.

12           THE COURT:  Let me see if I had any other issues

13  before we get to the next one.

14      (Pause in proceedings)

15           THE COURT:  All right.  We can go on to the use of

16  declarations for direct.

17           MS. MARKS:  Thank you, Your Honor.  I will turn it

18  over to Chris Harris.  This is a motion in limine, this issue

19  is teed up in the motion in limine filed by the Ad Hoc Acthar

20  Group, which we have responded to.  So Mr. Harris will

21  address this issue in the context of our reviewing that

22  motion.

23           THE COURT:  All right.  Go ahead, Mr. Harris.

24      (No verbal response)

25           THE COURT:  I can't hear you, Mr. Harris, and

1  you're frozen.  I don't know if there's something wrong with

2  your computer.

3       (No verbal response)

4            THE COURT:  Can't hear you, Mr. Harris.

5            This is another issue that everybody needs to be -

6  - make sure before we start that I can hear -- especially the

7  witnesses, but I've got to hear the counsel asking the

8  questions, too, obviously.  But everybody should test their

9  systems.  If you need to work with the Court ahead of time to

10  try and test your systems, that's fine, too, we can

11  accommodate that.  But let's make sure everything is working

12  properly.

13            MS. MARKS:  Your Honor, if Mr. Harris needs to

14  figure out the microphone, we could move on to other topics

15  while he does that.  Does that make sense?

16            THE COURT:  Well, let's see --

17            MS. MARKS:  Chris --

18            THE COURT:  -- if he's working now?

19       (No verbal response)

20            THE COURT:  No, still can't hear you, Mr. Harris.

21            All right.  Let's move on to another issue.

22            MS. MARKS:  Okay.  So I believe what we should

23  turn to next would be the rest of the witnesses for phase

24  one.  As I mentioned, for the funded debt litigation on the

25  5th, the counterparties to that dispute do have their own

1   witness.  There is no dispute over that.  And a little bit

2   later, I will be turning it over to Wachtell Lipton, who will

3   be litigating that issue, and they can describe that process

4   for you in more detail.

5           But to go back to phase one, the only other party

6   who has served witnesses for their case-in-chief is the Ad

7   Hoc Acthar Group.  The Ad Hoc Acthar Group has listed in

8   their case-in-chief the same witnesses that the debtors are

9   calling, so Mr. Mehta, Mr. Brown, Mr. Daloia.  To the extent

10  that the debtors are calling those witnesses anyway and

11  they'll be on the stand, you know, we don't have any

12  objection to the Ad Hoc Acthar Group also questioning them.

13          We would ask, though, that the Ad Hoc Acthar Group

14  question them when they are on the stand for all purposes.

15  So, if the debtors are putting them on, on Monday and

16  Tuesday, they will then be available for cross-examination.

17  We would ask that, at that point, the Ad Hoc Acthar Group

18  also question them for whatever purposes they wanted in their

19  case-in-chief, and then the witnesses do not need to be

20  called back the next day or a few days later for the Ad Hoc

21  Acthar Group's case-in-chief.  But I would defer to Your

22  Honor on how you would like to handle that.

23          THE COURT:  Well, as long as it relates to phase

24  one.  As I already said, I'm not going to make anybody cross-

25  examine a witness on phase two issues during phase one.  So,

1   if they intend to use those witnesses in phase two -- I don't

2   know whether that is the case or not -- but to the extent

3   that they -- I don't want to have witnesses called back just

4   because someone else has identified them as a witness.  If

5   they're on the stand being called by the debtor, they can be

6   cross-examined for all purposes.  And I'm not going to allow

7   objections to outside the scope of direct, so that anybody

8   who wants to call a witness can call them or can cross-

9   examine them on the issues outside the scope of direct, as

10  long as it's relate -- relevant to the issues in phase one.

11          MS. MARKS:  Understood, Your Honor.  And yes, this

12  is solely phase one.  We're just talking about the phase one

13  witnesses now.  We do understand and we'll -- our witnesses

14  will be available if someone wants to bring them back for

15  phase two.

16          THE COURT:  Okay.

17          MS. MARKS:  The other witnesses on the Ad Hoc

18  Acthar Group's witness list are what I'll call "new," they

19  are not on any other party's witness list, so they will not

20  otherwise be appearing.  The Ad Hoc Acthar Group -- I'll

21  address the last witness on their list first; it was their

22  expert witness George Miller.  And they have notified me this

23  morning that they will solely be calling Mr. Miller in phase

24  two.  So we don't need to discuss Mr. Miller today.  It

25  sounds like he will be moved from phase one to phase two.

1          The rest of the witnesses on the Ad Hoc Acthar

2     Group's list are all adverse witnesses.  They're seeking to

3     call several members of the UCC, both counsel and committee

4     members.  They're also seeking to call a few other attorneys

5     or parties in this case, Mr. Joe Rice and Mr. Jeffrey Krol.

6          So, at this point, I understand that the UCC had

7     filed a motion to quash the four UCC depositions yesterday.

8     And I think it might make the most sense at this point if I

9     turn it over to them to address those witnesses and argue

10    their motions to quash.  But again, I would defer to the

11    Court on how you would like to hear that.

12         THE COURT:  Well, let me hear from Mr. Haviland

13    first, or whoever is going to speak for the ad hoc group.

14    I'd like to know what the relevance of each of these

15    witnesses is to phase one because it wasn't included in the

16    proposed pretrial order.

17         MR. HAVILAND:  This is Don Haviland for Ad Hoc

18    Acthar Group.  Can you hear me all right, Judge?

19         THE COURT:  Yes.

20         MR. HAVILAND:  Thank you.

21         I think it was in the submission that we got,

22    Judge.  The list is on the combined list that was circulated

23    by the debtors, so I'm not sure if I'm looking on the wrong

24    document, but I'm happy to go through that.

25         So we had agreed with the debtors, once it was

1  made clear what phase one's scope would be, that we would

2  focus on those witnesses and documents, and I think the

3  exchange was done Tuesday; I believe we might have done ours

4  even sooner, to make clear the issues and witnesses that we

5  wanted for valuation and plan voting issues in phase one.

6         The counsel for the debtors was clear that we are

7  going to cross the three witnesses.  Mr. Ciardi is on, to the

8  extent that's an issue that needs to be addressed.

9         As far as the nondebtor witnesses, there are --

10  one, two, three, four, five, six -- six.  We pointed out Mr.

11  Miller will not be called.  Let me work my way back from the

12  last.

13         Mr. Rice, who I actually had a conversation with;

14  he called me from his cell phone after the meet-and-confer,

15  and he told me that he was actually on a meet-and-confer, but

16  hadn't spoken.  We pointed out to him that he, like others,

17  is being called with respect to plan solicitation and voting

18  issues.  There were a number of communications sent by

19  individuals, not committee members, to voters.  Mr. Rice has

20  a number of letters written to opioid creditors.

21         I know Mr. Rice has a busy schedule, Judge, and he

22  agreed to make himself available Wednesday.  We found out

23  from the meet-and-confer that -- and it was the first time we

24  heard that the opioid notice issues were being deferred.  And

25  so it might make sense to have Mr. Rice deferred to that

SA0120

1  phase two because -- and one of the problems we're struggling

2  with, Judge, is, you know, there's an issue of claims,

3  validity of claims, which then create the right to vote.  And

4  I'll get to the issue raised by Judge Silverstein in Imerys

5  in a moment.  But that's a significant issue in this case.

6          We, the Ad Hoc Acthar Group, this morning, filed a

7  motion for appointment of an examiner, which I see Mr. Astin

8  and Mr. Ciardi on, who are very familiar with that filing,

9  and I think they would like to address that to the Court at

10  some point.  But the issues that are raised in that examiner

11  motion go to the heart of the plan solicitation and voting

12  that's coming up in phase one.

13          And so Mr. Rice is probably an easy one, in terms

14  of the opioid portion of this and what he wrote to and what

15  was done in terms of representations to voters.  To be clear,

16  Judge, there is no one creditor.  Okay?  You've got -- and

17  I'll give you a prime example:  The City of Rockford, my

18  client, has a significant Acthar claim.  Well, Mr. Rice also

19  represents the City of Rockford -- I saw that in a long list

20  of municipalities -- for opioids.

21          So the court-approved notice that went out was

22  vetted, was supposed to be fair and balanced, give folks the

23  chance to objectively decide how to vote.  But when you've

24  got others writing behind that and speaking, they're not

25  giving the same information, in fact, in some ways giving

1   misinformation through the lack of inclusion.  And when you

2   take a claimant like Rockford, they're not being told by that

3   solicitation directive, hey, if you vote this way, it may

4   benefit you in this part of the plan, but it may impact your

5   rights in this other part of the plan.

6           And obviously, the solicitation directive that

7   went out back in the spring is incomplete, in the sense that

8   we now know that there's a significant UCC settlement, which

9   was never disclosed, never described.  The allocation of

10  monies, the least of which going to Acthar to the tune of

11  seven and a half million, none of that was ever noticed,

12  vetted.  So it's a significant issue for this case, Judge.

13          But to close on Mr. Rice, I'm happy to defer that

14  to phase two.  We've got discovery that's ongoing of the UCC,

15  the members that the Court has now heard four times.  So that

16  might be the easiest issue.

17          Let me address the two committee members, Mr.

18  Bevan and Edmond George, who Your Honor has allowed discovery

19  to proceed on.  I think we had a conference on Monday and I

20  reported that we had gotten a schedule for those depositions

21  from the UCC counsel, and then they were abruptly changed and

22  canceled, literally within an hour, Judge.  We were told by

23  Mr. George's counsel that he had an emergency that took him

24  out the entire day Tuesday, so it was canceled.  And it took

25  until yesterday of getting to the point of having to threaten

1   to come to Your Honor for an order that we got a date.  And

2   now we have him scheduled for Tuesday, next week, during this

3   plan confirmation process.  It's frustrating.  So we don't

4   even have the discovery completed yet of Mr. George.

5            And we've had a meet-and-confer, as counsel

6   pointed out, we went over these issues of our witnesses.  We

7   explained in a proffer why they were being called.  Of course

8   we told them we're not going to give you a roadmap on our

9   cross-examination, they are adverse witnesses.  But we told

10  them that they're being called for plan voting, solicitation

11  issues, and the like.  And we gave even greater detail, as I

12  just gave with Mr. Rice.

13           I was able to depose Mr. Bevan yesterday at

14  length.  Mr. Dehney participated with me in that deposition,

15  it went until the end of the day.  And it -- we don't have

16  the transcript yet, Judge, but it just reaffirmed the

17  importance that Mr. Bevan appear before this Court, live on

18  cross-examination.

19           I was, frankly, shocked to get an in limine motion

20  at almost nine o'clock last night, and I apologize for

21  writing your clerk, Judge.  I was reading the Great Gatsby

22  with my fifteen-year-old, and so, as you can imagine, from

23  that book, you wax poetic as we were preparing for his exam

24  today, and I used maybe more prose than I should have.  But I

25  was shocked that we would get something like that, that was

1  clearly planned well in advance of last evening.

2           When this disclosure was made, there was a meet-

3  and-confer.  And then we take this long deposition of a

4  committee member, with committee counsel repeatedly,

5  inappropriately instructing on privilege, when the witness

6  testified under oath that his retainer as a committee member

7  was not for the purpose of practice of law.  And let me say

8  that again.  He was engaged as a proxy, not as a lawyer.

9  There is no privilege when Mr. Bevan sits in his capacity as

10  a committee proxy, and the retainer confirmed that and he

11  agreed to that.

12           But what we learned yesterday, Judge -- and it's

13  not in the motion.  So now I'm arguing a motion that we got

14  at nine o'clock last night that doesn't give this Court the

15  flavor of what has -- what was learned in Imerys -- they

16  don't even mention Imerys and Judge Silverstein striking Mr.

17  Bevan's votes.  Now that situation --

18           THE COURT:  Well, let me --

19           MR. HAVILAND:  -- was different only --

20           THE COURT:  Let me shortcut you here, Mr.

21  Haviland, because I'm not going to hear --

22           MR. HAVILAND:  All right.

23           THE COURT:  -- the motion in limine today.

24           MR. HAVILAND:  Thank you, Your Honor.

25           THE COURT:  I haven't even looked at it, so I'm

22

1   not hearing that today.

2                MR. HAVILAND:  Then --

3                THE COURT:  So my only question now --

4                MR. HAVILAND:  Then I will just --

5                THE COURT:  My only question now is:  What are the

6   relevance of these witnesses that you want to call to the

7   issues that are going to be presented during phase one?

8                MR. HAVILAND:  Okay.

9                THE COURT:  And it's really --

10               MR. HAVILAND:  So the four --

11               THE COURT:  At this point, it's just a relevancy

12   issue.  Are they relevant to phase one --

13               MR. HAVILAND:  That --

14               THE COURT:  -- or are these phase two issues?

15               MR. HAVILAND:  They're phase one voting, Judge.

16   And obviously, the UCC settlement, the allocation, the

17   claims, they're going to be phase two.  But as I said

18   earlier, you can't bifurcate the two because you -- we are,

19   we're looking just at their votes.

20               And we learned yesterday that there was an

21   interesting vote by the committee; there was a two/two split,

22   in terms of the settlement, on whether to approve.  And I

23   won't get into the details on that, but there was a lock.

24   And then we see two things happen:

25               We see the asbestos claimants vote a master ballot

1  of sixteen -- 15,000, the same master ballot that Judge

2  Silverstein struck.  So that's the issue.  We're going to

3  present that to the Court, that we don't think those votes

4  are valid for the same reasons.  And it's framed in the

5  examiner motion.

6          Mr. George, who we have not had a chance to talk

7  to, I believe voted no.  So we were told that he, as a proxy

8  for DC 47, voted in favor of the allocation, but then voted

9  no against the plan.  And in the absence of that deposition

10 Tuesday, we won't know how to present that issue.  And we may

11 just agree that the deposition or a portion can be used for

12 that, and so we wouldn't have to call him live.  But we don't

13 know the answer to those questions, so it goes to voting.

14         Let me talk to the two committee counsel.  Ms.

15 Ramsey.  You don't hear anything about Ms. Ramsey's role.

16 She was prominent in Judge Silverstein's Court in her role as

17 a committee counsel in getting Mr. Bevan to change his vote.

18 He voted against the plan, and then he voted to abstain, and

19 then he voted for the plan.  And that was material to Judge

20 Silverstein's analysis of the propriety of the vote at large.

21         What we learned yesterday, though, Ms. Ramsey, in

22 this case, convened a meeting of the asbestos creditors, a

23 whole group of them, before the claims process took place,

24 and encouraged claims to be filed, which Your Honor would not

25 find pass muster under Allegheny or any stretch of Allegheny.

SA0126

1   We have heard Your Honor's ruling on class proof of claim and

2   unsubstantiated proofs of claim.

3          These block claims, Judge, are as skeletal as

4   anything you can see.  It is literally -- Mr. Bevan didn't

5   even remember that he had filed the claims.  When I showed it

6   to him and the list of the names, he couldn't identify them,

7   other than to say, oh, I believe they have unsubstantiated

8   injury, which he finally confirmed means they're not injured

9   and they never sued Mallinckrodt, but that they're part of

10  this voting block.  And we now know that committee counsel,

11  with a committee member, reached out to a group of creditors

12  to poll all that.  And there are 43,000 such votes, Judge.

13         So Mr. Bevan told us the limits of his knowledge,

14  that he has his 15,000.  But there's 28,000 votes out there,

15  and we don't have even a final vote report yet.  We'll get it

16  today.  And I suspect Prime Clerk will testify, as they did

17  in the Imerys case, we just count the votes, we don't decide

18  this one is good, bad, or indifferent.

19         And I don't want to get into next week without

20  having the ability to have a witness with knowledge.  And in

21  this case, it seems to be Ms. Ramsey who had the meeting

22  before the February claims deadline, and then convened

23  another meeting by Zoom to encourage the vote of these

24  people.  And we don't hear from Mr. Bevan that anybody ever

25  vetted the claims.  The debtors never challenged the claims,

1  as they did the Ad Hoc Acthar Group and the Acthar Insurance

2  Group.  They're happy to have 43,000 yes votes, but they're

3  infirm.

4          And we know they're infirm because there is no

5  claim.  There is no such thing as unsubstantiated injury for

6  premises liability against Mallinckrodt for a premise you

7  haven't identified.  Mr. Bevan couldn't tell me that he had

8  one client that ever worked in a Mallinckrodt facility that

9  was exposed to asbestos that has a case against Mallinckrodt.

10 And yet, he filed thousands of claims and thousands of votes

11 on that issue and committed that others had done so, too.  So

12 we just learned that yesterday, literally until five o'clock,

13 when Mr. Dehney finished his examination, and I'm sure he

14 could give you more.  But there's no doubt in my mind that

15 Ms. Ramsey is relevant.  And Judge, this isn't a privilege

16 issue.  She's talking to creditors.

17         Now let me talk to you about Ms. Hershcopf.  We

18 were told -- we were contacted by an attorney, Jeffrey Krol,

19 who I think wrote a letter to Your Honor back at the time

20 when the issue of notice came up.  And he represents some 16

21 third-party payers who paid for Acthar.  We were told that,

22 on the day of the vote, Ms. Hershcopf and a group of

23 attorneys on a Zoom reached out to him after he had voted

24 against the plan, weeks before, to encourage him to vote to

25 accept the plan.

1           Judge, that sounds a lot like what happened in

2    Imerys.  Now we don't know who was on for Robinson & Cole,

3    but that's a serious issue.  It's a serious issue of vote

4    tampering.  And I'll pause with that.  But we are concerned

5    about what the committee has been doing with or without the

6    debtors' knowledge.

7           But they want to go forward with plan voting

8    issues, well, then we have to vet those to the core because,

9    Your Honor, there are serious problems with this vote, and

10   all we're doing is seeing a tabulation.  We don't have any of

11   the backup that was produced before Judge Silverstein in

12   Imerys.  That process, Judge, which began in March, only just

13   concluded with the Court's decision in mid-October.  Think of

14   that window of time just on voting.

15          And it was begun because of the problem -- and I

16   just call it a "problem."  In our motion for examiner we call

17   it the "Bevan situation.  Because what are you going to call

18   it, right?  You've got this group of lawyers -- and it's not

19   just him -- who don't talk to their clients.  And he

20   confirmed that what he does is what he did here.  He doesn't

21   talk to his clients.  He files omnibus proofs of claim, which

22   Your Honor has found to be not sufficient.

23          And then he votes because he thinks he knows

24   what's best for his clients, even though I pointed out to him

25   that only those who have asbestos exposure and personal

SA0129

1   injury are covered by the insurance policies, some $17.8

2   million.  And only 200,000 of the 18 million was put in by

3   the debtors as cash.  Well, that's for the premises liability

4   claims.  So those claimants -- and they're allowed to

5   participate, late-filed claims are allowed to participate.  I

6   don't know if late-filed claims were allowed to vote, we

7   haven't gotten that answer yet.

8           THE COURT:  All right.  Mr. Haviland --

9           MR. HAVILAND:  But think --

10          THE COURT:  -- I'm going to cut you off because I

11  got your point, I see what your --

12          MR. HAVILAND:  All right.

13          THE COURT:  -- what your issue is.

14          So let me hear from the debtors on what their view

15  is on the relevancy of these witnesses to phase one.

16          MR. HAVILAND:  Okay.  Thank you, Your Honor.

17          MS. MARKS:  And thank you, Your Honor.

18          You know, I would preface by saying that we did

19  have a meet-and-confer, it included the Ad Hoc Acthar Group

20  and the UCC, several days ago to try to understand the

21  relevancy.  And on that meet-and-confer, we did not hear all

22  of the information we just did.  We didn't really hear much

23  explanation of anything.  I know that the UCC followed up

24  several times after that with additional emails.  And so I

25  think it's helpful today to hear the relevancy, but this is

1   really the first that we're hearing of it.

2              You know, I think, at this point, these are UCC

3   witnesses.  And I see several members of the UCC on the Zoom.

4   And so, if it pleases the Court, I would turn it over to them

5   to address.

6              THE COURT:  All right.  Let me hear from the UCC,

7   keeping in mind I'm not hearing your motion in limine because

8   it -- I haven't even read it yet.

9              MR. BIRNEY:  Good morning, Your Honor.  Patrick

10  Birney, Robinson & Cole, on behalf of the UCC.

11             Your Honor, let me first start by saying that it's

12  somewhat comical that the Ad Hoc Acthar Group's counsel

13  complains about the late-filed motion to quash subpoena that

14  was filed last night, yet spends about 70 percent of his time

15  this morning arguing a designation motion that literally was

16  filed at approximately 10 a.m.  And that's what we're dealing

17  with.  There's two sides of every story.  Most of the time,

18  we have an opportunity to hear Mr. Haviland's story and no

19  one has an opportunity to actually put forth evidence, which

20  is what phase one is all about.

21             Your Honor, I'm not arguing the motion in limine.

22  But this is a pretrial conference.  At Docket Number 4649,

23  the UCC objected to the Ad Hoc Acthar Group's disclosed

24  witness list, including Attorneys Ramsey and Hershcopf.  That

25  testimony is not related to or relevant to phase one.  Phase

1  one was detailed in the pretrial order, phase one was further

2  articulated this morning by Ms. Marks.

3          Your Honor, I've read through Document 4955, 4999,

4  which are the two Prime Clerk declarations.  I didn't hear

5  anything in Mr. Haviland's commentary related to those

6  declarations, as to the relevance.

7          Your Honor, more trouble is that, notwithstanding

8  how Mr. Haviland or the ad hoc -- counsel for the Ad Hoc

9  Acthar Group sort of portrays his inquiries as a fact

10  witness, he's clearly attempting to pierce the privilege and

11  the work product doctrine.  If he has issues with phase one

12  and aspects related to phase one, he'll have more than an

13  opportunity to cross-examine the fact witness from Prime

14  Clerk.

15          Your Honor, we just view this, the designation

16  this morning, the argument on the designation this morning,

17  after he complains about the motion in limine, as just an

18  effort to divert the Court's attention from getting to a

19  confirmed plan, getting through phase one and getting to

20  phase two, Your Honor.

21          Your Honor, a couple of other things that were

22  raised by Mr. Haviland this morning.  Indeed, the UCC

23  participated in the pretrial meet-and-confer with the

24  debtors, the AHG and the UCC.  We did request, as we noted in

25  our objection, that we had concerns and wanted to get a

1  proffer on what exactly he wanted to call Ms. Hershcopf and

2  Ms. Ramsey for.  He didn't mention anything about what he

3  mentioned now, although he claims constant surprise.

4          He said he may call her or Ms. Ramsey.  He

5  conceded that he -- that day, that he was seeking the same

6  testimony from both.  And his proffer was limited to the fact

7  that those witnesses had signed a letter that was sent out

8  both the solicitation procedures and once the amended plan

9  and settlement were advanced.  Your Honor, those letters are

10 customary.  They are standard operating procedure in this

11 case.  And we're not arguing the motion in limine.  But the

12 best evidence under 1004 is those letters.  If he has issues

13 with those letters, he can determine what those issues are

14 from reading the four corners of the letter.

15         Your Honor, again, I do not want to belabor points

16 that we will argue as it relates to our motion in limine in

17 this week.  But there is no doubt that, based on the proffers

18 that were advanced in the pretrial order and Mr. Haviland's

19 commentary this morning, that, if he has an issue with when

20 the votes count or should not be counted, that's a

21 designation issue.  That designation motion has not been --

22 is not ripe, hasn't been joined.

23         We view that has been the case, without evidence,

24 but just oral argument from Mr. Haviland that we view he's

25 mischaracterizing Judge Silverstein's decision.  What the

1    Court found there has not happened here.  Mr. Bevan is a

2    member of the committee in this case, he has filed proofs of

3    claim in this case and testified for seven hours under

4    grueling questions by Mr. Haviland.

5            Your Honor, if the -- again, this is not -- this

6    is my view.  If the Ad Hoc Acthar Group had complied with

7    this Court's pretrial order and the Local Rule 7016 regarding

8    pretrial orders, it was by the figurative skin of its teeth.

9    What is happening here, Your Honor, is another attempt for

10   derailment of this confirmation.  Instead of working

11   constructively through the confirmation case phases, it seems

12   the Ad Hoc Acthar Group is causing needless administrative

13   burn, including by requiring Ms. Hershcopf or Ramsey to

14   testify.

15           Again, Your Honor, I reserve my right to advance -

16   - the UCC reserves its rights to advance all of its arguments

17   that were lodged in our motion to quash subpoena, which the

18   subpoena was served, effectively, on Monday.  It's Friday

19   now, we served it on Thursday with a lot of moving parts

20   during the course of the week.  There's no unfair surprise

21   here.

22           And Your Honor, as we advance those arguments in

23   our motion -- preliminarily, in our motion to quash next

24   week, we are going to reiterate the fact that we simply do

25   not believe that any testimony from Ms. Hershcopf or Ms.

32

1  Ramsey is relevant for purposes of phase one.  We are going

2  to also argue that we truly believe that the Ad Hoc Acthar

3  Group is attempting to pierce privilege, get into mental

4  impressions, which we do not believe Third Circuit precedent

5  actually allows.

6           And finally, Your Honor, the best evidence rule.

7  If Mr. Haviland and the Ad Hoc Acthar Group has an issue with

8  the letters, it can review the letters and call us.  Thank

9  you, Your Honor.

10          THE COURT:  All right.  Well, here's what we're

11  going to do.  I'm going to reserve on deciding whether or not

12  the ad hoc group can call Ms. Hershcopf, Ms. Ramsey, Mr.

13  Bevan, and Mr. George until I review the motion in limine.

14  I'll hear that at some point later this week, hopefully.

15  I'll give Mr. Haviland an opportunity to respond to the

16  motion in limine.  Is it a motion in limine or a motion to

17  quash?  It's a motion to quash, right?  Is that what we're

18  talking about?

19          MR. BIRNEY:  Correct, Your Honor.  We framed it as

20  a motion to quash subpoena.

21          THE COURT:  All right.  I'll give Mr. Haviland an

22  opportunity to respond to that and I will consider it.  If we

23  don't get to it later this week, we'll get to it some time

24  next week for sure.

25          There's no prejudice to the Ad Hoc Acthar Group if

1   those witnesses aren't called in week one because, as laid

2   out in the pretrial order, there will be no oral arguments at

3   the end of phase one and I will not be making any rulings at

4   the end of phase one.  So the whole thing will be ruled upon

5   after we get through the entire confirmation hearing.

6          So let's get the briefing -- get some additional

7   briefing on the motion to quash and we'll deal with once I

8   have an opportunity to review it more carefully.

9          MR. HAVILAND:  Your Honor, may I suggest that we

10  get a response in by Tuesday.  Under the debtors' schedule, I

11  think that might be the point where they are possibly

12  wrapping up; and then, before we transition to objection

13  evidence, that might be the opportunity to fit in the in

14  limine discussion.

15         THE COURT:  All right.  If you can get it done

16  that quickly, that would be great.

17         MR. HAVILAND:  Thank you, Your Honor.

18         THE COURT:  All right.  So that takes care of --

19  so Mr. Miller is going to be a phase two witness, Mr. Rice is

20  going to be a phase two witness.  And then the other four

21  witnesses, we'll decide after I hear the motion to quash.

22         All right.  Ms. Marks, next -- I have some other

23  hands up.  Mr. Pohl, did you want to say something?

24      (No verbal response)

25         THE COURT:  If you do, you're frozen, Mr. Pohl,

 1   and I can't hear you.

 2         (No verbal response)

 3               MS. MARKS:  Your Honor, it did look like he froze.

 4   Maybe he'll log back on.

 5               I was also going to raise there's another witness

 6   on the Ad Hoc Acthar Group's, Mr. Krol.  So would -- and just

 7   to clarify, was that addressed, he's also phase two?

 8               THE COURT:  Mr. Krol?

 9               MS. MARKS:  Or was Mr. Krol not discussed yet.  He

10   -- mister --

11               THE COURT:  I don't think Mr. Krol was discussed

12   at this point.  Who is Mr. Krol?

13               MS. MARKS:  Okay.  He is a -- he falls in a

14   different category.  So, Mr. Haviland, if you want to go

15   ahead with him.

16               MR. HAVILAND:  I did -- can you hear me, Judge?

17               THE COURT:  Yes.

18               MR. HAVILAND:  I did mention Mr. Krol.  I worked

19   my way of up the bottom.  Mr. Krol had written to the Court

20   back at the time of the class claims objection about not

21   receiving notice.  And then we were contacted recently that

22   he had been contacted by Ms. Hershcopf on the day of the plan

23   vote.  I think I did mention this.  And we had put into our

24   evidentiary submission an email that he received from Ms.

25   Hershcopf about his vote.  His clients all voted to reject

35

1  the plan and he was encouraged to change that vote and vote

2  in favor of the plan.  I -- there's no motion to quash as to

3  him.  We might wait to see what happens with these committee

4  counsel depositions.  But he's relevant to that issue, in

5  terms of the vote.

6            And Judge, this goes beyond what Mr. Birney

7  described.  This isn't about the letter by the UCC; this is

8  about the UCC reaching out to creditors who have lodged a

9  vote.  We don't know why they do that, why they did that.

10 But the evidence shows that there was a plan solicitation,

11 that the committee made a recommendation in June to reject,

12 and the committee made a recommendation to accept, but then

13 felt the need to contact people on the day of the vote.  And

14 that raises some serious issues in our mind, and that's what

15 Mr. Krol speaks to.

16            THE COURT:  All right.  I've got a couple of hands

17 up now.  Mr. Cicero?

18            MR. CICERO:  Good morning, Your Honor.  Can you

19 hear me and see me?

20            THE COURT:  Yes, yes.

21            MR. CICERO:  I'm standing in for Mr. Pohl

22 (indiscernible)

23            THE COURT:  Well, now I'm losing you, too, Mr.

24 Cicero, you're breaking up.

25            MR. CICERO:  Can you hear me?

36

```
 1              THE COURT:  Yes.  Now I can.

 2              MR. CICERO:  Okay.  I'm going to -- yeah, I'm

 3   going to stand as close -- sit as close to the --

 4              THE COURT:  Let me give you another piece of

 5   advice for everybody on the call, on the Zoom.  If you dial

 6   in separately by telephone, it makes it easier for me to hear

 7   you if there are issues with your computer because,

 8   sometimes, if you're only using your computer microphone and

 9   you have a bad internet connection, I can loose you.  You can

10   dial in to Zoom and dial in on your phone and use your phone

11   for audio and the Zoom for video, and it makes it easier

12   sometimes, so ...

13              MR. CICERO:  Thank you, Your Honor.  I will

14   implement that advice going forward.

15              My firm Brown Rudnick is co-counsel with Kramer

16   Levin to the Governmental Plaintiffs' Ad Hod Group.  And I

17   just wanted to rise to speak a little bit about the

18   (indiscernible) in a little more context (indiscernible)

19              THE COURT:  Now --

20              MR. CICERO:  I think it was very helpful.

21              THE COURT:  You're breaking up too much, Mr.

22   Cicero, I can't hear you.

23              MR. CICERO:  Okay.  That's unfortunate.  If you

24   give me one second, I'm going to try and put headphones in --

25              THE COURT:  All right.
```

37

1           MR. CICERO:  -- if you give me one second.

2        (Pause in proceedings)

3           MR. CICERO:  Can you hear me any better now, Your

4   Honor.

5           THE COURT:  Much better.  Thank you.

6           MR. CICERO:  Okay.  I apologize again for the

7   inconvenience.

8           Brown Rudnick, my firm, is co-counsel with Kramer

9   Levin and the Gilbert firm for the Ad Hoc Governmental

10  Plaintiffs' Group.  And we just wanted to provide a little

11  more context for what we understand Mr. Rice is being called

12  for.  And I think it was very helpful for Mr. Haviland to

13  agree to shift him to phase two, where it -- you know, any

14  relevant testimony that may be adduced would probably be best

15  put there.

16          But Mr. Rice and his firm are co-lead counsel of

17  the PEC and the MDL for the National Opioid Litigation that

18  is, you know, pretty much the landing ground for most of the

19  major opioid litigation against all of the -- you know, all

20  of the defendants, if they're not inside of bankruptcy.

21          And the PEC, as a sitting member, in and of itself

22  on the ad hoc committee, negotiated the restructuring support

23  agreement that you've heard a lot about early on in the case.

24  And one of the obligations in that agreement with the debtors

25  was for the PEC to recommend to vote -- recommend to the MDL

1  constituents to vote their opioid claims in favor of the --

2  in favor of the plan, accepting the plan, if the ultimate

3  deal that was embodied in the plan of reorganization, you

4  know, conformed with the RSA and was agreed to by the ad hoc

5  committee.

6          And you know, we got a little color on what Mr.

7  Haviland is seeking to speak with Joe Rice, who was the

8  signatory on ultimately the recommendation that went out to

9  the MDL members regarding their opioid claims.  And you know,

10  we could sit and debate, you know, the relevance of that to,

11  you know, his plan objections.  But you know, maybe that's

12  better reserved for when we're actually in phase two.  I just

13  wanted to give the Court, you know, a little more context on

14  what that issue is.  And you know, maybe we will be able to,

15  going forward with Mr. Haviland, kind of, you know, determine

16  really what the contours of what he's looking for Joe to

17  speak on.

18          As you might know, the Motley Rice firm is

19  involved elsewhere in the case.  We, as committee -- ad hoc

20  committee counsel, don't represent the Motley Rice firm in

21  connection, for example, their representation of Rhode

22  Island.  You know, they may -- they certainly represent

23  individual clients, governmental creditors in the case.  We

24  don't represent them in that capacity.  So there is -- has to

25  be more discussion done, you know, prior to actually Mr. Rice

1  being called, to determine who -- whether he -- his own

2  counsel needs to be, you know, available to, you know, help

3  defend him, and really kind of gauging exactly what

4  testimony, you know, Mr. Haviland deems may be relevant to

5  this case is going to be necessary for those discussions.

6          So that's all I rise to tell and to talk about

7  now.

8          THE COURT:  All right.  Well --

9          MR. CICERO:  And if Your Honor has any questions -

10  -

11          THE COURT:  Yeah, we'll deal --

12          MR. CICERO:  -- for me (indiscernible)

13          THE COURT:  -- with all of that when we get to

14  phase two because we'll have another pretrial order when we

15  get to phase two and it will discuss those issues then.

16          MR. CICERO:  Understood.  Thank you, Your Honor.

17          THE COURT:  All right.  Ms. Marks, where were we

18  before we switched gears here.

19          THE COURT:  Oh, Mr. Krol.

20          MS. MARKS:  So --

21          THE COURT:  Mr. Krol.  Yes, did we finish mister -

22  - Mr. Haviland, were you finished with Mr. Krol?

23          MR. HAVILAND:  I was.

24          THE COURT:  Yeah --

25          MS. MARKS:  So, Your Honor, I believe next we

1  could move to the Russian shareholders.

2          THE COURT:  Well, I don't think we have a --

3          MS. MARKS:  And there is --

4          THE COURT:  Is Mr. Krol being called in phase one

5  or not?  That hasn't been resolved yet.

6          MR. HAVILAND:  He's on our phase one list, Your

7  Honor, yes.

8          THE COURT:  Well, I think you said, Mr. Haviland,

9  that you would wait and see how the depositions played out,

10 and then also how this motion in limine plays out.  We can

11 deal with that issue when we get to the motion in limine.

12 We'll talk about Mr. Krol then, even though he's not a part

13 of the motion.  I keep calling it a "motion in limine."  It's

14 a motion to quash.  We can talk about him --

15          MR. BIRNEY:  Your Honor --

16          THE COURT:  -- when we get to the motion to quash,

17 as well.

18          MR. HAVILAND:  I agree with that, Your Honor.

19 Thank you.

20          THE COURT:  All right.  Mr. Birney, did you want

21 to say something?

22          MR. BIRNEY:  Your Honor, I apologize for burdening

23 the Court with this, but just I needed 30 seconds to respond

24 to what Mr. Haviland said.

25          Your Honor, the -- this Court's scheduling order

1  and Local Rule 7016 require meet-and-confer, require

2  cooperation and collaboration, in terms of preparing this

3  Court for the confirmation hearing.  And what I think I heard

4  Mr. Haviland just admit was that he really didn't meet and

5  confer.  He said it was voting and the letter, but it really

6  was more than that.

7          And Your Honor, that's the -- that's been the

8  problem.  As my colleague Mr. Klein noted on the record two

9  or three weeks ago, the meet-and-confer has a valuable place

10  in Chapter 11 restructuring.  And when a party actually comes

11  to the table and meets and confers, they need to do it in

12  good faith.  And just -- I just urge good faith meet-and-

13  confers on a going forward basis, and I just apologize if

14  Your Honor -- I had a requirement to make sure the record was

15  straight on that.

16          THE COURT:  Well, yeah, absolutely, meet-and-

17  confers are important, I expect them to be done in good

18  faith.  But when parties come in and say we had a meet-and-

19  confer and we said and they said and we disagree and they

20  disagree and we tried to this and they tried to do that, I

21  have no way of knowing.  I can't make rulings on those

22  issues.  So I expect the parties to meet and confer and do so

23  in good faith.  But at the end of the day, I just got to

24  decide based on whatever the issue is, as put before me.

25          All right.  Mr. Haviland?

42

1           MR. HAVILAND:  Your Honor, I don't want to belabor

2   the point, but we did have a meet-and-confer.  And during the

3   course of that entire hour, I didn't hear from Mr. Birney.

4   We spoke with the debtors about these issues, and now they're

5   before the Court.  I just -- this narrative that's being

6   created here is just -- it's not productive.

7           THE COURT:  All right.  I --

8           MR. HAVILAND:  Thank you.

9           THE COURT:  I agree and I don't want to talk about

10  it any more because I have no way of knowing which side is

11  correct, so let's move on.

12          MS. MARKS:  Your Honor, before we move on, I think

13  this is an appropriate time.  I did want to make one comment,

14  generally, on witness lists.  I think it's important for all

15  parties and all objecting parties to keep in mind, as we go

16  forward on to phase two, for phase one the issues were very

17  limited.  The debtors only have four witnesses on their case-

18  in-chief.  As I mentioned, the Ad Hoc Acthar Group's witness

19  list has a dozen.

20          We did attempt to meet-and-confer.  I can support

21  Mr. Birney that, you know, we don't believe the Ad Hoc Acthar

22  Group responded in good faith.  We really did not get

23  explanations from them as to relevancy.  They did not partake

24  the drafting of the pretrial order.

25          THE COURT:  All right.

1              MS. MARKS:  We explained --

2              THE COURT:  I've already --

3              MS. MARKS:  -- in writing --

4              THE COURT:  I've already said I don't want to --

5              MS. MARKS:  Okay.

6              THE COURT:  -- hear any more about what happened -

7  -

8              MS. MARKS:  Okay.

9              THE COURT:  -- during the meet-and-confers.

10             MS. MARKS:  Okay.  All right.  So, to move on,

11  Your Honor, the next objecting party that has requested to

12  bring witnesses is the Russian Federation of Shareholders.

13  These shareholders are not represented by counsel, they are

14  pro se.  We have been in touch with them over email.  They

15  have mentioned that they will be bringing four

16  representatives from brokers who bought their shares in

17  Mallinckrodt PLC.  I don't know whether there are any

18  representatives from the Russian Federation on this hearing.

19             The debtors do object to those witnesses

20  appearing. The first time that they were disclosed to us was

21  on the 27th, which was Wednesday.  We tried to depose them

22  today.  My understanding is that several of the shareholders

23  did show up at the deposition, but that the brokers could not

24  appear.  They're requiring some sort of order from the Court.

25             You know, in short, Your Honor, it's not clear to

1  me whether these brokers will actually be appearing or not.

2  I did want to raise it for the Court.  The same group has

3  also voiced some objections to the declaration of Mr. Daloia.

4  They were unspecified, I don't know what their objections

5  are, but they have objected to Mr. Daloia.

6          And so, at this point, I would pause to see if

7  anyone from the Russian Federation is on the hearing and

8  would like to address these issues.

9          THE COURT:  All right.  Is there anyone on for the

10  Russian Federation?

11     (No verbal response)

12          THE COURT:  All right.  Having heard nothing.

13          The witnesses were identified late.  If they are

14  not willing to appear for a deposition, they certainly are

15  not -- aren't going to be allowed to testify, so those

16  witnesses are not going to be allowed to appear.

17          MR. HAVILAND:  Your Honor, I know that counsel

18  probably knows this.  There's a deposition taking place in my

19  conference room of the Russian Federation as we speak, so --

20          THE COURT:  Well, individuals.

21          MR. HAVILAND:  -- I don't know what --

22          THE COURT:  I think it was individuals, wasn't it,

23  Ms. Marks, you said?

24          MS. MARKS:  Yes.  So we had counsel appear at the

25  deposition and several shareholders appeared at the

1   deposition to say that their witnesses, who are the brokers,

2   were not available to appear.  So I'm not sure --

3                  THE COURT:  And those --

4                  MS. MARKS:  -- what Mr. Haviland is --

5                  THE COURT:  And the broker --

6                  MS. MARKS:  -- referring to.

7                  THE COURT:  The witnesses who were identified were

8   officers of the broker.  So, if the officers of the brokers

9   are not willing to appear to be deposed, they're not going to

10  testify.

11                 MS. MARKS:  Thank you, Your Honor.

12                 Your Honor, the fourth -- or I should say the

13  third issue that will be litigated, as I've mentioned, it's

14  the funded debt litigation.  At this point, if Emil Kleinhaus

15  is on the conference, I was planning to turn it over to him

16  to address that litigation, which will occur on the 5th, if

17  that would please the Court.

18                 Mr. Kleinhaus, are you ready at this time?

19                 MR. KLEINHAUS:  I am here.  Good morning, Your

20  Honor.  I hope you can see and hear me.

21                 THE COURT:  I can.  Thank you.

22                 MR. KLEINHAUS:  So I will -- Emil Kleinhaus,

23  Wachtell, Lipton, Rosen & Katz, we're co-counsel for the

24  debtors, including on certain financing and corporate

25  matters.

1           I'm going to speak briefly about the proposed

2   approach to the so-called "make-whole" and "cram-down"

3   litigation, and then I want to flag one issue that we may

4   need help on with respect to that litigation.

5           The good news, Your Honor, on the funded debt is

6   that the debtors have agreements with the vast majority of

7   creditors in the capital structure:  Term lenders, revolving

8   lenders, unsecured noteholders, and most recently second lien

9   noteholders.  So we're down to the first lien noteholders who

10  are objecting to the plan.

11          Now the treatment of the first lien noteholders in

12  the plan is, in summary, that their debt will be reinstated

13  in full without paying a make-whole.  We, the debtors,

14  believe that's permitted under Section 1124.  The first lien

15  noteholders disagree.  That issue has been briefed

16  extensively and will be presented.

17          Now, if the Court does not agree with the debtors

18  on reinstatement, the debtors have various other objections

19  to the make-whole to be resolved and the debtors will issue

20  cram-down paper to satisfy the first lien note claim, to what

21  -- including the make-whole, to whatever extent it's allowed,

22  if at all.

23          So, in logical order, the first issue is

24  reinstatement.  That will be the only issue if the debtors

25  are correct.  The second issue is allowance of the make-whole

SA0149

1   without regard to reinstatement.  And the third issue is the

2   cram-down notes and, in particular, a dispute over the

3   interest rate on those notes.

4        And for the hearing, what -- we've been working

5   cooperatively with the first lien noteholders and reached

6   agreement on a number of things.  The first thing we've

7   reached agreement on is a process for the hearing, which is a

8   little bit different than the process for the rest of phase

9   one.  So I just want to explain that and make sure the Court

10  is comfortable with it.

11       In particular, we would propose to address the

12  issues in the order I just laid them out, which is

13  essentially the logical order under the plan, with

14  reinstatement and make-whole first, and then cram-down, and

15  to have oral argument on those issues during phase one, not

16  just evidence.

17       And as it happens, most of the testimony on these

18  issues relates to the last issue in the order, which is cram-

19  down, and the interest rate.  So we would have argument on

20  reinstatement and the make-whole and then testimony from the

21  two competing experts on each side.  And while this is a

22  somewhat different approach than the rest of phase one, our

23  view -- and I -- the first lien noteholders I think agree,

24  but they're on the hearing -- is that it would be the most

25  organized and logical way to present these issues in the

1   order that they present -- that they're presented in the

2   plan.

3           We've also reached agreement on witnesses.  There

4   will be one live witness from each side, Mr. Hayes on our

5   side, Mr. Manning from the objectors.  Both of their direct

6   testimony will be by declaration with limited supplemental

7   direct testimony permitted live, which we think is

8   appropriate because the declarations include -- in

9   particular, Mr. Manning's declaration made some changes to

10  the expert reports, some updates, so we'd like to have some

11  opportunity for live testimony to supplement the declaration

12  for direct testimony.

13          There will also be some deposition testimony that

14  will be designated.  We've been working with the first lien

15  noteholders on designations for Mr. Reasons, Mr. Einwalter,

16  and Mr. Welch.  We're not expecting to have live testimony

17  from those witnesses at this time on the make-whole and cram-

18  down litigation.

19          As to exhibits, we're working to reach agreement

20  on the admission of exhibits.  If there are any issues, we'll

21  have them ready for resolution at the hearing.

22          There is one issue to flag relating to

23  confidentiality.  As Your Honor may know, the company is out

24  in the market now and has been and will be, raising exit

25  financing.  It's received indications of interest from

1    various banks and will be negotiating over the coming weeks.

2              As part of the cram-down case, the first lien

3    notes have received those indications of interest in

4    discovery and their expert has opined that those responses

5    from banks support the objectors' position on the cram-down

6    rate, while Mr. Hayes, the company's witness, and the debtors

7    have responded that, to the extent these indications of

8    interest are probative, they support the company's position

9    on the cram-down rate.  Those arguments are set forth in the

10   first lien note objection and in the confirmation brief that

11   we filed that's focused on the first lien note issues.

12             Now the company, Your Honor, has a significant

13   concern about having a public trial regarding its ongoing

14   exit financing process.  If we have that kind of public

15   litigation, the different financing sources that are part of

16   a competitive process will see in real time what their

17   competitors have conveyed and communicated.  It would be like

18   giving bidders in an auction realtime information on what the

19   other bidders are doing.

20             Now we understand and respect the strong policy

21   and presumption in favor of public access to proceedings, and

22   the debtors would strongly prefer not to have to limit access

23   and raise those issues.  But we also have a duty to the

24   estate not to allow the confirmation hearing to affect and

25   possibly hurt the debtor in the marketplace in real time.  So

1  we may need to ask the Court to seal the courtroom or the

2  virtual courtroom for discrete lines of questioning.

3          What we would propose to do is to work with the

4  objectors over the next week to try to narrow this issue as

5  much as possible, so that any request for sealing would be

6  for as limited a time as possible and as limited subject

7  matter as possible.  In other proceedings, including another

8  confirmation hearing before another court in Delaware, I

9  remember trying to avoid specific references to certain

10  matters, so that it would be possible to avoid sealing.

11          I'm not sure and I'm not confident that, given the

12  nature of the expert testimony here, there won't be a need

13  for specific lines of questioning on matters that the debtors

14  are concerned would become public in a way that could be

15  detrimental from a competitive perspective.

16          So that's the issue.  I presented how we'd like to

17  deal with it.  And we'd, of course, welcome any guidance from

18  the Court as to how the Court thinks we should best deal with

19  it.  But otherwise, we'll bring it back to the Court next

20  Friday if it's a live issue.

21          THE COURT:  Well, yeah, we will have to deal with

22  that once we get to it, I think, and see what the testimony

23  is.  This is an issue that I wasn't prepared to address

24  today.  I know the difficulty of trying to avoid saying

25  things during an open hearing that might be confidential that

1 could have an adverse impact, but if there is something in

2 the expert reports, I don't know if there is -- are you

3 worried about cross examination of the experts?

4       MR. KLEINHAUS:  Yes.  Your Honor, I think in the

5 declarations we're going to deal with that with motions to

6 seal.  Of course, Your Honor will decide the motions to seal,

7 but we have a path to deal with it by those declarations

8 being sealed.  There is a written testimony record that the

9 court will have on the exact dispute that I referred to

10 regarding the ongoing financing.

11       So I think there is a path to deal with that.  Of

12 course, the court will decide whether to seal those

13 declarations or not.  What we are concerned about is cross

14 examination on this exact subject matter which will be live.

15       THE COURT:  Well, as I said, we will have to deal

16 with that once we get to it.  I know there is some way to

17 setup separate rooms within a zoom hearing that if we got to

18 a point where we needed to seal the courtroom we could

19 perhaps setup a separate zoom room.  I don't know how to do

20 that.  I will defer to the IT people for that one.  So that

21 might be a way to handle it if and when we get to that point.

22       I, at least, reviewed the papers initially on this

23 issue.  Is there testimony -- and I wasn't sure by what you

24 were saying.  Are you saying that the 1124 issue is a

25 strictly legal issue there would be no need for testimony?

1          MR. KLEINHAUS:  It's mostly legal.  There is some

2   limited testimony in Mr. Hayes's declaration.  So -- and Mr.

3   Hayes will be testifying that day on the cram-down issue.  So

4   he will be available for cross.  But the 1124 issue is

5   primarily legal with some limited factual testimony.

6          I think the same is true as to the debtors other

7   objections to the make-whole.  Again, primarily legal with

8   some limited testimony from Mr. Hayes and then the cram-down

9   dispute by contrast.  We have significant expert testimony on

10   both sides.

11          THE COURT:  So the experts are only for if there

12   has to be the cram-down?

13          MR. KLEINHAUS:  Not entirely, Your Honor.  Mr.

14   Hayes has some limited expert testimony on the make-whole

15   issue, but the vast majority is on cram-down.

16          THE COURT:  Alright, is there a way to separate

17   the issues so that I only hear the testimony regarding 11245

18   and the make-whole payment, and then have argument on that,

19   rule on that issue before we see if we need to go into the

20   additional testimony?

21          MR. KLEINHAUS:  The debtors would think that would

22   be fine in the sense that there are just a few paragraphs in

23   Mr. Hayes's direct testimony on the 1124 and make-whole

24   issues.  So we could present those few paragraphs and then

25   present the rest later as needed.

53

1          THE COURT:  Well let me ask the first lien lenders

2     what their position is on all of this.

3          Mr. Burke, are you speaking for them?

4          MR. BURKE:  Yes, Your Honor.  This is Donald Burke

5     from Robins Russell on behalf of the first lien notes group.

6          I think I largely agree with Mr. Kleinhaus's

7     summary of the issues and the order in which we would propose

8     to address them.  We do agree that the order that Mr.

9     Kleinhaus laid out is the, you know, logical order for the

10    court to hear these issues given the plan treatment here.

11         With respect to the confidentiality issue that Mr.

12    Kleinhaus flagged we have been in discussion with the debtors

13    on this point.  You know, I think in line with the general

14    preference for open and public court proceedings. It's our

15    preference to do as much as possible, potentially everything

16    in a public courtroom without sealing, but we are, as I said,

17    continuing to discuss with the debtors to understand their

18    position in the interest that they are asserting.  You know,

19    we are happy to work cooperatively with them to try to reduce

20    or eliminate any dispute on this issue.

21         I think it is something that is probably premature

22    to be getting into the details now, and we can, hopefully,

23    narrow or eliminate any dispute ahead of next week's hearing.

24         THE COURT:  Okay. Thank you, Mr. Burke.

25         Mr. Johnston, you wish to be heard?

1            MR. JOHNSTON:  Good morning, Your Honor.  Can you

2    hear me?

3            THE COURT:  Yes.

4            MR. JOHNSTON:  Jim Johnston of Jones Day on behalf

5    of a group of revolving credit facility lenders.

6            I just wanted to confirm and, I guess, clarify

7    that in connection with this day of phase one the

8    intercreditor issues that were raised by the first lien

9    noteholders also will be argued.  The first lien noteholders

10   implicated issues with respect to the distributions going to

11   the first lien revolving credit facility and term lender

12   facility, as well as the second lien noteholders in

13   conjunction with their arguments about the treatment, and

14   reinstatement and/or cram-down.

15           We will have something to say on that point and I

16   think it's probably best argued -- it implicates both

17   reinstatement as well as the cram-down.  So I'm not sure when

18   its best argued.  I think at that day and maybe at the end of

19   the reinstatement argument and then at the end of the cram-

20   down argument if you get there.  But I didn't want to be left

21   out in the cold and say that we will have something to say

22   and would like to argue it.

23           THE COURT:  Alright, Mr. Cohen, go ahead.

24           Let me hear from everybody before I speak.

25           MR. COHEN:  Your Honor, do you hear me?

1             THE COURT:  Yes.

2             MR. COHEN:  Thank you, Your Honor.  Michael Cohen,

3    Gibson Dunn & Crutcher on behalf of the ad hoc first lien

4    term loan group.

5             We too, in addition, would be, you know, speaking

6    on issues related to intercreditor matters as they relate to

7    reinstatement and logically understand that to be part of the

8    argument on the reinstatement point, but just wanted to

9    clarify that we would be involved in that.

10            In addition, I do echo and agree wholeheartedly

11   with Mr. Kleinhaus that it would be extremely prejudicial to

12   a live negotiation that the debtors are taking to have any

13   sort of market negotiated data put into the public domain.

14   So I just want to emphasize that, you know, it's a pretty

15   significant issue as well.

16            THE COURT:  Thank you.

17            Mr. Kleinhaus, you agree wiht the idea that the

18   intercreditor issues need to be addressed in both the make-

19   whole payment and the cram-down?

20            MR. KLEINHAUS:  I think that makes sense because

21   the noteholders have objected to reinstatement.  Their first

22   argument relates to the make-whole, but they have also made

23   an argument about it's a creditor matter.  So logically that

24   should be addressed as part of reinstatement.  Then if the

25   court does reach cram-down, because the court disagrees with

SA0158

1    the debtors on reinstatement, in that scenario then, yes, I

2    think if a creditor matters to the extent they need to be

3    addressed there as well.

4           THE COURT:  I think the best way to do this is to

5    -- it looks like your lights went out, Mr. Kleinhaus.  Did

6    you lose power or something?

7           MR. KLEINHAUS:  No, they go off automatically.

8    Embarrassing event, sorry.

9           THE COURT:  I think it makes sense to deal with

10   the 1124 and the make-whole payment issue first and present

11   whatever evidence relates to that, whatever argument relates

12   to that, have a ruling on that issue.  So we see if we need

13   to move to what we will refer to as phase one B of this

14   particular issue.  We got a lot of phases here. Then if need

15   be we will hear the testimony on the cram-down and the

16   argument on the cram-down afterwards.

17          MR. KLEINHAUS:  Your Honor, thank you.

18          Just to clarify that, so the parties know where

19   we're hearing, we had planned to do all of this next Friday.

20   In light of Your Honor's comment I would like to just get

21   clarification so if Your Honor intends to rule on the

22   threshold issues we may need to revisit the timing of these -

23   - of aspects of this hearing.

24          I think if the court is going to rule -- I also

25   just want to be clear as to where the delineation is going to

1  be because I really view it as three issues:

2         One, reinstatement. If the debtors win on

3  reinstatement we're done under 1124 because we have an

4  argument, of course, that we can reinstate without the make-

5  whole.  So that is issue one.

6         Issue two, we have a number of other objections to

7  the make-whole, if we're wrong on reinstatement, asking the

8  court not to enforce and allow the make-whole claim for

9  purposes of whatever treatment, including cram-down.  So that

10  is the second set of issues.  Whether the make-whole should

11  be enforced if we're wrong on reinstatement and then you have

12  cram-down.

13         So I would just ask for some further guidance as

14  to whether the court wants to hear issue one, reinstatement,

15  and then be done, then do everything else later, or should we

16  go through issue two in that first phase.

17         THE COURT:  Well I think it was my original

18  question whether 1124 -- the 1124 issue is just a strictly

19  legal issue. Is there any evidence that needs to be put on

20  just for the 1124 issue?

21         MR. KLEINHAUS:  Yeah, so on the 1124 issue the

22  evidence consists of a few paragraphs in Mr. Hayes's

23  declaration including paragraphs on matters such as how the

24  make-whole is calculated and there are a couple of other

25  paragraphs there about the make-whole. So it is very limited,

1    but the answer is, yes.

2            For that second set of issues, which is our other

3    objections to the make-whole including on various *ipso facto*

4    arguments, it's the same very limited evidence.  So it's very

5    limited evidence on our 1124 case and our objections to the

6    make-whole. Then quite a lot of evidence on the cram-down.

7            THE COURT:  Alright, it makes sense to me to do

8    1124 first, hear whatever evidence there is on 1124.  I will

9    make a ruling on that hopefully that day, if not certainly by

10   Monday.  So this may have to bleed over into the following

11   week, but we will see how that goes.  But we will do 1124

12   first, then we will do the other objections to the make-

13   whole, and then the cram-down if necessary in that order.

14           MR. KLEINHAUS:  Thank you, Your Honor.  So we will

15   plan and work with the objectors to be ready just on 1124 for

16   next Friday and we will take it from there.

17           THE COURT:  Thank you.

18           Ms. Meises, you raised your hand.  Did you want to

19   say something on this?

20       (No verbal response)

21           THE COURT:  You're muted.

22       (No verbal response)

23           THE COURT:  You're still muted.

24       (No verbal response)

25           THE COURT:  I lost her.  Well we will see if she

1   comes back on and wanted to say something related to this

2   issue.

3           But in the meantime let's move onto whatever our

4   next issue, Ms. Marks.

5           MS. MARKS:  Thank you, Your Honor.

6           THE COURT:  Here she is. Let's see if she comes

7   back on.

8           MS. MEISES:  Are you able to hear me now?

9           THE COURT:  Yes.  Thank you.

10          MS. MEISES:  Good morning, Your Honor.  Michele

11  Meises from White & Case on behalf of DB as administrative

12  agent under the credit agreement.

13          I just wanted to let the court know that we

14  received an extension to file a response to the first lien

15  noteholders' objection with respect to the intercreditor

16  issues and we also want to reserve time to address that issue

17  when it comes up.

18          THE COURT:  Okay.

19          MS. MEISES:  Thank you.

20          THE COURT:  Thank you.

21          Ms. Marks, any other issues?

22          MS. MARKS:  Thank you, Your Honor.

23          Your Honor may have noticed we did not include any

24  documentary issues in the pretrial order, evidentiary

25  objections to exhibits.  We believe that those could be

SA0162

1   handled next week either in advance of when the documents

2   will  be admitted or during the hearing itself.

3            The exhibit lists are relatively limited for phase

4   one.  I believe Richards Layton submitted exhibit binders to

5   the court last night.  We will work with the objecting

6   parties on any objections either party may have to one

7   another's exhibits, but we didn't think that it was necessary

8   to do those objections today.  So I just wanted to flag for

9   Your Honor that we will not be covering any exhibit

10  objections today.

11           THE COURT:  Okay.  I assume the parties are going

12  to meet and confer on those objections before you bring it to

13  me?

14           MS. MARKS:  Yes, Your Honor.

15           Your Honor, the last issue in the pretrial order

16  there are a series of disputes that we listed at the end.  I

17  think that the court has either covered most of those or

18  those will be covered in the *motions in limine.*

19           So I actually think that takes us to the end of

20  the pretrial order unless Your Honor has more questions. I

21  did want to close before we turn it over to Mr. Harris for

22  the *motions in limine* I did want to close by saying that the

23  debtors appreciate the cooperation of all of the creditors

24  and objecting parties in this case.  Moving forward to the

25  confirmation hearing and preparing is not easy when there are

1  so many parties involved.

2         This case has thousands of creditors, hundreds of

3  parties in this hearing and approximately 37 objecting

4  parties who have filed objections to the plan.  You know, we

5  appreciate that the vast majority of these objecting parties

6  are really seeking to limit the evidence and the argument

7  that they're going to put in at the plan confirmation

8  hearing.  We may see more of them wanting to be involved in

9  phase two, but we do appreciate that everyone or most

10 everyone is really trying to have an efficient and

11 streamlined process.

12        So the debtors just wanted to extend their

13 appreciation to all of the creditors and the objecting

14 parties who have been cooperating and acting in good faith.

15        THE COURT:  Thank you, Ms. Marks.

16        MS. MARKS:  With that, Your Honor, I will turn it

17 over to Mr. Harris.  He is going to address all of the

18 motions in limine.  I believe it may make sense to start with

19 the one that is most relevant to the witnesses that we teed

20 up earlier whether or not their testimony should come in live

21 on the stand or via declaration.

22        THE COURT:  Alright, I see Mr. Harris.

23        Mr. Ciardi, are you going to be responding for the

24 ad hoc group? Is that why your hand is up?

25        MR. CIARDI:  Your Honor, between Mr. Haviland and

1   I, we will both be responding. I have -- I didn't -- this

2   actually goes back to something Ms. Marks had said earlier,

3   not her closing, which we all appreciate, and I was not

4   objecting to that.

5          On exhibits and objections, Your Honor, some of

6   those objections are going to be really related to the

7   context in how they're presented and by what witness puts

8   them on.  So I did not want to foreclose being able to object

9   to an exhibit, or its introduction, or witness's use of that

10  because we somehow don't address all of our objections that

11  we may raise at trial because those objections may change

12  based on how they're presented or used.

13         So I didn't know what Your Honor's preference

14  would be for that just so that as we go into reviewing them

15  are we looking at really just authenticity type issues to try

16  to knock them out of the way or are we looking for every

17  trial objection that we may raise at the time of the hearing.

18  Some of this will bleed into the *motions in limine* I think,

19  but only because we didn't really address exhibits because

20  they're not in this.  I just want to know Your Honor's

21  preference so that we know what we should be addressing pre -

22  -

23         THE COURT:  No.  Pre-objections are only those

24  that are -- where the document just -- there is no way that

25  the documents should be able to come into evidence.  I will

63

1   put it that way.

2          MR. CIARDI:  So authenticity, but not hearsay.

3          THE COURT:  I'm not going to say that if you

4   didn't object to an exhibit prior to the person testifying

5   about that exhibit that you can't raise a subsequent

6   objection as well.

7          MR. CIARDI:  Understood.  Thank you, Your Honor.

8          THE COURT:  I will hear objections during trial.

9          Mr. Harris.

10         MR. HARRIS:  Thank you, Your Honor.

11         Let me first just make sure you can hear me now

12  and I have a working speaker.

13         THE COURT:  Yes, I can hear you.  Thank you.

14         MR. HARRIS:  Thank you.  My apologies for earlier.

15         The ad hoc group has filed a number of *motions in

16  limine*. They are their motions and I am not sure if they are

17  still pursuing them all. So I would suggest we turn it over

18  to Mr. Ciardi and Mr. Haviland to proceed with the ones they

19  are interested in pursuing.

20         THE COURT:  Mr. Haviland.

21         MR. HAVILAND:  Thank you, Your Honor.

22         I think you covered some of the issues.

23  Obviously, the *in limine* motion we filed for a live

24  proceeding was addressed by the court that we will proceed by

25  zoom.  We noted our objection.  Hopefully we could get in

1   person with Your Honor, but that does lead to the next issue

2   which is the -- its Docket 4787, the *motion in limine* to

3   require live testimony.  I don't know why there was some

4   confusion about that, but live is live.  It doesn't

5   necessarily leave live in Delaware, but we do want witnesses

6   live by zoom.

7           Your Honor has already given the parties a lot of

8   direction on that. I don't read the objection to be that

9   strong.  I think that the debtors quoted back Your Honor's

10  lines about the preference for live testimony if there is an

11  objection. I think the issue really comes to two.

12          So there's depositions and, Judge, in our motion

13  we did cite to Rule 34 -- I'm sorry, Rule 32, Federal Rules

14  (a)(4)(e).  And we did that because we were not a party to

15  all of the depositions that were taking place and, obviously,

16  under that rule it's the use by the party opponent against

17  the debtors we can use them, but -- and I know the debtors

18  have been designating various deposition testimony for their

19  use.  We're not yet clear at this point in time how much is

20  coming in on issues that concern the ad hoc Acthar group.

21          We're trying to make sure that we have the full

22  and fair opportunity to cross-examine.  So as far as the

23  depositions go I think Your Honor has asked for that citation

24  to the rule to be put in the court's order and all parties

25  abide by it.

1          I think the remaining issue, and Mr. Ciardi might

2    address this, since the witnesses he's handling are by

3    declaration.   I will just note the debtors acknowledge Your

4    Honor's observation that if a party objects then the witness

5    should come live unless it's a discreet issue that can be

6    handled by declaration.

7          Just as hearing the colloquy I pulled up Mr. Metta

8    [phonetic].   Obviously, he says who he is, what his history

9    was, the things he had done and we had no problem with that,

10   obviously, but when he gets to Paragraph 13 and he says now

11   I'm going to look at Mr. Eisenberg's expert report and I'm

12   going to tell you what I think about that I think Your Honor

13   will observe, well, that is hearsay and now you have a

14   declarant reaching out for a hearsay expert report that would

15   not come into trial.   You would have the expert live.

16          So with that I will turn it over to Mr. Ciardi

17   because I know he's focused on those particular witnesses and

18   declarations leaving with the point that we're in agreement

19   with the debtors that if it's a narrow issue that can be

20   addressed in a non-controversial way without citation to

21   hearsay we have no problem with declarations to streamline

22   factual issues, but I give you that one example that that's

23   where it gets difficult.   I think Your Honor said you spend

24   more time trying to excise the hearsay from the declaration

25   then just having the witness come and speak on it.

1          Thank you.

2          THE COURT:  Mr. Ciardi.

3          MR. CIARDI:  Yes, Your Honor.  Thank you.

4          So it really -- I mean I am just focusing on Mr.

5   Metta and Mr. Brown's proposed declarations.  They are the

6   experts.  This is a side or small piece of the case.

7   Valuation is critical.  We are not looking to -- I don't even

8   remember the last time I cross-examined an expert on their

9   qualifications especially on a case of this size.  They're

10  both highly qualified individuals.  We're not looking to do

11  that, but when you get to the meet of the opinion that should

12  be live.  The debtors need to present that witness, he needs

13  to present his opinions live so that we can examine what or

14  what not should come in on direct as opposed to by

15  declaration. Then we will cross-examine.

16          This is not -- these are not the two witnesses

17  that should be doing anything by a declaration, Your Honor.

18  These are the key witnesses in the case, at least in phase

19  one.  They should testify live.  If their declarations are

20  any gage of how long that direct will be it doesn't appear to

21  be that long, so we're not really adding too much in, but for

22  us to go back and pull out, well, this may be objectionable

23  hearsay or this may be objectionable lack of personal

24  knowledge, and do all that, and rewrite their direct, and

25  then lay out in the process of that our cross examination I

1   don't think that is appropriate.

2          I think it would be appropriate to have them

3   testify live.  It doesn't seem like it will be very long.

4   It's a trial.  There will then be cross, we move on.  That is

5   really where we are on that issue. We seem to be taking the

6   laboring war, at least, as to the cross of these two

7   witnesses.  And I think it would be appropriate for

8   everything to just be live, Your Honor.

9          THE COURT:  Well let me ask you in the interest of

10  trying to streamline things, Mr. Ciardi, are you -- I think I

11  heard you say you're not objecting to the qualifications of

12  these witnesses.

13         MR. CIARDI:  We are not, Your Honor.  And we're

14  not looking to -- if -- again, I think we could stipulate to

15  that. I mean, again, it's as to valuation and we just need to

16  agree what they're the expert of, but then we stipulate.  I

17  am not looking to have a half an hour of testimony and then

18  me not cross just to waste the court's time on their

19  qualifications.

20         THE COURT:  Alright, well to the extent you can

21  stipulate to their expertise and what the area of their

22  expertise is I would encourage you to do that and we can

23  submit the curriculum vitae of the experts without objection

24  and that takes care of the qualifications which is usually a

25  fairly good chunk of expert testimony.

1          Are there expert reports of the experts in

2    addition to their declarations?

3          MR. CIARDI:  There are, Your Honor.  Yes.

4          THE COURT:  Okay.  Is there an objection to the

5    introduction of the expert reports?

6          MR. CIARDI:  So, Your Honor, and I raise it only

7    because the expert's opinion is really what comes out on the

8    stand and what they testify too; however, experts have been

9    able to use their reports in conjunction with their

10   testimony. So while we may have issues in the reports and may

11   cross-examine them on the reports and the opinion, I only

12   raise that, Your Honor, because it is a witness gives their

13   opinion the stand as to what their issue is, but they have,

14   obviously, relied upon what is in their report and may refer

15   to it.  It's certainly not a memory test.

16         So I don't have an issue with the report.  We have

17   it.  We're going to use it in cross examination.  But I don't

18   want the allowance of that to come in, in some fashion that

19   that is the opinion, it's what the witness says ultimately

20   becomes the opinion.  So I don't know if that made sense what

21   I just said, Your Honor, but I think you understand where I'm

22   going.  I don't want the allowance of the report in to

23   somehow allow that to substitute for the witness's testimony.

24         THE COURT:  No, I understand.  So if there is no

25   objection to the introduction of the reports I would ask that

1   they be submitted.  In the "real world" so to speak they

2   wouldn't be considered hearsay, but it's certainly in the

3   context of a bench trial to have those expert reports so that

4   I can look at them as well while the witness is testifying

5   and while they are being cross-examined. It certainly helps

6   me.

7           So if there is no objection to the introduction of

8   the reports I would have them introduced subject to the idea

9   as you said, Mr. Ciardi, that their opinion is what they

10  testify to on the stand, not what is in the report.

11          MR. CIARDI:  Understanding, Your Honor, that we

12  may have issues with certain things that are said in the

13  report which will, obviously, come out in cross examination -

14  -

15          THE COURT:  Of course.

16          MR. CIARDI:  -- but that, I think, can be

17  addressed then.  The report is coming in, I don't think Your

18  Honor admits it until we get to the end anyway.  So just with

19  that caveat we would be okay wiht that, Your Honor.

20          THE COURT:  Alright.  So the only question then is

21  whether or not these declarations are going to come in, in

22  lieu of direct testimony.  Is that what I am hearing?

23          MR. CIARDI:  I believe that is correct, Your

24  Honor.  And given the length of them we think it would just

25  be easier and more streamlined to do everything as a direct

1   and cross in the traditional fashion especially since phase

2   one, as it relates to value, is two witnesses.

3                THE COURT:  Alright.

4                MR. CIARDI:  We're not dealing with dozens of

5   witnesses that are getting to a point, its two witnesses.

6                THE COURT:  Mr. Harris.

7                MR. HARRIS: Thank you, Your Honor.

8                So I will try and be brief here, but the *motion in*

9   *limine* itself, which calls for a blanket rule that all

10  declarations are excluded as a matter of law, I think that is

11  no longer before Your Honor. I think at the last hearing, on

12  the 19th, you made clear you were not adopting a blanket

13  rule, you would address this case by case.  That is because

14  there are many different evidentiary issues at play here.

15               So what we now have is a dispute about two

16  declarations that the debtors would like to use as their

17  affirmative testimony.  Those are of Mr. Pudent Metta

18  [phonetic] and Mr. Mark Brown.  We have provided three other

19  declarations that appears no one is objecting to their use as

20  our affirmative testimony.  That is a declaration by Mr.

21  Hayes, Brendan Hayes of Guggenheim, which will be for the

22  make-whole dispute.  Then two declarations of Mr. James

23  Daloia of Prime Clerk about voting.  I didn't hear any

24  objection to those going in as the direct testimony.

25               So just to be clear on the two declarations that

1  we do hear an objection to all we are trying to do is

2  simplify the hearing by having those serve as the direct

3  testimony. Those declarations were served on October 20th.

4  They track the expert reports that were served two months ago

5  in August.  Those witnesses were available to be deposed for

6  the last two months.  No one has sought to depose them and

7  they will all be in the courtroom and they will be cross-

8  examined.

9          Why am I pointing out these facts?  I am pointing

10  them out because that means they satisfy the requirements for

11  admissibility under Rule 807 which is the cash-all exception

12  which as Your Honor knows allows what might, otherwise, be

13  hearsay to be admitted if there are sufficient guarantees of

14  trustworthiness.  These declarations clearly satisfy that.

15  They are sworn under penalty of perjury.  The witnesses have

16  been available to be deposed on the statements in them.  You

17  know, the declarations themselves have been out there have

18  been served a week and a half ago and the expert reports that

19  they track were served two months ago.

20          All the witnesses will be available for cross

21  examination. So those are exactly the factors that the courts

22  say are guarantees of sufficient trustworthiness for 807.  So

23  the Third Circuit in Bohler-Uddeholm, 247 F.3d 79, listed

24  those exact factors as indicating when there is sufficient

25  guarantees of trustworthiness for an out of court statement

1  to be admitted.

2          The declarant was known and named, the statement

3  was made under oath and penalty of perjury, the declarant was

4  aware of the pending litigation at that time, he made the

5  declaration and, thus, knew his assertions were subject to

6  cross examination.  The statements were based on personal

7  observation.  The declarant was not employed by the plaintiff

8  at the time of this statement and had no financial interest.

9  And his position and background qualified him to make the

10 assertions.

11          There are clearly sufficient guarantees of

12 trustworthiness and for that reason many courts have allowed

13 similar out of court statements to be admitted when the

14 witness is available for cross examination.  You know, the

15 cases that the ad hoc group cites are all about the

16 importance and criticality of cross examination as the most

17 important took for trustworthiness.  We agree.  These

18 witnesses will be there.  There is really no benefit to be

19 served and certainly no dispute as to the trustworthiness of

20 these declarants by minimizing the burden on the court by

21 having the declarations come in as their direct testimony.

22          The only other thing I would add on this is that

23 this issue has come  up before in other courts and many other

24 courts have a process or a rule that for bench trials they

25 prefer that direct testimony come in through the form of

1  declarations.  That is both because it fits within 807 and

2  because in the alternative a witness could just stand up and

3  adopt the declaration live and that would be their testimony.

4  There is nothing to be gained from going through that

5  additional step.

6          Just to give Your Honor one cite on a case that

7  approved exactly these two points that I just made that this

8  kind of a declaration, as the affirmative testimony, followed

9  by cross examination sufficient under 807 or that

10 alternatively if a witness could just stand up and adopt the

11 testimony its Kuntz v. Sea Eagle Diving Adventures Corp., 199

12 F.3d 665, District of Hawaii case.

13          So we're focusing on these two declarations.  We

14 know these witnesses have sufficient credibility, their

15 credentials aren't at stake.  The declarations had been in

16 the hands of the ad hoc group for a week and a half and the

17 expert reports that they track had been in their hands for

18 two months subject to deposition and will be available for

19 cross examination.

20          THE COURT:  Well I am not -- I am going to make

21 the witnesses testify live. I have an objection to the use of

22 the declarations.  I have seen this problem come up before

23 where a declaration is sought to be introduced and then I

24 have to go through the declaration and resolve objections to

25 what is in the declaration for any number of evidentiary

1  reasons.  Frankly, I want to hear from the witnesses, so

2  we're going to them live; at least Mr. Metta and Mr. Brown.

3  Those are the only two.

4          Are there any other objections to introductions of

5  declarations for any other witnesses?

6          MR. HARRIS:  I think Mr. Haviland had a comment on

7  Mr. Daloia, Your Honor.

8          MR. HAVILAND:  Your Honor, Don Haviland from

9  Haviland Hughes for the ad hoc Acthar group again.

10          Mr. Daloia's declaration that we received is an

11  unsigned document that really only relates to notices that

12  were sent to Class 14 equity interest.  So I -- we have no

13  problem with the declaration as submitted. I expect that Mr.

14  Daloia is going to testify more to the substance of what was

15  done in terms of plan solicitation, voting, and things like

16  that.

17          To the extent that I'm missing something in the

18  declaration I have no problem with that one, but I expect the

19  substance is really going to come in on the stand.  So I just

20  wanted to be clear that what we see and what we receive is

21  not objectionable, but -- and, obviously, Your Honor, there

22  is a voluminous exhibit that summarized the tabulation of

23  voting and I think there is a final report due today that we

24  haven't seen.

25          So I would expect the debtors would be calling Mr.

1   Daloia live on direct.  And if I'm hearing that correctly

2   then we don't have an issue, we're not really focused on the

3   declaration per say.

4          THE COURT:  Alright, well to the extent this

5   declaration is unsigned it needs to be signed under penalty

6   of perjury or it's not going to be admitted.  Is there a

7   signed version, Mr. Harris?

8          MS. MARKS:  Your Honor, if I may.  Mr. Daloia he

9   will be filing an amended declaration today with the final

10  voting results.  So the prior declarations were preliminary,

11  they were just for preliminary voting results.  So it will be

12  signed and I would just -- I didn't quite understand Mr.

13  Haviland's position.  We are planning to proffer his direct

14  testimony for the amended declaration that will get filed

15  today and will be signed.

16         THE COURT:  Well I guess we will have to wait to

17  see the amended declaration then before I rule on this issue.

18         MR. HAVILAND:  Judge, I will talk to Ms. Marks

19  about it and maybe there's a process to allow that to come in

20  whole or in part, but I can't comment on something that we

21  haven't seen.

22         Thank you.

23         THE COURT:  Okay.  Any other *motions in limine*?

24         Mr. Haviland.

25         MR. HAVILAND:  Judge, I think there is only other

1  issue that pertains to phase one.  There are three other

2  motions that I will just cover later, but we had made a

3  general *motion in limine,* which is at Docket 4786, to

4  sequester witnesses.

5          This issue has come up a couple of times in these

6  proceedings about sequestration.  I think the issue we have

7  here is I don't believe that any of the debtor witnesses are

8  going to reappear in phase two.  I think that was the issue

9  that was raised by the debtors in their response.

10          As far as the voting portion of phase one we would

11  ask that -- and I know, Judge, a lot of this is going to be

12  addressed once we get to the *in limine* motion, but our

13  witnesses and -- but our concern is for fact witnesses that

14  are being asked to testify on the stand about voting they --

15  well I know for a fact that some, Mr. Bevan's, Mr. George,

16  will be called in phase two as committee members in terms of

17  the settlement and what they voted on there and all the

18  issues about the allocation.

19          We just -- Your Honor had already made the

20  admonition that witnesses shouldn't be talking to counsel and

21  shouldn't be during the stand.  And I guess -- so the issue

22  that we have right now is if we go forward with any of those

23  witnesses -- and I will exclude committee counsel, obviously

24  I am not asking that Ms. Hershcopf and Ms. Ramsey not

25  participate; although, I see they're not in the 250 some

1  people today.  So that is not the request.  It would be as to

2  Mr. Bevan, Mr. George and any fact witness who is going to

3  reappear in phase two.

4         We want to make sure that they are sequestered as

5  the testimony is coming in because as we learned yesterday in

6  the deposition of Mr. Bevan a lot of good facts come out when

7  you're cross examining somebody and they don't have prior

8  information about what others have said.  So the issue I'm

9  struggling with, Judge, is how we handle that in the

10  intervening couple of weeks from phase one to phase two,  and

11  really as to the non-lawyer, although they're both lawyers,

12  but committee members as a proxy.

13         I believe that is the only -- Mr. Kroll will not

14  be coming back, I don't believe, and I don't think there is

15  any other fact witness.

16         THE COURT:  Mr. Harris.

17         MR. HARRIS:  Thank you, Your Honor.

18         So what we heard today is a lot more limited then

19  what the *motion in limine* about sequestration raises.  It

20  sounds like the only sequestering they are asking for is for

21  Mr. Daloia.  I just wanted to make a few other things clear

22  because the motion is a lot broader than this.

23         One is that the standard rule that experts are not

24  sequestered because they need to hear the facts in lieu of a

25  legal case we mentioned.

1          Second is that if a party is a natural person that

2     person is not sequestered.  So among our witnesses is Roger

3     Frankel the future claims representative who is a party in

4     interest to the confirmation hearing and a natural person.  I

5     don't know if he has an interest in attending, but he would

6     be exempt under Rule 615(a) as well.

7          The third point, which is one that Mr. Haviland

8     conceded which is helpful, is that, of course, counsel who

9     has been identified as witnesses are not excluded and we

10    appreciate that.

11         A further point is that, of course, a party, who

12    is the corporation, can designate a representative. So if

13    there are multiple corporate entities involved each one can

14    designate a representative and that is the Forest Lab's case.

15         THE COURT:  Can we mute everybody please.

16         MR. HARRIS:  Mr. Daloia, of course, is not --

17         THE COURT:  Hold on one second, Mr. Harris.

18    (Pause)

19         THE COURT:  Mr. Harris, you are good to go.

20         Everyone else, if you are not speaking --

21         UNIDENTIFIED SPEAKER:  Judge, we can't hear you

22    now.

23         THE COURT:  They can't hear me, I'm mute too.

24    (Pause)

25         THE COURT:  Can everyone hear me now?

1       (No verbal response)

2              THE COURT:  No, they can't hear me.

3       (Audio goes off)

4              THE COURT:  Can everyone hear me now?

5              MR. HARRIS:  Yes, Your Honor.

6              THE COURT:  Okay.  We had a slight technical

7    problem there.

8              I'm sorry.  Go ahead, Mr. Harris.

9              MR. HARRIS:  Thank you, Your Honor.

10             I was just clarifying that we also have some

11   witnesses who are the representative of a particular debtor

12   such as our two independent directors.  I don't know if they

13   will want to attend any other portions besides when they

14   testify in phase two, but they would fit within 615(b) if

15   they did.

16             So then just specific to Mr. Daloia's situation,

17   and it may apply if there are any other witnesses who would

18   be called in phase one and then again in phase two.  The only

19   thing we would like to -- you know, there will be likely a

20   two week recess between these two portions and they will be

21   covering different topics.

22             What we would like to be clear on is that these

23   witnesses are not prevented from speaking --

24             THE COURT:  You froze, Mr. Harris.

25             MS. MARKS:  Your Honor, I can jump-in while he

1   unfreezes.

2            THE COURT:  I heard the point which is they want -

3   - you want to be able to talk to witnesses between phases one

4   and two.  That is -- there is a general Delaware rule that if

5   you take more than a couple of days between a witness's

6   testimony that counsel is allowed to speak to that witness

7   and particularly in this case where it is going to be

8   completely different issues between phase one and phase two.

9            So there is no prohibition to counsel talking to a

10  witness who might appear and testify in phase one who is then

11  going to appear and testify in phase two.

12            MR. HARRIS:  Thank you, Your Honor.

13            MR. BIRNEY:  Your Honor, may I be heard?

14            THE COURT:  Go ahead, Mr. Birney.

15            MR. BIRNEY:  Your Honor, Patrick Birney, Robinson

16  & Cole, on behalf of the committee.

17            As noted earlier in today's proceeding there are

18  two members, two legal counsels who have proxies for members

19  of the committee and there are two counsel on the committee

20  that are on Mr. Haviland's witness list. Obviously, the UCC

21  raises concerns in advance of objections with this order

22  would prohibit committee from conducting its business.  We

23  have weekly meetings.  We have emails that go back and forth.

24  We don't want to be prohibited from being able to conduct

25  committee business.

81

1          THE COURT:  Well certainly the committee has to

2     conduct its business.  The prohibition on speaking to

3     witnesses has to do with their testimony or potential

4     testimony, not to conducting day to day business of the

5     committee.  So there is no blanket prohibition as it relates

6     to matters outside the scope of the hearing.

7          MR. BIRNEY:  Thank you for the clarification on

8     the record for that, Your Honor.  We appreciate it.

9          THE COURT:  Counsel for the committee, obviously,

10    are not to be sequestered even if they do become witnesses,

11    they are allowed to appear. Experts are allowed to be on for

12    the entire case.  Representatives of not only counsel, but a

13    client representative is allowed to be on the call at all

14    times.

15          So at least one member of the committee should be

16    allowed to be on for all purposes at all times, but I will

17    leave that up to the parties to figure out.  If there is an

18    issue that comes up we will discuss it at that time.

19          MR. BIRNEY:  Thank you, Your Honor.

20          THE COURT:  Any other *motion in limine,* Mr.

21    Haviland?

22          MR. HAVILAND:  Your Honor, there are three, but

23    perhaps Mr. Harris and I can have one of our on the record

24    agreements as we like to do.

25          My first one is Docket 4788 which was a *motion in*

1  *limine* to limit testimony in relation to 30(b)(6) designees.

2  I don't think there are any in phase one, in fact I'm

3  confident there aren't. So I believe that is a phase two

4  issue.  We have seen the debtor's response to that. I think

5  there is probably good reason to meet and confer over that

6  issue between the two phases. So I don't think that that

7  needs to be pressed today.

8           Mr. Harris.

9           MR. HARRIS:  I'm fine meeting and conferring. I

10  think we likely will reach agreement on that.

11          THE COURT:  Alright.

12          MR. HAVILAND:  Thank you.

13          Then Docket 4785 and somewhat related is the 4780.

14  4785 is a *motion in limine* going to the merits of antitrust

15  issues.  This motion, since it was filed back on October the

16  18th, has been informed by the phasing, I know we don't like

17  to use that, but I think Ms. Marks has come around to the

18  idea that they're phases.

19          We don't know what the adversary phase, whatever

20  that is, is going to be.  This really was directed at the

21  October 25th hearing on the motion to assume and then that

22  morphed into an adversary.  So I think -- and the debtor's

23  response was they are not putting on any evidence, certainly

24  not in phase one, and between phases one and two we will have

25  to decide -- they also said debtors were not intending to

1  introduce evidence in phase two.  So that may be an agreement

2  as well and maybe Mr. Harris and I can (indiscernible) on

3  that one.

4          THE COURT:  Alright.

5          MR. HARRIS:  I agree.  I believe this motion is

6  probably no longer relevant.  It was focused on the motion to

7  assume, not really on the confirmation hearing.  We do not,

8  certainly in phase one or in phase two, intend to put on

9  evidence about the legality of the CuraScript contract which

10  is the focus of this.  So I imagine we will likely decide

11  that this motion doesn't need to be decided before phase two

12  either.  I am happy to address this with Mr. Haviland at a

13  later time as we get closer to phase two.

14          THE COURT:  Alright.

15          MR. HAVILAND:  Your Honor, the one caveat is that

16  the plan that is before the court still has incorporated into

17  it findings relating to antitrust, but, again, I will meet

18  with Mr. Harris over those issues.

19          The last one, if I may, Your Honor, is Docket

20  4780. It is our *motion in limine* to preclude the use of late

21  produced documents by the debtor's counsel, Arnold & Porter,

22  who have been directing the discovery on Acthar issues.

23          This is a very large *motion in limine,* Judge.  It

24  has a long declaration.  Its phase two.  To give you that

25  comfort we don't need to get into the issues now.  Again,

84

1  related to the one we just dealt with I'm not sure how much

2  at all these issues will come in phase two.  Mr. Harris and I

3  may agree.

4          Our concern, Your Honor, was we were stayed and

5  enjoined in proceeding on the merits under 362 and 105.  And

6  we have, despite accusations to the contrary, adhered to the

7  stays and injunctions, and not participated in merits based

8  discovery. I know Your Honor has suspended discovery in the

9  adversary with the exception of propounding it.

10          So we have a significant issue as to what was

11  generated in the context of this bankruptcy realizing there

12  is a separate Acthar insurance group case going on and there

13  is some overlap there.  I don't know -- I do think a meet and

14  confer with Mr. Harris would be very helpful on that because

15  I think some of this has been mooted to the extent the

16  adversary is coming in and they're not going to use phase two

17  for these issues.  But I don't think there is anything to

18  address today, Your Honor.

19          THE COURT:  Thank you.

20          MR. HARRIS:  I'm fine not having this addressed

21  today, but just to be clear there was no stay of Mr. Haviland

22  seeking discovery in the bankruptcy.  Discovery is not

23  suspended in the adversary, but I am hopeful we can reach

24  resolution on whatever objections he may have to particular

25  exhibits when he identifies the things he does not like for

1   phase two.  So I am not fine not having this decided today.

2               THE COURT:  Thank you.

3               MR. HAVILAND:  Thank you, Your Honor.  That's all

4   we have.

5               THE COURT:  Anything else for today?  I do need to

6   -- if we do have to go much further I am going to have to

7   take a recess for about an hour.

8               MR. HOPKINS:  Your Honor, Jason Hopkins, DLA

9   Piper, on behalf of sanofi-aventis US LLC.

10               We've got our pre-confirmation motion that we

11   discussed with the court earlier this week.  That is set for

12   hearing today. I don't think it will take a whole lot of

13   time, but we could certainly break now if the court is

14   prepared for that.

15               THE COURT:  Yes.  We will take a recess now then

16   because I do have a meeting I need to attend.  So we will

17   recess until, let's make it, 1:15. So I will see everybody at

18   1:15.

19          (Recess taken at 11:58 a.m.)

20          (Proceedings resumed at 1:24 p.m.)

21               THE COURT:  I apologize for the delay.  The

22   meeting I had took a little bit longer than expected.

23               We were going to go to, I think, Mr. Hopkins, who

24   is going to speak about Sanofi.

25               MR. HOPKINS:  Thank you, Your Honor.  I appreciate

1   it.

2           We've got to motions set for hearing this

3   afternoon.  One is the motion we discussed earlier this week

4   that's seeking a pre-confirmation determination as to whether

5   debtors can continue to sell Acthar Gel without paying an

6   ongoing royalty that's provided for in the asset purchase

7   agreement, pursuant to which debtors acquired the ability to

8   sell that Acthar Gel.  And I see Phil Wang on.  He joined

9   that, on behalf of the Glenridge Principals, and I suspect he

10  may want to chime in on that.

11          Separately, we have a motion for a temporary

12  allowance of claims for voting purposes, I suspect -- well, I

13  don't suspect -- the Court's determination of that first

14  motion may impact whether we need to proceed with that second

15  one.  So, if the Court is okay with it, I'd start with that

16  royalty motion.

17          THE COURT:  All right.  Let's go ahead.

18          MR. HOPKINS:  So, as I said, Your Honor, this

19  dispute is about that asset purchase agreement that contains

20  the royalty provisions in it.  This is the agreement 20 years

21  ago, pursuant to which Sanofi sold to Mallinckrodt, the

22  rights to sell this Acthar Gel.  There were sort of two

23  components of the agreement.  The first was the sale of that,

24  in exchange for a set consideration.  The second part was an

25  ongoing professional royalty; 1 percent of net sales.

87

1          So, the question this motion is asking the Court

2    to answer for us is whether the debtors can continue to sell

3    Acthar Gel post-confirmation and in perpetuity, without

4    paying for it, without paying that royalty.  And we're only

5    talking, here, Your Honor, about post-confirmation sales and

6    we're asking the Court to make this ruling now, because we

7    think that it will, among other things, significantly impact

8    the length and issues to be tried over the next three weeks

9    and in the various phases.

10          Now, the debtors have put forth two arguments for

11   why they think they can sell Acthar Gel without paying that

12   royalty.  The first one is they say the contract is

13   executory.  The royalty agreement is executory under Section

14   365 and they can, therefore, reject it.

15          Leaving aside the question of, how can they reject

16   the contract and then still continue to derive a benefit from

17   it -- we don't think they can -- but I think we can leave

18   that set aside, because it appears, at least to Sanofi,

19   pretty clear, that this contract is not executory.

20   Obviously, here, we're looking for material performance on

21   both sides of the contract.

22          Now, as I said, there are two components to this

23   asset purchase agreement.  One was the purchase and sale of

24   the ability to sell Acthar Gel.  That happened 20 years ago.

25   There is no dispute that as to that portion of the asset

88

1   purchase agreement, there is no remaining obligation on the

2   part of Sanofi.

3          The second part is the royalty obligation.  As to

4   that, Sanofi has absolutely nothing left to do.  Sanofi's

5   only role here is to sit back and collect a check once a year

6   after debtors tally up their net sales and pay 1 percent of

7   that over to Sanofi.  So, on that basis, we think that this

8   is not an executory contract because there is no ongoing

9   material obligation of Sanofi.

10          The debtors say, okay, well, we got that, but

11   there is an indemnity provision in this agreement.  There is,

12   it's at Section 5.1; routine, straightforward indemnity for

13   things like litigation arising from acts prior to the

14   effective date of the contract.

15          When you look at an indemnity clause like that,

16   the question set up by the Weinstein case from earlier this

17   year is whether it goes to the heart of the contract; if so,

18   then perhaps there is -- perhaps there can be a finding of

19   executoriness of the contract, but if not, the contract is

20   not executory.  And we think, Your Honor, that this indemnity

21   provision, just like the one in Weinstein, is routine and

22   immaterial, especially given the fact that 20 years has

23   passed since it was executed and no claim has ever been made

24   on it and debtors have not explained to the Court or to us

25   how any claim ever could be made on it, you know, the fact

1   that 20 years has gone by.

2           The debtors cite, in support of their argument,

3   that this is a material provision.  They cite environmental

4   cases.  Now, obviously, if you buy a Superfund site and the

5   seller is going to indemnify you for cleanup costs, there is

6   a certain material nature to that ongoing indemnification for

7   the cleanup costs, but this isn't a Superfund case; it's an

8   asset purchase agreement that contains a royalty provision

9   and we can't find any law, and I'd submit that the debtors

10  have not provided any to the Court that says that a routine,

11  normal indemnification provision, the kind of which is found

12  in virtually every commercial contract in the world, supports

13  a finding of executoriness under Section 365.

14          So, for those reasons, we ask the Court to find

15  that that indemnity provision does not go to the root of the

16  contract and to hold that that royalty agreement is not

17  executory.  But we need one more thing from the Court and

18  that is where the debtors have their other basis that they

19  use to try to avoid ongoing payment of that royalty, post-

20  confirmation.  They say, well, if we go sell Acthar Gel post-

21  confirmation and then at the end of the year of say, 2025, in

22  January of 2026, if you calculate 1 percent of total net

23  sales and we'll tell you what that is, they say, Your Honor,

24  that that gives rise to a dischargeable pre-petition claim.

25  2025 rulings are a dischargeable pre-petition claim.

1           But the question that's obvious here is:  When

2   does that claim arise?  When is the right to payment for the

3   royalties that are payable in 2025?  Is there a present right

4   to pay on those?

5           I don't see how.  We don't know what they are.  We

6   don't know the amount of them.  We don't even know if debtors

7   will be selling Acthar Gel in 2025.  If they don't have any

8   obligation to do that, they could decide not to and avoid the

9   royalty.

10          I think that if Sanofi had sued Mallinckrodt to

11  collect on royalties that would be payable in 2025, that

12  Mallinckrodt would have very little work to do to get that

13  work dismissed.  So, it's hard to me to understand the

14  argument that that claim, which won't arise until 2025 is

15  somehow a dischargeable pre-petition claim.

16          I think more fundamentally, maybe -- the Court has

17  already ruled on this -- last week, the Court says, antitrust

18  claims that arise, if at all, from the post-confirmation sell

19  of Acthar Gel, arise when that gel is sold, if it ever is.

20          We'd submit, Your Honor, this is the same thing

21  here.  That contract claim, that royalty claim, that arises,

22  if at all, from post-confirmation sales of Acthar Gel as

23  rises, if at all, when that Acthar Gel is sold.

24          So, for those reasons, Your Honor, we'd ask the

25  Court to, number one, tell the parties, determine for the

1    benefit of the parties that this royalty agreement is not

2    executory and to make a determination that claims arising

3    from post-confirmation sales of Acthar Gel are not

4    dischargeable, pre-petition claims that have already arisen.

5              THE COURT:  All right.  Mr. Wang did you want to

6    be heard in support, as well?

7              MR. WANG:  Yes, Your Honor.

8              Phillip Wang, on behalf of three clients here:

9    Kenneth Greathouse, Stuart Rose, and Lloyd Glenn, who we've

10   all been referring to as the "Glenridge Principals."

11             Also on the Zoom call today, Your Honor, is my co-

12   counsel, Grant Dick, from the Cooch and Taylor firm.  I

13   believe this is our first opportunity to appear in front of

14   Your Honor, so thank you for that.

15             The Glenridge Principals are the original source

16   of the vision for Acthar Gel, which I think we all understand

17   is the debtors' most successful, valuable, and profitable

18   pharmaceutical product.  These three individuals are the ones

19   who had the vision and the expertise to devise the successful

20   and complicated manufacturing and regulatory strategy to

21   acquire Acthar on behalf of the Mallinckrodt predecessor,

22   QuestCor.

23             So, really, in short, Your Honor, they originated

24   Acthar for Mallinckrodt.  They are owed royalty payments for

25   their vision and their work based on future net sales of

1   Acthar and I think it's important to note that there are no

2   pre-petition royalties due to them from the debtors.

3           I do want to address the non-executoriness the

4   Glenridge Principals' royalty agreement, because it is a

5   different agreement than Sanofi's APA.  The debtors here are

6   contending that the confidentiality provision in the royalty

7   agreement for the Glenridge Principals is what makes it an

8   executory contract, but that confidentiality provision, Your

9   Honor, by itself, is insufficient to transform the contract

10  into an executory one.

11          First, I want to note that it's the debtors'

12  burden to prove that the royalty agreement is executory.  The

13  test is just like what Mr. Hopkins had set forth.  I believe

14  he was referring to the Exide case in the Third Circuit, you

15  know, whether a breach of the allegedly remaining

16  confidentiality obligations is material as whether a breach

17  is so substantial as to defeat the purpose of the entire

18  transaction that goes to the root of the contract, and this

19  is significant, that excuses the other parties' performance.

20          Here, the royalty agreement is governed by

21  California law, but the Ninth Circuit and California law are

22  consistent in this test, that's the In re Aslan case, 909

23  F.2d 367.  And the Ninth Circuit said that departure from

24  full performance constitutes a material breach if it is so

25  dominant or pervasive as in any real or substantial measure

1    to frustrate the purpose of the contract.

2           So, here, this is a run-of-the-mill, boilerplate

3    confidentiality provision in the Glenridge Principals'

4    royalty agreement.  It can't be said that this breach defeats

5    the purpose of the contract, that it goes to the root of the

6    contract, or that it frustrates the purpose of the contract.

7    Certainly, a Glenridge Principals' breach cannot excuse

8    performance by the debtors, and this makes sense because the

9    debtors have already received all of the benefits under the

10   royalty agreement.

11          The fact remains that the Glenridge Principals

12   have already substantially performed.  Mallinckrodt has

13   enjoyed billions of dollars in revenue from Acthar sales over

14   the last 20 years, none of which would have been possible but

15   for the Glenridge Principals' origination of this product for

16   Mallinckrodt's predecessor.

17          The only real remaining obligation is for the

18   debtors to pay the royalties and that's it.  Confidentiality

19   is merely ancillary.

20          And as a practical matter, Your Honor, if a

21   confidentiality provision were sufficient, to change a

22   contract into an executory contract, there really would be

23   very few, if any, non-executory contracts.  The debtors point

24   to the language in the confidentiality clause which says that

25   the parties intend for the confidentiality provision to be

1   material.

2          But the decision whether a contract obligation is

3   material is not for the parties to decide; it's for the Court

4   to analyze whether they're producing is sufficiently material

5   for purposes of deciding if the contract is executory.  So,

6   it's not outcome determinative, Your Honor, that the royalty

7   agreement recites the confidentiality as a material term.

8          If you look at the royalty agreement, and I'm sure

9   Your Honor has already done that, there's nothing

10  commercially sensitive in the royalty agreement and the

11  debtors have not identified any specific term that they want

12  to keep confidential.  And the debtors, themselves, are okay

13  with discussing the terms of the royalty agreement in open

14  court today.

15         Your Honor, we join in Mr. Hopkins' argument and

16  Sanofi's argument that this charge is not appropriate.  We

17  think it is definitely appropriate to refer to Your Honor's

18  decision on the partial summary judgment motion, with regard

19  to, I think this is the Attestor and Humana, the Acthar

20  Insurance Claimants' administrative expense claims, and

21  Mr. Hopkins highlighted the point there that the claims, tort

22  claims, right, only arise when and if the debtors sell

23  Acthar, post-petition, post-confirmation, et cetera.

24         So, I want to make the extra point here that's,

25  right now, unique to the Glenridge Principals, is that the

1   pending -- there's a pending adversary proceeding that the

2   Glenridge Principals have commenced and that adversary

3   proceeding should not be affected by this motion.  In the

4   adversary proceeding, and I know the judge may not have seen

5   it, because there's nothing for the judge to do in that case

6   just yet, the Glenridge Principals raise tort claims against

7   Mallinckrodt, this would be MPIL, so Mallinckrodt Ireland,

8   and also Mallinckrodt ARD, LLC.

9           There's no breach of contract claims in the

10  adversary proceeding.  The tort claims are not quite as grand

11  as the antitrust claims brought by Attestor and Humana,

12  because the damages are much less; although, those damages

13  are still very substantial to the three individuals, who are

14  our clients.

15          But the issues addressed in this motion under the

16  Bankruptcy Code, with regard to executoriness and with regard

17  to whether they condition assume or reject, these are issues

18  that are unique to this motion.  They are separate, toward

19  issues in the adversary proceeding, so our reservation of

20  rights as to the adversary proceeding is appropriate, Your

21  Honor.

22          Based on our Rule 2004 investigation earlier in

23  the case, we obtained evidence to be able to bring these

24  claims against MPIL and ARD because we learned that ARD is

25  the only Mallinckrodt entity that is actually selling Acthar.

 1   It's not MPIL, the one who purchased Acthar and signed the

 2   royalty agreement with the Glenridge Principals.

 3          We also learned that ARD receives all the income

 4   from the sales of Acthar.  So, tracing for conversion and

 5   constructive trust purposes is going to be relatively

 6   straightforward in the adversary proceeding, we believe.  And

 7   neither the deponent, nor debtors' counsel, could explain how

 8   or why the ability to sell Acthar was somehow transferred

 9   from MPIL to ARD.

10          And this is exactly a proper topic for fact

11   discovery that is needed in the adversary proceeding to

12   determine the liability of MPIL, ARD, and perhaps there's

13   other debtors and nondebtors that might be liable for the

14   royalty payments, as well, but we just don't know that yet,

15   Your Honor.  But, again, the proper proceeding for such

16   discovery is the pending adversary proceeding.

17          I wanted to raise one point about the cross-

18   motions, Your Honor, too, and then I think I'll be done.  And

19   I think Mr. Hopkins alluded to this, as well, but our view is

20   that the debtors are not entitled to any affirmative relief

21   by their cross-motion.  It was procedurally defective.  It's

22   not noticed for hearing today.  There's no briefing schedule.

23   So, in short, I think it lacks due process.

24          Now, Sanofi filed their motion on the 13th.  The

25   Glenridge Principals filed our joinder on the 21st.  And then

1   the debtors filed an objection to our joinder on the evening

2   of the 26th.  That's really not sufficient time for the

3   Glenridge Principals to file a timely response before this

4   morning's hearing, Your Honor.

5           So, we don't believe the debtors are entitled to

6   any affirmative relief under the cross-motion.  It can be

7   essentially ignored.

8           Your Honor, the debtors also raised in their

9   objection, something they quoted as the law of the case.  I

10  don't think that's applicable here.  The way I understand how

11  the law of the case works is that there's an issue in the

12  case, then it's taken up on appeal, and then it comes back.

13  And then as the Trial Court-level tribunal, we're all bound

14  by the Appellate Court's decision on that.  That's (audio

15  interference) here, but if the debtors continue to press

16  their version of law of the case, it's got to be a two-way

17  street, right.

18          So, the Court's decision to deny the debtors'

19  partial summary judgment motion that we mentioned earlier for

20  the Acthar Insurance Claimants' tort claims, that they arose

21  post-petition, should then also apply to the Glenridge

22  Principals' similar claim, because in addition to the

23  adversary proceeding, Your Honor, the Glenridge Principals

24  have also filed administrative expense claims -- they were

25  filed timely -- in this case, as well, in addition to the

1   proofs of claim that they filed.

2              I'll leave it at that, Your Honor, and reserve

3   some time if you have questions or if we need to respond to

4   the debtors' counsel.

5              THE COURT:  Okay.  Thank you, Mr. Wang.

6              Mr. Gott, are you speaking for the debtors?

7              MR. GOTT:  Yes, Your Honor.

8              Can you hear me okay?

9              THE COURT:  Yes.

10             MR. GOTT:  Jason Gott from Latham & Watkins on

11  behalf of the debtors for the record.

12             Let me tackle the procedure point up front and

13  then I'll dive into the argument.  By our cross-motions that

14  were stated in our two separate responses to Sanofi's and

15  Glenridge's motions, all we're really asking for is that the

16  Court, instead of simply denying the two motions, the two

17  requests, simply state in the affirmative what the rationale

18  would be behind those denials that, as we believe, Sanofi's

19  argument is wrong and Glenridge's argument is wrong, and that

20  the contracts are, in fact, rejectable and rejection should

21  be approved and the claims thereunder should be considered

22  discharged.

23             So, I don't really see how anyone is prejudiced.

24  These two parties have brought these issues in front of Your

25  Honor today.  Glenridge complains about the timing of our

1   response to their motion as a reason that our motion is

2   deficient.  Of course, their motion, their joinder was only

3   filed eight days ago and it's about a different contract.

4   So, it necessarily involves different issues and so, you

5   know, if any shortcomings in the amount of time that they had

6   to deal with our response were really of their own making and

7   (audio interference) --

8               THE COURT:  You're starting to break up, Mr. Gott.

9               MR. GOTT:  Can you hear me any better now?  Maybe

10  I should speak louder.

11              THE COURT:  Yes.

12              MR. GOTT:  Okay.  I will certainly speak louder

13  and I'll dial in on the phone, if need be.

14              So, with the procedural points noted, and you

15  know, we can tackle any procedural deficiencies Your Honor

16  may have concerns about at the end depending on which way

17  you're inclined to rule.  But allow me to set the table and

18  make sure that we're all on the same page with the issues.

19              There's two overlapping things for each of these

20  creditors.  Are their respective contracts executory and are

21  their claims for royalties under those contracts

22  dischargeable, despite the debtors' intention to continue

23  selling Acthar?

24              So, under controlling law, the claims are

25  dischargeable.  There's nothing, either Sanofi or Glenridge

1   can do to stop the debtors from selling Acthar after

2   emergence and the debtors will have no obligations to pay

3   those royalties.  That's true whether the contracts are

4   executory or (audio interference).

5          So, the executoriness question is really only

6   relevant to the process of getting from here to there; in

7   other words, do the debtors have to reject the agreement to

8   discharge the claims?

9          Of course, the wise thing for any debtor to do in

10   this situation is to pursue rejection, especially with a plan

11   of reorganization that provides for the assumption of all

12   executory contracts that aren't expressly rejected.  One

13   could imagine a scenario where six months after we emerge, a

14   claimant shows up and argues that their contract was

15   executory and assumed by default, and we then have lost the

16   option of rejection.

17          But the reality is, it doesn't matter for the

18   endgame if these contracts are not executory.  What matters

19   is there's nothing unique about these claims that make them

20   any different than any other claim under the contract.  The

21   debtors owe these parties money and they will be paid under

22   the plan and these creditors are trying to elevate their

23   simple, contractual claims to something they are not.

24          I'll start first with Sanofi.  You just heard

25   their arguments.  They recognize that what they have is a

1    contractual point.  So, the first issue is, is Sanofi's APA

2    executory?

3           Now, we're all in agreement that Countryman is the

4    standard here.  The royalty payments contemplated in the APA

5    are, of course, material and ongoing.  And that means that

6    with this first question, what we really need to answer is

7    does Sanofi have a material, ongoing obligation?

8           And the answer is:  Yes.  Sanofi owes

9    indemnification for any liability that the debtors might be

10   exposed to that is actually Sanofi's retained liability under

11   the APA.  We pointed out that that could cover environmental

12   liabilities, which Sanofi states in its public filings, it

13   has material exposure to.

14          So, the description you heard a few minutes ago of

15   that indemnification clause is much narrower than it really

16   is, which is it's a broad indemnification.  The only real

17   response to that argument that we've heard from Sanofi is

18   that the indemnity must be dead, in effect, because any

19   possible liability it covers must be time-barred.

20          But there's no legal backup for that.  They didn't

21   cite any and I think it's a position that most environmental

22   regulators might find alarming, that if Sanofi was dumping

23   pollution in 2000 and it isn't discovered until 2020, that

24   Sanofi's liability might be time-barred.

25          So, the obligation is there and it is real, but

1   that leads to the question:  Is it material to the contract?

2              And once again, the answer is:  Yes.  In fact, the

3   right to indemnification is central to the bargain the

4   parties struck.  Like in many other acquisitions, it operates

5   to reallocate value between the parties if a future event

6   affecting value comes to pass.

7              So, if Sanofi were to refuse to pay the debtors

8   indemnity for a loss the debtors suffer on account of a

9   liability that's really Sanofi's, the question under

10  applicable law here is whether that would deprive the debtors

11  of what they bargained for, and of course it would.  The

12  debtors bargained to buy certain assets, assume certain

13  liabilities, and not be exposed to any other liability.  And

14  the price they agreed to pay incorporated those deals.

15             Sanofi tries to dismiss the indemnity as standard

16  in any asset purchase agreement but isn't that exactly the

17  point; it's an economic term that is important to ensuring

18  the parties get the benefit of their bargain, which is

19  exactly why it appears in most asset purchase agreements.

20  Sanofi's argument is like dismissing the purchase price terms

21  as immaterial because they're in every contract.

22             We're not talking about the governing law

23  provision or severability or lawyers' notice (indiscernible).

24  The indemnification can fundamentally alter the allocation

25  value between the buyer and the seller.

1          Indeed, courts have recognized that

2   indemnification rights can support a finding of executoriness

3   in circumstances like these.  We think the relevance of the

4   cases in their briefs, compared to the relevance of the cases

5   in ourself speaks volumes.  They cite to a case with an

6   individual movie producer indemnifying for his own contract

7   breaches and another case where the debtor was the seller,

8   and those are Third Circuit cases, to be sure, but they are

9   completely different circumstances.

10          On the other hand, we cite the decision in, In re

11  Safety-Kleen Corp., 410 B.R. 164 (Bankr. D. Del. 2009), which

12  involved a debtor that was a buyer with a 15-year

13  indemnification right under the purchase agreement.

14          The debtors, here, are the buyer under this APA

15  and the indemnification is open-ended.  But Safety-Kleen is

16  the closest analog by a mile and it's on our side.  This APA

17  could be deemed executory.

18          Now, the second big question:  Are the royalty

19  claims dischargeable?

20          Sanofi seemingly concedes that if the contract is

21  executory, the claims are, strictly speaking, dischargeable

22  after rejection.  But that conclusion just opens a different

23  trapdoor in their version of the story, that the debtors

24  can't keep the benefits of the APA while rejecting the

25  burdens.

1          And they're right about that, as a statement of

2     the law, but what they're wrong about is when they define the

3     benefits under the APA as including the right to utilize the

4     Acthar intellectual property.

5          When a debtor rejects a contract, it loses the

6     future benefits of (audio interference), because rejection is

7     a breach that then excuses the other party from performing

8     going forward.  But rejection doesn't undo the things the

9     parties have already done under the (audio interference);

10    it's just a breach.  It isn't a rescission.  It doesn't

11    permit the counterparty to set aside everything that's been

12    done.  It's just a breach and the nondebtor can stop

13    performing from that point on.

14         And that's fine here.  We have made that

15    calculation.  Walking away from our indemnification rights,

16    an acceptable trade-off for not paying royalties into the

17    future.  But the asset-sale fees is already done and (audio

18    interference).  It was completed 20 years ago, as you heard

19    Mr. Hopkins say.  So there's no basis for suggesting that

20    owning and using the assets is a future benefit that the

21    debtors will lose after rejection.

22         Sanofi has no right to interfere with the debtors'

23    intellectual property rights or to try to sell Acthar,

24    itself, and Sanofi hasn't articulated any such situation.

25    Whatever happens in this bankruptcy process doesn't change

1   that because bankruptcy generally takes parties' property

2   rights as it finds (audio interference).  That's (audio

3   interference) bankruptcy law under (audio interference).

4          And this is also consistent with principals stated

5   by the Supreme Court recently in the Mission Products

6   Holdings case:

7          "Rejection of a contract -- any contract -- in

8   bankruptcy operates not as a rescission, but as a breach."

9          That's Mission Product Holdings, Inc. v

10  Tempnology, LLC, 139 S. Ct. 1652, 1661 (2019).

11         So, Sanofi will be excused after rejection from

12  having to honor its obligations like the indemnity, but it

13  doesn't get to unwind everything that was done before the

14  breach, especially the transfer of property rights that

15  occurred 20 years ago.

16         Now, what if Your Honor feels that the contract is

17  not executory?

18         Well, we get to the same place.  The rule is well

19  stated by the Third Circuit in the Weinstein decision from

20  this past May that Sanofi has cited repeatedly.  Now, Sanofi

21  wants to use this case to support its argument that a

22  reorganized debtor has to honor a non-executory contract

23  (indiscernible).  Here's what the Third Circuit directly

24  said:

25         "In the case of a non-executory contract where

1   only the debtor has material obligations left to perform, the

2   contract is a liability of the estate.  And if the buyer

3   wants to buy them, the buyer is voluntarily assuming that

4   liability.  Under the terms of the sale, the buyer must

5   typically fulfill obligations under the contract it bought

6   after the sale closes, just as it would with any other asset

7   or liability."

8            And this next part is key:

9            "If no buyer came forward, the non-bankrupt

10   counterparty would only have an unsecured claim against the

11   debtor, on which it can typically expect to recover, merely,

12   cents on the dollar."

13           That's In re Weinstein HoldCo., LLC, 997 F.3d 497,

14   505-506, (3d Cir. 2020).  So, it's right there.  That's the

15   rule.  That's the law that governs.

16           If a contract is not executory because the

17   nondebtor has performed, the nondebtor just has a claim.

18   It's only if that claim gets voluntarily assumed that the

19   claimant would get anything other than cents on the dollar,

20   even for post-bankruptcy obligations.

21           Sanofi quotes language in its reply from the

22   Weinstein decision about the consequences for a buyer that

23   voluntarily assumes an agreement and they seem to expect that

24   the same principle should hold for a debtor that goes through

25   bankruptcy and doesn't voluntarily (audio interference).

1          Of course, going through Chapter 11 means a debtor

2     can reject agreements and can get a discharge; two benefits

3     that are not available to a buyer in a 363 sale.  So,

4     Sanofi's argument fails.

5          We also cited the Columbia Gas decision from the

6     Third Circuit that says the same thing, where a contract is

7     non-executory against the debtor, there's just, "A simple

8     claim held by the non-bankrupt (audio interference) against

9     the estate."  In re Columbia Gas System, Inc., 50 F.3d 233,

10    239 (3d Cir. 1995).

11         So, the creditor doesn't have a non-dischargeable

12    claim, doesn't have a right to take back everything that it

13    had given to the debtor; it just has a simple (audio

14    interference).

15         Now, we have for the first time in Sanofi's reply,

16    a reference to Grossman's in their attempt to argue that Your

17    Honor's summary judgment ruling in the Acthar administrative

18    claims proceedings somehow bolsters their position.  Now, I

19    want to dig in on that a little bit because, one, we didn't

20    have an opportunity to respond on Grossman's in writing and,

21    two, it really helps illustrate where their reasoning goes

22    wrong.

23         The argument is that because the debtors don't

24    have to pay the royalty unless and until we sell Acthar, the

25    claim doesn't arise under Grossman's until we sell (audio

1   interference).  And that's simply a misapplication of

2   Grossman's and Your Honor's ruling, both of which concern

3   remedies and law for torts or antitrust injury, and so we're

4   not analogous at all.

5           Unlike what Sanofi is saying, it's been repeated

6   over and over again by courts that obligations under a pre-

7   petition contract are pre-petition claims.  They arise when

8   the contract is signed.  The Third Circuit said that in

9   Weinstein and in Columbia Gas.

10          And, really, even if you read Grossman's

11  carefully, the Third Circuit said the same there.  The Court

12  discussed the then-latest thinking from its fellow circuit

13  courts and the various approaches had taken on the question

14  of when does a claim arise?

15          And they're all really focused on the tort

16  context, to be sure, but it's still informative.  There's one

17  point where the Court looks at the Eleventh Circuit's Piper

18  test and that's a pre-petition relationship; in other words,

19  was there a pre-petition relationship between the debtor and

20  the claimant?

21          Plainly, a documented, contractual relationship

22  contemplating the payments at issue would satisfy that

23  standard.  Now, the Third Circuit in Grossman's then says

24  that the pre-petition relationship test is too narrow.

25          So, if Sanofi's claims here under a pre-petition

1   contract would satisfy that <u>Piper</u> test and the claims

2   satisfying the <u>Piper</u> test all fit completely inside the

3   universe of claims that are pre-petition under <u>Grossman's</u>,

4   then Sanofi's claims are pre-petition claims under

5   <u>Grossman's</u>.  They're just contingent on future events

6   occurring; in other words, selling Acthar.

7        Even more relevant is what the <u>Grossman's</u> Court

8   was rejecting in its (audio interference), which is the

9   <u>Frenville</u>.  <u>Frenville</u> is exactly the principle Sanofi is

10  arguing (audio interference).  The <u>Frenville</u>'s Court's

11  reasoning was that because applicable law wouldn't have

12  allowed the creditor there to institute its lawsuit for

13  indemnification pre-petition, its claim couldn't have arisen

14  pre-petition.

15       Sanofi is saying the same thing, when you peel

16  things back; you even heard a little bit of it in

17  Mr. Hopkins' argument.  They're saying that they don't have a

18  right to collect a payment, to sue for a payment until the

19  royalty is triggered by an Acthar sale.  That's what they

20  mean when they say a sale of Acthar gives rise to the royalty

21  (audio interference).

22       That reasoning cannot be followed hereafter

23  <u>Grossman's</u>.  But the reasoning also falls under its own

24  weight because there would be no royalty obligation if

25  weren't for the contract.  It's not just a sale of Acthar

 1  that, in Sanofi's words, "gives rise to the royalty"; it was

 2  the execution of the agreements in 2001, followed by the

 3  realization of the contingency of Acthar being sold.

 4          As a matter of fact, if you read the Frenville

 5  decision, even the Frenville Court says what the debtors are

 6  saying here today about contractual relationship:

 7          "When parties agree in advance that one party will

 8  indemnify the other party in the event of a certain

 9  occurrence, there exists a right to payment; albeit,

10  contingent, upon the signing of that agreement."

11          And the Court said that that is:

12          "A classic case of a contingent right to payment

13  under the Code.  The right to payment exists as of the

14  signing of the agreement but is dependent on the occurrence

15  of a future event."

16          And that's at 744 F.2d 336.

17          Now, of course, that is a statement in *dicta*.

18  Frenville, of course, was overruled on other grounds, but we

19  can take from that statement, and from Grossman's, which said

20  Frenville was too narrow (audio interference) and from

21  Columbia Gas --

22          THE COURT:  Hold on, Mr. Gott.

23          Whoever's not speaking, mute your phone.

24          VOICE:  You will now be placed into the

25  conference.  Press star for help.

1           THE COURT:  Mr. Garfinkel, I think that's you.  I

2   see your microphone coming up.  Please mute yourself.

3           Okay.  Go ahead, Mr. Gott.

4           MR. GOTT:  Sure.  So, what we can take from the

5   statement in Frenville from Grossman's, which said Frenville

6   was too narrow, from Columbia Gas and from Weinstein and from

7   dozens of other cases around the country that we could cite,

8   is that contingent claims created by a pre-petition contract

9   arise pre-petition.

10          Now, those are all reasons under controlling law

11  that their claims are pre-petition, dischargeable claims.

12  But we can even go one step further, because Sanofi's royalty

13  claims are just like the claims in two of the highly

14  persuasive cases that we cited, to which Sanofi did not

15  respond at all in their papers.  Those are, In re Lason, 309

16  B.R. 441, and, In re APF Co., 270 B.R. 567.

17          Now, there's a wrinkle, which is that the debtors

18  had already rejected the relevant contracts under their plans

19  in those cases, but for all the reasons I just argued, that

20  doesn't change the analysis.  The claim is the claim is the

21  claim, whether it's under a non-executory contract or a

22  rejected executory contract.

23          Each of the debtors in those two cases rejected

24  pre-petition acquisition agreements, in which they owed their

25  sellers contingent (audio interference).  They were

1   contingent because they were only payable if the buyer ended

2   up hitting EBITDA targets at various checkpoints after

3   closing.

4            Now, the courts in those two cases considered

5   whether those specific payments, which were triggered by

6   events that the buyer/debtor did not achieve and could not

7   have achieved until after the petition date, whether those

8   payments were administrative claims.

9            And that's exactly the principle that Sanofi is

10  arguing for here, in saying that their claims don't arise

11  until the contingency occurs.  But the Lason and the APF

12  opinions directly refute that.  To quote Judge Walsh:

13           "It is an installment of the purchase price,

14  payment of which is conditioned on the future profitability

15  of the business.  If the buyer goes into bankruptcy, as it

16  did here, the consideration not received up front becomes

17  part of the sellers' prepetition claim for damages.  I have

18  seen any number of situations where a prepetition seller's

19  earnout entitlements are adversely impacted by the buyer's

20  bankruptcy."

21           That's 270 B.R. 572.

22           Sanofi's royalty is exactly like an amount,

23  exactly like the EBITDA milestones in these two cases; in

24  other words, to better phrase Judge Walsh, this isn't

25  particularly close.  Those royalty claims arose pre-petition

1   and they will be (audio interference).

2         I'll move to Glenridge now and then, if it's

3   necessary, we'll come back down to Sanofi's voting issues

4   that Mr. Hopkins suggested.

5         So, on to Glenridge.  You heard Mr. Wang's version

6   of the backstory.  Just briefly, to frame up our view of that

7   backstory, the Glenridge Principals purport to have come up

8   with the idea for what later became QuestCor's Acthar

9   strategy.  Then they say they raised that idea and the

10  opportunity to acquire Acthar from Sanofi to QuestCor.

11        So, QuestCor and Glenridge agreed that in

12  exchange, QuestCor would make periodic payments to Glenridge,

13  based upon how well Acthar did.  Glenridge never actually

14  acquired any rights to Acthar.  They claim they had,

15  essentially, a deal in principle with Sanofi to buy them, but

16  that isn't an accurate characterization and, in any event, it

17  isn't relevant to the issues today.

18        Instead, what matters is Glenridge never had any

19  rights in the intellectual property underlying Acthar;

20  moreover, if one supposes that Glenridge did acquire rights

21  from Sanofi in 2001, they then signed a royalty agreement in

22  QuestCor in 2002, under which Glenridge expressly assigned

23  any rights it may have had to QuestCor.

24        Now, under the 2002 royalty agreement, QuestCor

25  did, indeed, make payments for several years of more than

1    $30 million worth.  The parties' relationship apparently

2    devolved though and in the early teens, they were caught up

3    in cross-litigations against (audio interference).

4            So, when Mallinckrodt fired QuestCor in 2014, the

5    debtors looked to settle those litigations and in doing so,

6    they agreed to the (audio interference).  The deal is pretty

7    straightforward.  The lawsuits were settled.  The releases

8    were exchanged.  And the debtors agreed to make an up-front

9    payment of $35 million and then a quarterly payment based on

10   Acthar sales, and so the aggregate amount with quarterly

11   payments came to $170 million.

12           There are a number of other terms in that

13   agreement, including one that's important for today; an

14   agreement that the contract's terms would remain

15   confidential.  And that's where I want to bridge to the legal

16   argument, because that confidentiality provision is a really

17   clear and simple basis for the Court to find that the

18   contract is executory.

19           The Third Circuit said in the Weinstein decision

20   we discussed earlier:

21           "Where the contract makes plain that certain

22   unperformed obligations are material, we can conclude the

23   contract is executory without further analysis."

24           That's In re Weinstein Co. Holdings, LLC, 997 F.3d

25   508.

1          And you heard Mr. Wang say in the confidentiality

2     term in the Glenridge agreement, the parties agree that term

3     was a material term of disagreement and that the breach of

4     this term may cause irreparable harm.

5          That's really the end of the story, per the Third

6     Circuit, in the Weinstein case.  The contract could be deemed

7     executory.

8          And other than that question, Your Honor, meaning

9     the executoriness question, the rest of the analysis is based

10    on the same legal principles I articulated earlier.

11    Glenridge's rights to payment of the royalties comes from a

12    pre-petition contract, so it's a pre-petition claim.  It

13    doesn't arise from Acthar sales here.  The sale of Acthar is

14    just a contingency that causes the right to accrue or to

15    (indiscernible).

16         Those pre-petition claims are dischargeable,

17    whether the agreement is executory or not.  Glenridge has not

18    articulated any reason why they would be non-(audio

19    interference).

20         Finally, Glenridge has no right under the

21    agreement or otherwise to interfere with the debtors'

22    enjoyment of its property.  Glenridge never owned, and does

23    not own today, any rights whatsoever in the Acthar

24    intellectual property.

25         Whether the contract with Glenridge is rejected

1  because it's executory or even if it's not executory, the

2  debtors simply do not derive their rights from (audio

3  interference).  And the theory that you heard articulated

4  that the Glenridge agreement is a but-for predicate to those

5  rights and, therefore, Glenridge has the ability to impede

6  Acthar sales if the royalties aren't paid, it's just not

7  supported by any law and really finds no support in the

8  agreement itself, though, in our view, the Glenridge

9  agreement checks all the same boxes under the agreement.

10  It's executory and can be rejected.  But even if it isn't

11  executory, any claims deriving from it are pre-petition and

12  dischargeable, and there's nothing in the contract that would

13  give Glenridge any right to interfere with the debtors'

14  enjoyment of their property rights after approval.

15          And with that, I'm concluded on the two issues

16  that Mr. Hopkins teed up at the beginning of this session of

17  the hearing, so unless Your Honor has any questions, I'll

18  stop.

19          THE COURT:  All right.  Mr. Hopkins and then I'll

20  come to you, Mr. Wang.

21          MR. HOPKINS:  Thank you, Your Honor.  I'll be very

22  brief.

23          We both now have cited to the Exide case and that

24  Court found that the contract was not executory to that

25  contract because there had been no evidence establishing that

1   any liability was pending or threatened.  The same is true

2   here.

3          Mr. Gott accuses me of misrepresenting the scope

4   of the indemnity provision.  It's pretty straightforward,

5   Your Honor.  It says, for misrepresentation of breach of

6   warranty by the seller for covenants in the agreement:

7          "For the use, storage, or transportation of Acthar

8   Gel prior to the effective date of the contract."

9          It's a standard provision.  Pre-effective date

10  stuff is the responsibility of the seller.  Post-effective

11  date stuff is the responsibility of the buyer.  The problem

12  here, the effective date was 20 years ago.

13         Mr. Gott said, well, maybe there's some

14  environmental liability.  There's no evidence of that, but

15  more to the point, Sanofi didn't sell Mallinckrodt any real

16  property as to which environmental liability could attach.

17  Sanofi told Mallinckrodt the right to sell Acthar Gel.  There

18  is no environmental liability that could ever attach to that.

19         On the dischargeability issue, Mr. Gott says all

20  claims on non-executory, pre-petition contracts are

21  dischargeable.

22         That's not what the Code says.  The Code says,

23  pre-petition claims are dischargeable.  And that gets to the

24  question of, when does a claim arise?

25         Now, Mr. Gott says, Well, okay, antitrust claims

1  relating to the post-confirmation sale of Acthar Gel arise

2  post-confirmation, but contract claims relating to the post-

3  confirmation sale of Acthar Gel somehow arise pre-petition.

4          There's no basis for distinguishing between tort

5  and contract claims when these facts that give rise to the

6  claim are some future, potential sale of Acthar Gel.  This is

7  not a contingent claim.  It's a claim that doesn't exist yet.

8  It may never exist.  If debtors don't sell Acthar Gel, no

9  royalty will be due.  If they do sell the gel, the royalty

10  will be due.

11          That's not a contingent claim.  It is a claim --

12          THE COURT:  Well, Mr. Hopkins, let me ask you a

13  question about that, because isn't that exactly what the

14  Court in Grossman's said, that if there is -- in Grossman's,

15  the claim arose at the time the party was, the claimant was

16  exposed to the debtors' product or conduct.  Even though they

17  would have had no right to get a payment at that time,

18  because they hesitant exhibited any effects from that

19  exposure and it was only after the bankruptcy that those

20  people developed symptoms, as a result of exposure to the

21  asbestos, but the Court said that was still a pre-petition

22  claim, didn't it?

23          MR. HOPKINS:  Yes, Your Honor, it did.

24          And I don't think that's inconsistent with what

25  I'm asking the Court to do here.  Grossman's stands for the

SA0221

1  proposition that if you cause damage to someone pre-petition

2  and that damage manifests itself later, that is a

3  dischargeable pre-petition claim.

4         But that's not what's happening here.  There has

5  been no harm caused that is yet to be determined.  There has

6  been no wrongful acts that will later result in harm.  This

7  is the analysis the Court went through in its October 19th

8  opinion and said, Wait a minute, if there is going to be harm

9  caused by sales of Acthar Gel in violation of antitrust laws,

10  that harm is not going to occur until post-confirmation sales

11  of Acthar Gel, and that's exactly what I think holds true

12  with this contract claim.

13         So, this is not where there was some damage that

14  was caused pre-petition, as in Grossman's and all of those

15  product liability cases, where we find out later that, here's

16  the dollar amount it needs to be.  There just isn't any harm

17  yet and there might not ever be.

18         THE COURT:  Well, that was true in Grossman's,

19  true.  There was no harm at the time the person was exposed

20  to asbestos and there might not never have been, but they

21  still had a pre-petition claim.

22         MR. HOPKINS:  That's right, Your Honor, but the

23  wrongful act, the exposing someone to asbestos, distributing

24  a negligently manufactured product, whatever it is, that had

25  already occurred.  I think that was the basis for the Third

1  Circuit's ruling is, hey, the damage has already been done.

2  The ball has been set in motion that will ultimately result

3  in recoverable damages.

4          That's not true here.  There is no wrongful act

5  and we're just waiting to see if and when damages become

6  recoverable for it.  There's not a wrongful act here yet.

7          THE COURT:  Okay.  Go ahead.

8          MR. HOPKINS:  That's all I have, Your Honor,

9  unless the Court has other questions?

10          THE COURT:  All right.  Thank you.

11          Mr. Wang?

12          MR. WANG:  Yes, Your Honor.  Just to follow-up on

13  that Grossman's point, for the Glenridge Principals, there

14  are no royalties that are due for any pre-petition period.

15  So, there is no possibility of an exposure to asbestos, like

16  what happened in Grossman's, pre-petition, in this situation.

17  And so, I think the denial of the debtors' partial summary

18  judgment motion, Your Honor's decision on that was right on

19  point.

20          You know, each time the debtors sell Acthar post-

21  petition now, right, and use the Glenridge Principals'

22  royalties for some other purpose, that's a new injury and

23  that's exactly why we have raised tort claims in our

24  adversary proceeding.

25          I think that's all I have, Your Honor.  I would

1   just be repeating myself on the confidentiality provisions,

2   as just boilerplate language.  It does not go to the root of

3   the contract.  I'll leave it there.

4           THE COURT:  Okay.  Thank you.

5           Mr. Gott, I have a question for you.  Why should

6   the debtors be able to reject these contracts and still reap

7   the benefit of these contracts by selling the product that

8   they bought from somebody else or royalties payments for the

9   development of that product?

10          MR. GOTT:  Your Honor, the answer is built into

11  your question there, which is, or at least as to Sanofi.  If

12  you recall, Glenridge has never owned any rights to the

13  intellectual property, but as to Sanofi, the rights were

14  purchased and this royalty payment was a component of the

15  purchase price.

16          So, one thing that gets a little, that's been a

17  little lost in all this, and you hear some of the principals,

18  I think, muddy it up in the briefing from Sanofi and in

19  argument, just because this payment stream is called a

20  royalty doesn't mean that there's a license or an ongoing

21  transferal of intellectual property rights by Sanofi to the

22  debtors.

23          And, usually, when you hear the term "royalty,"

24  you think of something like that, there where's a required

25  payment to be made periodically and that payment forms the

SA0224

1   basis for continued conferral of rights.

2          Here, if you look at the APA, it's plain under the

3   conveyance provisions that Sanofi, and I'll pull up the

4   language to quote it, explained that Sanofi hereby sells --

5   apologies -- here we go.  It says:

6          "Sanofi hereby sells, assigns, conveys, transfers,

7   and delivers to Mallinckrodt, all of Sanofi's rights, title,

8   and interests in the Acthar intellectual property."

9          So, and, again, I think I said it during my

10  argument, I do not disagree with the principle that if you

11  reject a contract, you don't get the benefits of future

12  performance by the other side.  But you heard Mr. Hopkins

13  said at the outset that, at least as to the delivery of

14  intellectual property rights, Sanofi has completed performed.

15  Sanofi performed 20 years ago.  We don't need them to perform

16  tomorrow.  We don't need them to perform next year in order

17  for the debtors to own the intellectual property.  That's our

18  property rights and we don't need anything from Sanofi to be

19  able to utilize those.

20          THE COURT:  Okay.  Thank you, Mr. Gott.

21          All right.  Well, I'm going to take it under

22  advisement.  I'm not going to rule right now, but I will rule

23  before we get to Phase II, which I think this would be more

24  of a Phase II issue.  I'm not going to be ruling on any, on

25  the confirmation of the plan during Phase I or making any

1  findings at all during Phase I.

2         So, I'm going to take this under advisement and at

3  some point, between now and whenever we get to Phase II, I'll

4  give you my ruling on it.

5         I guess that brings up the question of how we deal

6  with the second motion, which is the motion to -- what was

7  it? -- oh, for temporary allowance of claims.

8         Mr. Hopkins, how does this affect that or do we

9  need to address that at this point?

10        MR. HOPKINS:  I think that we can deal with that

11 however the Court wants.  There seems to be there are two

12 approaches.  We can reset this for one of the various

13 hearings that will be scheduled over the next week or 10 days

14 or we could proceed now.

15        THE COURT:  Okay.  Why don't we -- I think it's

16 going to, like you said, Mr. Hopkins, it's going to depend on

17 how I rule on this, so let's wait on that issue until after I

18 rule on this one, rather than take the time now.

19        MR. HOPKINS:  Yes, sir.

20        THE COURT:  All right.  Okay.

21        Anything else on the agenda, Mr. Merchant?

22        MR. MERCHANT:  I'm looking at my colleagues just

23 to confirm, Your Honor, but I don't believe so, from the

24 debtors' perspective.

25        THE COURT:  All right.  Mr. Ciardi, I see you have

124

1  your hand raised.

2          MR. CIARDI:  Your Honor, I have two questions and

3  one goes to a process for Monday, and I only ask how the

4  Court wants us to proceed with the exhibits.  So, if we're

5  going to have 250 people on the Zoom and start with share

6  screen, I don't know if that's going to cause delays in the

7  system.  I mean, today was very choppy for a lot of the

8  people that were participating.

9          So, will the witnesses have the exhibits on their

10 own screens already because the debtor put them up on a share

11 file for everybody?  Will this be (indiscernible)?

12         Whatever the Court's preference is, I just don't

13 want to learn it Monday morning; I'd like to know it now.

14 So, if it's something I've got to be ready for, I can at

15 least get my IT people prepared.

16         THE COURT:  Mr. Harris, what's the proposal for

17 the debtors?

18         MR. HARRIS:  Your Honor, we propose that any party

19 sponsoring a witness, and most of these people are the

20 debtors' witnesses, to make sure that the witness has

21 available, you know, the zip folder with all of the exhibits.

22 I think I agree with Mr. Ciardi, it's more efficient to have

23 the witness look at the document on their own screen, as

24 opposed to trying to look at it through a shared screen.

25         THE COURT:  I agree.  I think it works better.

SA0227

1   So, the witnesses should have whatever documents they're

2   going to be asking -- well, I guess they should have all of

3   them, because we don't know what cross-examination is going

4   to bring.  So, they should have access to all of the joint

5   exhibits so they can bring them up on their own.

6           And I have them, as well, and I can bring them up

7   on one of my screens, so that should work.  The same would

8   work as if they were sitting in the courtroom; they'd have

9   the document in front of them and I'd have it in front of me

10  and everybody else would have it in front of them.  So, I

11  think that works fine.

12          MR. CIARDI:  Understood, Your Honor.

13          And that would have been my preference, as well, I

14  just didn't know if, at the same time, it also needed to get

15  it up on the screen.  I assume as long as we identify it and

16  there is a common set of identifications that are, I think,

17  for all the exhibits, so the record will be clear.  It just

18  won't be on the screen.

19          And then the only other point I wanted to raise

20  with Your Honor is we did file, which I think obviously is

21  not for today or even for maybe next week, but the hearing on

22  the examiner and the designation of ballots probably should

23  be teed up before the Phase II part starts, because it would

24  be dealing with a voting issue.

25          And I'm glad to meet-and-confer with all the

 1  parties on that, but I did want to get Your Honor's idea of

 2  where you would want it to be.  So, before we disagree and

 3  then have to come back to you, at least we have a little

 4  guidance to help, I guess, guide us in our meet-and-confer.

 5          THE COURT:  Well, I haven't seen the motion, so I

 6  can't really comment on what I think, in terms of when it

 7  should be heard.  I'll ask the parties to meet-and-confer on

 8  that and then, if I have to, I'll decide when it's going to

 9  be heard; otherwise, if the parties agree, then I'll hear it

10  when it's agreed to.

11          MR. CIARDI:  Understood, Your Honor.

12          And then we will -- these issues may come up, but

13  whenever Your Honor hears the issue on the motion to quash,

14  so we just wanted to, I guess, bring it up to the forefront,

15  but thank you.  We'll address it with the parties.

16          THE COURT:  All right.  Thank you.

17          MR. GOTT:  Your Honor, if I may just very briefly?

18          Can you hear me okay?

19          THE COURT:  Go ahead, Mr. Gott.

20          MR. GOTT:  Thank you.

21          I just wanted to raise as a matter of timing and

22  for Your Honor's awareness because I know there's a lot on

23  your agenda, we have another motion from Sanofi set for next

24  Thursday at 3:30 p.m., where I think these issues of the

25  interplay between the contract and the rights and the

1   arguments you just heard are going to be pretty central to

2   the arguments that you're going to hear next Thursday.  So, I

3   wanted to make sure that you're aware of that.  I think it

4   would be beneficial to have Your Honor's ruling before that

5   hearing if at all possible, but in any event, you'll hear

6   more from both sides next Thursday.

7              THE COURT:  All right.  We'll see how that goes.

8              A couple of housekeeping issues for the hearing.

9   When witnesses are testifying, I have a screen right in front

10  of me that allows me to see whoever has their camera on, on

11  the Zoom call separately.  So, when there are -- when there's

12  a witness testifying, I only want to see the witness,

13  whoever's questioning the witness and whoever's going to be

14  cross-examining or defending the witness.  I should only see

15  those people on the screen.

16             And, really, I don't need to see cross-examination

17  until you get there, but if you have an objection, you can

18  just raise it at the time.  But I'm sure there are going to

19  be main parties that are going to be cross-examining, so,

20  basically, I don't want to see more than three people on the

21  screen at one time is what I'm trying to say.  So, the

22  witness, whoever's questioning the witness, and whoever's

23  defending the witness, or whoever is going to be objecting to

24  questions on direct.

25             Mr. Ciardi?

1          MR. CIARDI:  Yes, Your Honor.

2          And I guess on objections, do you want us to, I

3   mean because there is somewhat of a lag, if we believe there

4   will be an objection at some point in time, do a hand raise

5   and then at least you know something's coming; again, I'm

6   just trying to get a feel for how you want to run the Zoom

7   trial.

8          Every one, I have been in, every judge does them

9   differently, so I just -- I don't know what your preference

10  is.

11         THE COURT:  Well, a hand raise certainly makes it

12  easier because I can see you before the question is finished

13  and I can then tell the witness to pause until I hear what

14  the objection is.  I'll assume it's an objection if a witness

15  is testifying.  And in that case, you do need to have your

16  camera on.  These are all, like, these little things that we

17  pick up as we've gone through this whole process with remote

18  hearings.

19         If your camera is not on and you raise your hand

20  and I'm looking at the screen in front of me, I can't see the

21  hand raise.  So, if you raise your hand and want to be heard,

22  raise your hand and have your camera on so I can see it on

23  the screen in front of me.

24         MR. CIARDI:  So, then, if I'm the party cross-

25  examining Mr. Mette (phonetic), for example, I would still

1  leave my screen on.  The debtors have their screen on.

2  Mr. Mette, and those should be the only three screens that

3  are live at that point, then?

4              THE COURT:  Yes.  Yes.

5              MR. CIARDI:  Okay.

6              THE COURT:  Now, I understand there may be

7  multiple parties who want to ask cross-examination questions.

8  I don't know.  I guess I should ask that question:  Are there

9  plans for multiple cross-examinations of the witnesses?

10             Do we know, Mr. Harris?

11             MR. HARRIS:  Your Honor, at this point, the only

12  parties who have indicated that they will cross-examine are

13  the ad hoc group.  Other parties have reserved their rights.

14  So, as of now, it's just the ad hoc group, but (audio

15  interference).

16             THE COURT:  All right.  So, for now, it should

17  just be debtors' counsel and the Ad Hoc Acthar Group counsel,

18  the witness, and then if somebody else wants to raise an

19  objection, turn your camera on and raise your hand, then I'll

20  see you on my screen.

21             MR. CIARDI:  Your Honor, those were my only

22  issues, just so get the logistics for Monday.  That's all.

23             THE COURT:  All right.  Any other housekeeping

24  things before we -- or any other questions people have about

25  how the process is going to work?

1          MS. MARKS:  Your Honor, this is Betsy Marks from

2    the debtors.

3          Just to clarify, while everyone is on the hearing

4    together, are we starting at 10:00 a.m. on Monday and

5    9:30 a.m. Tuesday?  Do I have that right?

6          THE COURT:  Yeah, I wanted to -- I was going to

7    talk about that.  I had originally had it on my calendar

8    starting at 9:30, but because it was in the scheduling order

9    at 10:00, I kept it at ten o'clock.  I will leave it to the

10   parties.  I know we have people all over the country and all

11   over the world, in some cases, who are going to be

12   participating in this.  I know it's probably difficult for

13   people on the West Coast if we start earlier than 10:00;

14   that's seven o'clock for them.  But, I prefer, during trial,

15   to start at 9:30.  That gives me a little bit of time in the

16   morning to see if anything has come up in my emails and take

17   care of any issues that have popped up before we start.  That

18   still gives us an extra half hour for the trial.

19         So, if there's no objection to that, we'll start

20   at 10:00 on Monday and then after that, we'll start at 9:30.

21   Now, there may be days where we're starting at different

22   times, because I do have other hearings that I had to

23   schedule in between.  So, for example, and I tried to do

24   these at times when it wouldn't interfere with the trial.

25   So, Monday, I have you all day.  Tuesday, I have a chambers

1    conference at noon.  I set it for noon so that we could do it

2    during the lunch hour.  So, that shouldn't interfere with the

3    day.  On Wednesday, I have a 1:00 p.m. sale hearing, which

4    hopefully won't take more than an hour.  So, we'll still

5    start at 9:30 on Wednesday.  I'll take a late lunch break so

6    that we can have lunch and hopefully be done with the sale

7    hearing before we begin again, but I would anticipate

8    probably picking up again on Wednesday at 2:00.  On Thursday,

9    I have us starting at 1:00, because I have another sale

10   hearing in the morning, so we'll just plan on starting at

11   1:00 on Thursday, and then Friday, you have all day.  So,

12   that's the schedule for next week.

13              And then we can talk -- I have other things for

14   the week after that.  Hopefully some of those will come off,

15   so we'll hold off on talking about those until we get to

16   closer to the end of next week and then we'll figure out what

17   the schedule will be for the week after that.

18              MS. MARKS:  Thank you, Your Honor.

19              THE COURT:  Okay.  All right.

20              Any other issues that people have before we break?

21              MS. MARKS:  Not from the debtors.  Thank you, Your

22   Honor.

23              THE COURT:  All right.  Thank you, all.

24              I know this is challenging, especially as a remote

25   hearing, but we'll do the best we can.  Hopefully, we will

132

1   minimize difficulties with video and voice and we'll be able

2   to move this along pretty smoothly.

3            As I said, if you want to talk with IT people

4   ahead of time, you should do that to see about making sure

5   that you are set up properly so that I can hear you and I can

6   hear the witness and see the witness, particularly, the

7   witnesses, and hopefully, we'll make this go as smoothly as

8   possible.

9            Okay.  Thank you all very much.  Have a good

10  weekend.  I'll see -- well, you are all going to be very busy

11  this weekend, I think.  I'll see everybody on Monday.

12            We're adjourned.

13            COUNSEL:  Thank you, Your Honor.

14       (Proceedings concluded at 2:31 p.m.)

15

16                      CERTIFICATE

17

18     We certify that the foregoing is a correct transcript

19  from the electronic sound recording of the proceedings in the

20  above-entitled matter.

21
    /s/Mary Zajaczkowski            October 29, 2021
22  Mary Zajaczkowski, CET**D-531

23  /s/Coleen Rand                   October 29, 2021
    Coleen Rand, AAERT Cert. No. 341
24
    /s/William J. Garling            October 29, 2021
25  William J. Garling, CE/T 543