## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MALLINCKRODT, PLC, *et al.*,<br><br>Debtors. | Chapter 11<br>Case No. 20-12522-JTD<br>(Jointly Administered) |
| AD HOC FIRST LIEN NOTES GROUP, *et al.*,<br><br>Appellants,<br><br>v.<br><br>MALLINCKRODT, PLC, *et al.*,<br><br>Appellees. | Appeals from the Bankruptcy Court<br><br>Case No. 22-cv-00331-TLA<br><br>Case No. 22-cv-00330-TLA<br><br>Oral Argument Requested |

## CONSOLIDATED REPLY BRIEF OF APPELLANTS
## AD HOC FIRST LIEN NOTES GROUP AND
## COLUMBUS HILL MANAGEMENT, L.P.

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
K. John Shaffer
Benjamin I. Finestone
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
johnshaffer@quinnemanuel.com

SULLIVAN HAZELTINE ALLINSON LLC

William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Telephone: (302) 428-8191
Facsimile: (302) 428-8195
whazeltine@sha-llc.com

July 1, 2022          *Counsel to Appellant Ad Hoc First Lien Notes Group*

HUNTON ANDREWS KURTH LLP
Paul N. Silverstein
Brian M. Clarke
Philip M. Guffy
200 Park Avenue
New York, New York 10166
Telephone: (212) 309-1000
paulsilverstein@andrewskurth.com
brianclarke@huntonak.com
pguffy@huntonak.com

GABELL BEAVER LLC
Brian M. Gottesman (No. 4404)
1207 Delaware Avenue, Unit 2
Wilmington, DE 19806
Telephone: (302) 772-4291
gottesman@gabellbeaver.com

July 1, 2022          *Counsel to Columbus Hill Capital Management, L.P.*

## SUPPLEMENTAL CORPORATE DISCLOSURE STATEMENT PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 8012[1]

An additional First Lien Noteholder—Kite Lake Capital Management (UK) LLP—has joined the Ad Hoc First Lien Notes Group, which supplements its Rule 8012 statement as follows:

The parent corporations of Kite Lake Capital Management (UK) LLP are Kite Lake Capital Management Ltd. and Kite Lake Capital Ltd.  No publicly held corporation owns 10% or more, directly or indirectly, of Kite Lake Capital Management (UK) LLP.

---

[1] The Ad Hoc First Lien Notes Group's Bankruptcy Rule 8012 disclosures were included in its Opening Brief (D.I. 39 in this appeal), and also were attached as Exhibit "A" to Appellant's Omnibus Objection To Motions To Intervene (D.I. 23 in this appeal).

**TABLE OF CONTENTS**

<u>Page</u>

INTRODUCTION ................................................................................1

ARGUMENT .....................................................................................5

I.   THE PLAN IMPAIRS THE FIRST LIEN NOTEHOLDERS'
     CLAIMS BY NOT HONORING THE APPLICABLE
     PREMIUM ...........................................................................5

     A.   The Plain Language Of Section 1124(2) Mandates
          Reversal .....................................................................5

          1.   Section 1124(2) Does Not Apply To Non-
               Executory Agreements .....................................7

          2.   Even If Section 1124(2) Does Apply To Non-
               Executory Agreements, It Does Not Disallow The
               Applicable Premium .......................................16

     B.   No Other Basis Exists To Disallow The Applicable
          Premium ...................................................................28

II.  EVEN IF DEBTORS ARE EXCUSED FROM THE
     APPLICABLE PREMIUM, THEY MUST PAY INTEREST
     ON THE PREMIUM THAT ACCRUED DURING THEIR
     CHAPTER 11 CASES .........................................................33

III. THE PLAN IMPAIRS THE FIRST LIEN NOTEHOLDERS
     BY EXTINGUISHING THEIR RIGHTS UNDER THE
     SECOND LIEN INTERCREDITOR AGREEMENT ........................38

     A.   The Plan Distributions To The Second Lien Noteholders
          Are "In Respect Of Or On Account Of The Collateral,"
          And Thus Subject To Turnover .................................38

     B.   The Applicable Premium Is A "First Lien Obligation"
          Under The Second Lien Intercreditor Agreement ...................44

     C.   The Second Lien Noteholders Are Required To Turnover
          Payments They Received During The Chapter 11 Cases .........49

CONCLUSION ................................................................................52

## TABLE OF AUTHORITIES

**Page**

**CASES**

*AXA Inv. Managers UK Ltd. v. Endeavor Cap. Mgmt. LLC*,
  890 F. Supp. 2d 373 (S.D.N.Y. 2012) ..................................................... 30, 31

*BFP v. Resol. Tr. Corp.*,
  511 U.S. 531 (1994).............................................................................30

*Butner v. U.S.*,
  440 U.S. 48 (1979)............................................................................ 9, 15

*Citibank, N.A. v. Nyland (CF8) Ltd.*,
  878 F.2d 620 (2d Cir. 1989) ................................................................26

*Cuomo v. Clearing House Ass'n, L.L.C.*,
  557 U.S. 519 (2009).......................................................................... 14, 15

*Doe v. Hesketh*,
  828 F.3d 159 (3d Cir. 2016) ................................................................15

*In re 1141 Realty Owner LLC*,
  598 B.R. 534 (Bankr. S.D.N.Y. 2019) .....................................................31

*In re 139-141 Owners Corp.*,
  313 B.R. 364 (S.D.N.Y. 2004) ..............................................................36

*In re 405 N. Bedford Dr. Corp.*,
  778 F.2d 1374 (9th Cir. 1985) ..............................................................34

*In re A & B Assocs., L.P.*,
  2019 WL 1470892 (Bankr. S.D. Ga. Mar. 29, 2019) ............................. 20, 36

*In re AMR Corp.*,
  730 F.3d 88 (2d Cir. 2013) ..................................................................31

*In re Bartomeli*,
  303 B.R. 254 (Bankr. D. Conn. 2004).....................................................14

*In re Chedick*,
  1996 WL 762329 (Bankr. D.D.C. Mar. 22, 1996) ................................. 29, 30

*In re Combustion Eng'g, Inc.*,
  391 F.3d 190 (3d Cir. 2004) ................................................................47

*In re Connors*,
  497 F.3d 314 (3d Cir. 2007) ................................................................23

*In re Deseno*,
   17 F.3d 642 (3d Cir. 1994) ......................................................23

*In re Energy Future Holdings Corp.*,
   842 F.3d 247 (3d Cir. 2016) ............................................. *passim*

*In re Energy Future Holdings Corp.*,
   566 B.R. 669 (Bankr. D. Del. 2017), *aff'd*, 585 B.R. 341 (D. Del.
   2018), *aff'd*, 773 F. App'x 89 (3d Cir. 2019). ...................... *passim*

*In re EP Energy Corp.*,
   case no. 19-35654 (Bankr. S.D. Tex. 2020) ...............................7

*In re Gen. Growth Props., Inc.*,
   451 B.R. 323 (Bankr. S.D.N.Y. 2011) ........................... 20, 21, 36

*In re Haimil Realty Corp.*,
   546 B.R. 257 (Bankr. S.D.N.Y. 2016) .....................................32

*In re Insilco Techs., Inc.*,
   480 F.3d 212 (3d Cir. 2007) .................................................. 39, 41

*In re John Q. Hammons Fall 2006, LLC*,
   614 B.R. 371 (Bankr. D. Kan. 2020) .......................... 20, 21, 22, 36

*In re Mod. Textile, Inc.*,
   900 F.2d 1184 (8th Cir. 1990) ...............................................47

*In re Moody Nat'l SHS Houston H, LLC*,
   426 B.R. 667 (Bankr. S.D. Tex. 2010) ........................... 11, 12, 19

*In re MPM Silicones, LLC*,
   518 B.R. 740 (Bankr. S.D.N.Y. 2014) ................................. *passim*

*In re Onco Inv. Co.*,
   316 B.R. 163 (Bankr. D. Del. 2004) .................................. 35, 48

*In re Pillowtex, Inc.*,
   349 F.3d 711 (3d Cir. 2003) .......................................................10

*In re PPI Enters. (U.S.), Inc.*,
   324 F.3d 197 (3d Cir. 2003) ............................................ 5, 33, 34

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000) ...................................................47

*In re Rack Eng'g Co.*,
   212 B.R. 98 (Bankr. W.D. Pa. 1997).......................................50

*In re Railway Reorganization Estate, Inc.*,
   133 B.R. 578 (Bankr. D. Del. 1991).......................................29

*In re Reeves*,
   2006 WL 6811012 (B.A.P. 9th Cir. 2006) .................................48

*In re Roach*,
  824 F.2d 1370 (3d Cir. 1987), *superseded on other grounds*, *In re Connors*, 497 F.3d 314, 322 (3d Cir. 2007) ...................................................23

*In re Satellite Rests. Inc. Crabcake Factory USA*,
  626 B.R. 871 (Bankr. D. Md. 2021)............................................................12

*In re Taddeo*,
  685 F.2d 24 (2d Cir. 1982) ........................................................ 5, 6, 35

*In re TransAmerican Nat. Gas Corp.*,
  978 F.2d 1409 (5th Cir. 1992)....................................................................46

*In re Tribune Co.*,
  972 F.3d 228 (3d Cir. 2020) ................................................... 15, 16

*Proactive Measures USA, LLC v. D'Angelo*,
  2021 WL 5412533 (S.D. Ind. Oct. 21, 2021) .................................................47

*Raleigh v. Ill. Dep't of Revenue*,
  530 U.S. 15 (2000)......................................................... 8, 15, 26

*Rousey v. Jacoway*,
  544 U.S. 320 (2005)....................................................... 39, 41

*Ruskin v. Griffiths*,
  269 F.2d 827 (2d Cir. 1959) ....................................................................21

*Sapos v. Provident Inst. of Sav.*,
  967 F.2d 918 (3d Cir. 1992) .................................................. 23, 35

*Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*,
  549 U.S. 443 (2007)...................................................... 8, 15

*U.S. v. Security Indus. Bank*,
  459 U.S. 70 (1982)....................................................... 40, 42

**STATUTES**

11 U.S.C. § 363(l) ................................................................. 3, 28, 30

11 U.S.C. § 365(b) ............................................................... 8, 12, 14

11 U.S.C. § 365(b)(1)...............................................................................14

11 U.S.C. § 365(b)(2)................................................................... *passim*

11 U.S.C. § 365(d) ...............................................................................15

11 U.S.C. § 365(e) ...............................................................................30

11 U.S.C. § 502 ................................................................... 1, 3, 28

11 U.S.C. § 502(b) .......................................................... 17, 18, 30, 36, 47

11 U.S.C. § 502(d) ..........................................................................17

11 U.S.C. § 502(e) ..........................................................................17

11 U.S.C. § 506 ...................................................................... 1, 3, 28

11 U.S.C. § 506(a) ................................................................ 29, 39, 50

11 U.S.C. § 506(b) ................................................................... *passim*

11 U.S.C. § 510(a) ................................................................... 4, 16, 47

11 U.S.C. § 523(a) ............................................................ 10, 12, 13, 14

11 U.S.C. § 524 ......................................................................... 47, 48

11 U.S.C. § 541(c) ................................................................... 3, 28, 29

11 U.S.C. § 727 ..............................................................................13

11 U.S.C. § 1110 ......................................................................... 9, 10

11 U.S.C. § 1111 ..............................................................................18

11 U.S.C. § 1124 .................................................................... *passim*

11 U.S.C. § 1124(2) ................................................................ *passim*

11 U.S.C. § 1141 .................................................................... 9, 10, 13

11 U.S.C. § 1192 ......................................................................... 12, 13

## OTHER AUTHORITIES

H.R. Rep. No. 95-595 (1977)..................................................................15

Douglas G. Baird, *Making Sense of Make-Wholes*, 94 Am. Bankr. L.J. 567
    (2020)..................................................................................26

## INTRODUCTION

The bankruptcy court excused Debtors from honoring the Applicable Premium, a claim that is payable under the plain language of the First Lien Notes Indenture.[2]  Appellees do not dispute that, but rather attempt to justify the bankruptcy court's decision based on Debtors' power to "unimpair" claims under section 1124(2).  But Appellees have identified nothing in section 1124(2) that purports to *disallow* claims such as the Applicable Premium.  Debtors may not have to "cure" their default of filing a bankruptcy case, and they may be able to reinstate the maturity of the First Lien Notes, but there is no statutory basis to effectively vaporize millions of dollars in contractual principal under the guise of unimpairment.  Very simply, section 1124 addresses claim *impairment*, not claim *allowance*, and the claim that Debtors must unimpair is the First Lien Noteholders' allowable claim under sections 502 and 506, which includes the Applicable Premium.

At the heart of Appellees' argument is the contention that section 1124(2)(A) not only excused the cure of certain defaults, but that it wipes away every

---

[2]   References herein to "Debtors __" are to the Brief Of Reorganized Debtor Appellees In Opposition To First Lien Noteholder Appeals (D.I. 49) and references to "Intervenors __" are to the Joint Omnibus Brief Of Intervenor-Appellees (I) Deerfield Private Design Fund IV, L.P. And Deerfield Partners L.P., (II) BOKF, N.A., (III) Ad Hoc First Lien Term Lender Group, And (IV) Deutsche Bank AG New York Branch In Opposition To Appeal Of The Confirmation Order (D.I. 47).  Each Member of the Ad Hoc First Lien Notes Group files this brief exclusively on its own behalf and does not assume any fiduciary or other duties to any other Member or to any other entity or individual.

1

consequence of those defaults, retroactive to the Petition Date.  The cases requiring debtors to pay default interest, even when a default has been "cured" or "waived" under section 1124, plainly show otherwise.   Congress relieved debtors of the obligation to cure certain defaults, but nothing in section 1124(2), or otherwise in the Code, states that "debtors are excused from all consequences of a cured or waived default," or that "debtors need not pay any claim that arose upon the cured or waived default."  Debtors correctly ask this Court to consider the plain language of the Code, and yet they load their brief with legislative history and policy, and they seek to write into the Code provisions that simply do not exist.  Thus, regardless of whether the exceptions to "cure" in section 1124(2)(A) even apply to non-executory contracts (and they do not), section 1124(2)(A) does not authorize the relief the bankruptcy court granted—*i.e.*, a wholesale disallowance of the Applicable Premium.

Moreover, even if Debtors could, upon the Effective Date of their "unimpairment" Plan, negate their obligation to pay the Applicable Premium, they are not excused from paying interest on the Applicable Premium during the over twenty months that passed between the Petition Date and the Effective Date. Unimpairment under section 1124 is for purposes of a plan; and "unimpairment"— if it happened—was not effective until the Effective Date of Debtors' Plan.  Until that time, the First Lien Notes Indenture and section 506(b) mandated payment of interest on Appellants' claims, which included the Applicable Premium.  Appellees'

only response to this is their "time travel" argument, that unimpairment under section 1124 somehow winds back the clock to the beginning of the case.  But try as they may, they cannot identify any language in section 1124 or otherwise that says that.

Nor do Appellees identify any other basis for disallowing the Applicable Premium.  The principal Code sections they cite—541(c) and 363(*l*)—say nothing about the disallowance of claims, but rather govern what constitutes property of the estate and how that property can be used.  Claim allowance is governed by sections 502, 506, and a small handful of other sections that clearly address the allowance or disallowance of specific types of claims.  Nothing in any of those sections would disallow the Applicable Premium.  The disallowance of claims in bankruptcy is a fundamental exercise of federal power—one which must be grounded in statute, not in varying, judicial views of policy.

Finally, assuming *arguendo* the Applicable Premium (or interest thereon) was appropriately disallowed and cannot be enforced *vis-à-vis* the Debtors, it can *vis-à-vis* the Second Lien Noteholder Appellees who never filed for bankruptcy themselves.  Appellees' reliance on *Momentive* and *EFH* fails, because the turnover provisions at issue in those cases were materially narrower than those at issue here.  Just as the First Lien Notes Indenture was drafted to "*Momentive*-proof" its terms (Debtors 24-25), so too was the Second Lien Intercreditor Agreement, which was

drafted after *Momentive* and *EFH*.  These cases shed important light on how to draft intercreditor agreements to protect the rights of senior creditors.  Nor does anything in section 1124 or otherwise in the Code relieve the Second Lien Noteholders of their obligations under the Second Lien Intercreditor Agreement, which is enforceable under Bankruptcy Code section 510(a) and, by its terms, applies even if the Applicable Premium cannot be enforced against Debtors.  Section 1124(2)(E) requires that Appellants' rights vis-à-vis the Second Lien Noteholders be preserved, but Debtors' Plan purports to release the Second Lien Noteholders of their intercreditor obligations with respect to distributions they received under the Plan.

Appellees incorrectly accuse Appellants of trying "to exploit the bankruptcy to obtain a windfall."  Debtors 1.  That is incorrect—Appellants are simply requesting that the negotiated, express terms of the First Lien Notes Indenture and Second Lien Intercreditor Agreement be honored.  It is Appellees who are trying to use bankruptcy to avoid their obligations beyond what the Code provides, including the Second Lien Noteholder Appellees who are not even debtors.[3]

---

[3]  Appellees suggest that this appeal may be moot.  Appellants strongly disagree and reserve all rights with respect thereto.

4

## ARGUMENT

I.   **THE PLAN IMPAIRS THE FIRST LIEN NOTEHOLDERS' CLAIMS BY NOT HONORING THE APPLICABLE PREMIUM**

### A.     The Plain Language Of Section 1124(2) Mandates Reversal

Debtors are correct that this "Court should 'begin with the text of [the] provision and, if its meaning is clear, end there.'"  Debtors 17 (quoting *In re Price*, 370 F.3d 362, 368 (3d Cir. 2004)).  Debtors err, however, in contending that the plain language of section 1124(2) supports the bankruptcy court's decision; it does not.  Debtors' *second* mistake is, lacking statutory support for their position, resorting to "stated goals" and "policies" that, in fact, are not stated anywhere in the plain language of section 1124.  Indeed, lacking textual support for their arguments, Debtors resort to legislative history in the ***first paragraph*** of their brief, Debtors 1, and do so repeatedly throughout.

Debtors concede (as they must) that unimpairment under section 1124(2) requires compliance with all five subparagraphs (A) through (E).  Debtors 21. Failure to satisfy any one of these subparagraphs would render the First Lien Noteholders impaired.  In fact, the Plan fails to satisfy a number of them.  "The Bankruptcy Code creates a presumption of impairment … [and] [t]he burden is placed on the debtor to demonstrate the plan leaves the creditor's rights unaltered." *In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 203 (3d Cir. 2003); *see also In re*

5

*Taddeo*, 685 F.2d 24, 28 (2d Cir. 1982) (Congress "defined impairment in the broadest possible terms," and section 1124(2) is a "small exception").

Section 1124(2)(A) provides that a class of claims is impaired unless the plan:

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—

(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured ….

Thus, section 1124(2)(A) requires that for a class of claims to be unimpaired, defaults must be cured unless a "small exception" applies: the default is "of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured."

The bankruptcy court deviated from the plain language in two ways: (1) it applied the exception to a non-executory obligation, which is not subject to section 365, and (2) it not only excused Debtors from curing the relevant default—the chapter 11 filings—but also used section 1124 to effectively disallow the Applicable Premium.  Either of these errors, standing alone, is sufficient to require reversal, because each improperly deprived the First Lien Noteholders of their rights to the Applicable Premium.

6

### 1.    Section 1124(2) Does Not Apply To Non-Executory Agreements

Debtors acknowledge—as they must—that section 1124(2) only exempts defaults "of a kind specified" in section 365(b)(2).  Debtors 31.  They also acknowledge—as again they must—that section 365(b)(2) *specifically* applies "in the context of assumption of an executory contract."  *Id.*  Section 365(b)(2) has no application except to executory contracts and unexpired leases.  Debtors nonetheless assert that defaults under the non-executory First Lien Notes Indenture are "of a kind specified in section 365(b)(2)."

Debtors cite but one case supporting their "of a kind" argument in the context of section 1124(2)—a vacated, unpublished, oral decision in *EP Energy*.  But even putting aside that decision's lack of precedential value, its rationale is murky.  The *EP Energy* court made clear that it was ***not*** "decid[ing] for sure whether 365(b)(2) is referenced and 1124(2) would include a debt contract, since it refers to executory contract provisions of the Code," saying no more than it "probably would."  A.2711.  Rather, the court endorsed a flexible interpretation of section 1124(2) in which "the Court must determine whether there has been a cure in the context of the specifics of the case."  A.2710-11.  The "specifics" the *EP Energy* court was concerned about were whether the make-whole in that case violated "public policy."  A.2709.  The court avoided that issue, however, by interpreting section 1124(2), in the context of

that case, to enable the debtor to avoid paying the make-whole by unimpairing the loan.  A.2709-10.

*EP Energy*'s vacated, oral decision does not withstand scrutiny.  *First*, nothing in the plain statutory language of section 1124(2) supports different interpretations of its provisions based on case "specifics" and "public policy" concerns.  The "of a kind" reference to section 365(b) either is, or is not, limited to executory contracts—nothing in the statute suggests differing results in different cases.

*Second*, there is no room for the *EP Energy* court's "public policy" concerns.  As set forth in Appellants' Opening Brief (at 23-34), Congress has spoken clearly and extensively on when claims are, or are not, to be allowed in bankruptcy.  Claims in bankruptcy are governed by state law unless the Code expressly provides otherwise, a fundamental principle which is embedded in Bankruptcy Code section 502.  *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 452 (2007) ("[W]e generally presume that claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed."); *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000) ("The 'basic federal rule' in bankruptcy is that state law governs the substance of claims ….").  This principle underlies Appellees' often—but only *partially*—quoted phrase that: "Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from

8

receiving 'a windfall merely by reason of the happenstance of bankruptcy.'" *Butner v. U.S.*, 440 U.S. 48, 55 (1979). The "windfall" that the Supreme Court was concerned about in *Butner* was not whether creditors such as the First Lien Noteholders could enforce their negotiated contractual rights in bankruptcy, but rather whether debtors could avoid their obligations in bankruptcy based on equitable policy considerations. Thus, it is Appellees who are seeking a "windfall" in bankruptcy by attempting to override the plain language of the First Lien Notes Indenture.

Apart from *EP Energy*, Debtors' argument focuses on analogies to two other sections that employ "of a kind" language: §§ 1110 and 1141(d)(6). Debtors 32-33. But those analogies fail, because the "of a kind" references in those sections are expressly modified by language that makes clear they apply more broadly than the statutes they reference. No such modifying language exists in section 1124(2).

*Section 1110* provides that "the right of a secured party with a security interest in" aircraft equipment pursuant to a "security agreement, lease, or conditional sale contract" is not subject to the automatic stay unless, among other things, the debtor cures "any default, other than a default of a kind specified in section 365(b)(2), under such security agreement, lease, or conditional sale contract." Although this language is in some respects similar to section 1124(2)(A), it differs materially because it expressly applies to a "security agreement" ("agreement that creates or provides for

9

a security interest," § 101(50)) and "lease" (for which section 1110 expands the definition beyond that normally applied in section 365 to include financings).[4]  Thus, by its terms, section 1110's cross-reference to section 365 includes security arrangements that would not, in themselves, be subject to section 365.  That is very different from section 1124(2)(A), which contains no such expansive language.

*Section 1141(d)(6)* provides that "a debtor that is a corporation" is not discharged from "any debt … of a kind specified in paragraph (2)(A) or (2)(B) of section 523(a)," when the debt is owed to the government.  Debtors argue that because only an individual's debts are nondischargeable under section 523(a), this must mean that the phrase "of a kind specified" includes debts that are not subject to section 523(a).  Debtors 33.  But again, the express text of section 1141(d)(6) makes clear that it is being applied to corporations—there is no other possible way to interpret it.  This is in stark contrast to section 1124(2)(A), which says nothing about applying to any agreements other than those actually covered by section 365(b)(2).

---

4   Section 1110(d)(1) provides—for purposes of section 1110 only—that "lease" includes "any written agreement" where the parties "have expressed … that the agreement is to be treated as a lease for Federal income tax purposes."  By its terms, this expands section 1110's scope well beyond that of section 365(b)(2). *See In re Pillowtex, Inc.*, 349 F.3d 711, 722 (3d Cir. 2003) ("lease" was disguised financing notwithstanding the parties' intentions for "tax purposes").

Debtors try—but fail—to distinguish Appellants' cases.  Notably, the *EP Energy* court itself—in a *published*, *not vacated*, decision—adopted the correct interpretation of the "of a kind" exception in *In re Moody National SHS Houston H, LLC*, 426 B.R. 667 (Bankr. S.D. Tex. 2010).  *Moody* held that the "of a kind" proviso in section 1124(2)(A) was inapplicable to a non-executory mortgage.  *Id.* at 673-74.

Debtors try to distinguish *Moody* by claiming it involved a debtor who "had to pay default interest resulting from a *pre-petition* payment default, which is not excused from cure under Section 1124(2)(A)."  Debtors 36.  That misstates both the plain language of section 1124(2)(A) and the holding of *Moody*.  *First*, to the extent the "of a kind" exception in section 1124(2)(A) applies, it is equally applicable to both pre- and postpetition defaults.  The section 1124(2)(A) "of a kind" exception applies to "any such default that occurred ***before or after the commencement of the case*** under this title," as long as the default is "of a kind specified" in section 365(b)(2) (emphasis added).  Thus, the fact that it was a "pre-petition" default is irrelevant.

*Second*, the debtor in *Moody* was seeking not only to cure a "payment default," but also to avoid paying *additional* default interest on the grounds that such interest was a "penalty."  The court rejected that argument, holding:

> Although it is true that § 1124(2)(A) references defaults "of a kind" described in § 365(b)(2), ***the defaults described in § 365(b)(2) are defaults under leases or executory contracts.  A mortgage note is neither a lease nor an executory contract***.

11

*Moody*, 426 B.R. at 673 (emphasis added).  *Moody* further held:

> **It would stretch the language of § 1124(2)(A) far beyond its plain meaning to believe that it refers to any default rate of interest on any type of agreement.**  Indeed, **none of Moody's published decisions hold that § 1124(2)(A)'s reference to § 365(b)(2) should be applied to a mortgage note**….
>
> This Court declines to apply the § 365(b)(2) exception that is contained in § 1124(2)(A) to determine whether the holder of a claim secured by a garden variety real estate mortgage is unimpaired.

*Id.* at 674 (emphasis added).

Debtors' other attempts to distinguish Appellants' authorities also fail. *Satellite Restaurants*[5] held that Bankruptcy Code section 1192(2)—which excepts from a small business debtor's discharge "any debt … of the kind specified in section 523(a)"—only applied to individual debtors, because only individual debtors are the subject of section 523(a).  626 B.R. at 876.  In so holding, *Satellite* rejected the argument—analogous to Debtors' here—that a corporate small business debtor could not discharge debts of the type set forth in section 523(a).  *See id.* at 875.  The court held that, because section 523(a) "is clear and unambiguous that it applies only to individual debtors," a corporate debtor's debts were not of the kind specified in section 523(a).  *Id.* at 876.  Likewise, section 365(b) is clear and unambiguous that it only applies to executory contracts and leases.

---

[5]  *In re Satellite Rests. Inc. Crabcake Factory USA*, 626 B.R. 871 (Bankr. D. Md. 2021).

12

Debtors argue that "core" to the result in *Satellite* was the inclusion of a cross-reference to section 1192 in the preamble of section 523(a).  Debtors 35.  But that preamble language simply lists all sections of the Code in which a discharge could be granted (*e.g.*, §§ 727, 1141, 1192) and states that such a discharge "does not discharge an individual debtor" from the debts specified in section 523(a).  Debtors argue that including section 1192 and the phrase "individual debtor" in the preamble to section 523(a) is sufficient to make debts "of the kind specified" in that section inapplicable to corporate small business debtors.  Debtors 35-36.

Debtors' argument undercuts their own analogy to section 1141(d)(6).  The preamble to section 523(a) cross-references ***both*** sections 1141 and 1192.  Yet, while Debtors embrace section 1141(d)(6)'s use of the phrase "of a kind" to broadly interpret section 1124(2)(A), they reject the opposite result demonstrated by section 1192's use of the same phrase.  Thus, a cross-reference to section 1141 in section 523(a)'s preamble cannot be the reason why section 1141(d)(6)'s reference to "of a kind specified in" section 523 is broad enough to include corporate debts.  Rather, it is because section 1141(d)(6) expressly refers to "a debtor that is a corporation," leaving no choice but to broadly interpret its cross-reference to section 523(a) as including corporate debts.  By contrast, there is nothing in section 1124(2)(A) that compels its application to anything other than what section 365(b)(2) applies to by its terms—executory contracts and unexpired leases.

13

More fundamentally, Debtors ignore the fact that, like section 523(a), section 365(b) begins with clear, limiting language.  Section 365(b)(1) provides that, "[i]f there has been a default in an ***executory contract or unexpired lease*** of the debtor," the trustee cannot assume that contract or lease without satisfying various conditions. Section 365(b)(2) is directly tied to (b)(1), and indeed is an *exception* to it.  Section 365(b)(2) cannot apply to non-executory contracts, since that would make it broader than the rule it excepts.  *See Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 530 (2009) (rejecting interpretation of statutory exception that "would swallow the rule").

Debtors' attempt to distinguish *Bartomeli*[6] similarly fails.  *Bartomeli* did not "generically" address the phrase "of a kind specified" in another section of the Code. Debtors 34-35.  Rather, it squarely addressed the question whether a claim was not dischargeable because it was a debt "of a kind specified" in section 523(a)(2).  The court rejected the argument that a party objecting to the discharge need only show that a claim could have fallen within that section—the party had to prove each of the "substantive elements" of those sections applied.  303 B.R. at 270 n.24 ("'[O]f a kind' captures the elements or characteristics specified in another section of the

---

6    *In re Bartomeli*, 303 B.R. 254 (Bankr. D. Conn. 2004).

Bankruptcy Code and ***makes the incorporated provision a condition for satisfaction of the section making the reference***." (emphasis added)).[7]

Finally, Debtors argue that, to accept Appellants' argument, the Court would have to conclude that Congress "goofed and limited the reach of [the 'of a kind' exception in section 1124(2)(A)] to executory contracts." Debtors 4.  But a decision by Congress to respect state-law contractual rights in whole or part is hardly a "goof," and in fact that decision is reflected throughout the Code (*e.g.*, §§ 365(d)(3), 365(d)(5), 555, 556).  Moreover, it is reflected in the holding of *Butner*—that rights in bankruptcy are established in first instance by non-bankruptcy law, absent a federal interest that requires a different result, 440 U.S. at 55—and repeated by the Supreme Court in *Travelers*, 549 U.S. at 452, and *Raleigh*, 530 U.S. at 20.  And, even if Congress may have "goofed" and failed to articulate a federal interest here, it is for Congress to act, as it has many times since the Code was enacted in 1978.  *See In re Tribune Co.*, 972 F.3d 228, 239 (3d Cir. 2020) (holding that "we rely on

---

[7]  Debtors acknowledge that "there is no necessity to resort to legislative history" of section 1124, Debtors 20, but they do so anyway.  The legislative history, however, merely shows how Congress could have drafted section 1124 if Debtors' interpretation of it were correct—unimpairment "consists of curing any default (other than a default under an ipso facto or bankruptcy clause) and reinstatement of the maturity of the claim or interest."  H.R. Rep. No. 95-595, at 408 (1977).  In any event, legislative history should not be considered here: "When the statutory language is unambiguous, our inquiry is complete and we ordinarily do not consider statutory purpose or legislative history."  *Doe v. Hesketh*, 828 F.3d 159, 167 (3d Cir. 2016).

15

the plain language of § 1129(b)(1)" and its cross-reference to section 510(a), because "Congress has not changed the law" notwithstanding criticism by one of the Code's principal drafters).

### 2.   Even If Section 1124(2) Does Apply To Non-Executory Agreements, It Does Not Disallow The Applicable Premium

Debtors acknowledge that "the default giving rise to the make-whole obligation is self-evidently a breach of a provision relating to commencement of a chapter 11 case." Debtors 31.  Because "the commencement of a case" is one of the defaults excused from cure by section 365(b)(2), Debtors argue that they are likewise excused from curing the commencement default, and can reinstate the maturity of the First Lien Notes.  And, assuming for these purposes that the "of a kind" exception in section 1124(2)(A) applies to non-executory contracts, Debtors are **partially** correct.  Debtors would not have to "cure" the commencement of the case, and they could reinstate the maturity of the First Lien Notes.

But the bankruptcy court granted Debtors far more than that—it not only excused Debtors from *curing* the commencement default, but it also authorized Debtors to completely vaporize the Applicable Premium, as if it never was owing. Those are two different things.  Nothing in the Bankruptcy Code permits that result, and Debtors have provided no convincing justification for it.

We begin with what section 1124(2)(A) **does say**.  It says "notwithstanding any contractual provision or applicable law that entitles the holder of such claim or

16

interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default," the plan must cure "any such default," unless such default is of the kind specified in section 365(b)(2).  If so, the plan may also reinstate the maturity and, assuming all other conditions in section 1124(2) are met, unimpair the claim.

But it is equally important to consider what section 1124(2)(A) **does not say**. It does not say that "any claim arising on account of such default shall be disallowed," or that "all consequences of such default shall be excused."  Rather, it simply says that the debtor is excused from curing "such default" itself.

Disallowance is not something that Congress approached coyly.  The Bankruptcy Code contains numerous provisions that provide expressly for the disallowance of claims, starting most notably with section 502(b).  But in those sections, Congress made clear that a claim would, in fact, be allowed or disallowed based on the section's application.  *E.g.*, § 502(b) (court "**shall allow** such claim in such amount, except to the extent that" one of the nine grounds for disallowance in § 502(b) applies); § 502(d) ("the court **shall disallow** any claim of any entity from which property is recoverable under section 542, 543, 550, or 553" absent satisfaction of requisite conditions); § 502(e)(1) ("the court **shall disallow**" certain reimbursement and contribution claims)).  Congress also knew how to allow, or disallow, claims for specific purposes, including in the context of chapter 11 plans.

17

*See, e.g.*, § 1111(b)(1)(A) (allowing or disallowing nonrecourse secured creditor's claim "the same as if the holder of such claim had recourse against the debtor on account of such claim").

Nothing in section 502(b) or otherwise, however, states that any portion of a claim which is deaccelerated under section 1124(2)(A) is disallowed, or that any portion of a claim arising on account of acceleration is disallowed.  Debtors are improperly trying to write those provisions into the Code, when Congress did not.

Debtors argue that Section 6.02 of the First Lien Notes Indenture is "precisely" the "kind of contractual provision" that section 1124(2)(A) excuses. Debtors 21.  But section 1124(2)(A) does not excuse "***provisions***"; it excuses the curing of "***defaults***."  The "defaults" are defaults that give rise to acceleration (*i.e.*, "any such default"), but they are still just defaults.  Appellants do not dispute that, if the "of a kind" exception in section 1124(2)(A) applies, Debtors would be excused from curing the "default"—the commencement of the case.  But nothing in section 1124(2)(A) excuses Debtors from every ramification of "any such default."  Rather, what section 1124(2)(B) does is permit Debtors to restore the original maturity. Section 1124(2)(B) would not even be necessary if, as Debtors argue, section 1124(2)(A) itself not only excused the curing of "such defaults," but also nullified every consequence thereof in "contractual provisions" such as Section 6.02 of the First Lien Notes Indenture.

18

The argument that Debtors are making—and the bankruptcy court incorrectly accepted—was considered, and rejected, by the court in *Moody*. There, the debtor argued that if section 1124(2)(A) applied, it would be excused from paying any default interest. As discussed above, the court rejected the application of section 1124(2)(A) to a non-executory contract, and it also rejected using section 1124(2)(A) to, in effect, disallow claims arising as a consequence of the default.

> Instead of viewing § 1124 as simply setting forth the standards by which to determine a party's unimpaired status, Moody's interpretation perverts § 1124(2)(B) into a mechanism by which a debtor has substantive authority to truncate a creditor's contractual and state law rights to collect default interest.

*Moody*, 426 B.R. at 672.

Debtors dismiss *Moody* and numerous other cases as distinguishable because they involved default interest, rather than a make-whole. But there is no functional difference between the two for purposes of section 1124(2)(A). Both are contingent, unliquidated claims that become owing upon a default, including quite commonly a default based on a bankruptcy filing. And, contrary to Debtors' assertions, courts have allowed default interest to be paid, even when (i) the only default is a bankruptcy default, and (ii) the debtor, in the bankruptcy thereafter, purported to unimpair the creditor under section 1124(2)(A).

*First*, case law supports the payment of default interest based solely on a bankruptcy default, including:

19

the Debtors' *ipso facto* default (the mere act of filing bankruptcy petitions) was sufficient to support the award of default interest under the parties' contract, and was permitted by state law and the Bankruptcy Code.

*In re John Q. Hammons Fall 2006, LLC*, 614 B.R. 371, 378 (Bankr. D. Kan. 2020).

GGP's filing of a voluntary petition for relief under chapter 11 of the Bankruptcy Code on April 16, 2009 constituted an automatic and immediate event of default.... [Secured creditor]'s right to receive default interest derives from the Debtors' reinstatement of the loan under § 1124 of the Bankruptcy Code. Section 1124 permits a debtor to reinstate debt in connection with confirmation of a Plan by curing any existing defaults and reinstating the maturity of the debt, without altering the legal, equitable or contractual rights of the debt holder.

*In re Gen. Growth Props., Inc.*, 451 B.R. 323, 324, 327 (Bankr. S.D.N.Y. 2011).

[Creditor]'s entitlement to default interest for the pendency period does not require a finding that the Debtor was in default under the Loan Agreement before filing bankruptcy. Rather, its entitlement to default interest was triggered by the bankruptcy filing itself.

*In re A & B Assocs., L.P.*, 2019 WL 1470892, at *46 n.59 (Bankr. S.D. Ga. Mar. 29, 2019).

*Second*, in both *General Growth* and *Hammons*, the debtors had to pay default interest notwithstanding their unimpairing the claims under section 1124(2). Likewise, here Debtors *during these chapter 11 cases* paid the equivalent of default interest to certain unimpaired secured creditors as "adequate protection," based simply on the *ipso facto* default of Debtors' bankruptcy filing. *See* A.0284.

Debtors try to dismiss *General Growth* by arguing that "the court awarded default interest based on 'binding authority' from the Second Circuit requiring a

20

'highly solvent' debtor to pay interest at the full contract rate." Debtors 36 (quoting *Gen. Growth*, 451 B.R. at 327-31 & n.14).[8] But that explanation ignores the court's express holding that, "[i]n the case at bar, [creditor]'s right to receive default interest derives from Debtors' reinstatement of the loan under § 1124 of the Bankruptcy Code." *Gen Growth*, 451 B.R. at 327. The court's discussion of other considerations, such as the debtor's solvency, was in response to the debtor's argument that it should be relieved from the requirement to pay default interest. The court noted that, even under the reasoning of the "several older cases" cited by the debtor, "[i]n the instant case, none of the factors typically justifying the nullification of a default rate interest provision are present." *Id.* at 327-28.

Debtors similarly try to dismiss *Hammons* as "sparsely reasoned" and involving a solvent debtor. Debtors 28 & n.15. *Hammons* in fact was very well reasoned, including:

> At its base, § 1124 "concern[s] de-acceleration and reinstatement of the original maturity date of a loan upon curing of a default. [It] say[s] nothing about eliminating otherwise enforceable, accrued default interest which would have to be paid as part of the default cure." The

---

[8] The "binding authority" was *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959), an Act case which held that a solvent debtor must pay contract-rate default interest postpetition. *General Growth* held that *Ruskin* remained good law. 451 B.R. at 326. But under Debtors' theory, unimpairment under section 1124(2)(A) would override *Ruskin*, since—according to Debtors—unimpairment erases all consequences of the default. For Debtors to suggest that solvent debtors have to honor defaults, but insolvent ones do not, is to add yet another uncodified exception to section 1124(2)(A)'s plain language.

> key here is that § 1124(2) applies to accelerated payment, and that is all
> it does.  The point of § 1124(2) is to deaccelerate—it does not invalidate
> all *ipso facto* defaults, it only reverses *acceleration* arising out of *ipso
> facto* defaults.  Section 1124 simply provides "no basis to nullify the
> post-petition default interest claimed by [a creditor] to the extent it is
> otherwise allowable under [the creditor's] loan documents and
> applicable nonbankruptcy law."

*In re John Q. Hammons Fall 2006, LLC*, 612 B.R. 779, 804–05 (Bankr. D. Kan.)

(citations and footnotes omitted), *on reconsideration*, 614 B.R. 371 (Bankr. D. Kan.

2020).

Debtors argue that "[t]he First Lien Noteholders have not cited a single case

enforcing a make-whole in the face of reinstatement."  Debtors 27.  But Debtors

likewise have not cited a single case denying a make-whole in that scenario, other

than the vacated, unreported, oral decision in *EP Energy*.  The lack of reported

authority is not surprising, because as Debtors acknowledge, the First Lien Notes

Indenture is a new form, expressly designed to overcome the limitations that

prevented creditors from receiving make-wholes in prior bankruptcy cases.  Debtors

24 (First Lien Notes Indenture, "negotiated in 2019 [sic[9]], was an attempt to make

the premium '*Momentive*-proof'").

---

[9]   In fact, the First Lien Notes Indenture was negotiated and executed in *2020*, after
the Second Lien Noteholders' indenture, and it includes additional provisions that
reinforce the Appellants' rights to the Applicable Premium.  *See* Appellants'
Opening Brief 6, 11-13.

22

None of Debtors' authorities with respect to undoing a contractual acceleration support Debtors' argument that all consequences of the default evaporate simply because a creditor is "unimpaired." Indeed, most of the cases stand for the simple proposition—often in *dicta*—that, if the Code's requirements for unimpairment are met, loans can be deaccelerated. *See, e.g.*, *In re Roach*, 824 F.2d 1370, 1376 (3d Cir. 1987) (*dicta* stating that Code's prohibition on modification of home mortgages did not prevent a chapter 13 debtor from unimpairing the mortgage, but holding that the mortgage could not be unimpaired because it already had been foreclosed upon), *superseded on other grounds*, *In re Connors*, 497 F.3d 314, 322 (3d Cir. 2007); *In re Deseno*, 17 F.3d 642, 643-44 (3d Cir. 1994) (following *Roach* in chapter 11 case, but also *dicta* because the home had been foreclosed upon).

Debtors (at 20) misinterpret the statement in *Sapos v. Provident Inst. of Sav.*, 967 F.2d 918, 926 (3d Cir. 1992), that cure "is to remedy or rectify the default and restore matters to the *status quo ante*." Debtors argue that means by "curing" an acceleration, the parties are automatically returned to their pre-default position. In fact, the Third Circuit in *Sapos* was explaining what a debtor has to do to "cure," which is that the debtor has to take actions to restore the parties' positions, including satisfying missed payments. Debtors are thus inverting the "cause" and "effect" in *Sapos*. Unimpairment does not cause a return to *status quo*; it results from it.

Ultimately, Debtors try to argue (at 22) that the Applicable Premium itself is "acceleration." But Debtors are conflating the claim itself with the acceleration of payment of the claim. The First Lien Notes Indenture provides that various things happened with respect to the Applicable Premium on the Petition Date: (i) it became fixed in a liquidated amount, (ii) it was added to principal, and (iii) it became due and owing, because all principal was accelerated. If section 1124(2)(A) applies, Debtors may be able to deaccelerate the principal without curing the bankruptcy default. But nothing in section 1124(2)(A) authorizes Debtors to disallow, unliquidate, or otherwise annul the Applicable Premium—it is part of the reinstated principal. Indeed, there is nothing in the Bankruptcy Code or the First Lien Notes Indenture which provides that, if the First Lien Notes are deaccelerated, the Applicable Premium disappears. To the contrary, Section 6.02 of the First Lien Notes Indenture makes clear that once the Applicable Premium arises, it is part of the principal—full stop.

Debtors argue (at 22) "[t]he fact that the accelerated payment is treated as 'principal' … makes no difference: however labeled, it is an 'accelerated payment' obligation." But assuming section 1124(2) applies, Debtors can deaccelerate that obligation, such that the Applicable Premium will be due when the First Lien Notes mature. What Debtors cannot do, however, is annul the Applicable Premium altogether. Section 1124(2)(A) does not disallow "payment obligations," but rather

only requires (or waives) cure of "any such default[s]" that accelerated such obligations.  In other words, the plain language of section 1124 relieves the debtor from paying an obligation on an accelerated time frame, but it does not cause the obligation to go away.  Rather, section 1124(2)(B) makes clear that the original maturity of the obligation must be restored, while section 1124(2)(E) requires that the plan "does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest."

Debtors also argue (at 23) that "the requirement to pay the Applicable Premium is also in substance an 'accelerated payment' of interest."  But while lost future interest is one harm that holders may suffer in the event of a redemption, the parties agreed—and the First Lien Notes Indenture makes clear—that the Applicable Premium applies to more than just redemptions; it applies in various circumstances including payment defaults and bankruptcy.  The parties also agreed that the Applicable Premium is "intended to be liquidated damages and not unmatured interest or a penalty."  A.1622.  The Applicable Premium here is thus distinct from the make-whole at issue in *Energy Future*, which applied only in the event of an actual redemption.  *See In re Energy Future Holdings Corp.*, 842 F.3d 247, 251 (3d Cir. 2016).

Lenders are often compensated for the effects of a default, including by receiving default interest and late fees.  Defaults—even if they are eventually

"cured"—expose lenders to additional risk and uncertainty. *See Citibank, N.A. v. Nyland (CF8) Ltd.*, 878 F.2d 620, 625 (2d Cir. 1989).[10] Here, where the First Lien Notes Indenture did not otherwise provide for default interest, the Applicable Premium compensates the First Lien Noteholders for these additional risks. As explained by Professor Baird in the article Debtors cite repeatedly:

> make-whole premiums should not be considered "unmatured interest" within the meaning of the bankruptcy code. They are instead best understood as prepetition claims for contract damages that are routinely allowed when a party to a favorable contract files a claim.

Douglas G. Baird, *Making Sense of Make-Wholes*, 94 Am. Bankr. L.J. 567, 567-68 (2020).[11]

---

[10] In *Citibank*, the Second Circuit reiterated its holding in *Ruskin* that "variable rates simply reflected the heightened risk of repayment that the creditor bears upon entry of default. Indeed, … debtors might fare worse in the future if creditors were not allowed to impose variable rates, because creditors would then impose higher rates for the full life of the loan in order to reallocate the risk." 878 F.2d at 625 (citing *Ruskin*, 269 F.2d at 832).

[11] Professor Baird goes on to advocate that make wholes should not be enforceable—as a matter of claim allowance—except to the extent they compensate a lender for lost future interest. *Id.* But he acknowledges the lack of any such provision in the Bankruptcy Code—"Nothing explicitly prohibits a creditor from writing a contract that purports to increase its claim in the event of bankruptcy." *Id.* at 585. And the position that he advocates—that "[e]ven if a court outside of bankruptcy would find such a clause to be for liquidated damages and not a penalty, a bankruptcy court should not enforce it"—is contrary to well-established law that, absent an express provision in the Code to the contrary, claims in bankruptcy are allowed as they would be outside of bankruptcy. *See Raleigh*, 530 U.S. at 20 ("The basic federal rule in bankruptcy is that state law governs the substance of claims." (internal quotations omitted)).

Debtors rely heavily on the testimony of their expert, Brendan Hayes.  Debtors 13-14.  The bankruptcy court did not, however, rely on Mr. Hayes' testimony, and there was no reason for it to do so.  The First Lien Notes Indenture is clear on its face, and there is no basis for a witness—expert or otherwise—to testify as to its meaning or purpose.  Indeed, Mr. Hayes' testimony is directly contradicted by the plain language of the Indenture, which provides that the Applicable Premium is "intended to be liquidated damages and not unmatured interest or a penalty." A.2174.  Moreover, cross-examination revealed Mr. Hayes' lack of any real familiarity with the Indenture.  Although he professed to have read and understood its terms (A.2738), he admitted to not focusing on its specific language, stating as to make-whole provisions: "they're generally pretty standard."  A.2737.  This flies in the face of Debtors' own admission that the First Lien Notes Indenture is anything but standard, but was drafted to address issues that arose in *Momentive* and other cases.  Debtors 24.  It likewise overlooks the *weaker* make-whole provisions of other creditors in this case, which show how the First Lien Notes Indenture was carefully negotiated among the "sophisticated business entities ably represented by counsel" (including Debtors).  A.1566; *see also* Appellants' Opening 11-13.

Mr. Hayes also admitted on cross-examination (A.2739) that calculation of the Applicable Premium based on future interest payments was one of two alternative ways to calculate the premium, the alternative being "1% of the then

27

outstanding principal amount of the Note." A.1495. Debtors similarly omit this alternative from their block quote of the "Applicable Premium" in their brief (at 9). Although that method is not being used here, Mr. Hayes admitted the drafters of the First Lien Notes Indenture could not have known which method would be applied in the future. A.2739-41. The alternative shows that the Applicable Premium was not merely a substitute for future interest, particularly in light of the fact that the Applicable Premium is triggered by various events other than a redemption or other prepayment.

### B.    No Other Basis Exists To Disallow The Applicable Premium

Debtors contend that the Applicable Premium should be disallowed under sections 541(c) and 363(*l*). Debtors 46-51. But, as explained in Appellants' opening brief (at 29-31), those sections do not govern the allowance of claims. Rather, they govern how property comes into the bankruptcy estate, and how that property may be used. What constitutes property of the estate is very different from what constitutes a claim against the estate.

Congress knew how to provide for the allowance and disallowance of claims, and did so quite clearly in sections 502, 506, and a handful of other sections that expressly address claims allowance. Debtors do not even attempt to explain how Congress could have drafted two other sections that purportedly can be used to

disallow claims, but not even mention "claim" in either (despite "claim" being one of the most commonly used defined terms in the Bankruptcy Code).

Debtors' authority for their argument is inapplicable and unpersuasive. In *Railway Reorganization*,[12] the court held that a security interest in the debtor's property that would spring to life only in the event of a bankruptcy filing was avoidable under section 541(c). Here, no new security interest was created upon Debtors' filing, and no property was precluded from passing into Debtors' estate. Rather, all that occurred was the addition of the Additional Premium to the principal, which was secured by the exact same collateral that existed prior to the Petition Date. There was no new lien on estate property, but rather a change in the amount of the First Lien Noteholders' secured claim. The amount of creditors' secured claims often changes during a bankruptcy case, as is expressly contemplated by both section 506(a) and 506(b).

In *Chedick*,[13] the court held that a fee imposed upon a bankruptcy filing "is void as a matter of public policy." But the court failed to cite any authority for that "public policy" other than the debtor's "fresh start" and a handful of sections which,

---

[12]   *In re Railway Reorganization Estate, Inc.*, 133 B.R. 578 (Bankr. D. Del. 1991).

[13]   *In re Chedick*, 1996 WL 762329 (Bankr. D.D.C. Mar. 22, 1996).

in *specific circumstances*, bar the enforcement of *ipso facto* clauses in bankruptcy. 1996 WL 762329, at *3 (citing §§ 363(*l*), 365(e)(1)).

The fact that the Bankruptcy Code prohibits *ipso facto* clauses in *some circumstances* is not grounds to conclude that they cannot be enforced in all circumstances. Indeed, rules of statutory construction compel the opposite conclusion. If Congress intended to bar the enforcement of all *ipso facto* clauses and claims, it would have drafted a blanket prohibition, and included that prohibition in the categories of claims that are disallowed under section 502(b). Congress did not, and its silence is compelling. "[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 537 (1994).

Debtors also assert that "[t]he make-whole is punitive and unreasonable." Debtors 51. But they stipulated to the exact opposite just months before their bankruptcy, agreeing that the Applicable Premium represents a "reasonable calculation of each holder's lost profits" from the triggering event, "in view of the impracticability and difficulty of ascertaining actual damages" and that the premium "shall be presumed to be liquidated damages sustained by each holder as the result of the acceleration of the Notes." A.1566; *see AXA Inv. Managers UK Ltd. v. Endeavor Cap. Mgmt. LLC*, 890 F. Supp. 2d 373, 388 (S.D.N.Y. 2012) (court must "give due consideration to 'whether the parties were sophisticated and represented

30

by counsel, the contract was negotiated at arms-length between parties of equal bargaining power, and ... that [the provision] was freely contracted to" (citation omitted)). Although Debtors could have negotiated to exclude a bankruptcy filing from the list of defaults that would trigger an acceleration giving rise to their obligation to pay the Applicable Premium, *compare In re AMR Corp.*, 730 F.3d 88, 99 (2d Cir. 2013), that was not the bargain the parties struck.

"[C]ourts should not interfere with the parties' agreement regarding liquidated damages absent some persuasive justification," and the "party seeking to avoid the liquidated damages clause bears the burden of proving that it is a penalty and must demonstrate either that the damages flowing from prepayment were readily ascertainable at the time the parties entered into the lending agreement or the prepayment premium is conspicuously disproportionate to the lender's foreseeable losses." *In re 1141 Realty Owner LLC*, 598 B.R. 534, 542 (Bankr. S.D.N.Y. 2019) (quotations omitted). These stringent requirements are particularly apt here, where Debtors were "sophisticated business entities ably represented by counsel" and agreed to alter the terms of the Applicable Premium from their prior issuances. *See* A.1566; Appellants' Opening 11-13.

Debtors complain that the Applicable Premium is equal to "19% of outstanding principal." Debtors 2. But they ignore the fact that Debtors' chapter 11 cases lasted more than 20 months, during which other "unimpaired" creditors (but

not Appellants) were paid default interest.  An enhancement of less than 1% per month is hardly unreasonable or punitive, and Appellees cite no case holding as such.  *See In re Haimil Realty Corp.*, 546 B.R. 257, 265 (Bankr. S.D.N.Y. 2016) (enforcing 24% annual default rate, citing various New York cases also doing so).[14]

Debtors also complain that the Applicable Premium should not be owing because there has not been an actual redemption.  Debtors 2.  But that once again ignores the negotiated language of the First Lien Notes Indenture.  Unlike in *EFH* and *Momentive*, the Indenture's plain language provides that an amount equal to the Applicable Premium is added to principal upon acceleration following various types of defaults, including missed payments of principal or interest, and an insolvency filing.  A.1566.  The addition of the Applicable Premium does not require an actual redemption under the First Lien Notes Indenture.

---

[14]  Appellees take issue with the absence of evidence of reliance damages at the confirmation hearing.  Debtors 37-38.  However, the best evidence of reliance of damages was the bespoke language of First Lien Notes Indenture, including the parties' agreement that the Applicable Premium was a "reasonable calculation of each holder's lost profits" from the triggering event, "in view of the impracticability and difficulty of ascertaining actual damages."  A.1566.  The First Lien Notes Indenture was executed in April 2020, when Debtors were facing a real prospect of bankruptcy.  As evidenced in the Indenture's plain language, *id.*, the Applicable Premium would be payable in the upcoming restructuring (not merely following a "redemption" in bankruptcy), and Debtors—"sophisticated business entities ably represented by counsel"—"expressly acknowledge[d] that their agreement to pay the premium … [was] a material inducement to holders to acquire the Notes," *id.*

## II.   EVEN IF DEBTORS ARE EXCUSED FROM THE APPLICABLE PREMIUM, THEY MUST PAY INTEREST ON THE PREMIUM THAT ACCRUED DURING THEIR CHAPTER 11 CASES

The unimpairment of the First Lien Notes did not purport to occur until the Effective Date of the Plan, more than twenty months after the Petition Date.  During that time, Debtors' default was neither "cured" nor "waived," regardless of whether the "of a kind" exception in section 1124(2)(A) applies at all.   Because the Applicable Premium was added to the principal of the First Lien Notes as of the Petition Date, at a minimum the First Lien Noteholders are entitled to interest on the Applicable Premium during the pendency of the case.[15]   In other words, even if Debtors can disallow the Applicable Premium itself, they cannot disallow the obligation to pay interest on the claim during the twenty months that it was unpaid prior to the Plan's Effective Date.

"'Impairment' is a term of art crafted by Congress to determine a creditor's standing in the ***confirmation phase of bankruptcy plans***."  *In re PPI Enters. (U.S.),*

---

[15]  Contrary to Debtors' suggestion (at 40), the interest issue was squarely raised below.  It was an entire section in Appellant Ad Hoc Group's confirmation objection.  (A.1383-86).  Moreover, the Indenture Trustee's proof of claim asserted "any and all obligations arising under the First Lien Indenture or under any other First Lien Secured Notes Documents … including the full and punctual payment of the principal of, premium, if any, and interest on, and all other amounts payable under, the First Lien Notes …." (A.3688).  The claim made a half-dozen other references to interest owing under the First Lien Notes Indenture (A.3690-91, 3694), and as Debtors admit, the First Lien Notes Indenture made clear that Applicable Premium was added to principal as of the Petition Date.

*Inc.*, 324 F.3d 197, 202 (3d Cir. 2003) (emphasis added).   Unimpairment only happens under a plan, and unless and until the plan goes effective, there is no unimpairment.  "Because the power to cure defaults under section 1124 is relevant only in the context of a plan of reorganization, an order granting the debtor the power to cure is contingent upon confirmation of the entire plan." *In re 405 N. Bedford Dr. Corp.*, 778 F.2d 1374, 1380 (9th Cir. 1985).

Debtors argue (at 40) that because section 1124(2) allows "reinstatement 'notwithstanding' a 'provision' that accelerates obligations," they are permitted to reinstate "in spite of" the Applicable Premium.  But even if that were correct (and it is not), nothing in section 1124(2) purports to alter the rules on postpetition interest.

The First Lien Noteholders were oversecured creditors and thus under section 506(b) were entitled to postpetition interest on their entire principal amount, including the Applicable Premium.  Even if "unimpairment" caused the Applicable Premium to vanish as of the Plan's Effective Date, it was in existence until that time.  Debtors cannot avoid paying interest on the Applicable Premium during the case any more than they could avoid paying interest on a claim that was paid off under the Plan.  Until the satisfaction or waiver of that claim, interest accrues under section 506(b).

Debtors again rely on the Third Circuit's *Sapos* decision for the proposition that cure or waiver "'restore[s] matters to the *status quo ante.*'"  Debtors 41 (quoting

34

967 F.2d at 926).  But as discussed above (at 23), what *Sapos* was talking about was what a debtor has to do to achieve unimpairment (including making any payments that were owing), not what unimpairment accomplishes.

Debtors (at 42) also rely on *In re Onco Inv. Co.*, 316 B.R. 163, 167 (Bankr. D. Del. 2004), as did the bankruptcy court below.  In that case, however, the senior creditor *conceded* that cure and reinstatement under section 1124(2) relieved the debtor from satisfying a make-whole, 316 B.R. at 166, and there was no request for interest during the pendency of the case.  Thus, the issue here was not even before the court.  Rather, the only contested issue was whether the creditor could recover the make-whole from other, subordinated creditors.  The court held that the language of the applicable subordination agreement—which differs materially from the intercreditor language in this case—did not allow such recovery.  *Id.* at 166-67.

The court then stated (arguably in *dicta*) that its conclusion as to the agreement's meaning was consistent with "the intended effect of reinstatement under section 1124(2)."  *Id.* at 167.  *Onco*'s sole purported support for that proposition was the Second Circuit's decision in *Taddeo*.  But in *Taddeo*—a chapter 13 case—the only issue was whether the debtor could de-accelerate the loan; there was no contention that the debtor could also avoid payment of any additional charges that arose on account of the default.  *See* 685 F.2d at 26-27.  Nothing in the plain

35

language of section 1124 (or anywhere else in the Code) provides for the disallowance of claims simply because they are "unimpaired."

Debtors' final argument—that interest on the Applicable Premium should be disallowed under sections 502(b)(2) and 506(b)—fails for the reasons stated above and in Appellants' Opening Brief. Nothing in the Bankruptcy Code disallows a claim that arises automatically upon the filing of the case. Congress included many grounds to disallow claims, including some expressly tied to the bankruptcy process, but nowhere did Congress provide for the blanket disallowance of claims that arise on account of bankruptcy. And more specifically, Congress did not disallow claims for postpetition interest based on a bankruptcy-filing default. To the contrary, section 506(b) expressly allows oversecured creditors such as the First Lien Noteholders "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose."

As discussed above, *supra* 19-20, case law supports the payment of default interest based solely on a bankruptcy default. *See John Q. Hammons Fall 2006, LLC*, 614 B.R. at 378; *Gen. Growth Props., Inc.*, 451 B.R. at 324 & 327; *A & B Assocs., L.P.*, 2019 WL 1470892, at *46-47 & n.59. Moreover, it supports the payment of default interest, even if all defaults ultimately are "cured" or "waived" under section 1124(2). *See supra* 19-20; *see also In re 139-141 Owners Corp.*, 313 B.R. 364, 368 (S.D.N.Y. 2004) ("while a few Bankruptcy courts in this circuit and

Appeals courts in other circuits have found that § 1124(2) does apply to post-default interest rates, … there is nothing in the plain language of § 1124(2) or in Second Circuit caselaw that supports that determination").  Indeed, Debtors themselves paid the equivalent of postpetition default interest as "adequate protection" to some secured creditors (A.0284), including "unimpaired" creditors (A.3107-08) whose only claimed default was the bankruptcy filing.  This makes sense, because "unimpaired" creditors are not, in fact, unimpaired until the effective date of a plan.

Finally, the amount of interest on the Applicable Premium is hardly unreasonable, particularly given that the First Lien Notes Indenture did not otherwise provide for default interest.  The Applicable Premium bore interest at approximately $785,000 per month.  This is equal to less than 2% per annum of the $495 million prepetition principal amount.  As noted, Debtors paid some other secured creditors a 2% interest rate enhancement during the case as "adequate protection."  Paying the First Lien Noteholders this amount is neither unfair nor unreasonable, and thus fully warranted under section 506(b).

**III.  THE PLAN IMPAIRS THE FIRST LIEN NOTEHOLDERS BY EXTINGUISHING THEIR RIGHTS UNDER THE SECOND LIEN INTERCREDITOR AGREEMENT**

**A.  The Plan Distributions To The Second Lien Noteholders Are "In Respect Of Or On Account Of The Collateral," And Thus Subject To Turnover**

Section 1124(2)(E) requires that, to unimpair a creditor's claim, the plan's treatment must not "otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest."  Debtors' Plan violates this requirement, because it bars the First Lien Noteholders from collecting the Applicable Premium from the subordinated Second Lien Noteholders.  Thus, even if the *Debtors* are not required to honor the Applicable Premium, the Second Lien Noteholders' recoveries are subordinated to it.

The Second Lien Intercreditor Agreement makes clear in section 4.2(b) that:

> so long as the Discharge of First Lien Obligations has not occurred, if in any Insolvency or Liquidation Proceeding the Second Lien Collateral Agent or any other Second Lien Claimholders ***shall receive any distribution of money or other property in respect of or on account of the Collateral*** … , such money, other property or amounts shall be segregated and held in trust and forthwith paid over to the First Lien Collateral Agent for the benefit of the First Lien Claimholders ….

A.2316 (emphasis added).  Appellees do not dispute that the Discharge of the First Lien Obligations has not occurred, and that Debtors' chapter 11 case was an "Insolvency or Liquidation Proceeding."  The only material dispute thus is whether the New Second Lien Notes constitute "any distribution of money or other property in respect of or on account of the Collateral."  They do.

38

Appellees quote Section 4.2(b), but then basically ignore its broad references to "any distribution of … property in respect of or on account of the Collateral." They argue that "the New Second Lien Notes are not the Debtors' property," and thus "are not collateral or proceeds thereof." Intervenors 26. But the plain language of the turnover provisions in the Second Lien Intercreditor Agreement is not limited to the creditor's receipt of "collateral or proceeds thereof," but rather includes "*any distribution of … property in respect of or on account of* the Collateral."

A "distribution of … property in respect of or on account of" Collateral does not have to include the Collateral itself or its proceeds. The phrase "in respect of" means "as relates to," *In re Insilco Techs., Inc.*, 480 F.3d 212, 219 (3d Cir. 2007), while the "common understanding" of "on account of" requires nothing more than a "causal connection." *Rousey v. Jacoway*, 544 U.S. 320, 326 (2005). Thus, turnover here is not limited to the Collateral or its proceeds, but rather includes "*any*" property that the Second Lien Noteholders receive relating to or because of the Collateral.

Intervenors argue that Section 4.2(b) does not apply because the New Second Lien Notes were distributed on account of their *claims*, rather than the Collateral. Intervenors 20. But the two are not mutually exclusive—distributions in bankruptcy are a function of both the creditor's claim and the collateral that secures it. *See* 11 U.S.C. § 506(a) ("allowed claim of a creditor secured by a lien on property in which the estate has an interest … is a secured claim to the extent of the value of such

39

creditor's interest in the estate's interest in such property").  It thus does not matter whether the Second Lien Noteholders' distributions were on account of claims, so long as they also were "distribution[s] of money or other property in respect of or on account of the Collateral."  And they clearly were "in respect of or on account of the Collateral," because it is undisputed that the Second Lien Noteholders received distributions based on their interests in the Collateral, thus enabling them to receive far greater percentage distributions than unsecured creditors.

Nor are Appellees correct that Section 4.2(b) requires a distribution of the "*Debtors'* property"—Intervenors have added the word "Debtors."  *See* Intervenors 13, 26.  The turnover provisions apply to "any distribution of … property," without any further limitation as to the source of that property.  The notes unquestionably are "property," just as would be cash or accounts receivable.  Moreover, the New Second Lien Notes do, in fact, involve a distribution of *Debtors'* property, because they include liens on the Collateral, *i.e.*, property interests in Debtors' property.  *See U.S. v. Security Indus. Bank*, 459 U.S. 70, 75 (1982) (liens are property interests in debtors' property).

Appellees rely heavily on *EFH* and *Momentive*,[16] but neither supports their position.  *EFH* and *Momentive* are distinguishable because in those cases (1) the

---

[16]  *In re MPM Silicones, LLC*, 518 B.R. 740 (Bankr. S.D.N.Y. 2014), *aff'd*, 596 B.R. 416 (S.D.N.Y. 2019); *In re Energy Future Holdings Corp.*, 566 B.R. 669, 675

turnover language was fundamentally different, and (2) the consideration that the junior creditors received was fundamentally different.  A side-by-side comparison of the relevant language is set forth in Annex 1 hereto.

*First*, in both *Momentive* and *EFH*, the turnover provisions only applied to "Collateral or proceeds thereof *received in connection with the sale or other disposition of, or collection on, such ... Collateral upon the exercise of remedies*." *Momentive*, 518 B.R. at 752 (emphasis added); *see also EFH*, 566 B.R. at 675 (adding "any" before proceeds, but otherwise identical).  The courts held that distribution of the debtor's common stock did not constitute "proceeds" of the collateral.  518 B.R. at 754; 566 B.R. at 684-86.  That may have made sense—in those cases—because the equity was neither collateral nor derived from the sale or other disposition of collateral, as required by ***those*** intercreditor agreements.

Here, by contrast, the broad turnover provision that governs is not limited to "Collateral or proceeds received in connection with the sale or other disposition" or "exercise of remedies."  Rather, it includes "any distribution of money or other *property in respect of or on account of* the Collateral."  As noted, the phrase "in respect of" means "as relates to," *Insilco Techs.*, 480 F.3d at 219, while "on account of" requires nothing more than a "causal connection," *Rousey*, 544 U.S. at 320.

_____

(Bankr. D. Del. 2017), *aff'd*, 585 B.R. 341 (D. Del. 2018), *aff'd*, 773 F. App'x 89 (3d Cir. 2019).

Thus, turnover here is not limited to the Collateral or its proceeds, but rather includes "*any*" property relating to or distributed because of the Collateral.  By contrast, the phrases "any distribution of … property," "in respect of," and "on account of" do not appear anywhere in the relevant *Momentive* or *EFH* intercreditor language—there the triggering event had to be an actual disposition of the Collateral or proceeds thereof.  Moreover, unlike in *Momentive* or *EFH*, the turnover provision here does not require a sale, disposition, or other exercise of remedies—rather, it applies to "*any*" distribution "in respect of or account of" Collateral in an insolvency proceeding.  No sale or other transformation of the Collateral into "proceeds" is required.

*Second*, this case is materially different from *Momentive* and *EFH* because in those cases the junior creditors received equity in the debtor.  *Momentive* and *EFH* held "that the new stock to be distributed to the defendants under the plan is not proceeds of the Common Collateral," *Momentive*, 518 B.R. at 754; *see also EFH*, 566 B.R. at 686.  Here, by contrast, the Second Lien Noteholders are not receiving equity in the reorganized Debtors.  Rather, they are receiving new notes secured by the Collateral itself.  The Second Lien Noteholders' new liens are property interests in the Collateral.  *See U.S. v. Security Indus. Bank*, 459 U.S. at 75.  Thus, here, the granting of the liens to the second noteholders is "any distribution of money or other

property in respect of or on account of the Collateral," and plainly covered by the intercreditor agreement.

Intervenors again rely on *Momentive* and *EFH* to argue that the new notes are "*not* debtor property," and thus "cannot be property on account of collateral." Intervenors 22.  But they again ignore that, unlike in *Momentive* and *EFH*, the intercreditor agreement here only requires that the distribution be "in respect of or on account of the Collateral."  It need not be the actual Collateral or its proceeds themselves; nor must the distribution itself be "debtor property."  It is sufficient that the New Second Lien Notes are themselves a form of "money or other property," which property is both (1) secured by the Collateral (which lien is a transfer of an interest in Debtors' property), and (2) being distributed on account of claims secured by the Collateral.  The New Second Lien Notes are a "distribution of … property in respect of or on account of the Collateral."

Finally, Intervenors incorrectly argue that the *Momentive* and *EFH* turnover provisions were somehow broader because they included references to "proceeds." Intervenors 24 n.27.  But, Appellants' turnover rights are not dependent on whether the New Second Lien Notes are "proceeds" (unlike in *Momentive* and *EFH*), but rather whether they are distributions "in respect of or on account of the Collateral."

In any event, the Collateral in this case includes "proceeds."  Debtors' Credit Agreement provided for liens "on substantially all assets … , as well as all proceeds,"

and the First and Second Lien Notes were secured by "substantially the same collateral as secures the obligations under the Credit Agreement." A.0538-39. Thus, including an express reference to "proceeds" would have been unnecessary, because "Collateral" already includes "proceeds." But unlike in *Momentive* and *EFH*, the turnover provision in this case includes far more than just proceeds—it includes "any distribution of money or other property in respect of or on account of the Collateral."

## B. The Applicable Premium Is A "First Lien Obligation" Under The Second Lien Intercreditor Agreement

Intervenors argue that the definition of "First Lien Obligations" in the Second Lien Intercreditor Agreement "does not include any claims that (like the Applicable Premium) are not due and payable under the terms of the First Lien Indenture." Intervenors 27. That argument fails for two reasons.[17]

*First*, the Applicable Premium *is* due and payable under the First Lien Notes Indenture, and is thus clearly a "First Lien Obligation." "First Lien Obligations"

---

[17] Appellees' assertion that this argument was "waived" is meritless. *See* Debtors 67, Intervenors 27. The Ad Hoc Group argued throughout its brief below (including in the first sentence of the first paragraph) that the First Lien Noteholders were "entitled to an additional payment, referred to as the 'Applicable Premium.'" A.1366. They also argued that "[t]he Plan's attempt to exculpate the Second Lien Noteholders" incorrectly "rests on the theory that the Plan will provide recovery in full to the First Lien Noteholders, leaving them without any claims against the Second Lien Noteholders," A.1368, and that "the governing intercreditor agreement requires turnover from the Second Lien Noteholders unless the First Lien Notes are repaid in full *in cash*," *id*. There can be no doubt that "in full" included the Applicable Premium, and footnote 26 of the Ad Hoc Group's brief only makes that more clear. A.1408

44

include "all other 'Secured Obligations' (or any similar term) as defined in any other First Lien Financing Document."  A.2302.  The secured obligations under the First Lien Notes Indenture are the "First Priority Notes Obligations," which include "all Obligations of the Issuers and the Guarantors under the Note Documents."  A.1513. Those Obligations, in turn, include "any principal, interest, penalties, fees, indemnifications, reimbursements (including, without limitation, reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities payable under the documentation governing any Indebtedness." A.1519.  This includes the Applicable Premium, which under Section 6.02 of the First Lien Notes Indenture is "due and payable" and a part of principal.  A.1566.

Moreover, "First Lien Obligations" *also* include "interest, fees, expenses or other amounts (including any interest accruing at the default rate or any Post-Petition Interest) to be paid by a First Lien Obligor," ***regardless of whether such obligations "are disallowed by order of any court of competent jurisdiction, including by order of a court presiding over an Insolvency or Liquidation Proceeding***."  A.2302 (emphasis added).  "***[S]uch interest, fees, expenses and other amounts (including default interest and Post-Petition Interest) shall, as between the First Lien Claimholders and the Second Lien Claimholders, be deemed to continue to accrue and be added to the amount to be calculated***," even if they are disallowed vis-à-vis Debtors.  *Id.* (emphasis added).

45

Finally, "Discharge" of the First Lien Obligations means "***notwithstanding any discharge of such Series under any Debtor Relief Laws or in connection with any Insolvency or Liquidation Proceeding*** … **(a)** *payment in full in cash of the principal of and interest (including Post-Petition Interest), and premium*, if any, on all Indebtedness outstanding under the First Lien Documents …."  A.2299 (emphasis added).  "Discharge" under the Second Lien Intercreditor Agreement does not occur unless, and until, all postpetition interest and premiums are paid, regardless of whether those amounts are allowed vis-à-vis Debtors.

Thus, the First Lien Notes Indenture's plain language could not be more clear. The Applicable Premium is part of the "First Lien Obligations," and are therefore subject to the turnover provision in the Second Lien Intercreditor Agreement.

*Second*, nothing in Bankruptcy Code section 1124 or otherwise in the Code relieves the Second Lien Noteholders of their obligations under the Second Lien Intercreditor Agreement.  Even if, as Appellees contend, "unimpairment" relieved *the Debtors* of their obligation to satisfy the Applicable Premium or interest thereon, it did not relieve *the Second Lien Noteholders* or other non-debtor parties of their obligations.

With very limited exceptions, the benefits of bankruptcy "are not available to non-debtors."  *In re TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1419 n.4 (5th Cir. 1992).  The Bankruptcy Code makes clear that "discharge of a debt of the debtor

does not affect the liability of any other entity on, or the property of any other entity for, such debt, 11 U.S.C. §524(e).  *See In re PWS Holding Corp.*, 228 F.3d 224, 245–46 (3d Cir. 2000) ("discharge in bankruptcy does not extinguish claims by third parties against guarantors … for the debt discharged in bankruptcy").  Similarly, the automatic stay is "not designed to afford collateral benefits to non-debtor parties." *Proactive Measures USA, LLC v. D'Angelo*, 2021 WL 5412533, at *1 (S.D. Ind. Oct. 21, 2021) (quotations omitted).  Nor do nondebtors benefit from section 502(b)'s caps on various types of damages, even when they are secondarily liable for the debtor's capped obligation.  *See In re Mod. Textile, Inc.*, 900 F.2d 1184, 1191-92 (8th Cir. 1990) (section 506(b)(6) does not benefit nondebtor guarantor).  And in those rare instances when Congress has afforded benefits to non-debtor parties, such as asbestos injunctions under section 524(g), the relief must be in accordance with the Code's requirements.  *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 237 (3d Cir. 2004).  Finally, the Code makes clear that "[a] subordination agreement [such as the Second Lien Intercreditor Agreement] is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."  11 U.S.C. §510(a).

Nothing in section 1124 purports to override these fundamental principles and bestow the powers and benefits of unimpairment on non-debtor parties.  To the contrary, section 1124(2)(E) makes clear that all other legal rights must be preserved.

47

*See In re Reeves*, 2006 WL 6811012, at *6 (B.A.P. 9th Cir. 2006) (debtor cannot

"obtain[ ] one benefit from the court (plan confirmation) on the premise that the

Bank was unimpaired, and then seek[ ] a contradictory benefit on the premise that

the Bank gave up a valuable right in connection with the plan confirmation").  If

Congress intended to allow non-debtor subordinated creditors, guarantors, or other

entities who are co-liable with the debtor to receive the benefit of section 1124's

negation of certain *ipso facto* defaults, then certainly Congress would have made

that clear, as it did in sections 524(g) (asbestos liabilities), or 1301(a) (co-debtor

stay).

Intervenors' sole authority is *Onco*, which rejected a senior creditor's attempt

to recover a prepayment charge from a subordinated creditor following reinstatement

of the senior creditor's claim vis-à-vis the debtor.  *See* 316 B.R. at 167.  But the court

in that case construed the specific contractual agreements at issue in that case, which

differed materially from those here.  Critically, *Onco* did not consider any

contractual provision confirming that amounts held to be unrecoverable vis-à-vis the

debtor in bankruptcy would remain recoverable from the subordinated creditor.  *See*

*id.* (noting, in response to the argument that the contract "was intended to make the

Subordinated Noteholders subordinate to any amount not paid by the Debtor if the

Debtor ever owed such amount, the Court cannot find such an obligation created in

the scant language cited by the Plaintiffs").  Here, by contrast, Section 1.01 of the

Second Lien Intercreditor Agreement contains just such a provision in the definition

of "First Lien Obligations" (A.2302) and "Discharge" (A.2299).

### C.   The Second Lien Noteholders Are Required To Turnover Payments They Received During The Chapter 11 Cases

Section 6.3(b)(ii) of the Second Lien Intercreditor Agreement (A.2325)

requires that "[i]If any Second Lien Claimholder is entitled by order of a court of

competent jurisdiction to receive or receives adequate protection payments for post-

petition interest and/or fees and expenses," they must turn over such payments until

the First Lien Noteholders have received full payment of the First Lien Obligations,

which include the Applicable Premium.

It is undisputed that the Second Lien Noteholders received significant

payments of fees and interest during the case.  Those payments were pursuant to the

cash collateral order, which provided "[a]s further adequate protection, the Debtors

… are authorized and directed by this Final Order, to pay to the Second Lien

Collateral Agent for the ratable benefit of the Prepetition Second Lien Notes Secured

Parties, adequate protection payments in cash" for fees and interest.  A.0294.

Notwithstanding the clear language in the cash collateral order, Appellees

dispute whether these payments were "adequate protection."  Instead, they argue that

because the Second Lien Noteholders were oversecured, the payments they received

during the case should be characterized as part of their plan distributions, rather than as "adequate protection."[18]

Appellees' argument ignores the plain language of the Second Lien Intercreditor Agreement and cash collateral order.  The cash collateral order is an "order of a court of competent jurisdiction" under which the Second Lien Noteholders "receive[d] adequate protection payments for post-petition interest and/or fees and expenses."  That the adequate protection payments ultimately were applied to postpetition interest and fees, rather than principal, does not matter.  Adequate protection often is paid in the form of postpetition interest and fees (which, per § 506(a), requires a creditor to be oversecured), subject to the ability to reapply the payments to principal if, in fact, the creditor was not entitled to such interest and fees.  *See, e.g.*, *In re Rack Eng'g Co.*, 212 B.R. 98, 105 (Bankr. W.D. Pa. 1997).  As Debtors admit, "'[i]f a creditor is oversecured, adequate protection payments serve as payment of postpetition interest on the oversecured claims.'"  Debtors 65 n.40 (quoting *In re SunCruz Casinos, LLC*, 298 B.R. 833, 845 (Bankr. S.D. Fl. 2003)).  Treating "adequate protection" as interest does not mean that it is not "adequate protection" nonetheless.

---

[18]  Debtors erroneously cite § 5(b) of the cash collateral order (A.0292), which limited the Second Lien Noteholders' adequate protection *replacement liens* to diminution in value.  No such limitation was included in § 5(c), which required adequate protection payments of interest and fees (A.0294).

In any event, regardless of whether the payments should be considered distributions under the Plan, those distributions must be turned over to the First Lien Noteholders because they were "in respect of or on account of" the Collateral.  As Appellees acknowledge, the payments were made because the Second Lien Noteholders were oversecured, and on account of their oversecured claims.  Debtors 66 (citing § 506(b)).  Thus, those payments clearly were "in respect of" (related to) or "on account of" (because of) the Second Lien Noteholders' collateral, and they must be turned over under Section 4.2 regardless.

Finally, the Second Lien Noteholders' argument (at 35-36) that any turnover by them requires a reciprocal turnover by the First Lien Noteholders is meritless. The section of the Second Lien Intercreditor Agreement upon which they rely (§ 6.3(b)(ii)) only applies to the extent that the First Lien Noteholders have received payment on the claim in some form other than cash.  In that circumstance, the First Lien Noteholders can force the Second Lien Noteholders to exchange any cash they have received for the non-cash the First Lien Noteholders have received.[19]  But here,

---

[19]  Second Lien Intercreditor Agreement § 6.3(b)(ii) provides, in part, "to the extent any portion of the Short-Fall represents payments received by the First Lien Claimholders in the form of promissory notes, equity or other property equal in value to the cash paid in respect of the Pay-Over Amount, the First Lien Claimholders shall, upon receipt of the Pay-Over Amount, transfer those promissory notes, equity or other property, equal in value to the cash paid in respect of the Pay-Over Amount, to the applicable Second Lien Claimholders pro rata in exchange for the Pay-Over Amount." A.2325.

the First Lien Noteholders have received nothing on account of the Applicable Premium.  Absent payment by Debtors, the only source of payment for the Applicable Premium is the First Lien Noteholders' turnover rights against the Second Lien Noteholders.

## CONCLUSION

The judgment of the bankruptcy court should be reversed as to (i) the Plan's treatment of the Applicable Premium and (ii) the First Lien Noteholders' rights under the Second Lien Intercreditor Agreement.

DATED:  July 1, 2022

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By:   */s/ K. John Shaffer*
K. John Shaffer
Benjamin I. Finestone
865 S Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
johnshaffer@quinnemanuel.com

SULLIVAN HAZELTINE ALLINSON LLC
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Telephone: (302) 428-8191
Facsimile: (302) 428-8195
bsullivan@sha-llc.com
whazeltine@sha-llc.com

*Counsel to Appellant Ad Hoc First Lien
Notes Group*

HUNTON ANDREWS KURTH LLP
Paul N. Silverstein
Brian M. Clarke
Philip M. Guffy
200 Park Avenue
New York, New York 10166
Telephone: (212) 309-1000
New York, New York 10166
Telephone: (212) 309-1000
Email: paulsilverstein@andrewskurth.com
brianclarke@huntonak.com
pguffy@huntonak.com

GABELL BEAVER LLC
Brian M. Gottesman, Esq.
(DE Bar ID No. 4404)
1207 Delaware Avenue, Unit 2
Wilmington, DE 19806
Telephone: (302) 772-4291
E-mail: gottesman@gabellbeaver.com

*Counsel to Appellant Columbus Hill Capital Management, L.P.*

## RULE 8015(h) CERTIFICATION

Pursuant to Fed. R. Bankr. P. 8015(h), I certify that this brief complies with the Type-Volume Limitation of Fed. R. Bankr. P. 8015(a)(7), as modified by D.I. 56 (permitting consolidated reply of no more than 13,000 words ).  This brief contains 12,852 words, excluding parts of the document excluded by Fed. R. Bankr. P. 8015(g).

DATED:  July 1, 2022

*/s/ K. John Shaffer*
K. John Shaffer

## CERTIFICATE OF SERVICE

I, William A. Hazeltine, hereby certify that on July 1, 2022, a copy of the foregoing ***Consolidated Reply Brief Of Appellant Ad Hoc First Lien Notes Group and Columbus Hill Capital Management, L.P.*** was served via cm/ecf on all parties who are registered to receive efiling notifications in this case.


DATED:  July 1, 2022


By:  */s/ William A. Hazeltine*
      William A. Hazeltine (No. 3294)