# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| MALLINCKRODT PLC, et al., | Case No. 20-12522 (JTD) (Bankr. D. Del.) |
| Debtors.[1] | (Jointly Administered) |
| AD HOC FIRST LIEN NOTES GROUP, | |
| Appellants, | |
| v. | Case No. 22-cv-00331-TLA |
| MALLINCKRODT PLC, et al., | |
| Appellees. | |

**BRIEF OF AMICUS CURIAE RICHARD SQUIRE, ESQ.,
PROFESSOR AND ALPIN J. CAMERON CHAIR IN LAW
AT FORDHAM UNIVERSITY SCHOOL OF LAW**

Thomas A. Uebler (#5074)
Kathleen A. Murphy (#5215)
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Rd. Suite. 401
Wilmington, DE 19808
(302) 468-5963

*Counsel for Amicus Curiae*

April 25, 2023

---

[1] A complete list of the Debtors may be obtained on the website of the Debtors' claims and noticing agent: http://restructuring.primeclerk.com/Mallinckrodt.  The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

W0369089.docx.v1

# TABLE OF CONTENTS

Page

**TABLE OF AUTHORITIES** ................................................................................ ii

**IDENTITY AND INTEREST OF AMICUS CURAE** ........................................1

**INTRODUCTION** ...............................................................................................1

**ARGUMENT** ......................................................................................................2

   I.    Mandatory Payment of the Applicable Premium as a Condition of
       Reinstatement Would Contradict the Manifest Congressional Policy
       Against Bankruptcy Windfalls at the Expense of General Creditors ...........2

   II.   Payment of the Applicable Premium Would Have Greatly
       Overcompensated the First Lien Noteholders for any Conceivable Loss ..10

   III.  A Contrary Interpretation of Section 1124(2) Would Produce Results
       that Served no Positive Purpose and that Congress Could Not
       Have Intended ............................................................................................12

**CONCLUSION** ..................................................................................................18

W0369089.docx.v1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Butner* v. *United States*,
   440 U.S. 48 (1979)...............................................................................................8

**Statutes**

11 U.S.C. § 365(a) ...............................................................................................15

11 U.S.C. § 365(b)(2)...........................................................................................14

11 U.S.C. § 1124(2) ........................................................................................*passim*

11 U.S.C. § 1124(2)(A).........................................................................................14

11 U.S.C. § 1124(2)(B).........................................................................................16

**Other Authorities**

Fed. R. Bankr. P. 8017(c) .....................................................................................1

Richard Squire, *Shareholder Opportunism in a World of Risky Debt*,
   123 HARV. L. REV. 1151 (2010).......................................................................4, 8

Richard Squire, *Distress-Triggered Liabilities and the Agency Costs
of Debt*, in RESEARCH HANDBOOK ON CORPORATE BANKRUPTCY
LAW, (Barry E. Adler ed., Edward Elgar Publishing, 2020) ...............................7

W0369089.docx.v1

## IDENTITY AND INTEREST OF AMICUS CURIAE

I am a Professor of Law and the holder of the Alpin J. Cameron Chair in Law at Fordham University School of Law, where I teach corporate and bankruptcy law. I have no financial interest in the outcome of this case, but rather a professional interest in the development and sound application of bankruptcy law for the common good.[2]

## INTRODUCTION

This Court has invited amici to file briefs on the question "whether the Debtors could reinstate the First Lien Notes under Section 1124(2) of the Bankruptcy Code without paying the Applicable Premium." I will argue that the answer to this question is yes. Judge Dorsey's holding to this effect is fully consistent with the plain language of Section 1124(2). In addition, it is fully consistent with the congressional policy that a lender should not be able to use the occasion of a borrower's bankruptcy to recover a windfall—that is, an amount exceeding what the lender would have recovered in the absence of the borrower's insolvency and bankruptcy—at the expense of the borrower's other creditors. It is telling that while the First Lien Noteholders argue in their brief for a different interpretation of the text of Section

---

[2] Undersigned counsel for Amicus Curiae affirms, pursuant to Fed. R. Bankr. P. 8017(c), that no counsel for a party authored this brief in whole or in part, and no person or entity other than Richard Squire and his counsel contributed monetarily to the preparation or submission of this brief.

1124(2), they nowhere attempt to suggest *why* Congress would want to permit such bankruptcy windfalls, the pursuit of which would pits creditors against each other in a zero-sum struggle over the division of an insolvent debtor's assets. Such a struggle forces all participants to incur large costs yet generates no offsetting social benefits.

## ARGUMENT

I.  **Mandatory Payment of the Applicable Premium as a Condition of Reinstatement Would Contradict the Manifest Congressional Policy Against Bankruptcy Windfalls at the Expense of General Creditors**

It makes sense as a policy matter that Congress structured the Bankruptcy Code in a manner that permitted the Debtors to reinstate the First-Lien Notes without paying the $94 million Applicable Premium. To see why, it will be useful to image a simplified, hypothetical loan arrangement that is similar in certain details to the First Lien Notes Indenture in this case. Thus, imagine a loan agreement in which a corporate borrower promises to pay a senior, oversecured lender a fixed $94 million premium (in addition to all contractually owed principal and interest) if the borrower becomes a debtor in bankruptcy before the loan matures. Such a contingent, $94 million bankruptcy-triggered premium would be of obvious attractiveness to the lender. If collectable, the premium would greatly increase the lender's expected return on the loan arrangement—in particular, by (approximately[3]) $94 million

---

[3] In these and subsequent calculations the time value of money is ignored, as it is not relevant to the points the calculations serve to illustrate.

2

multiplied by the probability that the borrower will file for bankruptcy before the loan matures. The lender would thus be willing to accept a lower interest rate in consideration for the borrower's promise to pay the premium.

This opportunity to obtain a lower interest rate would, in turn, make a loan agreement that provides for such a bankruptcy-triggered premium more attractive to the borrower's managers as well. Those managers formally act on behalf of the borrower's shareholders, and (in a typical corporate debtor) are also counted among them. Lower interest rates on a corporate borrower's debts translate to higher future profits for the borrower's shareholders, at least as long as the borrower remains solvent.[4] Of course, there will be some risk that the borrower lapses into insolvency before the loan matures, leading to a bankruptcy filing that triggers the $94 million bankruptcy premium. But in that situation, the triggering of the premium would be a matter of indifference to the borrower's shareholders, as their interests would then be wiped out anyway. The burden of the triggered premium would fall solely on the borrower's junior creditors, who would have to collect less in bankruptcy so that the senior lender could collect more. Heads, the shareholders win – tails, the borrower's creditors (other than the senior lender) lose.

---

[4] If the borrower was not insolvent when the loan was made, then a lower interest rate would mean higher shareholder profits during any future period in which the borrower reattained and maintained solvency.

To be sure, the fact that the senior lender might charge less interest in consideration for the borrower's promise to pay the bankruptcy-triggered premium could provide a countervailing benefit to the borrower's junior creditors. In particular, if the borrower suffers a business downturn steep enough to render it insolvent, the avoided interest expenses might leave more value in the borrower's bankruptcy estate than would have been there otherwise. However, unless the probability of the borrower's future bankruptcy was 100% at the time the loan was made, this potential benefit could never be large enough to neutralize the burden on the junior creditors imposed by the triggering of the premium.[5]

To see why the burden on the junior creditors would always outweigh the benefit to them, imagine that, at the time the loan was made, the estimated probably of the borrower's future insolvency and thus bankruptcy was 20%. This probably would make the promise to pay the bankruptcy-triggered premium worth, at most, 20% x $94 million = $18.8 million to the senior lender. To calculate the maximum value that the borrower's promise to pay the premium might provide to the

---

[5] As a general matter, the consideration that a debtor might receive in exchange for a agreeing to incur a contingent liability will never be large enough to offset the liability's expected burden on the debtor's general creditors as long as the risk that the liability will be triggered correlates positively with the risk that the debtor will become insolvent. This is especially true if the contingent claimant has a secured claim, as in the present case, but it will also be true even if the claimant is unsecured. *See* Richard Squire, *Shareholder Opportunism in a World of Risky Debt*, 123 HARV. L. REV. 1151, 1167 (2010).

4

borrower's junior creditors, let us make three additional assumptions: (1) in consideration for the borrower's promising to pay the premium in the loan agreement, the senior lender agrees to charge $18.8 million (the premium's full expected value to the senior lender) less in interest than it would have charged otherwise[6]; (2) the borrower always captures this full $18.8 million in reduced interest expenses before filing for bankruptcy; and (3) the full $18.8 million in avoided interest payments always remains in the borrower's estate when the borrower enters bankruptcy—meaning that none of it amount has been distributed to the borrower's shareholders through dividends or share buybacks. Under these assumptions, the reduced interest expenses associated with the promise to pay the premium will enhance the borrower's bankruptcy estate by $18.8 million, while the triggering of the premium will impose an additional $94 million senior liability upon the estate. Therefore, the net cost to the bankruptcy estate will be $94 million - $18.8 million = $75.2 million,[7] a cost borne entirely by the borrower's junior creditors so long as the senior lender is oversecured.

---

[6] Although I am making his assumption for illustrative purposes here, I do not know whether the First Lien Noteholders actually made such an interest-rate concession in their agreement with the Debtors.

[7] The net cost to the junior creditors will be even greater than $75.2 million if any of the three specified assumptions are inaccurate. For example, if the borrower obtains no interest-rate discount in exchange for the promise to the pay the premium, the net burden on them will be the full $94 million.

The reason that the expected burden of the premium on the borrower's junior creditors is so much greater than their expected benefit from the borrower's potential savings on interest expenses is that they receive the benefit of those interest savings only if the borrower becomes insolvent, which occurs only 20% of the time. In the remaining 80% of the time—during which the borrower remains solvent through the duration of the senior loan—the saved interest expenses accrue instead to the benefit of the borrower's shareholders. In short, the shareholders get the benefit of the promise to pay the premium 80% of the time, but they bear the burden (virtually) none of the time.[8] In monetary terms, the expected net benefit of the bankruptcy-premium clause in the loan agreement to the borrower's shareholders is 80% x $18.8 million = $15.04 million, while the expected net *cost* to the borrower's junior creditors is $75.2 million x 20% = $15.04 million. The promise to pay the premium thus effects a direct value transfer from the junior creditors to the shareholders, a transfer for which the senior lender serves as a mere conduit by, per the assumptions in this hypothetical, charging less interest *ex ante* in exchange for a larger bankruptcy recovery *ex post*. Put another way, the bankruptcy-premium clause serves as a mechanism whereby the borrower sells the senior lender a portion of the borrower's

---

[8] The shareholders would bear the burden of the bankruptcy-triggered premium only in the rare case in which the borrower entered bankruptcy despite being solvent.

6

future bankruptcy estate that would otherwise go to the borrower's junior creditors, with the reduced interest rate representing the sales price.

Congress would not have intended for a debtor and senior creditor to be able to extract value from the debtor's future bankruptcy estate in this way, namely by permitting the creditor to recover far more from that estate than it would have received had the debtor remained solvent and made all of its ordinary interest and principal payments on time and in full. This is the most obvious reason why Section 1124(2) allows a debtor in possession to reinstate a claim without curing a default caused by the debtor's bankruptcy filing. 11 U.S.C. § 1124(2)(A), cross-referencing § 365(b)(2)(B). Otherwise, a lender could use the occasion of a debtor's insolvency and bankruptcy to vacuum millions of dollars out of the estate at the direct expense of other creditors, even while also continuing to receive all contractually promised principal and interest payments outside bankruptcy.

No positive social purpose would be served by allowing senior creditors to collect such bankruptcy-triggered windfalls at the direct expense of other creditors. But there would be clear social costs.[9] To protect themselves against the consequent

---

[9] *See* Richard Squire, *Distress-Triggered Liabilities and the Agency Costs of Debt in* RESEARCH HANDBOOK ON CORPORATE BANKRUPTCY LAW, 124–49 (Barry E. Adler ed., Edward Elgar Publishing, 2020) (describing the costs to a debtor's general creditors of contingent claims against the debtor triggered by the debtor's own financial distress).

dilution of their own bankruptcy recoveries, the debtor's other creditors would have to demand loan covenants prohibiting the debtor from promising to pay bankruptcy-triggered premiums. To the extent that such covenants were feasible at all, they would require the creditors to incur transaction costs to draft and negotiate them and, more importantly, monitoring costs to ensure the debtor's compliance. Alternatively, the other creditors would try to neutralize the effect of hostile bankruptcy-triggered premiums by demanding that they receive similar premiums. Of course, not all creditors will be equally equipped to fight in this battle, and those that are less sophisticated, or whose individual claims are too small to make all of the associated covenant-drafting and monitoring worthwhile, will lose out.[10] Notably, the consequences of the premiums would not be merely redistributive. Creditors as a whole would lose, as they would be pitted against each other in an expensive arms race to capture larger portions of a fixed sum: the value of their insolvent debtor's estate. Section 1124(2) of the Bankruptcy Code is, in effect, a mutual disarmament treaty that makes creditors better off by removing their incentive to expend resources trying to win a zero-sum game.

---

[10] The social costs described here arise generally whenever a debtor incurs a contingent liability whose probability of being triggered correlates positive with the risk that the debtor will become insolvent. Richard Squire, *Shareholder Opportunism in a World of Risky Debt*, 123 HARV. L. REV. 1151, 1180 (2010). The costs are avoided, however, if the claim on the contingent liability is subordinated to the claims of the debtor's general creditors. *Id.* at 1205.

W0369089.docx.v1

The Supreme Court has for a long time recognized that interpreting the Bankruptcy Code to permit a lender to obtain "a windfall merely by the happenstance of ... bankruptcy" would be contrary to congressional intent. *Butner* v. *United States*, 440 U.S. 48, 55 (1979). It is important to add here that the real threat to bankruptcy policy arises when a lender seeks not just any bankruptcy windfall, but rather one that will come at the expense of the debtor's other creditors. In the rare case in which a bankrupt debtor is solvent, allowing a lender to recover a bankruptcy-triggered premium does not raise the same concerns. In that situation, the burden of the premium falls on the debtor's shareholders, the same group that mainly benefits—as illustrated above—from any interest-rate concession that the lender might have made in exchange for the debtor's promise to pay the premium. There is no net wealth transfer at the expense of creditors in that situation, and thus no collective-action problem among creditors, in the form of an expensive arms race, for the Bankruptcy Code to solve.

The problem of the costly zero-sum battle among creditors is the answer to the oft-made argument that a lender deserves to receive the benefit of a bankruptcy-triggered contingent claim because the lender bargained with the debtor for the claim and "paid" for it up front by agreeing to a lower interest rate. What the lender really did was bargain for the claim with the debtor's *managers*, who are the agents of the debtor's *shareholders*. Therefore, those shareholders should bear the burden of that

9

claim to the extent that the principle of limited shareholder liability permits. But the claim should not be the responsibility of the debtor's other creditors (who in cases such as this one will include involuntary tort claimants), who did not consent to it and whose burden on them would be many times greater than any potential benefit it might confer on them. In short, the debtor's managers should not be able to use a bankruptcy-triggered contingent liability to "sell," for the benefit of shareholders, a slice of the debtor's future bankruptcy estate that would otherwise go to other creditors.

## II. Payment of the Applicable Premium Would Have Greatly Overcompensated the First Lien Noteholders for any Conceivable Loss

In contrast with the simple, hypothetical loan agreement considered above, the First Lien Notes Indenture in this case does not specify a *fixed* bankruptcy-triggered premium of $94 million. Rather, it specifies a premium that varies based on the discounted present value (using something akin to a risk-free discount rate) of future interest payments that have not yet accrued. Reo. Deb. Br. 9.[11] But the use of a formula for calculating a variable premium should not be allowed to obscure the fact that payment of the Applicable Premium would still have conferred a windfall

---

[11] The brief of Reorganized Debtor Appellees in Opposition to First Lien Noteholder Appellants is referred to as "Reo. Deb. Br.", and the opening brief of the Ad Hoc First Lien Notes Group as "Ad Hoc Br."

on the First Lien Noteholders, unrelated in amount to any actual losses attributable to the Debtors' bankruptcy filing, that would have come at the expense of the Debtor's other creditors.

I understand that the Debtors in this case, both during and after their bankruptcy, paid the Noteholders all interest earned on the contractually specified payment dates. Therefore, even without payment of the Applicable Premium, the Noteholders are now in the same financial position that they would have been had the Debtors never filed for bankruptcy. Indeed, reinstatement put them in a *better* position because it allowed them to keep their original debt claims even while the Debtors used bankruptcy to deleverage. And deleveraging generally buoys up the value of reinstated debt by reducing its riskiness. Since reinstatement almost always confers this type of deleveraging-induced benefit to the reinstated creditors, it would be especially contrary to any conceivable congressional policy to allow reinstated creditors to insist upon a further windfall in the form of a large, bankruptcy-triggered cash payment.

Notably, the Noteholders do not argue in their appellate brief that payment of the $94 million premium was necessary to compensate them for any real financial or economic losses they have suffered. Nor could they. Rather, they argue only that the Debtors' promise in the governing indenture to pay the premium was a "material

11

inducement" to acquirers of the notes, without which the Noteholders would not have lent or "would have insisted on a higher rate of interest." Ad Hoc. Br. 12.

Of course, a disappointed hope of recovery lies at the end of every judicial ruling that a particular contractual payment term is unenforceable. Therefore, the enforceability of a payment term in a loan agreement can never turn on whether the term's inclusion affected the contractual interest rate on the loan. Otherwise, a lender could always insist upon the enforcement of a dubious or punitive payment term simply by demonstrating (or perhaps merely asserting) that the lender agreed to a lower interest rate on the expectation that the term would be enforced. Such logic would enable lenders to render all otherwise unenforceable payment terms enforceable merely by adjusting interest rates up front. Surely, Congress would not have intended for parties to be able in this way to contract around the provisions of the Bankruptcy Code, including Section 1124(2), at will.

### III.   A Contrary Interpretation of Section 1124(2) Would Produce Results that Would Serve no Positive Purpose and that Congress Could Not Have Intended

The Bankruptcy Court based its denial of recovery of the bankruptcy-triggered premium upon, as an initial matter, the plain language of Section 1124(2) of the Bankruptcy Code. Judge Dorsey held that the First Lien Notes could be reinstated without payment of the Applicable Premium because the event of default triggering the premium was the Debtors' bankruptcy filing, and Section 1124(2)(A)

indicates by cross-reference that a plan may reinstate a claim even if the plan does not cure a default of an *ipso facto* clause relating to the debtor's financial condition, insolvency, or bankruptcy filing. Besides being consistent with the plain language of Section 1124(2), Judge Dorsey's ruling is consistent with the general congressional intention that a lender should not be able to use bankruptcy to recover more, at the expense of other creditors, than the lender would have received in the absence of its borrower's insolvency and consequent bankruptcy. This harmony of text and purpose is, of course, unsurprising, as we would not expect Congress to write a statute whose plain language conflicts with Congress's intentions.

In their appeal to this court, the Noteholders suggest a different interpretation of the text of Section 1124(2), one that would have required payment of the Applicable Premium notwithstanding reinstatement of their claims. Notably, however, the Noteholders propose no reason *why* Congress would have intended such a result. Thus, while Judge Dorsey's interpretation of the statute harmonizes with manifest congressional policy, the Noteholders' position finds no resonance in any plausible congressional purpose, as there is no suggested rationale for it. This lack of correspondence between text and purpose, in contrast with the clear correspondence in Judge Dorsey's ruling, is a strong indication that Judge Dorsey's interpretation is the correct one.

The Noteholders have advanced two textual arguments for why Section 1124(2) required payment of the Applicable Premium in this case. The first is Section 1124(2)(A)'s cross-reference to Section 365(b)(2), which lists various kinds of *ipso facto* clauses breaches of which need not be cured in order for an accelerated claim to be reinstated. The Noteholders argue that, because the other subsections of Section 365 address the bankruptcy treatment of executory contracts and unexpired leases, then the exceptions to the cure requirement in Section 1124(2)(A) must apply solely to breaches of executory contracts and leases as well. In other words, this argument goes, the option to reinstate a claim without curing a breach of an *ipso facto* or bankruptcy clause applies *only* when the claim arises from an executory contract or lease, but not from a regular debt agreement.

This suggested reading of Section 1124(2)(A) is implausible under that provision's plain language, for the reasons that Judge Dorsey stated in his opinion. But its implausibility is underlined by the fact that the Noteholders have offered no rationale for why Congress would want to confine the cure requirement's *ipso facto* exception to executory contracts and unexpired leases, rather than applying it to regular debt contracts. And no such rationale could have been offered, for the distinction urged by the Noteholders is illogical on its face and would lead to absurd results. To see why, imagine a simple debt contract providing that "Borrower must pay lender $2 million on December 31st, unless Borrower files for bankruptcy before

then, in which case Borrower must immediately pay Lender $3 million." According to the Noteholders, if Borrower filed for bankruptcy before December 31st and wished to reinstate Lender's $2 million claim to its original, December 31st maturity date, Borrower would have to pay Lender the $1 million bankruptcy-triggered liability immediately, regardless of whether the liability bore any relationship to the costs to Lender of the bankruptcy filing.

For purposes of contrast, now imagine a lease providing that "Lessee must pay Lessor monthly payments of $2,000, unless Lessee files for bankruptcy before the lease's termination date, in which case all remaining monthly payments are increased to $3,000 and due immediately." Here, according to the logic of the Noteholders' argument, the Lessee could "reinstate" the lease in its reorganization plan and disregard the bankruptcy-triggered premium of $1,000 per month, since the lease itself falls under the general provisions of Section 365. (Quotation marks are required around "reinstate" here because of course Lessee would not use Section 1124(2) to reinstate the lease if it wanted to continue honoring it; rather, Lessee would *assume* the lease per Section 365(a). The Noteholders would thus confine the *ipso facto* exception to cure in Section 1124(2)(A) to a pair of contract classes for which Section 1124(2) is not even employed, thereby effectively reading the exception out of the Code.) No rationale—economic, financial, or otherwise—is offered for why Congress would have wanted a simple lender, but not a lessor or

15

executory-contract counterparty, to be able to insist upon receipt of a bankruptcy-triggered windfall as a condition of reinstatement. And this is because there is no good reason: Congress's policy against bankruptcy-triggered windfalls applies with equal force to claims arising under all such contracts.

The Noteholders' alternative argument with respect to Section 1124(2) is that the claim for the Applicable Premium cannot be "reinstate[d] to the maturity …as such maturity existed before … default" because it never had an original maturity date to begin with. Ad Hoc Br. 42. Rather than being a fixed claim with a specified maturity date, the premium is, as the Noteholders describe, "a contingent obligation trigged by the Debtors' bankruptcy filing." Ad Hoc Br. 43 n.41. In other words, because the Debtors' bankruptcy filing did not cause the claim for the premium to accelerate from one set due date to another, there is no original maturity date to restore, and hence the reinstatement option under Section 1124(2) is unavailable.

It is notable that, in Section 6.02 of the Noteholders' loan agreement—the "Acceleration" provision—the parties provided that the Applicable Premium would accelerate along with principal and interest.  Therefore, in this particular case, the parties contractually placed the premium in question directly within the ambit of the "accelerated payment" language of Section 1124(2).

Even, however, had the parties not done this, there is no reason to think that Congress, in using the term "accelerated" in Section 1124(2), intended to exclude

16

bankruptcy-triggered contingent claims from the reinstatement option. Any such interpretation of Section 1124(2) would permit creditors to collect bankruptcy-triggered windfalls at other creditors' expense simply by recharacterizing acceleration of a payment obligation as the triggering of such an obligation. Consider the absurdity of allowing reinstatement under Section 1124(2)(B) of claims with a set maturity date but not of claims with a contingent maturity date. The acceleration of a claim with a set maturity date increases the burden on the debtor through the time value of money. But the impact of the acceleration is at least attenuated by the fact that the debtor would have had to pay the claim anyway, only later in time. By contrast, when a contingent claim matures, a payment burden arises that might not have arisen otherwise. Therefore, if we hold other factors (such as the sizes of the claims) constant, the maturing of a bankruptcy-triggered contingent claim imposes a larger burden on the debtor—and allows for a greater potential bankruptcy windfall for the claimant—than does the bankruptcy-triggered acceleration of a set claim. The Noteholders suggest no reason why Congress would have wanted a debtor to be able to reinstate the latter type of claim under Section 1124(2) but not the former. And this is unsurprising, as there is no good reason. Therefore, the natural reading of an "accelerated payment of such claim" in Section 1124(2) covers promises not only to pay immediately a fixed claim that certainly would otherwise be payable in the

17

future, but also to pay immediately a contingent claim that might otherwise be payable in the future.

## CONCLUSION

Both the text and the manifest purpose of the Bankruptcy Code support the Bankruptcy Court's holding that the First Lien Notes could be reinstated without payment of the $94 million Applicable Premium. This result accords with the plain language of Section 1124(2). And it accords with the congressional intention to prevent lenders from using the occasion of their debtors' bankruptcy filing to recover, at the expense of their debtors' other creditors, more than the lenders would have received had their debtors never entered bankruptcy and made all regularly scheduled principal and interest payments on time and in full.

/s/ Kathleen A. Murphy
Thomas A. Uebler (#5074)
Kathleen A. Murphy (#5215)
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Rd. Suite. 401
Wilmington, DE 19808
(302) 468-5963
*tuebler@mdsulaw.com*
*kmurphy@mdsulaw.com*

April 25, 2023                    *Counsel for Richard Squire, Amicus Curiae*

18